UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
AMERIDREAM, INCORPORATED,        )
                                )
          Plaintiff,             )
                                )
     v.                          )     Civil Action No. 07-1752(PLF)
                                )
HON. ALPHONSO JACKSON            )
SECRETARY OF THE UNITED          )
STATES DEPARTMENT OF             )
HOUSING AND URBAN                )
DEVELOPMENT,                     )
                                )
          Defendant.             )
_____         )
```

## MOTION FOR PRELIMINARY INJUNCTION

Comes now the plaintiff pursuant to Rule 65(a), Federal Rules of Civil Procedure, and moves the Court for a Preliminary Injunction preventing the defendant from enforcing "Standards for Mortgagor's Investment in Mortgaged Property," a regulation published in the Federal Register on October 1, 2007; and as grounds therefor refers to the Memorandum Of Points And Authorities and Affidavit attached hereto and made a part thereof.

WHEREFORE, plaintiff prays that the Motion be granted and the injunction issued.

BAKER & HOSTETLER LLP


By:/s/ Lee T. Ellis, Jr.
    Lee T. Ellis, Jr. (3863)
    Washington Square, Suite 1100
    1050 Connecticut Avenue, N.W.
    Washington, D.C.  20036
    Tel:  202-861-1521
    Fax:  202-861-1783
    lellis@bakerlaw.com

    Attorneys for Plaintiff


CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of October, 2007, a copy of the foregoing Motion For Preliminary Injunction with its accompanying Memorandum Of Points And Authorities and Affidavit were filed and served pursuant to the Court's electronic filing procedures using the Court's CM/ECF System, and copies were hand delivered to Daniel Van Horn, Esquire, Assistant United States Attorney, United States Attorney for the District of Columbia, 555 4th Street, N.W., Washington, D.C. 20001; and Robert M. Couch, Esquire, General Counsel, Office of General Counsel, U.S. Department of Housing and Urban Development, 451 7th Street, S.W., Washington, D.C. 20410-0500.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07 1752 (PLF) |
| | ) |
| HON. ALPHONSO JACKSON | ) |
| SECRETARY OF THE UNITED | ) |
| STATES DEPARTMENT OF | ) |
| HOUSING AND URBAN | ) |
| DEVELOPMENT, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION OF PLAINTIFF AMERIDREAM, INCORPORATED, FOR PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

BACKGROUND................................................... 2

I.   FHA AND DOWNPAYMENT ASSISTANCE ............................... 2

  A.   HUD Longstanding Policy Allowed DPA Through Gifts Funded
  in Part by Seller Contributions ........................... 3

  B.   The AmeriDream DPA Program ........................... 6

  C.   HUD's Prior Policy Against Curtailing or Eliminating
  Seller-Assisted DPA Programs ............................. 7

II.  THE REGULATION .......................................... 8

III. HUD RATIONALE FOR THE REGULATION .......................... 8

  A.   February 2005 GAO Report ........................... 10

  B.   IRS Press Release on Revenue Ruling 2006-27 .......... 13

IV.  THE EFFECTIVE DATE OF THE REGULATION....................... 14

ARGUMENT..................................................... 15

I.   AMERIDREAM IS SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS....... 16

  A.   The Regulation Violates the Administrative Procedures
  Act 16

  B.   The Regulation Violates the Equal Protection Component
  of the Due Process Clause of the Fifth Amendment .......... 33

  C.   HUD Improperly Prejudiced the Outcome of the Rulemaking
  Proceeding ............................................. 39

II.  AMERIDREAM WILL SUFFER IRREPARABLE HARM ABSENT  INJUNCTIVE RELIEF.. 41

III. ISSUANCE OF AN INJUNCTION WILL NOT CAUSE SUBSTANTIAL HARM TO HUD. 43

IV.  GRANTING INJUNCTIVE RELIEF TO AMERIDREAM WILL FURTHER THE PUBLIC
INTEREST.................................................... 43

CONCLUSION.................................................. 45

# TABLE OF AUTHORITIES

## CASES

ANR Pipeline Co. v. FERC,
    71 F.3d 897 (D.C. Cir. 1995) ...........................18

Action on Smoking & Health v. CAB,
    699 F.2d 1209 (DC. Cir. 1983) ....................24, 26

Ass'n of Nat'l Advertisers, Inc. v. FTC,
    627 F.2d 1151 (D.C. Cir. 1979) ........................40

Baptist Health v. Thompson,
    458 F.3d 768 (8th Cir. 2006) ..........................31

Bolling v. Sharpe,
    347 U.S. 497 (1954) ...................................34

Brown v. Barry,
    710 F. Supp. 352 (D.D.C. 1989) ...............34, 35, 36

CSX Transport, Inc. v. Williams,
    406 F.3d 667 (D.C. Cir. 2005) .........................16

City of Brookings Municipal Telephone Co. v. FCC,
    822 F.2d 1153 (D.C. Cir. 1987) ........................22

City of Cleburne v. Cleburne Living Center,
    473 U.S. 432 (1985) ...............................34, 35

Columbia Broad. System v. FCC,
    454 F.2d 1018 (D.C. Cir. 1971) ........................17

Conn. Light & Power Co. v. Nuclear Regulatory Comm'n,
    673 F.2d 525 (D.C. Cir. 1982) .........................29

Consumers Union of the United States v. FTC,
    801 F.2d 417 (D.C. Cir. 1986) .........................41

Cook County, Ill. v. United States ex rel. Chandler,
    538 U.S. 119 (2003) ...................................33

Cottage Sav. Ass'n v. Comm'r,
    499 U.S. 554 (1991) ...................................33

County of Los Angeles v. Shalala,
    192 F.3d 1005 (D.C. Cir. 1999) .........................30

Ellipso, Inc. v. Mann,
    480 F.3d 1153 (D.C. Cir. 2007) .........................16

Garrett v. FCC,
    513 F.2d 1056 (D.C. Cir. 1975) .........................30

Greater Boston Television Telegraph Corp. v. FCC,
    444 F.2d 841 (D.C. Cir. 1970) ..........................17

Housing Study Group v. Kemp,
    736 F. Supp. 321 (D.D.C. 1990) .....................40, 41

Int'l Ladies' Garment Workers' Union v. Donovan,
    722 F.2d 795 (D.C. Cir. 1983) ......................23, 24

Int'l Snowmobile Mfrs. Ass'n v. Norton,
    340 F. Supp. 2d 1249 (D. Wyo. 2004) ...............33, 41

McCain v. United  States,
    No. 06-1701 (RCL), 2007 WL 1127883 (D.D.C. Apr. 16,
    2007) .............................................34, 35

Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut.
    Auto. Ins., Co.,
    463 U.S. 29 (1983) ................................18, 21

Muwekma Ohlone Tribe v. Kempthorne,
    452 F. Supp. 2d 105 (D.D.C. 2006) ......................30

NAACP Legal Defense & Educ. Fund v. Horner,
    636 F. Supp. 762 (D.D.C. 1986) .........................42

NLRB v. Bell Aerospace,
    416 U.S. 267 (1974) ....................................32

Office of Commc'n of United Church of Christ v. FCC,
    707 F.2d 1413 (D.C. Cir. 1983) .........................24

Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed.
    Motor Carrier Safety Admin.,
    494 F.3d 188 (D.C. Cir. 2007) ..........................27

iii

<u>Planned Parenthood of Metropolitan Washington, D.C.,</u>
  <u>Inc., v. Horner</u>,
  691 F. Supp. 449 (D.D.C. 1988) .....................33, 42

<u>Quinn v. Milsap</u>,
  491 U.S. 95 (1989) ....................................36

<u>Ramaprakash v. FAA</u>,
  346 F.3d 1121 (D.C. Cir. 2003) ........................17

<u>Romer v. Evans</u>,
  517 U.S. 620 (1996) ...........................35, 36, 38

<u>Shays v. FEC</u>,
  337 F. Supp. 2d 28 (D.D.C. 2004) (Shays I) ............20

<u>Shays v. FEC</u>,
  No. 04-1597, 2007 WL. 2446159 (D.D.C. Aug. 30, 2007)
  (Shays III) ..................................16, 22, 26

<u>Smiley v. Citibank (South Dakota) N.A.</u>,
  517 U.S. 735 (1996) ...................................31

<u>Sundance Assocs. v. Reno</u>,
  139 F.3d 804 (10th Cir. 1998) .........................19

**STATUTES**

5 U.S.C. § 553(b)(3) (2000)........................26, 27

5 U.S.C. § 706 (2000)..................................16

5 U.S.C. § 706(2) (2000)...........................32, 33

12 U.S.C. §§ 1701 <u>et seq.</u> (2000)..........................2

12 U.S.C. § 1709(b)(9) (2000)........................2, 3

12 U.S.C. § 1209 (2000).............................33, 36

National Housing Act, ch. 847, 48 Stat. 1246 (1934).......2

**MISCELLANEOUS**

H.R. Rep. No. 1922, 73rd Cong., 2d Sess. 1 (1934)........36

Proposed Rule on Sources of Homeownership Downpayment,

66 Fed. Reg. 2851, 2852 (Jan. 12, 2001) .................7

Notice of Withdrawal of Proposed Rule, 66 Fed. Reg. at
    2851 (Jan. 12, 2001) ..................................7

Rev. Rul. 2006-27, 2006-21 I.R.B. 915.....................14

Standards for Mortgagor's Investment in Mortgaged
    Property,
    72 Fed. Reg. 27,048-27,051 (proposed May 11, 2007)
    (to be codified at 24 C.F.R. pt. 203) ..............8, 10

Standards for Mortgagor's Investment in Mortgaged
    Property, 72 Fed. Reg. 56,002-07 (Oct. 1, 2007) (to
    be codified at 24 C.F.R. pt. 203) .................passim

Plaintiff AmeriDream, Inc. ("AmeriDream") respectfully requests that this Court grant its Motion for Preliminary Injunction staying enforcement of the regulation recently issued by HUD, entitled Standards for Mortgagor's Investment in Mortgaged Property, 72 Fed. Reg. 56,002-07 (Oct. 1, 2007) (to be codified at 24 C.F.R. pt. 203) ("Regulation").[1]  In issuing this Regulation, HUD abruptly reversed a decade-old policy of approving and facilitating downpayment assistance ("DPA") programs without explaining or even acknowledging its departure from this history, without addressing less-restrictive alternatives, and without producing for public comment data and analysis that it substantially relied on to justify its action.

Moreover, HUD has granted one DPA provider five months longer than all others to comply with the Regulation, without a reasoned basis for doing so and contrary to previous written assurance.  Simply put, the challenged Regulation is the product of a rush to judgment, reflected by the foregoing circumvention of administrative process and revealed in comments by HUD's Secretary during the comment period that HUD would shut down DPA programs regardless of what commenters had to say.

In light of these clear violations of the Administrative Procedure Act, together with the Regulation's discriminatory

---

[1] The facts set forth in this Memorandum are supported by the Affidavit of Ann Ashburn, attached hereto and made a part hereof as Exhibit A.

classifications that do not rationally advance legitimate legislative interests, AmeriDream will likely succeed on the merits of its claims in this litigation. Because the Regulation effectively terminates AmeriDream and the DPA programs that it provides to underserved low- and moderate-income homebuyers, this Court should grant preliminary injunctive relief.

## BACKGROUND

### I.    FHA AND DOWNPAYMENT ASSISTANCE

Congress created the Federal Housing Administration ("FHA") in 1934 to establish and implement crucial policy initiatives to assist low- and moderate-income individuals and families in making the transition from tenants to homeowners. See National Housing Act, ch. 847, 48 Stat. 1246 (1934) (codified as amended at 12 U.S.C. §§ 1701 et seq. (2000)). To achieve this goal, the FHA guarantees certain loans for moderately priced homes. To qualify for FHA loan guarantees, both the homes and the prospective purchasers must meet certain criteria, among which is the statutory requirement that the homebuyer must make a downpayment of at least three percent of the purchase price of the home. National Housing Act, 12 U.S.C. § 1709(b)(9) (2000).

As HUD has noted, this criterion has proved to be an insurmountable obstacle for many otherwise qualified low- and

moderate-income families seeking to purchase their own homes: "Many renters find it difficult to save for a downpayment, but have adequate incomes to make monthly mortgage payments and do not pose a significant credit risk. They simply need an affordable financing vehicle to get them in the door. FHA can and should be there for these families." Ex. B, Brian D. Montgomery, Ass't Sec'y for Hous.-Fed. Comm'r, HUD, Statement in a Hearing Before the Subcomm. on Housing and Transportation of the S. Comm. On Banking, Housing, and Urban Affairs: FHA: Issues for the Future, at 4 (June 20, 2006) ("HUD Senate Testimony").

Congress has long recognized that the downpayment requirement would prove too burdensome for many of the families whom Congress sought to help. For this reason, prospective homebuyers are expressly permitted to use monetary gifts to make the required downpayments, provided that those gifts come from certain specified sources, including family members, employers, labor unions, and charities certified by the Internal Revenue Service (IRS) pursuant to section 501(c)(3) of the tax code. See 12 U.S.C. § 1709(b)(9).

### A. HUD Longstanding Policy Allowed DPA Through Gifts Funded in Part by Seller Contributions

Beginning in the mid-1990s, a number of 501(c)(3) organizations came forward to meet the need for DPA, initially led by faith-based organizations serving the communities in

which they were located. Other, non faith-based, charities like AmeriDream were established soon thereafter to assist low- and moderate-income families not served by faith-based DPA charities. As the scale of DPA programs quickly outgrew the capacity of churches and other traditional sources of support, DPA providers turned to other sources, particularly within the real estate industry. This expanded donor base has extended DPA to far more families, allowing the growth of DPA programs without taxpayer dollars. To date, approximately one million low- and moderate-income families and individuals have purchased homes using DPA. Moreover, a study by the George Mason University School of Public Policy estimated that those purchasers built approximately $9.6 billion in home equity between 2000 and 2005. Ex. C, Lisa A. Fowler & Stephen S. Fuller, George Mason Univ. Sch. of Pub. Policy, National Economic Impact of Non-Profit Downpayment Assistance Providers ii (2007) ("2007 GMU Study").

For approximately ten years, HUD has expressly permitted DPA charities like AmeriDream to accept contributions from sellers and others involved in the real estate industry.[2]  For example, in 1998, HUD's Office of General Counsel reviewed the process for accepting contributions and awarding gifts utilized

---

[2] HUD Handbook 4155.1 Rev. 5, § 2-10 provides authority for DPA through gifts by DPA charities like AmeriDream.

by AmeriDream and numerous other DPA providers, and found that it was in compliance with HUD's guidelines. In 2005, HUD defended this approved process, explaining that it did not involve a seller's inducement to purchase:

> HUD's Office of General Counsel has advised that the timing of the payments is a key point in whether there is a seller inducement to purchase. If a gift is made from a nonprofit entity (either directly or through an entity such as a closing agent), from the nonprofit's own funds, prior to the completion of the closing, the gift becomes the homebuyer's property so the buyer can make the three percent required downpayment. After the completion of the closing, a seller makes a contribution (perhaps through the closing agent as well) from the gross process sales proceeds to the nonprofit entity. The donation is commingled with other nonprofit funds that later become a source of donations to buyers other than the buyer who has just closed the purchase of the seller's property.

Ex. D, Letter from FHA Ass't Sec'y Brian Montgomery, to the Gov't Accountability Office ("GAO") (Oct. 25, 2005) ("2005 HUD Letter to GAO").

Moreover, the standard HUD-1 form allows for reporting on the use of DPA, and HUD has issued several mortgagee letters that clarify the appropriate use of DPA without questioning the source of DPA funding.[3] HUD has also encouraged the rapid growth of charitable DPA providers by readily extending FHA insurance to loans obtained in transactions utilizing

---

[3] For example, Mortgagee Letter 2004-02 addresses proper documentation when downpayment funds are provided from charities, Ex. E, Letter from HUD, to All Approved Mortgagees (Jan. 12, 2004), and Mortgagee Letter 2002-02 addresses credit policy issues regarding payment of borrower's obligations, Ex. F, Letter from HUD to All Approved Mortgagees (Jan. 16, 2002).

downpayment assistance.  HUD has even used charitable DPA in the sale of certain HUD-owned properties.

### B.   The AmeriDream DPA Program

Using the process approved by HUD's Office of General Counsel in 1998 and facilitated by HUD ever since, AmeriDream, a 501(c)(3) charity established in 1999, has disbursed over 200,000 gifts to aspiring homeowners totaling $726 million, resulting in $21.8 billion in FHA-insured loans.  AmeriDream has established itself as one of the nation's most prominent DPA providers, and is the nation's largest nonfaith-based DPA charity.

AmeriDream has had particular success assisting low- to moderate-income families not previously served by HUD and FHA: roughly 80 percent of the recipients of DPA from AmeriDream are purchasing their first home.[4]   In addition, since 1999, AmeriDream has educated over 60,000 homebuyers through homebuyer-education courses; counseled and assisted

---

[4]   Since 1999, the average gift amount for an AmeriDream gift recipient has been $3,600, 3.3% of the average $108,000 price of homes purchased by AmeriDream DPA recipients; the comparable HUD overall average is $116,000.  The AmeriDream average purchase price is also lower than the homes purchased with gifts from family, employers, or with no gifts.  AmeriDream's gifts have gone to low- and moderate-income individuals and families with a median income of $49,700: the median income of AmeriDream gift recipients has averaged 74 percent of the HUD national area median income of that same period, which meets the HUD and IRS definition of low income.

approximately 1,200 people to retain their homes when confronted with mortgage difficulties; and built 168 affordable housing units in the inner cities, most notably in Southeast Washington, DC.    To date, AmeriDream has committed over $30 million to projects unrelated to its DPA programs.

### C.    HUD's Prior Policy Against Curtailing or Eliminating Seller-Assisted DPA Programs

Since it approved AmeriDream's DPA program almost ten years ago, HUD has not acted to curtail or eliminate seller-assisted DPA programs.    For example, eight years ago, HUD initiated a rulemaking similar to the one at issue here, but withdrew its proposal because "[t]he overwhelming majority of comments opposed the rule."    Withdrawal of Proposed Rule on Sources of Homeownership Downpayment, 66 Fed. Reg. 2851, 2852 (Jan. 12, 2001).

More recently, HUD noted the successes of seller-financed DPA, rejecting suggestions that those programs be curtailed:

> Borrowers who rely on seller-funded downpayment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector.    Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA. Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these

7

borrowers the advantage of a more affordable, less risky loan.

Ex. D, 2005 HUD Letter to GAO.

## II. THE REGULATION

In May 2007 HUD departed from its longstanding approval of seller-financed DPA when it published "Standards for Mortgagor's Investment in Mortgaged Property", 72 Fed. Reg. 27,048-051 (proposed May 11, 2007) (to be codified at 24 C.F.R. pt. 203 ("Proposed Regulation"). Contrary to its prior position, the Proposed Regulation sought completely to prohibit DPA in the form of gifts from charities supported in part by contributions from sellers or others that financially benefit from the transaction.

The public comment period for the Proposed Regulation was extended from July 10, 2007 until August 10, 2007, during which time HUD received approximately 15,000 comments. Regulation, 72 Fed. Reg. at 56,003. Over 14,000 comments opposed the Regulation and requested that it be withdrawn, while fewer than 30 comments supported the Regulation. Notwithstanding this strong opposition, HUD published the Regulation adopting this change on October 1, 2007. Id. at 56,002-07.

## III. HUD RATIONALE FOR THE REGULATION

There is no dispute that HUD-approved DPA programs

administered by AmeriDream and other nonprofits have enabled hundreds of thousands of low- to moderate-income families to purchase homes for the first time, thus helping to increase homeownership rates to record levels, particularly among minority groups. Yet despite their undisputed success, HUD provides no reasoned explanation for its abrupt change of course and flat contradiction of its prior longstanding policy and statements regarding these DPA programs.

Instead, HUD summarily denies its longstanding approval and support of these programs by suggesting that the Regulation merely "codifies HUD's longstanding practice" of allowing nonseller-funded DPA and denigrating the seller-funded DPA programs and providers it previously supported by referencing "so-called charities" who award "so-called gifts." 72 Fed. Reg. at 56,002. HUD then flatly contradicts without explanation its prior published position that approved seller-financed DPA gifts are not a seller's inducement to purchase, see Ex. D, 2005 HUD Letter to GAO, by summarily stating that DPA gifts directly or indirectly supported by seller contributions often "function as an inducement to purchase the home." 72 Fed. Reg. at 56,002.

Finally, HUD articulates a single "primary" concern "that the sales price is often increased to ensure that the seller's net proceeds are not diminished." Id. But the only two sources cited as providing the basis for that concern—a February 2005

GAO study and a 2006 IRS Revenue Ruling *as described in a related press release*—do not state what HUD claims. <u>See</u> <u>id.</u> at 56,002-03. Moreover, HUD fails to cite a more relevant November 2005 GAO study in which the GAO makes five specific recommendations regarding DPA programs, none of which is discussed in the Regulation. Ex. G, Gov't Accounting Office, Mortgage Financing: Additional Action Needed to Manage Risk of FHA-Insured Loans with Downpayment Assistance (2005) ("November 2005 Report").

### A.  February 2005 GAO Report

In the Notice of Proposed Rulemaking and explanation for the final rule, HUD claims that a GAO report released in February 2005, entitled "Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Loan Products" ("February 2005 Report"), found "that seller-related contributions *could* contribute to an overvaluation of the price of the property." 72 Fed. Reg. at 27,048-49; 72 Fed. Reg. at 56,002 (<u>citing</u> February 2005 GAO Report at 16) (emphasis added). Yet what HUD presents as a determination made by GAO, presumably based upon rigorous analysis of reams of data, is in fact only a remark made, without attribution, in a conversation with unidentified Fannie Mae and Freddie Mac officials. The GAO Financing Report merely states that "Fannie Mae and Freddie Mac officials told

10

us that such seller-related contributions could contribute to an overvaluation of the property." Ex. G, February 2005 GAO Report at 16. Moreover, there is no indication in the GAO report that the Fannie Mae or Freddie Mac officials with whom GAO chatted cited any data or other source supporting their observation, or whether they even had any particular knowledge of the issue, or any expertise to evaluate the relevant facts.

Inexplicably, absent from the Proposed or Final Regulation is any mention of the November 2005 GAO Report, which is more recent than the GAO report HUD cites and addresses the issues associated with DPA more directly. In the latter report, the GAO presented to HUD six specific recommendations. Nov. GAO Report at 44-45 ("November 2005 GAO Report"). At the time it was issued, HUD reviewed these recommendations and responded to GAO in the 2005 HUD Letter to GAO discussed supra. See Ex. D, 2005 HUD Letter to GAO, also appended to November 2005 GAO Report at 89-91. In its letter to GAO, HUD emphatically rejected a ban on seller-funded DPA programs. However, HUD expressed its intention to implement several of GAO's recommendations relating to nonprofit DPA, particularly those that sought to address the higher credit risk associated with the recipients of charitable DPA, "while still permitting these borrowers the advantage of a more affordable, less risky [FHA] loan" through continued DPA assistance. Id.

