UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                                )
AMERIDREAM, INCORPORATED,            )
                                                                )
          Plaintiff,                                     )
                                                                )
          v.                                              )          Civil Action No. 07-1752 (PLF)
                                                                )
HON. ALPHONSO JACKSON                    )
SECRETARY OF THE UNITED               )
STATES DEPARTMENT OF                     )
HOUSING AND URBAN                          )
DEVELOPMENT,                                   )
                                                                )
          Defendant.                                  )
_____)

### MOTION FOR LEAVE TO FILE
### BRIEF OF AMICI CURIAE

The Genesis Foundation ("Genesis") and the Home Downpayment Gift
Foundation ("HDGF") together provide over half of the seller funded down payment assistance
that HUD's proposed Regulation will abolish on October 31, 2007, unless this Court grants
AmeriDream's preliminary injunction motion.  Specifically, between the two of them, Genesis
and HDGF provide over 50,000 individuals and families a year with downpayment assistance.
In August 2007 alone, Genesis enabled 2,938 families to become homeowners; HDGF enabled
1,656 additional families to do the same.  From January through September of this year alone,
Genesis and HDGF helped 30,000 (mostly first-time) homeowners, who in turn created $165
million in homeowner equity.  Genesis and HDGF provided additional services to keep clients in
their homes.  For example, HDGF provided pre-homebuyer education to more than 7,000
individuals and families this year.  HDGF's Rainy Day Program provided nearly $500,000 this
year in emergency mortgage payment grants to assist homeowners who have lost their jobs.

For these reasons, Genesis and HDGF are intimately familiar with the needs of the low- and moderate-income families who rely on seller-funded downpayment assistance, because Genesis and HDGF serve such families as clients every day. Genesis and HDGF can assist the Court by explaining from their perspectives the irreparable harm that they and the public will suffer in the absence of the injunctive relief that AmeriDream seeks against HUD. Accordingly, Genesis and HDGF respectfully move the Court to accept and file in this cause the Proposed Brief of Amici Curiae, attached as Exhibit 1.

A federal district court has inherent authority to accept briefs that amici curiae file. *Animal Prot. Inst. v. Martin*, 2007 WL 647567 at *1 (D. Me. 2007); *Resort Timeshare Resales, Inc. v. Stuart*, 764 F.Supp. 1495, 1500 (S.D. Fla. 1991); *United States v. Michigan*, 116 F.R.D. 655, 660 (W.D. Mich. 1987). This Court has explained that it has no amicus rules, but that such briefs "'shall avoid repetition of facts or legal arguments made in the principle [sic]. . . brief, and shall focus on points not made or adequately elaborated upon in the principle [sic] brief although relevant to the issues before this Court." *Rick v. Simons*, 1990 WL 116834, *1, n.1 (D. D.C. 1990). An amicus curiae "'does not represent the parties but participates only for the benefit of the Court.'" *United States v. Microsoft Corp*., 2002 WL 319366, *2 (D. D.C. 2002) (quoting *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1064 (7th Cir. 1997)). As Judge (now Justice) Alito explained: if an amicus has an interest, the amicus brief is relevant, and it alerts the court to possible implications of the case, leave should be granted so that the court is not deprived of the assistance of a good brief. *Neonatology Assocs., P.A. v. Comm'r of Internal Revenue*, 293 F.3d 128, 131-134 (3d Cir. 2002).

Genesis and HDGF have the most direct and vital interest possible. Unless this Court preliminarily enjoins HUD's implementation of its new rule, HUD will put Genesis and

BDDB01 4918759v1

HDGF out of business. The proposed amicus brief addresses key on-point authorities applying injunctive relief standards to agency decisions like HUD's that have not been cited in any prior brief. Genesis and HDGF also provide information based upon their own first-hand experience about the irreparable harm that they and would-be, first-time homebuyers will suffer unless the Court grants an injunction. In this way, Genesis's and HDGF's brief meets the standards for the filing of an amicus brief by providing the Court with a greater understanding of how the HUD Regulation would harm them and the public interest if this Court denies equitable relief.

Pursuant to LCvR 7(a), this Motion recites the specific points of law and authority and provides a concise statement of fact that supports this Motion.

Undersigned counsel has contacted counsel for AmeriDream and is authorized to represent that AmeriDream consents to this Motion.

WHEREFORE, Genesis and HDGF respectfully move the Court to accept and file in this cause the Proposed Brief of Amici Curiae, attached as Exhibit 1.

Respectfully submitted this 19th day of October, 2007.

Respectfully submitted,

/s/ Frank S. Swain
Frank S. Swain, #427792
Baker & Daniels LLP
805 15th Street NW, Suite 700
Washington, DC 20005
Telephone 202.312.7440
Facsimile 202.312.7460
frank.swain@bakerd.com

Attorneys for Genesis Foundation and Home
Downpayment Gift Foundation

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 19, 2007, a copy of the foregoing was filed

electronically. Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system. Parties may access this filing through the Court's system.

> Lee T. Ellis, Jr.
> Baker & Hostetler LLP
> Washington Square, Suite 1100
> 1050 Connecticut Avenue, N.W.
> Washington, DC  20036
>
> Daniel Van Horn
> Assistant United States Attorney for the District of Columbia
> 555 4th Street, N.W.
> Washington, DC  20001
>
> Robert M. Couch
> General Counsel
> Office of General Counsel
> U.S. Department of Housing and Urban Development
> 451 7th Street, S.W.
> Washington, DC  20410-0500

/s/ Frank S. Swain

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED,<br><br>        Plaintiff,<br><br>v.<br><br>HON. ALPHONSO JACKSON<br>SECRETARY OF THE UNITED<br>STATES DEPARTMENT OF<br>HOUSING AND URBAN<br>DEVELOPMENT,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 07-1752 (PLF) |

## **PROPOSED BRIEF OF AMICI CURIAE**

### **Introduction**

The Genesis Foundation ("Genesis") and the Home Downpayment Gift Foundation ("HDGF") support AmeriDream's request for a preliminary injunction staying enforcement of the Department of Housing and Urban Development's ("HUD") proposed "Standards for Mortgagor's Investment in Mortgaged Property" (the "Regulation"). Genesis and HDGF are two of the largest non-profit organizations in the country that provide privately funded downpayment assistance to low- and moderate-income homebuyers. Genesis and HDGF collectively provide over 50,000 individuals and families a year with downpayment assistance, pre-homebuyer education, job loss insurance, emergency mortgage assistance, and early delinquency counseling. The majority of their clients are minorities, women, and single parents who are purchasing a home for the first time. Genesis and HDGF rely on contributions from sellers and builders to fund their operations. This is known as seller-funded downpayment

1

assistance ("SFDPA"). SFDPA enables families who *can* afford to make monthly mortgage payments but *cannot* put down the 3% that FHA requires for protected financing to buy homes and start building equity.

Absent injunctive relief, the Regulation will put Genesis, HDGF, and others similarly situated out of business. This immediate, irreparable harm substantially outweighs any potential harm alleged by HUD and tips the scale in favor of injunctive relief. The public interest also weighs in favor of an injunction.

In this brief, Genesis and HDGF provide descriptions of their important public services through first-hand accounts from their directors and clients. This brief provides key authorities directly on point from this and other courts applying the standard for injunctive relief to agency decisions similar to HUD's decision here. These authorities, combined with Genesis's and HDGF's first-hand information, demonstrate that, in addition to the grounds set forth in AmeriDream's memorandum, the Court should grant a preliminary injunction to prevent irreparable harm to Genesis, HDGF, and all others similarly situated, and to serve the public's interest.

## Background

For over a decade, HUD's position has been that SFDPA programs such as those run by Genesis and HDGF are permitted and even praise-worthy. *See 2005 HUD Letter to U.S. Office of Accountability in Response to GAO Draft Report on Mortgage Financing, attached as Exh. A* ("Borrowers who rely on seller-funded downpayment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be

2

beneficial, leaving this population with financing options that are more costly and riskier than FHA").

On May 11, 2007, as the housing market was headed downward, HUD abruptly changed course and published the proposed Regulation, which completely prohibits SFDPA. HUD's stated "primary concern" for the proposed change in policy was "that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA." *See Federal Register, attached as Exh. B, at 56002.* In support of this assertion, HUD cited the very 2005 GAO Report on Mortgage Financing to which it had previously objected. *Id.; see 2005 HUD Letter, Exh. A.*

In response to its proposal, HUD received over 15,000 comments – over 14,000 in opposition and fewer than 1,000 in support – between May 11, 2007, and August 10, 2007. *Id.* at 56003. On June 5, 2007, Bloomberg News reported that HUD Secretary Alphonso Jackson stated in an interview that he was "very much against [SFDPA programs]," and that "HUD intends to approve the new rule by the end of the year even if the agency receives critical comments." *See Bloomberg News Report, attached as Exh. C.*

On October 1, 2007, HUD adopted the Regulation as originally proposed and provided notice that it will take effect on October 31, 2007. *See Federal Register, at 56002.*[1]

## **Argument**

AmeriDream's request for a preliminary injunction turns on (1) whether AmeriDream will suffer irreparable injury if an injunction is denied; (2) whether AmeriDream's claims have a reasonable likelihood of success on the merits; (3) whether an injunction would

---

[1] As noted in AmeriDream's memorandum and below, however, HUD has deferred the effective date as to the Nehemiah Foundation, another SFDPA provider, for six months.

substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest. *Al-Fayed v. CIA*, 254 F.3d 300, 303 (D.C. Cir. 2001). "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).

When the balance of hardships tips decidedly toward the movant, it will "'ordinarily be enough that the Plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." *Id.* at 844.

AmeriDream has ably explained why it has a reasonable likelihood of success on the merits and that AmeriDream will suffer irreparable injury unless the Court enjoins enforcement of HUD's about-face decision to prohibit downpayment assistance from charities who receive support from sellers or others who benefit from the transactions that DPA makes possible. Genesis and HDGF will not repeat those arguments here. Rather, Genesis and HDGF offer this brief as *amici curiae* to underscore how they, others similarly situated, and the public will be irreparably harmed unless this Court enjoins enforcement of the Regulation to permit a fully informed presentation of and decision on the merits of AmeriDream's claims.

4

**I.      The Court should grant an injunction to prevent irreparable harm to Genesis, HDGF and all others like them.**

> **A.      The Regulation will put seller-funded downpayment assistance programs out of business.**

HUD acknowledges that of the approximately 15,000 public comments it received concerning the proposed rule, "the overwhelming majority of these comments consisted of brief statements opposing HUD's rule." *Federal Register, Exh. B, at 56003*. Many commenters urged HUD not to *eliminate* downpayment assistance, but to *regulate* it, or to establish standards for down-payment-supported loans. *Id.* In response, HUD insists that it "is not eliminating all privately funded downpayment assistance." *Id.* Rather, HUD argues, the Regulation will still permit DPA in the form of gifts from family members, employers, state or local governments, or charitable organizations that do not rely on seller contributions. *Id.* As it did with the comments generally, HUD is ignoring the practical realities reflected in its own data.

A report by Market Innovators, Inc. analyzing HUD-reported data for August 2007 found that the majority of all FHA borrowers who purchased homes in August used some form of downpayment assistance. *See Declaration of Chris Hauver, attached as Exh. D and attached report at p. 6* (52% – or 15,134 of the 29,150 total FHA purchase transactions in August – used some form of downpayment assistance). Of that majority who relied on DPA, HUD's data reflect that only 24% (3659 of the 15,134 who used DPA) received assistance from a relative or an employer. *Id.* at p. 5. The remainder of assistance came from non-profits and government programs. However, HUD's data do not separate non-profit and government programs that provide seller-funded downpayment assistance from those that do not. *Id.* at p. 7. For example, programs administered by the Penobscot Indiana Nation, the Lower Brule Sioux Tribe, the Ely Shoshone Tribe and the Confederate Tribes of Goshute Nation all rely on seller

5

contributions. But HUD lumps these programs in with other government programs that do not

provide SFDPA. *Id.* Also, a preliminary review of the tax identification numbers of the

organizations HUD includes under the non-profit category reveals that, at a minimum, 9,210 of

the 9,980 loans from this category were from SFDPA programs – approximately 92.2% – which

represents approximately $1.25 billion in total loan volume. *Id.*[2]

   Genesis, HDGF, and other organizations like them rely entirely on seller

contributions to keep their organizations alive. From January 1, 2007 to September 30, 2007,

Genesis enabled 18,747 families to become homeowners. *Declaration of Kelly Schwedland*

*("Schwedland Decl."), attached as Exh. E, at ¶ 5.* In the month of August 2007 alone, HDGF

helped 1,656 do the same. *Declaration of Rick Del Sontro ("Del Sontro Decl."), attached as*

*Exh. F, at ¶ 5.* Contributions from sellers and homebuilders made these gifts possible.

*Schwedland Decl. at ¶ 3*; *Del Sontro Decl. at ¶ 3.* Genesis has over 50 employees and

independent contractors who help over 3,000 families attain homeownership every month.

*Schwedland Decl. at ¶ 8.* HDGF has over 30 employees and independent contractors. *Del*

*Sontro Decl. at ¶ 7.* If the Regulation goes into effect on October 31, 2007, Genesis and HDGF

will be forced to shut down. Without seller contributions to replenish the pool of gift funds,

neither organization can continue to provide downpayment assistance. Indeed, the looming

effective date is already causing the pool to evaporate. *Schwedland Decl. at ¶ 4*; *Del Sontro*

*Decl. at ¶ 4.*

---

[2]  Market Innovators could not identify some non-profit organizations because or reporting errors. For example, HUD listed at least 149 transactions involving assistance from organizations with invalid tax identification numbers that appear to be just one digit away from accurate tax identification numbers of known SFDPA programs. *Id.* at pp. 7-8.