The Regulation does not even attempt to explain HUD's stunning and abrupt reversal from the position it took in late 2005. Indeed, other than proposing a ban on seller-funded DPA, HUD does not identify or discuss *any* of GAO's recommendations in the comments accompanying the Regulation, nor assess their efficacy as alternative ways to address the issues that the Regulation purports to resolve.

Nor does HUD address the serious flaws identified in the methodology used by GAO to examine the relationship between nonprofit downpayment DPA and home purchase prices. See George Mason Univ. Sch. of Pub. Policy, An Evaluation of Research on the Performance of Loans with Downpayment Assistance (Sept. 2006) ("2006 GMU Study"). The GMU Study questioned the methodology underlying the GAO study because it "could be overstating the extent of the default and/or claim rates of FHA loans with assistance from NDPA [nonprofit downpayment assistance] providers." Id. at 2.

Specifically, the GMU Study rebuked the GAO for the "lack of attention given to two key factors that influence whether or not a loan is defaulted or goes to claim: (1) the financial situation of the borrower and (2) the economic conditions of the area in which the home is located." Ex. K, 2006 GMU Study at 4. As HUD itself acknowledges, nonprofit DPA providers tend to help families with more limited means, living in more marginal

12

neighborhoods than FHA generally serves, and any quantitative analysis of their work properly should factor in the types of families and communities they serve.

Finally, even with its skewed methodology, the findings of the November 2005 GAO Report fails to support HUD's position that the sales price of homes purchased with nonprofit DPA "often increased to ensure that the seller's net proceeds are not diminished." 72 Fed. Reg. at 56,002. Specifically, the report states that the price of homes purchased with DPA tended to exceed the purchase price of comparable homes by a modest increment, but this increment was *less than* the average DPA provided by AmeriDream, *i.e.*, 3.3 percent of the purchase price. Ex. J, November 2005 GAO Report at 4.

### B.  IRS Press Release on Revenue Ruling 2006-27

HUD also relies on statements found in an *IRS press release* and claims its final regulation is justified because it "harmonize[s] its regulations regarding downpayment assistance with recent rulings of the IRS." 72 Fed. Reg. at 56,003. It is unclear what "rulings" HUD has in mind, because HUD points only to a single IRS revenue ruling. More significantly, Revenue Ruling 2006-27 concerns an entirely different set of regulatory concerns.

According to HUD, the revenue ruling "addresses [the] same

concerns" that HUD incorrectly attributes to the February 2005 GAO Report, *i.e.*, that the sales price of homes purchased with nonprofit DPA "often increased to ensure that the seller's net proceeds are not diminished." In fact, Revenue Ruling 2006-27 states precisely the opposite: in those cases where home purchasers received DPA from charities that received contributions from home sellers, "the downpayment assistance represents a *rebate or purchase price reduction*." Ex. H, Rev. Rul. 2006-27, 2006-21 I.R.B. 915, at 16. HUD's confusion on the meaning of the revenue ruling may be due to its misplaced reliance on a one-page IRS *press release* announcing the revenue ruling, instead of the ruling itself.[5]

## IV.  THE EFFECTIVE DATE OF THE REGULATION

The Regulation will take effect thirty days after publication in the *Federal Register* Regulation, 72 Fed. Reg. at 56,002, except as to one DPA provider, Nehemiah Progressive Housing Development Corporation ("Nehemiah"), which is not subject to the Regulation until six months after publication (March 31, 2008), id. At 56,003. According to HUD, this disparate treatment purportedly stems from an April 1998

---

[5] Ironically, however, even the press release to which HUD refers does not mention, let alone support, the proposition for which HUD cites the Revenue Ruling  Although the press release briefly discusses "financing arrangements" among the seller, buyer, and DPA provider, it does so only in the context of compliance with § 501(c)(3). Ex. I, Press Release, IRS, IRS Targets Down-Payment-Assistance Scams (May 4, 2006).

settlement agreement resolving litigation with Nehemiah. Id. at 56,003. However, in a letter that forms part of HUD's court-approved settlement agreement with Nehemiah, HUD states that this six-month "grace period" will apply not just to Nehemiah but also to all similarly situated DPA programs:

> Although HUD has no immediate plans to change its policies regarding downpayment assistance programs or regarding the source of borrower downpayment funds, HUD reserves the right to do so in the future in accordance with applicable procedures. In the event that there are any such changes regarding the source of borrower downpayment funds, *the changes will become applicable to Nehemiah and all other similarly situated downpayment assistance programs six months after the final promulgation and issuance* of any such changes.

Ex. L, Letter from Emelda Johnson, Deputy Assistant Secretary, Single Family Housing Programs, U.S. Dept. of Housing Urban Dev. to Don F. Harris, Esq., Nehemiah Home Ownership 2000 (Apr. 3, 1998) (emphasis added).

## ARGUMENT

This Court should grant the requested relief because the applicable criteria for granting injunctive relief are clearly met in this case. It is well settled that these criteria include whether: "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably harmed if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4)

the public interest will be furthered by the injunction." Ellipso, Inc. v. Mann, 480 F.3d 1153, 1157 (D.C. Cir. 2007); see also CSX Transp., Inc. v. Williams, 406 F.3d 667, 670 (D.C. Cir. 2005).

Courts must balance these factors and "[t]he test is a flexible one." CSX Transp., 406 F.3d at 670. Indeed, "if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Ellipso, 480 F.3d at 1157 (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

## I.  AMERIDREAM IS SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS.

### A.  The Regulation Violates the Administrative Procedures Act

The Regulation is subject to judicial review pursuant to the Administrative Procedures Act, 5 U.S.C. § 706 (2000) ("APA"). While APA review is deferential, this Court has recognized that an agency has a higher burden where, as here, it changes longstanding policy. Shays v. FEC, No. 04-1597, 2007 WL 2446159, at *4 (D.D.C. Aug. 30, 2007) (Shays III). The D.C. Circuit has explained the reason for this higher burden:

An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or

16

swerves from prior precedents without discussion, it may cross the line from tolerably terse to the intolerably mute.

Greater Boston Tel. Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970). The Regulation fails to meet this higher burden and should be vacated as arbitrary and capricious because HUD (1) failed to supply a reasoned analysis for departing from its longstanding policy; (2) failed to consider or offer reasoned explanations for rejecting reasonable alternatives; (3) relied on data it never mentioned or produced for comment in its notice of rulemaking; and (4) failed to give reasoned justification for providing different effective dates for similarly-situated entities.

### 1. HUD Fails to Supply a Reasoned Analysis for Departing from Its Longstanding Position on DPA Programs

The "failure to come to grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirement of reasoned decision making.'" Ramaprakash v. FAA, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (citing Columbia Broad. Sys. v. FCC, 454 F.2d 1018, 1027 (D.C. Cir. 1971)). "[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and

17

capricious." <u>ANR Pipeline Co. v. FERC</u>, 71 F.3d 897, 901 (D.C. Cir. 1995).[6]

For nearly a decade, HUD has regarded seller-funded DPA programs as consistent with the letter of the law, as well as the purposes of the National Housing Act to promote housing affordability and choice, and protect the availability of adequate funding for housing at low cost. It defies well-settled principles of administrative law for HUD to pull the plug on these DPA programs without addressing its longstanding record and explaining the reasons for the complete reversal in its position.

Yet such an explanation is utterly lacking in the explanation for the challenged regulation. HUD fails to acknowledge, much less explain, the striking departure from its record of approving these DPA programs, facilitating their operation, and even utilizing such programs itself when selling some of its own inventory of properties.

Nor does HUD even attempt to explain how its current reversal in policy better fulfills the will of Congress than its

---

[6] The same principles apply to an agency's rescission of a regulation. "A 'settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.'" <u>Motor Vehicle Mfrs. Ass'n. of U.S. v. State Farm Mut. Auto. Ins. Co</u>, 463 U.S. 29, 41 (1983) (citation omitted). Accordingly, an agency changing it course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." <u>Motor Vehicle Mfrs. Ass'n of U.S.</u>, 463 U.S. at 41-42.

decade-long position on DPA programs.  It is axiomatic that an "agency's rulemaking power is not the power to make law, it is only the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." Sundance Assocs. v. Reno, 139 F.3d 804, 808 (10th Cir. 1998) (internal quotation marks and citations omitted).  HUD only mentions its authorizing statute to acknowledge that "[t]he statute [is] silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute."  72 Fed. Reg. at 56,002.

HUD's explanation for the Regulation fails to come to grips with agency precedent on the subject.  HUD also fails to indicate whether there has been any change whatsoever in the risk of defaults or claims with various DPA programs over the past decade.  HUD does not even attempt to explain why the purported risks associated with such loans are unacceptable now, but have been acceptable over the last ten-year period.

Indeed, HUD merely pronounces, without explanation or empirical support, that the difference between claim rates for loans with DPA from relatives, public agencies, and employers, and loans with DPA from nonprofit entities that receive reimbursements from sellers, is "the difference between acceptable and unacceptable levels or risk to the FHA insurance fund."  72 Fed. Reg. at 56,004.

19

HUD provides no evidence to explain its new-found position beyond irrelevant and unsupported assertions. For example, HUD's misplaced reliance on statements found in an *IRS press release* are irrelevant and do not support HUD's assertions because the referenced revenue ruling concerns an entirely different set of regulatory issues, rests neither on expertise nor evidence about the effect of DPA loans on defaults or sale prices, and states precisely the opposite of the proposition that HUD claims it supports. See Shays v. FEC, 337 F. Supp. 2d 28, 126-128 (D.D.C. 2004) (Shays I) (finding FEC regulation arbitrary and capricious where FEC assumed the compatibility of the Federal Election Campaign Act [FECA] with IRS requirements and noting that "[i]t is the FEC, not the IRS, that is charged with enforcing FECA").

HUD's passing references to the February 2005 GAO Report fare no better because the report merely refers to unattributed comments made by unidentified individuals with no indicia of reliability or empirical or other support. Finally, HUD completely ignores the November 2005 GAO Report, never addressing either the GAO recommendations or HUD's published position opposing a ban on seller-funded DPA programs. And in response to commenters' objections that the November 2005 GAO Report does not "segregate the effects of downpayment assistance from those of low downpayments and low credit ratings," 72 Fed.

Reg. at 56,005, HUD offers no rebuttal at all.[7]  Similarly, HUD provides no support for the stray sentence in which HUD cites an analysis of Real Estate Owned (REO) sales since 2004 that "*suggests* that the sales prices of such properties *may* have been inflated."  (emphasis added). 72 Fed. Reg. at 56,005.  Such overreaching reveals the rulemaking for what it really is: a desired result in search of a justification.

Although courts clearly may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (internal quotations omitted), there is no such record here.  In this case, HUD's path may reasonably be discerned, but it is one of a rush to judgment.  HUD simply ignores its long history of approving, facilitating, and using DPA programs.  HUD presents no evidence that the purported risks associated with DPA programs are any greater than they ever were, or why the purported risk is suddenly unacceptable after ten years of agency approval.  A press release from another agency, combined with a desire to "harmonize" action with that agency, and bald assertions that other studies "could" or "may" indicate that certain DPA programs cause inflated property values, cannot substitute for

---

[7]  As AmeriDream noted in its comments, the GAO Report does not analyze DPA in general nor does it examine property values when DPA is used.  Ex. M, Comment Submitted by Ann Ashburn, President, AmeriDream, Incorporated, to U.S. Dep't of Hous. & Urban Dev. Regarding Docket No. FR-5087-P-01, Standards for Mortgagor's Investment in Mortgaged Property (Aug. 9, 2007) ("AmeriDream

reasoned analysis.   Nor can HUD's eleventh-hour effort to prop

up its desired conclusion with unsubstantiated data, drawn from

sources lacking citations, never offered for comment satisfy

basic notice obligations under the APA.

> **2.  HUD Failed To Consider Reasonable**
> **Alternatives For Its Chosen Policy And Offer**
> **A Reasoned Explanation For Rejecting Them**

The law in this Circuit is quite clear that an agency must,

in a statement of basis and purpose accompanying the final rule,

provide a reasoned explanation its rejection of responsible

alternatives.  If the agency fails to do so, the final rule will

be vacated.  See Shays III, 2007 WL2616689, at *24 ("Unless the

[agency] answers objections that on their face seem legitimate,

its decision can hardly be classified as reasoned.").

In flagrant violation of APA requirements, HUD simply

ignores proposals advanced by AmeriDream for remedying alleged

shortcomings in current DPA programs instead of completely

abolishing them.   Indeed, HUD merely shrugs off the few

alternatives that it even bothers to mention, characterizing

them as outside the scope of the rule.   This circular

reasoning—we don't have to consider it, because it's not what we

proposed—is flatly improper.

In City of Brookings Mun. Telephone Co. v. FCC, 822 F.2d

---

Comment").

1153, 1169 (D.C. Cir. 1987), the D.C. Circuit invalidated action by the FCC for "failure to even consider" a commenter's proposal:

> It is well settled than an agency has 'a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.' Of course, as the [FCC] emphasizes in its defense, this duty extends only to 'significant and viable' alternatives, not to 'every alternative device and thought conceivable by the mind of man … regardless of how uncommon or unknown that alternative may have been. But with that sensible caveat, the fact remains that '[t]he failure of an agency to consider obvious alternatives has led uniformly to reversal.'

(citations omitted).

An agency's duty to consider responsible alternatives clearly applies where, as here, the agency is offered less restrictive alternatives to the action taken. For example, in Int'l Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795 (D.C. Cir. 1983), the D.C. Circuit considered the Secretary of Labor's rescission of longstanding restrictions on employing homeworkers in the knitted outerwear industry. The court vacated the agency's decision because the Secretary ignored various proposed alternatives aimed at accommodating the Secretary's concerns without completely rescinding the Department of Labor's longstanding restrictions:

> We do not suggest that [the Secretary] had to opt for any particular one of these proposals. However, he was required to address common and known or otherwise reasonable options, and to explain any decision to

23

> reject such options. His complete failure to satisfy these quintessential aspects of reasoned decision making is the primary basis for our decision to vacate his rescission of the restrictions in the knitted outerwear industry.

Id. at 818; see also Office of Commc'n of United Church of Christ v. FCC, 707 F.2d 1413 (D.C. Cir. 1983); Action on Smoking & Health v. CAB, 699 F.2d 1209 (DC. Cir. 1983), opinion supplemented by 713 F. 2d 795 (D.C. Cir. 1983) (Board's reliance on "generalized and conclusory policy considerations" was inadequate basis for rejecting less restrictive alternatives).

Like these earlier cases, HUD's explanation for the challenged regulation fails to address responsible alternatives to abolishing AmeriDream's program and others like it. AmeriDream identified various options available to HUD to improve FHA-insured loan programs that use downpayment assistance from any allowable source or that provide 100 percent financing. As AmeriDream explained in its comment, homebuyers who need assistance, regardless of the source of those funds, or homebuyers qualifying for 100 percent financing, present a higher risk and need additional services to be successful. See Ex. M, AmeriDream Comment at 14-15. These homebuyers have the same very high loan-to-value (LTV) characteristic. To address the concerns HUD identified in the NPRM, AmeriDream proposed numerous detailed policy proposals. Id. at 14-16. Not one of these proposals is even mentioned in HUD's statement of basis

24

and purpose for the final regulation.  The regulation cannot be sustained in the face of such egregious disregard of less restrictive alternatives.

In fact, HUD makes only cursory mention of other alternatives long known to the agency and advanced by commenters in the rulemaking.  For example:

> Rather than eliminate downpayment assistance, HUD can further mitigate risk by requiring a complete home inspection, to avoid potentially huge repair costs to the homeowner.  HUD could also require the owner to obtain a homeowner's warranty for a specified period of time, to avoid high repair cost as a potential source of default and foreclosure.  Alternatively, HUD could require downpayment assistance companies to offer mandatory risk mitigation tools or offer insurance to the buyer.

72 Fed. Reg.  at 56,004.   HUD simply responds that "[t]he commenters recommendations are noted, but the suggested actions are outside the scope of the present rule."  Id.  Assuming that HUD means that the suggested actions are outside the scope of the *rulemaking proceeding*, this  position is plainly contrary to the law in this Circuit.  A notice-and-comment rulemaking is not a take-it-or-leave-it proposition:

> The Board offers several reasons to justify its minimal discussion of individual proposals.  First, the Board claims that even though it did not explicitly discuss each proposal, 'there can be little doubt that the Board was aware of the pros and cons of each alternative.'  Thus, the Board suggests that as long as the record contains evidence to support its conclusion, it need not explain its action.  Precisely the opposite is true.  The APA guarantees the public an opportunity to comment on proposed rules.  That

25

opportunity is 'meaningless unless the agency responds to significant points made by the public.'

Smoking & Health, 699 F.2d at 1217.

Finally, HUD completely ignores studies presented in the rulemaking proceeding that contradict the information on which HUD purports to rely.  For example, HUD did not address the 2006 GMU Study cited by AmeriDream, which showed that homeowners receiving assistance from DPA saw their total wealth grow by $9.6 billion between 2000 and 2005, thereby generating additional spending and new jobs.  Ex. M, AmeriDream Comment at 7.

In its rush to judgment, HUD simply ignored its obligation to consider less-restrictive alternatives.  Indeed, HUD even ignored its prior commitment published in its response to the November 2005 GAO Report to implement recommendations short of banning seller-funded DPA programs.  As this Court observed only last month, a decision lacking such consideration "can hardly be classified as reasoned."  Shays III, 2007 WL 2616689, at *24.

### 3.    HUD Relies Substantially On Data That It Never Produced For Comment Or Even Mentioned In The Notice Of Proposed Rulemaking

The APA requires that an agency publish a notice of proposed rulemaking, setting forth "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), and "give interested

26

persons an opportunity to participate in the rule making through submission of written data, views, or arguments." <u>Id.</u> at § 553(c).

As the D.C. Circuit recently explained:

'Integral' to these requirements 'is the agency's duty 'to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules . . . . An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.'

Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin., 494 F.3d 188, 199 (D.C. Cir. 2007) (internal citations omitted).

As discussed above, HUD's rulemaking proposal cited only two sources for HUD's purported concerns about the impact of DPA loans on sales prices, and the alleged negative impact on borrowers and FHA: an IRS press release (and related revenue ruling) and a 2005 GAO report. As discussed <u>supra</u>, and as AmeriDream argued in its comments on the proposed rule, HUD may not defer to a press release and ruling issued by an agency with an entirely different mission and expertise. As discussed <u>supra</u>, and as AmeriDream argued in its comments, the GAO report does not examine DPA programs or their impact on property values, and HUD offered no defense in response to commenters' criticisms concerning its reliance on the GAO report. 72 Fed. Reg. at 56,005.

27

Instead, HUD responded to commenters' objections by interjecting the unsubstantiated claim that it has performed a *new* analysis to support its conclusions, purportedly based on its loan portfolio dating back to 1998.  Id. HUD appears to be saying, "never mind the flaws in our reliance on the GAO report, we have come up with something else." This bait-and-switch approach is simply not permissible.  Moreover, the rulemaking proposal contains no mention of the data that HUD purportedly relies on, and no information about HUD's methodology in choosing the data and conducting its analysis.[8]

The APA permits an agency to "use 'supplementary' data, unavailable during the notice and comment period, that "expands on and confirms information contained in the proposed rulemaking and addresses 'alleged deficiencies' in the preexisting data, so long as no prejudice is shown." Chamber of Commerce of U.S. v. SEC, 443 F.3d 890, 900 (D.C. Cir. 2006)(internal citations omitted).  But to be permissible, "'at least the most critical factual material that is used to support the agency's position on review . . . [must have] been made public in the proceeding and exposed to refutation.'" Id. (citation omitted).

---

[8] For example, HUD refers to an "analysis of its loan portfolio going back to 1998", highlighting those "loans endorsed for insurance in Fiscal Year (FY) 2001", in which it purports to compare the claim rates of loans in which DPA was received from a seller-funded charity, compared to DPA received from other sources. 72 Fed. Reg. at 56,003.  However, the basis for HUD's statements is entirely conjectural, for HUD did not keep records concerning the source of DPA in loan closings during that period.

28

Here, the newly-revealed analysis purportedly derives from HUD's own loan portfolio going back to 1998. By definition, such data was available to HUD *before* the notice-and-comment period. Moreover, in failing to dispute criticisms about its reliance on the GAO report, HUD's portfolio analysis stands as the *only* data upon which HUD relies in the final rule to support its conclusions about the impact of DPA programs. It is this analysis alone that HUD cites in response to the comment: "The rule is not supported by data." 72 Fed. Reg. at 56,005. Accordingly, the new data is not supplementary; it is all the data HUD has.

As the D.C. Circuit aptly stated in Conn. Light and Power Co. v. Nuclear Regulatory Comm'n, 673 F.2d 525, 530 (D.C. Cir. 1982), "[t]o allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport." HUD's failure to disclose the data on which it relied and the methodology it employed for reaching its conclusions violates fundamental tenets of administrative law, and compels reversal of the final regulation.

**4.  *HUD Fails To Provide A Reasoned Justification For Providing Different Effective Dates For Similarly-Situated Entities***

HUD provides that the Regulation will take effect thirty days after publication in the Federal Register for all DPA providers except for Nehemiah, which is not subject to the Regulation until six months after publication. This widely disparate treatment of major DPA providers is the essence of arbitrariness, and HUD's attempt to justify it falls well short of what is required under settled principles of administrative law.

Both this Court and the D.C. Circuit have recognized that "[a] long line of precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) (internal citation omitted); *see also Muwekma Ohlone Tribe v. Kempthorne*, 452 F. Supp. 2d 105, 115 (D.D.C. 2006) and cases cited therein. Under this well-established precedent, "[m]ore than enumeration of factual differences between cases is required, . . . the [agency] must explain their relevance to the purposes of the legislation it administers." *Garrett v. FCC*, 513 F.2d 1056, 1060 (D.C. Cir. 1975).

HUD did not mention the 1998 Nehemiah settlement agreement in the Proposed Regulation, thus depriving other DPA providers an opportunity to comment. Even the brief reference in the final Regulation, *see* 72 Fed. Reg. 56,003, omits the critical

30

fact that, at that time, HUD stated in writing that the six-month delay in the effective date of any change would apply to "all other similarly situated DPA programs". <u>See</u> Ex. L.

It is clear that HUD years ago recognized the patent unfairness in giving one major industry competitor six months to challenge final agency action and address operational concerns in an orderly way, while requiring similarly-situated DPA providers to bring their programs to a complete halt within thirty days. HUD cannot ignore the plain language of this document to support widely disparate treatment today. There is simply nothing "reasoned" about HUD's current favoritism towards Nehemiah.