**B.     The balance of harms favors injunctive relief:  while granting an injunction would merely preserve a status quo that HUD approved for years, refusal to do so will eliminate a means of facilitating homeownership for thousands of Americans.**

The destruction of an on-going business constitutes irreparable harm. *Washington Metro. Area Trans. Comm. v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (stating that Holiday Tours had "clearly" shown irreparable harm where "[t]he harm to Holiday Tours in the absence of a stay would be its destruction in its current form as a provider of bus tours"). Other courts agree that "[w]here the result of denying injunctive relief would be the destruction of an on-going business, such a result generally constitutes irreparable injury." *Canterbury Career School, Inc. v. Riley*, 833 F.Supp. 1097, 1105 (D. N.J. 1993). This Court likewise has held that the irreparable harm requirement was satisfied where denial of an injunction would have cut off income from student financial aid programs necessary to continue operating a school. *Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Ltd. v. Cavazos*, 716 F.Supp. 638, 644 (D. D.C. 1989).

The plaintiff in *Canterbury* operated a post-secondary school that provided career training to economically disadvantaged students. *Canterbury*, 833 F.Supp. at 1100. The Department of Education ("DOE"), which administers the Federal Family Educational Loan ("FFEL") programs that enable students to obtain federally guaranteed education loans, was preparing to publish certain loan default rates that the school alleged had been calculated erroneously. *Id.* at 1100. Because of an increasing default rate on education loans, Congress had passed the Student Loan Default Prevention Initiative Act, which revoked the FFEL eligibility of schools whose students had high default rates. The school alleged that the DOE had improperly calculated its default rate by failing to exclude certain loans from the calculation and by uncritically relying on information from guaranty agencies without independently reviewing

7

their conclusions. *Id.* at 103. The DOE responded that it had properly calculated Canterbury's default rate and that the information that the guaranty agencies provided was reliable. *Id.* at 1104.

Federal education loans accounted for approximately 85% of the tuition payments to Canterbury. *Id.* at 1105. If Canterbury students had not been eligible to receive such loans, the school would not have been able to operate for longer than a month and would likely have lost its accreditation. *Id.* The court held that "plaintiff will suffer harm in that it will be unable to continue to operate its school. This type of harm is severe in nature." *Id.* "The resulting injury to plaintiff in the demise of its school will be irreparable." *Id.*

On the other side of the scale, the court found that "[t]he harm to DOE that would result from a grant of the injunction is minimal at best." *Id.* The court noted that injunctive relief would not significantly interfere with the DOE's internal operations. The DOE disagreed, citing "the danger of additional economic and social costs associated with high default schools." *Id.* at 1106. But the court found the balance favored the school:

> Plaintiff stands to suffer severe harm, which is specific in nature, if injunctive relief is denied. Defendant stands to potentially suffer a very general sort of harm if this injunction is granted. Thus, it is clear that the balance of the respective harms weighs in plaintiff's favor.

*Id.* The *Canterbury* court also found that an injunction would serve the public interest by allowing the school to continue to "provide[] a service to society by educating [low-income people] and by supplying them with the means to be self-sufficient." The court therefore granted the school's request for a preliminary injunction.

This case parallels *Canterbury*, and this Court should reach the same result. Without injunctive relief, Genesis, HDGF, AmeriDream and others similarly situated will go out

8

of business. It is difficult to envision more irreparable harm than that. Approximately 80 people at Genesis and HDGF will be without work. A majority of the Genesis and HDGF employees are long-term, specialized, and highly skilled. *Schwedland Decl. at ¶ 8; Del Sontro Decl. at ¶ 7.* If AmeriDream prevails on its challenge to the Regulation after discovery and a full presentation of the merits, it will be too late. These people will of necessity have moved on to other jobs. Genesis and HDGF will have dismantled their operations. Their donors will have been out of touch for months, and their clients will have had no means to fund the downpayments they need to escape the rent cycle and start building equity in a home. These injuries would be severe and irreparable.

If this Court grants an injunction, on the other hand, any potential harm to HUD would be "minimal at best." HUD's internal operations will not be disrupted by delaying implementation of the Regulation pending a final resolution of the merits. <u>HUD itself provides the best evidence of this</u>: HUD has already agreed to delay implementation of the Regulation for six months with respect to the Nehemiah Foundation (a SFDPA program) based on a promise HUD made in 1998. *See April 3, 1998 Letter, Attached as Exh. G.* Indeed, HUD agreed in 1998 that, if it ever decided to "change its policies regarding downpayment assistance programs or regarding the source of borrower downpayment funds," those changes would not apply to Nehemiah or "all other similarly situated down payment assistance programs" until six months after they were finally promulgated and issued. *Id.* If immediate enforcement were necessary to prevent harm – significant or otherwise – to HUD, HUD would not have made that commitment (or kept it as to Nehemiah).

The balance of harms to interested parties strongly favors the injunctive relief that AmeriDream requests. Any potential harm that HUD alleges is significantly outweighed by the

9

immediate, specific, and irreparable harm that will befall Genesis, HDGF, and all similarly situated organizations upon implementation of the Regulation.

**II.     A preliminary injunction will also further the public interest.**

> **A.     Genesis and HDGF provide important public services to low- and moderate-income families.**

From January through September of this year alone, Genesis and HDGF have helped over 30,000 families become homeowners – a majority of them for the first time. *Schwedland Decl. at ¶ 6.* This represents over $165 million in equity for homeowners. *Id.* According to HUD's Economic Report 101502, "Economic Benefits of Increasing Minority Homeownership," increasing minority homeownership spurs job growth, benefits communities, induces higher levels of housing maintenance, boosts property price values, positively impacts children, increases community involvement, and fosters entrepreneurship. *See Economic Report, attached as Exh. H.*

There are thousands of heartwarming examples. Genesis enabled Mr. and Mrs. A to buy a home. *See letter from Jerry Hinson, attached to Schwedland Decl.*[3] The As have two children. Their son is nine-years old, was born nearly blind, and has an inoperable tumor. *Id.* He requires full-time, in-home assistance during the day. *Id.* The As' son shared a bedroom with his sister in their rented home. *Id.* The As couldn't save enough money for a downpayment because of their son's heavy medical expenses. *Id.* They viewed a number of homes for which they knew they could afford the monthly payments, but the down-payment requirement kept them from buying one. *Id.* With help from Genesis, the As were able to purchase their own

---

[3] At the request of this family, Genesis has redacted their names from the attached letter and refers to them by the letter "A" here.

home, start accumulating equity, and provide their children with space of their own, better suited to their son's special needs. *Id.*

The benefits that these organizations provide do not stop with downpayment assistance. Rather, they include important ancillary services such as pre-homebuyer education, job loss insurance, and early delinquency counseling. For example, HDGF provided pre-homebuyer education to more than 7,000 individuals and families this year to help them understand and manage the financial obligations associated with the significant, life-changing event of home ownership. *See Del Sontro Decl. at ¶ 8.* HDGF's Rainy Day Program provided nearly $500,000 this year in emergency mortgage payment grants to assist homeowners who experience short-term financial difficulties. *Id.* at ¶ 10. Also this year, over 1,000 individuals and families will receive early delinquency counseling from HDGF. *Id.* at ¶ 11. This service helps homeowners correct financial problems and change unproductive behavior before they become irreversible problems. *Id.* Both organizations offer mortgage protection programs designed to provide mortgage payment grants in the event of unemployment. *Id.* at ¶ 9; Schwedland Decl. at ¶ 10. These services help new homeowners who unexpectedly loose their jobs to keep their homes while they search for new employment.

For example, Mildred Black is a single, African-American, working mother of two who received downpayment assistance from HDGF. *See Letter from Mildred Black, attached to Del Sontro Decl.* Mildred qualified for a mortgage but couldn't accumulate the full downpayment on her own. Her family could not help her, and there were no government programs available. *Id.* HDGF bridged the gap. After purchasing her home, Mildred accepted a promotion with a new company, which she thought would advance her career. Shortly after making the move, however, Mildred was devastated when her new employer eliminated her

11

position. *Id.* Suddenly out of work, with a new home and two young children, Mildred turned to

HDGF for help from its Home Mortgage Protection Plus program, which provides up to six

months of mortgage payments in the event of job loss at no cost to HDGF clients. *Id.* If Mildred

had received downpayment assistance from a different source, such as her parents or the

government, she would likely be facing foreclosure because neither provides job loss protection.

*Id.* Instead, Mildred is able to search for a new job without losing her home.

### B. The public interest weighs in favor of an injunction.

Recently, in *Ramirez v. U.S. Customs and Border Protection*, 477 F.Supp.2d 150

(D. D.C. 2007), this Court considered plaintiff Ramirez's request for a preliminary injunction

prohibiting Customs and Boarder Protection ("CBP") from implementing a change in long-

standing policy. Ramirez was employed as a CBP Officer in Presidio, Texas. His job was to

inspect vehicles and people entering the United States from Mexico. *Id.* at 153. Presidio is a

small, poor town with close connections to its "sister city" of Ojinaga, across the Rio Grande in

Mexico. *Id.* In May 2004, after obtaining approval from CBP, Ramirez ran for and was elected

to serve a two-year term on Presidio's City Counsel. *Id.* Ramirez was not compensated for his

service as a counsel member. *Id.*

In 2006, at the close of his term, Ramirez ran unopposed for reelection and was

again seated as a counsel member. *Id.* He did not file a request for CBP approval of his second

term. *Id.* On December 1, 2006, CBP changed its procedures to shift responsibility for making

certain decisions from local CBP offices to CBP headquarters in Washington, D.C. *Id.* Shortly

after this centralization of decision-making, CBP's director of field operations directed Ramirez

to resign his position as a counsel member on the ground that it created actual or apparent

12

conflicts of interest. *Id.* at 154. Ramirez responded that the CBP's directive violated his First

Amendment rights.

In considering Ramirez's request for injunctive relief, this Court held that "if the

Government is incorrect in its legal arguments" then "there can be no question" that the denial of

an injunction would cause Ramirez immediate irreparable harm. *Id.* at 159. This Court noted,

however, that the Government's argument was "by no means frivolous:"

> The Government argues that Plaintiff's daily inspection duties
> which require him, as a law enforcement officer, to carefully
> inspect and scrutinize individuals, their vehicles, and their
> belongings crossing the border, create the appearance of a conflict
> of interest because the people he must scrutinize are the very
> voters who will elect or reject him as a member of the City
> Counsel. This argument is by no means frivolous.

*Id.* at 157. Nevertheless, the Court also observed that

> the Agency has totally reversed its position on this issue. For a
> period of at least two years (and probably a lot longer), Defendants
> had no objection whatsoever to CBP employees serving their
> community in unpaid, non-partisan political positions. Moreover,
> Defendants have failed to give any persuasive justification for the
> abrupt change in the Agency's position. Indeed, on the record as it
> exists at the time, it would appear that the reversal in the Agency's
> position is directly related to the simple bureaucratic or managerial
> shifts . . .

*Id* (emphasis added).

This Court then concluded that the final factor "which must be addressed under

the case law, the likelihood of success on the merits, is in equipoise and falls squarely within the

Court's direction in *WMATA v. Holiday Tours*: 'An order maintaining the status quo is

appropriate when a serious legal question is presented, when little if any harm will befall other

interested persons or the public and when denial of the order would inflict irreparable injury on

the movant.'" *Id.* (quoting *Holiday Tours*, 559 F.2d at 844). Accordingly, this Court granted an

13

injunction because "[a]t a very minimum 'Plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Id.* at 158-59 (quoting *Holiday Tours*, 559 F.2d at 884).

Just so here. As in *Ramirez*, a federal agency has totally reversed its position on an issue. For nearly ten years, HUD has permitted the use of seller-funded downpayment assistance. HUD has offered little explanation for its change in policy, other than (1) its demonstrably erroneous claim that it is not actually eliminating downpayment assistance (a substantial portion of which comes from SPDPAs HUD is eliminating); and (2) its assertion that homeowners who receive SFDPA are more likely to default on their loans. But HUD is wrong about the former and has not provided the data on which it purports to base the latter. HUD controls the data. Its unreliable reporting based on data it exclusively controls calls both conclusions into question.

With so little justification or even explanation for its reversal of long-standing policy, HUD's decision to implement the Regulation appears to be the result of a pre-determined decision by its secretary, who publicly stated during the rulemaking process that he would implement the Regulation regardless of what the public had to say about it. This Court should preserve the status quo to ensure that Genesis, HDGF, and the public they serve do not suffer irreparable harm as a result of a sham rulemaking process intended to deflect blame for a depressed housing market away from the government.

The government will undoubtedly claim that the Regulation is in the public's interest. But HUD's longstanding acceptance of this practice belies its claim. HUD's unreliable reporting of its own data and apparent predetermination of the outcome regardless of public comment highlight why this case should be litigated on a schedule that allows discovery and a

14

full presentation of the merits before the Regulation takes effect.  At a minimum, this case raises questions "so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation."  *Ramirez*, 477 F.Supp.2d at 157.

### Conclusion

There is no imminent danger that either the government's or the public's interest will be harmed while this case is litigated and given the in-depth consideration it deserves.  This Court should preserve the status quo to prevent irreparable injury to Genesis, HDGF, and the families they serve pending a resolution on the merits.