Based on the plain language of the letter and ordinary principles of fair play, AmeriDream could have reasonably relied on the expectation that HUD would afford DPA programs similarly situated to Nehemiah the same six months. <u>See, e.g.</u>, <u>Smiley v. Citibank (South Dakota) N.A.</u>, 517 U.S. 735, 742 (1996) ("change that does not take account of legitimate reliance on prior [agency] interpretation may be arbitrary and capricious [or] an abuse of discretion") (internal citations omitted). Indeed, "[l]egitimate reliance on prior administrative decisions can be shown where 'some <i>new liability</i> is sought to be imposed on individuals for past actions which were taken in good-faith reliance on [agency] pronouncements.'" <u>Baptist Health v.</u>

31

Thompson, 458 F.3d 768, 777 (8th Cir. 2006) (quoting NLRB v. Bell Aerospace, 416 U.S. 267, 295, 94 S. Ct. 1757 (1974)) (emphasis added).  The "new liability" here could not be more stark.  AmeriDream must shut down in thirty days the charitable program it has operated since 1999, and thousands of aspiring homeowners must go elsewhere.  At a minimum, HUD should be compelled by this court to provide all DPA programs affected by the new regulation the same six months to comply.

### 5.   The Secretary Exceeded His Statutory Authority to Make Interpretations and Promulgate Regulations

The Regulation exceeds the scope of the Secretary's authority to interpret, and promulgate regulations under section 1709(b)(9) of the NHA.  Because the regulation exceeds HUD's statutory jurisdiction, authority, and right, it is invalid under the APA, 5 U.S.C. § 706(2)(c).

This rulemaking is not prompted by any instruction from Congress or implied from any change in the law.  To the contrary, HUD concedes that the section of the statute that it purports to apply here is "silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute."  72 Fed. Reg. at 56,002.  Congress has yet to place a single prohibition on downpayment assistance.  When Congress revises a statute, its

decision to leave certain sections unamended constitutes at least acceptance, if not explicit endorsement, of the preexisting construction and application of the statute's unamended terms. See, e.g., Cook County, Ill. v. United States ex rel. Chandler, 538 U.S. 119, 132 (2003); Cottage Sav. Ass'n v. Comm'r, 499 U.S. 554, 561-62 (1991).

### B.    The Regulation Violates the Equal Protection Component of the Due Process Clause of the Fifth Amendment

The Regulation is also invalid because it irrationally discriminates between similarly situated companies and individuals in violation of the equal protection component of the Due Process Clause of the Fifth Amendment.  For example, the regulation unconstitutionally prohibits DPA from seller-funded charitable organizations like AmeriDream, while permitting similar gifts from similar entities that are not so supported. The Regulation also imposes a disparate burden on low- and moderate-income homebuyers, a disproportionate number of whom are legal immigrants, female heads of household or single parents.  Finally, the regulation impermissibly discriminates among those similarly situated charities that fall within its prohibitions because it is effective thirty days after publication in the Federal Register for all such organizations except for Nehemiah, which is not subject to the regulation

33

until six months after its publication.  72 Fed. Reg. at 56,003.

1.  *Equal Protection Requires that Government Classifications Rationally Advance a Legitimate Interest or Purpose*

The Regulation creates classes of DPA providers and recipients: those that provide or receive gifts supported in part by seller-funded donations and those that provide or receive gifts that are not so supported.  In creating this classification, HUD is subject to the limitations imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, which prohibits the federal government from invidiously discriminating between individuals and groups.  See Bolling v. Sharpe, 347 U.S. 497 (1954).  Under standards virtually identical to those of the Fourteenth Amendment, see, e.g., Brown v. Barry, 710 F. Supp. 352, 353n.4 (D.D.C. 1989), the Fifth Amendment requires that all persons similarly situated must be treated alike.  See, e.g., City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985); McCain v. United States, No. 06-1701 (RCL), 2007 WL 1127883 at *2 (D.D.C. April 16, 2007).

As noted earlier, the burdens imposed by the Regulation's classification fall disproportionately on minorities, immigrants, and female heads of households, which are suspect classes generally accorded heightened constitutional scrutiny.

34

But because neither the downpayment classification itself, nor the effective-date classification favoring Nehemiah, is expressly based on a suspect classification, the constitutionality of the Regulation depends on whether it rationally advances a legitimate government interest or purpose. See, e.g., Romer v. Evans, 517 U.S. 620, 632 (1996).

This rational-basis standard clearly requires that courts give deference to the expressed objectives of the legislature. But it is also "is clear that a court would be shrinking from its most basic duty if it abstained from both an analysis of the legislation's articulated objective and the method that the legislature used to achieve that objective." Brown, 710 F. Supp. at 355. Indeed, under the rational-basis standard, the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne, 473 U.S. at 446.

Although most statutes and regulations have been upheld as meeting this deferential standard, see Brown, 710 F. Supp. 352 (discussing cases), both the Supreme Court and this Court have invalidated a number of statutes, regulations, and ordinances under rational-basis analysis. See, e.g., Romer, 517 U.S. 620; Quinn v. Milsap, 491 U.S. 95 (1989); Brown, 710 F. Supp. 352. AmeriDream will likely succeed on its claims that the

35

regulation, too, should be struck down under even the deferential rational-basis standard.

### 2. Regulation Classifications Lack Rational Basis

Neither the Regulation's DPA classification nor its effective-date disparity can pass the rational-basis test. The relationship, if any, between these classifications and the goals asserted by HUD is simply too attenuated to pass constitutional muster.

### a. DPA Prohibition Does Not Rationally Advance Legislative Goals

The DPA classification in the Regulation is fundamentally inconsistent with the legislative goals of the National Housing Act, 12 U.S.C. § 1209. Congress created the FHA to establish and implement crucial policy initiatives to assist low-and moderate-income individuals in making the transition from tenants to homeowners. See H.R. Rep. No. 1922, 73rd Cong., 2d Sess. 1 (1934). By prohibiting borrower access to DPA from charitable organizations like AmeriDream that are supported in part by seller-funded contributions, the Regulation runs counter to this legislative goal by drastically reducing the number of low- and moderate-income families eligible for FHA loans. Indeed, the very DPA programs that this Regulation would eviscerate have been crucial to the success of the FHA's mission

36

to assist low- and moderate-income individuals purchase their own homes: home purchases that utilize downpayment assistance comprise approximately 40 percent of FHA loans. HUD itself has consistently recognized as much, perhaps most prominently in the 2005 HUD Letter to GAO.

Nor is the DPA classification rationally related to the purposes HUD attributes to the Regulation. The Regulation's stated purpose is to codify "HUD's longstanding practice, authorized by statute, of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations." 72 Fed. Reg. at 56,002. But contrary to this stated purpose, the DPA classification abruptly changes HUD's longstanding practice of allowing gifts by charitable organizations like AmeriDeam, which are supported in part by seller-funded contributions.

HUD's articulated "concern" that seller-related contributions could contribute to an overvaluation of the price of the mortgaged property simply does not withstand analysis. Implicit in this concern is HUD's legitimate interest in improving DPA programs to protect low- to moderate-income homebuyers. Complete eradication of DPA programs that rely in part on donations prohibited by the Regulation does not rationally advance this legitimate purpose. In the 2006 HUD Senate Testimony, Assistant Secretary Montgomery elaborated on

37

the problems presented by FHA's downpayment requirement and the need to help aspiring homeowners who lacked the means to make the requisite downpayment.    See Ex. B, HUD Senate testimony at 4.  Assistant Secretary Montgomery testified:

> Without a viable FHA alternative, many homebuyers turned to high-cost financing and nontraditional loan products to afford their first homes. While low initial monthly payments seemed like a good thing, the reset rates on some interest-only loans are substantial and many families are unable to keep pace when the payments increase....Some will be forced to sell or lose their homes to foreclosure. The foreclosure rate for subprime loans is twice that of prime loans. And I think we can all agree that foreclosures are bad for families, bad for neighborhoods, and bad for the economy as a whole.

Id. at 3.

In the absence of a rational relationship between the classification adopted and the legitimate goals of the Regulation, the Regulation's wholesale classification of these programs as "prohibited" unconstitutionally discriminates against providers and recipients of downpayment gifts from such programs.  Romer, 517 U.S. at 633.

### b.    The Effective-Date Disparity is Irrational

Nor does the Regulation's effective-date classification satisfy the rational-basis test.  As noted supra, the Regulation impermissibly discriminates among those similarly-situated charitable organizations that fall within its prohibitions

38

because it is effective thirty days after publication in the Federal Register for all such organizations except for Nehemiah, which is not subject to the Regulation until six months after its publication. This classification bears no rational relationship to the purposes of the Federal Housing Act or the Regulation—instead it merely singles out a single faith-based organization for less burdensome treatment. HUD's reference to a prior settlement with Nehemiah requiring that the effective date be six months after publication in the Federal Register does not satisfy the rational-basis standard. While this may explain Nehemiah's effective date, it does not explain or provide any rational basis for treating differently all other similarly-situated charitable organizations, particularly in light of the fact that this portion of the agreement was expressly intended to extend to all similarly-situated DPA programs. Accordingly, this classification should be struck down as violating the equal protection component of the Fifth Amendment.

### C.  HUD Improperly Prejudiced the Outcome of the Rulemaking Proceeding

A court may set aside a final regulation based on prejudgment of the outcome "only when there has been a clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the

39

proceeding." Ass'n of Nat'l Advertisers, Inc., 627 F.2d 1151, 1170 (D.C. Cir. 1979). "Mere proof that the official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute" cannot overcome the presumption that an official has to keep an open mind. Hous. Study Group v. Kemp, 736 F.Supp. 321 (D.D.C. 1990). That is not the case in this instance: the deciding official did not merely express an opinion, he committed himself to an outcome.

Indeed, statements made by HUD Secretary Alphonso Jackson, during the pendency of the challenged rulemaking, establish beyond doubt that HUD was not going to be swayed by the comment process, and would reach exactly the conclusion it did: adoption of the proposed rule. On June 5, 2007, Bloomberg News reported that HUD "will ban a downpayment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said." Ex. O. The Secretary stated: "I'm very much against it . . . I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments." Id. With respect to the then-pending rulemaking proceeding, *Jackson said in his interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments."* Id. (emphasis added).

40

These statements amply satisfy the "clear and convincing showing" of agency prejudgment. First, the statements not only express the Secretary's strong opposition to DPA programs, but they convey, in explicit terms, HUD's intention to approve the proposal to abolish DPA programs by year-end "even if the agency receives critical comments." Second, the Secretary's comments were made during the very period HUD's proposal was out for public comment and agency decision-makers were required to exercise an open mind.

Under these circumstances, HUD's rule violates due process and cannot stand. See Int'l Snowmobile Mfrs. Ass'n v. Norton, 340 F.Supp.2d 1249, 1261 (D. Wyo. 2004) ("definite" statements by Assistant Secretary during the administrative process show that the National Park Service had already reached a prejudged political conclusion).[9]

## II. AMERIDREAM WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

The Regulation will cut off the great majority of AmeriDream's funding. This fact alone constitutes grounds for

---

[9] The situation here is distinguishable from Hous. Study Group, 736 F.Supp.2d at 333, where the district court stressed that Secretary Kemp's statements were made *prior* to the initiation of any rulemaking proceedings and did not establish an intention "set in stone." See also Consumers Union of the U.S. v. FTC, 801 F.2d 417 (D.C. Cir. 1986) (FTC Chairman expressed preference for one proposed rule over another, but did so prior to the rulemaking process). Moreover, in neither of those cases did the decision-maker come even close to saying, as Secretary Jackson did, that the agency would take specific action by a date certain regardless of public comments received through the

41

injunctive relief.    In Planned Parenthood of Metropolitan
Washington, D.C., Inc., v. Horner, 691 F. Supp. 449, 457 (D.D.C.
1988), this Court granted the preliminary injunction, ruling
that Planned Parenthood would suffer irreparable injury because
the sources of donations from which the charity would be cut off
by the rule would be "irreplaceable," even though those
donations constituted a small portion of the organization's
revenues.    Because the Regulation would terminate most of
AmeriDream's funding, the direct financial harm to AmeriDream is
much greater than that found sufficient in Planned Parenthood to
support a preliminary injunction.    See also NAACP Legal Defense
and Education Fund v. Horner, 636 F. Supp. 762, 765 (D.D.C.
1986) ("irreparable harm" occurs when a charity "lose[s]
charitable contributions they would otherwise receive").

Moreover, by cutting off AmeriDream's principal sources of
funding, the Regulation will cause AmeriDream to cease
operations and terminate its employees in the near term.
AmeriDream is totally dependent on a highly skilled and highly
specialized staff whose tenures with the organization are quite
long; the organization experiences little employee turnover.
Once those employees depart, it will be virtually impossible to
replace them with similarly-skilled employees.    Accordingly,
even if AmeriDream were ultimately to prevail in its litigation

administrative process.

42

against HUD, AmeriDream, and its charitable DPA programs, would be terminated permanently without interim injunctive relief.

### III. ISSUANCE OF AN INJUNCTION WILL NOT CAUSE SUBSTANTIAL HARM TO HUD.

HUD adopted this Regulation after ten years of actively facilitating seller-funded DPA programs, and has presented no meaningful evidence that it will incur any substantial harm if a preliminary injunction against implementation of the Regulation is issued.

### IV. GRANTING INJUNCTIVE RELIEF TO AMERIDREAM WILL FURTHER THE PUBLIC INTEREST.

Granting injunctive relief to AmeriDream will further the public interest. If the Regulation is implemented, AmeriDream and other similar charities, which fund virtually all nonprofit DPA programs, will cease operations.

The resulting harm to the public will be immediate and severe. A range of statistics quantify the devastating impact of this result, particularly to the low- and moderate-income families that the FHA historically has had difficulty reaching: most notably, over the past decade, seller-funded DPA programs have helped over one million of those individuals and families to buy their own homes. However, HUD itself presents the most

43

compelling accounts of the devastating impact of how curtailing DPA.

HUD expressly recognized as much in its 2005 HUD Letter to GAO. See Ex. D, 2005 HUD Letter to GAO. More recently, HUD addressed the problems presented by FHA's downpayment requirement and the need to help aspiring homeowners who "find it difficult to save for a downpayment, but have adequate incomes to make monthly mortgage payments and do not pose a significant credit risk." Ex. B, HUD Senate Testimony at 4. Assistant Secretary Montgomery noted that those families "[w]ithout a viable FHA alternative" would be left vulnerable to predatory lenders, which in turn presented greater foreclosure risks. He added, "I think we can all agree that foreclosures are bad for families, bad for neighborhoods, and bad for the economy as a whole." Id. at 3.

Assistant Secretary Montgomery further acknowledged that "[t]he downpayment is the biggest barrier to homeownership in this country," and a major impediment to borrowers seeking access to FHA-insured loans. Id. at 4. Although his testimony advocated overcoming that impediment by changing FHA's authorizing statute to permit it to insure zero downpayment loans, the fact remains that FHA cannot insure such loans under current law. Thus, homebuyers deprived of seller-funded DPA will likely be unable to purchase a home at all or forced to

take out predatory loans.  <u>See also</u> Ex. P, U.S. Conference of Mayors, "Resolution on Downpayment Assistance Programs" (2007) (declaring that "nonprofit and city downpayment assistance programs combined with FHA mortgage insurance is often a cheaper and financially better homeownership solution than other products available in the private mortgage marketplace").

## CONCLUSION

For the foregoing reasons, AmeriDream respectfully requests that this Court grant its motion for a preliminary injunction.

BAKER & HOSTETLER LLP

                    BAKER & HOSTETLER LLP

                    By:

                      <u>/s/ Lee T. Ellis, Jr.</u>
                    Lee T. Ellis, Jr. (3863)
                    Washington Square
                    Suite 1100
                    1050 Connecticut Avenue, N.W.
                    Washington, D.C.  20036-5304
                    Tel: 202.861.1500
                    Fax: 202.861.1783

                    Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                                              |     |                                    |
| -------------------------------------------- | --- | ---------------------------------- |
|                                              | )   |                                    |
| AMERIDREAM, INCORPORATED,                     | )   |                                    |
|                                              | )   |                                    |
| Plaintiff,                                   | )   |                                    |
|                                              | )   |                                    |
| v.                                           | )   | Civil Action No. 07-1752 (PLF)     |
|                                              | )   |                                    |
| HON. ALPHONSO JACKSON                          | )   |                                    |
| SECRETARY OF THE UNITED                        | )   |                                    |
| STATES DEPARTMENT OF                           | )   |                                    |
| HOUSING AND URBAN                              | )   |                                    |
| DEVELOPMENT,                                  | )   |                                    |
|                                              | )   |                                    |
| Defendant.                                   | )   |                                    |
|                                              | )   |                                    |

## ORDER FOR PRELIMINARY INJUNCTION

Upon consideration of plaintiff's Motion For Preliminary
Injunction filed herein, the Court having considered the Complaint,
the Motion, and the Memorandum Of Points And Authorities and the
Affidavit in support thereof, any opposition thereto and oral
argument thereon, and it appearing to the Court after due
deliberation that defendant is engaged in committing and will
continue to commit acts to the irreparable injury and harm of the
plaintiff pending final resolution of the case, it is this _____
day of October, 2007 hereby

ORDERED that defendant, his successors in office, officers,
agents, servants, employees, attorneys and all others acting in
concert and participation with him be, and they are, restrained and
enjoined from implementing, enforcing or applying the regulation of
the United States Department of Housing and Urban Development which

is the subject of this action, namely "Standards for Mortgagor's

Investment in Mortgaged Property," 72 Fed. Reg. 56,002-07 (Oct. 1,

2007) (to be codified at 24 C.F.R. pt. 203), until such time as

plaintiff is afforded a hearing and given the opportunity for

judicial review of the validity of the aforesaid regulation and his

promulgation thereof.


_____
United States District Judge

Copies To:

Rudolph Contreras, Esq.
Chief, Civil Division
United States Attorney for the
     District of Columbia
555 4th Street, N.W.
Washington, D.C. 20001

Robert M. Couch, Esquire
General Counsel
Office of General Counsel
U.S. Department of Housing and
     Urban Development
451 7th Street, S.W.
Washington, D.C. 20410-0500

Lee T. Ellis, Jr., Esq.
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036

**Exhibit H**

Part I

Section 501.--Exemption From Tax on Corporations, Certain Trusts, Etc.

26 CFR 1.501(c)(3)-1: Organizations organized and operated for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals.
(Also §§ 61, 102, 1012.)

Rev. Rul. 2006-27

ISSUES:

1.    Whether organizations that otherwise meet the requirements of § 501(c)(3) of the Internal Revenue Code and are described in the situations below operate exclusively for charitable purposes.

2.    Whether home buyers who receive down payment assistance from the organizations may exclude the amount of the assistance from their gross income as gifts under § 102.

3.    Whether home buyers who receive down payment assistance from the organizations may include the amount of the assistance in the cost basis of their homes under § 1012.

- 2 -

FACTS

Situation 1

    X̲ is a non-profit corporation that helps low-income individuals and families purchase decent, safe and sanitary homes throughout the metropolitan area in which X̲ is located.  As a substantial part of its activities, X̲ makes assistance available exclusively to low-income individuals and families to provide part or all of the funds they need to make a down payment on the purchase of a home.  X̲ uses standards set by Federal housing statutes and administered by the Department of Housing and Urban Development to determine who is a low-income individual.  Individuals are eligible to receive assistance from X̲'s program if they are low-income individuals, have the employment history and financial history necessary to qualify for a mortgage, and would so qualify but for the lack of a down payment.  X̲ also offers financial counseling seminars and conducts other educational activities to help prepare potential low-income home buyers for the responsibility of home ownership.

    X̲ will consider applications for assistance in connection with an applicant's purchase of any home that meets X̲'s standards for habitability.  Before making a grant of down payment assistance, X̲ requires a home inspection report for the property that the applicant intends to buy to ensure that the house will be habitable.

    To fund its down payment assistance program and other activities, X̲ conducts a broad based fundraising program that attracts gifts, grants and contributions from several foundations, businesses and the general public.

- 3 -

X's grantmaking process is structured to ensure that X's staff awarding grants on behalf of X does not know the identity of the party selling the home to the grant applicant or the identities of any other parties, such as real estate agents or developers, who may receive a financial benefit from the sale. The staff also does not know whether any of the interested parties to the transaction have been solicited for contributions to X or have made pledges or actual contributions to X. Further, X does not accept any contributions contingent on the sale of a particular property or properties.

Situation 2

Y is a nonprofit corporation that is like X in all respects as set forth in Situation 1, except as follows. Under Y's grantmaking procedures, Y's staff considering a particular applicant's application knows the identity of the party selling the home to the grant applicant and may also know the identities of other parties, such as real estate agents and developers, who may receive a financial benefit from the sale. Moreover, in substantially all of the cases in which Y provides down payment assistance to a home buyer, Y receives a payment from the home seller. Further, there is a direct correlation between the amount of the down payment assistance provided by Y in connection with each of these transactions and the amount of the home seller's payment to Y. Finally, Y does not conduct a broad based fundraising campaign to attract financial support. Rather, most of Y's support comes from home sellers and real estate-related businesses that may benefit from the sale of homes to buyers who receive Y's down payment assistance.

Situation 3

- 4 -

<u>Z</u> is a nonprofit corporation formed to combat community deterioration in an economically depressed area that has suffered a major loss of population and jobs. Studies have shown that the average income in the area is below the median level for the State. <u>Z</u> cooperates with government agencies and community groups to develop an overall plan to attract new businesses to the area and to provide stable sources of decent, safe and sanitary housing for the area residents without relocating them outside the area. As part of the renewal project, <u>Z</u> receives funding from government agencies to build affordable housing units for sale to low and moderate-income families. As a substantial part of its activities, <u>Z</u> makes down payment assistance available to eligible home buyers who wish to purchase the newly-constructed units from <u>Z</u>. <u>Z</u> also offers financial counseling seminars and conducts other educational activities to help prepare potential low and moderate-income home buyers for the responsibility of home ownership.

To fund its down payment assistance program and other activities, <u>Z</u> conducts a broad based fundraising program that attracts gifts, grants and contributions from several foundations, businesses and the general public.

LAW

Section 501 of the Code provides for the exemption from federal income tax of corporations organized and operated exclusively for charitable or educational purposes, provided that no part of the net earnings inures to the benefit of any private shareholder or individual. <u>See</u> § 501(c)(3).

Section 1.501(c)(3)-1(c)(1) of the Income Tax Regulations provides that an

- 5 -

organization operates exclusively for exempt purposes only if it engages primarily in

activities that accomplish exempt purposes specified in § 501(c)(3). An organization

must not engage in substantial activities that fail to further an exempt purpose. In Better

Business Bureau of Washington, D.C. v. U.S., 326 U.S. 279, 283 (1945), the Supreme

Court held that the "presence of a single . . . [nonexempt] purpose, if substantial in

nature, will destroy the exemption regardless of the number or importance of truly . . .

[exempt] purposes."