Respectfully submitted,


/s/ Frank S. Swain
Frank S. Swain, #427792
Baker & Daniels LLP
805 15th Street NW, Suite 700
Washington, DC  20005
Telephone  202.312.7440
Facsimile  202.312.7460
frank.swain@bakerd.com

Attorneys for Genesis Foundation and Home
Downpayment Gift Foundation

15

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **EXHIBIT A**

Appendix IV

# Comments from the Department of Housing and Urban Development



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

ASSISTANT SECRETARY FOR HOUSING-
FEDERAL HOUSING COMMISSIONER

October 25, 2005

Mr. William B. Shear
Director
Financial Markets and Community Investments
United States Government Accountability Office
441 G Street, NW
Washington, D. C. 20548

Dear Mr. Shear:

Thank you for permitting FHA to respond to the GAO Draft Report 06-24, "MORTGAGE FINANCING: Additional Action Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance." As you know, FHA has been examining these types of down payment assistance programs for the past several years. The report confirms FHA's own analysis of loan performance and the findings of an independent contractor hired by FHA to evaluate how seller-funded gift programs operate.

The GAO report provides additional analysis and reiterates that borrowers receiving seller-funded down payment assistance pay more for their homes than homebuyers who receive no such assistance or assistance from down payment programs funded without seller involvement. Borrowers who rely on seller-funded down payment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA. Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan.

FHA has also determined that a Zero Down program would better serve borrowers who have little savings for a down payment, but who have steady incomes and acceptable credit. The proposed Zero Down program was designed to address the concerns that GAO raises in the report – that buyers using seller-funded gifts are paying too much for their homes and putting themselves in a risky position, as evidenced by the historical loan performance – and to ensure that FHA was keeping pace with the rest of the mortgage market, where 100% financing products have become increasingly common.

That said, although the report reaffirms FHA's own findings, the agency is disappointed that the recommendations do not acknowledge that a Zero Down program would provide FHA with a better way to serve families in need of down payment assistance. FHA represents a better, safer

-2-

financing alternative for many families with blemished credit. Providing a new product would serve these families well, by offering consumer protections to ensure that these families would not pay more than they should for their homes or their financing, and that these families would have the benefits of loss mitigation to help them stay in their homes should they experience any future financial hardship.

FHA's responses to the individual recommendations are as follows:

GAO Recommendation: To provide FHA with data that would permit it to identify whether down payment assistance is from a seller-funded down payment assistance provider, modify FHA's "gift letter source" categories to include "nonprofit seller-funded" and "nonprofit non-seller-funded" and require lenders to accurately identify and report this information when submitting loan to FHA.

FHA Response: FHA agrees with this recommendation and will modify the systems to collect this additional information.

GAO Recommendation: To more fully consider the risk posed by down payment assistance when underwriting loans, include the presence and source of down payment assistance as a loan variable in FHA's TOTAL Scorecard.

FHA Response: Consistent with past practice, HUD will consider and incorporate into TOTAL all appropriate factors, including the presence and source of down payment assistance, that can with historical data be shown empirically relevant for assessing borrower credit risk with respect to loan performance.

GAO Recommendation: To ensure that FHA has an ongoing understanding of the impact that down payment assistance has on loan performance, implement routine and targeted performance monitoring of loans with down payment assistance, including analyses that consider the source of assistance.

FHA Response: FHA agrees and believes that it already performs monitoring of portfolios of such mortgages based on the information residing in its system of records. Obviously, FHA's concern, based on loan performance data, resulted in seeking the services of a contractor to analyze and explore these down payment assistance programs in detail.

GAO Recommendation: To improve the forecasting ability of the loan performance models used in the annual review of actuarial soundness, consider the presence and source of down payment assistance.

FHA Response: FHA incorporated the source of down payment assistance into its FY 2005 Actuarial Review of the Mutual Mortgage Insurance Fund, a variable that has proved to have considerable explanatory power. FHA informed GAO that it planned to incorporate this variable during its interviews about down payment assistance.

-3-

GAO Recommendation: To ensure appraisers have the information necessary to establish the market value of the property, require lenders to inform appraisers about the presence of down payment assistance from a seller-funded source.

FHA Response: Lenders are required to inform appraisers about all seller concessions, including down payment assistance. Appraisers are aware of seller funded down payment assistance providers in their markets, as evidenced by the findings of the Concentrance study referenced several times in the GAO report. Regardless, FHA will consider imposing the additional requirement that the lender inform the appraiser when down payment assistance is provided by a nonprofit that relies on contributions from the seller.

GAO Recommendation: Because down payment assistance provided by seller funded entities is, in effect, a seller inducement, revise FHA standards to treat assistance from a seller-funded nonprofit as a seller contribution, and therefore subject to the 6 percent limit on seller contributions and the prohibition against using seller contributions to meet the 3 percent borrower contribution requirement.

FHA Response: HUD's Office of General Counsel has advised that the timing of the payments is a key point in whether there is a seller contribution that is an inducement to purchase. If a gift is made from a nonprofit entity (either directly or through an entity such as the closing agent), from the nonprofit's own funds, prior to the completion of the closing, the gift becomes the homebuyer's property so the buyer can make the three percent required down payment. After completion of the closing, a seller makes a contribution (perhaps through the closing agent as well) from the gross sales proceeds to the nonprofit entity. The donation is commingled with other nonprofit funds that later become a source of donations to buyers other than the buyer who has just closed the purchase of the seller's property. Because the buyer has not received funds from the nonprofit that can be traced to the seller's contribution, there has not been an inducement to purchase provided by the seller.

Thank you again for the opportunity to review the GAO report. Consistent with the spirit of your report and its recommendations, HUD will continue to take all steps needed for responsible financial management of its down payment assistance programs, while ensuring that FHA programs serve effectively families who are otherwise underserved by the private sector.

Sincerely,

Brian D. Montgomery
Assistant Secretary for Housing-
Federal Housing Commissioner

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **<u>EXHIBIT B</u>**



Monday,
October 1, 2007

Part IV

# Department of Housing and Urban Development

**24 CFR Part 203**
**Standards for Mortgagor's Investment in**
**Mortgaged Property: Final Rule**

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**24 CFR Part 203**

**[Docket No. FR–5087–F–02]**

**RIN 2502–AI52**

**Standards for Mortgagor's Investment in Mortgaged Property**

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends the Department's regulations governing the specific standards for a mortgagor's investment in property for which the mortgage is insured by the Federal Housing Administration (FHA). Specifically, this final rule codifies HUD's longstanding practice, authorized by statute, of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations.

The standards established by this final rule address a situation in which the mortgagor's investment is derived from a gift, loan, or other payment that is provided by any donor, including an individual or an organization, and also specify prohibited sources for a mortgagor's investment. The final rule establishes that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: The seller, or any other person or entity that financially benefits from the transaction; or any third party or entity that is reimbursed directly or indirectly by the seller, or any other person or entity that financially benefits from the transaction.

This final rule follows publication of a May 11, 2007, proposed rule and takes into consideration the public comments received on the proposed rule. After considering all comments received, HUD is adopting the May 11, 2007, proposed rule with certain minor clarification changes.

**DATES:** *Effective Date:* October 31, 2007.

**FOR FURTHER INFORMATION CONTACT:** Margaret Burns, Director, Office of Single Family Program Development, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; telephone number (202) 708–2121 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Information Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In order for a mortgage to be eligible for insurance by the Federal Housing Administration (FHA), section 203(b)(9) of the National Housing Act (12 U.S.C. 1709(b)(9)) requires the mortgagor (with narrow exceptions) to pay on account of the property at least 3 percent of the cost of acquisition. The statute and the implementing regulation at 24 CFR 203.19 are silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute. For example, section 203(b)(9) of the National Housing Act permits family members to provide loans to other family members, and permits the mortgagor's downpayment to be paid by a corporation or person other than the mortgagor in certain circumstances, such as when the mortgagor is 60 years of age or older, or when the mortgage covers a housing unit in a homeownership program under the Homeownership and Opportunity Through HOPE Act (Title IV of Pub. L. 101–625, 104 Stat. 4148, approved November 28, 1990). HUD has long taken the position that downpayment funding from the seller of the home to be purchased by a borrower with an FHA-insured loan is not a permissible source of the mortgagor's investment in the property. FHA's experience is that loans made to borrowers who rely on these types of seller-funded assistance perform very poorly.

Although FHA has attempted to preclude downpayment funding derived from contributions of the seller of the property, some so-called charitable organizations have been able to circumvent these restrictions in various ways, including the establishment of a fund that provides the so-called "gift" to the homebuyer. The situations that cause FHA concern are those in which a so-called charitable organization provides a so-called gift to a homebuyer from funds that it receives, directly or indirectly, from the seller. In these cases, there is a clear *quid pro quo* between the homebuyer's purchase of the property and the seller's "contribution" or payment to the charitable organization. This is also true if the contribution to the charitable organization comes from an entity, other than the seller, that has an expectation of being reimbursed by the seller. Often, these contributions function as an inducement to purchase the home. It is these concerns that prompted HUD's rulemaking in 1999, which did not

result in final regulations, and now again, in 2007.

**II. The May 11, 2007, Proposed Rule**

On May 11, 2007, HUD published a proposed rule (72 FR 27047) for public comment to codify standards regarding the use of gifts as a source of the mortgagor's investment in the mortgaged property, and to also specify prohibited sources for a mortgagor's investment. The proposed rule established that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: (1) The seller, or any other person or entity that financially benefits from the transaction; or (2) any third party or entity (referred to as a "donor") that is reimbursed directly or indirectly by any of the parties listed in clause (1).

As discussed in the proposed rule, FHA's primary concern with these transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA. A Government Accountability Office (GAO) report released in 2005 entitled "Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Loan Products' (GAO Mortgage Financing Report) stated that Fannie Mae and Freddie Mac do not allow seller-related contributions to the downpayment, and that seller-related contributions could contribute to an overvaluation of the price of the property (GAO Mortgage Financing Report, at page 16).

In May 2006, the Internal Revenue Service (IRS) addressed these same concerns by issuing Revenue Ruling 2006–27, which provides guidelines on organizations that may provide downpayment assistance to homebuyers and qualify as tax-exempt charitable or educational organizations under Internal Revenue Code (IRC) section 501(c)(3), and those that do not qualify for this tax-exempt status. The IRS, in its press announcement of the ruling, stated that funneling downpayment assistance from sellers to buyers through "self-serving, circular-financing arrangements" is inconsistent with operation as a section 501(c)(3) charitable organization. The IRS stated that, in a typical scheme, there is a direct correlation between the amount of the downpayment assistance provided to the buyer and the payment received from the seller, the seller pays the organization only if the sale closes, and the organization usually charges an

Case 1:07-cv-01752-PLF    Document 11-2    Filed 10/19/2007    Page 24 of 65

additional fee for its services. The IRS noted that so-called charities that manipulate the system do more than mislead honest homebuyers; these organizations ultimately cause an increase in the cost of the home and damage the image of honest, legitimate charities. (See IRS News Release of May 4, 2006, at *http://www.irs.gov/newsroom/article/0,id=156675,00.html.*)

As the IRS also noted in its press release, inflated sales prices are often found on properties purchased with downpayment assistance from seller-funded nonprofit programs. Unlike true gifts that reduce the amount of the purchase price financed by the homeowner, such seller contributions increase the sales price of the home and result in higher mortgage payments.

Given that seller-funded gift programs thrive in stagnant or depreciating housing markets, the risk to FHA increases if FHA cannot recover the full amount owed when FHA acquires and resells a home that had been purchased by a participating borrower who had defaulted on the FHA-insured loan. While these situations represent a financial burden for FHA and taxpayers, of equal if not greater concern, is that they hurt the families who lose their homes and the neighborhoods in which those homes are located.

### III. This Final Rule

For the foregoing reasons, HUD is proceeding, through this final rule, to codify the regulations submitted for public comment in the May 11, 2007, proposed rule. This final rule makes the following change to the May 11, 2007, proposed rule in response to public comment. This final rule clarifies in § 203.19(f) that a tribal government or a tribally designated housing entity (TDHE), as defined at 25 U.S.C. 4103(21), is a permissible source of downpayment assistance. Additionally, the final rule revises in § 203.19(f) the description of tax-exempt organizations that are permissible sources of gifts to more closely align this description with the description used by IRS of such organizations.

In addition, notwithstanding the effective date provided under the **DATES** caption of this rule, pursuant to an April 1998 settlement agreement resolving litigation between the Nehemiah Progressive Housing Development Corporation (Nehemiah) and HUD, the effective date shall be March 31, 2008 for the Nehemiah downpayment assistance program described in the settlement agreement between Nehemiah and HUD.

While this rule prevents sellers from funding downpayments in their own

home sales transactions, the rule is not intended to preclude sellers from contributing to charitable organizations that provide downpayment assistance that is unrelated in any manner to any properties sold by the seller. In addition, the rule is not intended to preclude reasonable assistance with closing costs not related to the minimum investment, which may be permitted under local practice. Nothing in this rule changes HUD's policy of allowing builders and other sellers to offer cash incentives to homebuyers, provided that any cash or cash equivalent given to a homebuyer before, at, or after closing results in a proportionate reduction to the mortgage; an amount which the homebuyer then would have to provide as additional funds at closing. The primary focus of this rule is to establish appropriate standards for downpayment assistance to a homebuyer that is categorized as a gift.