Section 1.501(c)(3)-1(d)(1)(ii) provides that an organization is not organized or

operated exclusively for exempt purposes unless it serves a public rather than a private

interest. To meet this requirement it is necessary for an organization to establish that it

is not organized or operated for the benefit of private interests.

Section 1.501(c)(3)-1(d)(2) defines the term "charitable" as used in § 501(c)(3) as

including the relief of the poor and distressed or of the underprivileged, and the

promotion of social welfare by organizations designed to lessen neighborhood tensions,

to eliminate prejudice and discrimination, or to combat community deterioration. The

term "charitable" also includes the advancement of education.

Section 1.501(c)(3)-1(d)(3)(i) provides, in part, that the term "educational" as

used in § 501(c)(3) relates to the instruction of the public on subjects useful to the

individual and beneficial to the community.

Section 1.501(c)(3)-1(e) provides that an organization that operates a trade or

business as a substantial part of its activities may meet the requirements of § 501(c)(3)

if the trade or business furthers an exempt purpose, and if the organization's primary

- 6 -

purpose does not consist of carrying on an unrelated trade or business.

In Easter House v. U.S., 12 Cl. Ct. 476, 486 (1987), aff'd, 846 F.2d 78 (Fed. Cir. 1988), the U.S. Court of Federal Claims considered whether an organization that provided adoption and related health services to pregnant women who agreed to place their newborns for adoption through the organization qualified for exemption under § 501(c)(3). The court concluded that the organization did not qualify for exemption under § 501(c)(3) because its primary activity was placing children for adoption in a manner indistinguishable from that of a commercial adoption agency. The court rejected the organization's argument that the adoption services merely complemented the health-related services to unwed mothers and their children. Rather, the court found that the health-related services were merely incident to the organization's operation of an adoption service, which, in and of itself, did not serve an exempt purpose. The organization did not provide health-related services to unwed mothers who wished to keep their children or who arranged for an adoption independent of the organization. The organization's sole source of support was the fees it charged adoptive parents, rather than contributions from the public. The court also found that the organization competed with for-profit adoption agencies, engaged in substantial advertising, and accumulated substantial profits. Accordingly, the court found that the "business purpose, and not the advancement of educational and charitable activities purpose, of plaintiff's adoption service is its primary goal" and held that the organization was not operated exclusively for purposes described in § 501(c)(3). Easter House, 12 Cl. Ct. at 485-86.

- 7 -

In <u>American Campaign Academy v. Commissioner</u>, 92 T.C. 1053 (1989), the

court held that an organization that operated a school to train individuals for careers as

political campaign professionals, but that could not establish that it operated on a

nonpartisan basis, did not exclusively serve purposes described in § 501(c)(3) because

it also served private interests more than incidentally.  The court found that the

organization was created and funded by persons affiliated with a particular political party

and that most of the organization's graduates worked in campaigns for the party's

candidates.  Consequently, the court concluded that the organization conducted its

educational activities with the objective of benefiting the party's candidates and entities.

 Although the candidates and entities benefited were not organization "insiders," the

court stated that the conferral of benefits on disinterested persons who are not

members of a charitable class may cause an organization to serve a private interest

within the meaning of § 1.501(c)(3)-1(d)(1)(ii).  The court concluded by stating that even

if the political party's candidates and entities did "comprise a charitable class, [the

organization] would bear the burden of proving that its activities benefited members of

the class in a non-select manner."  <u>American Campaign Academy</u>, 92 T.C. at 1077.

In <u>Columbia Park and Recreation Association v. Commissioner</u>, 88 T.C. 1 (1987),

<u>aff'd</u> without published opinion, 838 F.2d 465 (4th Cir. 1988), the court held that an

association formed in a private real estate development to operate parks, swimming

pools, boat docks, and other recreational facilities did not qualify as a § 501(c)(3)

organization.  Although the organization provided some benefit to the general public, the

primary intended beneficiaries were the residents and property owners of the private

- 8 -

development.  Thus, the organization operated for a substantial non-exempt purpose rather than for exclusively charitable purposes.

Rev. Rul. 67-138, 1967-1 C.B. 129, held that helping low-income persons obtain adequate and affordable housing is "charitable" because it relieves the poor and distressed or underprivileged.  In Rev. Rul. 67-138, the organization carried on several activities directed to assisting low-income families in obtaining improved housing, including (1) conducting a training course relative to various aspects of homebuilding and homeownership, (2) coordinating and supervising joint construction projects, (3) purchasing building sites for resale at cost, and (4) lending aid in obtaining home construction loans.

Rev. Rul. 70-585, 1970-2 C.B. 115, discussed four situations of organizations providing housing and analyzed whether each organization qualified as charitable within the meaning of § 501(c)(3).  Situation 1 described an organization formed to construct new homes and renovate existing homes for sale to low-income families who could not obtain financing through conventional channels.  The organization also provided financial aid to low-income families eligible for loans under a Federal housing program who did not have the necessary down payment.  The organization made rehabilitated homes available to families who could not qualify for any type of mortgage.  When possible, the organization recovered the cost of the homes through very small periodic payments, but its operating funds were obtained from federal loans and contributions from the general public.  The revenue ruling held that by providing homes for low-income families who otherwise could not afford them, the organization relieved the poor

- 9 -

and distressed.

Situation 2 described an organization formed to ameliorate the housing needs of minority groups by building housing units for sale to persons of low and moderate-income on an open-occupancy basis. The housing was made available to members of minority groups who were unable to obtain adequate housing because of local discrimination. The housing units were located to help reduce racial and ethnic imbalances in the community. As the activities were designed to eliminate prejudice and discrimination and to lessen neighborhood tensions, the revenue ruling held that the organization was engaged in charitable activities within the meaning of § 501(c)(3).

Situation 3 described an organization formed to formulate plans for the renewal and rehabilitation of a particular area in a city as a residential community. The median income level in the area was lower than in other sections of the city and the housing in the area generally was old and badly deteriorated. The organization developed an overall plan for the rehabilitation of the area, sponsored a renewal project, and involved residents in the area renewal plan. The organization also purchased an apartment building that it rehabilitated and rented at cost to low and moderate-income families with a preference given to residents of the area. The revenue ruling held that the organization was described in § 501(c)(3) because its purposes and activities combated community deterioration.

Situation 4 described an organization formed to alleviate a shortage of housing for moderate-income families in a particular community. The organization planned to build housing to be rented at cost to moderate-income families. The Service held that the organization failed to qualify for exemption under § 501(c)(3) because the

- 10 -

organization's program was not designed to provide relief to the poor or further any other charitable purpose within the meaning of § 501(c)(3) and the regulations.

Rev. Rul. 72-147, 1972-1 C.B. 147, held that an organization that provided housing to low-income families did not qualify for exemption under § 501(c)(3) because it gave preference to employees of a business operated by the individual who also controlled the organization.  Although providing housing for low-income families furthers charitable purposes, doing so in a manner that gives preference to employees of the founder's business primarily serves the private interest of the founder rather than a public interest.

Rev. Rul. 72-559,  1972-2 C.B. 247, held that an organization that subsidized recent law graduates during the first three years of their practice to enable them to establish legal practices in economically depressed communities that have a shortage of available legal services, and to provide free legal services to needy members of the community, qualified for exemption under § 501(c)(3).  Although the recipients of the subsidies were not themselves members of a charitable class, the resulting benefit to them did not detract from charitable purposes.  Rather, the young lawyers were merely the instruments by which the organization accomplished the charitable purpose of providing free legal services for those unable to pay for, or obtain, such services.

Rev. Rul. 74-587, 1974-2 C.B. 162, held that an organization providing low-cost or long-term loans to, or equity investments in, businesses operating in economically depressed areas qualified for exemption under § 501(c)(3).  The organization provided financial assistance only to businesses that were unable to obtain funds from

- 11 -

conventional sources, and gave preference to businesses that would provide training and employment opportunities for unemployed or under-employed area residents. Although some of the individual business owners receiving financial assistance from the organization were not themselves members of a charitable class, the benefit to them did not detract from the charitable character of the organization's program. As in Rev. Rul. 72-559, the recipients of aid were instruments for accomplishing the organization's charitable purposes.

Rev. Rul. 76-419, 1976-2 C.B. 146, held that an organization that converts blighted land in an economically depressed community to an industrial park and leases space on favorable terms to businesses that agree to hire a significant number of unemployed area residents and train them in needed skills qualifies for exemption under § 501(c)(3). The organization furthered charitable purposes by improving economic conditions for the poor and distressed and combating community deterioration. The organization offered inducements to businesses solely for the purpose of advancing charitable goals.

Section 61 provides that, except as otherwise provided in subtitle A (relating to income taxes), gross income means all income from whatever source derived.

Section 1012 provides, generally, that the basis of property shall be its cost to the taxpayer.

Section 1016(a)(1) provides that proper adjustment shall be made to the basis of property for expenditures, receipts, losses, or other items properly chargeable to capital account.

- 12 -

Section 1001(a) provides that the gain from the sale or other disposition of property is the excess of the amount realized over the adjusted basis for determining gain provided in § 1011. Section 1011(a) provides generally that the adjusted basis for determining gain from the sale or other disposition of property is the basis determined under § 1012, adjusted as provided in § 1016.

Section 102 provides that the value of property acquired by gift is excluded from gross income. A gift "proceeds from a 'detached and disinterested generosity,' . . . 'out of affection, respect, admiration, charity or like impulses.'" Commissioner v. Duberstein, 363 U.S. 278, 285 (1960). Payments that proceed from "the constraining force of any moral or legal duty," or from "'the incentive of anticipated benefit' of an economic nature," are not gifts. Duberstein, 363 U.S. at 285. Thus, payments attendant to ordinary business or commercial transactions, or that proceed primarily from the moral or legal obligations attendant such transactions, are not gifts. However, a payment made to an individual that responds to the individual's needs, that is made without economic or other consideration being received by the donor, and that does not proceed from any moral or legal duty, is motivated by detached and disinterested generosity, and may be excluded from gross income as a gift under § 102. See, e.g., Rev. Rul. 99-44, 1999-2 C.B. 549.

ANALYSIS

In Situation 1, X's purposes and activities relieve the poor, distressed and underprivileged by enabling low-income individuals and families to obtain decent, safe and sanitary homes. The way X conducts its down payment assistance program

- 13 -

establishes that X's primary purpose is to address the needs of its low-income grantees. See Rev. Rul. 70-585, Sit.1.  As a condition of providing assistance, X requires a home inspection to ensure that the house the applicant intends to buy will be habitable.  X's financial counseling seminars and other educational programs help to prepare potential home buyers for the responsibility of home ownership. See Rev. Rul. 67-138.  X conducts a broad based fundraising program, and X receives support from a wide array of sources.  X's policies of ensuring that its grantmaking staff does not know the identity or contributor status of the party selling the home to the grant applicant (or any other party who may receive a financial benefit from the sale), and of not accepting contributions contingent on the sale of any particular properties, ensure that X is not beholden to any particular donors or other supporters whose interest may conflict with that of the low-income buyers X is working to help.

X's grantmaking procedures combined with its efforts to educate homebuyers ensure that X is operated primarily to benefit the low-income beneficiaries of its downpayment assistance.  The low-income beneficiaries constitute a charitable class. Any benefit to other parties (such as home sellers, real estate agents, or developers) who participate in the transactions does not detract from the charitable purpose of relieving the poor and distressed. See Rev. Ruls. 72-559, 74-587, 76-419.  Because X is operated exclusively for charitable purposes, X qualifies for exemption from federal taxation as an organization described in § 501(c)(3).

By contrast, in Situation 2, Y does not qualify as an organization described in § 501(c)(3).  To finance its down payment assistance activities, Y relies on sellers and

- 14 -

other real-estate related businesses that stand to benefit from the transactions $Y$ facilitates. Furthermore, in deciding whether to provide assistance to a low-income applicant, $Y$'s grantmaking staff knows the identity of the home seller and may also know the identities of other interested parties and is able to take into account whether the home seller or another interested party is willing to make a payment to $Y$. $Y$'s receipt of a payment from the home seller corresponding to the amount of the down payment assistance in substantially all of the transactions, and $Y$'s reliance on these contributions for most of its funding indicate that the benefit to the home seller is a critical aspect of $Y$'s operations. In this respect, $Y$ is like the organization considered in Easter House, which received all of its support from fees charged to adoptive parents, so that the business purpose of the adoption service became its primary goal and overshadowed any educational or charitable purpose. Like the organization considered in American Campaign Academy, $Y$ is structured and operated to assist private parties who are affiliated with its funders. Like the organizations considered in American Campaign Academy, Easter House, and Columbia Park Recreation Association, $Y$ also serves an exempt purpose, but because $Y$ is not operated exclusively for exempt purposes, $Y$ does not qualify for exemption from federal income tax as an organization described in § 501(c)(3).

In Situation 3, although $Z$ does not limit its down payment assistance program to low-income recipients, $Z$'s down payment assistance program still serves a charitable purpose described in § 501(c)(3) because it combats community deterioration in a specific, economically depressed area that has suffered a major loss of population and

- 15 -

jobs.  Through a combination of counseling and financial assistance, $\underline{Z}$ helps low and moderate-income families in that area to acquire decent, safe and sanitary housing and to prepare for the responsibilities of home ownership.  In this respect, $\underline{Z}$ is like the organization described in Situation 3 of Rev. Rul. 70-585.  Because $\underline{Z}$ is operated exclusively for charitable purposes, $\underline{Z}$ qualifies for exemption from federal taxation as an organization described in § 501(c)(3).

Down payment assistance payments for home buyers in Situations 1 and 3 are made by those organizations out of a detached and disinterested generosity and from charitable or like impulse, rather than to fulfill any moral or legal duty, and thus qualify for exclusion from such home buyers' gross incomes as "gifts" under § 102.  The benefits provided to the home buyers in these circumstances are sufficiently removed from the interests of any home sellers or sales agents that they proceed from a detached and disinterested generosity on the part of the donor organization, and such grants lack the indicia of a rebate, price adjustment, or *quid pro quo* incident to a sale. Favorable treatment under § 102 is thus appropriate.  The home buyer's payment of such amount toward the purchase of the residence will be included in his or her cost basis under § 1012.

In Situation 2, in substantially all of the cases in which $\underline{Y}$ provides down payment assistance to a home buyer, $\underline{Y}$ receives a payment from the home seller that directly correlates to the amount of the down payment assistance $\underline{Y}$ provides to the home buyer. In those cases, the payments received by the home buyers do not qualify for exclusion from gross income as gifts under § 102.  The payments do not proceed from detached

- 16 -

and disinterested generosity, but rather are in response to an anticipated economic benefit, namely facilitating the sale of a seller's home.  Under <u>Duberstein</u>, <u>supra</u>, such payments are not gifts for purposes of § 102.  Unlike in Situations 1 and 3, in Situation 2, the down payment assistance received by those home buyers represents a rebate or purchase price reduction.  As a rebate or purchase price reduction, the down payment assistance is not includible in a home buyer's gross income under § 61 and the amount of the down payment assistance is not included in the home buyer's cost basis under § 1012, as adjusted under § 1016.

HOLDINGS

1.      In Situations 1 and 3, the organization is operated exclusively for charitable purposes and qualifies for exemption from federal income tax as an organization described in § 501(c)(3).  In Situation 2, the organization is not operated exclusively for charitable purposes, and consequently, does not qualify for exemption from federal income tax as an organization described in § 501(c)(3).

2.      In Situations 1 and 3, the home buyers may exclude the down payment assistance from their gross income as gifts under § 102.  In Situation 2, the home buyers may not exclude the down payment assistance as gifts under § 102.  However, in Situation 2, the down payment assistance is excluded from the gross income of home buyers because it represents a rebate or purchase price reduction.

3.      In Situations 1 and 3, the home buyers may include the down payment assistance in the cost basis of their homes under § 1012.  In Situation 2, the home buyers may not include the amount of the down payment assistance in the cost basis of

- 17 -

their homes under § 1012.  Rather, the amount of the down payment assistance represents a rebate or purchase price reduction that is excluded from the home buyer's cost basis under § 1012.

DRAFTING INFORMATION

The principal author of this revenue ruling is Elizabeth C. Kastenberg of Exempt Organizations, Tax Exempt and Government Entities Division.  For further information regarding this revenue ruling, contact Elizabeth C. Kastenberg on (202) 283-9468 (not a toll-free call).

**Exhibit I**

## IRS Targets Down-Payment-Assistance Scams; Seller-Funded Programs Do Not Qualify As Tax Exempt

IR-2006-74, May 4, 2006

WASHINGTON — Organizations that provide seller-funded down-payment assistance to home buyers do not qualify as tax-exempt charities, the Internal Revenue Service said in a ruling released today.

Down-payment-assistance programs provide cash assistance to homebuyers who cannot afford to make the minimum down payment or pay the closing costs involved in obtaining a mortgage. Such programs can qualify as tax-exempt charitable and educational organizations under Internal Revenue Code section 501(c)(3) when properly structured and operated. In Revenue Ruling 2006-27, released today, the IRS provides a detailed discussion of the guidelines – including two examples that meet – and one that fails to meet – the tests for exemption.

The ruling makes it clear that seller-funded programs are not charities because they do not meet the requirements of section 501(c)(3). Increasingly, the IRS has found that organizations claiming to be charities are being used to funnel down-payment assistance from sellers to buyers through self-serving, circular-financing arrangements. In a typical scheme, there is a direct correlation between the amount of the down-payment assistance provided to the buyer and the payment received from the seller. Moreover, the seller pays the organization only if the sale closes, and the organization usually charges an additional fee for its services.

A March 2005 report entitled, "An Examination of Downpayment Gift Programs Administered By Non-Profit Organizations," commissioned by the U.S. Department of Housing and Urban Development (HUD), found that seller-funded down-payment assistance has led to underwriting problems and resulted in an increase in the effective cost of homeownership. A report from November 2005 entitled, "Mortgage Financing: Additional Action Needed to Manage Risks of FHA-Insured Loans with Down Payment Assistance," conducted by the U.S. Government Accountability Office (GAO) found similar results.

"The IRS is increasingly concerned with organizations that are taking advantage of homebuyers who need assistance for a down payment to realize the American dream of homeownership," said IRS Commissioner Mark W. Everson. "So-called charities that manipulate the system do more than mislead honest homebuyers and ultimately jack up the cost of the home. They also damage the image of honest, legitimate charities."

The IRS is examining 185 organizations that operate down-payment-assistance programs. A particular organization's tax-exempt status can be verified using the on-line database at irs.gov (click on "Charities & Non-Profits" and then click on "Search for Charities"). In addition, the agency has denied applications for tax exemption from over 20 organizations that seek to provide this service and is considering applications from a number of other down-payment assistance organizations.

Revenue Ruling 2006-27 will be published in Internal Revenue Bulletin 2006-21, dated May 22, 2006.

# Exhibit J

**United States Government Accountability Office**

# GAO

Report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

November 2005

# MORTGAGE FINANCING

## Additional Action Needed to Manage Risks of FHA-Insured Loans with Down Payment Assistance



**G A O**
Accountability ★ Integrity ★ Reliability

GAO-06-24

Down payment assistance provided by a seller-funded nonprofit can alter the structure of the purchase transaction in important ways. First, when a homebuyer receives assistance from a seller-funded nonprofit, many nonprofits require the property sellers to make a payment to the nonprofit that equals the amount of assistance the homebuyer receives plus a service fee, after the closing. This requirement creates an indirect funding stream from property sellers to homebuyers that does not exist in other transactions, even those involving some other type of down payment assistance. Second, mortgage industry participants reported, and a HUD contractor study found, that property sellers who provided down payment assistance through nonprofits often raised the sales price of the homes involved in order to recover the required payments that went to the organizations.[8] Our AVM analyses found that homes bought with seller-funded nonprofit assistance appraised at and sold for higher prices than comparable homes bought without assistance, resulting in larger loans for the same collateral and higher effective loan-to-value (LTV) ratios.[9] Specifically, we found that homes with seller-funded down payment assistance were appraised and sold for about 2 to 3 percent more than comparable homes without such assistance. That is, homebuyers would have less equity in the transaction than would otherwise be the case. FHA requires lenders to inform appraisers of the presence and source of down payment assistance but does not require that lenders identify whether the down payment assistance provider receives funding from property sellers. Without this information, appraisers cannot consider the impact that such assistance could have on the purchase price of a home and potentially on the appraiser's estimate of the home's market value.

Loans with down payment assistance do not perform as well as loans without down payment assistance; this may be explained, in part, by the homebuyer having less equity in the transaction. Holding other variables constant, our analysis indicated that FHA-insured loans with down payment assistance had higher delinquency and claim rates than similar loans without such assistance. These differences in performance may be explained, in part, by the higher sales prices of comparable homes bought with seller-funded down payment assistance.

---

[8]Concentrance Consulting Group, *An Examination of Downpayment Gift Programs Administered by Nonprofit Organizations*, prepared for the U.S. Department of Housing and Urban Development (Washington D.C.: March 2005).

[9]We define effective LTV ratio to equal the loan amount divided by the true market value of the home that would exist without the presence of down payment assistance.

Specifically, given the increased risks posed by loans with down payment assistance, from any source, we recommend that the Secretary of HUD direct the Assistant Secretary for Housing (Federal Housing Commissioner) to consider the following four actions to better understand and manage these risks:

- To provide FHA with data that would permit the agency to identify whether down payment assistance is from a seller-funded down payment assistance provider, modify FHA's "gift letter source" categories to include "nonprofit seller-funded" and "nonprofit nonseller-funded" and require lenders to accurately identify and report this information when submitting loan information to FHA;

- To more fully consider the risks posed by down payment assistance when underwriting loans, include the presence and source of down payment assistance as a loan variable in FHA's TOTAL Mortgage Scorecard during the underwriting process;

- To ensure that FHA has an ongoing understanding of the impact that down payment assistance has on loan performance, implement routine and targeted performance monitoring of loans with down payment assistance, including analyses that consider the source of assistance; and

- To more accurately reflect the impact that down payment assistance has on loan performance, continue to include the presence and source of down payment assistance in future loan performance models. To enhance the actuarial reviews' estimates of claims, consider including in the annual review of actuarial soundness, the impact that the presence and source of down payment assistance has on claim severity.

We further recommend that the Secretary of HUD direct the Assistant Secretary for Housing (Federal Housing Commissioner) to take the following two actions to balance the goals of expanding homeownership and sustaining the actuarial soundness of the Fund by managing the risks associated with loans that involve "gifts" of down payment assistance from nonprofit organizations that receive funding from sellers:

- To ensure that appraisers have the information necessary to establish the market value of the properties, require lenders to inform appraisers about the presence of down payment assistance from a seller-funded source; and

- Because down payment assistance provided by seller-funded entities is, in effect, a seller inducement, revise FHA standards to treat assistance from seller-funded nonprofits as a gift from the seller and, therefore, subject to the prohibition against using seller contributions to meet the 3 percent borrower contribution requirement.