### IV. Discussion of Key Issues Raised by Public Commenters on Proposed Rule

The public comment period for the May 11, 2007, proposed rule was initially set to close on July 10, 2007, but HUD extended the comment period to August 10, 2007. HUD received approximately 15,000 public comments on the proposed rule. The overwhelming majority of these comments consisted of brief statements opposing HUD's rule, with the majority also submitting their comments in a standard similar format and wording, and urging HUD not to eliminate downpayment assistance in connection with FHA-insured mortgages. However, a number of comments supported the rule, and approved of FHA's efforts to harmonize its regulations regarding downpayment assistance with recent rulings of the IRS. These commenters shared HUD's concerns about home price inflation and the associated risks for increased delinquency and foreclosure. They stated that inflated home prices affect a community's housing market, and can magnify existing housing affordability problems.

The following provides a summary of the major themes and issues raised during the public comment period on the proposed rule.

*Comment:* HUD should not eliminate downpayment assistance, but regulate such assistance, or establish standards for downpayment supported loans, including taking action to improve appraisals and require stricter underwriting and a higher insurance premium for such loans.

*HUD response:* Many commenters, through their statements urging HUD

not to eliminate downpayment assistance, indicated that they believed the May 11, 2007, proposed rule would eliminate all downpayment assistance. HUD's May 11, 2007, rule did not propose to eliminate downpayment assistance, but rather proposed to regulate such assistance as the commenters requested. Additionally, HUD is not eliminating all privately funded downpayment assistance. Such assistance is permitted, for example, from family members, the borrower's employer, state or local governments, charitable organizations that do not rely upon a party with a financial interest in the transaction for downpayment assistance, or labor organizations. The proposed rule, however, did propose to preclude as acceptable downpayment assistance, assistance that, in whole or in part, is funded by the seller or any other person or entity that financially benefits from the transaction or any third party or entity that is reimbursed, directly or indirectly, by the seller or any other party that financially benefits from the transaction.

*Comment:* Although downpayment assistance presents risks, HUD should address what an acceptable level of risk is, and determine how the risk can be maintained at or below that level.

*HUD response:* Based on HUD's analysis of its loan portfolio going back to 1998, HUD has assessed that risk and has determined that there is 2 to 3 times greater risk of default and claim with purchase loans that receive downpayment assistance from the seller or other persons or entities that financially benefit from the sale of a home to the borrower than from all other loans with downpayment assistance from all other sources.

For example, for loans endorsed for insurance in Fiscal Year (FY) 2001, the cumulative claim rate as of July 2007 was 7.1 percent for loans with downpayment assistance from relatives, public agencies, and employers, but 15.8 percent for loans with downpayment assistance from nonprofit entities that received reimbursements from sellers. A cumulative claim rate is calculated by dividing the number of claims that have occurred to date by the number of loans endorsed in a particular fiscal year. In conjunction with the FY 2006 Actuarial Review of the Mutual Mortgage Insurance Fund, FHA's independent actuaries estimated that the ultimate claim rate for 30-year fixed-rate purchase loans endorsed in FY 2008 would be 11.04 percent if they did not have seller-funded downpayment assistance, but 23.06 percent if they did. An ultimate claim rate is defined as the total number of

claims expected to occur over the 30-year life of a book of business divided by the total number of loans endorsed in a particular fiscal year. The difference between these rates represents the difference between acceptable and unacceptable levels of risk to the FHA insurance fund.

In addition, HUD has determined that loans with downpayment assistance from sellers or other parties with a financial interest in the transaction are also associated with a higher loss rate than other single family loans insured by FHA. In other words, homeowners with this type of downpayment assistance have a two to three times higher possibility of losing their home. This rule, therefore, is HUD's effort to mitigate an unacceptable level of risk.

*Comment:* HUD can mitigate the risk from downpayment assistance by requiring full disclosure of the amount of downpayment assistance for underwriting and to appraisers.

*HUD response:* FHA requirements currently require disclosure of the full amount of downpayment assistance.

*Comment:* Rather than eliminate downpayment assistance, HUD can further mitigate risk by requiring a complete home inspection, to avoid potentially huge repair costs to the homeowner. HUD could also require the owner to obtain a homeowner's warranty for a specified period of time, to avoid high repair cost as a potential source of default and foreclosure. Alternatively, HUD could require downpayment assistance companies to offer mandatory risk mitigation tools or offer insurance to the buyer.

*HUD response:* HUD reiterates that downpayment assistance is not being eliminated by this rule. The commenters' recommendations are noted, but the suggested actions are outside the scope of the present rule. In addition, the recommendations pertaining to warranty or insurance does not deal directly with sales price inflation, which is a separate issue from repair costs a homeowner may face after purchasing a home.

*Comment:* Price inflation does not arise from downpayment assistance, but from the appraisal process. The appraisal process should be reformed, for example, by establishing a blind pool appraiser selection process for loans with downpayment assistance.

*HUD response:* Downpayment assistance can be an independent source of price inflation separate from, or in conjunction with, any price inflation that may arise from the appraisal process, which, while noted by HUD, is an issue beyond the scope of the present rule. HUD has already taken steps to

address the appraisal issue. HUD's Appraiser Roster, for which the regulations can be found in 24 CFR part 200, subpart G, is intended to ensure fairness and accuracy in the appraisal process for FHA-insured mortgages.

*Comment:* HUD should make rules to deal with predatory lenders and lenders who charge outrageous rates. Such lenders are the real problem, rather than downpayment assistance. It is a lender's responsibility to ensure that people cannot buy more than they can afford, and downpayment assistance should not be affected because of bad lender decisions.

*HUD response:* HUD acknowledges that problems may arise at each stage of, and with each party to, a complex transaction such as purchasing a home. In addition, problems change over time, and the way any given problem is addressed also changes. This rule addresses an aspect, other than predatory lending, of the home purchase transaction that has been identified as a problem. HUD notes the recommendation is outside the scope of this rule. Although HUD does not regulate non-FHA lending practices, HUD has taken steps, such as issuing rules on property flipping, appraisal reform, and lender accountability, to address predatory lending, and continues to monitor this problem and develop new ways of addressing it. FHA has also taken steps to mitigate mortgage insurance losses with the development and implementation of Credit Watch, Neighborhood Watch, and Appraiser Watch. FHA also strengthened its education efforts by doubling housing counseling grant funds, creating anti-predatory lending brochures, featuring anti-predatory lending messages in advertising, and increasing training opportunities for FHA's program participants.

*Comment:* HUD should require homebuyer education instead of eliminating downpayment assistance.

*HUD response:* HUD notes that it is not eliminating downpayment assistance but, as requested by many commenters, is establishing standards for the use of downpayment assistance in FHA-insured mortgages. HUD encourages and supports homebuyer education, and for some programs requires homebuyer counseling, but addressing that subject is beyond the scope of the current rule.

*Comment:* HUD should permit sellers to directly contribute downpayment assistance to buyers without a middleman.

*HUD response:* HUD has determined that contributions to downpayment assistance from sellers and other parties

with a financial interest in the transaction, whether direct or indirect, present an unacceptable level of risk for FHA-insured mortgages.

*Comment:* Rather than doing away with downpayment assistance, HUD should increase FHA loan limits.

*HUD response:* It is unclear how increasing loan limits would mitigate the risk that HUD has experienced with seller-funded downpayment assistance.

*Comment:* Rather than doing away with downpayment assistance, HUD should enforce Mortgagee Letter 02–02.

*HUD response:* While noting again that HUD is not ending downpayment assistance, HUD also notes that Mortgagee Letter 02–02 addresses a different issue than that addressed by this rule. Mortgagee Letter 02–02 addresses a situation where a seller or a nonprofit entity has paid a homebuyer's consumer debt, which then makes it easier for the buyer to meet debt to income ratios. Further, HUD does enforce Mortgagee Letter 02–02. The focus of this rule is downpayment assistance provided by a party with a financial interest in the transaction.

*Comment:* Rather than doing away with downpayment assistance, HUD should limit the seller contribution to 3 percent.

*HUD response:* HUD reiterates that it is seeking to establish reasonable and prudent standards for the use of downpayment assistance, and that downpayment assistance from a seller or other party with a financial interest in the transaction presents an unacceptable risk to FHA.

*Comment:* Downpayment assistance should be permitted in the 6 percent seller concession for closing costs that FHA allows.

*HUD response:* The downpayment differs from closing costs in that the downpayment creates equity in the property for the buyer and closing costs do not. As such, the downpayment cannot be included in the mortgage, whereas certain closing costs are permitted to be included in the mortgage. For this reason, downpayment assistance cannot be treated as closing costs.

*Comment:* Downpayment assistance helps first-time, low-credit, and low-income homebuyers, who are often minority or single-parent households. HUD should not eliminate or limit such assistance.

*HUD response:* As noted, HUD is not eliminating downpayment assistance but is establishing reasonable and prudent standards for the use of downpayment assistance. All homebuyers will benefit if the debt

burdens of homeownership are set more realistically and if price inflation at the time of purchase is mitigated. Further, mortgage insurance premiums would likely have to be increased without these standards, which would negatively impact all homebuyers. In addition, an analysis of HUD Real Estate Owned (REO) sales since 2004 shows that sales proceeds from this type of downpayment assistance is 3 to 6 percent less than other REO sales. This suggests that the sales prices of such properties may have been inflated.

*Comment:* This rule will negatively impact the market devastated by Hurricane Katrina by reducing the number of families willing to rebuild or buy in that market.

*HUD response:* A number of special incentives and forms of assistance, such as disaster relief loans and grants and lower buyer investment requirements, are available in disaster zones such as that created by Hurricane Katrina. FHA, for example, offers eligible disaster victims section 203(h)-insured mortgages, which require no downpayment. Such assistance and requirements appropriately leave homebuyers in a much more favorable position to reestablish homeownership. The reasonable and prudent standards established by this rule will help to ensure that the benefits provided to disaster victims are not undercut by burdensome price and debt inflation.

*Comment:* The rule will have a negative impact on FHA's business, because of the substantial percentage of loans supported by downpayment assistance. The rule would immediately cause a huge contraction in FHA's business.

*HUD response:* HUD does not intend to maintain or expand the volume of FHA business at the expense of sound and sustainable purchases by homebuyers. Such a result would be contrary to the public purposes underlying FHA's business.

*Comment:* The rule is not supported by data. The analysis of the Government Accountability Office (GAO) found that downpayment-assisted loans had higher default and claim rates than other FHA loans, but did not segregate the effects of downpayment assistance from those of low downpayments and low credit ratings. HUD should conduct additional research because the data presented does not appear to be conclusive.

*HUD response:* HUD has collected and analyzed additional data through its portfolio analysis. This analysis provides additional verification of the higher level of risk associated with downpayments funded by a seller or other financially interested party

compared to downpayments funded from other sources, which HUD continues to permit. HUD's analysis has also established that loans with downpayment assistance from sellers or other parties with a financial interest in the transaction have a higher loss rate associated with them and currently represent 30 percent of FHA's REO portfolio.

*Comment:* Prohibition of downpayment assistance would harm otherwise qualified borrowers, who will have to delay or forego homeownership or turn to the subprime market.

*HUD response:* HUD notes again that the current rule does not prohibit or eliminate downpayment assistance, but only establishes reasonable and prudent standards for its use that will benefit, and not harm, homebuyers. The purpose of the rule is to mitigate the harm caused by downpayment assistance from sources with a financial interest in the transaction, and help assure continued homeownership. As previously stated, downpayment assistance from parties with a financial interest in the transaction have higher default and claim rates and higher loss rates.

*Comment:* Downpayment assistance should not be prohibited because it provides borrowers instant equity when they purchase a home.

*HUD response:* HUD agrees, and the rule does not prohibit all downpayment assistance.

*Comment:* The rule will have a negative impact on the housing market and on the economy.

*HUD response:* To the contrary, HUD expects that the reasonable and prudent approach taken by this rule will have a positive impact on the housing market and on the economy by reducing the number of mortgages that would otherwise default and go into foreclosure, driving down property values and negatively impacting a community's tax base and economic viability.

*Comment:* HUD should partner with downpayment assistance programs to promote homeownership. A zero downpayment program or downpayment assistance is needed to address the subprime crisis, because there is little or no equity in a substantial number of troubled properties. HUD should postpone action on downpayment assistance until 100 percent financing is permitted.

*HUD response:* HUD does sponsor downpayment assistance programs through such programs as the American Dream Downpayment Initiative, and others in which the assistance is not linked to the financial interest of parties

other than the homebuyer. HUD currently does not have the authority for a zero downpayment program; however, a zero downpayment program would not address this issue of the financial interest of the providers of downpayment assistance. Reasonable standards would still be necessary for downpayment assistance, even if there is no requirement for a minimum investment by the homebuyer.

*Comment:* HUD is replacing a private sector program that works and is forcing people to rely on government bureaucracy. In addition, government-sponsored downpayment assistance has eligibility requirements such as income limits. Private downpayment assistance is available to anyone. The rule will vastly increase the size and cost of government.

*HUD response:* Many of the comments recognized the value of, and the need for, reasonable standards, and the eligibility requirements noted here provide such standards. The cost of government is controlled by prioritizing the availability of benefits to those who need them most. Private downpayment assistance that does not rely upon a party with a financial interest in the transaction is not affected by this rule, which establishes reasonable and prudent standards for the use of downpayment assistance. This rule addresses certain forms of downpayment assistance that increase the cost of government because they increase FHA mortgage insurance payments for losses attributable to loan defaults and lower REO sales proceeds.

*Comment:* A developer should be able to offer buyers incentives to purchase properties.

*HUD response:* A developer's ability to offer incentives, such as a reduced purchase price or a lower interest rate, is not affected by this rule. These incentives are distinguishable from downpayment assistance, and only the provision of downpayment assistance by a seller or a party with a financial interest in the transaction is prohibited by this rule.

*Comment:* Real estate agents should be permitted to use their commission to fund the downpayment where the real estate agent is the buyer/mortgagor, because the commission is earned, and not a seller contribution or gift.