## Agency Comments and Our Evaluation

We provided a draft of this report to HUD for its review and comment. We received written comments from HUD's Assistant Secretary for Housing (Federal Housing Commissioner), which are reprinted in appendix IV. HUD generally agreed with the report's findings, noting that the analysis of loan performance is consistent with its own findings regarding the performance of loans with down payment assistance and how seller-funded down payment assistance programs operate. HUD also agreed to take steps that will improve its oversight of down payment assistance lending. Specifically, HUD will modify its information systems to document assistance from seller-funded nonprofits, and HUD will consider incorporating down payment assistance into FHA's TOTAL Mortgage Scorecard and requiring lenders to inform appraisers when assistance is provided by seller-funded nonprofits.

The department commented on certain aspects of selected recommendations. First, although HUD agreed with the report's recommendation to perform routine and targeted loan performance analyses of loans with down payment assistance, it maintained that FHA already performs monitoring of these loans. We recognized that FHA has conducted ad hoc risk analyses of its loans with down payment assistance. Additionally, the actuarial review of FHA's insurance Fund for 2005 includes, for the first time, down payment assistance as a variable in its model of loan performance. Consistent with our findings, the 2005 actuarial review found the presence of down payment assistance to be a significant factor in explaining loan performance. Further, the 2005 actuarial review states that loans with down payment assistance should be closely monitored. We agree. Because the proportion of loans FHA insures that involve some form of down payment assistance is growing dramatically, and because the risks associated with down payment assistance are substantial, we continue to recommend that FHA more routinely monitor the performance of loans with down payment assistance.

Second, HUD disagreed with our recommendation that it should revise its standards to prohibit the use of down payment assistance from seller-funded nonprofit organizations to meet the three percent borrower

# Exhibit K

George Mason University School of Public Policy
**Center for Regional Analysis**

# *An Evaluation of Research on the Performance of Loans with Down Payment Assistance*

by

Lisa A. Fowler, PhD
Stephen S. Fuller, PhD

Center for Regional Analysis
George Mason University
Fairfax, Virginia

September 2006

## Purpose

The purpose of this report is to review critically prior analyses of the performance of home loans secured by buyers receiving down payment assistance from nonprofit down payment assistance (NDPA) programs.  Research by the HUD Office of the Inspector General and the U.S. Government Accountability Office has been used to argue that FHA loans that receive assistance from NDPA programs perform worse than other FHA loans, even those with other types of down payment assistance, such as gifts from relatives.  This independent evaluation assesses those claims based on the data and methodology used in the prior research.  This evaluation is in lieu of an independent analysis of the performance of NDPA program mortgage loans against the performance of other FHA mortgage loans.  The information requirements for an independent evaluation were deemed too onerous for a non-federal government research team.  Furthermore, several studies have been done previously by federal agencies with access to the requisite data.

This report reviews the following three studies:

• Office of Inspector General. *Final Report of a Nationwide Audit: Down Payment Assistance Programs*. 2000-SE-121-0001. March 2000. (OIG 2000)
• Office of Inspector General. *Follow Up of Down Payment Assistance Programs Operated by Private Nonprofit Entities*. 2002-SE-001. September 2002. (OIG 2002)
• U.S. Government Accountability Office. *Mortgage Financing: Additional Action Needed to Manage Risks of FHA-Insured Loans With Down Payment Assistance*. GAO-06-24. November 2005. (GAO 2005)

## Analysis

This review raises several methodological issues, particularly for the studies done by the Office of the Inspector General.  These criticisms raise concerns that the descriptive results from the three studies reviewed could be subject to erroneous interpretation or could be overstating the extent of the default and/or claim rates of FHA loans with assistance from NDPA programs compared with loans with other types of assistance (e.g. gifts from relatives.)  This conclusion is supported by the results from the most rigorous study, which was done by the U.S. Government Accountability Office. The national results from the GAO multivariate regression analysis show no statistically significant difference in the claim rates of NDPA loans and FHA loans with other types of gifts.

### Key Methodological Issues Affecting Study Results

#### 1.  Measure of Loan Performance
These studies use two different measures of loan performance: (1) default, as defined as a 90+ day delinquent loan and (2) claim, defined as a loan that has a claim submitted to the FHA for foreclosure.  When evaluating the performance of a program, it is necessary to consider carefully what "good performance" and "bad performance" mean.  It seems apparent that mortgages that end in foreclosure are bad.  These loans force additional costs on the FHA and, therefore, society at large. It is less clear that delinquency—even delinquency of 90 or more days—is particularly problematic at the macro level.  Being delinquent on one's mortgage payments certainly does have implications for an individual's credit, but does it have a social cost?  If not, how concerned should we be?

None of the studies reviewed explained how it chose default (as measured by 90+ days of delinquency) and claim rate as their measure of performance.  None of the studies showed

assistance providers are serving. Thus, limiting analysis to areas with large numbers of home buyers receiving down payment assistance could overstate the relative differences in loan performance.

The GAO 2005 report uses a sample of national data, in addition to a sample of targeted metropolitan areas, which is a better approach. When GAO compared the differences in default/claim rates between loans with what GAO termed "seller-funded assistance" and loans with no assistance, they found greater differences in the MSA sample compared with their national sample. This finding is further suggestion that focusing on underserved or economically lagging metropolitan areas may result in findings that overstate the difference in performance nationally of loans with nonprofit down payment assistance and loans with other types of assistance.

### 3. Focus on home prices
Both the OIG and GAO commented on the circuitous relationship between down payment assistance, home prices, and default, though no data was provided that empirically linked these three items in the study samples. The OIG reviewed several independent studies showing a strong relationship between the amount of equity a buyer has in the home and the default rates on FHA-insured mortgages. According to one independent study, "When borrowers experiencing mobility-induced events such as a job loss which produce significant changes in household income have little or no equity, they may be unable to sell their properties for a profit and may have insufficient income to meet mortgage payments, resulting in higher claim rates." (OIG 2000, Appendix A, p. 6)

GAO contracted out an empirical analysis of the relationship between down payment assistance, appraisal and home price. Their analysis showed that homes with "seller-funded assistance" were appraised and sold for about three percent more than comparable homes without such assistance. (p. 22) Both GAO and OIG also cited agents involved in loan transactions involving nonprofit down payment assistance saying that home prices were sometimes increased.

Assuming that this phenomenon does occur,[1] the question becomes "Should we be concerned?" Higher home prices hurt the buyer *only if they would have been able to purchase the home for the lower price otherwise.* Without the down payment assistance program, the potential home buyer may not have been able to purchase a home at any price. However, if higher prices facilitated by down payment assistance lead directly to more foreclosures, then there is a social cost associated with the phenomenon. None of the studies reviewed provided sufficient evidence to show this link in their study samples.

### 4. Omission of factors related to the financial situation of the family and the economic conditions in the area.
The most significant issue that stands out with regards to the studies reviewed is the lack of attention given to two key factors that influence whether or not a loan is defaulted on goes to claim: (1) the financial situation of the borrower and (2) the economic conditions of the area in which the home is located. Families in more precarious financial situations are probably more likely to be in default. Areas with poor economic conditions likely contribute to the instability of financially precarious families. If these families, living in these areas, are more likely to be participants in NDPA programs than are other families, then their presumed higher default rates will show up as defaults in loans with nonprofit down payment assistance. However, the cause of the default could have little to do with the down payment assistance itself but everything to do with the characteristics of the home buyers the down payment assistance providers serve.

---

1    This analysis did not rigorously examine the methodology GAO used; however, the model used to estimate home prices is standard in the field.

GAO attempted to account for these other factors in their regression analysis but data limitations and/or specification errors led to inclusion of incomplete information. The GAO regression models included variables for borrowers' resources, first-time home buyer, whether or not the area was a HUD-designated underserved area, unemployment rate, and home price appreciation. None of these variables was a statistically significant predictor of the probability of default or foreclosure.

It is possible that the lack of significant results is related to how the independent variables were specified. The variable for borrowers' resources is a notable example. The independent variable for borrowers' reserves is a dummy variable that takes a value of 1 if the borrower had less than two months of mortgage payments in liquid assets after closing, 0 otherwise. The GAO report does not explain how this threshold was decided upon. However, this type of dummy variable may be an inadequate measure of resources, and thus, an insufficient approximation of the financial situation of the borrower.

One reason GAO may have defined this variable in this way is limited data availability. According to the Concentrance Consulting Group which developed the database on which GAO based its analysis, there was missing and inconsistent data on borrower assets. Concentrance notes that the excluded and inconsistent data resulted because there was no uniformity among lenders as to what to include in the total assets available field on the MCA worksheet.[2]

In an ideal regression analysis of loan performance, the independent variables would include:

o **Characteristics of the loan**—15- or 30-year term, ARM, down payment assistance, amount, loan-to-value ratio;
o **Characteristics of the borrower**—income, income history, employment, assets, family composition;
o **Characteristics of the market**—unemployment rate, job mix (e.g. some indicator of jobs with high layoff potential), home price appreciation, poverty rates or average family incomes; and
o **Characteristics of the home**—size, age, quality.

It would be virtually impossible to collect all of this data for a large enough sample with which to run a regression. The point is not that GAO should have included all of the above factors as independent variables; rather, the point is that there are numerous other factors that influence the probability of default and/or foreclosure. When other factors are excluded, the results could show that one factor has significant predictive power (e.g. presence of nonprofit down payment assistance) when really there are omitted variables that are correlated with the one factor, that are truly driving the prediction.

# Review

This section provides more details on each study's data, methodology and main findings. Table A in the appendix summarizes the review.

The *Final Report of a Nationwide Audit: Down Payment Assistance Programs* (OIG 2000) report was prepared for the U.S. Department of Housing and Urban Development's (HUD's) Office of Inspector General (OIG) in late 1999. The purpose of the OIG audit was three-fold: (1) to determine

---

2    Concentrance Consulting Group. 2004. *Audit of Loans with Downpayment Assistance*. Contract Number C-OPC-22550.

**Exhibit L**

WASHINGTON, D.C. 20410

OFFICE OF THE ASSISTANT SECRETARY FOR
HOUSING-FEDERAL HOUSING COMMISSIONER

APR 3 1998

Don F. Harris, Esq.
Nehemiah Home Ownership 2000
770 L St. Suite 750
Sacramento, CA 95814

RE: Nehemiah Home Ownership 2000

Dear Mr. Harris:

The United States Department of Housing and Urban Development ("HUD") has received and reviewed the IRS ruling that the non-profit organization which administers the Nehemiah down payment assistance program qualifies for Section 501(c)(3) status. Based upon the program specific information accompanying your submission to the IRS, we find that your program complies with HUD's regulations and guidance pertaining to the source of funds for the borrowers' down payments. Accordingly, HUD will insure eligible mortgages in which home buyers use Nehemiah's program(as set out in the submission to the IRS for Section 501 (c)(3) status) for borrower down payment assistance.

Although HUD has no immediate plans to change its policies regarding down payment assistance programs or regarding the source of borrower down payment funds, HUD reserves the right to do so in the future in accordance with applicable procedures. In the event that there are any such changes regarding the source of borrower down payment funds, the changes will become applicable to Nehemiah and all other similarly situated down payment assistance programs six months after the final promulgation and issuance of any such changes.

Sincerely,

Imelda Johnson
Deputy Assistant Secretary
Single Family Housing Programs

**Exhibit M**

200 Professional Drive | 4th Floor | Gaithersburg, MD 20879
ph 301-977-9144 | fx 301-987-5156 | www.ameridream.org

**AmeriDream**
Down Payment Assistance Program

August 9, 2007

Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street, S.W.
Room 10276
Washington, DC 20410-0500

Re:  Docket No. FR-5087-P-01, "Standards for Mortgagor's Investment in Mortgaged
     Property"

Dear Sir/Madam:

On behalf of AmeriDream, Inc., a 501(c)(3) charitable entity which is dedicated to
helping low and moderate income families purchase their own homes, I respectfully
submit these comments on Docket No. FR-5087-P-01, "Standards for Mortgagor's
Investment in Mortgaged Property".

### *Summary*

Any policy initiative directed at down payment assistance (DPA) programs must
serve the broader purpose of helping responsible, low and moderate income families to
purchase their own homes.  Judged by that criterion, DPA programs work, and work well,
having provided critical assistance to over one million individuals and families in the past
few years to buy their own homes, some 80% of whom for the first time.

Because down payment assistance programs are so critical, AmeriDream
welcomes efforts by the Department of Housing and Urban Development (HUD) to
ensure that down payment assistance providers adhere to their mission and work
assiduously to assist families with limited means to buy their own homes.  AmeriDream
also applauds HUD's insistence that down payment assistance providers conduct
themselves in strict compliance with both sound business practices and high ethical
standards.  Finally, AmeriDream acknowledges that some down payment assistance
programs have had significant problems.  Those issues tend to be endemic among nascent
industries, particularly those which experience very rapid growth, and DPA providers, a
sector of nonprofits which began barely a decade ago, are no exception.  AmeriDream
and other responsible DPA providers have worked hard to resolve those problems, and
would support HUD initiatives that did the same.

For all those reasons, AmeriDream strongly encourages HUD to actively take steps to
strengthen down payment assistance programs.  However, if HUD is to do so effectively, and
in the interests of the aspiring homeowners whom HUD is committed to serve, it is essential
that HUD develop rules that seek to improve DPA programs, not eradicate them.  Moreover,

Doing things right for America's homebuyers.

if those rules are to improve DPA programs, HUD must properly assess their problems, and its rules must be specifically targeted to remedy those concerns. Unfortunately, the proposed "Standards for Mortgagor's Investment in Mortgaged Property", which seeks to cut off most current funding to DPA programs, fails on both counts.

As the scale of the down payment assistance programs quickly grew beyond the means of the traditional donor base of the churches and other charities which were the initial providers of down payment assistance, DPA programs sought other sources of support, particularly within the real estate industry, including home builders and home sellers. That expanded donor base has permitted down payment assistance to be extended to far more families, and enabled DPA programs to grow without using taxpayer dollars. Yet HUD views that essentially positive development as inherently abusive. As a result, the proposed rule seeks to prohibit most current donors from contributing as they have in the past, a ban which would not improve DPA programs, but eradicate them.

A more constructive approach would be to target specific problems within DPA programs. However, the proposed rule has only a tenuous relationship with the very problem it purports to address. The background to the proposed HUD rule states that "FHA's primary concern with these transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and the FHA." That statement asserts, in essence, that the families who purchase homes with down payment assistance may pay prices which have been manipulated to exceed actual fair market value; that is, the purchase price may not be supported by an accurate appraisal. Yet that assertion fails to acknowledge that transactions involving down payment assistance, like all purchases utilizing loans guaranteed by the Federal Housing Administration (FHA), are based on valuations validated using HUD-approved appraisal criteria applied by HUD-certified appraisers neither chosen by, nor related to, either the DPA providers or their donors.

If further safeguards are required to ensure the integrity of the appraisal process, such as random assignment of HUD-certified appraisers or mechanisms for reviewing appraisals prior to closing, AmeriDream strongly supports implementing such measures which relate *directly* to the alleged problem. Seeking to remedy alleged flaws in the appraisal process *indirectly*—through restricting how donations are made to a down payment assistance provider, which provides funds to a low or moderate income family seeking to buy a home, who borrows money from a mortgage lender, which hires the appraiser—is simply the wrong approach.

AmeriDream stands ready, as it has for years, to work with HUD to improve current DPA programs to provide critical help to the low and moderate income aspiring homebuyers whom both HUD and AmeriDream are dedicated—and, indeed, legally obligated—to serve. Towards that end, these comments offer a detailed description of current DPA programs, a candid assessment of issues relating to the provision of DPA, and a suggested list of steps which may be taken to ensure that down payment assistance is provided to deserving families in an efficient, effective, and ethical manner.

HUD's proposed rule seeks to change current policy and long standing practice regarding a mortgagor's investment in a property. The proposed rule is both premised upon, and symptomatic of, fundamental misconceptions regarding downpayment assistance programs. As a consequence, the proposed rule is deeply flawed, and should be withdrawn.

### *Discussion*

### Background Information on AmeriDream

AmeriDream, a 501(c)(3) charity, was established in 1999. Based in Gaithersburg, Maryland, AmeriDream conducts housing-related programs throughout the United States. AmeriDream provides a wide range of programs to benefit the families it serves, including homebuyer education, loss mitigation counseling, community development, and privately-funded down payment gift assistance. Through those various programs, AmeriDream not only seeks to help families to purchase homes, but also to provide those families with the education and other resources needed to help them meet the responsibilities of homeownership. In turn, those responsible, committed homeowners help build safe, thriving communities.

AmeriDream exists to serve low and moderate income individuals and families. Our mission is to permit these aspiring homeowners, a disproportionate number of whom are first-time homebuyers, minorities, legal immigrants, women headed households, and single-parents, achieve homeownership. Most significantly, AmeriDream has provided critical down payment assistance to over 200,000 low and moderate income homebuyers, enabling them to purchase their homes. In addition, since 1999, AmeriDream has educated over 60,000 homebuyers through our homebuyer education course; counseled and assisted approximately 1,200 people to retain their home when confronted with mortgage difficulties; and built 168 affordable housing units in our inner cities, most notably in Southeast Washington, DC. To date, AmeriDream has committed over $30 million to projects unrelated to its down payment assistance programs.

### Charitable Sector's Successful Response to FHA Authorization of DPA

(a) **FHA Loan Guarantees.** Congress created the Federal Housing Administration to establish and implement crucial policy initiatives to assist low and moderate income individuals and families make the transition from tenants to homeowners. To help achieve that worthy goal, the FHA guarantees certain loans for moderately priced homes. That single program, the FHA loan guarantee, is perhaps the most important federal initiative to promote homeownership among families with limited means. Significantly, low and moderate income borrowers who qualify for FHA-backed loans are able to get credit at reasonable rates from reputable lenders. They do not fall prey to predatory lenders, and are not burdened with debt accruing at confiscatory rates.

To qualify for FHA loan guarantees, both the homes and the prospective purchasers must meet certain criteria, among which is the statutory requirement that the homebuyer must make a down payment of at least 3% of the purchase price of the home. That criterion has proven to be an insurmountable obstacle for many otherwise qualified low and moderate income families seeking to purchase their own homes. Even families who have pristine credit histories, steady employment, and sufficient income to meet mortgage payments nonetheless often have trouble setting aside a significant portion of their paychecks to meet the FHA's down payment requirement. As a result, the FHA program, though highly commendable, nonetheless has failed to benefit many of the very families which it was designed to serve. As a result, families who have been denied access to FHA-backed loans are left with two options, both very unfavorable: resort to potentially predatory, sub-prime loans, or do not purchase a home at all.

To the credit of both Congress and the FHA, they have long recognized that the down payment requirement would prove too burdensome for many of the families whom they sought to help. For that reason, prospective homebuyers are expressly permitted to use monetary gifts to make the required down payments, provided that those gifts come from certain specified sources, including family members, employers, labor unions, and charities certified by the Internal Revenue Service (IRS) pursuant to section 501(c)(3) of the tax code. As a practical matter, for many aspiring home purchasers—whose relatives also have modest means, who do not belong to a union, and do not have employers who provide the requisite gifts—the only source of down payment assistance on that list to whom they may have recourse are charities.

**(b) Evolution of DPA Organizations.** One of the largest barriers to homeownership is saving the down payment, particularly for low and moderate income families and traditionally underserved home buyers. Many of these individuals and families can meet all the requirements of an FHA-insured loan, such as, employment history, income, and credit, yet cannot afford to set aside the minimum down payment of 3% of the contract sales price of the home. DPA was designed to work with FHA and its population of homebuyers to safely help them overcome the down payment barrier to homeownership while also giving homebuyers positive equity in their home day one which is the beginning of wealth building for these lower income homebuyers. Beginning in the mid-1990s, a number of 501(c)(3) organizations began to step up to meet this need. Faith-based organizations first took the lead, initiating programs to provide needed down payment assistance to these low and middle income aspiring homebuyers, typically from the very communities in which the churches were based.

From those modest beginnings, down payment assistance programs grew very rapidly to meet the pent up demand of hundreds of thousands of families who longed to purchase their own homes, and qualified for FHA loans in every respect except for the required down payment.

As the scale of the down payment assistance programs quickly grew beyond the means of the traditional donor base of the churches and other providers of down payment

assistance, providers turned to other sources of support, particularly within the real estate industry. That expanded donor base has permitted down payment assistance to be extended to far more families, who then are able to purchase homes at valuations validated by HUD-certified appraisers. Moreover, an expanded donor base has permitted down payments assistance programs to grow without taxpayer dollars.

(c) **Compliance and Acceptance of DPA.** AmeriDream and other reputable charitable organizations which provide down payment assistance seek to operate their programs in compliance with both sound financial management principles and applicable law, including existing HUD rules.

HUD Handbook 4155.1 Rev 5, Section 2-10 provides the authority for charitable organizations to provide down payment assistance.

> Gift Funds. An outright gift of the cash investment is acceptable if the donor is the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers, or a close friend with a clearly defined and documented interest in the borrower.

AmeriDream raises money for down payment gifts from various sources. That money is deposited into a commingled account, which is episodically drawn upon to make down payment gifts to qualified home buyers taken from a waiting list. The money is sent directly to the closing attorney and placed in the home buyer's escrow account in advance of the loan closing. After the loan closes and the real estate transaction is complete, the seller of that property often pays the organization a service fee, typically within seven to ten days after closing. The service fee is deposited into the organization's fund for down payment assistance and is later used for new homebuyers requesting down payment assistance, other charitable programs, and administrative costs.

This process, still adhered to today, was developed with the full knowledge of HUD's Office of General Counsel. Significantly, in 1998, HUD's Office of General Counsel reviewed the down payment assistance process and found that it was in compliance with HUD's guidelines. Further, in a letter dated October 25, 2005 from HUD to GAO, Brian Montgomery, Assistant Secretary for Housing - Federal Housing Commissioner relied on the Office of General Counsel's determination to respond to GAO recommendations.

> HUD's Office of General Counsel has advised that the timing of the payments is a key point in whether there is a seller inducement to purchase. If a gift is made from a nonprofit entity (either directly or through an entity such as a closing agent), from the nonprofit's own funds, prior to the completion of the closing, the gift becomes the homebuyer's property so the buyer can make the

three percent required down payment. After the completion of the closing, a seller makes a contribution (perhaps through the closing agent as well) from the gross sales proceeds to the nonprofit entity. The donation is commingled with other nonprofit funds that later become a source of donations to buyers other than the buyer who has just closed the purchase of the seller's property. Because the buyer has not received funds from the nonprofit that can be traced to the seller's contribution, there has not been an inducement to purchase provided by the seller.

GAO-06-24 Mortgage Financing: Additional Actions Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance (Appendix IV)

Further, the use of down payment assistance is reported on the HUD-1, a standard form that itemizes all funds associated with the home purchase. In addition, HUD has issued several mortgagee letters clarifying the appropriate use of down payment assistance which did not question the way DPA providers are funded. For instance, Mortgagee Letter 2004-02 addresses proper documentation when downpayment funds are provided from charities and Mortgagee Letter 2002-02 addresses credit policy issues regarding payment of borrower's obligations. In fact, HUD has not only made favorable statements about DPA programs in the past, HUD actually has utilized DPA programs itself when selling some of its own inventory of properties.