*HUD response:* The circumstance described by this comment are not affected by this rule, because a borrower's earned income, such as a real estate agent's commission, is a permissible source of downpayment.

*Comment:* The rule should not exclude Indian tribes or tribally designated housing entities (TDHEs)

from the governments considered in the rule. In taking this significant action, HUD did not follow its own policy on tribal consultation and the rule should be withdrawn until HUD follows the consultation procedure.

*HUD response:* The rule did not intend to exclude Indian tribes or TDHEs from the governments considered in the rule. This final rule specifically clarifies the treatment of downpayment assistance from Indian tribes and TDHEs. As with other rules that are generally applicable and, thus, also incidentally apply to Indian tribes, HUD did not undertake tribal consultation. HUD's tribal consultation policy states, "Tribal Coordination, Collaboration and Consultation applies when any proposed policies, programs or actions are identified by HUD as having a substantial direct effect on an Indian tribe." (66 FR 49785). Since the effect of the rule on tribes is only incidental and since the rule applies to all FHA-insured single family mortgages, the tribal consultation policy is not applicable. All providers of downpayment assistance are subject to the general standard of this rule and their downpayment assistance cannot be funded by sellers or other parties with a financial interest in the transaction. HUD follows, and will continue to follow, its tribal consultation policy when identified by HUD as applicable.

*Comment:* HUD should clarify whether downpayment assistance provided by grantees under government programs is permitted.

*HUD response:* Grant funds made available to assist homebuyers may be used for downpayment assistance because such funds are not linked to the sources addressed by this standard, namely, the seller or other parties with a financial interest in the transaction. Grantees act with a public purpose, using government-provided funds, rather than acting with a private financial interest in the transaction or using funds from parties with a financial interest in the transaction.

*Comment:* HUD should provide a definition of "family members."

*HUD response:* The term "family member" is defined at section 201(e) of the National Housing Act (12 U.S.C. 1707(e)) and governs regulations issued for FHA programs under section 203 of the National Housing Act, such as the current rule.

*Comment:* HUD should permit loans for downpayment assistance and second mortgages, including loans from the seller and from governments.

*HUD response:* The rule continues to permit loans authorized by statute as a source for the minimum investment.

Loans from sellers are not authorized by statute.

*Comment:* HUD should clarify that this rule does not prohibit assistance from nonprofit developers.

*HUD response:* HUD permits downpayment assistance from charitable organizations. Downpayment assistance from nonprofit developers is permitted as long as it complies with this general standard and their downpayment assistance cannot be funded by sellers or other parties with a financial interest in the transaction.

## V. Findings and Certifications

### Regulatory Planning and Review

The Office of Management and Budget (OMB) reviewed the rule under Executive Order 12866, *Regulatory Planning and Review.* OMB determined that the rule is a "significant regulatory action," as defined in section 3(f) of the Order (although not an economically significant regulatory action under the Order). The docket file was available for public inspection in the Regulations Division, Office of General Counsel, Room 10276, 451 Seventh Street, SW., Washington, DC 20410–0500.

### Environmental Review

A Finding of No Significant Impact was not required for the proposed rule. Under 24 CFR 50.19(b)(6), the rule is categorically excluded from the requirements of the National Environmental Policy Act (42 U.S.C. 4332 *et seq.*) and that categorical exclusion continues to apply.

### Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.

The purpose of this rule, as noted in the preamble, is to establish standards regarding the use of gifts by borrowers with an FHA-insured mortgage—primarily standards that would address gifts by charitable organizations—as a source of an FHA mortgagor's investment in the mortgaged property. To date, HUD's practice has been to limit permissible sources of gifts to family members, governmental agencies, employer of the mortgagor, labor union of the mortgagor, or charitable organizations. HUD is not narrowing the sources of gifts through this rulemaking, but rather is striving to ensure that gifts are gifts and that, especially in the

situation of gifts from charitable organizations, the gift is not a *quid pro quo* between the homebuyer's purchase of the property and the seller's "contribution" or payment to the charitable organization.

The prohibited sources of downpayment assistance, as structured in the final rule, are narrow and should not encompass a substantial number of small entities that are engaged in downpayment assistance to homebuyers, which, to date, have primarily been charitable organizations with tax-exempt status. Charitable organizations, large or small, remain eligible to provide downpayment assistance to FHA mortgagors, subject to meeting the requirements of § 203.19, as revised by this final rule.

Accordingly, the undersigned certifies that this rule will not have a significant economic impact on a substantial number of small entities.

### Executive Order 12612, Federalism

Executive Order 12612, (entitled "Federalism") prohibits, to the extent practicable and permitted by law, an agency from promulgating a regulation that has federalism implications and either imposes substantial direct compliance costs on state and local governments and is not required by statute, or preempts state law, unless the relevant requirements of section 6 of the Executive Order are met. This final rule does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order. This final rule solely addresses requirements under HUD's FHA mortgage insurance programs.

### Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4, approved March 22, 1995) established requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and the private sector. This final rule does not impose any federal mandates on any state, local, or tribal governments or the private sector within the meaning of the Unfunded Mandates Reform Act of 1995.

### Catalog of Federal Domestic Assistance

The Catalog of Federal Domestic Assistance Number for the principal FHA single family mortgage insurance program is 14.117. This final rule also applies through cross-referencing to FHA mortgage insurance for condominium units (14.133), and other smaller single family programs.

**List of Subjects in 24 CFR Part 203**

Loan programs—housing and community development, Mortgage insurance, Reporting and recordkeeping requirements.

■ Accordingly, the Department amends 24 CFR part 203, as follows:

## PART 203—SINGLE FAMILY MORTGAGE INSURANCE

■ 1. The authority citation for part 203 continues to read as follows:

**Authority:** 12 U.S.C. 1709, 1710, 1715b, 1715z–16, and 1715u; 42 U.S.C. 3535(d).

■ 2. Section 203.19 is revised to read as follows:

### § 203.19  Mortgagor's investment in the property.

(a) *Required funds.* The mortgagor must have available funds equal to the difference between:

(1) The cost of acquisition, which is the sum of the purchase price of the home and settlement costs acceptable to the Secretary; and

(2) The amount of the insured mortgage.

(b) *Mortgagor's minimum cash investment.* The required funds under paragraph (a) of this section must include an investment in the property by the mortgagor, in cash or cash equivalent, equal to at least 3 percent of the cost of acquisition, as determined by the Secretary, unless the mortgagor is:

(1) A veteran meeting the requirements of § 203.18(b); or

(2) A disaster victim meeting the requirements of § 203.18(e).

(c) *Restrictions on seller funding.* Notwithstanding paragraphs (e) and (f) of this section, the funds required by paragraph (a) of this section shall not consist, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale:

(1) The seller or any other person or entity that financially benefits from the transaction; or

(2) Any third party or entity that is reimbursed, directly or indirectly, by any of the parties described in paragraph (c)(1) of this section.

(d) *Gifts and loans usually prohibited for minimum cash investment.* A mortgagor may not use funds for any part of the minimum cash investment under paragraph (b) of this section if the funds were obtained through a loan or a gift from any person, except as provided in paragraphs (e) and (f) of this section, respectively.

(e) *Permissible sources of loans.*

(1) *Statutory authorization needed.* A statute must authorize a loan as a source of the mortgagor's minimum cash investment under paragraph (b) of this section.

(2) *Examples.* The following loans are authorized by statute as a source for the minimum investment:

(i) A loan from a family member, a loan to a mortgagor who is at least 60 years old when the mortgage is accepted for insurance, or a loan that is otherwise expressly authorized by section 203(b)(9) of the National Housing Act;

(ii) A loan made or held by, or insured by, a federal, state, or local government agency or instrumentality under terms and conditions approved by the Secretary;

(iii) A loan made or held by, or insured by, a tribal government or an agency or instrumentality thereof, including a tribally designated housing entity as defined at 25 U.S.C. 4103(21), which is treated as a state or local government under applicable state or local law, under terms and conditions approved by the Secretary; and

(iv) A federal disaster relief loan.

(f) *Permissible sources of gifts.* The following are permissible sources of gifts or grants used for the mortgagor's minimum investment under paragraph (b) of this section:

(1) Family members and governmental agencies and instrumentalities eligible under paragraphs (e)(2)(i) and (ii) of this section;

(2) A tribal government or an agency or instrumentality thereof, including a tribally designated housing entity, as defined at 25 U.S.C. 4103(21);

(3) An employer or labor union of the mortgagor;

(4) Organizations described in section 501(c)(3) and exempt from taxation under section 501(a) of the Internal Revenue Code;

(5) Disaster relief grants; and

(6) Other sources as may be approved by the Secretary on a case-by-case basis.

Dated: September 26, 2007.

**Brian D. Montgomery,**

*Assistant Secretary for Housing—Federal Housing Commissioner.*

[FR Doc. 07–4846 Filed 9–28–07; 8:45 am]

**BILLING CODE 4210–67–P**

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **EXHIBIT C**

# Bloomberg.com



## U.S. to Ban Down Payment Program Over Objections, Jackson Says

By Neil Roland

June 5 (Bloomberg) -- The U.S. Department of Housing and Urban Development will ban a down payment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said.

``I'm very much against it,'' Jackson said in an interview. ``I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments.''

The program, which was used by more than 100,000 low- and moderate-income consumers last year, allows nonprofit groups to fund down payments and get reimbursed by sellers. Audits have found it has contributed to higher housing prices and a surge in foreclosures of government-backed mortgages.

HUD is seeking to end it at a time when foreclosure filings have hit an all-time high, spurred by rising delinquencies among borrowers with poor or limited credit histories. The agency last month proposed terminating the assistance and has given the housing industry and consumer groups until July 10 to comment.

The National Association of Home Builders and nonprofits including AmeriDream Inc. and Sacramento, California-based Nehemiah Corp. of America criticized HUD's plan last week. They said the program helps consumers become home owners and should be tightened, not ended.

`Sham' Period?

``Did Secretary Jackson just imply that the governmental process of an open public comment period is just a sham?'' AmeriDream Chief Executive Officer Ann Ashburn said in an e-mail today. ``I know that the American people expect more from Secretary Jackson.''

AmeriDream, based in Gaithersburg, Maryland, makes as much as $100 million a year in fees from the program, Ashburn said.

Under the HUD program, nonprofit groups fund the entire down payment for buyers and get reimbursed by the sellers. The arrangement was designed with HUD's approval to circumvent U.S. rules that bar sellers from giving direct assistance.

Audits have found that home sellers typically pay a service fee to the nonprofits and raise the price of their homes to recoup the money. Once sold, the foreclosure rate on these homes is more than double that of other loans sponsored by HUD's Federal Housing Administration, according to HUD data.

Jackson said in the interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments. A similar 1999 HUD proposal was withdrawn by the agency in 2001 following industry opposition.

To contact the reporter on this story: Neil Roland in Washington at **nroland@bloomberg.net**

*Last Updated: June 5, 2007 12:18 EDT*

Bloomberg Printer-Friendly Page



2007 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **EXHIBIT D**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERIDREAM, INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>HON. ALPHONSO JACKSON<br>SECRETARY OF THE UNITED<br>STATES DEPARTMENT OF<br>HOUSING AND URBAN<br>DEVELOPMENT,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 07-1752 (PLF)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **DECLARATION OF CHRISTOPHER HAUVER**

1.      I am of legal age of majority and fully competent to testify to the following matters of my own personal knowledge.

2.      I am employed as a research analyst for Market Innovators, Inc. in Boise, Idaho.

3.      I drafted the report "Analysis of FHA Insured Single Family Mortgage Downpayment Sources and Market Share Data Findings," attached to this affidavit.

4.      The data that I analyzed and discussed in the report came from the Department of Housing and Urban Development's Single Family Portfolio Snap Shot for August 2007.

5.      Although I am not able to verify the accuracy of the data that HUD compiled and included in the Portfolio Snap Shot, the findings contained in my report are based on HUD's data and accurately calculated and/or drawn.

I declare under the penalties for perjury that the foregoing representations are true

and correct.

Executed on    10/18/07

W. Christopher Hauver



# Analysis of FHA Insured Single Family Mortgage Downpayment Sources and Market Share Data Findings

## Commissioned by Genesis Foundation & Home Downpayment Gift Foundation

**MARKET** **INNOVATORS**
*business intelligence*

# October 2007

## Table of Contents

Introduction................................................................................................ 2

Approach.................................................................................................... 2

Analysis..................................................................................................... 5

Conclusion................................................................................................. 8

*While Market Innovator was contracted to perform the analysis of FHA mortgage data and corresponding down payment assistance sources, it did not audit nor does it validate the accuracy or completeness of the data available.*

Market Innovators                 3452 Riva Ridge Way                 Boise, ID 83709



## Introduction

This report was prepared at the request of the Genesis Foundation program and the Home DownPayment Gift Foundation. This report provides an analysis of data in reference to the amount and source of down payment assistance associated with FHA Purchase loans. This report seeks to determine the number of people that would be affected by the inability to use Seller-Funded Down Payment Assistance (SFDPA).

## Approach

To compile the report, Market Innovators reviewed FHA data which was provided by the Department of Housing and Urban Development (HUD) through HUD's Single Family Portfolio Snap Shot. The data analyzed consisted of the most recent information available for August 2007.

Market Innovators reviewed data on 44,589 loan transactions. Market Innovators also analyzed the data variables and data definitions listed in Table A for each loan transaction.