## (d) DPA Benefits to Low and Moderate Income Families & the Economy.

As recently as 2005, FHA itself has affirmed that DPA programs, as currently structured, serve the low and moderate income families to whom FHA is committed, and that DPA programs permit those aspiring homebuyers to purchase their homes without resorting to potentially predatory lenders. FHA has affirmed that down payment assistance does, in fact, serve a disadvantaged population. In his 2005 letter, FHA Commissioner Brian Montgomery stated:

> Borrowers who rely on seller-funded down payment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier then FHA.

By any quantitative measure, down payment assistance programs have proven to be an enormous success.

- To date, over one million low and moderate income individuals and families in all 50 states, the District of Columbia, and Puerto Rico have received down payment assistance which has allowed them to buy their own homes, usually for the first time.

- Approximately, $3.8 billion in down payment assistance was given to these low and moderate income families. Funds were entirely from private sources; no government funds were used.

- Down payment assistance programs are targeted at low and moderate income purchasers purchasing modestly priced homes in neighborhoods which would particularly benefit from an increase in owner-occupied housing.

- In 2005, the average income of a homebuyer receiving DPA was $43,551, or 69 percent of the average household income nationally. In addition, about two in five homebuyers receiving assistance had a co-borrower, indicating a need for additional financial resources. [George Mason University Center for Regional Analysis Report "Characteristics of Home Buyers Receiving Assistance from Non-Profit Down Payment Assistance Providers" November 2006 (page 1)]

- The average down payment gift amount is approximately $3,600.

- In 2005, the average sales price of homes purchased with down payment assistance is $125,000 compared with a national home value of $247,000.

- Homeowners receiving assistance from DPA benefited from increase in housing values between 2000-2005. They saw their total wealth grow by $9.6 billion over this period. [George Mason University Center for Regional Analysis Report "National Economic Impact of Non-Profit Down Payment Assistance Providers" March 2007 (GMU 2007 Study) (page ii)]

- Down payment assistance has been given to deserving, credit worthy borrowers who, notwithstanding their limited incomes, are able to meet their mortgage payments. They are only unable to come up with the required down payments. A GAO report concluded that approximately 94% of down payment assistance recipients have met their mortgage obligations in a timely manner. [GAO-06-24 Mortgage Financing: Additional Actions Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance (page 28 – National claim rate graph)]

- Down payment assistance programs have been crucial to achieving record levels of homeownership, both among the general population and among groups which historically have been denied the ability to purchase their own homes. In its June 2, 2006 edition, *The Washington Post* reported that DPA has helped boost homeownership to a record 69% level.

- Home purchases which utilize down payment assistance now reportedly comprise approximately 40% of FHA's loans with over 80% of those home purchases being made by first time homebuyers.

- Housing is a corner stone of the national economy. The opportunity for homeownership provided by DPA generated additional spending by families totaling $12.9 billion. These expenditures supported 211,000 new jobs, which generated $8.2 billion in increased personal income and $24.8 billion in total national economic output. [GMU 2007 Study (page ii)]

In short, down payment assistance works. No one disputes that these programs have enabled many hundreds of thousands of low and moderate income families to purchase homes for the first time. No one questions whether the beneficiaries of these programs have received every penny promised. And no one doubts that these programs have been instrumental in lifting homeownership rates to record levels, particularly among minority groups. To our knowledge there has been no report undertaken or released for public review that finds there would not be a significant gap if DPA were eliminated.

### Housing Policy Issues Presented by DPA Programs

It is appropriate to categorize issues relating to DPA programs into two types—those issues which relate to HUD's areas of expertise and jurisdiction, and those which do not. Only the former are properly addressed by HUD's proposed rule. Conversely, HUD is not an expert to assess, nor empowered to issue rules with respect to, the latter. Accordingly, this comment letter focuses on housing policy issues which are presented by the proposed rule.

(a) **Validity of Appraisals in DPA Transactions.** In the "Background" discussion prefacing the proposed rule, HUD mentions only one housing policy concern as justifying the proposed action. HUD asserts that the families who purchase homes with down payment assistance may pay prices which have been manipulated to exceed actual fair market value; that is, the purchase price might not be supported by an accurate appraisal. Specifically, HUD states, "FHA's primary concern with [DPA] transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and the FHA." (page 27048)

HUD cites two sources for this assertion.

First, HUD states that a 2005 Government Accountability Office (GAO) report entitled "Mortgage Financing Actions Need to Help FHA Manage Risks from New Loan Products" concludes, as summarized by HUD, "that seller-related contributions *could* contribute to the overvaluation of the property". (Emphasis supplied.) We note that this report is not an analysis on DPA in general nor is it an analysis on property values when DPA is used. To our knowledge there has been no quantitative report undertaken on this issue.

Second, and at greater length, HUD cites an IRS press release of May 4, 2006 to support the proposition that "seller contributions increase the sales price of the home". The extensive reliance on the IRS press release is misplaced. HUD is the expert on

housing policy; the IRS is the expert on tax policy. HUD's failure to substantiate its housing policies with its own research, and reliance on a *press release* issued by an agency whose expertise is limited to tax matters raises questions about those policies, to say the least.

In fact, all homes with an FHA-insured mortgage, including all those acquired with the benefit of down payment assistance, must have their purchase price validated through a home appraisal performed by a HUD-certified appraiser using appraisal criteria established by the Secretary of HUD. Nowhere in its discussion accompanying the proposed rule does HUD acknowledge that fact, let alone seek to explain why those appraisals are inaccurate.

More fundamentally, even if one assumes that HUD's claim that appraisals prepared by HUD-certified appraisers using HUD-approved criteria overstate the true fair market value of homes purchased with down payment assistance, though inadequately substantiated, is nonetheless true, HUD does not explain how the proposed rule would remedy that perceived problem.

AmeriDream strongly supports any HUD initiative which would impose further safeguards on the appraisal process, such as requiring qualified appraisers to be randomly assigned to transactions or providing additional levels of review of the appraisal by disinterested experts. Yet it is essential that this concern be addressed *directly*. To do so *in*directly—through restricting donations to a down payment assistance provider, which provides funds to a low or moderate income family seeking to buy a home, who borrows money from a mortgage lender, which hires the appraiser—is simply the wrong approach. The practical effect of the proposed rule would hurt, not help, aspiring homebuyers. It would wipe out the capacity of downpayment assistance providers to help all but a relative handful of the low and moderate income families they now serve.

**(b)  Default or Claim Rates on Loans Obtained in DPA Transactions.** Neither HUD's proposed rule nor the accompanying discussion make any mention of the default or claim rates on loans obtained to finance homes purchased with down payment assistance. However, as detailed below, that issue is raised often in other contexts. For that reason, it merits mention in discussing housing policy issues presented by down payment assistance programs, and possible policy initiatives to address those issues.

It is well documented that foreclosure is typically due to life catastrophic events such as unexpected job loss, serious illness, or divorce - to name a few. It is also well documented and acknowledged that the population of homebuyers that HUD and DPA serve are financially the riskiest. However, HUD has not determined an acceptable risk or claim rate level. AmeriDream encourages HUD to establish a threshold so that programs and services can be evaluated appropriately.

The statistics regarding the incidence of default or claim among borrowers of FHA-insured loans who utilize down payment assistance relative to those who do not is a matter of considerable dispute. However, HUD itself apparently has determined that the

problem, to the extent it exists, may be effectively addressed through improved underwriting standards, which AmeriDream strongly supports.

In the recent June 2007 GAO report entitled "Federal Housing Administration: Modernization Proposals would have Program and Budget Implications and Require Continued Improvements in Risk Management", GAO stated that HUD indicated that the underwriting criteria for purchasers utilizing down payment assistance were "well understood". Specifically, GAO reported that:

> HUD indicated that it had a firm basis for anticipating the performance of zero- and lower-down-payment loans as a result of its experience with mortgages with seller-funded down payment assistance. HUD said it used this experience to establish risk-based insurance premiums and minimum credit scores for zero- and lower-down-payment borrowers.

GAO report, at page 42.

Although HUD did not cite default or claim rates among borrowers utilizing down payment assistance as a justification for its proposed rule, if, as HUD has claimed in other discussions, that is a concern, that may be effectively addressed through applying the underwriting criteria which HUD says it has developed for those borrowers. Doing so would be an example of the right way to address a problem—target it directly, and in a way that improves down payment assistance programs rather than abolishes them.

**(c) DPA Policy Issues Relating to HUD Zero Down Payment Program.** In the past several Congresses, HUD has strongly advocated passage of legislation which would authorize FHA to insure zero-down payment mortgages. AmeriDream does not object to those proposals; in general, we support legislation and other policy initiatives which help low and moderate income families achieve their dream of homeownership. However, AmeriDream strongly objects to HUD's contradictory positions opposing current down payment assistance programs and supporting proposed zero-down payment mortgages.

As HUD itself notes, as reported by GAO in the language excerpted above, the policy issues presented by down payment assistance are highly analogous to those relating to zero-down payment mortgages—so much so that HUD advised GAO that it did not require a pilot program for the latter because it could simply structure its program based on the data acquired through dealing with the former. How, then, can HUD actively lobby for zero-down payment programs while attacking current programs that also do not require a purchaser to come up with a down payment, but instead of requiring the purchaser to borrow the down payment, gives it to the purchaser? Clearly, if there is any meaningful difference between the two programs, down payment assistance confers the greater benefit to the purchaser. If the appraisals in DPA transactions are valid—and, again, AmeriDream very much supports measures designed to ensure that they are—families who purchase homes with down payment assistance rather than zero-down

payment mortgages benefit from a lower purchase price, smaller mortgage payments, and immediate equity in their homes.

Similarly, in the proposed rule, HUD goes out of its way to point out that the proposed rule does not interfere with "market practices in which sellers customarily agree to pay some of buyer's closing costs…[up to] 6 percent of the purchase price." (page 27050) Yet HUD does not seek to explain why seller-financed down payment assistance (applied to future homebuyers) of up to 6 percent is pernicious, while seller-financed closing cost assistance of up to 6 percent is benign. If HUD determines that the 6 percent threshold is meaningful in terms of housing policy, perhaps it may wish to consider limiting the *total* amount of seller-financed down payment assistance *and* closing cost assistance to that amount.

## Rulemaking Considerations

**(a) HUD's Proposed Rule is Impermissibly Arbitrary and Capricious.** HUD's proposal that would eliminate DPA programs cannot be justified. The programs are a proven success and have years of regulatory acceptance and recent legislative actions. HUD has done more than acquiesce; for the past decade, it has actively facilitated DPA programs and, over six years ago, shut down a formal proceeding in which it proposed virtually the same change in the regulations as it proposes here.

This rulemaking is not prompted by any instruction from Congress or implied from any change in the law. HUD concedes that the section of the statute that it purports to apply here is "silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute." In fact, HUD initiated a rulemaking proceeding eight years earlier, which made the very same proposal to restrict downpayment assistance, Congress has amended §1709 several times. Each time, it has left §1709(b) untouched, adding not one prohibition on downpayment assistance. When Congress revises a statute, its decision to leave certain sections unamended constitutes at least acceptance, if not explicit endorsement of the preexisting construction and application of the unamended terms. *See Cook County, Illinois v. United States ex rel. Chandler*, 538 U.S. 119, 132 (2003); *Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 561-62 (1991); *Asarco Inc. v. Kadish*, 490 U.S. 605, 632 (1989).

HUD also shut down its prior rulemaking on prohibited sources of DPA, leaving its existing regulations undisturbed. HUD initiated the earlier rulemaking in September 1999, expressing concern that "the sales price is often increased so that the seller's net proceeds are not diminished … [which] increases FHA's risk that it will not recover the full amount owed if forced to acquire and resell a home purchased by a participating borrower who then defaults on the loan." In January 2001, HUD withdrew the proposed rule, noting that it had received 1,871 comments during the commend period, with only 21 favoring the rule. "The overwhelming majority of comments opposed the rule." 66 FR 2851. HUD said nothing to suggest that the decision was a close call, that it continued to have concerns, or that it planned to revisit the subject at a later time.

For the next six-and-a-half years, HUD made no further proposals for DPA regulations and took no other action inconsistent with DPA programs. The current proposed rule states, however, that "[t]he matter … remains of concern" to HUD for what appears to be the same reason as expressed in the 1999 rulemaking – "that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA." HUD points to little or no evidence, however, for renewing the proposal, or for why its concerns are any different now than when it decided to close its rulemaking in January 2001.

If HUD is relying on more compelling evidence than it had in 2001 to support its concern about sales prices, basic Administrative Procedures Act (APA) notice requirements dictate that the evidence be presented in the proposed rule and subjected to public comment. While "the mere fact that an agency interpretation contradicts a prior agency position is not fatal," *Baptist Health v. Thompson*, 458 F.3d 768, 777 (8th Cir. 2006), a "[s]udden and unexplained change .. or change that does not take account of legitimate reliance on prior interpretation may be arbitrary, capricious, or an abuse of discretion." *Id.*, citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996).

Finally, although HUD is not bound by comments made by individual Members of Congress, the recent comments by Members of the House Subcommittee on Housing and Community Opportunity, coming just a month after HUD issued the proposed rule, are worthy of notice. Subcommittee Members strongly and unequivocally supported the continued operation of DPA programs. Indeed, there was not a single voice in favor of HUD's proposed action. Chairwoman Maxine Waters (CA) noted that between 2000 and 2005, approximately 680,000 homebuyers have been supported by downpayment assistance. Congressman Gary Miller (CA) observed: "Let's not just throw a program out that obviously is benefiting hundreds of low-income people who otherwise would never have an opportunity to own a home." Congressman Al Green (TX) noted that DPA programs help many break the cycle of poverty. Congressman David Scott (GA) commented. "What we can look at and continually strive for is the goodness and decency in man. Nowhere is that more applicable than in making sure that this DPA program continues and is strengthened." These comments further demonstrate that this rulemaking is headed in the wrong direction.

An agency must "supply a reasoned analysis" when it departs from a prior position. *Sun Country Airlines v. F.A.A., 56 F.3d 1531* (D.C. Cir. 1995), citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*, 463 U.S. 29, 42 (1983). There is no sound basis for HUD to abandon a position it has consistently maintained for a decade, and to reverse a path that literally hundreds of thousands have followed in pursuit of home ownership.

**(b) Administrative Procedures Act Compliance.** The regulatory process of a proposed rule is subject to the Administrative Procedures Act. As such, the public, entities affected by the proposed rule, and other stakeholders are able to provide

comments so that their views are considered and appropriately addressed. AmeriDream, its programs and its program participants of which 95% are FHA homebuyers, will be negatively affected should this proposed rule become final.

Prior to the end of the proposed rule comment period, over 14,000 comments have been submitted to the regulations division opposing the proposed rule and requesting it be withdrawn. There are less than 30 comments supporting the proposed rule.

The proposed rule was issued May 11, 2007, and recommended that comments be submitted through www.regulations.gov. However, the regulations.gov site was not operating May 29-31, 2007 and experienced subsequent problems. Additionally, a significant number of comments submitted to regulations.gov are not posted on the website. Less than 3,000 comments are posted.

A statement causing concern to the fairness of this rulemaking process was made by Secretary Jackson that he intended to ban DPA by the end of the year even if critical comments to the proposed rule were received. [June 5, 2007 *Bloomberg News* "U.S. To Ban Down Payment Program Over Objections Jackson Says."]

The first time HUD issued a similar proposed rule in 1999, that rule was ultimately withdrawn in January 2001. The withdraw notice states "by the time of the close of the comment period, HUD received 1,871 comments. Only 21 of these comments favored the rule. The overwhelming majority of comments opposed the rule. Based on these public comments, HUD has determined to withdraw this proposed rule on sources of homeowner downpayment."

(c) **Executive Order 12866 & Regulatory Flexibility Act Best Practices**. We recognize the discretion in applying the EO and RFA best practices to proposed rules is in the sole discretion of the agencies. However, we submit for the record, the "Findings and Certifications" portion of the proposed rule contains flaws in analysis and conclusions. The two primary inaccuracies are: 1) this proposed rule meets all 4 components of the definition of "Significant Regulatory Action" defined in Executive Order 12866. While there is no specific definition for "economically significant" listed in the Executive Order, the description of "having an annual effect on the economy of $100 million or more..." is clearly met by DPA, as detailed above. As such that would then provide under the Regulatory Flexibility Act additional analysis on the DPA subject matter to be undertaken; 2) IRS Revenue Ruling 2006-27 does not warrant the deference given it in the proposed rule. HUD's Mortgagee Letter 2006-13 recognizes charities operating today with a 501(c)(3) tax exemption as allowable sources to provide down payments. The organizations providing DPA contain a 501(c)(3) status and warrant the recognition of a small entity.

(d) **Proposed Regulation Violates the United States Constitution**. The proposed regulation, if adopted, would also violate the United States Constitution's Fifth

Amendment's Equal Protection clause by discriminating against charitable, non-profit organizations that provide down payment assistance in the form of gifts, which are supported through service fees paid by home sellers, while permitting down payment gifts from governmental agencies and instrumentalities, family members, disaster relief grants, and charitable organizations that are not reimbursed, directly, or indirectly, by the seller. The proposed regulation also discriminates among groups of potential homebuyers: those who have access to funds from churches, government agencies, and approved charities will have the means to buy their own homes, while those for whom DPA programs are the only recourse will "suffer precisely the privations [that Congress, HUD, and FHA have long sought] to alleviate." *U.S. v. Califano*, 506 F. Supp. 1230 (D. Mass. 1981).

"Where a governmental regulation creates a classification which results in different treatment of the members of each class, the constitutional requirement of equal protection mandates that the classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relationship to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Id.*, quoting *Reed v. Reed*, 404 U.S. 71 (1971). *See also General Media Communications, Inc. v. Cohen*, 131 F.3d 273, 285 (2d Cir. 1997, cert. denied, 524 U.S. 951 (1998

In this case, HUD asserts that the targeted group of charitable nonprofit organizations offers gifts to homebuyers in a manner that "often" increases the sales price "to the detriment of the borrower and FHA." 72 FR 27048. HUD not only fails to identify reliable evidence to support this assertion, but it literally ignores the fact that hundreds of thousands of borrowers would not have acquired their first homes if not for these programs. Even if the proposed regulation is not foreclosed by the statutory provisions governing applications for mortgage insurance - and AmeriDream makes no concession as to that point - it is flatly inconsistent with the goals of the National Housing Act, and imposes burdens irrationally on some groups and not others. It therefore violates the Equal Protection Clause of the Fifth Amendment.

### Policy Recommendations

In order to best serve the interests of aspiring low and moderate income homebuyers who rely on down payment assistance to purchase their homes, AmeriDream respectfully requests that HUD withdraw its proposed rule. Instead, AmeriDream asks that HUD promulgate new rules which are directly targeted at remedying alleged shortcomings in current DPA programs, not abolishing them.

Towards that end, AmeriDream would like to identify some of the policy options available to HUD to improve all FHA-insured loan programs that use down payment assistance from any allowable source or provide 100% financing. Homebuyers who need assistance, regardless of the source of those funds, or homebuyers qualifying for 100%

financing present a higher risk and need additional services to be successful. These homebuyers have the same very high loan-to-value (LTV) characteristic.

- Require mandatory homebuyer/ownership education for very high LTV homebuyers either in person or online. Pre and post-purchase education has been proven to lower foreclosure rates. Often the difficulty with administering pre and post-purchase education is the location of the classes. It is also suggested that HUD approve long distance learning via the internet to better serve today's homebuyers.

- Mitigate default rates by developing and applying eligibility criteria for borrowers receiving down payment assistance in accordance with the data HUD advised GAO it has acquired and analyzed with respect to such borrowers.

- Refine the current appraisal process:

  o Select appraisers through a blind draw process modeled upon programs currently administered under the auspices of the Department of Veterans Affairs.

  o Require, in accordance with GAO's recommendation, that the appraiser be informed about the use of down payment assistance in the transaction.

  o Require the lender, seller, and appraiser to affirm that no coercion or manipulation took place in connection with the appraisal.

- Limit the total amount of down payment assistance and closing cost assistance to 6 percent of the purchase price of homes financed by FHA-insured mortgages.

- HUD should review and approve organizations that want to provide DPA. HUD currently has an approval process for several of its programs. Approval and oversight of entities providing down payment assistance will help ensure a successful program.

  o In order to offset any administrative costs of implementing a review and approval of organizations to provide DPA, it is recommended that HUD charge an application fee that would appropriately cover HUD's administrative costs.

  o Impose more rigorous standards and certification requirements for down payment assistance organizations, such as strengthened financial requirements, annual disclosures for participating organizations, and greater accountability.

  o Require minimum levels of experience and strong histories of compliance with applicable law for down payment assistance providers seeking to

raise funds from private sellers that operate in states other than their own home state.

o  Require background checks for all officers and board members or other such decision-makers for down payment assistance.

If you have any questions or wish to discuss this comment letter in more detail, please do not hesitate to contact me.  All of the reports referenced in these comments are public documents or are in HUD's possession.  If duplicate reports are needed please let me know.  I may be contacted at (301) 977-9133.

On behalf of AmeriDream, thank you for your consideration of our comments.  We look forward to working with HUD to address these very important issues in a manner which best serves the public interest.

Respectfully submitted,

Ann Ashburn
President
AmeriDream, Inc.

Page 16

# Exhibit N

2 of 201 DOCUMENTS

Copyright 2006 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

June 2, 2006 Friday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1169 words

**HEADLINE:** IRS Ruling Imperils 'Gift Fund' Charities For Home Buyers

**BYLINE:** Jacqueline L. Salmon and Kirstin Downey, Washington Post Staff Writers

**BODY:**

A ruling by the Internal Revenue Service threatens to extinguish a fast-growing -- but controversial -- charitable industry that has funneled hundreds of millions of dollars in cash to first-time home buyers for their down payments.

The unexpected IRS edict throws into question a practice that has helped boost national home ownership rates to a near-record 69 percent in the past six years.

Almost 200 charities, such as AmeriDream, based in Gaithersburg, and Nehemiah Corp. in California, have acted as cash conduits between home sellers and buyers.

Under the system, sellers provide cash to the charities, which then give it to home buyers for their down payments. The sellers, who pay the charities a service fee, often recoup their money by charging a higher price for the homes -- usually 2 or 3 percent more, or an amount equal to the down payment, says a Government Accountability Office study.

Federal authorities have raised concerns, because the mortgages are insured by the Federal Housing Administration. When a home buyer defaults, the FHA loan fund suffers. Home buyers receiving assistance from the charities were more than twice as likely to default or become delinquent in their payments as those who used FHA loans without the charities' assistance, according to a GAO study last year.