### Table A

| Variable | Definition |
|---|---|
| Down Payment Source | Values other than "Borrower" indicate the presence of downpayment assistance from an authorized source. That assistance need not be for 100% of the downpayment for such other values to be used in the HUD data systems. This data element is provided to HUD by the originating lenders. |
| Interest Rate | The Interest rate charged annually by the mortgagee, in accordance with the mortgage note of deed of trust note Rate is established at the time of Firm Commitment. |
| Loan Purpose | A derived indicator that reflects whether the case is a refinanced loan. |
| Non Profit Number | The tax identification number of non profit agencies (only) providing the gift |

**MARKET INNOVATORS**
*business intelligence*

| | |
|---|---|
| Mortgage Amount | The actual insured amount of the mortgage as determined by statutory limitations, minimum requirements, loan value ratio limitation, and the original requested amount plus any unpaid portions of mip if applicable. The original amount of the mortgage is reported from the lender. |
| Originating Mortgagee | Name of the originating lender. |
| Originating Mortgagee Number | Identifies the parent company of the lender that originated the loan. This 5-digit number remains unchanged even after the loan has been sold a number of times |
| Product Type | Identifies whether the loan has an adjustable rate mortgage. |
| Property and Product Type | Section of the Act Code(SOA). One or more ADP Codes are grouped under a Section of the Act.<br><br>Single Family Property - By insuring commercial lenders against loss, HUD encourages them to invest capital in the home mortgage market.<br><br>Condo - HUD insures mortgages made by private lending institutions for the purchase of individual family units in multifamily housing projects under Section 234©<br><br>Purchase/Rehabilitation - HUD insures rehabilitation loans to (1) refinance rehabilitation of an existing property; (2) finance a rehabilitation or refinancing of the outstanding indebtedness of a property and (3) purchase and rehabilitation of a property. |
| Property City | City in which the insured property is located. |
| Property County | Current County Name, blank if address does not geocode using Census 2000. |
| Property State | The official alphabetic 2-character US Postal Service state abbreviation for the property local associated with an FHA Mortgage Insurance application. |
| Property Zip | Postal zip code where the property is located. |
| Sponsor Name | Mortgagee sponsoring the loan or mortgage for the originator. Sponsor Mortgagee underwrites the loan and decides whether the borrower represents an acceptable credit risk for HUD. |
| Sponsor Number | The 5-digit lender identification number of the parent company which is the sponsoring financial institution with direct endorsement approval. |

Market Innovators      3452 Riva Ridge Way      Boise, ID 83709

**MARKET** **INNOVATORS**
*business intelligence*

## Analysis

Data were imported in a Microsoft Excel Spreadsheet and sorted by Property and Product Type and Down Payment Source. Market Innovators isolated all *purchase* loan transactions. The resulting data set contained 29,150 transactions from August 1, 2007 through August 31, 2007 representing $4,057,654,637 in transactions. Table B shows the Down Payment Source information provided by HUD.

**Table B**

| August 2007<br>Total FHA Purchase Analysis<br>Displayed by HUD Definition | |
| --- | --- |
| Source | FHA Purchase Transactions |
| Borrower | 14016 |
| Employer | 40 |
| Govt | 1495 |
| NonProfit | 9980 |
| Relative | 3619 |

Source: *Single Family Portfolio Snap Shot August 2007*

In analyzing the data of borrowers utilizing SFDPA non-profit providers their transactions, Market Innovators verified 27 unique SFDPA non-profit providers.

From these identified SFDPA providers, we have documented 9,210 homebuyers that received down payment assistance.

The list of known non-profit SFDPA providers in August is found in Table C.



**Table C**

| Known Non-Profit Seller Funded Downpayment Program Providers | |
|---|---|
| 481288208 | Alta Crossing |
| 630837399 | American Family Funds |
| 061670138 | American Homebuyers Foundation |
| 522145694 | Ameridream |
| 742321634 | Baptist General of Texas |
| 161527355 | CDS Grants |
| 870669895 | DPA Alliance |
| 421453840 | Equity Funding Corp |
| 582200391 | Family Home Providers |
| 582569951 | Futures |
| 931195886 | Housing Action Resource Trust |
| 581988781 | Home Ownership Foundation |
| 582467304 | Home Ownership Providers |
| 650719616 | Homes for All |
| 591959721 | Individual Freedom Ministries |
| 680422086 | International Housing Solutions |
| 943391461 | JW Hansen Foundation |
| 752911493 | Mountain Movers International |
| 570980253 | Nehemiah |
| 611344613 | New Home Gallery |
| 364378897 | Partners in Charity |
| 870501592 | Positive Alternatives |
| 870635224 | The Buyers Fund |
| 352114498 | The Genesis Foundation |
| 542017625 | The Home Down Payment Gift Foundation |
| 870677118 | The Ownership Gift |
| 520734710 | United American Housing |

In analyzing this data set of 29,150 home buyers who obtained an FHA mortgage and their corresponding down payment source, Market Innovators determined:

- 15,134 homebuyers (52%) purchasing a home in the month of August 2007 used some form of down payment assistance;

- 9,980 of these homebuyers (34%), representing $1,349,897,802 in new home purchases, received their down payment from a non-profit organization;

  - 9,210 homebuyers representing $1,245,747,370 in new home purchases (and possibly more than 9360[1]) received down payment assistance from a SFDPA non-profit provider.

Market Innovators          3452 Riva Ridge Way          Boise, ID 83709

MARKET **INNOVATORS**
*business intelligence*

- 5,154 of these homebuyers (17%) received their down payment from government programs, employers and relatives.

**Table D**

| August 2007 Total FHA Purchase Analysis by Downpayment Source | |
|---|---|
| Source | FHA Purchase Transactions |
| Total | 29,150 |
| Borrower | 14016 |
| **SFDPA Nonprofit** | **9,210** |
| Relative | 3619 |
| Govt | 1495 |
| Other NonProfit | 770 |
| Employer | 40 |

In addition, while four of these programs provide more assistance than others, it is important to note that not one of the 27 non-profit down payment assistance programs provide more than 20% of the entire SFDPA.

**Other Seller Funded programs affected.**

HUD's data does not provide enough information to track the individual Seller Assisted programs offered by government entities. We are currently aware of Seller Funded tribal programs of the Penobscot Indian Nation, Lower Brule Sioux Tribe, Ely Shoshone Tribe and the Confederate Tribes of the Goshute Nation.

**Note 1)** We were unable to identify the nonprofit organizations that provided down payment assistance for 770 homebuyers due to the fact that we did not have the time to verify their source from all the Tax Identification numbers (TIN) provided other than those we routinely track.

We did, however, provide some analysis on these DPA transactions and discovered that at least 148 of TINs provided were very close to other TIN's matching Known Non-Profit SFDPA organizations (within in a few digits). We also found that 109 TIN appear to be one number short to be valid. In addition, we found that some TIN's were clearly not valid.

-148 Additional SFDPA

Market Innovators          3452 Riva Ridge Way          Boise, ID 83709

**MARKET**<sup>INNOVATORS</sup> *business intelligence*

For Example:

One of the TINs entered was 35211449**5** which does not represent any organization but is only one digit off from being the number for The Genesis Foundation- 35211449**8**

With this in mind we were able to conclude with much assurance that of the 770 unconfirmed down payment assistance transactions 148 are from known seller assisted down payment assistance providers with a high probability that still many more are from SFDPA.

- Short numbers

For Example:

We also found that 109 TIN appear to be one number short to be valid.  One of the TINs entered was 35211498 which does not represent any organization but is only one digit short (4) from matching the number for The Genesis Foundation- 352114**4**98

- We also found that some of TINs were altogether illegitimate.

For Example:

One of the TINs entered was 999999999 and another 111111111

**Note 2)** Further investigation with HUD revealed that HUD currently has no means to verify whether or not the TIN entered by the mortgage company is legitimate.  It is important to note, however, that the number of unknown sources of non-profit down payment assistance is extremely small in comparison to the known sources.

**Conclusions**

These findings strongly suggest that any policy change prohibiting SFDPA would have an overwhelming and immediate impact on the ability of 9,210 (to 9,360) borrowers to purchase a home in August. This would have affected at least $1,245,747,370 in new home sales in only one month alone.

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **<u>EXHIBIT E</u>**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERIDREAM, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1752 (PLF) |
| | ) | |
| HON. ALPHONSO JACKSON | ) | |
| SECRETARY OF THE UNITED | ) | |
| STATES DEPARTMENT OF | ) | |
| HOUSING AND URBAN | ) | |
| DEVELOPMENT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>DECLARATION OF KELLY SCHWEDLAND</u>

1.      I am of legal age of majority acid fully competent to testify to the following matters of my own personal knowledge.

2.      I am the President of the Genesis Foundation ("Genesis").

3.      Genesis relies on contributions from home sellers and builders to provide seller-funded downpayment assistance ("SFDPA") to low- and moderate-income homebuyers. If SFDPA is eliminated, Genesis will be forced to go out of business.

4.      Genesis is already experiencing reduced activity because of HUD's new Regulation that is to become effective on October 31. 2007. We would typically have approximately 1000 contracts scheduled for November grants around this time of the year. Right now, Genesis has only 251 November cases pending, and those will be reduced TO zero if the Regulation takes effect at the end of October.

5.      Genesis currently enables approximately 30,000 individuals and families to purchase homes each year. From January 1, 2007 to September 30, 2007, Genesis provided $87,451,253.17 in grants to 18,747 homebuyers. Genesis currently has 3,282 homebuyers scheduled to receive grants in October.

6.      Genesis and the Home Downpayment Grant Foundation ("HDGF") are two of the largest non-profit organizations providing downpayment assistance in America. From January through September 2007, Genesis and HDGF have collectively helped over 30,000 homebuyers. This represents over $165 million in equity.

7.      The majority of Genesis's clients are first-time homebuyers. Many of our clients are minorities, women, and single parents.

8.      Fifty-six (56) people work for Genesis, most as employees. Most Genesis employees are highly skilled people who have been with us for a long time.

9.      Jerry Hinson, a loan officer with LMI Funding, provided the attached letter detailing his experience working with a family who received downpayment assistance from Genesis.

10.     In addition to downpayment assistance, Genesis offers important ancillary services such as our mortgage protection program.

I declare under the penalties for perjury that the foregoing representations are true and correct.

Executed on 10/19/07

_____
Kelly Schwedland

To The Genesis Foundation:

Regarding ⌐                                                              October 18, 2007

As a loan officer with LMI Funding I had the opportunity to help a sweet family, ᵗ
_____ ), get into a home of their own by using down payment assistance. I was
particularly impressed with this couple. They have two children, ᵢ_____
_____ was born 90% blind and has an inoperable tumor which of course causes him to
require special assistance.

Before being able to get into a home of their own they lived in a small rent house in which
their kids had to share a bedroom. The landlord told them that when their lease was up that
they had to move because he was going to move his elderly mom into it. With all of the
expenses related to taking care of Austin around the clock the        's were never able to
save up enough money to put down on a home to get a mortgage.

I told them that I could help by getting their down payment covered with down payment
assistance. So they got a realtor to show them some homes. They settled on a nice new
home in which the builder agreed to pay for the majority of the closing costs. If I recall, they
only had to come to the table with about $700. I was there when they moved in as I had
become kind of like a family friend. They and their kids just about burst into tears of joy as
they were so thrilled to have a place that they could call their own!

Because of The Genesis Foundation, they and their two children have their very own
bedrooms! It's been almost three years since they moved in and they're still so thankful to
me, The Genesis Foundation for the down payment assistance, and of course the FHA loan
that allowed them to have a piece of the great American Dream. It is awesome to be able to
witness the smiles on the faces of people like the        's that just need a break to be able to
experience the joy of owning a home.

Sincerely,

Jerry Hinson
LMI Funding
Plano, Texas

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **EXHIBIT F**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERIDREAM, INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-1752 (PLF) |
| ) | |
| HON. ALPHONSO JACKSON ) | |
| SECRETARY OF THE UNITED ) | |
| STATES DEPARTMENT OF ) | |
| HOUSING AND URBAN ) | |
| DEVELOPMENT, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF RICK DEL SONTRO

1.      I am of legal age of majority and fully competent to testify to the following matters of my own personal knowledge.

2.      I am the Chief Operating Officer of the Home Downpayment Gift Foundation ("HDGF").

3.      HDGF relies on contributions from home sellers and builders to provide seller-funded downpayment assistance ("SFDPA") to low- and moderate-income homebuyers. If SFDPA is eliminated, HDGF will be forced to go out of business.

4.      HDGF will not be able to attract contributions as we have in the past if SFDPA is barred at the end of October. Instead, the Nehemiah Foundation will be the only entity that can lawfully obtain seller contributions – at least, for six months after the Regulation's effective date.

5.      HDGF provided grants to 1,656 homebuyers in the month of August 2007. HDGF will help approximately 20,000 families and individuals this year.

6.      Most of our clients are minorities, women, and single parents. Eighty-eight percent (88%) of our clients are first-time homebuyers.

7.      Approximately thirty people work for HDGF, many as employees. It would be very difficult to replace our employees if we are forced out of business and later allowed to reopen, because many of them are specialized workers who have been working in this business for some. We have a very low employee turnover rate.

8.      HDGF provides a number of services that benefit the public. Our Pre-Homebuyer Education program will serve more than 7,000 individuals this year. This is important because the great majority of the first-time homebuyers that we serve have no formal understanding of homeownership or the financial obligations that are associated with this significant, life-changing event.

9.      HDGF also provides job loss insurance policies at no cost to homebuyers. The number one reason for mortgage defaults within the FHA portfolio is loss of employment. Our policy provides coverage of up to six mortgage payments per year in the event of job loss. Mildred Black is an HDGF client who benefits from this program. She has provided a letter about her experience, which is attached to this affidavit.