Although the system has helped hundreds of thousands of low-income households buy their first homes, it is riddled with abuse, according to the IRS and a variety of government studies. The IRS called the programs "scams" in its ruling last month and said that by providing down payments, the charities actually inflated home prices, making it more likely that homeowners would default on their loans.

Sen. Charles E. Grassley (R-Iowa), chairman of the Senate Finance Committee, who is pushing for charitable reform measures, blasted the down payment assistance charities and praised the IRS ruling.

IRS Ruling Imperils 'Gift Fund' Charities For Home Buyers The Washington Post June 2, 2006 Friday

"Unfortunately, this sector of charities is riddled with individuals who believe their role is to help themselves, not to lend a helping hand," he said. "Some so-called charities need a wake-up call that their business is charitable work."

The IRS's "revenue ruling," issued May 4, states that charities that dole out cash to home buyers that comes from sellers do not qualify as tax-exempt organizations because they benefit private interests, such as builders and other home sellers. The IRS expects to begin revoking some charities' tax-exempt status as it finishes audits, said Marvin Friedlander, chief of the IRS's exempt-organizations technical branch. The IRS also could assess the organizations millions of dollars in income taxes if it decides they are for-profit organizations, not charities.

Executives at the charities say they have helped renters who would not otherwise have been able to buy homes because they were unable to afford the down payment. They dispute the GAO study and disagree with the IRS findings.

Last week, a coalition of the charities asked the Treasury Department to suspend the IRS ruling and solicit public comment before issuing a final decision.

"This could have a sweeping impact on the whole housing industry," said Ann Ashburn, chief executive of AmeriDream, the nation's second-largest down payment assistance charity, and the coalition chair.

The IRS action has also roiled the real estate industry, which depends on the charities as a way to move cash-poor home buyers into the housing market. The charities say they move $500 million a year from sellers to buyers -- money that would disappear if many down payment assistance charities were put out of business.

"Almost anybody building for the first-time home buyer is using these programs," said David Ledford, staff vice president for housing finance and housing policy with the National Association of Home Builders. "Builders are concerned about what would happen not just in the future but for buyers who have already qualified and are going through a sale but who have not closed yet."

Among those who have benefited are Beverly and Kevin Queen, who used $2,500 they received through the AmeriDream down payment program to move their five children out of an Anacostia apartment to a four-bedroom single-family home they bought in Fort Washington in 2000. The only cash the couple had at the time, Beverly Queen said only half-jokingly, "was the $5 holding our bank account open."

Their brick-front home sits on a half-acre backing up to farmland. "This is what I wanted," said Beverly Queen, 44.

The Queens said they have faced no problems keeping up with their mortgage payments.

But consumer advocate Allen Fishbein, director of housing and credit policy with the Consumer Federation of America, said some borrowers have been financially damaged when they fell behind on their mortgages but could not sell the houses because they paid inflated prices.

"Our concern is that people who became homeowners will have trouble making payments," which he said could cause them to lose their homes and wreck their credit.

The IRS has discovered other irregularities in the down payment charities. Although the organizations are meant for home buyers of modest means, the IRS has found that affluent home buyers have improperly taken advantage of them -- even using the "gift funds" to buy vacation residences, Friedlander said.

The charities have also lavished perks on themselves, according to the IRS. Recent audits of 15 of the largest down payment organizations have raised questions about extravagant pay to executives, problematic ties to for-profit companies and inflated prices to low-income buyers that the charities were purporting to help, Friedlander said.

As a result, the IRS has widened its investigation to include an additional 170 charities -- virtually all of the down payment assistance charities that use seller funds.

IRS Ruling Imperils 'Gift Fund' Charities For Home Buyers The Washington Post June 2, 2006 Friday

The "gift fund" mechanism was devised by Don Harris, a Sacramento lawyer and minister who in the late 1990s found a loophole in the rules governing FHA mortgages that generally forbade home sellers from helping customers directly with down payments. He devised the idea of establishing a charity as a go-between for buyers and sellers.

The group Harris started, then called Nehemiah Home Ownership, gave buyers cash for the down payment on an FHA mortgage, generally 3 percent of the purchase price. The sellers then paid the charity an equal amount toward the down payment plus a service fee, typically 0.75 percent of the down payment.

Harris got a ruling from HUD approving the arrangement, and others copied Nehemiah's concept. Within a few years, a multibillion-dollar charitable industry was born, with about 200 nonprofits offering the service. In all, the industry says, it has given down payments to 625,000 households.

These loans make up an increasing amount of the FHA's volume. In 2006, about 28 percent of households receiving FHA loans got their down payments from the charities, up from 1.7 percent in 2000.

**LOAD-DATE:** June 2, 2006

**Exhibit O**

**Bloomberg.com**



## U.S. to Ban Down Payment Program Over Objections, Jackson Says

By Neil Roland

June 5 (Bloomberg) -- The U.S. Department of Housing and Urban Development will ban a down payment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said.

``I'm very much against it,'' Jackson said in an interview. ``I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments.''

The program, which was used by more than 100,000 low- and moderate-income consumers last year, allows nonprofit groups to fund down payments and get reimbursed by sellers. Audits have found it has contributed to higher housing prices and a surge in foreclosures of government-backed mortgages.

HUD is seeking to end it at a time when foreclosure filings have hit an all-time high, spurred by rising delinquencies among borrowers with poor or limited credit histories. The agency last month proposed terminating the assistance and has given the housing industry and consumer groups until July 10 to comment.

The National Association of Home Builders and nonprofits including AmeriDream Inc. and Sacramento, California-based Nehemiah Corp. of America criticized HUD's plan last week. They said the program helps consumers become home owners and should be tightened, not ended.

`Sham' Period?

``Did Secretary Jackson just imply that the governmental process of an open public comment period is just a sham?'' AmeriDream Chief Executive Officer Ann Ashburn said in an e-mail today. ``I know that the American people expect more from Secretary Jackson.''

AmeriDream, based in Gaithersburg, Maryland, makes as much as $100 million a year in fees from the program, Ashburn said.

Under the HUD program, nonprofit groups fund the entire down payment for buyers and get reimbursed by the sellers. The arrangement was designed with HUD's approval to circumvent U.S. rules that bar sellers from giving direct assistance.

Audits have found that home sellers typically pay a service fee to the nonprofits and raise the price of their homes to recoup the money. Once sold, the foreclosure rate on these homes is more than double that of other loans sponsored by HUD's Federal Housing Administration, according to HUD data.

Jackson said in the interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments. A similar 1999 HUD proposal was withdrawn by the agency in 2001 following industry opposition.

To contact the reporter on this story: Neil Roland in Washington at **nroland@bloomberg.net**

*Last Updated: June 5, 2007 12:18 EDT*



© 2007 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

**Exhibit P**



Celebrating *75* Years

## 2007 ADOPTED RESOLUTIONS
*COMMUNITY DEVELOPMENT AND HOUSING*

### RESOLUTION ON DOWNPAYMENT ASSISTANCE PROGRAMS

**WHEREAS,** home ownership is still the most effective wealth creation tool for working middle class families, and

**WHEREAS,** according to a 2004 study by the Milken Institute and the US Conference of Mayors concluded that working families qualifying to purchase a homes only because of receiving a private downpayment assistance grant, experience an $18,000 wealth equity gain through their successful ownership of a single family home, and

**WHEREAS,** homeownership stabilizes neighborhoods and makes for strong families and stronger cities, and

**WHEREAS,** the down payment is the primary barrier to homeownership for many qualified middle class and lower income families, and

**WHEREAS,** nonprofits and cities are currently allowed to assist families with downpayment to unlock the door to homeownership, and

**WHEREAS,** since 1997 over 500,000 families have accessed homeownership from a gift of downpayment assistance from non-profits, and

**WHEREAS,** 40% of the FHA's current single family mortgage production is from FHA loans combined with private downpayment assistance, and

**WHEREAS,** nonprofit and city downpayment assistance programs combined with FHA mortgage insurance is often a cheaper and financially better homeownership solution than other products available in the private mortgage marketplace, and

**WHEREAS,** downpayment assistance nonprofit providers are unregulated and like other communities there are good and bad actors and despite the lack of regulation downpayment has a much better performance record than abusive sub-prime lending products, and

**WHEREAS,** on May 11, 2007 - the U.S Department of Housing and Urban Development issued a Federal Register Notice FR5087-P-01, RIN 2503-AI52 banning the use of private downpayment assistance for use in obtaining an FHA insured loan, even by local governments including cities, and

**NOW THEREFORE BE IT RESOLVED** The US Conference of Mayors calls on Congress to continue to support private downpayment assistance provided by non-profits and cities regardless of contribution source, and Calls on Congress to

hold hearings on private downpayment assistance to gain greater insight into its successes and its need for further regulation to support sustainable homeownership, and Calls on Congress to regulate the downpayment assistance industry to ensure that providers offering services that support successful homeownership are not harmed by unscrupulous providers operating in an unregulated marketplace, and Calls on HUD to withdraw Federal Register Notice FR5087-P-01, RIN 2503-AI52 restoring the ability of local governments and non-profits to provide private downpayment assistance and urges HUD to work with Congress as well as other stakeholders in promoting homeownership in preserving this vital tool in helping cities to stabilize neighborhoods and support working families in creating long term prosperity for their families.

return to resolution index

©2007 The U.S. Conference of Mayors
Tom Cochran, Executive Director
1620 Eye Street, NW, Washington, DC 20006
Tel. 202.293.7330 ~ Fax 202.293.2352
info@usmayors.org

**Exhibit A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED,<br><br>      Plaintiff,<br><br>    v.<br><br>HON. ALPHONSO JACKSON<br>SECRETARY OF THE UNITED<br>STATES DEPARTMENT OF<br>HOUSING AND URBAN<br>DEVELOPMENT,<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. 07-1752(PLF)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>AFFIDAVIT OF ANN ASHBURN</u>

1.    I have personal knowledge of the facts contained herein and I am competent to testify thereto.

2.    I am the President and Chief Executive Officer of AmeriDream, Incorporated ("AmeriDream").

3.    AmeriDream is a 501(c)(3) charity organization.

4.    AmeriDream's mission is "to expand affordable housing opportunities for underserved groups and promote the value of homeownership as the foundation for building strong communities and individual prosperity."

5.    AmeriDream provides a wide range of programs to benefit the families it serves.    These programs include: homebuyer education, loss mitigation counseling, community development, and privately-funded down payment gift assistance.

6. AmeriDream's programs and services have, since their inception, been conducted with the explicit intention of enabling individuals and families to develop wealth through homeownership.

7. AmeriDream serves low- and moderate-income individuals and families who are trying to qualify for Federal Housing Administration ("FHA")-insured loans, many of whom can meet all the requirements for an FHA-insured loan—such as employment history, income, and credit—yet cannot afford to set aside the minimum down payment of three percent of the contract sales price of their home. A disproportionate number of the individuals benefiting from AmeriDream's activities are minorities, legal immigrants, female heads of household or single parents.

8. AmeriDream's down payment assistance ("DPA") program is designed to work with FHA and homebuyers to help homebuyers safely overcome the down payment barrier to homeownership while also giving them positive equity in their home from day one. Home purchases that utilize DPA comprise approximately 40 percent of FHA loans. Approximately 80 percent of the homes purchased with down payment assistance provided by AmeriDream are purchased by first-time homebuyers.

9. AmeriDream has relieved poverty, lessened the burdens of government, and improved community beautification and

maintenance.   AmeriDream also helps thousands of families break the cycle of poverty and develop financial independence, increases homeownership opportunities for thousands of underserved and traditionally disenfranchised populations, replaces blight with development, and sustains strong communities by preventing foreclosures.

10. Since 1999, AmeriDream has provided over 200,000 gifts to homebuyers, totaling over $726 million, resulting in $21.8 billion in FHA-insured loans.   The average gift amount was $3,600, or 3.3% percent of the average purchase price of $108,000, and went to individuals and families with a median income of $49,700.   The median income of AmeriDream gift recipients has averaged 74 percent of the United States Department of Housing and Urban Development ("HUD") national area median income of that same period.

11. Since 1999, the average house price for an AmeriDream gift recipient has been $108,000 compared to the HUD overall average of $116,000.   The AmeriDream average is also lower than the price of homes purchased with gifts from family, employers, or with no gifts.

12. While DPA programs began primarily as faith-based initiatives, AmeriDream relies on other sources of support, particularly within the real estate industry.   This expanded support base—home builders and home sellers—has enabled

AmeriDream to extend down payment assistance to far more families who are then able to purchase homes at valuations validated by HUD-certified appraisers.

13.  This expanded support base has also permitted AmeriDream's DPA programs to grow without reliance on taxpayer dollars.  No government funds are used.

14.  In addition to helping families purchase homes, AmeriDream provides education and other resources needed to help families meet the responsibilities of homeownership.  Since 1999, AmeriDream has educated over 60,000 homebuyers through its homebuyer education course; counseled and assisted approximately 1,200 people to retain their home when confronted with mortgage difficulties; and is responsible 168 affordable housing units in our inner cities, most notably in Southeast Washington, D.C.

15.  AmeriDream's homebuyer education program has, since the Spring 2003, helped give homebuyers the tools to understand what it means to purchase, own, and keep their own home.  The program is free and offered both online and in workshops throughout the country.  An ancillary benefit of this service is that some lenders require evidence of participation in a homebuyer education class.  Therefore, at the end of this course, we provide a certificate of completion.

16.  AmeriDream's loss mitigation service assists homeowners who are having difficulty maintaining ownership of

their homes.   Many homeowners find themselves at the crossroads of financial risks.   For example, an unexpected illness or a job layoff may put homeowners at risk.   AmeriDream's loss mitigation service is a free resource that provides counseling to homeowners in areas including, but not limited to: what to do if they miss their mortgage payment; how to catch up on insufficient escrows; what their rights may be regarding military service; and how to approach their mortgage company about foreclosure alternatives and reinstatement options.

17.   AmeriDream is also one of the largest "anti-predatory" lending programs in America.   AmeriDream has enabled hundreds of thousands of individuals and families to avoid the tricks and traps of predatory lending.

18.   Through its redevelopment program, AmeriDream builds new homes and renovates existing properties to create affordable housing opportunities for low- and moderate-income homebuyers. AmeriDream has invested more $12 million into its redevelopment projects over the last six years.   Projects included affordable housing developments locally in Maryland and Washington, DC, as well as in Florida.   AmeriDream's diverse redevelopment projects have included single-family and multi-family communities; environmentally friendly "green" homes; hurricane resistant homes, and a special accessible home built for a disabled couple.   AmeriDream is currently working with the District of

Columbia government to build a new affordable housing community of 106 homes in Woodson Heights. Without the funding support AmeriDream receives from DPA, it will very likely have to abandon the project.

19. AmeriDream raises money for down payment gifts from various sources. That money is deposited into a commingled account, which is episodically drawn upon to make down payment gifts to qualified homebuyers taken from a waiting list. The money is sent directly to the closing attorney and placed in the homebuyer's escrow account in advance of the loan closing. After the loan closes and the real estate transaction is complete, the seller of that property often pays the organization a service fee, typically within seven to ten days after closing.

20. The service fee is deposited into AmeriDream's fund for DPA and is later used to help homebuyers requesting DPA, fund other charitable programs, and pay administrative costs.

21. The process described above was developed with the full knowledge of HUD's Office of General Counsel. In 1998, HUD's Office of General Counsel reviewed the DPA process used by AmeriDream and found that it was in compliance with HUD's guidelines.

22. In a letter dated October 25, 2005 from HUD to the Government Accountability Office ("GAO"), Assistant Secretary

for Housing and Federal Housing Commissioner Brian Montgomery stated that the Office of General Counsel determined that in those instances where down payment assistance providers (such as AmeriDream) conformed to specified procedures regarding the processing of donations and the awarding of gifts, those gifts did not represent an improper inducement to purchase.

23. HUD's standard form, HUD-1, which itemizes all funds associated with a home purchase, reports the use of down payment assistance.

24. HUD has issued several mortgagee letters clarifying the appropriate use of down payment assistance. The letters did not question the way DPA providers are funded.

25. HUD has made favorable statements about DPA programs in the past.

26. HUD itself has utilized DPA programs when selling some of its own inventory of properties.

27. For approximately 10 years, DPA programs like AmeriDream's have helped over one million individuals and families to buy their own homes, some 80 percent for the first time.

28. Without funding from its sources in the real estate industry, AmeriDream will not be able to continue helping deserving low- and moderate-income families and individuals become homeowners.

29.  Once AmeriDream is prohibited from using funds provided by sources in the real estate industry to provide DPA assistance, the organization will most likely have to close its doors soon thereafter.

30.  AmeriDream is dependent on a highly skilled and specialized staff whose tenures with the organization have lasted many years and who have developed relationships with industry partners and vendors that enable AmeriDream to ensure that its resources are spent effectively and efficiently.  These staff will very probably be recruited to other organizations if AmeriDream is forced to suspend its operations.  A sudden loss of institutional knowledge of this magnitude will have a significantly deleterious effect on our ability to serve the public.  Any loss of staff due to the HUD Rule would likely be so time-consuming and expensive to overcome that it is probable that AmeriDream would not be able to resume operations even if it prevailed in this action.

Under penalty of perjury, I declare to the best of my knowledge and belief that the foregoing is true and correct.

Executed on October 9, 2007

_____
Ann Ashburn

**Exhibit B**

# STATEMENT OF BRIAN D. MONTGOMERY

Assistant Secretary for Housing – Federal Housing Commissioner
U.S. Department of Housing and Urban Development

Hearing before the United States Senate Committee on
Banking, Housing, and Urban Affairs
Subcommittee on Housing and Transportation

United States Senate



"FHA: Issues for the Future"

June 20, 2006

Thank you Chairman Allard and Ranking Member Reed for inviting me to be here today to testify on the Administration's proposed FHA Modernization Act.

As you are all aware, the Federal Housing Administration was created in 1934 to serve as an innovator in the mortgage market, to meet the needs of citizens otherwise underserved by the private sector, to stabilize local and regional housing markets, and to support the national economy. This mission is still very relevant, perhaps now more so than ever.

Moreover, the FHA model represents the very best of what government can and should do. Since its inception, FHA has helped more than 34 million Americans become homeowners. By operating through a private distribution network, FHA efficiently reaches families in need of safe and affordable home financing. Simply put, FHA insurance protects lenders against loss, enabling these private sector partners to offer market-rate mortgages to homebuyers who would otherwise remain unserved or underserved. FHA provides a substantial benefit to families, communities, and the entire national economy.

We believe that FHA should continue to play a key role in the national mortgage market and I'm here today to make the case for changes to the National Housing Act that will permit us to continue to fulfill our critical mission.

Let me explain. In recent years, FHA's outdated statutory authority has left the agency out of synch with the rest of the lending industry. Over the last decade, the mortgage industry transformed itself, offering innovative new products, risk-based pricing, and faster processing with automated systems. Meanwhile, FHA continued to offer the same types of products with the same kinds of pricing, becoming less attractive to lenders and borrowers alike.

As a result, FHA's business has dropped precipitously in housing markets all across the nation. For example, in Chairman Allard's home state of Colorado, FHA's volume has dropped from 42,609 loans in 1999 to 18,543 loans in 2005. For Ranking Member Sarbanes, during that same time period, FHA's volume in Maryland dropped from 61,201 to 11,824 loans. And for Ranking Member Reed, FHA's volume in Rhode Island is down from 4,695 loans in 1999 to just 906 loans in 2005.

FHA has fallen behind for a variety of reasons, from outdated business practices to cumbersome program requirements. Over the last nine months, we have made significant changes, streamlining and realigning FHA's operating procedures. While these changes are good and long overdue, they are not enough, a point that FHA's industry partners have clearly conveyed. Therefore, FHA is now requesting that we amend the law to give FHA the flexibility it needs to fulfill its original mission in today's marketplace.

As the dynamic mortgage market passed FHA by, many homebuyers – first-time homebuyers, minority homebuyers and homebuyers with less-than-perfect credit – were

2

left with fewer safe and affordable options. Many of them became homebuyers, but paid a steep price to do so, especially those living in higher cost states, such as California, New York, Rhode Island, and Massachusetts, to name a few.

Without a viable FHA alternative, many homebuyers turned to high-cost financing and nontraditional loan products to afford their first homes. While low initial monthly payments seemed like a good thing, the reset rates on some interest-only loans are substantial and many families are unable to keep pace when the payments increase. In addition, prepayment penalties make refinancing cost-prohibitive. According to Moody's Economy.com, more than $2 trillion of U.S. mortgage debt, or about a quarter of all mortgage loans outstanding, comes up for interest rate resets in 2006 and 2007. While some borrowers will make the higher payments, many will struggle. Some will be forced to sell or lose their homes to foreclosure. The foreclosure rate for subprime loans is twice that of prime loans. And I think we can all agree that foreclosures are bad for families, bad for neighborhoods, and bad for the economy as a whole.

That said, the FHA Modernization Act is part of the solution. FHA reform is designed to give homebuyers who can't qualify for prime financing a choice again.

Moreover, the FHA bill proposes changes that will strengthen FHA's financial position, improving FHA's ability to mitigate and compensate for risk. The proposed changes would permit FHA to operate like every other insurance company in the nation, pricing its products commensurate with the risk, as opposed to having some clients pay too much and some too little. Imagine if a car insurance company charged all clients the same premium – the 17-year-old teenager and a 40-year-old adult would pay the same rate. Is that fair? With a blended rate, those who know they're paying too much find themselves another insurance company. That leads to a portfolio that is increasingly lopsided: too many riskier borrowers, too few safer borrowers, and an insurance fund that poses a risk of default. This type of adverse selection is exactly what happened to FHA over the last decade. Those who were lower credit risks went elsewhere. The premium changes proposed in the bill will restore balance to the FHA funds, providing appropriate levels of revenue to operate in a more fiscally sound manner.

I know my introduction was lengthy, but I want you to understand how important FHA reform really is – for FHA, for the homebuyers we serve, and for the industry as a whole. FHA's private sector partners – the brokers, the realtors, the lenders, the home builders – want to tell their clients about the FHA alternative. They want low- to moderate-income homebuyers to have a safer, more affordable financing option. They want FHA to be a viable player again.

Now let me explain a little bit about the simple changes we're proposing. For one, we're proposing to eliminate FHA's complicated downpayment calculation and three percent cash investment requirement. Before the rest of the market began offering low downpayment loans, FHA was often the best option for first-time homebuyers because it required only a minimal downpayment. But, as I said before, the market passed FHA by. Last year, 43 percent of first-time homebuyers purchased their homes

3

with *no* downpayment. Of those who did put money down, the majority put down two percent or less.

The downpayment is the biggest barrier to homeownership in this country, but FHA has no way to address the barrier without changes to its statute. The FHA Modernization Act proposes to permit borrowers to choose how much to invest, from no money down to one or two or even ten percent.