10.      HDGF also addresses job loss and other financial emergencies through our Rainy Day Program. This year, HDGF will provide nearly $1,000,000 in funds to this program. Additionally the Rainy Day Program will give nearly $500,000 in grants for assistance to low-to-moderate income homeowners who experience short-term financial challenges.

11.      HDGF offers early delinquency counseling, which is critical to fixing financial problems and changing problematic behaviors before they become irreversible.

I declare under the penalties for perjury that the foregoing representations are true and correct.

Executed on ___10/19/07___           _____
                                         Rick Del Sontro

MILDRED BLACK
3888 BROOKGREEN POINT
DECATUR GA 30034


October 17, 2007


Mr. Rick Del Sontro
CEO
Home Downpayment Gift Foundation
1808 Corcoran Street NW
Washington DC 20009

Dear Mr. Del Sontro:

My name is Mildred Black; I am a single African American woman with a college degree. When I purchased my home I received down payment assistance from Home Downpayment Gift Foundation. At the time I purchased my home in September of 2006 I qualified for a mortgage but like many others I could not come up with the down payment. My family wasn't an option and there were no government programs available. So, thank goodness for Home Downpayment Gift Foundation.

Shortly after purchasing my home I was offered a promotion with a new company which would advance my career. After long consideration, I decided to make the move. Shortly thereafter, I was notified that my position was being eliminated. I was now out of work, and had a new home, two young children and other responsibilities. I was devastated. This was the first time in my life I was in a position like this. I did not know where to turn.

Remembering the letter I had received shortly after closing on my home, I contacted Home Downpayment Gift Foundation concerning a program that they call, Home Mortgage Protection Plus. In short, this is an insurance product that will provide homeowners with up to six months of mortgage payments in the event of loss of employment. I might add that this was provided to me at no cost. This program was made available to me because I used their down payment assistance program.

Faced with potential loss of my home, I contacted them and since July of 2007 I have received assistance with my mortgage payment. I can't imagine what things would have been like with out this program, that as I understand is funded through their seller assisted down payment program.

In my case, I would have defaulted on my home, not because I wasn't qualified for a home or because I didn't put my own money into the my down payment. I would have lost my home because of an event in my life beyond control. If I had received my down payment from any other source (parents or government) I would likely be facing foreclosure because neither would have provided the job loss protection.

I am shocked that HUD would consider eliminating programs like yours for down payment assistance and can't imagine how many people will suffer from the elimination of your job loss protection as well.

Gratefully yours,

Mildred Black

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **EXHIBIT G**

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410

OFFICE OF THE ASSISTANT SECRETARY FOR
HOUSING-FEDERAL HOUSING COMMISSIONER

**APR 3 1998**

Don F. Harris, Esq.
Nehemiah Home Ownership 2000
770 L St. Suite 750
Sacramento, CA 95814

RE: Nehemiah Home Ownership 2000

Dear Mr. Harris:

The United States Department of Housing and Urban Development
("HUD") has received and reviewed the IRS ruling that the non-
profit organization which administers the Nehemiah down payment
assistance program qualifies for Section 501(c)(3) status. Based
upon the program specific information accompanying your
submission to the IRS, we find that your program complies with
HUD's regulations and guidance pertaining to the source of funds
for the borrowers' down payments.  Accordingly, HUD will insure
eligible mortgages in which home buyers use Nehemiah's program(as
set out in the submission to the IRS for Section 501 (c)(3)
status) for borrower down payment assistance.

Although HUD has no immediate plans to change its policies
regarding down payment assistance programs or regarding the
source of borrower down payment funds, HUD reserves the right to
do so in the future in accordance with applicable procedures. In
the event that there are any such changes regarding the source of
borrower down payment funds, the changes will become applicable
to Nehemiah and all other similarly situated down payment
assistance programs six months after the final promulgation and
issuance of any such changes.

Sincerely,

Emelda Johnson
Deputy Assistant Secretary
Single Family Housing Programs

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **<u>EXHIBIT H</u>**

# ECONOMIC BENEFITS OF INCREASING
# MINORITY HOMEOWNERSHIP

## I. Introduction

Over the last century, the federal government has played a central role in developing institutions and infrastructure that have promoted economic stabilization and growth and carried a much broader spectrum of the nation's citizens into homeownership and increasing wealth. The 30-year, self-amortizing mortgage coupled with the primary market credit enhancement of mortgage insurance connected average Americans with few assets to low down payment financing from lenders. And lender credit enhancements in the secondary market made it possible for lenders to secure continual access to lower-cost, loanable funds from investors in the national capital markets. (See Appendix A for highlights.) With these innovations and related variations, credit-worthy households with little or no wealth across the nation have been able to qualify for relatively low-cost mortgage financing and the general rate of homeownership has risen from approximately 44 percent in 1940 to its current level of 67.6 percent.

Housing had one of its best years in history this past year with Americans buying a record six million new and existing homes. The boost from housing is credited with overcoming double digit declines in some key industries so that the economy overall actually rose slightly. Without the boost from housing, the recent recession would have started earlier, lasted longer, and been more severe.

However, while far more American households now share in the benefits of homeownership, minority households continue to share at substantially lower rates. The homeownership rate among white households is about 74.2 percent compared to 48.5 percent for minority households. Hence, a sizable "homeownership gap" persists for minority households despite some recent narrowing. Reducing this gap by expanding homeownership opportunities for minorities is a fundamental aim of the President's housing policy. President Bush is committed to ensuring that opportunities and benefits of homeownership are available for all American families.

In June 2002, President Bush announced a new goal to help close the homeownership gap by increasing minority homeownership by 5.5 million by the end of the decade. The analysis contained in this paper outlines the substantial benefits to the housing sector, along with related industries, that will result from this initiative.

This paper provides a brief discussion of the homeownership gap and the reasons for it. It then presents an analysis of the economic impact and benefits that may be expected from the President's policy. Finally, it concludes with a discussion of other private and public benefits that can be expected from the initiative.

## II. Homeownership Gap

As shown in Figure 1, U.S. Census Bureau statistics for the second quarter of 2002 indicate that the homeownership rate for white American households was 74.2 percent. By contrast, the homeownership rates for minority households were 47.1 percent for African Americans, 47.2 percent for Hispanic Americans, and 55.8 percent for Asian Americans and other races, respectively. Thus, it follows that the measured gap between the homeownership rates of white and African-American or Hispanic households measures approximately 27 percentage points. The gap for Asian Americans and others measures approximately 18 percentage points.

**Figure 1**
**Rate of Homeownership by Race**
**2ⁿᵈ Quarter, 2002**



There are multiple factors or barriers that have differentially affected minority households and contributed to the homeownership gaps. These include:

- lack of capital for a down payment and closing costs;

- lack of access to credit and/or poor credit history;

- lack of understanding and information about the home buying process;

- language difficulties and cultural differences leading to misperceptions of the mortgage finance system;

- regulatory burdens imposed on the production of housing that drive up costs; and continued housing discrimination.

In recent years government and industry have worked together and had some success in their effort to reduce the barriers and narrow the gap. Annual homeownership rates for minorities increased between 1994 and 2001. The annual homeownership rate for all minorities was 43.2

2

percent in 1994 but increased to 49.0 percent in 2001. The number of minority homeowners increased substantially during that period, from 9.5 million to 13.3 million. However, the reduction in the homeownership gap was somewhat smaller than the increase in the minority rates of homeownership because the homeownership rate for non-minority households increased as well.

Adding 5.5 million minority homeowners over the next decade will help to close the homeownership gap and as well as bring substantial economic and other benefits to the new homeowners.

## III.  Economic Benefits of Homeownership

### *Potential Economic Benefit to Housing Sector of 5.5 million new minority homebuyers within the decade totals $256 billion.*

Becoming a homeowner not only serves as a source of stability for families and communities but as a foundation for economic stability within housing and related industries. This section of the report identifies the economic benefits, to the housing sector, of helping minority families buy homes and presents the estimated dollar impact. These economic benefits include the following:

- Jobs created in the residential construction and remodeling industry that would be associated with the purchase of newly constructed homes.

- Benefits for businesses that sell home improvement and other housing related goods and services due to increases in household spending – first-time homebuyers consume more home- and housing-related goods and services than other households.

- Benefits for buyers from building home equity - buyers stand to benefit by building equity through house price appreciation and paying off their mortgage principal.

### Importance of Housing Industry to Economy

The production, transfer, and maintenance of housing are significant factors in the nation's economy. In the Gross Domestic Product (GDP) accounts, the housing sector is directly associated with residential fixed investment and housing services. Residential fixed investment includes the value of new residential construction, improvements and additions to existing units, brokers' commissions on the sale of existing properties, and net purchases of used structures from government agencies. In 2001, new residential construction totaled $262.8 billion, consisting of $232.1 billion in single-family structures and $30.7 billion in multifamily structures. An additional $8.8 billion in manufactured homes was produced. Improvements totaled $104.6 billion, and brokers' fees $60.0 billion. Total residential fixed investment was $433.9 billion, excluding college dormitory housing. Housing services include rent payments and implicit rent for homeowners and totaled $1.01 trillion in 2001. The combined total for housing's direct impact on GDP was $1.45 trillion, or 14 percent of GDP.

3

The importance of the housing industry is also evident by its weight in the market basket of goods and services for the Consumer Price Index. Shelter, consisting of rent, owners' equivalent rent, and insurance, represents just under 30 percent of the typical consumer's expenditures. Fuel and other utilities add another 4.9 percent, and household furnishings and operation amount to 4.8 percent of the market basket. In total, housing comprises 40 percent of the typical market basket for urban consumers, as measured by the Consumer Expenditure Survey of the Bureau of Labor Statistics (BLS). [1]

## Increasing Minority Homeownership Spurs Job Growth in Housing Sector[2]

Minority households who become homeowners will stimulate new home construction and related employment in several ways. First, 825,000 of the 5.5 million minority households who will become homeowners over the decade will likely purchase a new single-family home. Second, an additional one million new single-family homes will likely be purchased by sellers of existing homes to new minority homebuyers. Finally, 110,000 manufactured homes will likely be assembled for direct purchase by new minority homebuyers, for a grand total of 1.936 million additional new single-family housing units attributable to the minority homebuyer initiative. (See Table 1 for impact estimates.)

**Table 1.**

**Projected New Construction by Type of Minority's Home Purchased**

| Type of Home Purchased | Share | # New Housing Units Required |
|---|---|---|
| New Single Family Homes | 15% | 825,000 |
| Existing Single Family Homes | 70% | 1,001,000 |
| New Multifamily Homes | Less than 1% | Negligible |
| Existing Multifamily Homes | 6% | Negligible |
| New Manufactured Housing | 2% | 110,000 |
| Existing Manufactured Housing | 7% | Negligible |

However, the overall effect on construction must take into account the fact that there will be an offsetting reduction in the number of rental households and thus a reduced need for construction of rental housing. The offset is not one-to-one because an increase in the homeownership rate leads to an increase in household formations. Considering both new household formations induced by the increase in minority ownership, and the fact that the some rental housing will be removed from the supply, the shift from rental to owner housing by minorities will reduce the need for rental housing construction by 198,000 units over the decade.

4

The net increase in housing construction stimulated by minority purchases over the decade will generate 4.09 million full time job equivalents in construction and construction-related industries, many of which will be at high pay levels. This increase in jobs represents over $150 billion in new wages. (See Table 2.) About 40 percent of these jobs are on-site construction work; another 27 percent involve employment in transportation, trade, and other locally based services. Additional employment is created through the increase in demand for household goods and services.

### Table 2.

### Break Down of Jobs and Wages Generated
### by Change in Residential Construction

|                                     | Full-time Jobs | Wages ($ Billions) |
|-------------------------------------|----------------|--------------------|
| All Industries                      | 4,089,460      | 150.0              |
| Construction                        | 1,888,980      | 67.0               |
| On-site                             | 1,604,360      | 57.0               |
| Off-site                            | 284,620        | 10.0               |
| Other Industries                    | 2,200,490      | 82.0               |
| Manufacturing                       | 991,400        | 42.0               |
| Trade, transportation, and services | 1,123,360      | 38.0               |
| Mining and Other                    | 85,720         | 2.0                |

### Benefits to Businesses that Sell Home Improvement and Other Housing Related Goods

Homeownership does not end simply with the purchase of a home. The transition to homeownership is also associated with the purchase of new appliances and furnishings. Often new homeowners make significant alterations and repairs to their homes, in the process purchasing construction materials and employing remodeling contractors.

Using the Consumer Expenditure Survey to isolate specific impacts shows that households who buy a home spend more in the first year of occupancy than owners or renters who do not move.[3] Expenditures for decorating, landscaping, and other furnishings are higher than for similarly situated households who have not moved. Average homebuyers of all races who move into a new home spend an additional $4,912 in the first year and those who move into an existing home spend $3,706. Increasing minority homeownership by 5.5 million would increase spending on home improvement, appliances and furnishings by almost $36 billion, $17 billion for remodeling, repairs and alterations, and $19 billion for appliances and furnishings, when both direct and indirect effects are considered.

5

One of the largest categories of this new spending by homebuyers is furnishings. The projected increase in furniture spending associated with increasing minority homeownership by 5.5 million households exceeds $12 billion. Increased spending on home furnishings should add a considerable economic boost to sections of the country that are heavily dependent upon furniture production. A breakdown of the aggregate increase in expenditures on furnishings for selected categories is presented in Table 3.