The bill also proposes to provide FHA the flexibility to set the FHA insurance premiums commensurate with the risk of the loans. For example, no downpayment loans would be priced slightly higher, yet appropriately, to give homebuyers a fairly-priced option and to ensure that FHA's insurance fund is compensated for taking on the additional risk. FHA would also consider the borrower's credit profile when setting the insurance premium. FHA would charge lower-credit risk borrowers a lower insurance premium than it does today, and higher-credit risk borrowers would be charged a slightly higher premium. In so doing, FHA could reach deeper into the pool of prospective borrowers, while protecting the financial soundness of the FHA Fund.

A slightly higher premium would increase a borrower's monthly payment only minimally. For example, on a $200,000 loan, a 1 percent upfront premium financed into the loan would cost the borrower $12.64 per month; a 2 percent premium would cost $25.28 and a 3 percent premium, $37.92. Clearly, this higher premium is still affordable. Moreover, it's a smart investment, because the borrower is paying for the FHA insurance to obtain a market rate loan.

The primary concerns with a risk-based pricing approach are that FHA will target people who shouldn't be homebuyers and charge them more than they should pay. I want to address these concerns directly. Our goal is to reach families who are capable of becoming homeowners and to offer them a safe and fairly-priced loan option.

With a risk-based premium structure, FHA can reach hard-working, credit-worthy borrowers -- such as store clerks, bus drivers, librarians, and social workers -- who, for a variety of reasons, do not qualify for prime financing. Some have poor credit scores due to circumstances beyond their control, but have put their lives back together and need a second chance. For some, the rapid appreciation in housing prices has simply outpaced their incomes. Many renters find it difficult to save for a downpayment, but have adequate incomes to make monthly mortgage payments and do not pose a significant credit risk. They simply need an affordable financing vehicle to get them in the door. FHA can and should be there for these families.

The higher premiums that FHA will charge some types of borrowers are still substantially lower than they would pay for subprime financing. Let me repeat that point: the higher premiums that FHA will charge some types of borrowers are still substantially lower than they would pay for subprime financing. The cost of a loan with a higher FHA insurance premium is still substantially lower than the cost of a loan with a higher interest rate. For example, if FHA charged a 3 percent upfront insurance premium for a $200,000

4

loan to a credit-impaired borrower versus that same borrower obtaining a subprime loan with an interest rate 3 percent above par, the borrower would pay over $255 more in monthly mortgage payments with the subprime loan and over $125,000 more over the life of the loan, if they kept it for a full 30-year term.

Moreover, as I stated earlier, FHA intends to lower the insurance premium for many borrowers.  FHA will charge lower-risk borrowers a substantially lower premium than these types of borrowers pay today.  For example, homebuyers with higher credit scores who choose to invest at least 3 percent in a downpayment may pay as little as half a percent upfront premium.

So, while FHA may charge riskier borrowers more (and less risky borrowers less) than it does today, the benefit is three-fold.  First, FHA will be able to reach additional borrowers the agency can't serve today. There is nothing that upsets us more than to see people taken to the cleaners when they would have fared better with an FHA-insured product.  Second, these borrowers will pay less with FHA than with a subprime loan. And finally, the FHA Fund will be managed in a financially sound manner, with adequate premium income to cover any losses.

Another change proposed in the FHA Modernization Act is to increase FHA's loan limits.  Members of Congress from high-cost states have repeatedly asked FHA to do something about our antiquated loan limits.  This bill finally answers their concerns. FHA's loan limit in high-cost areas would rise from 87 to 100 percent of the GSE conforming loan limit and in lower-cost areas from 48 to 65 percent of the conforming loan limit.  In between high and lower-cost areas, FHA's loan limit will increase from 95 to 100 percent of the local median home price.  This change is extremely important and crucial in today's housing market.  In many areas of the country, the existing FHA limits are lower than the cost of new construction.  Buyers of new homes can't choose FHA financing in these markets.  In other areas, FHA has simply been priced out of the market.  For example, in 1999, FHA insured 127,000 loans in the state of California; in 2005, FHA insured only 5,000.

FHA is also proposing some changes to specific FHA products.  For example, the bill proposes to permit FHA to insure mortgages on condominiums under its standard single family product.  The existing condo program is very specialized and burdensome, as a result of outdated statutory provisions that were written at a time when condominiums were an unfamiliar form of ownership.  Condos represent 25 percent of the new and 12 percent of the existing home market today and serve as one of the primary forms of affordable housing for first-time homebuyers.  In fact, condos tend to be closer to city centers and offer lower income borrowers an opportunity to buy an affordable home without moving far from their jobs and away from the public transportation that gets them to those jobs.  Therefore, FHA should be able to serve condo buyers, just like any other homebuyers, under its standard single family program.

Our reform bill also proposes to modernize the Title I manufactured housing program, eliminating the portfolio insurance feature from the program and increasing the

loan limits to reflect the real cost of manufactured housing today. The existing statute restricts FHA claim payments to 10 percent of the value of a lender's loan portfolio. With portfolio insurance, lenders are not guaranteed coverage against loss and subsequently price their loans for additional risk. The higher loan costs, in turn, increase the likelihood of borrower default. With additional default risk, but insufficient coverage, the losses grew to unsustainable levels in the 1990s and Ginnie Mae pulled out of the program. Ginnie Mae has testified that with the elimination of this outdated insurance model it would reconsider participation in the Title I securities market, which will bring in more lenders and drive down the costs of manufactured home financing.

Finally, the FHA Modernization Act offers some changes to the Home Equity Conversion Mortgage (HECM) program, which enables senior homeowners, aged 62 years or older, to tap into their home equity to live comfortably in their golden years. The bill proposes elimination of the cap on the number of loans FHA can insure; a single, national loan limit set at conforming; and a new HECM for Home Purchase product to permit seniors to move from the family home to more suitable senior housing and convert the purchase loan into a HECM in a single transaction. Today, seniors who want to move, but need additional cash flow to pay their living expenses, must purchase a new home and take out a HECM in two distinct transactions, resulting in two sets of loan fees and charges.

Let me repeat a point I made earlier in the testimony. I want to assure you that the changes we are proposing will not increase the overall risk of the MMI Fund or impose a potential cost on taxpayers. We are proposing to manage the Fund in a financially prudent way, beginning with the change in FHA pricing to match premiums with risk. This will avoid FHA being exposed to excessive risk, as it is today, because some borrowers who use FHA are under-charged for their risk to the Fund while others are overcharged. Of course, we will continue to monitor the performance of our borrowers very closely, and make adjustments to underwriting policies and/or premiums as needed.

I know I've talked a lot here today, but I want to convey to you how passionate I am about the proposed changes. I believe we have an opportunity to make a difference in the lives of millions of low- and moderate-income Americans. We have a chance to bring FHA back into business, to restore the FHA product to its traditional market position. To all those families who can buy a home with prime conventional financing, I say, "Go for it!" They're fortunate and they should take full advantage of that benefit. But for those who can't, FHA needs to be a viable option. And when people ask me why are we proposing these changes, I tell them these exact words: "Families need a safe deal, at a fair price. Families need a way to take part in the American Dream without putting themselves at risk. Families need FHA."

I want to thank you again for providing me the opportunity to testify here today on the FHA Modernization Act. I look forward to working with all of you to make these reforms a reality.

6

**Exhibit C**

George Mason University School of Public Policy
Center for Regional Analysis

# *National Economic Impact of Non-Profit Down Payment Assistance Providers*

by

Lisa A. Fowler, PhD
Stephen S. Fuller, PhD

Center for Regional Analysis
George Mason University
Fairfax, Virginia

March 2007

# HIGHLIGHTS

### Table I. Total Economic Impacts of NDPA Providers by Year
### (in billions of 2005 $s, except New Jobs)

| Year | Direct Expenditures | Total Output | Personal Earnings | New Jobs |
|---|---|---|---|---|
| 2000 | 0.5 | 1.4 | 0.5 | 12,506 |
| 2001 | 1.1 | 2.5 | 0.8 | 21,439 |
| 2002 | 1.9 | 4.3 | 1.4 | 36,840 |
| 2003 | 2.9 | 6.1 | 2.0 | 51,924 |
| 2004 | 3.3 | 5.9 | 1.9 | 50,232 |
| 2005 | 3.2 | 4.6 | 1.5 | 38,540 |
| **Grand Total** | **12.9** | **24.8** | **8.2** | **211,481** |

Notes: Total Wealth Accumulation = total increase in home equity
Direct Expenditures = expenditures by new homeowners in excess of what they would have spent as renters
Total Output = conitrubtion to the total value of goods and services generated in the national economy
Personal Earnings = new wages and salaries earned by workers in the economy
New Jobs = new full-time, year-round equivalent jobs support by the direct expenditures and indirect impacts

Key findings from this analysis include:

• NDPA organizations provided downpayment gifts to more than 627,000 families between 2000 and 2005. Without this downpayment assistance, many of these families would not have been able to achieve the goal of homeownership.

• The opportunity for homeownership provided by NDPA programs generated additional spending by families totaling $12.9 billion. These expenditures supported 211,000 new jobs, which generated $8.2 billion in increased personal income and $24.8 billion in total national economic output.

• Homeowners receiving assistance from NDPA programs benefited from the exceptional increase in housing values between 2000 and 2005. Because these families were able to become homeowners, they saw their total wealth grow by $9.6 billion over this period.

• Homebuyers in NDPA programs generate jobs and economic output through the transactions of purchasing the home. These real estate transactions resulted in total additional spending of $5.5 billion, which generated 143,062 new jobs, $6.0 billion in additional personal income, and $17.4 billion in total economic output between 2000 and 2005.

• New homeowners spend about 30% more on housing than they did as renters. This increased spending encompasses the initial downpayment amount, and also reflects the fact that most homebuyers move into a larger and higher quality housing unit. Between 2000 and 2005, homebuyers participating in NDPA programs spent an additional $4.7 billion more on housing payments than they would have had they remained renters. Some of this spending goes towards paying off interest, which would support economic activity in the financial services sector. However, the effect will be very small, so it is assumed that the additional spending associated with ownership costs does not have a multiplier effect in the national economy.

**Exhibit D**

Appendix IV

# Comments from the Department of Housing and Urban Development



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

October 25, 2005

ASSISTANT SECRETARY FOR HOUSING-
FEDERAL HOUSING COMMISSIONER

Mr. William B. Shear
Director
Financial Markets and Community Investments
United States Government Accountability Office
441 G Street, NW
Washington, D. C. 20548

Dear Mr. Shear:

Thank you for permitting FHA to respond to the GAO Draft Report 06-24, "MORTGAGE FINANCING: Additional Action Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance." As you know, FHA has been examining these types of down payment assistance programs for the past several years. The report confirms FHA's own analysis of loan performance and the findings of an independent contractor hired by FHA to evaluate how seller-funded gift programs operate.

The GAO report provides additional analysis and reiterates that borrowers receiving seller-funded down payment assistance pay more for their homes than homebuyers who receive no such assistance or assistance from down payment programs funded without seller involvement. Borrowers who rely on seller-funded down payment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA. Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan.

FHA has also determined that a Zero Down program would better serve borrowers who have little savings for a down payment, but who have steady incomes and acceptable credit. The proposed Zero Down program was designed to address the concerns that GAO raises in the report – that buyers using seller-funded gifts are paying too much for their homes and putting themselves in a risky position, as evidenced by the historical loan performance – and to ensure that FHA was keeping pace with the rest of the mortgage market, where 100% financing products have become increasingly common.

That said, although the report reaffirms FHA's own findings, the agency is disappointed that the recommendations do not acknowledge that a Zero Down program would provide FHA with a better way to serve families in need of down payment assistance. FHA represents a better, safer

-2-

financing alternative for many families with blemished credit. Providing a new product would serve these families well, by offering consumer protections to ensure that these families would not pay more than they should for their homes or their financing, and that these families would have the benefits of loss mitigation to help them stay in their homes should they experience any future financial hardship.

FHA's responses to the individual recommendations are as follows:

<u>GAO Recommendation</u>: To provide FHA with data that would permit it to identify whether down payment assistance is from a seller-funded down payment assistance provider, modify FHA's "gift letter source" categories to include "nonprofit seller-funded" and "nonprofit non-seller-funded" and require lenders to accurately identify and report this information when submitting loan to FHA.

<u>FHA Response</u>: FHA agrees with this recommendation and will modify the systems to collect this additional information.

<u>GAO Recommendation</u>: To more fully consider the risk posed by down payment assistance when underwriting loans, include the presence and source of down payment assistance as a loan variable in FHA's TOTAL Scorecard.

<u>FHA Response</u>: Consistent with past practice, HUD will consider and incorporate into TOTAL all appropriate factors, including the presence and source of down payment assistance, that can with historical data be shown empirically relevant for assessing borrower credit risk with respect to loan performance.

<u>GAO Recommendation</u>: To ensure that FHA has an ongoing understanding of the impact that down payment assistance has on loan performance, implement routine and targeted performance monitoring of loans with down payment assistance, including analyses that consider the source of assistance.

<u>FHA Response</u>: FHA agrees and believes that it already performs monitoring of portfolios of such mortgages based on the information residing in its system of records. Obviously, FHA's concern, based on loan performance data, resulted in seeking the services of a contractor to analyze and explore these down payment assistance programs in detail.

<u>GAO Recommendation</u>: To improve the forecasting ability of the loan performance models used in the annual review of actuarial soundness, consider the presence and source of down payment assistance.

<u>FHA Response</u>: FHA incorporated the source of down payment assistance into its FY 2005 Actuarial Review of the Mutual Mortgage Insurance Fund, a variable that has proved to have considerable explanatory power. FHA informed GAO that it planned to incorporate this variable during its interviews about down payment assistance.

Appendix IV
**Comments from the Department of Housing
and Urban Development**

-3-

<u>GAO Recommendation</u>: To ensure appraisers have the information necessary to establish the market value of the property, require lenders to inform appraisers about the presence of down payment assistance from a seller-funded source.

<u>FHA Response</u>: Lenders are required to inform appraisers about all seller concessions, including down payment assistance. Appraisers are aware of seller funded down payment assistance providers in their markets, as evidenced by the findings of the Concentrance study referenced several times in the GAO report. Regardless, FHA will consider imposing the additional requirement that the lender inform the appraiser when down payment assistance is provided by a nonprofit that relies on contributions from the seller.

<u>GAO Recommendation</u>: Because down payment assistance provided by seller funded entities is, in effect, a seller inducement, revise FHA standards to treat assistance from a seller-funded nonprofit as a seller contribution, and therefore subject to the 6 percent limit on seller contributions and the prohibition against using seller contributions to meet the 3 percent borrower contribution requirement.

<u>FHA Response</u>: HUD's Office of General Counsel has advised that the timing of the payments is a key point in whether there is a seller contribution that is an inducement to purchase. If a gift is made from a nonprofit entity (either directly or through an entity such as the closing agent), from the nonprofit's own funds, prior to the completion of the closing, the gift becomes the homebuyer's property so the buyer can make the three percent required down payment. After completion of the closing, a seller makes a contribution (perhaps through the closing agent as well) from the gross sales proceeds to the nonprofit entity. The donation is commingled with other nonprofit funds that later become a source of donations to buyers other than the buyer who has just closed the purchase of the seller's property. Because the buyer has not received funds from the nonprofit that can be traced to the seller's contribution, there has not been an inducement to purchase provided by the seller.

Thank you again for the opportunity to review the GAO report. Consistent with the spirit of your report and its recommendations, HUD will continue to take all steps needed for responsible financial management of its down payment assistance programs, while ensuring that FHA programs serve effectively families who are otherwise underserved by the private sector.

Sincerely,

Brian D. Montgomery
Assistant Secretary for Housing-
Federal Housing Commissioner

**Exhibit E**



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, D.C. 20410-8000

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

January 12, 2004

**MORTGAGEE LETTER 2004-02**

**TO:  ALL APPROVED MORTGAGEES**

**SUBJECT**:  Temporary Suspension of General Insurance and Special Risk Insurance
Endorsement Authority

This Mortgagee Letter informs you that the Department of Housing and Urban
Development will temporarily cease endorsing any new single family mortgages that are to be
insured under either the General Insurance (GI) Fund or the Special Risk Insurance (SRI) Fund.
The Department's existing commitment authority for GI and SRI Fund loans, while it operates
under the continuing resolution, will soon be exhausted.

Subject to availability of commitment authority, HUD will stop endorsing GI and SRI
fund mortgages on or before close of business January 14, 2004 until the enactment of
supplemental commitment authority during the continuing resolution or new commitment
authority becomes available by enactment of an appropriations bill for FY 2004.  The GI and
SRI funds include, but are not limited to, Section 203(k) rehabilitation mortgages, Section 234(c)
condominium unit mortgages, mortgages made pursuant to the Hawaiian Homelands program
under Section 247 and reverse mortgages under HUD's Home Equity Conversion Mortgage
(HECM) program (Section 255).

**Mortgages to be insured as obligations of the Mutual Mortgage Insurance Fund
(i.e., under Section 203(b) of the National Housing Act) are not subject to this temporary
suspension.**

Mortgagees may choose to hold the case binders or send them to the jurisdictional
Homeownership Center.  Case binders submitted for endorsement processing more than 60 days
after mortgage closing must comply with the late request for endorsement requirements
contained in Chapter 3 of HUD Handbook 4165.1 REV-1.

While HUD regrets this suspension of endorsement activity and any disruption to lender
processing, it is made necessary by budgetary constraints.

2

      If you have any questions regarding this Mortgagee Letter, please contact your Homeownership Center in Atlanta (888) 696-4687; Denver (800) 543-9378; Philadelphia (800) 440-8647; or Santa Ana, CA (888) 827-5605.

                    Sincerely,

                    John C. Weicher
                    Assistant Secretary for Housing-
                      Federal Housing Commissioner

**Exhibit F**

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHNGTON, D.C. 20410-8000

January 16,2002

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

MORTGAGEE LETTER 2002-2

TO:    ALL APPROVED MORTGAGEES

SUBJECT:  Credit Policy Issues-Payment of Borrower Obligations by Nonprofits

The purpose of this Mortgagee Letter is to clarify and amplify existing FHA policy regarding mortgage credit underwriting.  FHA has become aware of some nonprofit entities providing gifts to homebuyers for the purpose of paying off installment loans, credit cards, collections, judgments, and similar debts.  The nonprofit receives a contribution for the payment of these debts from the seller of a property.  This practice raises underwriting issues and also falls within the guise of an inducement to purchase a property.

When a lender underwrites a mortgage loan, it is responsible for adequately analyzing the probability that the borrower will be able to repay the mortgage obligation in accordance with the terms of the loan.  The National Housing Act, its implementing regulations, and HUD Handbook 4155.1 REV-4 CHG-1 require the mortgagor to have the financial ability to be able to make the monthly mortgage payments.  FHA is concerned that payment of a purchaser's debt by a property seller, or by a nonprofit entity which obtains a contribution from the seller for this purpose, may result in a riskier mortgage loan.  Elimination of consumer debt under these circumstances (i.e., prior to obtaining FHA insured mortgage financing in order to have a favorable debt to income ratio), could result in a homebuyer using additional consumer credit which, when added to mortgage loan payments, could exceed a borrower's ability to pay.  High debt ratios with outstanding judgments, write offs, and collections are indicative of problems that should raise underwriting concerns.  When a property seller or a nonprofit has paid a homebuyer's consumer debts in order to meet debt to income ratios, the mortgage credit approval of such a borrower would not be considered by FHA to be acceptable underwriting.

In addition to underwriting, FHA deems the payment of consumer debt by third parties to be an inducement to purchase.  Although FHA policy permits sellers and other parties to make contributions of up to six percent of the sales price of a property toward a buyer's actual closing costs and financing concessions, this policy applies exclusively to the provision of mortgage financing.

2

Clearly established FHA policy is that <u>other</u> expenses paid on behalf of the borrower result in a dollar-for-dollar reduction to the sales price.  The dollar-for-dollar reduction to the sales price also applies to gift funds not meeting the requirement that the gift be for downpayment assistance and is provided by an acceptable source.  Therefore, if an underwriter determines that unique circumstances warrant credit approval for an application for insured mortgage financing when a gift from other than a family member has been made to pay off debts, the gift must be treated as an inducement to purchase and the sales price must be reduced by a commensurate amount in calculating the maximum insurable mortgage.

Some mortgagees may not have understood this portion of existing HUD policy so the provisions of this Mortgagee Letter will be effective for all case number assignments issued 30 days after the date of this Mortgagee Letter.

If you have any questions about this Mortgagee Letter, please contact your local Homeownership Center in Atlanta (888-696-4687), Denver (800-543-9378), Philadelphia (800-440-8647), or Santa Ana (888-827-5605).

Sincerely,

John C. Weicher
Assistant Secretary for Housing-
    Federal Housing Commissioner

**Exhibit G**

**United States Government Accountability Office**

# GAO

Report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

February 2005

# MORTGAGE FINANCING

## Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products



**G A O**
Accountability ★ Integrity ★ Reliability

| | |
|---|---|
| **Most Low and No Down Payment Products Require Some Form of Borrower Investment** | Most low and no down payment mortgage products require some form of borrower investment, either a borrower contribution or cash reserve, as a way of reducing risk and assuring that the borrower has a stake in the property. Low down payment products offered by FHA, Fannie Mae, Freddie Mac and private insurers require a cash investment of at least 3 percent from the borrower. No down payment mortgage products offered by VA, RHS, Fannie Mae, Freddie Mac, and some private insurers require either no down payment or a minimum amount (such as $500 in Fannie Mae's MyCommunityMortgage program). |

Many institutions permit down payment assistance. FHA stipulates that the gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or entity associated with them.  FHA mortgagee letters state that "gifts from these sources (seller, builder, etc.) are considered inducements to purchase and must be subtracted from the sales price." However, FHA allows nonprofit agencies that may receive contributions from the seller to provide down payment assistance to the borrower.  In contrast, Fannie Mae, Freddie Mac, and some of the private insurers generally do not allow down payment funds, either directly or indirectly, from an interested or seller-related party to the transaction. Fannie Mae and Freddie Mac officials told us that such seller-related contributions could contribute to an overvaluation of the price of the property.

Even where borrowers pay no down payment they very often must pay a minimum percentage of closing costs from their own funds.[18] FHA requires that borrowers pay 3 percent of the total loan amount toward the purchase of the home. This contribution may be used for down payment or closing costs. Thus, FHA borrowers may finance closing costs, within limits. FHA borrowers may also finance their insurance premium. Unlike FHA, some mortgage institutions do not allow financing of the closing costs and the insurance premiums in the first mortgage. VA generally allows payment of all closing costs to be negotiated while restricting those that may be charged to the borrower. VA allows borrowers to finance their insurance premium, called the funding fee. In the section 502 Guaranteed Loan program for RHS, borrowers may pay closing costs but they are not required to do so and may be allowed to finance the closing costs and their

---

[18]Closing costs could include a loan origination fee, a mortgage recordation fee, a title transfer tax, appraisal fees, attorney fees, and title insurance.