**Table 3.**

**Spending on Selected Furnishings and Appliances**
(\$ Thousands)

|  | Total* |
|---|---|
| Refrigerators | 375,880 |
| Clothes Washers and Dryers | 94,380 |
| Lawn Mowing Equipment | 466,190 |
| Color TVs | 785,100 |
| Sofas | 3,020,690 |
| Other Living Room Furniture | 1,622,870 |
| Modular Wall Units | 686,770 |
| Dining Room or Kitchen Furniture | 2,423,090 |
| Mattresses and Springs | 576,460 |
| Other Bedroom Furniture | 1,064,670 |
| Curtain and Drapes | 984,130 |
| Venetian Blinds/Shades | 1,455,090 |
| Installed Replacement Carpeting | 655,640 |

Source: NAHB calculations using data from the Consumer
Expenditures Survey, U.S. Bureau of Labor Statistics.

* Aggregate of increased spending by new minority home
buyers and trade-up sellers.

In addition, there are a number of expenses for professional services provided when buying and financing a home, including those of real estate agents, mortgage originators, appraisers, surveyors, credit bureaus, attorneys, and others. Total mortgage origination and real estate settlement expenditures stimulated by the additional home sales are estimated to be $70. (The real estate agent fee for new home sales is included in the construction impact above.)

**Benefits for Communities from Home Construction and Sales**

Increased home sales and new construction offers direct benefits to state and local governments. The new construction needed for 5.5 million more minority homebuyers over the decade will generate $80 billion in first-year tax revenues, including federal, state and local income taxes, transfer taxes, and fees paid for building permits, approvals, and impact fees. (See Table 4 for

6

aggregate impacts.) Furthermore, although not included in the dollar estimate of first-year tax impacts, it should be recognized that residential property taxes, which are certainly an important ongoing component of local revenues, will rise to reflect the increased value from the resulting property improvements.

**Table 4.**

**Break Down of First-Year Taxes Generated
by Full Change in Residential Construction**

|  | Taxes ($ Billions) |
|---|---|
| Total | 80.0 |
| Federal Taxes | 55.0 |
| Personal Income Tax | 14.0 |
| Corporate and Business Income Taxes | 18.0 |
| Social Security Taxes | 23.0 |
| State and Local Taxes & Fees | 14.0 |
| General Sales Taxes | 7.0 |
| Personal Income Tax | 3.0 |
| Corporate and Business Income Taxes | 4.0 |
| Local Taxes & Fees* | 11.0 |
| Property Transfer Taxes | 1.0 |
| Building Permits, Approval and Impact Fees | 10.0 |

*Excludes Annual Property Tax Revenues

**The Value of the Home Equity Accrued by New Buyers**

Housing is the primary store of personal wealth for American families. Home equity represents the single largest asset held by most Americans. Among owners with household incomes below $20,000, home equity accounts about 72 percent of household wealth. For those with incomes between $20,000 and $50,000, home equity constitutes 55 percent of their total wealth.[4] Over time, purchasing a home has proven to be an effective wealth building strategy for millions of Americans. For instance, the median wealth of a low-income homeowner under age 65 is 12 times that of a similar renter. By paying a portion of mortgage principal each month, homeowners accumulate home equity so long as property values do not decline. Most low-income households spend a third or more of their income on rent, none of which adds to their savings. By shifting spending to a home, homebuyers take on the risk of loss from a decline in house prices and substantially higher costs of moving to another residential location. However, they also begin to save, simply because part of their payment toward their housing now pays down principal over time and accrues as home equity. Moreover, because homebuying is a highly leveraged investment, potential increases in the values of homes can bring rich returns on

the money invested in a home in the form of a downpayment. For example, if a family purchases a home for $100,000 with a $5,000 down payment and the home price appreciates by 3 percent per year, the home will be worth $115,927 after 5 years. And because the homeowner will have paid his loan down to $90,074 over the same period, his equity will have grown by $20,853 for a 417 percent increase or 33 percent annual return on his initial $5,000 invested.

Gains to homeownership also benefit a larger share of the population, since homeownership is more widespread and evenly distributed than stock ownership. The Federal Reserve's Survey of Consumer Finances (1998) shows that home equity (the value of the home net of mortgages) was the largest component of total wealth for most households. The wealthiest 20 percent of households held slightly over 40 percent of all home equity wealth, while the same top 20 percent held close to 80 percent of stock market wealth.[5] When housing prices rise, the benefits flow to all income levels. In fact, evidence has shown that in a strong economy with rising incomes, lower-priced homes appreciate more than higher-priced homes.[6] Homeowner's equity has risen by an estimated $1.5 trillion since 2000.[7]

## IV. Other Private and Public Benefits of Homeownership

In addition to creating jobs in the housing sector, homeownership enhances the lives of individual households and increases the social capital of communities.

The view that homeownership provides public or social benefits to communities in addition to individual homeowners is quite pervasive and has long been thought to include improved outcomes for children, increased civic involvement, better maintenance of homes and greater neighborhood stability, a better sense of well-being, increased savings and wealth, and many other beneficial outcomes. Until recently, these social benefits to homeownership were simply taken as given because there was no empirical evidence either supporting or discrediting these long-held claims. Of late, a large number of academic studies conducted by demographers, sociologists, psychologists, and economists have been published that have consistently corroborated the view that the benefits of homeownership extend to the greater community. These studies and findings are reported below. Taken together, the weight of the evidence, the breadth of the disciplines, the variety of data sets, and the many time periods studied strongly suggest that intuition was right and that the benefits of homeownership do indeed extend beyond individual homeowners to society at large.

**Homeownership is associated with higher levels of housing maintenance and property price appreciation.** Property values not only measure the utility and condition of a structure for residential purposes, but also the value of the location in terms of community and neighborhood. Studies have found homeowners spend both more in dollar terms and personal labor on maintaining their residences than do landlords of comparable rental properties.[8] Moreover, areas with higher rates of homeownership also witness greater rates of property value appreciation.[9]

**Homeownership is associated with positive impacts on children.** Several researchers have reached the conclusion that, holding all else equal, homeownership has a positive impact on children within the household. These correlations include an improved cognitive stimulation and

emotional environment, an increased educational attainment for children (i.e., higher math and reading scores), fewer behavior problems, a lower teen-age pregnancy rate for daughters living in an owned home, and a higher lifetime annual income for children raised in an owned home.[10]

**Homeowners are more involved in their communities.** Although the level and benefits of community involvement are hard to measure, several researchers have found, using a wide variety of measures, that owners tend to be more involved in their communities and local governments than renters. For instance, owners participate in a greater number of non-professional organizations, have higher church attendance, and higher voter participation rates.[11] While it is hard to put a dollar value on something like church attendance, it is clear that these factors generally make a neighborhood a more pleasant place to live. In addition to higher civic participation, owners also tend to remain in their homes longer, adding stability and familiarity to the neighborhood.[12]

**Homeowners are more satisfied with their homes and neighborhoods.** The American Housing Survey (AHS) collects information on current resident's satisfaction with their home and neighborhood. According to an analysis conducted using the 1999 AHS, owners on average rated their satisfaction with their home at 8.0 (on a scale of 1 to 10), compared to 7.2 for renters. Among single-family home residents, owners rated their neighborhoods at 7.9, while renters rated their neighborhoods at 7.3.

**Homeowner equity can provide an important link to entrepreneurship.** Home equity serves as one method of enabling potential new business owners to gain access to the credit markets. Home equity tends to be one of the largest sources of collateral for bank loans to start new businesses.[13] Homeowners are almost three times as likely to hold direct ownership in business ventures than renters. The 1998 Survey of Consumer Finances reports that 14.5 percent of owners held some form of nonstock business equity, compared to only 5.4 percent of renters. Morevoer, a typical owner also held almost two-and-a-half times the dollar value of business equity as a typical renter. The median nonstock business equity holding for owners was $75,000 in 1998, compared to $31,000 for renters.

9

## A Brief History of Federal Activities to Promote Homeownership

From the Homestead Act of 1862 through the adoption of the mortgage interest deduction and the creation of the Federal Home Loan Banks, the Federal Housing Administration and a series of institutions supporting a secondary mortgage market, the Federal government has played a critical role in expanding homeownership opportunities for Americans. The following are some key events in this long and successful history:

1932    *Establishment of the Federal Home Loan Bank System.* The Federal Home Loan Bank System was created to ensure a stable flow of capital to private sector lenders who made mortgage loans available to home purchasers.

1934    *Establishment of the Federal Housing Administration (FHA).* FHA provides mortgage insurance to private lenders who provide low down payment long-term mortgages to homebuyers. FHA insurance played an important role in popularizing the 30-year fully-amortizing mortgage that is so common in today's U.S. mortgage market. Today, FHA and Ginnie Mae (Government National Mortgage Association)--which helps insure liquidity by guaranteeing pools of FHA and other government-supported mortgages--continue their traditional role in helping many families obtain mortgage financing, particularly first-time, low-income, and minority home buyers.

1938    *Creation of a Secondary Mortgage Market.* The federal role in ensuring a steady stream of capital to the homebuying market continued with the creation of a secondary mortgage market, first with the creation of Fannie Mae (Federal National Mortgage Association--1938) and later with the creation of its sister organization Freddie Mac (Federal Home Loan Mortgage Corporation--1970).

1944    *G.I. Bill.* The G.I. Bill provided returning servicemen and their families with assistance in buying homes. The Department of Veterans Affairs continues to play a key role in making the dream of homeownership a reality for the nation's veterans. The post-WW II era also saw the creation of homeownership programs within the Department of Agriculture that help ensure the flow of mortgage credit to hard to serve rural areas.

1946    *Farmers Home Administration.* The FmHA, later renamed the Rural Housing Service (RHS), makes and guaranties loans and provides grants for construction and repair of homes in non-metropolitan and rural areas. It also assists rural self-help housing groups.

1949    *Housing Act of 1949.* This act declared a national goal of "a decent home and a suitable living environment for every American family."

1968    *Fair Housing Act.* Federal policies to expand homeownership opportunities for all Americans continued with the passage of the Fair Housing Act in 1968, which banned discrimination based on race, color, religion or national origin (later amended to include sex, disability or familial status).

1977    *The Community Reinvestment Act (CRA).* CRA sought to prevent redlining and to encourage banks and thrifts to invest in all segments of the communities they served, including low- and moderate-income neighborhoods and the passage of federal laws regulating homebuying and settlement transactions.

1990    *The National Affordable Housing Act of 1990* established the HOME program to provide states and localities with federal funds for the construction and rehabilitation of affordable housing and instituted reforms of the FHA Single Family Mortgage Insurance program that returned FHA to an actuarially sound position. Since that time, FHA has insured over 12,000,000 home loans.

10

[1] See D'Allessandris, David, "The Importance of Real Estate to the Economy," *Real Estate Outlook*, National Association of REALTORS®, June 1998.

[2] Estimates in this section were produced by the National Association of Homebuilders (NAHB) in "Economic Impact of Adding 5.5 Million Minority Home Owners," September 20, 2002.

[3] P. Emrath, "What Else Home Buyers Buy," *Housing Economics*, April 2000.

[4] Retsinas, N. P., and E. S. Belsky, *Low-Income Homeownership: Examining the Unexamined Goal*, Washington, D.C.: Brookings Institution Press, 2002, p. 201.

[5] National Association of Realtors, "Economic Impacts of the Housing Sector," Research Division, July 2002.

[6] L.B. Smith and M.H.C. Ho, "The Relative Price Differential Between Higher and Lower Priced Homes," *Journal of Housing Economics*, 5(1996)#1, cited in Todd G. Buchholz, *Safe At Home: The New Role of Housing in the U.S. Economy*, Homeownership Alliance, 2002.

[7] Leigh Marjamaa, "Home Equity: The Cornerstone of Wealth," *Community Banker*, September 2002.

[8] Rohe, W., and L. Stewart, "Homeownership and Neighborhood Stability," *Housing Policy Debate*, 7 (1996) #1: 37-82. Galster, G., "Empirical Evidence on Cross-Tenure Differences in Home Maintenance and Conditions," *Land Economics*, 59(1983) #1:107-113.

[9] Rohe, W., and L. Stewart, "Homeownership and Neighborhood Stability," *Housing Policy Debate*, 7(1996) #1:37-82.

[10] See Haurin, D. R., T. Parcel, and R. J. Haurin, R. J., "The Impact of Home Ownership on Child Outcomes," Unpublished manuscript, 2000; Green, R., and M. White, "Measuring the Benefits of Homeowning: Effects on Children," *Journal of Urban Economics*, 41(1997)#3:441-461; Kane, T. "College Entry by Blacks since 1970: The Role of College Costs, Family Background, and the Returns to Education," *Journal of Political Economy*, 102(1994)#5: 879-911; and Boehm, T., and A. Schlottmann, "Does Homeownership by Parents Have an Economic Impact on their Children?" Unpublished manuscript, 1998.

[11] DiPasquale, D., and E. Glaeser, "Incentives and Social Capital: Are Homeowners Better Citizens?" *Journal of Urban Economics,* 45(1999) #45:354-384; also see Rossi, P., and E. Webb. "The Social Benefits of Homeownership: Empirical Evidence from National Surveys," *Housing Policy Debate,* 7(1996) #1:1-36.

[12] Rohe, W., and L. Stewart, "Homeownership and Neighborhood Stability," *Housing Policy Debate*, 7(1996)#1:37-82.

[13] Over 740,000 businesses in 1992 reported a mortgage or home equity loan as a source of start-up capital for their business, helping to create millions of new jobs. See US Bureau of the Census, *Characteristics of Business Owners, 1992*. Economic Census CBO92-1. US GPO, Washington, DC. September 1997.