UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                  )
AMERIDREAM, INCORPORATED,                          )
THE GENESIS FOUNDATION,                            )
HOME DOWNPAYMENT GIFT                              )
FOUNDATION, THE SOVEREIGN                          )
GRANT ALLIANCE, THE FUTURE                         )
HOME ASSISTANCE PROGRAM, and                       )
PARTNERS IN CHARITY, INC.                          )
                                                  )
                    Plaintiff,                     )
                                                  )
          v.                                       )          Civil Action No. 07-1752 (PLF)
                                                  )
HON. ALPHONSO JACKSON                              )
SECRETARY OF THE UNITED                            )
STATES DEPARTMENT OF                               )
HOUSING AND URBAN                                 )
DEVELOPMENT,                                       )
                                                  )
                    Defendant.                     )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

Genesis and the HDGF request that this Court stay enforcement of HUD's

Regulation (to be codified at 24 C.F.R. pt. 203) pending resolution of this action on the merits.

In issuing this Regulation, HUD abruptly reversed a decade-old policy of approving and

facilitating seller-funded downpayment assistance ("SFDPA") programs without explaining or

even acknowledging its departure from this history, without addressing alternative proposals, and

without producing for public comment data and analysis that it substantially relied upon to

justify its action.

Moreover, HUD has granted one SFDPA provider – the Nehemiah Foundation ("Nehemiah") – a six-month extension of the Regulation's enforcement, and, in this litigation, has granted a similar reprieve to AmeriDream (also an SFDPA provider) without a rational basis for distinguishing those entities from all others similarly situated and contrary to previous written assurance.  Simply put, the Regulation is the product of a rush to judgment, reflected by HUD's numerous violations of the Administrative Procedures Act and revealed in HUD Secretary Alphonso Jackson's public statements during the comment process that HUD would shut down SFDPA providers regardless of what the public had to say.

In light of HUD's violations of the Administrative Procedures Act, together with its disparate treatment of similarly situated entities without a rational reason that furthers a legitimate legislative interest, Genesis, HDGF, AmeriDream, the Penobscot Indian Nation, the Sovereign Grant Alliance, the Future Home Assistance Program, and Partners In Charity, Inc. are likely to succeed on the merits of their claims.  The Regulation will cause – and HUD's present actions are currently causing – irreparable harm to Genesis, HDGF, and all others similarly situated, as well as to the public's interest.  Finally, HUD's own actions demonstrate that it will not be harmed by delayed enforcement of the Regulation.  For all these reasons, this Court should grant preliminary injunctive relief.

## II.  BACKGROUND

For over a decade, HUD's position has been that SFDPA programs such as those run by Genesis and HDGF are permitted and even praise-worthy.  On May 11, 2007, however, as the housing market was headed downward, HUD abruptly changed course and published the proposed Regulation, which completely prohibits SFDPA.  *See Appendix p. 3, Federal Register,*

*Amici Curiae ("AC") Exh. B.* [1] HUD's stated primary concern for the change in policy was that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA. *Id.* In support of this assertion, HUD cited a report to which it had previously objected as an inadequate basis to restrict SFDPA programs. *Id.*

In response to its proposal, HUD received over 15,000 comments – over 14,000 in opposition and fewer than 1,000 in support – between May 11, 2007, and August 10, 2007. *Id.* On June 5, 2007, Bloomberg News reported that HUD Secretary Alphonso Jackson stated in an interview that he was very much against SFDPA programs, and that HUD intended to approve the new rule by the end of the year even if the agency receives critical comments. *See Appendix p.10, Bloomberg News Report, AC Exh. C.*

On October 1, 2007, HUD adopted the Regulation as originally proposed and provided notice that it will take effect on October 31, 2007.

### III. ARGUMENT

Genesis's and HDGF's request for a preliminary injunction turns on (1) whether they will suffer irreparable injury if an injunction is denied; (2) whether their claims have a reasonable likelihood of success on the merits; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest. *Al-Fayed v. CIA*, 254 F.3d 300, 303 (D.C. Cir. 2001). "These factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*, 158 F.3d

---

[1] For the Court's convenience, courtesy copies of all Exhibits on which movants rely are included in the attached Appendix. Additional evidence from the public record will be offered at the hearing.

1313, 1318 (D.C. Cir. 1998).  "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).

When the balance of hardships tips decidedly toward the movant, it will "'ordinarily be enough that the Plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'"  *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)).  "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant."  *Id*. at 844.

### A.     Genesis and HDGF will suffer (and are currently suffering) irreparable injury absent injunctive relief.

HUD's Regulation prohibits the use of SFDPA.  *See Appendix p. 3, Federal Register, AC Exh. B*.  Genesis and HDGF rely entirely on seller contributions to keep their organizations alive.  *See Appendix. p. 13, Schwedland Decl., AC Exh. E at ¶ 3; Appendix p.17, Del Sontro Decl., AC Exh. F at ¶ 3*.  The Regulation will put Genesis and HDGF out of business. Indeed, by publicly granting extensions to AmeriDream and Nehemiah – and not to identically situated organizations like Genesis and HDGF – HUD is destroying Genesis's and HDGF's business right now, even before the Regulation takes effect.  HUD's differential treatment of

BDDB01 4926041v1

identically situated entities has no rational basis and serves only to create an unfair competitive

advantage for those fortunate enough to receive the benefit of it.[2]

The destruction of an on-going business constitutes irreparable harm. *Washington*

*Metro. Area Trans. Comm. v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (stating

that Holiday Tours had "clearly" shown irreparable harm where "[t]he harm to Holiday Tours in

the absence of a stay would be its destruction in its current form as a provider of bus tours").

Other courts agree that "[w]here the result of denying injunctive relief would be the destruction

of an on-going business, such a result generally constitutes irreparable injury." *Canterbury*

*Career School, Inc. v. Riley*, 833 F.Supp. 1097, 1105 (D. N.J. 1993). This Court likewise has

held that the irreparable harm requirement was satisfied where denial of an injunction would

have cut off income from student financial aid programs necessary to continue operating a

school. *Ross University School of Medicine, School of Veterinary Medicine (St. Kitts) Ltd. v.*

*Cavazos*, 716 F.Supp. 638, 644 (D. D.C. 1989).

      **B.**     **The Plaintiffs are likely to succeed on the merits.**

The Regulation is subject to judicial review pursuant to the Administrative

Procedures Act, 5 U.S.C. § 706 (2000) ("APA"). While APA review is deferential, this Court

has recognized that an agency has a higher burden where, as here, it changes longstanding

---

[2]  Indeed, it seems that HUD is intent on *hastening* the demise of all SFDPA providers other
than AmeriDream and Nehemiah. Shortly after yesterday's hearing at which the Court set a
schedule for addressing the intervenors' requests for equal treatment via motions for a
preliminary injunction, HUD sent an e-mail to the industry (*See copy attached at Appendix p.
22*) advising that (1) Nehemiah "is granted relief from the effective date of the rule until
April 1, 2008" and (2) "HUD has agreed to grant the AmeriDream Downpayments Assistance
Program relief from the effective date of the rule until February 29, 2008," but (3) "*All other
similar* downpayment assistance providers have not been granted relief from the effective date
of the rule, which is October 31, 2007." Such treatment from a federal agency is not merely
irrational; it is outrageous.

BDDB01 4926041v1

policy. *Shays v. FCC ("Shays III")*, 2007 WL 2616689, at *4 (D. D.C. 2007). The D.C. Circuit

has explained the reason for this higher burden:

> An agency's view of what is in the public interest may change,
> either with or without a change in circumstances. But an agency
> changing its course must supply a reasoned analysis indicating that
> prior policies and standards are being deliberately changed, not
> casually ignored, and if an agency glosses over or swerves from
> prior precedents without discussion, it may cross the line from
> tolerably terse to the intolerably mute.

*Greater Boston Tel. Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970). The Regulation fails to

meet this higher burden and should be vacated as arbitrary and capricious because HUD

(1) failed to supply a reasoned analysis for departing from its longstanding policy; (2) failed to

consider or offer reasoned explanations for rejecting reasonable alternatives; (3) relied on data it

never mentioned or produced for comment in its notice of rulemaking; and (4) failed to give

reasoned justification for providing different effective dates for similarly-situated entities.

> **1.    HUD fails to supply a reasoned analysis for departing from its
> longstanding position on SFDPA programs.**

The "failure to come to grips with conflicting precedent constitutes 'an

inexcusable departure from the essential requirement of reasoned decision making.'"

*Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (citing *Columbia Broad Sys. v.

FCC*, 454 F.2d 1018, 1027 (D.C. Cir. 1971)). "[W]here an agency departs from established

-6-

precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995).[3]

For nearly a decade, HUD has regarded SFDPA programs as consistent with the letter of the law, as well as the purposes of the National Housing Act to promote housing affordability and choice, and to protect the availability of adequate funding for housing at low cost. It defies settled principles of administrative law for HUD to pull the plug on these SFDPA programs without addressing its longstanding record and explaining the reason for the complete reversal in its position.

Yet HUD has done just that. HUD fails to acknowledge, much less to explain, the striking departure from its record of approving these SFDPA programs. *See Federal Register, Appendix p. 3-8*. Nor does HUD even attempt to explain how its current reversal in policy better fulfills the will of Congress than its decade-long approval of SFDPA programs. *Id*. It is axiomatic that an "agency's rulemaking power is not the power to make law, it is only the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." *Sundance Assocs. v. Reno*, 139 F.3d 804, 808 (10th Cir. 1998) (internal quotation marks and citations omitted). HUD further fails to indicate whether there has been any change whatsoever in the risk of defaults or claims with various SFDPA programs over the past decade. *See Federal Register, Appendix p. 3-8*. HUD does not even attempt to explain why the purported risks

---

[3] The same principles apply to an agency's rescission of a regulation. "A 'settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress. There is, then, at least a presumption that those policies will be carried out best if the settled rule is adhered to.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 41 (1983) (citation omitted). Accordingly, an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 41-42.

associated with such loans are unacceptable now, but have been acceptable over the last ten years.  *Id*.  HUD provides no evidence to explain its new-found position beyond irrelevant and unsupported assertions.  *Id*.  HUD's last-minute effort to prop up its desired conclusion with unsubstantiated data, drawn from sources lacking citations and never offered for comment, cannot satisfy HUD's basic obligations under the APA.

> **2.     HUD failed to consider reasonable alternatives for its chosen policy and to offer a reasoned explanation for rejecting them.**

The law in this Circuit is clear that an agency must, in a statement of basis and purpose accompanying the final rule, provide a reasoned explanation for its rejection of responsible alternatives.  If the agency fails to do so, the final rule will be vacated.  *See Shays III*, 2007 WL 2616689, at *24 ("Unless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned.").

Despite this requirement, HUD simply ignores proposals advanced by public comment for remedying alleged shortcomings in current SFDPA programs and instead completely abolishes the programs.  Indeed, HUD merely shrugs off the few alternatives that it even bothers to mention, characterizing them as outside the scope of the rule.  *See Federal Register, Appendix p.4-7*.  This "we needn't consider it because it's not what we proposed" approach is not what the law requires.

In *City of Brookings Mun. Telephone Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987), the D.C. Circuit invalidated an action by the FCC for "failure to even consider" a commenter's proposal:

> It is well settled that an agency has 'a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.'  Of course, as the [FCC] emphasizes in its defense, this duty extends only to 'significant and viable' alternatives, not to 'every alternative device and thought

-8-

> conceivable by the mind of man . . . regardless of how uncommon
> or unknown that alternative may have been.  But with that sensible
> caveat, the fact remains that '[t]he failure of an agency to consider
> obvious alternatives has led uniformly to reversal.'

(citations omitted).

An agency's duty to consider responsible alternatives clearly applies where, as here, the agency is offered less restrictive alternatives to the action taken.  For example, in *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795 (D.C. Cir. 1983), the D.C. Circuit considered the Secretary of Labor's rescission of longstanding restrictions on employing homeworkers in the knitted outerwear industry. The court vacated the agency's decision because the Secretary ignored various proposed alternatives aimed at accommodating the Secretary's concerns without completely rescinding the Department of Labor's longstanding restrictions:

> We do not suggest that [the Secretary] had to opt for any particular
> one of these proposals. However, he was required to address
> common and known or otherwise reasonable options, and to
> explain any decision to reject such options. His complete failure to
> satisfy these quintessential aspects of reasoned decision making is
> the primary basis for our decision to vacate his rescission of the
> restrictions in the knitted outerwear industry.

*Id*. at 818; *see also Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413 (D.C. Cir. 1983); *Action on Smoking & Health v. CAB*, 699 F.2d 1209(DC. Cir. 1983), opinion supplemented by 713 F. 2d 795 (D.C. Cir. 1983) (Board's reliance on "generalized and conclusory policy considerations" was inadequate basis for rejecting less restrictive alternatives).

Like these earlier cases, HUD's explanation for the challenged regulation fails to address responsible alternatives to abolishing SFDPA programs, putting people out of work, and depriving thousands of low- and moderate-income people of the opportunity to buy homes and build equity.  The public's comments identified various options available to HUD to improve FHA-insured loan programs that use downpayment assistance from any allowable source or that

-9-

provide 100 percent financing. *See Appendix p. 26-30, HDGF Comments attached to 10/26 Del Sontro Aff.; Appendix p. 38-42, National Association of Homebuilders Comments, attached to 10/26 Schwedland Decl.; Appendix p. 44-59, AmeriDream Comment, AmeriDream Exh. M.* To address HUD's stated concerns, the public offered numerous detailed policy proposals. *Id.* HUD has failed adequately to address and explain its rejection of those alternatives.

In fact, HUD makes only cursory mention of other alternatives long known to the agency and advanced by commenters in the rulemaking process. For example:

> Rather than eliminate downpayment assistance, HUD can further mitigate risk by requiring a complete home inspection, to avoid potentially huge repair costs to the homeowner. HUD could also require the owner to obtain a homeowner's warranty for a specified period of time, to avoid high repair cost as a potential source of default and foreclosure. Alternatively, HUD could require downpayment assistance companies to offer mandatory risk mitigation tools or offer insurance to the buyer.

*See Appendix p. 5, Federal Register.* HUD simply responds that "[t]he commenters recommendations are noted, but the suggested actions are outside the scope of the present rule." *Id.* Yes, that is the point. To say that commenters' recommendations are different from what HUD has decided to do does nothing to explain the bases for HUD's decision. Notice-and-comment rulemaking is not a take-it-or-leave-it proposition:

> The Board offers several reasons to justify its minimal discussion of individual proposals. First, the Board claims that even though it did not explicitly discuss each proposal, `there can be little doubt that the Board was aware of the pros and cons of each alternative.' Thus, the Board suggests that as long as the record contains evidence to support its conclusion, it need not explain its action. Precisely the opposite is true. The APA guarantees the public an opportunity to comment on proposed rules. That opportunity is meaningless unless the agency responds to significant points made by the public.

*Smoking & Health*, 699 F.2d at 1217.

In its rush to judgment, HUD simply ignored its obligation to consider less-restrictive alternatives.  As this Court observed only last month, a decision lacking such consideration "can hardly be classified as reasoned."  *Shays III*, 2007 WL 2616689, at *24.

### 3.    HUD relies substantially on data that it never produced for comment or even mentioned in the notice of proposed rulemaking.

The APA requires that an agency publish a notice of proposed rulemaking, setting forth "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id*. at § 553(c).

As the D.C. Circuit recently explained:

> `Integral' to these requirements `is the agency's duty `to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules . . . . An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.'

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007) (internal citations omitted).

HUD's rulemaking proposal cited only two sources for HUD's purported concerns about the impact of DPA loans on sales prices and the alleged negative impact on borrowers and FHA:  an IRS press release (and related revenue ruling) and a 2005 GAO report.  *See Appendix p. 3, Federal Register, AC Exh. B*.  HUD may not defer to a press release and ruling issued by an agency with an entirely different mission and expertise.  Moreover, the GAO report does not examine SFDPA programs or their impact on property values, and HUD offered no defense in response to commenters' criticisms concerning its reliance on the GAO report.  *See Appendix p. 61-127, GAO Report*.  Moreover, this is the same GAO report to which HUD had previously

-11-

objected.  *See Appendix p. 129-131, 2005 HUD Letter in Response to GAO Draft Report, AC Exh. A.*  ("Borrowers who rely on seller-funded downpayment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector.  Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population without financing options that are more costly and riskier than FHA").

Instead, HUD responded to commenters' objections with the unsubstantiated claim that it has performed a new analysis to support its conclusions, purportedly based on its loan portfolio dating back to 1998.  *See Appendix p. 6, Federal Register.*  HUD appears to be saying, "never mind the flaws in our reliance on the GAO report, we have come up with something else."  Such a bait-and-switch approach is not permissible.  Moreover, the rulemaking proposal contains no mention of the data that HUD purportedly relies on, and no information about HUD's methodology in choosing the data and conducting its analysis.

The APA permits an agency to "use supplementary data, unavailable during the notice and comment period, that "expands on and confirms information contained in the proposed rulemaking and addresses alleged deficiencies in the preexisting data, so long as no prejudice is shown."  *Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) (internal citations omitted).  But to be permissible, "at least the most critical factual material that is used to support the agency's position on review . . . [must have] been made public in the proceeding and exposed to refutation."  *Id*. (citation omitted).

For example, HUD refers to an "analysis of its loan portfolio going back to 1998", highlighting those "loans endorsed for insurance in Fiscal Year (FY) 2001", in which it purports

to compare the claim rates of loans in which downpayment assistance was received from a seller-funded charity, compared to assistance received from other sources. *See Appendix p.6, Federal Register.* However, the basis for HUD's statements is entirely conjectural, for HUD did not keep records concerning the source of downpayment assistance in loan closings during that period.

Here, the newly revealed analysis purportedly derives from HUD's own loan portfolio going back to 1998. *Id.* By definition, such data were available to HUD before the notice-and-comment period. Moreover, in failing to dispute criticisms about its reliance on the GAO report, HUD's portfolio analysis stands as the only data upon which HUD relies in the final rule to support its conclusions about the impact of SFDPA programs. It is this analysis alone that HUD cites in response to the comment: "The rule is not supported by data." *Id.* Accordingly, the new data are not supplementary; they are all the data HUD has. As the D.C. Circuit aptly stated in *Conn. Light and Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C.Cir. 1982), "[t]o allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport." HUD's failure to disclose the data on which it relied and the methodology it employed for reaching its conclusions violates fundamental tenets of administrative law, and compels reversal of the final regulation.

      **4.**      **HUD fails to provide a reasoned justification for providing different effective dates for similarly situated entities.**

HUD's position is that the Regulation will take effect on October 31, 2007 for all SFDPA providers except for Nehemiah and now AmeriDream. This disparate treatment of major SFDPA providers is the essence of arbitrariness, and HUD simply cannot justify it on legal or public policy grounds.

-13-

Both this Court and the D.C. Circuit have recognized that "[a] long line of precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) (internal citation omitted); *see also Muwekma Ohlone Tribe v. Kempthorne*, 452 F. Supp. 2d 105, 115 (D.D.C. 2006) and cases cited therein.  Under this well-established precedent, "[m]ore than enumeration of factual differences between cases is required, the [agency] must explain their relevance to the purposes of the legislation it administers." *Garrett v. FCC*, 513 F.2d 1056, 1060 (D.C. Cir. 1975).

As AmeriDream originally requested, but now ignores after receiving relief only for itself, the Court should compel HUD to treat all SFDPA providers the same.

### 5.     The Secretary exceeded his statutory authority to make interpretations and promulgate regulations.

The Regulation exceeds the scope of the Secretary's authority to interpret and promulgate regulations under section 1709 (b) (9) of the NHA.  Because the regulation exceeds HUD's statutory jurisdiction, authority, and right, it is invalid under the APA, 5 U.S.C. § 706(2)(c).

This rulemaking is not prompted by any instruction from Congress or implied from any change in the law.  To the contrary, HUD concedes that the section of the statute that it purports to apply here is "silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute." *See Appendix p. 3, Federal Register*.  Congress has yet to place a single prohibition on downpayment assistance. When Congress revises a statute, its decision to leave certain sections unamended constitutes at least acceptance, if not explicit endorsement, of the preexisting construction and application of

BDDB01 4926041v1

the statute's unamended terms. *See, e.g., Cook County, Ill. v. United States ex rel. Chandler,* 538

U.S. 119, 132 (2003); *Cottage Say. Ass'n v. Comm'r,* 499 U.S. 554, 561-62 (1991).

#### 6.     The Regulation violates the equal protection component of the due process clause of the fifth amendment.

The Due Process Clause of the Fifth Amendment prohibits the federal

government from invidiously discriminating between individuals and groups. *See  Bolling v.*

*Sharpe*, 347 U.S. 497 (1954).  Under standards virtually identical to those of the Fourteenth

Amendment, *see, e.g., Brown v. Barry*, 710 F. Supp. 352, 353n.4 (D.D.C. 1989), the Fifth

Amendment requires that all persons similarly situated be treated alike.  *See, e.g., City of*

*Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *McCain v. United States*, No. 06-

1701 (RCL), 2007 WL 1127883 at *2 (D.D.C. April 16, 2007).

Under the rational-basis standard, the government "may not rely on a

classification whose relationship to an asserted goal is so attenuated as to render the distinction

arbitrary or irrational."  *City of Cleburne,* 473 U.S. at 446.  HUD has no rational basis for

treating identically situated organizations differently.

#### 7.     The Regulation lacks a rational basis.

The Regulation's prohibition of SFDPA does not rationally advance the legislative

goals of the National Housing Act, 12 U.S.C. § 1209.  Congress created the FHA to establish and

implement crucial policy initiatives to assist low-and moderate-income individuals in making the

transition from  tenants to homeowners.  *See* H.R. Rep. No. 1922, 73rd Cong., 2d Sess. 1 (1934).

By prohibiting borrower access to downpayment assistance from charitable organizations like

Genesis and HDGF that are supported by seller-funded contributions, the Regulation runs

counter to this legislative goal by drastically reducing the number of low- and moderate-income

families able to apply for FHA loans.  Indeed, the very SFDPA programs that this Regulation

would eviscerate have been crucial to the success of the FHA's mission to help low- and moderate-income individuals purchase their own homes. *See e.g., Appendix p. 15 & 20, personal accounts from J. Hinson and M. Black, AC Exhs. E & F.*

Nor is the Regulation rationally related to the purposes HUD claims. The Regulation's stated purpose is to codify "HUD's longstanding practice, authorized by statute, of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations." *Appendix p. 3, Federal Register.* But contrary to this stated purpose, the Regulation abruptly changes HUD's longstanding practice of allowing gifts by charitable organizations that are supported by seller-funded contributions.

### 8. HUD improperly prejudiced the outcome of the rulemaking proceeding.

A court may set aside a final regulation based on prejudgment of the outcome "only when there has been a clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the proceeding." *Ass'n of Nat'l Advertisers, Inc.*, 627 F.2d 1151, 1170 (D.C. Cir. 1979). "Mere proof that the official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute" cannot overcome the presumption that an official has to keep an open mind. *Hous. Study Group v. Kemp*, 736 F.Supp. 321 (D.D.C. 1990). That is not the case in this instance: the deciding official did not merely express an opinion, he committed himself to an outcome.

Indeed, statements made by HUD Secretary Alphonso Jackson during the pendency of the challenged rulemaking establish beyond doubt that HUD was not going to be swayed by the comment process; its mind was made up. On June 5, 2007, Bloomberg News reported that the Secretary stated that HUD would ban SFDPA programs over objections from

-16-

nonprofit groups, that he was very much against such programs, and that HUD would adopt the Regulation regardless of any public comments. *See Appendix p. 10, Bloomberg News Report, AC Exh. C.*

These statements amply satisfy the "clear and convincing showing" of agency prejudgment. First, the statements not only express the Secretary's strong opposition to SFDPA programs, but they convey, in explicit terms, HUD's intention to approve the proposal to abolish SFDPA programs by year-end even if the agency received critical comments. Second, the Secretary's comments were made during the very period in which HUD's proposal was out for public comment and agency decision-makers were required to keep their minds open.

Under these circumstances, HUD's rule violates due process and cannot stand. *See Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F.Supp.2d 1249, 1261 (D. Wyo. 2004) ("definite" statements by Assistant Secretary during the administrative process show that the National Park Service had already reached a prejudged political conclusion).

### C.    HUD's own actions demonstrate that it will not be injured by injunctive relief.

HUD will not be harmed by delaying implementation of the Regulation pending a final resolution of the merits. <u>HUD itself provides the best evidence of this</u>: HUD has already agreed to delay implementation of the Regulation for Nehemiah and AmeriDream. Indeed, HUD agreed in 1998 that, if it ever decided to "change its policies regarding downpayment assistance programs or regarding the source of borrower downpayment funds," those changes would not apply to Nehemiah or "<u>all other similarly situated down payment assistance programs</u>" until six months after they were finally promulgated and issued. *See Appendix p. 133, Letter to Nehemiah, AC Exh. G.* If immediate enforcement were necessary to prevent harm – significant

or otherwise – to HUD, HUD would not have made that commitment, or kept it as to Nehemiah, or now extended it to AmeriDream.  What is the harm in treating everyone the same?

At the hearing on the motions to intervene on October 25, 2007, HUD stated that, although it has granted extensions to the Nehemiah Foundation and AmeriDream, Inc., it will not agree to do the same for other similarly situated parties because this would "change the calculus."  HUD is incorrect.  HUD's disparate treatment does not reduce the demand for SFDPA.  It only shifts that demand to AmeriDream and Nehemiah.  For example, on October 9, 2007, the Countrywide Mortgage Department circulated a bulletin to lenders explaining that HUD's Regulation would eliminate all SFDPA providers except Nehemiah.  *See Appendix p. 35, Countrywide Bulletin attached as Exh. 1 to 10/26 Schwedland Decl*.  The bulletin stated that Nehemiah expects and is prepared for increased volume.  HUD's refusal to treat all similarly situated organizations the same will simply push all business to Nehemiah and AmeriDream, and put the rest of the industry ***out*** of business.

### D.    Injunctive relief will further the public's interest.

From January through September of this year alone, Genesis and HDGF have helped over 30,000 families become homeowners – a majority of them for the first time.  *See Appendix p. 14, Schwedland Decl. at ¶ 6, AC Exh. E.*  This represents over $165 million in equity for homeowners.  *Id*.  But the benefits that these organizations provide do not stop with downpayment assistance.  Rather, they include important ancillary services such as pre-homebuyer education, job loss insurance, and early delinquency counseling.  For example, HDGF provided pre-homebuyer education to more than 7,000 individuals and families this year to help them understand and manage the financial obligations associated with the significant, life-changing event of home ownership.  *See Appendix p. 18, Del Sontro Decl. at ¶ 8, AC Exh. F.*

HDGF's Rainy Day Program provided nearly $500,000 this year in emergency mortgage payment grants to assist homeowners who experience short-term financial difficulties. *Id. at ¶ 10*. Also this year, over 1,000 individuals and families will receive early delinquency counseling from HDGF. *Id. at ¶ 11*. This service helps homeowners correct financial problems and change unproductive behavior before they become irreversible problems. Both organizations offer mortgage protection programs designed to provide mortgage payment grants in the event of unemployment. *Id. at ¶ 9; Schwedland Decl. at ¶ 10*. These services help new homeowners who unexpectedly lose their jobs to keep their homes while they search for new employment. *See Appendix p. 20, Letter from Mildred Black, attached to Del Sontro Decl.*

This Court's decision in *Ramirez v. U.S. Customs and Border Protection*, 477 F.Supp.2d 150 (D. D.C. 2007), demonstrates that the overall balance of harms strongly supports injunctive relief. Ramirez requested a preliminary injunction prohibiting Customs and Boarder Protection ("CBP") from implementing a change in long-standing policy. The government argued that its change in policy was warranted to prevent actual and apparent conflicts of interest. This Court noted that although the Government's argument was "by no means frivolous," nevertheless

> the Agency has totally reversed its position on this issue. For a period of at least two years (and probably a lot longer), Defendants had no objection whatsoever to [Ramirez's actions]. Moreover, Defendants have failed to give any persuasive justification for the abrupt change in the Agency's position. Indeed, on the record as it exists at the time, it would appear that the reversal in the Agency's position is directly related to the simple bureaucratic or managerial shifts . . .

*Id*. at 157. (emphasis added).

This Court then concluded that the final factor "which must be addressed under the case law, the likelihood of success on the merits, is in equipoise and falls squarely within the

-19-

Court's direction in *WMATA v. Holiday Tours*: 'An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant.'" *Id.* (quoting *Holiday Tours*, 559 F.2d at 844). Accordingly, this Court granted an injunction because "[a]t a very minimum 'Plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Id.* at 158-59 (quoting *Holiday Tours*, 559 F.2d at 884).

This Court should reach the same result. As in *Ramirez*, a federal agency has totally reversed its position on an issue. For nearly ten years, HUD has permitted the use of SFDPA. HUD has offered no rational explanation for its reversal of long-standing policy. Rather, HUD's decision to implement the Regulation appears to be the result of a pre-determined decision by its Secretary, who stated publicly during the rulemaking process that he would implement the Regulation regardless of what the public had to say about it. This Court should bar HUD's enforcement of the Regulation to ensure that Genesis, HDGF, and the public they serve do not suffer irreparable harm as a result of a sham rulemaking process intended to deflect blame for a depressed housing market away from the government. The government will undoubtedly claim that the Regulation is in the public's interest. But HUD's longstanding acceptance of this practice belies that claim. And HUD's own actions with respect to AmeriDream and Nehemiah demonstrate that any claim of harm to the public is specious in any event.

## IV.  CONCLUSION

The balance of harms to all interested parties strongly favors injunctive relief. There is no imminent danger that either the government's or the public's interest will be harmed

-20-

while this case is litigated and given the in-depth consideration it deserves. The only imminent

danger is of catastrophic harm to Genesis, HDGF, and all similarly situated organizations.

HUD's improper actions with respect to this Regulation raise questions "so serious, substantial,

difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative

investigation." *Ramirez*, 477 F.Supp.2d at 157. This Court should grant a preliminary injunction

to prevent irreparable harm to Genesis, HDGF, and all similarly situated parties, and allow a full

and complete opportunity to litigate the issues raised in Genesis's, HDGF's, AmeriDream's, and

Penobscot's complaints.

Respectfully submitted this 26th day of October, 2007.


/s/ Frank S. Swain
Frank S. Swain, #427792
Baker & Daniels LLP
805 15th Street NW, Suite 700
Washington, DC 20005
Telephone 202.312.7440
Facsimile 202.312.7460
frank.swain@bakerd.com

Attorneys for Genesis Foundation and Home
Downpayment Gift Foundation

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 26, 2007, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

Lee T. Ellis, Jr.
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC  20036

Michael Sitcov
Christopher R. Hall
Robert J. Katerberg
Scott Risner
U.S. Department of Justice
20 Massachusetts Avenue, NW
Room 7224
Washington, DC  20530

David C. Merkin
McMillan Metro, PC
1901 Research Blvd., Suite 500
Rockville, MD  20850


/s/ Frank S. Swain

# GAO REPORT

# GAO

United States Government Accountability Office

Report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

February 2005

# MORTGAGE FINANCING

# Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products



**G A O**
Accountability ★ Integrity ★ Reliability

GAO-05-194

**February 2005**

# MORTGAGE FINANCING

## Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products

**G A O**
*Accountability·Integrity·Reliability*

# Highlights

Highlights of GAO-05-194, a report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

## Why GAO Did This Study

The U.S. Department of Housing and Urban Development (HUD), through its Federal Housing Administration (FHA), insures billions of dollars in home mortgage loans made by private lenders. FHA insures low down payment loans and a number of parties have made proposals to either eliminate or otherwise change FHA's borrower contribution requirements. GAO was asked to (1) identify the key characteristics of existing low and no down payment products, (2) review relevant literature on the importance of loan-to-value (LTV) ratios and credit scores to loan performance, (3) report on the performance of low and no down payment mortgages supported by FHA and others, and (4) identify lessons for FHA from others in terms of designing and implementing low and no down payment products.

## What GAO Recommends

GAO suggests that Congress consider limiting any new no down payment product it may authorize. GAO recommends that HUD, among other things, consider piloting new or changed products and that HUD establish a framework for when and how to pilot products. In written comments, HUD stated that it had considered these actions, including piloting, but instead adopted an alternative solution. However, it is not clear under which circumstances HUD would consider piloting.

www.gao.gov/cgi-bin/getrpt?GAO-05-194.

To view the full product, including the scope and methodology, click on the link above. For more information, contact William B. Shear at (202) 512-8678 or shearw@gao.gov.

## What GAO Found

FHA and many other mortgage institutions provide many low and no down payment products with requirements that vary in terms of eligibility, borrower investment, underwriting, and risk mitigation. While these products are similar, there are some important differences, including that FHA has lower loan limits, allows closing costs and the up-front insurance premium to be financed in the mortgage, and permits the down payment funds to come from nonprofits that receive funds from sellers. FHA also differs in that it does not require prepurchase counseling.

A substantial amount of research GAO reviewed indicates that LTV ratio and credit score are among the most important factors when estimating the risk level associated with individual mortgages. GAO's analysis of the performance of low and no down payment mortgages supported by FHA and others corroborates key findings in the literature. Generally, mortgages with higher LTV ratios (smaller down payments) and lower credit scores are riskier than mortgages with lower LTV ratios and higher credit scores.

Some practices of other mortgage institutions offer a framework that could help FHA manage the risks associated with introducing new products or making significant changes to existing products. Mortgage institutions may impose limits on the volume of the new products they will permit and on who can sell and service these products. FHA officials question the circumstances in which they can limit volumes for their products and believe they do not have sufficient resources to manage a product with limited volumes. Mortgage institutions sometimes require additional credit enhancements, such as higher insurance coverage; and sometimes require stricter underwriting, such as credit score thresholds, when introducing a new low or no down payment product. FHA is authorized to require an additional credit enhancement by sharing risk through co-insurance but does not currently use this authority. FHA has used stricter underwriting criteria but this has not included credit score thresholds.

**Average Four-Year Default Rates for FHA Insured Loans Originated in 1998, 1999, and 2000 (by LTV)**



| LTV | Average default rate | |
|---|---|---|
| High (>96%) | | 3.37 % |
| Medium (87%-96%) | | 2.26 |
| Low (<83%) | | .90 |

Source: FY 2003 Actuarial Review of the Mutual Mortgage Insurance Fund.

_United States Government Accountability Office_

# Contents

## Letter

| | |
|---|---|
| | 1 |
| Results in Brief | 3 |
| Background | 7 |
| Characteristics and Standards of Low and No Down Payment Products Vary by Mortgage Institution | 12 |
| Research Shows LTV Ratio and Credit Score Are Important When Estimating Risk of Individual Mortgages | 23 |
| Our Analysis Indicated That Mortgages with Higher LTV Ratios and Lower Credit Scores Pose Greater Risks | 28 |
| Several Practices Mortgage Institutions Use in Designing and Implementing Low and No Down Payment Products Could Be Instructive for FHA | 39 |
| Conclusions | 46 |
| Matters for Congressional Consideration | 47 |
| Recommendations for Executive Action | 48 |
| Agency Comments and Our Evaluation | 48 |

## Appendixes

| | | |
|---|---|---|
| Appendix I: | Scope and Methodology | 51 |
| Appendix II: | Papers Identified in Literature Search and Included in Analysis | 57 |
| Appendix III: | Comments from the Department of Housing and Urban Development | 60 |
| Appendix IV: | GAO Contacts and Staff Acknowledgments | 62 |
| | GAO Contacts | 62 |
| | Staff Acknowledgments | 62 |

## Tables

| | | |
|---|---|---|
| Table 1: | Eligibility Limitations of FHA Compared with RHS, VA, and Selected Products of Fannie Mae and Freddie Mac | 15 |
| Table 2: | LTV Calculations for FHA, RHS, VA, Fannie Mae, and Freddie Mac | 18 |

## Figures

| | | |
|---|---|---|
| Figure 1: | Evolution of Low and No Down Payment Products | 9 |
| Figure 2: | Percentage of Home Purchase Mortgages with a LTV Ratio Higher Than 95 Percent for HUD (FHA), VA, Fannie Mae, and Freddie Mac for Loans Originated in 2000 | 10 |

Contents

Figure 3:   Percentage of Loans with LTV Ratios of 95 Percent or
            Higher That Fannie Mae and Freddie Mac Purchased,
            1997-2000                                                    11
Figure 4:   Four-year Relative Default Rates by LTV Ratio for
            FHA-Insured Mortgages (1992, 1994, and 1996)                30
Figure 5:   Four-year Relative Default Rates by Credit Score for
            FHA-Insured Mortgages (1992, 1994, and 1996)                31
Figure 6:   Four–year Relative Default Rates by LTV Ratio and Credit
            Score for FHA-insured Mortgages (1992, 1994, and
            1996)                                                        32
Figure 7:   Four-Year Relative Default Rates by LTV Ratio for
            Conventional Mortgages (1997, 1998, and 1999)               34
Figure 8:   Four-Year Relative Default Rates by Credit Score for
            Conventional Mortgages (1997, 1998, and 1999)               35
Figure 9:   Four-Year Relative Default Rates by LTV Ratio and Credit
            Score for Conventional Mortgages (1997, 1998, and
            1999)                                                        37

## Abbreviations

| | |
|---|---|
| ARM | adjustable rate mortgage |
| FASAB | Federal Accounting Standards Advisory Board |
| FHA | Federal Housing Administration |
| GSE | government-sponsored enterprise |
| HECM | Home Equity Conversion Mortgage |
| HUD | U.S. Department of Housing and Urban Development |
| LTV | loan-to-value |
| MMI | Mutual Mortgage Insurance |
| OFHEO | Office of Federal Housing Enterprise Oversight |
| RHS | Rural Housing Service |
| USDA | U.S. Department of Agriculture |
| VA | U.S. Department of Veterans Affairs |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

64



**United States Government Accountability Office**
**Washington, D.C. 20548**

February 11, 2005

The Honorable Bob Ney
Chairman
Subcommittee on Housing and Community Opportunity
Committee on Financial Services
House of Representatives

Dear Mr. Chairman:

Every year, the U.S. Department of Housing and Urban Development
(HUD), through its Federal Housing Administration (FHA), insures billions
of dollars in home mortgage loans made by private lenders, very often with
low down payments. FHA mortgage insurance helps homebuyers with
limited funds to obtain a home mortgage. Homebuyers with FHA-insured
loans need to make a 3 percent contribution toward the purchase of the
property and may finance some of the closing costs associated with the
loan. As a result, an FHA-insured loan could equal nearly 100 percent of the
property's value or sales price—commonly called loan-to-value (or LTV)
ratio.[1] In recent years, various mortgage industry participants, such as
lenders, private mortgage insurers, and government-sponsored enterprises
(the Federal National Mortgage Association [Fannie Mae] and the Federal
Home Loan Mortgage Corporation [Freddie Mac]) have begun to support
mortgage products that require very little or no down payment. Among
these products, some allow third-party provision of gift down payment
assistance. Recently, in a HUD contractor study of a national sample of
FHA loans, of those loans that received down payment assistance, 29
percent received assistance from a nonprofit down payment assistance
provider. In addition, the FHA and others have proposed eliminating the
borrower contribution requirement for FHA-insured loans. At the same
time, the mortgage industry has moved toward greater use of automated
systems assessing the risk level of mortgages. These automated
underwriting systems rely, in part, on individuals' credit scores or credit
history, and these systems have played an integral role in the provision of
low and no down payment mortgage products.[2]

---

[1]For purposes of this report, we define loans with LTV ratios of greater than 97 percent as
having a high LTV ratio.

[2]Credit scores are a single numerical score, based on an individual's credit history, that
measures that individual's creditworthiness.

**65**

In light of recent changes in the composition of FHA-insured mortgage products and the proposal to eliminate the borrower contribution requirement for FHA-insured mortgages, you asked us to evaluate low and no down payment lending. Specifically, this report examines (1) the key characteristics and standards of mortgage products—supported by FHA and others—that require low or no down payments; (2) what published research indicates about the importance of variables such as LTV ratios and credit scores in estimating the risk level associated with individual mortgages; (3) the performance of low and no down payment mortgages supported by FHA and others; and (4) what lessons FHA might learn from others that support low and no down payment lending in terms of designing and implementing such products.

To address the objectives we interviewed officials at FHA, the U.S. Department of Agriculture (USDA), and U.S. Department of Veterans Affairs (VA); and staff at selected conventional mortgage providers[3]; private mortgage insurers; two government-sponsored enterprises (GSE); the Office of Federal Housing Enterprise Oversight (OFHEO); selected state housing finance agencies; and nonprofit down payment assistance providers. We reviewed descriptions of low and no down payment mortgage products supported by selected mortgage industry participants and compared the standards used by these entities. To determine what published research indicates about the variables that are most important when estimating the risk level associated with individual mortgages, we reviewed recent and relevant papers that we identified through a systematic search of economic literature. To describe the low and no down payment performance of loans supported by FHA and others, we examined the relationship among mortgage performance, LTV ratio, and credit score using 4-year default rates for a special research sample of over 400,000 mortgages insured by FHA during 1992, 1994, and 1996 and for all conventional loans originated in 1997, 1998, and 1999 and purchased by Fannie Mae or Freddie Mac. We chose these years because, for FHA, these data are the only significant data set of FHA-insured loans that includes credit scores and that had at least 4 years of loan performance activity. For Fannie Mae and Freddie Mac, in 1997, these institutions began purchasing an increasing number of loans with the highest LTV ratios; loans originated after 1999 would have less than 4 years of experience to analyze. The GSEs provided us data that they considered to be proprietary. We did not disclose

---

[3]Conventional lenders provide mortgages that do not carry government insurance or guarantees.

information that could be considered proprietary, but this did not limit our overall findings. We assessed the reliability of the FHA, Fannie Mae, and Freddie Mac data by discussing the data with knowledgeable FHA officials and Fannie Mae and Freddie Mac officials; reviewing recent audit reports that evaluated the information systems at each entity; and comparing the data with similar publicly available data. We determined that the data are sufficiently reliable to use in our analysis of the performance of low and no down payment mortgages. To determine what lessons FHA might learn from others that support low and no down payment lending, we obtained testimonial information from mortgage industry participants about the steps they take to design and implement low and no down payment lending products. We did not verify that these institutions, in fact, used these practices.

We performed our audit work from January 2004 to December 2004 in accordance with generally accepted government auditing standards. Appendix I provides a full description of our scope and methodology.

## Results in Brief

FHA and other mortgage institutions provide products that enable homebuyers to purchase homes using little of their own funds. While similar, the products offered by FHA and others have important differences in terms of eligibility, borrower investment, underwriting, and risk mitigation. With respect to eligibility, for example, FHA loan limits are lower than those in the conventional market. In terms of borrower investment, FHA's product differs from others in that it allows some of the closing costs and the up-front insurance premium to be financed in the mortgage. Although FHA requires a 3 percent borrower contribution, it can come from sources other than the borrower. Many conventional low and no down payment products also permit down payment funds to come from others but generally stipulate that down payment funds, either directly or indirectly, cannot come from an interested or seller-related party. FHA also does not permit down payment funds to come directly or indirectly from sellers but does permit nonprofits that receive contributions from sellers to provide down payment assistance to homebuyers. With respect to underwriting, many mortgage institutions use automated systems to some extent. These systems allow lenders to quickly assess the riskiness of mortgages by simultaneously considering multiple factors including the credit score and credit history of borrowers. With respect to risk mitigation, FHA differs from conventional mortgage institutions that provide low and no down payment products. For example, while FHA does not require prepurchase counseling, some institutions require borrowers to

receive counseling for their no down payment products. Additionally, some mortgage institutions require higher private mortgage insurance coverage on their no down payment products. While FHA already provides nearly 100 percent insurance, it does have the authority to share risk but does not currently use this authority.

A substantial body of economic research indicates that LTV ratio and credit score are among the most important factors when estimating the risk level associated with individual mortgages. We reviewed 45 economic research papers that examined multiple factors that could be important; of these, 37 examined if LTV ratio was important. Almost all of these papers (35) found the LTV ratio of a mortgage important when estimating the risk level associated with individual mortgages. For example, one study found that the default rates for mortgages with an LTV ratio above 95 percent are three to four times higher than default rates for mortgages with an LTV ratio of 90 to 95 percent. Of the 45 papers we reviewed, 19 examined whether credit score was important. All but one of these papers found the borrower's credit score important when estimating the risk level associated with individual mortgages. For example, one study found that a mortgage with a credit score of 728 (indicating an applicant with excellent credit) had a default probability of 1.26 percent, while the default probability of a mortgage with a credit score of 642 was more than two times higher—3.41 percent. The research also indicated that additional factors—such as characteristics of the borrower, mortgage, and property—may help in estimating the risk level associated with individual mortgages.

Our analysis of FHA and conventional mortgage data indicated that, generally, mortgages with higher LTV ratios (smaller down payments) and lower credit scores are riskier than mortgages with lower LTV ratios and higher credit scores.[4] For example, FHA-insured mortgages with LTV ratios greater than 80 percent and low credit scores (below 660), had a default rate above the FHA average default rate.[5] There is a similar relationship for conventional mortgages. For example, conventional mortgages with LTV

---

[4]While this analysis is useful in determining the extent to which LTV ratios and credit scores are helpful in predicting the risk level associated with individual mortgages, the FHA and conventional relative default rates are not strictly comparable because they are for different time periods and because FHA has a higher overall default rate.

[5]For this analysis, we define default as a credit event that includes foreclosed mortgages, as well as mortgages that did not experience a foreclosure, but that would typically lead to a credit loss, such as a "short sale" or a "third party sale" termination of the mortgage. Delinquency was not considered to be default.

**68**

ratios greater than 80 percent and credit scores below 700 had a default rate above the conventional average default rate.

FHA and other mortgage institution officials report using a number of similar practices in designing and implementing low and no down payment products but FHA does not typically follow some practices that could help it to manage the risks associated with introducing new products or making significant changes to existing products. Mortgage institutions we spoke with, such as Fannie Mae, Freddie Mac, and the private mortgage insurers, told us they often initially analyze the risk of products that are similar to those they are considering by both using internal data and data they acquire externally. For example, Freddie Mac officials said that Freddie Mac obtained external loan data when they purchased loans through a structured transaction to provide insight into low and no down payment lending when designing its low and no down payment products.[6] These loans had characteristics of loans they were considering purchasing on a routine basis. FHA officials also said they have purchased loan performance and other data when designing a new product or studying changes to an existing product but rely more heavily on internal data. Mortgage institutions also sometimes require additional credit enhancements or stricter underwriting when introducing a new low or no down payment product.[7] FHA has the authority, but does not currently require an additional credit enhancement, and has made adjustments to mortgage underwriting features but this has not included credit score thresholds such as those used by other mortgage institutions.[8] FHA does adjust premiums. In implementing new products, mortgage institutions may impose limits on the volume of the new products they will permit and on who can sell and service these products. Fannie Mae and Freddie Mac officials described new low and no down payment products that they first introduced as part of a pilot or with certain limits on how many of the new products they would commit to purchase. However, limits on the availability of new or revised FHA mortgage insurance are sometimes set

---

[6]Structured transaction is a broad term that covers any of several methods of dividing cash flows among several investors in a pool of mortgages.

[7]A credit enhancement is provided when a party agrees to assume risks associated with a loan. For example, mortgage insurance is a type of credit enhancement.

[8]FHA also has the authority to obtain credit enhancements through the use of co-insurance. Co-insurance requires lenders to share in the risks of insuring mortgages by assuming some percentage of the losses on the loans that they originated.

**69**

through legislation and focus on the volume of loans that FHA may insure.[9] FHA officials questioned the circumstances in which they can use pilots or limit volumes when it is not required by Congress and told us that they lack the resources to effectively manage a program with limited volumes. Finally, mortgage institutions, including FHA, establish enhanced monitoring and oversight for new low and no down payment products and revise new products as they improve their understanding of these products. In addition to reviewing routine data on the characteristics and performance of all loans, some institutions may regularly review the underwriting of all loans within a new product line as compared with a sample of loans for their established products (for which they better understand performance). FHA typically reviews a sample of loans for a new product and says that they make changes to products based on their acquired understanding.

This report includes matters for congressional consideration and recommendations to HUD. We suggest that Congress consider limiting the initial availability of any new single-family insurance product it may authorize. We recommend that FHA consider using pilots for new products and for making significant changes to its existing products and that, when doing so, FHA develop a framework for when to use pilots and how they should be implemented. We also recommend that FHA explore various techniques for mitigating risks when implementing new products that have greater risk or for which risk is not well understood.

We provided a draft of this report to HUD, Fannie Mae, Freddie Mac, USDA, and VA. We received written comments from HUD, which are discussed later in this report and reprinted in appendix III. We also received technical comments from HUD, Fannie Mae,  and USDA which have been incorporated where appropriate. VA did not have comments on the draft. HUD stated that in developing its proposed zero down payment product, it considered all of the items that we recommended they consider including piloting. However, it is not clear under what circumstances HUD believes piloting or limiting the availability of a changed or new product would be appropriate or possible. During the course of our work, HUD officials told us that they face challenges in administering a pilot program because of the difficulty of selecting only a limited number of lenders and borrowers. HUD officials also held that they may not have the authority to limit products

---

[9]For example, Congress established volume limits with the introduction of FHA's Home Equity Conversion Mortgage program.

**70**

and that they lacked sufficient resources to adequately manage products as part of a pilot or with limited volumes. We believe that HUD needs to further consider piloting or limiting volume of new or changed products. There are several available techniques for limiting an initial product, including limiting the time period in which it is available. Further we believe that in some circumstances the potential costs of making widely available a product with risk that is not well understood could exceed the cost of initially implementing such a product on a limited basis. We therefore recommend that HUD consider a wide range of options for mitigating risk, including piloting or limiting the volume of new or changed products. To the extent HUD believes it does not have the authority for exercising the options we describe, it should seek the authority from Congress.

## Background

Mortgage insurance, a commonly used credit enhancement, protects lenders against losses in the event of default. Lenders usually require mortgage insurance when a homebuyer has a down payment of less than 20 percent of the value of the home. FHA, VA, the USDA's Rural Housing Service (RHS), and private mortgage insurers provide this insurance. In 2003, lenders originated $3.8 trillion of single-family mortgage loans, of which more than 60 percent were for refinancing. Of all the insured loans including refinancings originated in 2003, private companies insured about 64 percent, FHA insured about 26 percent, VA insured about 10 percent, and RHS insured a very small number.  Private mortgage insurers generally offer first loss coverage— that is, they will pay all the losses from a foreclosure up to a stated percentage of the claim amount.[10] Generally, these insurers limit the coverage that they offer to between 25 percent and 35 percent of the claim amount. The insurance offered by the government varies in the amount of lender incurred losses it will cover. For example, VA guarantees losses up to 25 percent to 50 percent of the loan, while FHA's principal single-family insurance program insures almost 100 percent.[11] FHA plays a particularly large role in certain market segments, including low-income and first-time homebuyers. During fiscal years 2001 to 2003, FHA insured a total of about 3.7 million mortgages with a total value of about $425 billion. FHA insures most of its mortgages for single-family

---

[10]Claim amount includes outstanding loan amount plus other costs including legal fees.

[11]Single-family loans insured by FHA may be used to finance the purchase of new or existing one-to-four-family properties. 12 U.S.C. §1709(b).

housing under its Mutual Mortgage Insurance Fund. To cover lenders' losses, FHA collects insurance premiums from borrowers. These premiums, along with proceeds from the sale of foreclosed properties, pay for claims that FHA pays lenders as a result of foreclosures.

Fannie Mae and Freddie Mac are government-sponsored private corporations with stated public missions chartered by Congress to provide a continuous flow of funds to mortgage lenders and borrowers. Fannie Mae and Freddie Mac purchase mortgages from lenders across the country and finance their mortgage purchases through borrowing or issuing mortgage-backed securities that are sold to investors. They purchase single-family mortgages up to the "conforming loan limit," which for 2005 was set at $359,650.[12] Their purchase guidelines and underwriting standards have a dominant role in determining the types of loans that primary lenders will originate in the conventional conforming market.

Members of the conventional mortgage market (such as private mortgage insurers, Fannie Mae, Freddie Mac, and large private lenders) have been increasingly active in supporting low and no down payment mortgage products. Many private mortgage insurers will now insure a mortgage up to 100 percent of the value of the housing being purchased. Fannie Mae and Freddie Mac, working together with the private mortgage insurers, have become more aggressive in developing high LTV products that target low-and moderate-income or first-time homebuyers while also developing high LTV products designed for use by borrowers across the income spectrum. Figure 1 shows the history of the introduction of low and no down payment mortgage products at three LTV levels. FHA and VA have been backing low and no down payment mortgages for many years, and Fannie Mae and Freddie Mac permitted conventional lenders to sell them mortgages with an LTV of 97 percent in 1994 and 1998, respectively. Freddie Mac and Fannie Mae's no down payment mortgage products were introduced in 2000.

---

[12]Referred to as the conforming loan limit because the mortgages conform to underwriting standards established by Fannie Mae and Freddie Mac. The limit is higher for single-family mortgages secured by two-, three-, and four-unit dwellings.

**72**

**Figure 1: Evolution of Low and No Down Payment Products**



Sources: VA, USDA, FHA, Fannie Mae, and Freddie Mac.

As shown in figure 2, a greater proportion of the FHA-insured and VA-guaranteed mortgage loans had low down payments than was the case for loans purchased by Fannie Mae and Freddie Mac. Further, the number of loans FHA insured in 2000 that had LTVs greater than 95 percent exceeded the total number of loans with such LTVs that were guaranteed by VA and purchased by Fannie Mae and Freddie Mac combined.

**73**



**Figure 2: Percentage of Home Purchase Mortgages with a LTV Ratio Higher Than 95 Percent for HUD (FHA), VA, Fannie Mae, and Freddie Mac for Loans Originated in 2000**

Sources: HUD and VA.

While relatively few loans purchased by Fannie Mae or Freddie Mac had low or no down payments, in recent years the GSEs have purchased relatively more of these loans than in the past. As shown in figure 3, both Fannie Mae and Freddie Mac, during the years 1997-2000, acquired a higher proportion of mortgages with a high LTV than in previous years. To do this, they increased the number of product options available to borrowers with limited down payment funds.



**Figure 3: Percentage of Loans with LTV Ratios of 95 Percent or Higher That Fannie Mae and Freddie Mac Purchased, 1997-2000**

Source: Harold Bunce, "GSE's Funding of Affordable Loans: A 2000 Update," Department of Housing and Urban Development, April 2002.

The mortgage industry is increasingly using mortgage scoring and automated underwriting. During the 1990s, private mortgage insurers, the GSEs, and larger financial institutions developed automated underwriting systems. Mortgage scoring is a technology-based tool that relies on the statistical analysis of millions of previously originated mortgage loans to determine how key attributes such as the borrower's credit history, the property characteristics, and the terms of the mortgage note affect future loan performance. Automated underwriting refers to the process of collecting and processing the data used in the underwriting process. FHA has developed and recently implemented a mortgage scoring tool, called the FHA TOTAL Scorecard, to be used in conjunction with existing automated underwriting systems. More than 60 percent of all mortgages were being underwritten by an automated underwriting system, as of 2002,

75

and this percentage continues to rise.[13] The mortgage industry also uses credit scoring models for estimating the credit risk of individuals—these methodologies are based on information such as payment patterns. Statistical analyses identifying the characteristics of borrowers who were most likely to make loan payments have been used to create a weight or score associated with each of the characteristics. According to Fair, Isaac and Company sources, credit scores are often called "FICO scores" because most credit scores are produced from software developed by Fair, Isaac and Company.[14] FICO scores generally range from 300 to 850 with higher scores indicating better credit history. The lower the credit score, the more compensating factors lenders might require to approve a loan. These factors can include a higher down payment and greater borrower reserves.

## Characteristics and Standards of Low and No Down Payment Products Vary by Mortgage Institution

The characteristics and standards for low and no down payment mortgage products vary among mortgage institutions. Standards to determine a borrower's eligibility differ from lender to lender. For example, one mortgage institution might have a limit on household income where another might not. Each of these mortgage products requires some form of borrower investment. Most mortgage institutions use automated systems to underwrite loans but differ on how they consider factors such as the borrower's credit score and credit history. Finally, mortgage institutions also try to mitigate the increased risk associated with these products by employing tools like prepurchase counseling and greater insurance coverage.

---

[13]Susan Wharton Gates, Vanessa Gail Perry, and Peter Zorn, "Automated Underwriting in Mortgage Lending: Good News for the Underserved," *Housing Policy Debate*, 13, no. 2, 2002.

[14]Fair, Isaac and Company, "Understanding your Credit Score," July 2002.

**Eligibility Standards Are Not Uniform throughout the Mortgage Industry**

Each mortgage institution we studied limits in some way the mortgages or the borrowers that may be eligible for their low and no down payment products, but the specific limits and criteria differ among institutions. Fannie Mae and Freddie Mac are constrained in the size of the mortgages they may purchase. Specifically, the Housing and Community Development Act of 1980 requires a limit (conforming loan limit) on the size of mortgages that can be purchased by either Fannie Mae or Freddie Mac. In 2005, the conforming mortgage limit for Fannie Mae and Freddie Mac is $359,650 for most of the nation.[15] FHA is also limited in the size of mortgages it may insure. The FHA loan limit varies by location and property type, depending on the cost of homes in an area and the number of units in a property. Thus, FHA's loan limit may be as high as 87 percent of the conforming loan limit, or $312,895 in 2005; or as low as 48 percent of the conforming loan limit, or $172,632 in 2005. In addition, FHA also has higher limits in Alaska, Hawaii, Guam, and the U.S. Virgin Islands because these are considered to be high cost areas. Although VA does not have a mortgage limit, lenders generally limit VA mortgages to four times the VA guaranty amount, which is now set at 25 percent of the conforming loan limit. Since the maximum guaranty currently is legislatively set at $89,913, VA-guaranteed mortgages will rarely exceed $359,650.

---

[15]The conforming loan limit is 50 percent higher for Alaska, Hawaii, Guam, and the U.S. Virgin Islands.

77

Moreover, while FHA does not restrict eligibility to borrowers with certain income, other mortgage institutions may limit eligibility by borrower income and other measures. Most state housing finance agencies target their low and no down payment products to first-time homebuyers.[16] Some mortgage institutions providing affordable low and no down payment products also limit the loans to households with income at or below area median levels. For example, USDA's RHS, in its section 502 Guaranteed Loan program, does not guarantee loans to individuals with incomes exceeding 115 percent of the area median income or 115 percent of the median family income of the United States. We also found that Web sites of many state housing finance agencies show that their mortgage products include income limits as well as sales price limits and in some cases designated "targeted areas" within a state.[17] Table 1 illustrates some of the major similarities and differences in the eligibility criteria of FHA and other mortgage institutions.

---

[16]Often state housing finance agencies define first-time homebuyers as individuals who, during the past three consecutive years have not had ownership in a primary residence.

[17]State housing finance agencies have also been actively involved in low and no down payment mortgage lending. Using primarily mortgage revenue bonds that are sold to investors, they are able to originate, fund, or self-insure below-market interest rate mortgages.

**Table 1: Eligibility Limitations of FHA Compared with RHS, VA, and Selected Products of Fannie Mae and Freddie Mac**

| Eligibility criteria | FHA | RHS | VA | Fannie Mae MyCommunity-Mortgage program™ | Freddie Mac Affordable Gold programs |
|---|---|---|---|---|---|
| Borrower type | N/A[a] | Resident in rural-designated area | Veteran or active duty | N/A | N/A |
| Income | N/A | Cannot exceed 115 percent of area median income or the median family income of the U.S. | N/A | Cannot exceed 100 percent of area median income[b,c] | Cannot exceed 100 percent of area median income[b,c] |
| Property type | 1-4 unit, owner-occupied principal residence[d] | 1-unit, owner-occupied principal residence | 1-4 unit, owner-occupied principal residence | 1-4 unit, owner-occupied principal residence | 1-unit, owner-occupied principal residence |
| Mortgage type | Up to 30-year fixed rate or adjustable rate mortgages (ARM) | 30-year fixed rate | Up to 30-year fixed rate or ARMs | Up to 30 years fixed rate or ARMs | Up to 30-year fixed rate |

Legend

N/A = not applicable

Sources: HUD, VA, USDA, Fannie Mae, and Freddie Mac.

[a]While FHA does not set specific requirements for the type of borrower, it tends to serve low-income and first-time homebuyers.

[b]Can be higher in high cost areas.

[c]Waiver of income limit may apply in targeted areas.

[d]Under certain circumstances FHA may insure loans on second residences, investment properties, and properties owned by nonprofits and state and local governments.

Fannie Mae and Freddie Mac affordable mortgage products primarily target low-to-moderate income and first-time homebuyers. Freddie Mac and RHS allow a borrower to purchase a home containing one unit, while FHA, VA, and Fannie Mae allow a borrower to purchase properties that have up to four units with one mortgage. VA stipulates that if the veteran must depend on rental income from the property to qualify for the mortgage, the borrower must show proof that he or she has the background or qualifications to be successful as a landlord and have enough cash reserves to make the mortgage payments for at least 6 months without help from the rental income. With regard to mortgage type, many mortgage institutions permit 30-year fixed-rate mortgages. Some also permit adjustable rate mortgages (ARM).

**Most Low and No Down Payment Products Require Some Form of Borrower Investment**

Most low and no down payment mortgage products require some form of borrower investment, either a borrower contribution or cash reserve, as a way of reducing risk and assuring that the borrower has a stake in the property. Low down payment products offered by FHA, Fannie Mae, Freddie Mac and private insurers require a cash investment of at least 3 percent from the borrower. No down payment mortgage products offered by VA, RHS, Fannie Mae, Freddie Mac, and some private insurers require either no down payment or a minimum amount (such as $500 in Fannie Mae's MyCommunityMortgage program).

Many institutions permit down payment assistance. FHA stipulates that the gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or entity associated with them.  FHA mortgagee letters state that "gifts from these sources (seller, builder, etc.) are considered inducements to purchase and must be subtracted from the sales price." However, FHA allows nonprofit agencies that may receive contributions from the seller to provide down payment assistance to the borrower.  In contrast, Fannie Mae, Freddie Mac, and some of the private insurers generally do not allow down payment funds, either directly or indirectly, from an interested or seller-related party to the transaction. Fannie Mae and Freddie Mac officials told us that such seller-related contributions could contribute to an overvaluation of the price of the property.

Even where borrowers pay no down payment they very often must pay a minimum percentage of closing costs from their own funds.[18] FHA requires that borrowers pay 3 percent of the total loan amount toward the purchase of the home. This contribution may be used for down payment or closing costs. Thus, FHA borrowers may finance closing costs, within limits. FHA borrowers may also finance their insurance premium. Unlike FHA, some mortgage institutions do not allow financing of the closing costs and the insurance premiums in the first mortgage. VA generally allows payment of all closing costs to be negotiated while restricting those that may be charged to the borrower. VA allows borrowers to finance their insurance premium, called the funding fee. In the section 502 Guaranteed Loan program for RHS, borrowers may pay closing costs but they are not required to do so and may be allowed to finance the closing costs and their

---

[18]Closing costs could include a loan origination fee, a mortgage recordation fee, a title transfer tax, appraisal fees, attorney fees, and title insurance.

**80**

insurance premium, called the Guarantee Fee.[19] Freddie Mac in its no down payment product requires a 3 percent borrower contribution to be used for closing costs, financing costs, or prepaids and escrows, all of which can come from gifts or property seller contributions.

FHA, RHS, VA, Fannie Mae, and Freddie Mac differ somewhat in terms of their maximum allowable LTV ratios and how they calculate this ratio. LTV ratios are important because of the direct relationship that exists between the amount of equity borrowers have in their homes and the likelihood of risk of default. The higher the LTV ratio, the less cash borrowers will have invested in their homes and the more likely it is that they may default on mortgage obligations, especially during times of economic hardship.

The Omnibus Budget Reconciliation Act of 1990 (Pub. L. No. 101-508), established LTV limits for FHA-insured mortgages of 98.75 percent if the home value is $50,000 or less, or 97.75 percent if the home value is in excess of that. However, because FHA allows financing of the up-front insurance premium, borrowers can receive a mortgage with an effective LTV ratio of close to 100 percent.

In table 2, we calculate the effective LTV ratio for selected low and no down payment products. The example assumes a $100,000 purchase price (appraisal value) and a 30-year fixed-rate mortgage. It also assumes average closing costs of about 2.1 percent of sales price. FHA has a formula to calculate the maximum loan amount based on a percentage of the purchase price of the home. FHA does not have a down payment requirement but instead has what FHA calls a minimum cash investment requirement. This investment requirement can be used to pay either the down payment and in some cases the closing costs. Not shown are the actual out-of-pocket expenses to the borrower which could vary based on the individual transaction and whether the investment requirement was split among the closing costs and down payment, as well as whether the borrower opted to finance their up-front premium.[20]

---

[19]According to USDA officials, a borrower may finance closing costs and the Guarantee Fee as long as they do not exceed the property's appraised value.

[20]Out-of-pocket expenses can include expenses such as funds required to establish an escrow account.

**Table 2: LTV Calculations for FHA, RHS, VA, Fannie Mae, and Freddie Mac**

| Mortgage elements | Government | | | Conventional |
|---|---|---|---|---|
| | FHA[a] 203b | USDA 502 guaranteed program | VA zero down | Fannie Mae and Freddie Mac 100 LTV products |
| Purchase price | $100,000 | $100,000 | $100,000 | $100,000 |
| Loan amount before up-front insurance | 97,750[b] | 100,000 | 100,000 | N/A |
| Plus up-front insurance premium/fee | +1,466[c] (1.5%) | +2,000[d] (2%) | +2,150[e] (2.15%) | N/A |
| Total mortgage | 99,216[f] | 102,000 | 102,150 | 100,000 |
| Effective LTV ratio[g] | 99.2% | 102% | 102% | 100% |

Sources: HUD, VA, USDA, Fannie Mae, and Freddie Mac.

[a]This is the existing FHA mortgage insurance product that requires the least amount of a down payment. This product is not a "no down" mortgage product.

[b]We are assuming, for this example, that the mortgage is in a state with average closing costs of above 2.1 percent of sales price. In this case, the maximum mortgage (not including a financed up-front insurance premium) would be $100,000 x 97.75 percent.

[c]Up-front insurance premium = $97,750 x 1.5 percent = $1,466.

[d]Guarantee fee = $100,000 x 2 percent = $2,000. Loans can be guaranteed up to 102 percent LTV if doing so is necessary to allow the 2 percent guarantee fee to be financed by the borrower. A 100 percent LTV threshold may only be exceeded to allow the guarantee fee to be financed. If a borrower chooses not to finance the guarantee fee, loans are limited to 100 percent LTV.  Closing costs are allowed but closing costs may not be financed if the borrower is already financing the guarantee fee such that they have reached the maximum allowed LTV of 102 percent, not including closing costs.

[e]Funding fee = $100,000 x 2.15 percent = $2,150.

[f]The borrower is required to pay 3 percent (of the contract sales price—called a minimum cash investment requirement) toward closing costs and down payment.

[g]Calculation = total mortgage / purchase price.

In addition, some of the affordable conventional mortgage products allow for subordinate financing in the form of secondary mortgages to pay for a down payment and/or closing costs. These secondary mortgages allow for a total effective LTV of up to 105 percent.

## Some Underwriting Standards Differ between FHA and Other Mortgage Institutions

When underwriting mortgages, FHA and other mortgage institutions require that lenders examine a borrower's ability and willingness to repay the mortgage debt. Lenders for low and no down payment mortgages may use automated underwriting systems examining the borrower's credit score or creditworthiness, qualifying ratios, and cash reserves. In some cases, they use manual underwriting to accommodate nontraditional credit histories. By screening the majority of applications with automated

systems, underwriters have more time to review special cases with manual underwriting.

Many mortgage institutions use credit scores in assessing mortgage applicants through their automated underwriting systems. For standard products, institutions tend to rely on automated underwriting, which develops a mortgage score based on various factors including credit score and, based on this, they make a decision on the loan. However, in some instances, mortgage institutions set credit score minimums for some low and no down payment products. In some instances, these credit score minimums exist within the automated underwriting system. In other instances, the credit score minimums exist only in products that are underwritten using manual underwriting. FHA does not require a credit score minimum, nor do VA and RHS. These three governmental agencies examine the overall pattern of credit behavior rather than rely on one particular credit score. All three agencies allow a good deal of judgment and interpretation on the part of the underwriters in determining the creditworthiness of the prospective borrower. Fannie Mae does not use externally derived credit scores for its loan products that use automated underwriting but instead relies on the credit history of the borrower. Based on a review of Web sites of private mortgage insurers, products with no down payment that are insured by these private mortgage insurers have minimum credit score requirements ranging from 660 to 700. Individual low and no down payment products that use credit score minimums use a variety of cutoff scores. Many mortgage industry sources consider borrowers with credit scores of 720 or higher as having excellent credit. One study that focused on issues related to homeownership and cited extensive interviews with leading experts in government and industry found that mortgage applicants with scores above 660 are likely to have acceptable credit.[21] On the other hand, for applicants with FICO scores between 620 and 660, mortgage institutions typically perform more careful underwriting, scrutinizing many factors. FICO scores under 620 indicate higher risk and are unlikely to be approved by conventional lenders unless accompanied by compensating factors.

Some of these mortgage institutions may, under some circumstances, accept a lower credit score, if the borrower provides additional compensating factors (such as 2 months cash reserve) that would indicate

---

[21]Michael Collins, "Pursuing the American Dream: Homeownership and the Role of Federal Housing Policy," January 2002.

a lower risk on the part of the borrower. Mortgage institutions might also accept a lower credit score if they were receiving additional compensation for the risk, such as a mortgage originator receiving a higher interest rate or a mortgage insurer getting a higher insurance premium.  Some mortgage institutions state in their underwriting guidance that FICO scores together with the LTV determine in part the borrower's minimum contribution. For example, one private mortgage insurer allows borrowers with credit scores equal or greater than 700 to have a minimum borrower contribution of 0 percent on a 100 LTV loan. For this same insurer, a borrower with a credit score between 660 and 699 would have a minimum borrower contribution of 3 percent on a 100 LTV loan.

Many mortgage institutions use two qualifying ratios as factors in determining whether a borrower will be able to meet the expenses involved in homeownership. The "housing-expense-to-income ratio" examines a borrower's expected monthly housing expenses as a percentage of the borrower's monthly income, and the "total-debt-to-income ratio" looks at a borrower's expected monthly housing expenses plus long-term debt as a percent of the borrower's monthly income. Lenders who do business with Fannie Mae or Freddie Mac place more emphasis on the total-debt-to-income ratio. Total debt includes monthly housing expenses and the total of other monthly obligations, such as auto loans, credit cards, alimony, or child support.   The guidelines for manual underwriting are discussed below; automated underwriting systems weight the qualifying ratios, as well as numerous other factors, in assessing the borrower's ability to meet the expenses involved in homeownership.

Unless there are compensating factors, FHA monthly housing-expense-to-income ratio is set at a maximum of 29 percent, while the monthly "total-debt-to-income ratio" is, at most, 41 percent of the borrower's stable monthly income. The requirements set by Fannie Mae, Freddie Mac, and the private insurers on the monthly housing expense-to-income ratio vary greatly. Some have set lower thresholds, such as Freddie Mac, which uses as a guideline that the monthly housing expense-to-income ratio should not be greater than 25 percent to 28 percent, with exceptions for some products. Others, such as some private insurers, have set higher thresholds than FHA has set, such as 33 percent.

Some mortgage institutions set thresholds on the "total-debt-to-income" ratio that are lower than FHA's threshold. Conventional mortgages that are manually underwritten to Fannie Mae or Freddie Mac standards are set at a benchmark total-debt-to-income ratio of 36 percent of the borrower's stable

84

monthly income, compared with FHA's 41 percent. However, Fannie Mae and Freddie Mac state that they occasionally specify a higher allowable debt-to-income ratio for a particular mortgage loan if compensating factors are present.[22]

Cash reserves represent the amount of funds a borrower has after closing on the loan. Generally the reserves required of borrowers are expressed in terms of the numbers of monthly mortgage payments they may comprise. Conceptually they represent the ability of the borrower to repay the mortgage out of accumulated funds.  Many mortgage institutions including FHA consider it a compensating factor that reduces the risk of delinquency. FHA, unlike conventional lenders who do business with the GSEs and the private insurers, does not require cash reserves for its low down payment product. VA and RHS also do not require cash reserves. Generally the GSEs and the private insurers with whom we spoke required cash reserves of either 1 or 2 months of monthly mortgage payments for low and no down payment products.

## Mortgage Institutions Use Various Risk Mitigation Tools

Some of the mortgage institutions we spoke with used various tools to mitigate risk. For example, most mortgage institutions offering affordable low and no down payment mortgages to first-time homebuyers require prepurchase counseling, and some require postpurchase counseling. These include lenders working with Fannie Mae, Freddie Mac, private insurers, and state housing finance agencies. Homeownership counseling for first-time homebuyers takes a variety of forms. There are counseling programs administered by government agencies, lenders, nonprofit organizations, and the private insurers, among others. These programs are delivered through many different avenues including classroom, home study, individual counseling, and telephone. The content of the counseling programs also varies significantly across each of these administrative and delivery mechanisms, as does the timing of the counseling—which can be either prior to closing or postpurchase (when the borrower becomes delinquent on a payment).

More specifically, Freddie Mac in each of its Affordable Gold products (intended for first-time homebuyers who generally earn 100 percent or less of area median income) requires that at least one qualifying borrower in the

---

[22]Fannie Mae officials noted that Fannie Mae's automated underwriting system allows for a higher total-debt-to-income ratio and factors the ratio in its evaluation of the loan.

85

transaction must receive prepurchase counseling. Lenders must document the organization that administered the counseling and how the counseling was delivered. Freddie Mac exempts those borrowers who have cash reserves after closing equal to at least two monthly mortgage payments from the counseling requirement. Similarly, Fannie Mae in its MyCommunityMortgage, requires prepurchase counseling for first-time homebuyers when they are purchasing a one-unit property. If they are purchasing a two to four unit property, landlord counseling is required. Fannie Mae also requires postpurchase counseling for borrowers under certain low down payment programs who become delinquent on their payments early in the mortgage.

Some private insurers require pre- and postpurchase counseling, but some only recommend it. For example, two private insurers require pre- and postpurchase counseling with all of its affordable low and no down payment products, and they provide most of this counseling themselves. On the other hand, another private insurer recommends, but does not require, prepurchase counseling for first-time homebuyers in its low and no down payment products. However, this insurer's underwriting guidance states that prepurchase counseling is considered a positive underwriting factor. It also recommends postpurchase counseling, particularly for borrowers who are experiencing financial difficulties but have a good chance of overcoming their financial problems and maintaining homeownership.

FHA, unlike most low and no down payment mortgage institutions serving affordable first-time homebuyers, does not require prepurchase counseling. VA also does not require prepurchase counseling, but considers it to be a compensating factor in improving creditworthiness. RHS encourages lenders to offer or provide for homeownership counseling and lenders may require first-time homebuyers to undergo such counseling if it is reasonably available in the local area.

FHA, VA, RHS, and the private insurers also differ in the amount of insurance or guaranty they provide to protect lenders against the losses associated with mortgages that go to foreclosure. While FHA essentially protects against almost 100 percent of the losses associated with a foreclosed mortgage, VA, RHS and the private insurers protect against a

portion of the loss.[23] Private insurers generally provide protection to lenders for only a portion of losses. This protection is usually expressed as a percentage of the claim amount. For example, an insurer may provide insurance coverage of 30 percent. This means that the insurer will cover losses up to 30 percent of the claim amount. In exchange for offering this insurance, the insurer charges borrowers a premium.

Some of the insurers with whom we spoke, as well as the GSEs, noted that they require higher insurance coverage for mortgages with lower down payments. For example, one insurer said that the amount of insurance coverage tends to be 35 percent for no down payment mortgages, in contrast to 30 percent for low down payment mortgages. Private insurers noted that they charge higher premiums or require more stringent underwriting when they provide higher insurance coverage. For example, one private insurer stated that its monthly premium rates to a borrower increase about 15 percent for every 5 percentage point increase in insurance coverage between 20 and 35 percent.

## Research Shows LTV Ratio and Credit Score Are Important When Estimating Risk of Individual Mortgages

Economic research we reviewed indicated that LTV ratios and credit scores are among the most important factors when estimating the risk level associated with individual mortgages.[24] We identified and reviewed 45 papers that examined factors that could be informative.[25] Of these, 37 examined if the LTV ratio was important and almost all of these papers (35) found the LTV ratio of a mortgage important and useful. Nineteen research papers evaluated how effective a borrower's credit score was in predicting loan performance, and all but one reported that the credit score was

---

[23]FHA covers 100 percent of the mortgage balance but does not cover all of the costs of the foreclosure.

[24]Research we reviewed includes articles, reports, and papers that were made available to us from economic journals, the internet, libraries, or were provided to us by various entities (e.g., HUD, Fannie Mae, Freddie Mac). For the purposes of this report, we refer to these documents as "papers."

[25]Many papers employ multiple models to analyze the importance of variables; as a result, summing the number of papers that found a variable important and the number of papers that found a variable not important will not equal the total number of papers that analyzed the importance of a specific variable. For example, two of the papers that assessed the importance of LTV found it important in some circumstances but not in others.

important and useful.[26] In addition, a number of the papers reported that other factors were useful when estimating the risk level. For example, characteristics of the borrower—such as qualifying ratios—were cited in several of the papers we reviewed. Finally, other research evaluated additional factors; however, we identified very few papers that investigated the same variables or corroborated these findings. Collectively, the research we reviewed appeared to concur that considering multiple factors was important and useful in estimating the risk level of individual mortgages. For example, some of the papers (7) reported that considering LTV ratio and credit score concurrently was important and useful when estimating the risk level of individual mortgages.[27]

| LTV Ratio Helps Estimate Risk of Individual Mortgages | Many studies found that a mortgage's LTV ratio was an important factor when estimating the risk level associated with individual mortgages. In theory, LTV ratios are important because of the direct relationship that exists between the amount of equity borrowers have in their homes and the likelihood of risk of default. The higher the LTV ratio, the less cash borrowers will have invested in their homes and the more likely it is that they may default on mortgage obligations, especially during times of economic hardship (e.g., unemployment, divorce, home price depreciation). And, according to one study, "most models of mortgage loan performance emphasize the role of the borrower's equity in the home in the decision to default."[28] We identified 45 papers that examined the relationship between default and one or more predictive variables; of these, 37 examined if LTV ratio was important and useful. Almost all of these papers (35) determined that LTV ratio was effective in predicting loan performance—specifically, when predicting delinquency, default, and foreclosure. Several papers reported that there was a strong positive relationship between LTV ratio and default. Specifically, one paper reported that the default rates for mortgages with an LTV ratio above 95 percent were three to four times higher than default rates for mortgages |

---

[26]Of the 45 papers identified, 13 identified both LTV ratio and credit score as important and useful when estimating the risk level associated with individual mortgages.

[27]Of the papers we reviewed, researchers used several measures of loan performance (e.g., default, delinquency, severity). Please see each paper for the particular loan performance measure it used.

[28]Robert B. Avery, Raphael W. Bostic, Paul S. Calem, and Glenn B. Canner. "Credit Risk, Credit Scoring, and the Performance of Home Mortgages," *Federal Reserve Bulletin* (July 1996).

with an LTV ratio between 90 to 95 percent.[29] Another paper found that, at the end of 5 years, the cumulative probability of default risks for mortgages with an LTV ratio less than 95 percent was 2.48 percent; however, the cumulative probability of default for mortgages with an LTV ratio greater than or equal to 95 percent was 3.53 percent.[30] While the majority of the empirical research found that LTV ratio mattered, 4 of the research efforts did not find that LTV ratio is important when estimating the risk level associated with individual mortgages.[31] For example, one paper found that, for subprime loans, delinquency rates were relatively unaffected by the LTV ratio.[32] Generally, subprime loans are loans made to borrowers with past credit problems at a higher cost than conventional mortgage loans. Additionally, some (7) research efforts examined the relationship between the LTV ratio and severity (losses), and all found that there was a positive relationship between the LTV ratio and severity. For a detailed list of the economic research that addresses the relationship between LTV ratio and mortgage performance, see appendix II.

## Credit Score Helps Estimate Risk of Individual Mortgages

Despite the relatively recent use of credit score information in the mortgage industry, several studies found that credit score was an important and useful factor when estimating the risk level associated with individual mortgages.[33] In general, credit scores represent a borrower's credit history.

---

[29]Yongheng Deng, John M. Quigley, and Robert Van Order, *Mortgage Default and Low Downpayment Loans: The Costs of Public Subsidy*, National Bureau of Economic Research: Working Paper No. 5184 (Cambridge, Mass.: July 1995).

[30]Yongheng Deng and Stuart Gabriel, *Modeling the Performance of FHA-Insured Loans: Borrower Heterogeneity and the Exercise of Mortgage Default and Prepayment Options*, a report submitted to the Office of Policy Development and Research, U.S. Department of Housing and Urban Development, May 2002.

[31]Generally, the studies that found the LTV ratio to be important had sample sizes greater than 6,000 (and in some cases in the millions). In comparison, three of the four studies that did not find LTV to be important had smaller sample sizes and the fourth study found LTV to be important for the prime market, but not for the subprime market. Additionally, one study used national aggregate data rather than loan level data. This study found LTV important in some specifications, but not in others.

[32]Amy Crews Cutts and Robert Van Order, "On the Economics of Subprime Lending." Freddie Mac Working Paper Series #04-01 (January 2004) (http://freddiemac.com/corporate/reports/).

[33]Generally, the mortgage industry began widely using credit score information in the late 1990s; therefore, considering credit score in empirical loan performance analysis is very recent. Further, there was a particularly strong housing market during this period.

Credit histories consist of many items, including the number and age of credit accounts of different types, the incidence and severity of payment problems, and the length of time since any payment problems occurred. The credit score reflects a borrower's historic performance and is an indication of the borrower's ability and willingness to manage debt payments. Of the 45 papers we reviewed, 19 evaluated how effective a borrower's credit score was in predicting loan performance. Eighteen research efforts evaluated how effective a borrower's credit score was in predicting delinquency, default, and foreclosure; all of these efforts found that a borrower's credit score was important. Generally, the papers reported that higher credit scores were associated with lower levels of defaults. Specifically, one study found that a mortgage with a credit score of 728 (indicating an applicant with excellent credit) had a default probability of 1.26 percent, while a mortgage with a credit score of 642 had a default probability of 3.41 percent—or more than two times higher.[34] Additionally, four research efforts examined the relationship between credit score and severity (losses), and three reported that there was a negative relationship between credit score and severity. For example, one study found that credit scores were also helpful in predicting the amount of losses resulting from foreclosed mortgages. In particular, the paper reported the loss rate for defaulted mortgages with high credit scores was lower than foreclosed mortgages with low credit scores.[35] For a list of the economic research, that we reviewed, that addresses the relationship between credit score and mortgage performance, see appendix II.

## Other Factors May Help in Estimating the Risk of Individual Mortgages

Many of the papers we reviewed identified factors that, in addition to LTV ratios and credit scores, were important and useful determinants of credit risk for home mortgages. Of these, the most widely analyzed factor—accumulation of equity in the home—was a subject of 26 studies we reviewed. Some factors were the subject of far fewer papers. Yet other factors were the subject of a single paper only. The most widely assessed factors included borrower characteristics such as accumulation of equity in

---

[34]Robert F. Cotterman. *Analysis of FHA Single-family Default and Loss Rates,* a report submitted to the Office of Policy Development and Research, U.S. Department of Housing and Urban Development, March 25, 2004.

[35]Cotterman. *Analysis of FHA Single-family Default and Loss Rates.*

the home, qualifying ratios, and income.[36] Additionally, characteristics of the area in which the property was located included variables such as unemployment rates and income levels. Finally, characteristics of the mortgage included variables such as mortgage age and term of the mortgage (e.g., 15 year vs. 30 year). The extent to which the authors agreed on the importance of the other factors varied. For example, nearly all of the papers that looked at equity accumulation (a factor which is not known at the time of loan origination), the unemployment rate of the area in which the property is located, and mortgage age, found that these factors were important. However, the research was less certain as to the importance of qualifying ratios and income. That is, several of the papers found that the qualifying ratios and income were important in estimating risk; however, some found that qualifying ratios and income were not an important factor.

The economic research we reviewed also indicated that considering factors in combination was helpful in estimating the risk level of individual mortgages. Of all 45 papers we reviewed, more than half conducted multivariate analyses. For example, seven studies found that using credit score information in combination with the LTV ratio was helpful in estimating the risk level of individual mortgages. Specifically, one study found that the "foreclosure rate is particularly high for borrowers with both low credit scores and high LTV ratios—almost 50 times higher than that for borrowers with both high credit scores and low LTV ratios."[37] Other studies examined several aspects of a mortgage concurrently. For example, in one study, the authors controlled for certain loan characteristics, such as credit history and LTV, and they found that borrower income is useful in estimating risk levels of mortgages.[38] In another study, the authors controlled for house price appreciation (10 percent) and unemployment rates (8 percent) and examined loan performance—after 15 years—in terms of LTV ratio and a borrower's relative income. Regardless of income, default was higher for zero down payment mortgages. Specifically, under

---

[36]Qualifying ratios evaluated in the studies we identified include ratios such as payment-to-income, debt-to income, personal savings as percentage of disposable income, and household liabilities divided by household assets.

[37]Avery, Bostic, Calem, and Canner. "Credit Risk, Credit Scoring, and the Performance of Home Mortgages."

[38]Robert Van Order and Peter Zorn. "Performance of Low-Income and Minority Mortgages," A paper prepared for the Joint Center for Housing Studies' *Symposium on Low-Income Homeownership as an Asset-Building Strategy*, Working Paper: LIHO-01.10 (September 2001).

these conditions, the authors reported that zero down payment mortgages of borrowers with incomes below 60 percent of the metropolitan statistical area's (MSA) median level would have cumulative default rates about twice as high as mortgages that required a 10 percent down payment made to borrowers with similar incomes. Similarly, the zero down payment mortgages of borrowers with incomes greater than one-and-a-half times the MSA's median level would have cumulative default rates about 50 percentgreater than mortgages that required a 10 percent down payment made to borrowers with similar incomes.[39]

## Our Analysis Indicated That Mortgages with Higher LTV Ratios and Lower Credit Scores Pose Greater Risks

Consistent with studies we reviewed, our analysis of FHA and conventional mortgage data indicated that mortgages with high LTV ratios (smaller down payments) and low credit scores generally are riskier than mortgages with low LTV ratios and high credit scores.[40] For example, FHA-insured mortgages with LTV ratios greater than 80 percent and low credit scores (below 660) had a default rate above the FHA average default rate. Similarly, conventional mortgages with LTV ratios greater than 80 percent

---

[39]Deng, Quigley, and Van Order, *Mortgage Default and Low Downpayment Loans: The Costs of Public Subsidy.*

[40]The data used in the analysis include a sample of FHA-insured mortgages originated in calendar years 1992, 1994, and 1996 and conventional mortgages originated in calendar years 1997, 1998, and 1999. These data represent the most recently available data for each entity that includes variables necessary to conduct the analysis (such as LTV ratio and credit score). We did not include mortgages guaranteed by the USDA and VA in our analysis because credit score information for these mortgages was not readily available. Fannie Mae and Freddie Mac provided the conventional data.

In our analysis, we specified six LTV ratio categories and six credit score categories. We defined default as a credit event that includes foreclosed mortgages, as well as mortgages that did not experience foreclosure, but that would typically lead to a credit loss, such as a "short sale" or a "third party sale" termination of the mortgage.

We calculated average 4-year default rates (by dollar amount) for FHA-insured and conventional mortgages within specified LTV ratio and credit score categories. The average 4-year default rates for each LTV ratio and credit score categories were calculated as follows: the total dollar amount of mortgages originated (in all three cohorts) and defaulted within 4 years of origination, divided by the total dollar amount of mortgages originated (in all three cohorts). We then classified the default rates for each LTV ratio and credit score category relative to the average default rate for the FHA-insured and conventional mortgages, respectively. The relative default rates for each LTV ratio and credit score category were calculated as follows: the average default rate for each category, divided by the average default rate for all FHA-insured or conventional mortgages as appropriate. For a more detailed description of our analysis, see appendix I: Scope and Methodology.

and somewhat low credit scores (below 700) had a default rate above the conventional average default rate. While this analysis is useful in determining the extent to which LTV ratios and credit scores can help predict the risk level associated with individual mortgages, care should be taken when comparing the FHA with the conventional relative default. In particular, the relative default rates are derived from different calendar years (that is, a sample of FHA mortgages insured in 1992, 1994, and 1996 and conventional mortgages originated in 1997, 1998, and 1999 and purchased by Fannie Mae or Freddie Mac). Also the average default rate for FHA-insured mortgages is higher than the average default rate for conventional mortgages.

## FHA-Insured Mortgages with Higher LTV Ratios and Lower Credit Scores Are Riskier Than Other FHA-Insured Mortgages

When considering LTV alone, FHA-insured mortgages with higher LTV ratios (smaller down payments) generally perform worse than FHA-insured mortgages with lower LTV ratios. As figure 4 illustrates, our analysis indicates that the incidence of default increases as LTV ratios increase. When considering the LTV ratio alone, the default rate for sampled FHA-insured mortgages, with an LTV of 70 percent or less, is no more than half the average FHA default rate. In contrast, the default rate for mortgages with LTV ratios greater than 90 percent, as a group, surpasses the average FHA default rate. For the highest LTV ratio group—greater than 97 to 100 percent—the default rate for these mortgages is about 1.75 times the average FHA default rate.

Figure 4: Four-year Relative Default Rates by LTV Ratio for FHA-Insured Mortgages (1992, 1994, and 1996)



Source: GAO analysis of FHA data.

Note: Because of the sensitive nature of the data, we have chosen to illustrate relative 4-year default rates for each LTV ratio and credit score category. These relative 4-year default rates are defined as follows: the 4-year default rate for each category, divided by the average 4-year default rate for a sample of mortgages insured by FHA in 1992, 1994, and 1996. For example, if the 4-year default rate for a particular LTV ratio and credit score category was 3 percent, and the 4-year default rate for all FHA mortgages sampled was 2 percent, the relative 4-year default rate for this category would be 3 divided by 2, or 1.5 times the average 4-year default rate. To generate the average 4-year default rate, we merged mortgage volume and performance data for the sample of FHA mortgages insured in 1992, 1994, and 1996. Loan data are measured in dollars.

FHA-insured mortgages with lower credit scores generally perform worse than FHA-insured mortgages with higher credit scores, regardless of LTV ratio. As figure 5 illustrates, our analysis indicated that the incidence of default increases as credit scores decrease. Considering the credit score, the default rate for sampled FHA-insured mortgages with credit scores 700 and above is no more than half the average FHA default rate for all sampled mortgages. The default rate for mortgages with a credit score below 660, as a group, surpasses the average FHA default rate. For the lowest credit

score group—less than 620—the default rate for these mortgages is almost twice the average FHA default rate.

**Figure 5: Four-year Relative Default Rates by Credit Score for FHA-Insured Mortgages (1992, 1994, and 1996)**



Source: GAO analysis of FHA data.

Note: For description of relative default rates, please see note with figure 4.

As expected, FHA-insured mortgages with both high LTV ratios (smaller down payments) and low credit scores generally perform worse than mortgages with both low LTV ratios and high credit scores. Our analysis indicates that the incidence of default increases as LTV ratios increase and credit scores decrease. As figure 6 illustrates, mortgages with lower LTV ratios and higher credit scores (those at the bottom of the figure) have lower default rates than mortgages with higher LTV ratios and lower credit scores (at the top of the figure). FHA-insured mortgages with LTV ratios greater than 80 percent and low credit scores (below 660) had a default rate above the FHA average default rate. FHA-insured mortgages, with LTV

ratios greater than 90 percent and credit scores below 620, had a default rate more than double the FHA average.

**Figure 6: Four–year Relative Default Rates by LTV Ratio and Credit Score for FHA-insured Mortgages (1992, 1994, and 1996)**



Source: GAO analysis of FHA data.

Notes: For description of relative default rates, please see note with figure 4.

We do not present relative default rates for categories with fewer than 1,000 observations as the performance information may not be reliable when there are too few observations. In the figure, these instances are noted as "N/A." For a more detailed description of our analysis, see appendix I.

**Conventional Mortgages with Higher LTV Ratios and Lower Credit Scores Are Riskier Than Other Conventional Mortgages**

Generally, the performance relationships that exist for FHA-insured mortgages also exist for conventional mortgages originated in the late 1990s. As figure 7 illustrates, our analysis indicates that conventional mortgages with higher LTV ratios (smaller down payments) generally perform worse than conventional mortgages with lower LTV ratios. When considering LTV ratio alone, the default rate for the group of conventional mortgages with LTV ratios below 80 percent was no more than half the average conventional default rate. Generally, the default rates then increase with higher categories of the LTV ratio. In fact, the default rate for conventional mortgages with an LTV ratio greater than 90, but less than 97 percent, as a group, is more than twice the average conventional default rate. One notable exception to this general pattern is that conventional mortgages in the highest LTV ratio category (that is, greater than 97 to 100 percent) appear to have a lower risk of default than do conventional mortgages in some of the lower LTV ratio categories. According to GSE officials, this may be explained by a number of possible factors. The GSEs had just begun to purchase an increasing number of mortgages with very high LTV ratios during the late 1990s and the GSEs took steps to limit the risks associated with these mortgages. For example, some of these loans were part of negotiated deals with individual lenders. These negotiated transactions may have required the use of manual underwriting and minimum credit scores, and the GSEs may have used specific servicers for these loans. GSE officials told us that lenders and servicers operating as part of negotiated deals with them tend to be more conservative in their approach to these loans. GSE officials also told us that the borrowers during this time period would have been the very best segment of the applicant pool. Agency officials indicate that, for more recent loans where volumes are higher and lenders are reaching deeper into the applicant pool, default rates on loans in these categories are higher than they were in the 1997–1999 period and are now consistent with the relationship we would expect between LTV and default rates.   We discuss these practices in greater depth later in the report.

Figure 7: Four-Year Relative Default Rates by LTV Ratio for Conventional Mortgages (1997, 1998, and 1999)



Sources: GAO analysis of Fannie Mae and Freddie Mac data.

Note: Because of the sensitive nature of the data, we have chosen to illustrate relative 4-year default rates for each LTV ratio category. These relative 4-year default rates are defined as follows: the 4-year default rate for each category, divided by the average 4-year default rate for all conventional mortgages originated in 1997, 1998, and 1999 and purchased by Fannie Mae or Freddie Mac. For example, if the 4-year default rate for a particular LTV ratio category was 3 percent, and the 4-year default rate for all conventional mortgages sampled was 2 percent, the relative 4-year default rate for this category would be 3 divided by 2, or 1.5 times the average 4-year default rate. To generate the average conventional 4-year default rate, we combined Fannie Mae and Freddie Mac mortgage volume and mortgage performance data; we also combined the sample data for mortgages originated in 1997, 1998, and 1999. Loan data are measured in dollars.

When considering credit score alone, conventional mortgages with lower credit scores generally perform worse than conventional mortgages with higher credit scores. As figure 8 illustrates, our analysis indicates that the incidence of default generally increases as credit scores decrease. The average default rate for mortgages with credit scores of 740 and higher is no more than 20 percent that of the average default rate for conventional loans and loan performance declines for each lower category of credit score. In fact, the default rate for mortgages with a credit score below 700,

as a group, surpasses the average default rate. Ultimately, the average default rate for the lowest credit score category (below 620) is more than 4 times the average conventional default rate.

**Figure 8: Four-Year Relative Default Rates by Credit Score for Conventional Mortgages (1997, 1998, and 1999)**



Sources: GAO analysis of Fannie Mae and Freddie Mac data.

Note: For description of relative default rates, please see note with figure 7.

As expected, conventional mortgages with both high LTV ratios (smaller down payments) and low credit scores generally perform worse than mortgages with both lower LTV ratios (larger down payments) and higher credit scores. Our analysis indicates that the incidence of default generally increases as LTV ratios increase and credit scores decrease. As figure 9 illustrates, mortgages with lower LTV ratios and higher credit scores (those at the bottom of the figure) have much smaller default rates than mortgages with higher LTV ratios and lower credit scores (at the top of the figure).

Specifically, as a group, mortgages with LTV ratios greater than 80 percent and credit scores below 700 have default rates greater than the average conventional default rate. Further, conventional mortgages with LTV ratios greater than 80 percent and credit scores below 660 had a default rate more than twice the conventional average.

100

**Figure 9:  Four-Year Relative Default Rates by LTV Ratio and Credit Score for Conventional Mortgages (1997, 1998, and 1999)**



Sources: GAO analysis of Fannie Mae and Freddie Mac data.

Notes: For description of what we mean by relative default rates, please see note with figure 7.

We do not present relative default rates for categories with fewer than 3,000 mortgages as the performance information may not be reliable when there are too few observations. In the figure, these instances are noted as "N/A."  For a more detailed description of our analysis, see appendix I.

**101**

One notable exception to this general pattern is that the group of conventional mortgages with the highest LTV ratios (that is, greater than 97 to 100 percent) appears to have a lower risk of default than do the group of conventional mortgages with lower LTV ratios for loans originated during these years. For example, of conventional loans with credit scores of 740 and higher, those that had LTV ratios greater than 97 percent, as a group, performed better than those with LTV ratios greater than 90 to 97 percent. Similarly, of conventional loans with credit scores below 620, those with the highest LTV ratio performed better than those with LTV ratios greater than 90 to 97 percent. This anomaly, where the highest LTV mortgages appear to perform better than the lower LTV loans, may reflect that the GSEs had just begun to purchase an increasing number of mortgages with very high LTV ratios in the years we analyzed and that the GSEs took steps to limit the risks associated with these mortgages. Likewise, lenders may perform more rigorous underwriting when first originating a new loan product.

While this analysis is useful in determining the extent to which LTV ratios and credit scores are helpful in predicting the risk level associated with individual mortgages insured by FHA and for mortgages purchased by the GSEs during specific years, there are several reasons why care should be taken when comparing the FHA with the conventional relative default rates. The relative default rates are derived from different years (that is, FHA mortgages insured in 1992, 1994, and 1996; and conventional mortgages originated in 1997, 1998, and 1999 and purchased by Fannie Mae or Freddie Mac). Also, the actual average default rate for FHA-insured mortgages is higher than the actual average default rate for conventional mortgages. Finally, the distribution among LTV categories for FHA-insured loans and conventional loans differs. Generally, over half of the loans that the GSEs purchase have LTV ratios at or below 80 percent. In comparison, loans insured by FHA generally have LTV ratios greater than 95 percent.

**102**

## Several Practices Mortgage Institutions Use in Designing and Implementing Low and No Down Payment Products Could Be Instructive for FHA

Mortgage institutions we spoke with used a number of similar practices in designing and implementing new products, including low and no down payment products. Some of these practices could be helpful to FHA in its design and implementation of new products. When considering new products, mortgage institutions focused their initial efforts on identifying other products with similar enough characteristics to their new product so that data on these products could be used to understand the potential issues and performance for the proposed product. Some mortgage institutions, including FHA, said they may acquire external loan performance data and other data when designing new products. Moreover, mortgage institutions often establish additional requirements for new products such as additional credit enhancements or underwriting requirements. FHA has less flexibility in imposing additional credit enhancements but it does have the authority to seek co-insurance, which it is not currently using. FHA makes adjustments to underwriting criteria and to its premiums, but is not currently using any credit score thresholds. Mortgage institutions also use different means to limit how widely they make available a new product, particularly during its early years. FHA does sometimes use practices for limiting a new product but usually does not pilot products on its own initiative, and FHA officials question the circumstances in which they can limit the availability of a program and told us they do not have the resources to manage programs with limited availability. According to officials of mortgage institutions, including FHA, they also often put in place more substantial monitoring and oversight mechanisms for their new products including lender oversight, but we have previously reported that FHA could improve oversight of its lenders.

## Mortgage Institutions Initially Analyze the Risk of Products Similar to the Product They Are Seeking to Develop

Mortgage institutions, such as Fannie Mae, Freddie Mac, the private mortgage insurers, and FHA first identify what information, including data, they already have that would allow them to understand the performance of a potential product. When these institutions do not have sufficient data, they may purchase external data that allows them to conduct their own analysis of loans that are related to a type of loan product that they are considering. For example, Freddie Mac purchased structured transactions of Alt A and subprime loans in order to learn more about the underwriting characteristics and performance of high LTV and low credit score loans.[41] Freddie Mac officials reported that these data were very helpful to them in considering how to best structure some of their high LTV products. Moreover, the accounting standards related to the Federal Credit Reform Act of 1990, which requires federal agencies to estimate the budget cost of federal credit programs, suggest that federal agencies making changes to programs should consider external sources of data. FHA officials told us that FHA has purchased such loan performance data. According to FHA officials, FHA relies more heavily on data that it has collected internally from the approximately 1 million loans it endorses each year and its single-family data warehouse, which contains data on approximately 30 million loans. FHA officials stated that, when possible, they use these internal data to create a proxy for how a loan product with certain characteristics might perform. FHA officials said they used these data to create a "virtual zero down loan" when FHA was considering how it might implement a proposed no down payment product.

The mortgage institutions with whom we spoke noted that any loan performance data they develop or produce when implementing new products are also used to enhance their automated underwriting systems. The data improve the statistical models used in their automated underwriting systems. In May 2004, FHA implemented a statistical model for evaluating mortgage risk that may be used in lenders' automated underwriting systems, called the FHA TOTAL Scorecard. In developing the TOTAL Scorecard, FHA purchased external data (credit score data), which they merged with their existing FHA data to try to better understand the loan performance of FHA-insured loans.

---

[41]Structured transaction is a broad term that covers any of several methods of dividing cash flows among several investors in a pool of mortgages. Alt A is a broad term that describes mortgages that fall just outside of the underwriting guidelines that govern the regular mortgage purchase business of the GSEs. Alt A mortgages are loans to borrowers with relatively minor credit problems.

**104**

## Mortgage Institutions Require Additional Credit Enhancements or Stricter Underwriting for New Low and No Down Payment Products

Some mortgage institutions require additional credit enhancements—mechanisms for transferring risk from one party to another—on low and no down payment products and set stricter underwriting requirements for these products. Mortgage institutions such as Fannie Mae and Freddie Mac mitigate the risk of low and no down payment products by requiring additional credit enhancements such as higher mortgage insurance coverage. Fannie Mae and Freddie Mac require credit enhancements on all loans they purchase that have LTVs above 80 percent. Typically, this takes the form of private mortgage insurance. Fannie Mae and Freddie Mac also require higher levels of private mortgage insurance coverage for loans that have higher LTV ratios. For example, Fannie Mae and Freddie Mac require insurance coverage of 35 percent for loans that have an LTV greater than 95 percent. This means that, for any individual loan that forecloses, the mortgage insurer will pay the losses on the loan up to 35 percent of the claim amount. Fannie Mae and Freddie Mac require lower insurance coverage for loans with LTVs below 95 percent. Fannie Mae and Freddie Mac believe that the higher-LTV loans represent a greater risk to them and they seek to partially mitigate this risk by requiring higher mortgage insurance coverage.

Although FHA is required to provide up to 100 percent coverage of the loans it insures, FHA may engage in co-insurance of its single-family loans. Under co-insurance, FHA could require lenders to share in the risks of insuring mortgages by assuming some percentage of the losses on the loans that they originated (lenders may use private mortgage insurance). FHA has used co-insurance before, primarily in its multifamily programs, but does not currently use co-insurance at all.[42] FHA officials told us they tried to put together a co-insurance agreement with Fannie Mae and Freddie Mac and, while they were able to come to agreement on the sharing of premiums, they could not reach agreement on the sharing of losses and it was never implemented.

FHA could also benefit from other means of mitigating risk such as stricter underwriting or increasing fees. Fannie Mae officials also stated that they would charge higher guarantee fees on low and no down payment loans if they were not able to require the higher insurance coverage. Fannie Mae

---

[42]According to FHA, FHA discontinued the multifamily co-insurance program after experiencing significant losses. Since then, Congress provided FHA authority to enter into risk sharing agreements with GSEs and housing finance agencies on certain multifamily loans.

**105**

and Freddie Mac charge guarantee fees to lenders in exchange for converting whole loans into mortgage-backed securities, which transfer the credit risk from the lender to Fannie Mae or Freddie Mac. Within statutory limits, the HUD Secretary has the authority to set up-front and annual premiums that are charged to borrowers who have FHA-insured loans. In fact, in the administration's 2005 budget proposal for a zero down payment product, it included higher premiums for these loans. The Secretary has the authority to establish an up-front premium, which may be up to 2.25 percent of the amount of the original insured principal obligation of the mortgage. Within statutory limits, the Secretary may also require payment of an annual premium. Under the Administrative Procedures Act, the Secretary would generally follow a process in which the change to premiums would include issuing a proposed rule, receiving public comments, and then issuing a final rule.

Additionally, mortgage institutions such as Fannie Mae and Freddie Mac sometimes introduce stricter underwriting standards as part of the development of new low and no down payment products (or products about which they do not fully understand the risks). Institutions can do this in a number of ways, including requiring a higher credit score threshold for certain products, or requiring greater borrower reserves or more documentation of income or assets from the borrower. Freddie Mac officials stated that they believed limits on allowing ARMs or multiple-unit properties were also reasonable, at least initially. Once the mortgage institution has learned enough about the risks that were previously not understood, it can change the underwriting requirements for these new products to align with its standard products. Although FHA sometimes has certain standards set for it through legislation, there exists some flexibility in how it implements a newly authorized product or changes to an existing product. The HUD Secretary has latitude within statutory limitations in changing underwriting requirements for new and existing products and has done this many times. Examples included the decrease in what is included as borrower's debts and an expansion of the definition of what can be included as borrower's effective income when lenders calculate qualifying ratios. In the context of the new zero down product, the Federal Housing Commissioner at HUD has stated that all loans being considered for a zero down loan would go through FHA's TOTAL Scorecard, and borrowers would be required to receive prepurchase counseling.

**Before Fully Implementing New Products, Some Mortgage Institutions May Limit Their Availability**

Fannie Mae and Freddie Mac sometimes use pilots, or limited offerings of new products, to build experience with a new product type or to learn about particular variables that can help them better understand the factors that contribute to risk for these products. Freddie Mac and Fannie Mae also sometimes set volume limits for the percentage of their business that could be low and no down payment lending. Fannie Mae and Freddie Mac officials provided numerous examples of products that they now offer as standard products but which began as part of underwriting experiments.[43] These include the Fannie Mae Flexible 97® product, as well as the Freddie Mac 100 product. FHA has utilized pilots or demonstrations as well when making changes to its single-family mortgage insurance but generally does this in response to legislation that requires a pilot and not on its own initiative. One example in which FHA might have opted to do a pilot, or otherwise limited volumes, for a product is with allowing nonprofit down payment assistance. Concerns have been raised about the performance of FHA loans that have down payment assistance. FHA might have benefited from setting some limits on this type of assistance such that they could study its implications before allowing its broader use.

FHA's Home Equity Conversion Mortgage (HECM) insurance program is an example of an FHA program that started out as a pilot. HECM was initiated by Congress in 1987 and is designed to provide elderly homeowners a financial vehicle to tap the equity in their homes without selling or moving from their homes. Homeowners borrow against equity in their home and receive payments from their lenders (sometimes called a "reverse mortgage"). Through statute, HECM started out as a demonstration program that authorized FHA to insure 2,500 reverse mortgages. Through subsequent legislation, FHA was authorized to insure 25,000 reverse mortgages, then 50,000, and then finally 150,000 when Congress made the program permanent in 1998. Under the National Housing Act, the HECM program was required to undergo a series of evaluations and it has been evaluated four times since its inception. FHA officials told us that administering this demonstration for only 2,500 loans was difficult because of the challenges of selecting only a limited number of lenders and borrowers. FHA ultimately had to limit loans to lenders drawn through a lottery.

---

[43]The GSE officials did not tell us the numeric extent to which they limited products' issuance during its pilot phase.

The appropriate size for a pilot program depends on several factors. For example, the precise number of loans needed to detect a difference in performance between standard loans and loans of a new product type depends in part on how great the differences are in loan performance. If delinquencies early in the life of a mortgage were about 10 percent for FHA's standard high LTV loans, and FHA wished to determine whether loans in the pilot had delinquency rates no more than 20 percent greater that the standard loans (delinquency no more than 12 percent), a sample size of about 1,000 loans would be a sufficient size to detect this difference with 95 percent confidence. If delinquency rates are different, or FHA's desired degree of precision were different, a different sample size would be appropriate. FHA officials with whom we spoke told us they could use pilots or otherwise limit availability when implementing a new product or making changes to an existing product, but they also questioned their authority and the circumstances under which they would do so. FHA officials also said that they lacked sufficient resources to be able to appropriately manage a pilot.

Some mortgage institutions may also limit the initial implementation of a new product by limiting the origination and servicing of the product to their better lenders and servicers, respectively. Mortgage institutions may also limit servicing on the loans to servicers with particular product expertise, regardless of who originates the loans. Fannie Mae and Freddie Mac both reported that these were important steps in introducing a new product and noted that lenders tend to take a more conservative approach when first implementing a new product. FHA officials agreed that they could, under certain circumstances, envision piloting or limiting the ways in which a new or changed product would be available but pointed to the practical limitations in doing so. FHA approves the sellers and services that are authorized to support FHA's single-family product. FHA officials told us they face challenges in offering any of their programs only in certain regions of the country or in limiting programs to certain approved lenders or servicers. They generally offer their products on a national basis and, when they do not, specific regions of the county or lenders may question why they are not able to receive the same benefit (even on a demonstration or pilot basis). These officials did, though, provide examples in which their products had been initially limited to particular regions of the country or to particular lenders, including the rollout of the HECMs and their TOTAL Scorecard.

**Mortgage Institutions Establish Enhanced Monitoring and Oversight for New Low and No Down Payment Products and Make Changes Based on What They Learn**

Mortgage institutions, including FHA, may take several steps related to increased monitoring of new products and then make changes based on what they learn. Fannie Mae and Freddie Mac officials described processes in which they monitor actual versus expected loan performance for new products, sometimes including enhanced monitoring of early loan performance. FHA officials told us they also monitor more closely loans underwritten under revised guidelines. Specifically, FHA officials told us that FHA routinely conducts a review of underwriting for approximately 6 to 7 percent of loans it insures. FHA officials told us that, as part of the review, it may place greater emphasis on reviewing those aspects of the insurance product that are the subject of a recent change. Some mortgage institutions, such as Fannie Mae, told us that they may conduct rigorous quality control sampling of new acquisitions, early payment defaults, and nonperforming loans. Depending on the scale of a new initiative, and its perceived risk, these quality control reviews could include a review of up to 100 percent of the loans that are part of the new product.

Fannie Mae and Freddie Mac also reported that they conduct more regular reviews at seller/servicer sites for new products. In some cases, Fannie Mae and Freddie Mac have  staff who conduct on-site audits at the sellers and servicers to provide this extra layer of oversight. FHA officials also reported that they have staff that conduct reviews of lenders that they have identified as representing higher risk to FHA programs. However, we recently reported that HUD's oversight of lenders could be improved and identified a number of recommendations for improving this oversight.[44] Mortgage institutions may issue a lender bulletin, announcement, or seller/servicer guidelines to clarify instructions for new products or changes to existing products.  FHA does this through the mortgagee letters it issues to all of its approved lenders. Mortgage institutions may also issue a lender bulletin, announcement, or seller/servicer guidelines to communicate required additional controls, practices, procedures, reporting, and remitting. Importantly, changes can be made to the structure of a product, including the automated underwriting systems used to approve individual loans, based on information learned from monitoring of new products or from other sources.

---

[44]GAO, *Single-Family Housing: Progress Made, but Opportunities Exist to Improve HUD's Oversight of FHA Lenders*, GAO-05-13 (Washington, D.C.: Nov. 12, 2004).

FHA officials told us that they routinely analyze the changing performance of loans they insure as part of the annual process for estimating and re-estimating subsidy costs. The Federal Credit Reform Act of 1990 requires that federal government programs that make direct loans or loan guarantees (including insuring loans) account for the full cost of their programs on an annual budgetary basis. Specifically, federal agencies must develop subsidy estimates of the net cost of their programs that include estimates of the net costs and revenues over the projected lives of the loans made in each fiscal year. FHA's Mutual Mortgage Insurance Fund has historically been self-sufficient (not requiring subsidy). When preparing cost estimates for loan guarantee programs, agencies are expected to develop a plan to establish the appropriate information, models, and documentation to better understand the new product and to be able to make changes based on what they learn.[45] FHA officials state that they have a process in which changes to their model are made to reflect the incorporation of new programs and policies and that they review the performance of a new program in the context of their annual development of subsidy estimates, as well as their annual actuarial study.[46]

## Conclusions

While credit score is an effective predictor of default, LTV remains an effective predictor of default. Loans with lower or no down payments carry greater risk. Without any compensating measures such as offsetting credit enhancements and increased risk monitoring and oversight of lenders, introducing a new FHA no down payment product would expose FHA to greater credit risk. The administration's proposal for a zero down product included increased premiums to help compensate for an increase in the cost of the FHA program, and the Federal Housing Commissioner stated that borrowers would be required to go through prepurchase counseling. The extent to which increased cost for one program could effect the overall performance of FHA's Mutual Mortgage Insurance (MMI) fund depends, in

---

[45]The Federal Accounting Standards Advisory Board (FASAB) is responsible for promulgating accounting standards for the U.S. Government, and these standards are recognized as generally accepted accounting principles for the federal government. FASAB developed standards for agencies that describe the types of analysis that would be expected for a change to an existing program, including relevant historical data and modeling capabilities.

[46]The Cranston Gonzales National Affordable Housing Act requires an independent actuarial analysis of the economic net worth and soundness of FHA's MMI Fund.

part, on the scale of any new product, its relative cost, and how the new product affects demand for FHA's existing products.

Although FHA appears to follow many key practices used by mortgage institutions in designing and implementing new products, several practices not currently or consistently followed by FHA stand out as appropriate means to manage the risks associated with introducing new products or significantly changing existing products. Moreover, these practices can be viewed as part of a framework used by some mortgage institutions for managing the risks associated with new or changed products. The framework includes techniques such as limiting the availability of a new product until it is better understood and establishing stricter underwriting standards—all of which would help FHA to manage risk associated with any new product it may introduce. For example, FHA could set volume limits or limit the initial number of lenders participating in the product. Further, changes in FHA's premiums, an important practice used by FHA, within statutory limits, permits FHA to potentially offset additional costs stemming from a new product that entails greater risk or not well understood risk.

FHA officials believe that the agency does not have sufficient resources to implement products with limited volumes, such as through a pilot program. However, when FHA introduces new products or makes significant changes to existing products with risks that are not well understood, such actions could introduce significant risks when implemented broadly. Products that would introduce significant risks can impose significant costs. We believe that FHA could mitigate these costs by using techniques such as piloting.

## Matters for Congressional Consideration

If Congress authorizes FHA to insure no down payment products or any other new single-family insurance products, Congress may want to consider a number of means to mitigate the additional risks that these loans may pose. Such means may include limiting the initial availability of such a new product, requiring higher premiums, requiring stricter underwriting standards, or requiring enhanced monitoring. Such risk mitigation techniques would serve to help protect the Mutual Mortgage Insurance Fund while allowing FHA the time to learn more about the performance of loans using this new product. Limits on the initial availability of the new product would be consistent with the approach Congress took in implementing the HECM program. The limits could also come in the form of an FHA requirement to limit the new product to better

performing lenders and servicers as part of a demonstration program or to limit the time period during which the product is first offered.

## Recommendations for Executive Action

If Congress provides the authority for FHA to implement a no down payment mortgage product or other products about which the risks are not well understood, we recommend that the Secretary of HUD direct the Assistant Secretary for HUD-Federal Housing Commissioner to consider the following three actions:

- incorporating stricter underwriting criteria such as appropriate credit score thresholds or borrower reserve requirements,

- piloting the initial product or limiting its initial availability and asking Congress for the authority if HUD officials determine they currently do not have this authority, and

- utilizing other techniques for mitigating risks including use of credit enhancements and prepurchase counseling.

Regardless of any new products Congress may authorize, when making significant changes to its existing products or establishing new products, we recommend that the Secretary of HUD direct the Assistant Secretary for HUD-Federal Housing Commissioner to consider the following two actions:

- limiting the initial availability of the product and when doing so, the Commissioner should establish the conditions under which piloting should be used, the techniques for limiting the initial availability of a product, and the methods of enhanced monitoring that would be connected to predetermined measures of success or failure for the product.; and

- asking Congress for the authority to offer its new products or significant changes to existing products on a limited basis, such as through pilots, if HUD officials determine they currently lack sufficient authority.

## Agency Comments and Our Evaluation

We provided a draft of this report to HUD, Fannie Mae, Freddie Mac, USDA, and VA. We received written comments from HUD, which are reprinted in appendix III. We also received technical comments from HUD, Fannie Mae,

Freddie Mac, and USDA, which have been incorporated where appropriate. VA did not have comments on the draft.

HUD stated that it is in basic agreement with GAO that all policy options, implications, and implementation methods should be evaluated when considering or proposing a new FHA product. HUD also stated that in designing its zero down payment program it considered the items that we recommended it consider, including piloting. HUD stated that it adopted the prepurchase counseling requirement as a component of a proposed zero down program and that it determined that structuring the mortgage insurance premium in such a way as to minimize risk represents the most appropriate tool for managing the risk of this proposed program.

However, it is not clear under what circumstances HUD believes that piloting or limiting the availability of a changed or new product would be appropriate or possible. As we noted in our draft report, HUD officials told us that they face challenges in administering a pilot program because of the difficulty of selecting only a limited number of lenders and borrowers. HUD officials also held that they may not have the authority to limit products and that they lacked sufficient resources to adequately manage products as part of a pilot or with limited volumes.

We believe that HUD needs to further consider piloting or limiting volume of new or changed products because, as we state in the report, it is a practice followed by others in the mortgage industry and could assist HUD in mitigating the risks and costs associated with new or changed products, while still allowing HUD to meet its goal of providing homeownership opportunities. Difficulties in selecting a limited number of lenders and questions about a lack of authority could both be addressed by seeking clear authority from Congress on these matters, if HUD officials determine they currently lack sufficient authority. As we note in our report, when considering the resources necessary to implement products with limited volumes, if FHA does not use pilots or limit the availability of certain new or changed products, FHA may face costs due to the significant risks that can be associated with products that are implemented broadly and about which the risks are not well understood. We do not believe that implementing products with initial limits is appropriate or necessary in all cases. To ensure that piloting or limiting the initial availability is given sufficient consideration, we continue to recommend that HUD consider establishing the conditions under which piloting should be used and the techniques for limiting the initial availability of a product, as well as the

methods of enhanced monitoring that would be connected to predetermined measures of success or failure for the product.

As agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies of this report to the appropriate Congressional Committees and the Secretaries of Housing and Urban Development, Agriculture, and Veterans Affairs. We also will make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff have any questions concerning this report, please contact me at (202) 512-8678 or shearw@gao.gov or Mathew Scirè, Assistant Director, at (202) 512-6794 or sciremj@gao.gov. Key contributors to this report are listed in appendix IV.

Sincerely yours,

William B. Shear
Director, Financial Markets and
   Community Investment

**114**

Appendix I

# Scope and Methodology

To describe key characteristics and standards of mortgage products, we interviewed officials at the Federal Housing Administration (FHA), U.S. Department of Agriculture (USDA), and U.S. Department of Veterans Affairs (VA); as well as staff at a conventional mortgage providers (Bank of America); private mortgage insurers (for example, The PMI Group, Inc.; Mortgage Guarantee Insurance Corporation); government-sponsored enterprises (GSE) (such as Fannie Mae and Freddie Mac); Office of Federal Housing Enterprise Oversight (OFHEO); various state housing finance agencies; and nonprofit down payment assistance providers (for example, Nehemiah Corporation of America and Ameridream, Inc.). We reviewed descriptions of various mortgage products and compared the standards used across entities including FHA, USDA, and VA regulations and program guidance and the GSEs seller/servicer guides. We reviewed Web sites of state housing finance agencies and if we identified zero down payment programs, we corroborated some of the Web site information through interviews of agency officials. To report on the volume of mortgage products, we reviewed relevant reports including reports from the U.S. Department of Housing and Urban Development (HUD).

To determine what economic research indicates about the variables that are most important when estimating the risk level associated with individual mortgages, we conducted a literature search. To identify recent and relevant papers, we used various Internet search engines (such as Online Computer Library Center, FirstSearch: EconLit; HUD USER) and inquired with various mortgage industry participants (for instance, FHA, Fannie Mae, Freddie Mac, and Nehemiah). Research we reviewed includes articles, reports, and papers that were made available to us from economic journals, the Internet, libraries, or were provided to us by various entities (e.g., HUD, Fannie Mae, Freddie Mac). For the purposes of this report, we refer to these documents as "papers."

To facilitate the search we developed several criteria. For example, we used the following search terms: mortgage, performance, default, LTV ratio, credit score, and down payment assistance. We excluded the following terms from our search: multifamily and commercial. We limited our search to papers published or issued from 1999 to 2004; however, we did include some papers relevant to our inquiry that were published or issued prior to 1999 that we determined were significant to our research objectives. We identified 151 papers. There may be some relevant research that our search did not identify.

**115**

For the papers we identified, we conducted a multistep review. Initially, we determined which papers to include in our analysis. Papers included in the analysis were those that (1) were relevant to our inquiry, (2) included empirical analysis, and (3) utilized satisfactory methodologies. Papers that were not relevant were excluded from our analysis (for example, subject of paper was off-point—car loans; or analysis of loans in foreign country). Additionally, we determined if the paper included empirical analysis. If the paper did not include empirical analysis, we did not include it. However, we did review the paper to determine if it talked about papers that we had not yet identified that appeared to have empirical analysis. If the paper did identify an additional paper that appeared to be relevant to our inquiry, we attempted to obtain it. Finally, we excluded papers with weak methodologies. GAO economists conducted the evaluations of economic models. During this review, we excluded 106 papers leaving 45 for the second-stage review. Many of the papers we excluded were excluded for lack of relevance or because they did not include empirical analysis. The second review consisted of documenting the findings of the papers that were relevant, had empirical analysis, and used satisfactory methodologies. To facilitate this analysis, we developed and maintained an Access database to document our analysis—cataloging the specific factors these papers identified as being important to estimating the risk level associated with individual mortgages. Finally, for these papers, we synthesized the literature by determining how many papers found each variable to be important. For a bibliography of the 45 papers included in our analysis, see appendix II.

To examine the relationship between mortgage performance and two key underwriting variables, loan-to-value (LTV) ratio and credit score, we calculated 4-year default rates for several categories of mortgages with various LTV ratios and credit scores. We selected 4-year default rates because it best balanced the competing goals of having recent loans and the greatest number of years of default experience. To perform this analysis, we first obtained mortgage volume and performance data from three mortgage institutions: FHA (government mortgages) and Fannie Mae and Freddie Mac (conventional mortgages).[1] The FHA mortgage data consist of a stratified random sample of over 400,000 FHA-insured

---

[1] We did not include mortgages guaranteed by USDA and the VA in our analysis because credit score information for these mortgages was not readily available.

mortgages originated in calendar years 1992, 1994, and 1996.[2] We used
these data because they are the only significant data set of FHA loans that
includes credit scores and that had at least 4 years of loan performance
activity. The data come from a sample built by FHA for research purposes.
The Fannie Mae and Freddie Mac data consist of all purchase-money
mortgages originated in calendar years 1997, 1998, and 1999 and purchased
by Fannie Mae or Freddie Mac. The data provided by Fannie Mae and
Freddie Mac exclude government-insured mortgages. We selected these
loan years because they include loans that aged at least 4 years and
because, during these years, the GSEs began to purchase an increasing
number of loans with higher LTVs. The GSEs provided us data that they
considered to be proprietary. Although we limited the reporting of our
analysis to that which was considered nonproprietary, this did not limit our
overall findings for this objective. A comparison of results from the FHA
and the conventional mortgage performance analysis should be done with
care, for a number of reasons because the data are from different years,
FHA and the GSEs calculated LTVs differently, and FHA's average 4–year
default rate is higher than for the GSEs.

For this analysis, we used the LTV ratio contained in the data system for
each mortgage institution. FHA defines the LTV ratio as the original
mortgage balance, excluding the financed mortgage insurance premium,
divided by the appraised value of the house. For the GSEs, LTV ratio is
defined as the original mortgage balance divided by the lesser of the sale
price of the house or the appraised value of the house.

For this analysis, the credit score is the Fair Isaac score contained in each
institution's data system. The mortgage institutions obtain credit scores in
various ways. FHA has only recently begun to collect credit scores in its
single-family data warehouse. However, for research purposes, FHA
purchased historic credit score information for the sample of mortgages
originated in 1992, 1994, and 1996. On the other hand, Fannie Mae obtains
credit score information in two ways. For some mortgages, the lender
obtained the borrower's credit score information when it originated the
mortgage, and upon Fannie Mae's purchase of the mortgage, the lender
provides this credit score information to Fannie Mae. In some cases,
however, lenders do not obtain borrower's credit scores; when Fannie Mae
purchases the mortgage, it obtains a credit score for the borrower. For

---

[2]Foreclosed mortgages were over-sampled in 1992 and 1994. The figures presented in the
text are weighted according to the sample weights provided by HUD.

some mortgages, the institutions indicated that a credit score for a particular mortgage was unknown. Within the FHA data, about 8 percent of the mortgages had unknown scores; within the GSE data, about 3 percent of the mortgages had unknown scores. We included mortgages with unknown credit scores in our analysis and presented the loan performance results.

We carried out several actions to ensure that data provided by FHA, Fannie Mae, and Freddie Mac were sufficiently reliable for use in our analysis. For the FHA sample data, we met with FHA staff involved in generating the sample data set. We also discussed data quality procedures with appropriate FHA staff. Based on these discussions in which FHA officials described their policies and procedures and the results of external audits of their data systems, we determined that the FHA data were sufficiently reliable to use in our analysis. FHA officials indicated that their data systems contain data entry edit checks and that data submitted by lenders was reviewed by FHA. FHA's data system was audited by external auditors, and no major issues concerning data quality were raised. We also discussed data quality procedures with appropriate Fannie Mae and Freddie Mac staff. These procedures included data entry edit checks, exception reports, and checks for reasonableness. Additionally, we reviewed reports from audits of Fannie Mae and Freddie Mac. These audits included an assessment of the Fannie Mae information systems that generated the data used in this report. The audits also assessed Freddie Mac information systems that generated the data used in this report. We also compared the data with similar publicly available data. Based on these discussions and reviews of audit reports, we determined that the data Fannie Mae and Freddie Mac provided were sufficiently reliable to use in our analysis.

With these data, we generated FHA and conventional 4-year default rates for several combinations of LTV ratios and credit scores. To do this, we

- defined default as a credit event that includes foreclosed mortgages, as well as mortgages that did not experience foreclosure, but that would typically lead to a credit loss, such as a "short sale" or a "deed-in-lieu of foreclosure" termination of the mortgage;

- selected six LTV ratio categories;

- selected six credit score categories;

- combined Fannie Mae and Freddie Mac mortgage volume and performance data;

- combined mortgage volume and performance data for the sample (of mortgages insured by FHA in 1992, 1994, and 1996; and conventional mortgages originated in 1997, 1998, and 1999 and purchased by Fannie Mae or Freddie Mac);

- calculated the average 4-year default rate for FHA (weighted average) and for all conventional loans separately by dividing the total dollar amount of mortgages experiencing a credit event by the total dollar amount of mortgages originated (for FHA) or purchased (for conventional);

- calculated the average 4-year default rates for sampled FHA loans and for conventional loans that fell within each LTV ratio and credit score category; and

- calculated the relative 4-year default rates for each LTV ratio and credit score categories for FHA loans and for conventional loans by dividing the average 4-year default rate for each specific LTV and credit score category by the average 4-year default rate for sampled FHA loans and all conventional loans, respectively.

For example, if the merged average 4-year default rate for FHA loans within a particular LTV ratio and credit score category was 3 percent, and the average 4-year default rate for all FHA loans was 2 percent, the relative 4-year default rate for FHA loans within this particular category would be 3 divided by 2, or 1.5 times the average FHA default rate.

We do not present relative default rates for categories with small numbers of mortgages because the performance information may not be reliable when there are too few observations. In the figures, these instances are noted as "N/A." For the FHA analysis, we used a cutoff of about 1,000 mortgages to determine whether there were sufficient observations to reliably measure the relative default rate. For the conventional analysis, we used a cutoff of about 3,000 mortgages to determine whether the relative default rate was reliable. We chose a higher cutoff for the GSE analysis because the GSEs have a lower default rate, and analysis of less frequent events requires a larger sample size.

119

**Appendix I**
**Scope and Methodology**

To determine what lessons FHA might learn from others that support low and no down payment lending we obtained testimonial information from the mortgage industry (for example, FHA, GSEs, private mortgage insurers, and a private lender) about the steps they take to design and implement low and no down payment lending. We selected these entities based on the parallels to FHA, as well as their significance in the mortgage industry. Where available, we reviewed industry and academic information relevant to these steps in carrying out low and no down payment lending.

We performed our audit work from January 2004 to December 2004 in accordance with generally accepted government auditing standards.

**120**

Appendix II

# Papers Identified in Literature Search and Included in Analysis

| Paper | LTV | Credit score | Other factor(s) |
|---|---|---|---|
| Brent W. Ambrose and Charles A. Capone. "The Hazard Rates of First and Second Defaults," *Journal of Real Estate Finance and Economics*, vol. 20 no. 3 (May 2000). | X | | X |
| Brent W. Ambrose and Charles A. Capone. "Modeling the Conditional Probability of Foreclosure in the Context of Single-Family Mortgage Default Resolutions," *Real Estate Economics*, vol. 26 no. 3 (1998). | X | | X |
| Richard Anderson and James VanderHoff. "Mortgage Default Rates and Borrower Race," *The Journal of Real Estate Research*, vol. 18 no. 2 (Sep/Oct 1999). | | | X |
| Robert B. Avery, Raphael W. Bostic, Paul S. Calem, and Glenn B. Canner. "Credit Risk, Credit Scoring, and the Performance of Home Mortgages," *Federal Reserve Bulletin* (July 1996). | X | X | X |
| James A. Berkovec, Glenn B. Canner, Stuart A. Gabriel and Timothy H. Hannan. "Race, Redlining, and Residential Mortgage Loan Performance," *Journal of Real Estate Finance and Economics*, vol. 9 no. 1 (July 1994). | X | | X |
| Paul S. Calem and Susan M. Wachter. "Community Reinvestment and Credit Risk: Evidence from an Affordable-Home-Loan Program," *Real Estate Economics*, vol. 27 no. 1 (1999). | | X | |
| Paul S. Calem and James Follain. *The Asset-Correlation Parameter in Basel II for Mortgages on Single-Family Residences*, a report prepared as background for public comment on the Advance Notice of Proposed Rulemaking on the Proposed New Basel Capital Accord, November 6, 2003. | X | X | X |
| Paul S. Calem and Michael LaCour-Little. *Risk-based Capital Requirements for Mortgage Loans*, November 2001. | X | X | |
| Charles A. Calhoun and Yongheng Deng. "A Dynamic Analysis of Fixed- and Adjustable-Rate Mortgage Terminations," Journal of Real Estate Finance and Economics, vol. 24 no. 1/2 (Jan 2002). | X | | X |
| Dennis R. Capozza, Dick Kazarian, and Thomas A. Thomson. "Mortgage Default in Local Markets," *Real Estate Economics*, vol. 25 no. 4 (Winter 1997). | X | | X |
| Richard L. Cooperstein, F. Stevens Redburn, and Harry G. Meyers. "Modelling Mortgage Terminations in Turbulent Times," *AREUEA Journal*, vol. 19 no. 4 (1991). | X | | X |
| Robert F. Cotterman. *Analysis of FHA Single-Family Default and Loss Rates*, a report prepared for the Office of Policy Development and Research, U.S. Department of Housing and Urban Development, March 25, 2004. | X | X | X |
| Robert F. Cotterman. *New Evidence on the Relationship Between Race and Mortgage Default: The Importance of Credit History Data*, a report prepared for the Office of Policy Development and Research, U.S. Department of Housing and Urban Development, May 23, 2002. | X | X | X |
| Robert F. Cotterman. *Neighborhood Effects in Mortgage Default Risk*, a report prepared for the Office of Policy Development and Research, U.S. Department of Housing and Urban Development, March 2001. | X | X | X |
| Robert F. Cotterman. *Assessing Problems of Default in Local Mortgage Markets*, a report prepared for the Office of Policy Development and Research, U.S. Department of Housing and Urban Development, March 2001. | X | | X |
| Amy Crews Cutts and Robert Van Order. "On the Economics of Subprime Lending." *Freddie Mac Working Paper Series # 04-01*(January 2004) (http://freddiemac.com/corporate/reports/). | X | X | X |

*(Continued From Previous Page)*

| Paper | LTV | Credit score | Other factor(s) |
|---|---|---|---|
| Ralph DeFranco. "Modeling Residential Mortgage Termination and Severity Using Loan Level Data." *(Ph.D diss.,* University of California, Berkeley, 2002). | X | X | X |
| Yongheng Deng, John M. Quigley. *Woodhead Behavior and the Pricing of Residential Mortgages,* (December 2002). | X | | X |
| Yongheng Deng and Stuart Gabriel. *Enhancing Mortgage Credit Availability Among Underserved and Higher Credit-Risk Populations: An Assessment of Default and Prepayment Option Exercise Among FHA-Insured Borrowers,* a report prepared for the U.S. Department of Housing and Urban Development, August 2002. | X | X | X |
| Yongheng Deng and Stuart Gabriel. *Modeling the Performance of FHA-Insured Loans: Borrowers Heterogeneity and the Exercise of Mortgage Default and Prepayment Options,* a report submitted to the Office of Policy Development and Research, U.S. Department of Housing and Urban Development, May 2002. | X | X | X |
| Yongheng Deng, John M. Quigley, and Robert Van Order. "Mortgage Terminations, Heterogeneity and the Exercise of Mortgage Options," *Econometrica,* vol. 68 no. 2 (March 2000). | X | | X |
| Yongheng Deng, John M. Quigley, and Robert Van Order, *Mortgage Default and Low Downpayment Loans: The Costs of Public Subsidy,* National Bureau of Economic Research: Working Paper No. 5184 (Cambridge, Mass.: July 1995). | X | | X |
| Peter J. Elmer and Steven A Seelig. "Insolvency, Trigger Events, and Consumer Risk Posture in the Theory of Single-Family Mortgage Default," *Journal of Housing Research,* vol. 10 no. 1 (1999). | X | | X |
| Robert M. Feinberg and David Nickerson. "Crime and Residential Mortgage Default: An Empirical Analysis." *Applied Economics Letters,* vol. 9 (2002). | | | X |
| Dan Feshbach and Michael Simpson. "Tools for Boosting Portfolio Performance," *Mortgage Banking,* October 1999. | X | X | X |
| Dan Feshbach and Pat Schwinn. "A Tactical Approach to Credit Scores," *Mortgage Banking,* February 1999. | X | X | X |
| Gerson M. Goldberg and John P. Harding. "Investment Characteristics of Low- and Moderate-Income Mortgage Loans," *Journal of Housing Economics,* vol. 12 (2003). | X | | X |
| Government Accountability Office. *Mortgage Financing: Changes in the Performance of FHA-Insured Loans,* GAO-02-773. Washington, D.C. July 10, 2002. | X | | X |
| Government Accountability Office. *Mortgage Financing: FHA's Fund Has Grown, but Options for Drawing on the Fund Have Uncertain Outcomes,* GAO-01-460. Washington, D.C. February 28, 2001. | X | | X |
| Valentina Hartarska, Claudio Gonzalez-Vega, and David Dobos. *Credit Counseling and the Incidence of Default on Housing Loans by Low-Income Households,* a paper prepared as part of a collaborative research program between Ohio State University and Paul Taylor and Associates, of Columbus, Ohio. (February 2002). | | | X |
| Abdighani Hirad and Peter M. Zorn (corresponding author). *A Little Knowledge Is a Good Thing: Empirical Evidence of the Effectiveness of Pre-Purchase Homeownership Counseling,* May 22, 2001. | | | X |
| The Department of Housing and Urban Development, Office of Inspector General. *Follow-up of Down Payment Assistance Programs Operated by Private Nonprofit Entities.* 2002-SE-0001, Seattle, Washington, September 25, 2002. | | | X |

Appendix II
Papers Identified in Literature Search and
Included in Analysis

(Continued From Previous Page)

| Paper | LTV | Credit score | Other factor(s) |
|---|---|---|---|
| The Department of Housing and Urban Development, Office of Inspector General. *Final Report of Nationwide Audit: Down Payment Assistance Programs (Office of Insured Single Family Housing)*, 2000-SE-121-0001, Seattle, Washington, March 31, 2000. | | | X |
| Michael Lacour-Little and Stephen Malpezzi. "Appraisal Quality and Residential Mortgage Default: Evidence From Alaska," *Journal of Real Estate Finance and Economics*, vol. 27 no. 2 (2003). | X | | X |
| Andrey D. Pavlov. "Competing Risks of Mortgage Termination: Who Refinances, Who Moves, and Who Defaults," *Journal of Real Estate Finance and Economics*, vol. 23 no. 2 (September 2001). | X | | X |
| Anthony Pennington-Cross. "Credit History and the Performance of Prime and Nonprime Mortgages," *Journal of Real Estate Finance and Economics*, vol. 27 no. 3 (2003). | | X | X |
| Anthony Pennington-Cross. "Subprime and Prime Mortgages: Loss Distributions." *Office of Federal Housing Enterprise Oversight Working Paper Series 03-01* (May 27, 2003). | X | X | X |
| Anthony Pennington-Cross. "Patterns of Default and Prepayment for Prime and Nonprime Mortgages." *Office of Federal Housing Enterprise Oversight Working Paper 02-1* (March 2002). | X | X | X |
| Roberto G. Quercia, Michael A. Stegman, Walter R. Davis, and Eric Stein. *Community Reinvestment Lending: A Description and Contrast of Loan Products and Their Performance*, a report prepared for the Joint Center for Housing Studies' Symposium on Low-Income Homeownership as an Asset-Building Strategy, September 2000. | X | X | X |
| Roberto G. Quercia, George W. McCarthy, and Michael A. Stegman. "Mortgage Default Among Rural, Low-Income Borrowers," *Journal of Housing Research* vol. 6 no. 2 (1995). | X | | X |
| Stephen L. Ross. "Mortgage Lending, Sample Selection and Default," *Real Estate Economics*, vol. 28 no. 4 (Winter 2000). | X | | X |
| Robert A. Van Order and Peter M. Zorn. The *Performance of Low Income and Minority Mortgages: A Tale of Two Options*, August 2001. | X | X | X |
| Robert Van Order and Peter Zorn. *Performance of Low-Income and Minority Mortgages*, a report prepared for the Joint Center for Housing Studies' Symposium on Low-Income Homeownership as an Asset-Building Strategy, September 2001. | X | X | X |
| Robert Van Order and Peter Zorn. "Income, Location, and Default: Some Implications for Community Lending," *Real Estate Economics*, vol. 28 no. 3 (2000). | X | | X |
| Economic Systems Inc., ORC Macro, and The Hay Group. *Evaluation of VA's Home Loan Guaranty Program: Final Report*. A report prepared for the Department of Veterans Affairs. (July 2004). | X | | X |

Source: GAO.

123

Appendix III

# Comments from the Department of Housing and Urban Development



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC  20410-8000

ASSISTANT SECRETARY FOR HOUSING-
FEDERAL HOUSING COMMISSIONER

JAN 1 4 2005

Mr. William B. Shear
Director
Financial Markets and Community Investments
United States Government Accountability Office
Washington, DC  20548

Dear Mr. Shear:

Thank you for the opportunity to comment on the GAO Draft Report entitled _Actions Needed to Help FHA Manage Risks From New Mortgage Loan Products_.

The Department is in basic agreement with the GAO in that all policy options, implications, and implementation methods should be evaluated when considering or proposing a new FHA product. In fact, the Department conducts such evaluations routinely. New products are proposed only after a thorough and complete analysis of all aspects of implementation and risk management. Appropriate measures that balance financial risk with the intended social purpose of a program, most often to provide homeownership opportunities, are always proposed and evaluated as part of the process in developing new mortgage insurance products.

The Report identifies three specific actions which GAO recommends be considered for inclusion in the Department's proposed zero down payment program: imposing stricter underwriting criteria (higher credit scores or reserve requirements), artificially limiting program participation through the use of a pilot program, and credit enhancements and pre-purchase counseling. As we discussed with the GAO, these actions, along with others, were each considered during the Department's development of the zero down program and while most were not adopted, alternative solutions to achieve the objectives were incorporated into the program design.

The items the GAO recommended for consideration are all designed to mitigate risk and limit financial exposure to the FHA Insurance Fund consistent with the FHA's mission of providing homeownership opportunities to populations unserved or underserved by the private market. While FHA considered the recommended solutions proposed by GAO and adopted the pre-purchase counseling requirement as a component of the proposed zero down program, FHA determined, through the use of the same tools explored by GAO such as risk modeling, market comparison, portfolio performance, and consultation, that the most appropriate tool for balancing the expected performance of these loans against the goal of providing homeownership opportunities to this population was to structure the mortgage insurance premium in such a way as to minimize the financial risk.

www.hud.gov        espanol.hud.gov

2

Again, we appreciate the opportunity to comment on the Draft Report and will continue, as recommended by the GAO, to consider all possible elements of program design when developing new program proposals and adopt the combination that best fits the objectives of the proposed program.

Sincerely,

Margaret A. Young
Deputy Assistant Secretary
For Finance and Budget

**125**

Appendix IV

# GAO Contacts and Staff Acknowledgments

| | |
|---|---|
| **GAO Contacts** | William B. Shear, (202) 512-8678<br>Matthew Scirè, (202) 512-6794 |
| **Staff Acknowledgments** | In addition to those individuals named above, Anne Cangi, Rudy Chatloss, Bert Japikse, Austin Kelly, Marc Molino, Andy Pauline, Roberto Piñero, and Mitch Rachlis made key contributions to this report. |

| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice: (202) 512-6000<br>TDD:  (202) 512-2537<br>Fax:   (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

 PRINTED ON RECYCLED PAPER

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **EXHIBIT A**

Appendix IV

# Comments from the Department of Housing and Urban Development



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

ASSISTANT SECRETARY FOR HOUSING-
FEDERAL HOUSING COMMISSIONER

October 25, 2005

Mr. William B. Shear
Director
Financial Markets and Community Investments
United States Government Accountability Office
441 G Street, NW
Washington, D. C. 20548

Dear Mr. Shear:

Thank you for permitting FHA to respond to the GAO Draft Report 06-24, "MORTGAGE FINANCING: Additional Action Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance." As you know, FHA has been examining these types of down payment assistance programs for the past several years. The report confirms FHA's own analysis of loan performance and the findings of an independent contractor hired by FHA to evaluate how seller-funded gift programs operate.

The GAO report provides additional analysis and reiterates that borrowers receiving seller-funded down payment assistance pay more for their homes than homebuyers who receive no such assistance or assistance from down payment programs funded without seller involvement. Borrowers who rely on seller-funded down payment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA. Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan.

FHA has also determined that a Zero Down program would better serve borrowers who have little savings for a down payment, but who have steady incomes and acceptable credit. The proposed Zero Down program was designed to address the concerns that GAO raises in the report – that buyers using seller-funded gifts are paying too much for their homes and putting themselves in a risky position, as evidenced by the historical loan performance – and to ensure that FHA was keeping pace with the rest of the mortgage market, where 100% financing products have become increasingly common.

That said, although the report reaffirms FHA's own findings, the agency is disappointed that the recommendations do not acknowledge that a Zero Down program would provide FHA with a better way to serve families in need of down payment assistance. FHA represents a better, safer

129

-2-

financing alternative for many families with blemished credit. Providing a new product would serve these families well, by offering consumer protections to ensure that these families would not pay more than they should for their home or their financing, and that these families would have the benefits of loss mitigation to help them stay in their homes should they experience any future financial hardship.

FHA's responses to the individual recommendations are as follows:

GAO Recommendation: To provide FHA with data that would permit it to identify whether down payment assistance is from a seller-funded down payment assistance provider, modify FHA's "gift letter source" categories to include "nonprofit seller-funded" and "nonprofit non-seller-funded" and require lenders to accurately identify and report this information when submitting loan to FHA.

FHA Response: FHA agrees with this recommendation and will modify the systems to collect this additional information.

GAO Recommendation: To more fully consider the risk posed by down payment assistance when underwriting loans, include the presence and source of down payment assistance as a loan variable in FHA's TOTAL Scorecard.

FHA Response: Consistent with past practice, HUD will consider and incorporate into TOTAL all appropriate factors, including the presence and source of down payment assistance, that can with historical data be shown empirically relevant for assessing borrower credit risk with respect to loan performance.

GAO Recommendation: To ensure that FHA has an ongoing understanding of the impact that down payment assistance has on loan performance, implement routine and targeted performance monitoring of loans with down payment assistance, including analyses that consider the source of assistance.

FHA Response: FHA agrees and believes that it already performs monitoring of portfolios of such mortgages based on the information residing in its system of records. Obviously, FHA's concern, based on loan performance data, resulted in seeking the services of a contractor to analyze and explore these down payment assistance programs in detail.

GAO Recommendation: To improve the forecasting ability of the loan performance models used in the annual review of actuarial soundness, consider the presence and source of down payment assistance.

FHA Response: FHA incorporated the source of down payment assistance into its FY 2005 Actuarial Review of the Mutual Mortgage Insurance Fund, a variable that has proved to have considerable explanatory power. FHA informed GAO that it planned to incorporate this variable during its interviews about down payment assistance.

Appendix IV
Comments from the Department of Housing
and Urban Development

-3-

GAO Recommendation: To ensure appraisers have the information necessary to establish the market value of the property, require lenders to inform appraisers about the presence of down payment assistance from a seller-funded source.

FHA Response: Lenders are required to inform appraisers about all seller concessions, including down payment assistance. Appraisers are aware of seller funded down payment assistance providers in their markets, as evidenced by the findings of the Concentrance study referenced several times in the GAO report. Regardless, FHA will consider imposing the additional requirement that the lender inform the appraiser when down payment assistance is provided by a nonprofit that relies on contributions from the seller.

GAO Recommendation: Because down payment assistance provided by seller funded entities is, in effect, a seller inducement, revise FHA standards to treat assistance from a seller-funded nonprofit as a seller contribution, and therefore subject to the 6 percent limit on seller contributions and the prohibition against using seller contributions to meet the 3 percent borrower contribution requirement.

FHA Response: HUD's Office of General Counsel has advised that the timing of the payments is a key point in whether there is a seller contribution that is an inducement to purchase. If a gift is made from a nonprofit entity (either directly or through an entity such as the closing agent), from the nonprofit's own funds, prior to the completion of the closing, the gift becomes the homebuyer's property so the buyer can make the three percent required down payment. After completion of the closing, a seller makes a contribution (perhaps through the closing agent as well) from the gross sales proceeds to the nonprofit entity. The donation is commingled with other nonprofit funds that later become a source of donations to buyers other than the buyer who has just closed the purchase of the seller's property. Because the buyer has not received funds from the nonprofit that can be traced to the seller's contribution, there has not been an inducement to purchase provided by the seller.

Thank you again for the opportunity to review the GAO report. Consistent with the spirit of your report and its recommendations, HUD will continue to take all steps needed for responsible financial management of its down payment assistance programs, while ensuring that FHA programs serve effectively families who are otherwise underserved by the private sector.

Sincerely,

Brian D. Montgomery
Assistant Secretary for Housing-
Federal Housing Commissioner

131

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **EXHIBIT G**



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410

OFFICE OF THE ASSISTANT SECRETARY FOR
HOUSING-FEDERAL HOUSING COMMISSIONER

APR 3 1998

Don F. Harris, Esq.
Nehemiah Home Ownership 2000
770 L St. Suite 750
Sacramento, CA 95814

RE: Nehemiah Home Ownership 2000

Dear Mr. Harris:

The United States Department of Housing and Urban Development
("HUD") has received and reviewed the IRS ruling that the non-
profit organization which administers the Nehemiah down payment
assistance program qualifies for Section 501(c)(3) status. Based
upon the program specific information accompanying your
submission to the IRS, we find that your program complies with
HUD's regulations and guidance pertaining to the source of funds
for the borrowers' down payments. Accordingly, HUD will insure
eligible mortgages in which home buyers use Nehemiah's program(as
set out in the submission to the IRS for Section 501 (c)(3)
status) for borrower down payment assistance.

Although HUD has no immediate plans to change its policies
regarding down payment assistance programs or regarding the
source of borrower down payment funds, HUD reserves the right to
do so in the future in accordance with applicable procedures. In
the event that there are any such changes regarding the source of
borrower down payment funds, the changes will become applicable
to Nehemiah and all other similarly situated down payment
assistance programs six months after the final promulgation and
issuance of any such changes.

Sincerely,

Emelda Johnson
Deputy Assistant Secretary
    Single Family Housing Programs

133

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **EXHIBIT B**



Monday,
October 1, 2007

## Part IV

# Department of Housing and Urban Development

24 CFR Part 203
Standards for Mortgagor's Investment in
Mortgaged Property: Final Rule

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**24 CFR Part 203**

**[Docket No. FR-5087-F-02]**

**RIN 2502-AI52**

**Standards for Mortgagor's Investment in Mortgaged Property**

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends the Department's regulations governing the specific standards for a mortgagor's investment in property for which the mortgage is insured by the Federal Housing Administration (FHA). Specifically, this final rule codifies HUD's longstanding practice, authorized by statute, of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations.

The standards established by this final rule address a situation in which the mortgagor's investment is derived from a gift, loan, or other payment that is provided by any donor, including an individual or an organization, and also specify prohibited sources for a mortgagor's investment. The final rule establishes that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: The seller, or any other person or entity that financially benefits from the transaction; or any third party or entity that is reimbursed directly or indirectly by the seller, or any other person or entity that financially benefits from the transaction.

This final rule follows publication of a May 11, 2007, proposed rule and takes into consideration the public comments received on the proposed rule. After considering all comments received, HUD is adopting the May 11, 2007, proposed rule with certain minor clarification changes.

**DATES:** *Effective Date:* October 31, 2007.

**FOR FURTHER INFORMATION CONTACT:** Margaret Burns, Director, Office of Single Family Program Development, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; telephone number (202) 708-2121 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Information Relay Service at (800) 877-8339.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In order for a mortgage to be eligible for insurance by the Federal Housing Administration (FHA), section 203(b)(9) of the National Housing Act (12 U.S.C. 1709(b)(9)) requires the mortgagor (with narrow exceptions) to pay on account of the property at least 3 percent of the cost of acquisition. The statute and the implementing regulation at 24 CFR 203.19 are silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute. For example, section 203(b)(9) of the National Housing Act permits family members to provide loans to other family members, and permits the mortgagor's downpayment to be paid by a corporation or person other than the mortgagor in certain circumstances, such as when the mortgagor is 60 years of age or older, or when the mortgage covers a housing unit in a homeownership program under the Homeownership and Opportunity Through HOPE Act (Title IV of Pub. L. 101-625, 104 Stat. 4148, approved November 28, 1990). HUD has long taken the position that downpayment funding from the seller of the home to be purchased by a borrower with an FHA-insured loan is not a permissible source of the mortgagor's investment in the property. FHA's experience is that loans made to borrowers who rely on these types of seller-funded assistance perform very poorly.

Although FHA has attempted to preclude downpayment funding derived from contributions of the seller of the property, some so-called charitable organizations have been able to circumvent these restrictions in various ways, including the establishment of a fund that provides the so-called "gift" to the homebuyer. The situations that cause FHA concern are those in which a so-called charitable organization provides a so-called gift to a homebuyer from funds that it receives, directly or indirectly, from the seller. In these cases, there is a clear *quid pro quo* between the homebuyer's purchase of the property and the seller's "contribution" or payment to the charitable organization. This is also true if the contribution to the charitable organization comes from an entity, other than the seller, that has an expectation of being reimbursed by the seller. Often, these contributions function as an inducement to purchase the home. It is these concerns that prompted HUD's rulemaking in 1999, which did not

result in final regulations, and now again, in 2007.

**II. The May 11, 2007, Proposed Rule**

On May 11, 2007, HUD published a proposed rule (72 FR 27047) for public comment to codify standards regarding the use of gifts as a source of the mortgagor's investment in the mortgaged property, and to also specify prohibited sources for a mortgagor's investment. The proposed rule established that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: (1) The seller, or any other person or entity that financially benefits from the transaction; or (2) any third party or entity (referred to as a "donor") that is reimbursed directly or indirectly by any of the parties listed in clause (1).

As discussed in the proposed rule, FHA's primary concern with these transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA. A Government Accountability Office (GAO) report released in 2005 entitled "Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Loan Products' (GAO Mortgage Financing Report) stated that Fannie Mae and Freddie Mac do not allow seller-related contributions to the downpayment, and that seller-related contributions could contribute to an overvaluation of the price of the property (GAO Mortgage Financing Report, at page 16).

In May 2006, the Internal Revenue Service (IRS) addressed these same concerns by issuing Revenue Ruling 2006-27, which provides guidelines on organizations that may provide downpayment assistance to homebuyers and qualify as tax-exempt charitable or educational organizations under Internal Revenue Code (IRC) section 501(c)(3), and those that do not qualify for this tax-exempt status. The IRS, in its press announcement of the ruling, stated that funneling downpayment assistance from sellers to buyers through "self-serving, circular-financing arrangements" is inconsistent with operation as a section 501(c)(3) charitable organization. The IRS stated that, in a typical scheme, there is a direct correlation between the amount of the downpayment assistance provided to the buyer and the payment received from the seller, the seller pays the organization only if the sale closes, and the organization usually charges an

Federal Register / Vol. 72, No. 189 / Monday, October 1, 2007 / Rules and Regulations    **56003**

additional fee for its services. The IRS noted that so-called charities that manipulate the system do more than mislead honest homebuyers; these organizations ultimately cause an increase in the cost of the home and damage the image of honest, legitimate charities. (See IRS News Release of May 4, 2006, at *http://www.irs.gov/ newsroom/article/0,,id=156675,00.html*.)

As the IRS also noted in its press release, inflated sales prices are often found on properties purchased with downpayment assistance from seller-funded nonprofit programs. Unlike true gifts that reduce the amount of the purchase price financed by the homeowner, such seller contributions increase the sales price of the home and result in higher mortgage payments.

Given that seller-funded gift programs thrive in stagnant or depreciating housing markets, the risk to FHA increases if FHA cannot recover the full amount owed when FHA acquires and resells a home that had been purchased by a participating borrower who had defaulted on the FHA-insured loan. While these situations represent a financial burden for FHA and taxpayers, of equal if not greater concern, is that they hurt the families who lose their homes and the neighborhoods in which those homes are located.

### III. This Final Rule

For the foregoing reasons, HUD is proceeding, through this final rule, to codify the regulations submitted for public comment in the May 11, 2007, proposed rule. This final rule makes the following change to the May 11, 2007, proposed rule in response to public comment. This final rule clarifies in § 203.19(f) that a tribal government or a tribally designated housing entity (TDHE), as defined at 25 U.S.C. 4103(21), is a permissible source of downpayment assistance. Additionally, the final rule revises in § 203.19(f) the description of tax-exempt organizations that are permissible sources of gifts to more closely align this description with the description used by IRS of such organizations.

In addition, notwithstanding the effective date provided under the DATES caption of this rule, pursuant to an April 1998 settlement agreement resolving litigation between the Nehemiah Progressive Housing Development Corporation (Nehemiah) and HUD, the effective date shall be March 31, 2008 for the Nehemiah downpayment assistance program described in the settlement agreement between Nehemiah and HUD.

While this rule prevents sellers from funding downpayments in their own home sales transactions, the rule is not intended to preclude sellers from contributing to charitable organizations that provide downpayment assistance that is unrelated in any manner to any properties sold by the seller. In addition, the rule is not intended to preclude reasonable assistance with closing costs not related to the minimum investment, which may be permitted under local practice. Nothing in this rule changes HUD's policy of allowing builders and other sellers to offer cash incentives to homebuyers, provided that any cash or cash equivalent given to a homebuyer before, at, or after closing results in a proportionate reduction to the mortgage; an amount which the homebuyer then would have to provide as additional funds at closing. The primary focus of this rule is to establish appropriate standards for downpayment assistance to a homebuyer that is categorized as a gift.

### IV. Discussion of Key Issues Raised by Public Commenters on Proposed Rule

The public comment period for the May 11, 2007, proposed rule was initially set to close on July 10, 2007, but HUD extended the comment period to August 10, 2007. HUD received approximately 15,000 public comments on the proposed rule. The overwhelming majority of these comments consisted of brief statements opposing HUD's rule, with the majority also submitting their comments in a standard similar format and wording, and urging HUD not to eliminate downpayment assistance in connection with FHA-insured mortgages. However, a number of comments supported the rule, and approved of FHA's efforts to harmonize its regulations regarding downpayment assistance with recent rulings of the IRS. These commenters shared HUD's concerns about home price inflation and the associated risks for increased delinquency and foreclosure. They stated that inflated home prices affect a community's housing market, and can magnify existing housing affordability problems.

The following provides a summary of the major themes and issues raised during the public comment period on the proposed rule.

*Comment:* HUD should not eliminate downpayment assistance, but regulate such assistance, or establish standards for downpayment supported loans, including taking action to improve appraisals and require stricter underwriting and a higher insurance premium for such loans.

*HUD response:* Many commenters, through their statements urging HUD not to eliminate downpayment assistance, indicated that they believed the May 11, 2007, proposed rule would eliminate all downpayment assistance. HUD's May 11, 2007, rule did not propose to eliminate downpayment assistance, but rather proposed to regulate such assistance as the commenters requested. Additionally, HUD is not eliminating all privately funded downpayment assistance. Such assistance is permitted, for example, from family members, the borrower's employer, state or local governments, charitable organizations that do not rely upon a party with a financial interest in the transaction for downpayment assistance, or labor organizations. The proposed rule, however, did propose to preclude as acceptable downpayment assistance, assistance that, in whole or in part, is funded by the seller or any other person or entity that financially benefits from the transaction or any third party or entity that is reimbursed, directly or indirectly, by the seller or any other party that financially benefits from the transaction.

*Comment:* Although downpayment assistance presents risks, HUD should address what an acceptable level of risk is, and determine how the risk can be maintained at or below that level.

*HUD response:* Based on HUD's analysis of its loan portfolio going back to 1998, HUD has assessed that risk and has determined that there is 2 to 3 times greater risk of default and claim with purchase loans that receive downpayment assistance from the seller or other persons or entities that financially benefit from the sale of a home to the borrower than from all other loans with downpayment assistance from all other sources.

For example, for loans endorsed for insurance in Fiscal Year (FY) 2001, the cumulative claim rate as of July 2007 was 7.1 percent for loans with downpayment assistance from relatives, public agencies, and employers, but 15.8 percent for loans with downpayment assistance from nonprofit entities that received reimbursements from sellers. A cumulative claim rate is calculated by dividing the number of claims that have occurred to date by the number of loans endorsed in a particular fiscal year. In conjunction with the FY 2006 Actuarial Review of the Mutual Mortgage Insurance Fund, FHA's independent actuaries estimated that the ultimate claim rate for 30-year fixed-rate purchase loans endorsed in FY 2008 would be 11.04 percent if they did not have seller-funded downpayment assistance, but 23.06 percent if they did. An ultimate claim rate is defined as the total number of

**56004**    Federal Register / Vol. 72, No. 189 / Monday, October 1, 2007 / Rules and Regulations

claims expected to occur over the 30-year life of a book of business divided by the total number of loans endorsed in a particular fiscal year. The difference between these rates represents the difference between acceptable and unacceptable levels of risk to the FHA insurance fund.

In addition, HUD has determined that loans with downpayment assistance from sellers or other parties with a financial interest in the transaction are also associated with a higher loss rate than other single family loans insured by FHA. In other words, homeowners with this type of downpayment assistance have a two to three times higher possibility of losing their home. This rule, therefore, is HUD's effort to mitigate an unacceptable level of risk.

*Comment:* HUD can mitigate the risk from downpayment assistance by requiring full disclosure of the amount of downpayment assistance for underwriting and to appraisers.

*HUD response:* FHA requirements currently require disclosure of the full amount of downpayment assistance.

*Comment:* Rather than eliminate downpayment assistance, HUD can further mitigate risk by requiring a complete home inspection, to avoid potentially huge repair costs to the homeowner. HUD could also require the owner to obtain a homeowner's warranty for a specified period of time, to avoid high repair cost as a potential source of default and foreclosure. Alternatively, HUD could require downpayment assistance companies to offer mandatory risk mitigation tools or offer insurance to the buyer.

*HUD response:* HUD reiterates that downpayment assistance is not being eliminated by this rule. The commenters' recommendations are noted, but the suggested actions are outside the scope of the present rule. In addition, the recommendations pertaining to warranty or insurance does not deal directly with sales price inflation, which is a separate issue from repair costs a homeowner may face after purchasing a home.

*Comment:* Price inflation does not arise from downpayment assistance, but from the appraisal process. The appraisal process should be reformed, for example, by establishing a blind pool appraiser selection process for loans with downpayment assistance.

*HUD response:* Downpayment assistance can be an independent source of price inflation separate from, or in conjunction with, any price inflation that may arise from the appraisal process, which, while noted by HUD, is an issue beyond the scope of the present rule. HUD has already taken steps to

address the appraisal issue. HUD's Appraiser Roster, for which the regulations can be found in 24 CFR part 200, subpart G, is intended to ensure fairness and accuracy in the appraisal process for FHA-insured mortgages.

*Comment:* HUD should make rules to deal with predatory lenders and lenders who charge outrageous rates. Such lenders are the real problem, rather than downpayment assistance. It is a lender's responsibility to ensure that people cannot buy more than they can afford, and downpayment assistance should not be affected because of bad lender decisions.

*HUD response:* HUD acknowledges that problems may arise at each stage of, and with each party to, a complex transaction such as purchasing a home. In addition, problems change over time, and the way any given problem is addressed also changes. This rule addresses an aspect, other than predatory lending, of the home purchase transaction that has been identified as a problem. HUD notes the recommendation is outside the scope of this rule. Although HUD does not regulate non-FHA lending practices, HUD has taken steps, such as issuing rules on property flipping, appraisal reform, and lender accountability, to address predatory lending, and continues to monitor this problem and develop new ways of addressing it. FHA has also taken steps to mitigate mortgage insurance losses with the development and implementation of Credit Watch, Neighborhood Watch, and Appraiser Watch. FHA also strengthened its education efforts by doubling housing counseling grant funds, creating anti-predatory lending brochures, featuring anti-predatory lending messages in advertising, and increasing training opportunities for FHA's program participants.

*Comment:* HUD should require homebuyer education instead of eliminating downpayment assistance.

*HUD response:* HUD notes that it is not eliminating downpayment assistance but, as requested by many commenters, is establishing standards for the use of downpayment assistance in FHA-insured mortgages. HUD encourages and supports homebuyer education, and for some programs requires homebuyer counseling, but addressing that subject is beyond the scope of the current rule.

*Comment:* HUD should permit sellers to directly contribute downpayment assistance to buyers without a middleman.

*HUD response:* HUD has determined that contributions to downpayment assistance from sellers and other parties

with a financial interest in the transaction, whether direct or indirect, present an unacceptable level of risk for FHA-insured mortgages.

*Comment:* Rather than doing away with downpayment assistance, HUD should increase FHA loan limits.

*HUD response:* It is unclear how increasing loan limits would mitigate the risk that HUD has experienced with seller-funded downpayment assistance.

*Comment:* Rather than doing away with downpayment assistance, HUD should enforce Mortgagee Letter 02–02.

*HUD response:* While noting again that HUD is not ending downpayment assistance, HUD also notes that Mortgagee Letter 02–02 addresses a different issue than that addressed by this rule. Mortgagee Letter 02–02 addresses a situation where a seller or a nonprofit entity has paid a homebuyer's consumer debt, which then makes it easier for the buyer to meet debt to income ratios. Further, HUD does enforce Mortgagee Letter 02–02. The focus of this rule is downpayment assistance provided by a party with a financial interest in the transaction.

*Comment:* Rather than doing away with downpayment assistance, HUD should limit the seller contribution to 3 percent.

*HUD response:* HUD reiterates that it is seeking to establish reasonable and prudent standards for the use of downpayment assistance, and that downpayment assistance from a seller or other party with a financial interest in the transaction presents an unacceptable risk to FHA.

*Comment:* Downpayment assistance should be permitted in the 6 percent seller concession for closing costs that FHA allows.

*HUD response:* The downpayment differs from closing costs in that the downpayment creates equity in the property for the buyer and closing costs do not. As such, the downpayment cannot be included in the mortgage, whereas certain closing costs are permitted to be included in the mortgage. For this reason, downpayment assistance cannot be treated as closing costs.

*Comment:* Downpayment assistance helps first-time, low-credit, and low-income homebuyers, who are often minority or single-parent households. HUD should not eliminate or limit such assistance.

*HUD response:* As noted, HUD is not eliminating downpayment assistance but is establishing reasonable and prudent standards for the use of downpayment assistance. All homebuyers will benefit if the debt

Federal Register / Vol. 72, No. 189 / Monday, October 1, 2007 / Rules and Regulations     56005

burdens of homeownership are set more realistically and if price inflation at the time of purchase is mitigated. Further, mortgage insurance premiums would likely have to be increased without those standards, which would negatively impact all homebuyers. In addition, an analysis of HUD Real Estate Owned (REO) sales since 2004 shows that sales proceeds from this type of downpayment assistance is 3 to 6 percent less than other REO sales. This suggests that the sales prices of such properties may have been inflated.

*Comment:* This rule will negatively impact the market devastated by Hurricane Katrina by reducing the number of families willing to rebuild or buy in that market.

*HUD response:* A number of special incentives and forms of assistance, such as disaster relief loans and grants and lower buyer investment requirements, are available in disaster zones such as that created by Hurricane Katrina. FHA, for example, offers eligible disaster victims section 203(h)-insured mortgages, which require no downpayment. Such assistance and requirements appropriately leave homebuyers in a much more favorable position to reestablish homeownership. The reasonable and prudent standards established by this rule will help to ensure that the benefits provided to disaster victims are not undercut by burdensome price and debt inflation.

*Comment:* The rule will have a negative impact on FHA's business, because of the substantial percentage of loans supported by downpayment assistance. The rule would immediately cause a huge contraction in FHA's business.

*HUD response:* HUD does not intend to maintain or expand the volume of FHA business at the expense of sound and sustainable purchases by homebuyers. Such a result would be contrary to the public purposes underlying FHA's business.

*Comment:* The rule is not supported by data. The analysis of the Government Accountability Office (GAO) found that downpayment-assisted loans had higher default and claim rates than other FHA loans, but did not segregate the effects of downpayments from those of low downpayments and low credit ratings. HUD should conduct additional research because the data presented does not appear to be conclusive.

*HUD response:* HUD has collected and analyzed additional data through its portfolio analysis. This analysis provides additional verification of the higher level of risk associated with downpayments funded by a seller or other financially interested party

compared to downpayments funded from other sources, which HUD continues to permit. HUD's analysis has also established that loans with downpayment assistance from sellers or other parties with a financial interest in the transaction have a higher loss rate associated with them and currently represent 30 percent of FHA's REO portfolio.

*Comment:* Prohibition of downpayment assistance would harm otherwise qualified borrowers, who will have to delay or forego homeownership or turn to the subprime market.

*HUD response:* HUD notes again that the current rule does not prohibit or eliminate downpayment assistance, but only establishes reasonable and prudent standards for its use that will benefit, and not harm, homebuyers. The purpose of the rule is to mitigate the harm caused by downpayment assistance from sources with a financial interest in the transaction, and help assure continued homeownership. As previously stated, downpayment assistance from parties with a financial interest in the transaction have higher default and claim rates and higher loss rates.

*Comment:* Downpayment assistance should not be prohibited because it provides borrowers instant equity when they purchase a home.

*HUD response:* HUD agrees, and the rule does not prohibit all downpayment assistance.

*Comment:* The rule will have a negative impact on the housing market and on the economy.

*HUD response:* To the contrary, HUD expects that the reasonable and prudent approach taken by this rule will have a positive impact on the housing market and on the economy by reducing the number of mortgages that would otherwise default and go into foreclosure, driving down property values and negatively impacting a community's tax base and economic viability.

*Comment:* HUD should partner with downpayment assistance programs to promote homeownership. A zero downpayment program or downpayment assistance is needed to address the subprime crisis, because there is little or no equity in a substantial number of troubled properties. HUD should postpone action on downpayment assistance until 100 percent financing is permitted.

*HUD response:* HUD does sponsor downpayment assistance programs through such programs as the American Dream Downpayment Initiative, and others in which the assistance is not linked to the financial interest of parties

other than the homebuyer. HUD currently does not have the authority for a zero downpayment program; however, a zero downpayment program would not address this issue of the financial interest of the providers of downpayment assistance. Reasonable standards would still be necessary for downpayment assistance, even if there is no requirement for a minimum investment by the homebuyer.

*Comment:* HUD is replacing a private sector program that works and is forcing people to rely on government bureaucracy. In addition, government-sponsored downpayment assistance has eligibility requirements such as income limits. Private downpayment assistance is available to anyone. The rule will vastly increase the size and cost of government.

*HUD response:* Many of the comments recognized the value of, and the need for, reasonable standards, and the eligibility requirements noted here provide such standards. The cost of government is controlled by prioritizing the availability of benefits to those who need them most. Private downpayment assistance that does not rely upon a party with a financial interest in the transaction is not affected by this rule, which establishes reasonable and prudent standards for the use of downpayment assistance. This rule addresses certain forms of downpayment assistance that increase the cost of government because they increase FHA mortgage insurance payments for losses attributable to loan defaults and lower REO sales proceeds.

*Comment:* A developer should be able to offer buyers incentives to purchase properties.

*HUD response:* A developer's ability to offer incentives, such as a reduced purchase price or a lower interest rate, is not affected by this rule. These incentives are distinguishable from downpayment assistance, and only the provision of downpayment assistance by a seller or a party with a financial interest in the transaction is prohibited by this rule.

*Comment:* Real estate agents should be permitted to use their commission to fund the downpayment where the real estate agent is the buyer/mortgagor, because the commission is earned, and not a seller contribution or gift.

*HUD response:* The circumstance described by this comment are not affected by this rule, because a borrower's earned income, such as a real estate agent's commission, is a permissible source of downpayment.

*Comment:* The rule should not exclude Indian tribes or tribally designated housing entities (TDHEs)

**56006**    **Federal Register / Vol. 72, No. 189 / Monday, October 1, 2007 / Rules and Regulations**

from the governments considered in the rule. In taking this significant action, HUD did not follow its own policy on tribal consultation and the rule should be withdrawn until HUD follows the consultation procedure.

*HUD response:* The rule did not intend to exclude Indian tribes or TDHEs from the governments considered in the rule. This final rule specifically clarifies the treatment of downpayment assistance from Indian tribes and TDHEs. As with other rules that are generally applicable and, thus, also incidentally apply to Indian tribes, HUD did not undertake tribal consultation. HUD's tribal consultation policy states, "Tribal Coordination, Collaboration and Consultation applies when any proposed policies, programs or actions are identified by HUD as having a substantial direct effect on an Indian tribe." (66 FR 49785). Since the effect of the rule on tribes is only incidental and since the rule applies to all FHA-insured single family mortgages, the tribal consultation policy is not applicable. All providers of downpayment assistance are subject to the general standard of this rule and their downpayment assistance cannot be funded by sellers or other parties with a financial interest in the transaction. HUD follows, and will continue to follow, its tribal consultation policy when identified by HUD as applicable.

*Comment:* HUD should clarify whether downpayment assistance provided by grantees under government programs is permitted.

*HUD response:* Grant funds made available to assist homebuyers may be used for downpayment assistance because such funds are not linked to the sources addressed by this standard, namely, the seller or other parties with a financial interest in the transaction. Grantees act with a public purpose, using government-provided funds, rather than acting with a private financial interest in the transaction or using funds from parties with a financial interest in the transaction.

*Comment:* HUD should provide a definition of "family members."

*HUD response:* The term "family member" is defined at section 201(e) of the National Housing Act (12 U.S.C. 1707(e)) and governs regulations issued for FHA programs under section 203 of the National Housing Act, such as the current rule.

*Comment:* HUD should permit loans for downpayment assistance and second mortgages, including loans from the seller and from governments.

*HUD response:* The rule continues to permit loans authorized by statute as a source for the minimum investment.

Loans from sellers are not authorized by statute.

*Comment:* HUD should clarify that this rule does not prohibit assistance from nonprofit developers.

*HUD response:* HUD permits downpayment assistance from charitable organizations. Downpayment assistance from nonprofit developers is permitted as long as it complies with this general standard and their downpayment assistance cannot be funded by sellers or other parties with a financial interest in the transaction.

## V. Findings and Certifications

### Regulatory Planning and Review

The Office of Management and Budget (OMB) reviewed the rule under Executive Order 12866, *Regulatory Planning and Review.* OMB determined that the rule is a "significant regulatory action," as defined in section 3(f) of the Order (although not an economically significant regulatory action under the Order). The docket file was available for public inspection in the Regulations Division, Office of General Counsel, Room 10276, 451 Seventh Street, SW., Washington, DC 20410–0500.

### Environmental Review

A Finding of No Significant Impact was not required for the proposed rule. Under 24 CFR 50.19(b)(6), the rule is categorically excluded from the requirements of the National Environmental Policy Act (42 U.S.C. 4332 *et seq.*) and that categorical exclusion continues to apply.

### Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.

The purpose of this rule, as noted in the preamble, is to establish standards regarding the use of gifts by borrowers with an FHA-insured mortgage—primarily standards that would address gifts by charitable organizations—as a source of an FHA mortgagor's investment in the mortgaged property. To date, HUD's practice has been to limit permissible sources of gifts to family members, governmental agencies, employer of the mortgagor, labor union of the mortgagor, or charitable organizations. This rule is not narrowing the sources of gifts through this rulemaking, but rather is striving to ensure that gifts are gifts and that, especially in the

situation of gifts from charitable organizations, the gift is not a *quid pro quo* between the homebuyer's purchase of the property and the seller's "contribution" or payment to the charitable organization.

The prohibited sources of downpayment assistance, as structured in the final rule, are narrow and should not encompass a substantial number of small entities that are engaged in downpayment assistance to homebuyers, which, to date, have primarily been charitable organizations with tax-exempt status. Charitable organizations, large or small, remain eligible to provide downpayment assistance to FHA mortgagors, subject to meeting the requirements of § 203.19, as revised by this final rule.

Accordingly, the undersigned certifies that this rule will not have a significant economic impact on a substantial number of small entities.

### Executive Order 12612, Federalism

Executive Order 12612, (entitled "Federalism") prohibits, to the extent practicable and permitted by law, an agency from promulgating a regulation that has federalism implications and either imposes substantial direct compliance costs on state and local governments and is not required by statute, or preempts state law, unless the relevant requirements of section 6 of the Executive Order are met. This final rule does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order. This final rule solely addresses requirements under HUD's FHA mortgage insurance programs.

### Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4, approved March 22, 1995) established requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and the private sector. This final rule does not impose any federal mandates on any state, local, or tribal governments or the private sector within the meaning of the Unfunded Mandates Reform Act of 1995.

### Catalog of Federal Domestic Assistance

The Catalog of Federal Domestic Assistance Number for the principal FHA single family mortgage insurance program is 14.117. This final rule also applies through cross-referencing to FHA mortgage insurance for condominium units (14.133), and other smaller single family programs.

**7**

Federal Register / Vol. 72, No. 189 / Monday, October 1, 2007 / Rules and Regulations    **56007**

**List of Subjects in 24 CFR Part 203**

Loan programs—housing and community development, Mortgage insurance, Reporting and recordkeeping requirements.

■ Accordingly, the Department amends 24 CFR part 203, as follows:

## PART 203—SINGLE FAMILY MORTGAGE INSURANCE

■ 1. The authority citation for part 203 continues to read as follows:

Authority: 12 U.S.C. 1709, 1710, 1715b, 1715z–16, and 1715u; 42 U.S.C. 3535(d).

■ 2. Section 203.19 is revised to read as follows:

### § 203.19  Mortgagor's investment in the property.

(a) *Required funds.* The mortgagor must have available funds equal to the difference between:

(1) The cost of acquisition, which is the sum of the purchase price of the home and settlement costs acceptable to the Secretary; and

(2) The amount of the insured mortgage.

(b) *Mortgagor's minimum cash investment.* The required funds under paragraph (a) of this section must include an investment in the property by the mortgagor, in cash or cash equivalent, equal to at least 3 percent of the cost of acquisition, as determined by the Secretary, unless the mortgagor is:

(1) A veteran meeting the requirements of § 203.18(b); or

(2) A disaster victim meeting the requirements of § 203.18(e).

(c) *Restrictions on seller funding.* Notwithstanding paragraphs (e) and (f) of this section, the funds required by paragraph (a) of this section shall not consist, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale:

(1) The seller or any other person or entity that financially benefits from the transaction; or

(2) Any third party or entity that is reimbursed, directly or indirectly, by any of the parties described in paragraph (c)(1) of this section.

(d) *Gifts and loans usually prohibited for minimum cash investment.* A mortgagor may not use funds for any part of the minimum cash investment under paragraph (b) of this section if the funds were obtained through a loan or a gift from any person, except as provided in paragraphs (e) and (f) of this section, respectively.

(e) *Permissible sources of loans.*

(1) *Statutory authorization needed.* A statute must authorize a loan as a source of the mortgagor's minimum cash investment under paragraph (b) of this section.

(2) *Examples.* The following loans are authorized by statute as a source for the minimum investment:

(i) A loan from a family member, a loan to a mortgagor who is at least 60 years old when the mortgage is accepted for insurance, or a loan that is otherwise expressly authorized by section 203(b)(9) of the National Housing Act;

(ii) A loan made or held by, or insured by, a federal, state, or local government agency or instrumentality under terms and conditions approved by the Secretary;

(iii) A loan made or held by, or insured by, a tribal government or an agency or instrumentality thereof, including a tribally designated housing entity as defined at 25 U.S.C. 4103(21), which is treated as a state or local government under applicable state or local law, under terms and conditions approved by the Secretary; and

(iv) A federal disaster relief loan.

(f) *Permissible sources of gifts.* The following are permissible sources of gifts or grants used for the mortgagor's minimum investment under paragraph (b) of this section:

(1) Family members and governmental agencies and instrumentalities eligible under paragraphs (e)(2)(i) and (ii) of this section;

(2) A tribal government or an agency or instrumentality thereof, including a tribally designated housing entity, as defined at 25 U.S.C. 4103(21);

(3) An employer or labor union of the mortgagor;

(4) Organizations described in section 501(c)(3) and exempt from taxation under section 501(a) of the Internal Revenue Code;

(5) Disaster relief grants; and

(6) Other sources as may be approved by the Secretary on a case-by-case basis.

Dated: September 26, 2007.

**Brian D. Montgomery,**

*Assistant Secretary for Housing—Federal Housing Commissioner.*

[FR Doc. 07–4846 Filed 9–28–07; 8:45 am]

**BILLING CODE 4210–67–P**

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# EXHIBIT C

# Bloomberg.com



## U.S. to Ban Down Payment Program Over Objections, Jackson Says

By Neil Roland

June 5 (Bloomberg) -- The U.S. Department of Housing and Urban Development will ban a down payment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said.

``I'm very much against it,'' Jackson said in an interview. ``I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments.''

The program, which was used by more than 100,000 low- and moderate-income consumers last year, allows nonprofit groups to fund down payments and get reimbursed by sellers. Audits have found it has contributed to higher housing prices and a surge in foreclosures of government-backed mortgages.

HUD is seeking to end it at a time when foreclosure filings have hit an all-time high, spurred by rising delinquencies among borrowers with poor or limited credit histories. The agency last month proposed terminating the assistance and has given the housing industry and consumer groups until July 10 to comment.

The National Association of Home Builders and nonprofits including AmeriDream Inc. and Sacramento, California-based Nehemiah Corp. of America criticized HUD's plan last week. They said the program helps consumers become home owners and should be tightened, not ended.

`Sham' Period?

``Did Secretary Jackson just imply that the governmental process of an open public comment period is just a sham?'' AmeriDream Chief Executive Officer Ann Ashburn said in an e-mail today. ``I know that the American people expect more from Secretary Jackson.''

AmeriDream, based in Gaithersburg, Maryland, makes as much as $100 million a year in fees from the program, Ashburn said.

Under the HUD program, nonprofit groups fund the entire down payment for buyers and get reimbursed by the sellers. The arrangement was designed with HUD's approval to circumvent U.S. rules that bar sellers from giving direct assistance.

Audits have found that home sellers typically pay a service fee to the nonprofits and raise the price of their homes to recoup the money. Once sold, the foreclosure rate on these homes is more than double that of other loans sponsored by HUD's Federal Housing Administration, according to HUD data.

Jackson said in the interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments. A similar 1999 HUD proposal was withdrawn by the agency in 2001 following industry opposition.

To contact the reporter on this story: Neil Roland in Washington at **nroland@bloomberg.net**

*Last Updated: June 5, 2007 12:18 EDT*

Bloomberg Printer-Friendly Page



© 2007 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **EXHIBIT E**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERIDREAM, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1752 (PLF) |
| | ) | |
| HON. ALPHONSO JACKSON | ) | |
| SECRETARY OF THE UNITED | ) | |
| STATES DEPARTMENT OF | ) | |
| HOUSING AND URBAN | ) | |
| DEVELOPMENT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF KELLY SCHWEDLAND

1.    I am of legal age of majority and fully competent to testify to the following matters of my own personal knowledge.

2.    I am the President of the Genesis Foundation ("Genesis").

3.    Genesis relies on contributions from home sellers and builders to provide seller-funded downpayment assistance ("SFDPA") to low- and moderate-income homebuyers. If SFDPA is eliminated, Genesis will be forced to go out of business.

4.    Genesis is already experiencing reduced activity because of HUD's new Regulation that is to become effective on October 31, 2007. We would typically have approximately 1000 contracts scheduled for November grants around this time of the year. Right now, Genesis has only 251 November cases pending, and those will be reduced TO zero if the Regulation takes effect at the end of October.

5.    Genesis currently enables approximately 30,000 individuals and families to purchase homes each year. From January 1, 2007 to September 30, 2007, Genesis provided $87,451,253.17 in grants to 18,747 homebuyers. Genesis currently has 3,282 homebuyers scheduled to receive grants in October.

6.    Genesis and the Home Downpayment Grant Foundation ("HDGF") are two of the largest non-profit organizations providing downpayment assistance in America. From January through September 2007, Genesis and HDGF have collectively helped over 30,000 homebuyers. This represents over $165 million in equity.

7.    The majority of Genesis's clients are first-time homebuyers. Many of our clients are minorities, women, and single parents.

8.    Fifty-six (56) people work for Genesis, most as employees. Most Genesis employees are highly skilled people who have been with us for a long time.

9.    Jerry Hinson, a loan officer with LMI Funding, provided the attached letter detailing his experience working with a family who received downpayment assistance from Genesis.

10.    In addition to downpayment assistance, Genesis offers important ancillary services such as our mortgage protection program.

I declare under the penalties for perjury that the foregoing representations are true and correct.

Executed on 10/19/07

_____
Kelly Schwedland

To The Genesis Foundation:

Regarding !                                                          October 18, 2007

As a loan officer with LMI Funding I had the opportunity to help a sweet family, ¦
           ), get into a home of their own by using down payment assistance. I was
particularly impressed with this couple. They have two children, )
           was born 90% blind and has an inoperable tumor which of course causes him to
require special assistance.

Before being able to get into a home of their own they lived in a small rent house in which
their kids had to share a bedroom. The landlord told them that when their lease was up that
they had to move because he was going to move his elderly mom into it. With all of the
expenses related to taking care of Austin around the clock the        's were never able to
save up enough money to put down on a home to get a mortgage.

I told them that I could help by getting their down payment covered with down payment
assistance. So they got a realtor to show them some homes. They settled on a nice new
home in which the builder agreed to pay for the majority of the closing costs. If I recall, they
only had to come to the table with about $700. I was there when they moved in as I had
become kind of like a family friend. They and their kids just about burst into tears of joy as
they were so thrilled to have a place that they could call their own!

Because of The Genesis Foundation, they and their two children have their very own
bedrooms! It's been almost three years since they moved in and they're still so thankful to
me, The Genesis Foundation for the down payment assistance, and of course the FHA loan
that allowed them to have a piece of the great American Dream. It is awesome to be able to
witness the smiles on the faces of people like the        's that just need a break to be able to
experience the joy of owning a home.

Sincerely,

Jerry Hinson
LMI Funding
Plano, Texas

15

*AmeriDream, Incorporated v. Hon. Alphonso Jackson, et al.*
USDC, District of Columbia
Civil Action No. 07-1752 (PLF)

# **EXHIBIT F**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-1752 (PLF) |
| ) | |
| HON. ALPHONSO JACKSON ) | |
| SECRETARY OF THE UNITED ) | |
| STATES DEPARTMENT OF ) | |
| HOUSING AND URBAN ) | |
| DEVELOPMENT, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF RICK DEL SONTRO

1.      I am of legal age of majority and fully competent to testify to the following matters of my own personal knowledge.

2.      I am the Chief Operating Officer of the Home Downpayment Gift Foundation ("HDGF").

3.      HDGF relies on contributions from home sellers and builders to provide seller-funded downpayment assistance ("SFDPA") to low- and moderate-income homebuyers. If SFDPA is eliminated, HDGF will be forced to go out of business.

4.      HDGF will not be able to attract contributions as we have in the past if SFDPA is barred at the end of October. Instead, the Nehemiah Foundation will be the only entity that can lawfully obtain seller contributions – at least, for six months after the Regulation's effective date.

5.      HDGF provided grants to 1,656 homebuyers in the month of August 2007. HDGF will help approximately 20,000 families and individuals this year.

BDDB01 4918708v1

17

6.    Most of our clients are minorities, women, and single parents. Eighty-eight percent (88%) of our clients are first-time homebuyers.

7.    Approximately thirty people work for HDGF, many as employees. It would be very difficult to replace our employees if we are forced out of business and later allowed to reopen, because many of them are specialized workers who have been working in this business for some. We have a very low employee turnover rate.

8.    HDGF provides a number of services that benefit the public. Our Pre-Homebuyer Education program will serve more than 7,000 individuals this year. This is important because the great majority of the first-time homebuyers that we serve have no formal understanding of homeownership or the financial obligations that are associated with this significant, life-changing event.

9.    HDGF also provides job loss insurance policies at no cost to homebuyers. The number one reason for mortgage defaults within the FHA portfolio is loss of employment. Our policy provides coverage of up to six mortgage payments per year in the event of job loss. Mildred Black is an HDGF client who benefits from this program. She has provided a letter about her experience, which is attached to this affidavit.

10.    HDGF also addresses job loss and other financial emergencies through our Rainy Day Program. This year, HDGF will provide nearly $1,000,000 in funds to this program. Additionally the Rainy Day Program will give nearly $500,000 in grants for assistance to low-to-moderate income homeowners who experience short-term financial challenges.

11.    HDGF offers early delinquency counseling, which is critical to fixing financial problems and changing problematic behaviors before they become irreversible.

BDDB01 4913708v1

18

I declare under the penalties for perjury that the foregoing representations are true and correct.

Executed on ___10/19/07___

Rick Del Sontro

MILDRED BLACK
3888 BROOKGREEN POINT
DECATUR GA 30034


October 17, 2007

Mr. Rick Del Sontro
CEO
Home Downpayment Gift Foundation
1808 Corcoran Street NW
Washington DC 20009

Dear Mr. Del Sontro:

My name is Mildred Black; I am a single African American woman with a college degree. When I purchased my home I received down payment assistance from Home Downpayment Gift Foundation. At the time I purchased my home in September of 2006 I qualified for a mortgage but like many others I could not come up with the down payment. My family wasn't an option and there were no government programs available. So, thank goodness for Home Downpayment Gift Foundation.

Shortly after purchasing my home I was offered a promotion with a new company which would advance my career. After long consideration, I decided to make the move. Shortly thereafter, I was notified that my position was being eliminated. I was now out of work, and had a new home, two young children and other responsibilities. I was devastated. This was the first time in my life I was in a position like this. I did not know where to turn.

Remembering the letter I had received shortly after closing on my home, I contacted Home Downpayment Gift Foundation concerning a program that they call, Home Mortgage Protection Plus. In short, this is an insurance product that will provide homeowners with up to six months of mortgage payments in the event of loss of employment. I might add that this was provided to me at no cost. This program was made available to me because I used their down payment assistance program.

Faced with potential loss of my home, I contacted them and since July of 2007 I have received assistance with my mortgage payment. I can't imagine what things would have been like with out this program, that as I understand is funded through their seller assisted down payment program.

In my case, I would have defaulted on my home, not because I wasn't qualified for a home or because I didn't put my own money into the my down payment. I would have lost my home because of an event in my life beyond control. If I had received my down payment from any other source (parents or government) I would likely be facing foreclosure because neither would have provided the job loss protection.

I am shocked that HUD would consider eliminating programs like yours for down payment assistance and can't imagine how many people will suffer from the elimination of your job loss protection as well.

Gratefully yours,

Mildred Black

**20**

# HUD EMAIL

-----Original Message-----
From: Mayer, Jerrold H <jerrold.h.mayer@HUD.GOV>
To: HOMEOWNERSHIP-L@hudlist.hud.gov <HOMEOWNERSHIP-L@hudlist.hud.gov>
Sent: Thu Oct 25 14:01:27 2007
Subject:    Downpayment Assistance Rule

All-


Downpayment Assistance Rule:


FHA will issue official guidance regarding implementation of the regulation regarding a mortgagor's cash investment.  In the interim, to address the questions raised by many industry partners, FHA is providing the following information:


1. Nehemiah Corporation of America, due to a previous Settlement Agreement and as discussed in the rule, is granted relief from the effective date of the rule until April 1, 2008.


2. HUD has agreed to grant the AmeriDream Downpayment Assistance Program relief from the effective date of the rule until February 29, 2008.


3. All other similar downpayment assistance providers have not been granted relief from the effective date of the rule, which is October 31, 2007.


Provided that the homebuyer has entered into a contract of sale (including any amendments to purchase price) on or before October 31, 2007, FHA will recognize the gift if made to the homebuyer and properly documented as an acceptable source of the downpayment.


To read the final rule in its entirety and for more information please visit:
http://hudclips.org/sub_nonhud/cgi/pdf/4846a.pdf <http://hudclips.org/sub_nonhud/cgi/pdf/4846a.pdf>

---

# 10/26/07 DEL SONTRO DECLARATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED,<br><br>        Plaintiff,<br><br>    v.<br><br>HON. ALPHONSO JACKSON<br>SECRETARY OF THE UNITED<br>STATES DEPARTMENT OF<br>HOUSING AND URBAN<br>DEVELOPMENT,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 07-1752 (PLF) |

## OCTOBER 26TH DECLARATION OF RICK DEL SONTRO

      1.     I am of legal age of majority and fully competent to testify to the following matters of my own personal knowledge.

      2.     I am the Chief Operating Officer of the Home Downpayment Gift Foundation ("HDGF").

      3.     Attached to this Declaration as Exhibit 1 are the public comments that HDGF submitted in response to HUD's Regulation.

      I declare under the penalties for perjury that the foregoing representations are true and correct.

Executed on <u>10/26/07</u>

                              Rick Del Sontro

# EXHIBIT 1



**Home Downpayment Gift Foundation, Inc.**

*"Creating and Maintaining Home Ownership"*

1808 Corcoran St. NW
Washington, DC 20009
888-856-4600
*fax:* 202-234-7535
*www.HomeDownpayment.org*

Regulations Division
Office of the General Counsel
U.S. Department of Housing and Urban Development
451 7th Street SW Room 10276
Washington DC 20410

Reference:     Docket No. FR-5087-P-01
               Standard's For Mortgagor's Investment in Mortgages

Dear Sir or Madam:

The other day my daughter returned home from school and informed her mother and me that her school was closing. "Why we inquired?" Well as it turns out there are approximately 100 students in the school and 6 of them are failing. With a 94% success rate, the school has decided to close. This seemed almost impossible to believe. Rather than address the 6 students that are failing and trying to work with them, the other successful students are going to have to find another school.

Clearly I am making an analogy to the proposed rule change that HUD has put forth. HUD is concerned that because roughly 6% of FHA borrowers that use seller assisted down payment programs default on their loans and believe that the entire process is unsound. This is being done really with little or no regard to the homeowners who are successful. While I clearly understand the need and the desire to reduce the impact to the insurance pool, I believe the approach is flawed. The elimination of seller assisted down payment programs would do dramatically more harm then good and would jeopardize over 100,000 potential homebuyers annually.

HUD is concerned that high LTV loans lead to foreclosures and therefore are risky. They believe that seller assisted down payment programs lead to over inflated home prices and put homeowners in a precarious position. Having spent the past five years working with low-moderate income homeowners I can tell you that the reason they default on loans is because, "Life happens". You can't underwrite a mortgage file to life. The only thing we can do to prevent this from happening is to adequately educate homebuyers and to mitigate on their behalf.

October 22, 2007

So, really what is needed with seller assisted down payment programs is reform and not elimination. Remember, 94% of the students graduate from my daughter's school and only 6% are in trouble. This suggests that we should address the problem borrower's and not eliminate the seller assisted programs.

There are a few simple steps that would greatly assist these homeowners who run into trouble. The reason they default is not because they don't have any of their own money in the home, but moreover because they run into unforeseeable financial challenges and are not adequately prepared. Most FHA borrowers will spend their financial reserves by the time they get the keys to their new home. Additionally they create between $3000 and $6000 worth of credit card debt related to the home in their initial two years of homeownership. Therefore the first time they run into an unforeseen financial problem they are in trouble. We have to try to take steps to prevent this from happening if you want to reduce defaults.

So, here are a few simple suggestions on how we can address these issues. HUD could and should require any individuals using seller assisted down payment assistance to have the following:

- *Pre-purchase Counseling:*  **(Required prior to closing)**

  This educational program should provide homebuyers with the knowledge necessary for them to become successful long-term homeowners. The primary objective of the pre-purchase counseling is to ensure that homebuyers have a good understanding of buying and maintaining their home as well as identifying any potential weaknesses in the buyers' comprehension or financial capacities.

  Items to be reinforced should be the available risk mitigations tools at their disposal as well as what to do if unforeseen economic situations arise. At the most critical moment for these new homeowners, they are not being educated. They don't understand their mortgages, potential challenges, how to create an emergency fund to prevent from unforeseen financial challenges.

  Immediately following the successful completion of the homebuyer education-counseling program, a certificate of completion should be issued to the lender as evidence that the prospective borrower(s) understands the course content and the responsibilities of homeownership.

- *Post-purchase Counseling:*

  This post-purchase counseling should include implementing concepts taught in pre-purchase counseling from; preparing and following a budget, to understanding the impact of compound interest and determining and implementing a personal savings strategy. An integral component would be to reinforce a savings strategy as well as fostering an environment for "on-time" mortgage payment during a specific time period. This may be done through monthly communication prior to mortgage payments being due.

- **Mortgage Protection Program:  (2 Years Coverage)**

  Through Involuntary Unemployment Insurance (IUI) the borrower and/or co-borrower could be insured for up to six months of mortgage payments if the either becomes involuntarily unemployed. That means that while the homeowner seeks new employment, the policy benefits will be there to assist by making the mortgage payments which provides peace of mind for the employment seeker and their family. Remember the number one reason for defaults is the job loss!

  *The IUI coverage should offer a broad range of eligibility for homeowners and strong coverage benefits to accommodate, or greatly off-set the majority of loan payments.*

  In short, this insurance would provide a safety net for homeowners who lose their job during their initial two years of homeownership. This is the time when things are most critical for new homeowners.  This policy works and does protect against the unexpected.

- **Emergency Mortgage Assistance Program (EMA):**

  The *EMA Program* would be in place to assist individuals through financially difficult times.  The assistance provided may be financial, educational or both.  The mission would be quite simple: "Protect homeowners from the unexpected".

  There are many homebuyers who during their first year or two of home ownership encounter short-term financial difficulties.  These challenges often lead to early defaults or delinquencies.  Suddenly the dream of homeownership is not as fulfilling as once thought.

  This is where the *EMA Program* comes in to play.  In short, the *EMA Program* would be a safety net for homeowners.  If the homeowner experiences an unexpected financial emergency, the *EMA Program* may provide gift funds or short term low interest loans, to be used for the express purpose of making a mortgage payment.  This assistance would always be coupled with counseling and budgeting to ensure that there is a path for financial success in the future.

  Have each of the DPA providers contribute some amount of money to an emergency pool of funds to be used as stated below.

  Examples of items that will be covered are unexpected medical expenses, protection for various short-term disabilities, unusually high car repair bills, catastrophic events, or other major financial events.

– 4 –                                                October 22, 2007

I am concerned that HUD has not clearly analyzed the impact of the proposed rule change on homebuyer's that currently utilize seller assisted down payment programs. It is my belief (as conveyed to me from individuals within the administration) that HUD feels as though the 94% of the homebuyer's who today need down payment assistance, would somehow still buy homes if the program is eliminated. They believe, but have provided no evidence, that these buyers would somehow find the necessary down payment money to purchase a home. I feel that this theory is flawed and the negative economic impact would be immense.

Without any reliable research or data to support this decision they are putting an entire home buying sector at risk. Remember, the successful 94% of the students at my daughter's school are now at risk. The school administrator thinks they will find another school. He has no evidence; he just believes this to be the case.

The number one barrier to home entry in the United States is the down payment funds needed. In today's market with the near elimination of sub-prime lending, more than ever, FHA needs to provide a vehicle that would allow for homebuyer's to access the down payment funds needed. The purpose of FHA is to fill the gaps in homeownership.

HUD needs to provide the data that shows how they are drawing the conclusion that these buyers would have access to the required 3% to get into homes. If they don't have this data or don't care about losing potentially 100,000 homebuyers each year then they should make this known. You can't just overlook the economic impact of this decision. With a rapidly deteriorating housing market, with more and more lenders going out of business, there is a need now more then ever for seller assisted programs.

So the real question is, "Why does HUD want to eliminate these programs"? HUD has put forth a number of reasons.

HUD believes the following to be true:

1.  **Home prices are inflated to allow for seller assisted down payment programs.**
    There has never been any evidence to support this claim. The IG stated that they spoke with some real estate professionals that told them this was the case. Today, 65% of the homes sold through these programs come from builders. As a general practice builders take the participation in the programs out of the marketing allowances built into the overall community pricing. Even more to the point, FHA has approved appraisers and this type of home inflation should be detected. FHA should look at AVM's or some other secondary appraisal review. Additionally, they should consider enforcing the appraiser requirement of denoting the down payment program on the appraisal.

2.  **High LTV Homes are a key indicator to defaults.**
    First, 94% of the time that is not true. The number one reason people default on loans is life happens. When it happens they are not prepared (no education) and they can't manage through the problems. The number one problem is loss of employment and there is a way to assist in protecting against that. HUD believes that these homeowners, because they don't have any of their money into the home will find it easy to walk away from their responsibility. What they don't understand is that people don't want to lose their home. They still need a place to live and will likely have to pay rent somewhere.

– 5 –                                         October 22, 2007

3.  **Some of the people who have access to homeownership because of seller assisted
    down payment programs shouldn't be homeowners.**
    If this belief is true, then the underwriting guidelines for individuals utilizing seller assisted
    down payment programs should be changed.  You can't blame seller assisted programs
    for allowing people to buy homes.  The programs are a conduit to the down payment but
    are not a means of qualification based upon income and expenses.

4.  **HUD believes that their hands are tied concerning non-profit programs that provide
    down payment assistance in light of a recent IRS ruling.**
    If this were the case, HUD would only be attempting to eliminate non-profit seller assisted
    down payment programs.  The proposed rule change would eliminate ALL seller assisted
    programs.

So, in the end you have to ask yourself if it makes sense to eliminate a program that would
be much easier to reform.  Why close down the school when 94% of the students graduate
and go on to be successful?  This is the real question.  What would you do if your son or
daughter, niece or nephew came home with the news that their school was closing because 6%
of the students were not successful.  Would you close the school or address the problem?

Sincerely,

Rick Del Sontro
CEO
Home Downpayment Gift Foundation

# 10/26/07 SCHWEDLAND DECLARATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERIDREAM, INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-1752 (PLF) |
| ) | |
| HON. ALPHONSO JACKSON ) | |
| SECRETARY OF THE UNITED ) | |
| STATES DEPARTMENT OF ) | |
| HOUSING AND URBAN ) | |
| DEVELOPMENT, ) | |
| ) | |
| Defendant. ) | |

## OCTOBER 26TH DECLARATION OF KELLY SCHWEDLAND

1.    I am of legal age of majority and fully competent to testify to the following matters of my own personal knowledge.

2.    I am the President of the Genesis Foundation ("Genesis").

3.    Attached to this Declaration as Exhibit 1 is an email bulletin sent from the Countrywide Mortgage Department on October 9, 2007 ("the CMD Bulletin). The CMD Bulletin explains that all SFDPA providers will be put out of business by HUD's Regulation except for the Nehemiah Foundation ("Nehemiah").

4.    The CMD Bulletin also states that Nehemiah is prepared to handle a significant increase in volume and that Nehemiah is adding resources to accommodate the additional volume.

5.    Attached to this Declaration as Exhibit 2 are the public comments submitted by the National Association of Home Builders in response to HUD's proposal of the

Regulation. The Genesis Foundation participated significantly in preparing and submitting these public comments.

I declare under the penalties for perjury that the foregoing representations are true and correct.

Executed on <u>10/26/07</u>

_____
Kelly Schwedland

2

# EXHIBIT 1

## Paavola, Emily C.

| | |
|---|---|
| **From:** | Kelly Schwedland [kellys@abdus.com] |
| **Sent:** | Thursday, October 25, 2007 8:18 PM |
| **To:** | Swain, Frank S.; Herzog, David K.; rick@homedownpayment.org |
| **Cc:** | Paavola, Emily C. |
| **Subject:** | CMD GB #07-0559: HUD Cuts Programs for Seller-Funded Down Payment Assistance on FHA Transactions |

CMD Bulletins

CMD GB #07-0559: HUD Cuts Programs for Seller-Funded Down Payment
Assistance on FHA Transactions


Author: Gordon Hunter      Date: 10/09/2007


CMD Branch Updates, CMD Bulletin CC GB, Gerould Sims/Contractor/CF/CCI


Effective October 31, 2007, you are prohibited from originating loans that
rely entirely or in part on most seller-funded grant programs for down
payment assistance.

To use a seller-funded grant program for all or part of the down payment,
the buyer and seller must execute the purchase sales contract before
October 31, 2007.


Summary

The U.S. Department of Housing and Urban Development prohibits any down
payment assistance on Federal Housing Administration (FHA) transactions
from sellers, or any third-party down payment assistance that is reimbursed
directly or indirectly by the seller. This ruling effectively eliminates
most seller-funded programs operated primarily by non-profit corporations
as a source of down payment assistance.

Countrywide anticipates that some of the non-profit entities will limit or
shut down operations as a result of the HUD ruling. As a result, you must
closely monitor loans that include down payment funds from the affected
non-profits to closing.

The Nehemiah Corporation of America is an exception to the October 31,
2007, cutoff date. The Nehemiah grant program can be included in a
transaction with a purchase sales contract executed prior to March 31,
2008. Countrywide has been informed by Nehemiah that Nehemiah is prepared
to handle a significant increase in volume through March 31, 2008, and that
Nehemiah is adding resources to accommodate the additional volume. However,
you should anticipate service issues, since the full impact of the
additional volume is unpredictable.

A complete list of seller-funded grant programs and expirations dates is
available in the Strategic Programs Portal under the category Grants
(Seller / Builder). The same portal provides assistance finding approved
assistance programs. The House America Homebuyer Assistance Program (HHAP)

database is updated to include, in the Special Comments section, the
seller-funded grant programs expiration dates, as well as reminders of the
cutoff dates.

Questions? Call CMD Underwriting Support at (888) 888-5363, Option 1.

---------------------------
ATTENTION:

To ensure compliance with applicable Internal Revenue Service Regulations,
we inform you that any tax advice contained in this electronic message was
not intended or written to be used, and cannot be used, for the purpose of
avoiding penalties under the Internal Revenue Code.

This message and all its attachments are PRIVATE and may contain
information that is CONFIDENTIAL and PRIVILEGED.

If you received this message in error, please notify the sender by reply
e-mail and delete the message immediately.

# EXHIBIT 2

 

**NAHB**
NATIONAL ASSOCIATION
OF HOME BUILDERS

**Advocacy Group**

*William P. Killmer*
**Group Executive Vice President**

July 10, 2007

Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
471 7th Street, SW, Room 10276
Washington, DC  20410-0500

Reference:    Docket No. FR-5087-P-01
              Standards for Mortgagor's Investment in Mortgaged Property

Dear Sir or Madam:

On behalf of the 235,000 members of the National Association of Home Builders (NAHB), I welcome the opportunity to comment on the Department of Housing and Urban Development's (HUD's) Proposed Rule on Standards for Mortgagor's Investment in Mortgaged Property.

The Proposed Rule would prohibit seller-provided downpayment assistance under any circumstances for a home purchase that is being financed with a Federal Housing Administration (FHA)-insured mortgage loan.  Under the Proposed Rule, sellers could not provide funds for a buyer's downpayment, either directly or through a third party, including persons or entities who would receive a financial benefit as a result of the sale transaction.  The Proposed Rule also would codify standards regarding the use of gifts or grants from family members, governmental agencies, employers, labor unions, and charitable organizations for mortgagor's downpayments, which would continue to be permitted as long as the source of the funds is not the seller or another party that is directly or indirectly linked to a party of interest in the sale.

NAHB believes that sellers should be permitted to provide downpayment assistance to buyers under appropriate circumstances that would include prudent credit analysis and underwriting and adequate home buyer information and counseling.  NAHB is concerned that FHA's proposed rule prohibiting any and all seller downpayment

U.S. Department of Housing and Urban Development
Docket No. FR-5087-P-01
Standards for Mortgagor's Investment in Mortgaged Property
July 10, 2007
Page 2

contributions would unnecessarily impede efforts to expand homeownership opportunities. Thus, NAHB urges HUD to refrain from an absolute prohibition of seller-provided downpayment assistance.

<u>Background</u>

For nearly a decade, HUD's regulations and policies have permitted charitable organizations to provide "gifts" to pay all or part of purchasers' required three percent cash contributions toward home purchases when using FHA-insured mortgage loans, regardless of the ultimate sources of the funds for these gifts. During this time, thousands of home purchase transactions have been assisted by gifts and, with the default rate at worst 15 to 20 percent, the vast majority of the resulting loans have performed according to the terms of the mortgage.

A number of NAHB builder members have participated in downpayment assistance programs to provide homeownership opportunities to buyers using FHA-insured mortgages. It is typical for new home transactions to include one or more of a variety of builder sales incentives. Many builders have provided downpayment assistance as a sales incentive for entry-level homes. One local home builder association has established a nonprofit affiliate that provides downpayment assistance funded by builders.

In the Proposed Rule, HUD expresses concern regarding the performance of loans involving seller-assisted transactions, which have historically experienced default and loss rates that are higher than that associated with non-assisted loans. FHA cites a lack of borrower equity and inflation of sales prices to cover seller downpayment contributions as key factors in this adverse performance. NAHB believes the concerns on credit risk and inflated sales prices can and should be addressed, but through means other than an outright and total prohibition of seller downpayment contributions. For example, by implementing education and underwriting standards, HUD could reduce the risks associated with seller-assisted transactions while allowing the seller-assisted downpayment programs to continue to function.

<u>Gaps in Homeownership Assistance</u>

Studies continue to show that lack of a downpayment is a major, if not primary, obstacle to homeownership. A number of federal and state programs have been established to help first-time home buyers clear this imposing hurdle. While these programs have been effective, their capacity is severely limited in comparison to the need for such assistance. This gap has been partially filled by seller-assisted downpayment programs. A sudden shutdown of this supplementary source of assistance would have a devastating impact on efforts to expand homeownership opportunities. It would also

U.S. Department of Housing and Urban Development
Docket No. FR-5087-P-01
Standards for Mortgagor's Investment in Mortgaged Property
July 10, 2007
Page 3

have a serious adverse impact on FHA's role in support of homeownership, which has become rapidly less significant over the past several years.

<u>NAHB Recommendations</u>

Home builders have a strong interest in, and commitment to, the communities in which they build and, therefore, take a long-term view of their home sales transactions. It is certainly not in a builder's interest to have recently-sold homes return to the market through foreclosure. That is why NAHB members have directed the association to work with FHA to find ways to continue seller provided downpayment assistance in a manner that is in the best interest of home buyers, builders and the FHA. NAHB urges HUD to make the following changes in lieu of a complete prohibition of seller-provided downpayment assistance.

*Require Home Buyer Counseling for Seller-Assisted Borrowers*

HUD should require pre- and post-purchase counseling for FHA borrowers whose transactions will be seller-assisted. Studies have shown that home buyers who receive high quality education and counseling regarding the responsibilities of homeownership prior to becoming homeowners are more likely to meet their financial obligations than buyers who do not receive such training. The 2005 study on downpayment programs that was conducted by Concentrance Consulting for HUD points out that many of the home buyers who were surveyed received little or no education regarding personal financial management or the rights and responsibilities of homeownership.

The primary objective of pre-purchase counseling should be to ensure that prospective home buyers have a good understanding of the home buying and home financing processes, the available financing options, and the responsibilities that accompany homeownership. The mechanism to deliver education and counseling already exists. HUD maintains a sizable roster of approved housing counseling agencies, many of which receive HUD grants to help support their operations. Many additional providers of quality home buyer education and counseling work with lenders who sell or securitize loans through Fannie Mae and Freddie Mac. When considered in total, these counseling organizations can effectively deliver hands-on training to prospective home buyers in most parts of the nation.

In addition, many lenders, loan servicers, and housing counseling agencies are likely to be in contact with new homeowners in the post-purchase environment and can use these contacts as opportunities to reinforce the information provided in the pre-purchase phase. It is worthwhile to note that meaningful post-purchase borrower contact is a key risk reduction strategy that is often successfully employed in conjunction with conventional low-downpayment mortgage loan programs.

U.S. Department of Housing and Urban Development
Docket No. FR-5087-P-01
Standards for Mortgagor's Investment in Mortgaged Property
July 10, 2007
Page 4

Post-purchase counseling should ensure that home buyers can prepare and follow family budgets. These plans should implement strategies to pay a homeowner's mortgage and other obligations while helping to establish the personal discipline needed to set aside monies in anticipation of the types of exceptional family- and housing-related expenses that are likely to occur during the owner's tenure in the home. Post-purchase counseling would also enable home buyers to establish relationships with skilled counselors who could be relied upon for advice and assistance in the future should difficult circumstances arise.

### Include Seller-Funded Downpayment Assistance with Seller Concessions

In Handbook 4155.1 (Revision 5, section 1-7), FHA allows sellers and other parties of interest to the transaction to contribute up to six percent of a property's sale price toward home buyers' closing costs, prepaid expenses, discount points, and other financing concessions.

NAHB recommends that seller assistance for home buyers' downpayments should be included under the umbrella of seller concessions. Home builders frequently offer their purchasers a choice of either downpayment assistance, an interest rate buy-down, or additional options, but typically not more than two of the three choices. Simply put, seller-funded downpayment assistance is a sales-related cost to home builders and NAHB suggests that this assistance be treated as such.

### Strengthen Appraisal and Underwriting Standards

NAHB believes that concerns about credit risk and inflated appraisals on seller-assisted loans should be addressed through stronger appraisal and underwriting standards. Credit risk concerns should be addressed through requirement of thorough credit analysis and prudent underwriting standards. In addition, borrowers should receive full disclosure and information on all of the features of their mortgage. Appraisal criteria should require comparison of the price on homes with downpayment assistance to prices on similar homes without such assistance.

### FHA Revitalization Legislation Contains Key Reforms

NAHB has long been a strong supporter of FHA's mortgage insurance programs. Notably, NAHB's leadership, members and staff have worked hand-in-hand for over two years with HUD's leadership and leaders of other housing stakeholder organizations to urge Congress to pass legislation that would put in place the authority for HUD to take much-needed steps to revitalize FHA.

U.S. Department of Housing and Urban Development
Docket No. FR-5087-P-01
Standards for Mortgagor's Investment in Mortgaged Property
July 10, 2007
Page 5

Several provisions of the FHA Revitalization legislation would address FHA's concerns with seller-assisted downpayment assistance. Key among these would be granting FHA authority for greater flexibility in setting downpayment requirements along with authority to establish a risk-based premium pricing structure. An important complement would be appropriation of sufficient funds for housing counseling.

<u>Conclusion</u>

Again, NAHB appreciates the opportunity to provide these comments on the Proposed Rule. NAHB strongly urges HUD to enact reforms in consumer counseling, underwriting and appraisal requirements rather than prohibiting all seller-provided downpayment assistance. We look forward to working with HUD to develop a seller-assisted downpayment program that best serves home buyers, builders and the FHA.

Please feel free to contact Bill Renner, NAHB's Director, Single Family Finance, at 202-266-8597 if you have any questions regarding this letter and the suggestions contained herein.

Best regards,

William P. Killmer
Executive Vice President
Advocacy Group

WPK: wr

# Exhibit M

[illegible address] Gaithersburg, MD 20636
ph 301 987 3 1 8 fx 301 987 3150 www.ameridream.org

**AmeriDream**
Down Payment Assistance Program

August 9, 2007

Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street, S.W.
Room 10276
Washington, DC 20410-0500

Re:  Docket No. FR-5087-P-01, "Standards for Mortgagor's Investment in Mortgaged
      Property"

Dear Sir/Madam:

On behalf of AmeriDream, Inc., a 501(c)(3) charitable entity which is dedicated to
helping low and moderate income families purchase their own homes, I respectfully
submit these comments on Docket No. FR-5087-P-01, "Standards for Mortgagor's
Investment in Mortgaged Property".

### Summary

Any policy initiative directed at down payment assistance (DPA) programs must
serve the broader purpose of helping responsible, low and moderate income families to
purchase their own homes. Judged by that criterion, DPA programs work, and work well,
having provided critical assistance to over one million individuals and families in the past
few years to buy their own homes, some 80% of whom for the first time.

Because down payment assistance programs are so critical, AmeriDream
welcomes efforts by the Department of Housing and Urban Development (HUD) to
ensure that down payment assistance providers adhere to their mission and work
assiduously to assist families with limited means to buy their own homes. AmeriDream
also applauds HUD's insistence that down payment assistance providers conduct
themselves in strict compliance with both sound business practices and high ethical
standards. Finally, AmeriDream acknowledges that some down payment assistance
programs have had significant problems. Those issues tend to be endemic among nascent
industries, particularly those which experience very rapid growth, and DPA providers, a
sector of nonprofits which began barely a decade ago, are no exception. AmeriDream
and other responsible DPA providers have worked hard to resolve those problems, and
would support HUD initiatives that did the same.

For all those reasons, AmeriDream strongly encourages HUD to actively take steps to
strengthen down payment assistance programs. However, if HUD is to do so effectively, and
in the interests of the aspiring homeowners whom HUD is committed to serve, it is essential
that HUD develop rules that seek to improve DPA programs, not eradicate them. Moreover,

if those rules are to improve DPA programs, HUD must properly assess their problems, and its rules must be specifically targeted to remedy those concerns. Unfortunately, the proposed "Standards for Mortgagor's Investment in Mortgaged Property", which seeks to cut off most current funding to DPA programs, fails on both counts.

As the scale of the down payment assistance programs quickly grew beyond the means of the traditional donor base of the churches and other charities which were the initial providers of down payment assistance, DPA programs sought other sources of support, particularly within the real estate industry, including home builders and home sellers. That expanded donor base has permitted down payment assistance to be extended to far more families, and enabled DPA programs to grow without using taxpayer dollars. Yet HUD views that essentially positive development as inherently abusive. As a result, the proposed rule seeks to prohibit most current donors from contributing as they have in the past, a ban which would not improve DPA programs, but eradicate them.

A more constructive approach would be to target specific problems within DPA programs. However, the proposed rule has only a tenuous relationship with the very problem it purports to address. The background to the proposed HUD rule states that "FHA's primary concern with these transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and the FHA." That statement asserts, in essence, that the families who purchase homes with down payment assistance may pay prices which have been manipulated to exceed actual fair market value; that is, the purchase price may not be supported by an accurate appraisal. Yet that assertion fails to acknowledge that transactions involving down payment assistance, like all purchases utilizing loans guaranteed by the Federal Housing Administration (FHA), are based on valuations validated using HUD-approved appraisal criteria applied by HUD-certified appraisers neither chosen by, nor related to, either the DPA providers or their donors.

If further safeguards are required to ensure the integrity of the appraisal process, such as random assignment of HUD-certified appraisers or mechanisms for reviewing appraisals prior to closing, AmeriDream strongly supports implementing such measures which relate *directly* to the alleged problem. Seeking to remedy alleged flaws in the appraisal process *indirectly*—through restricting how donations are made to a down payment assistance provider, which provides funds to a low or moderate income family seeking to buy a home, who borrows money from a mortgage lender, which hires the appraiser—is simply the wrong approach.

AmeriDream stands ready, as it has for years, to work with HUD to improve current DPA programs to provide critical help to the low and moderate income aspiring homebuyers whom both HUD and AmeriDream are dedicated—and, indeed, legally obligated—to serve. Towards that end, these comments offer a detailed description of current DPA programs, a candid assessment of issues relating to the provision of DPA, and a suggested list of steps which may be taken to ensure that down payment assistance is provided to deserving families in an efficient, effective, and ethical manner.

HUD's proposed rule seeks to change current policy and long standing practice regarding a mortgagor's investment in a property. The proposed rule is both premised upon, and symptomatic of, fundamental misconceptions regarding downpayment assistance programs. As a consequence, the proposed rule is deeply flawed, and should be withdrawn.

### *Discussion*

### Background Information on AmeriDream

AmeriDream, a 501(c)(3) charity, was established in 1999. Based in Gaithersburg, Maryland, AmeriDream conducts housing-related programs throughout the United States. AmeriDream provides a wide range of programs to benefit the families it serves, including homebuyer education, loss mitigation counseling, community development, and privately-funded down payment gift assistance. Through those various programs, AmeriDream not only seeks to help families to purchase homes, but also to provide those families with the education and other resources needed to help them meet the responsibilities of homeownership. In turn, those responsible, committed homeowners help build safe, thriving communities.

AmeriDream exists to serve low and moderate income individuals and families. Our mission is to permit these aspiring homeowners, a disproportionate number of whom are first-time homebuyers, minorities, legal immigrants, women headed households, and single-parents, achieve homeownership. Most significantly, AmeriDream has provided critical down payment assistance to over 200,000 low and moderate income homebuyers, enabling them to purchase their homes. In addition, since 1999, AmeriDream has educated over 60,000 homebuyers through our homebuyer education course; counseled and assisted approximately 1,200 people to retain their home when confronted with mortgage difficulties; and built 168 affordable housing units in our inner cities, most notably in Southeast Washington, DC. To date, AmeriDream has committed over $30 million to projects unrelated to its down payment assistance programs.

### Charitable Sector's Successful Response to FHA Authorization of DPA

(a) **FHA Loan Guarantees.** Congress created the Federal Housing Administration to establish and implement crucial policy initiatives to assist low and moderate income individuals and families make the transition from tenants to homeowners. To help achieve that worthy goal, the FHA guarantees certain loans for moderately priced homes. That single program, the FHA loan guarantee, is perhaps the most important federal initiative to promote homeownership among families with limited means. Significantly, low and moderate income borrowers who qualify for FHA-backed loans are able to get credit at reasonable rates from reputable lenders. They do not fall prey to predatory lenders, and are not burdened with debt accruing at confiscatory rates.

To qualify for FHA loan guarantees, both the homes and the prospective purchasers must meet certain criteria, among which is the statutory requirement that the homebuyer must make a down payment of at least 3% of the purchase price of the home. That criterion has proven to be an insurmountable obstacle for many otherwise qualified low and moderate income families seeking to purchase their own homes. Even families who have pristine credit histories, steady employment, and sufficient income to meet mortgage payments nonetheless often have trouble setting aside a significant portion of their paychecks to meet the FHA's down payment requirement. As a result, the FHA program, though highly commendable, nonetheless has failed to benefit many of the very families which it was designed to serve. As a result, families who have been denied access to FHA-backed loans are left with two options, both very unfavorable: resort to potentially predatory, sub-prime loans, or do not purchase a home at all.

To the credit of both Congress and the FHA, they have long recognized that the down payment requirement would prove too burdensome for many of the families whom they sought to help. For that reason, prospective homebuyers are expressly permitted to use monetary gifts to make the required down payments, provided that those gifts come from certain specified sources, including family members, employers, labor unions, and charities certified by the Internal Revenue Service (IRS) pursuant to section 501(c)(3) of the tax code. As a practical matter, for many aspiring home purchasers—whose relatives also have modest means, who do not belong to a union, and do not have employers who provide the requisite gifts—the only source of down payment assistance on that list to whom they may have recourse are charities.

(b) **Evolution of DPA Organizations.** One of the largest barriers to homeownership is saving the down payment, particularly for low and moderate income families and traditionally underserved home buyers. Many of these individuals and families can meet all the requirements of an FHA-insured loan, such as, employment history, income, and credit, yet cannot afford to set aside the minimum down payment of 3% of the contract sales price of the home. DPA was designed to work with FHA and its population of homebuyers to safely help them overcome the down payment barrier to homeownership while also giving homebuyers positive equity in their home day one which is the beginning of wealth building for these lower income homebuyers. Beginning in the mid-1990s, a number of 501(c)(3) organizations began to step up to meet this need. Faith-based organizations first took the lead, initiating programs to provide needed down payment assistance to these low and middle income aspiring homebuyers, typically from the very communities in which the churches were based.

From those modest beginnings, down payment assistance programs grew very rapidly to meet the pent up demand of hundreds of thousands of families who longed to purchase their own homes, and qualified for FHA loans in every respect except for the required down payment.

As the scale of the down payment assistance programs quickly grew beyond the means of the traditional donor base of the churches and other providers of down payment

assistance, providers turned to other sources of support, particularly within the real estate industry. That expanded donor base has permitted down payment assistance to be extended to far more families, who then are able to purchase homes at valuations validated by HUD-certified appraisers. Moreover, an expanded donor base has permitted down payments assistance programs to grow without taxpayer dollars.

(c) **Compliance and Acceptance of DPA.** AmeriDream and other reputable charitable organizations which provide down payment assistance seek to operate their programs in compliance with both sound financial management principles and applicable law, including existing HUD rules.

HUD Handbook 4155.1 Rev 5, Section 2-10 provides the authority for charitable organizations to provide down payment assistance.

> Gift Funds. An outright gift of the cash investment is acceptable if the donor is the borrower's relative, the borrower's employer or labor union, a charitable organization, a governmental agency or public entity that has a program to provide homeownership assistance to low- and moderate-income families or first-time homebuyers, or a close friend with a clearly defined and documented interest in the borrower.

AmeriDream raises money for down payment gifts from various sources. That money is deposited into a commingled account, which is episodically drawn upon to make down payment gifts to qualified home buyers taken from a waiting list. The money is sent directly to the closing attorney and placed in the home buyer's escrow account in advance of the loan closing. After the loan closes and the real estate transaction is complete, the seller of that property often pays the organization a service fee, typically within seven to ten days after closing. The service fee is deposited into the organization's fund for down payment assistance and is later used for new homebuyers requesting down payment assistance, other charitable programs, and administrative costs.

This process, still adhered to today, was developed with the full knowledge of HUD's Office of General Counsel. Significantly, in 1998, HUD's Office of General Counsel reviewed the down payment assistance process and found that it was in compliance with HUD's guidelines. Further, in a letter dated October 25, 2005 from HUD to GAO, Brian Montgomery, Assistant Secretary for Housing - Federal Housing Commissioner relied on the Office of General Counsel's determination to respond to GAO recommendations.

> HUD's Office of General Counsel has advised that the timing of the payments is a key point in whether there is a seller inducement to purchase. If a gift is made from a nonprofit entity (either directly or through an entity such as a closing agent), from the nonprofit's own funds, prior to the completion of the closing, the gift becomes the homebuyer's property so the buyer can make the

three percent required down payment. After the completion of the closing, a seller makes a contribution (perhaps through the closing agent as well) from the gross sales proceeds to the nonprofit entity. The donation is commingled with other nonprofit funds that later become a source of donations to buyers other than the buyer who has just closed the purchase of the seller's property. Because the buyer has not received funds from the nonprofit that can be traced to the seller's contribution, there has not been an inducement to purchase provided by the seller.

GAO-06-24 Mortgage Financing: Additional Actions Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance (Appendix IV)

Further, the use of down payment assistance is reported on the HUD-1, a standard form that itemizes all funds associated with the home purchase. In addition, HUD has issued several mortgagee letters clarifying the appropriate use of down payment assistance which did not question the way DPA providers are funded. For instance, Mortgagee Letter 2004-02 addresses proper documentation when downpayment funds are provided from charities and Mortgagee Letter 2002-02 addresses credit policy issues regarding payment of borrower's obligations. In fact, HUD has not only made favorable statements about DPA programs in the past, HUD actually has utilized DPA programs itself when selling some of its own inventory of properties.

**(d)** __DPA Benefits to Low and Moderate Income Families & the Economy.__
As recently as 2005, FHA itself has affirmed that DPA programs, as currently structured, serve the low and moderate income families to whom FHA is committed, and that DPA programs permit those aspiring homebuyers to purchase their homes without resorting to potentially predatory lenders. FHA has affirmed that down payment assistance does, in fact, serve a disadvantaged population. In his 2005 letter, FHA Commissioner Brian Montgomery stated:

> Borrowers who rely on seller-funded down payment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier then FHA.

By any quantitative measure, down payment assistance programs have proven to be an enormous success.

- To date, over one million low and moderate income individuals and families in all 50 states, the District of Columbia, and Puerto Rico have received down payment assistance which has allowed them to buy their own homes, usually for the first time.

- Approximately, $3.8 billion in down payment assistance was given to these low and moderate income families. Funds were entirely from private sources; no government funds were used.

- Down payment assistance programs are targeted at low and moderate income purchasers purchasing modestly priced homes in neighborhoods which would particularly benefit from an increase in owner-occupied housing.

- In 2005, the average income of a homebuyer receiving DPA was $43,551, or 69 percent of the average household income nationally. In addition, about two in five homebuyers receiving assistance had a co-borrower, indicating a need for additional financial resources. [George Mason University Center for Regional Analysis Report "Characteristics of Home Buyers Receiving Assistance from Non-Profit Down Payment Assistance Providers" November 2006 (page 1)]

- The average down payment gift amount is approximately $3,600.

- In 2005, the average sales price of homes purchased with down payment assistance is $125,000 compared with a national home value of $247,000.

- Homeowners receiving assistance from DPA benefited from increase in housing values between 2000-2005. They saw their total wealth grow by $9.6 billion over this period. [George Mason University Center for Regional Analysis Report "National Economic Impact of Non-Profit Down Payment Assistance Providers" March 2007 (GMU 2007 Study) (page ii)]

- Down payment assistance has been given to deserving, credit worthy borrowers who, notwithstanding their limited incomes, are able to meet their mortgage payments. They are only unable to come up with the required down payments. A GAO report concluded that approximately 94% of down payment assistance recipients have met their mortgage obligations in a timely manner. [GAO-06-24 Mortgage Financing: Additional Actions Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance (page 28 – National claim rate graph)]

- Down payment assistance programs have been crucial to achieving record levels of homeownership, both among the general population and among groups which historically have been denied the ability to purchase their own homes. In its June 2, 2006 edition, *The Washington Post* reported that DPA has helped boost homeownership to a record 69% level.

- Home purchases which utilize down payment assistance now reportedly comprise approximately 40% of FHA's loans with over 80% of those home purchases being made by first time homebuyers.

- Housing is a corner stone of the national economy. The opportunity for homeownership provided by DPA generated additional spending by families totaling $12.9 billion. These expenditures supported 211,000 new jobs, which generated $8.2 billion in increased personal income and $24.8 billion in total national economic output. [GMU 2007 Study (page ii)]

In short, down payment assistance works. No one disputes that these programs have enabled many hundreds of thousands of low and moderate income families to purchase homes for the first time. No one questions whether the beneficiaries of these programs have received every penny promised. And no one doubts that these programs have been instrumental in lifting homeownership rates to record levels, particularly among minority groups. To our knowledge there has been no report undertaken or released for public review that finds there would not be a significant gap if DPA were eliminated.

### Housing Policy Issues Presented by DPA Programs

It is appropriate to categorize issues relating to DPA programs into two types—those issues which relate to HUD's areas of expertise and jurisdiction, and those which do not. Only the former are properly addressed by HUD's proposed rule. Conversely, HUD is not an expert to assess, nor empowered to issue rules with respect to, the latter. Accordingly, this comment letter focuses on housing policy issues which are presented by the proposed rule.

(a) **Validity of Appraisals in DPA Transactions.** In the "Background" discussion prefacing the proposed rule, HUD mentions only one housing policy concern as justifying the proposed action. HUD asserts that the families who purchase homes with down payment assistance may pay prices which have been manipulated to exceed actual fair market value; that is, the purchase price might not be supported by an accurate appraisal. Specifically, HUD states, "FHA's primary concern with [DPA] transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and the FHA." (page 27048)

HUD cites two sources for this assertion.

First, HUD states that a 2005 Government Accountability Office (GAO) report entitled "Mortgage Financing Actions Need to Help FHA Manage Risks from New Loan Products" concludes, as summarized by HUD, "that seller-related contributions *could* contribute to the overvaluation of the property". (Emphasis supplied.) We note that this report is not an analysis on DPA in general nor is it an analysis on property values when DPA is used. To our knowledge there has been no quantitative report undertaken on this issue.

Second, and at greater length, HUD cites an IRS press release of May 4, 2006 to support the proposition that "seller contributions increase the sales price of the home". The extensive reliance on the IRS press release is misplaced. HUD is the expert on

housing policy; the IRS is the expert on tax policy. HUD's failure to substantiate its housing policies with its own research, and reliance on a *press release* issued by an agency whose expertise is limited to tax matters raises questions about those policies, to say the least.

In fact, all homes with an FHA-insured mortgage, including all those acquired with the benefit of down payment assistance, must have their purchase price validated through a home appraisal performed by a HUD-certified appraiser using appraisal criteria established by the Secretary of HUD. Nowhere in its discussion accompanying the proposed rule does HUD acknowledge that fact, let alone seek to explain why those appraisals are inaccurate.

More fundamentally, even if one assumes that HUD's claim that appraisals prepared by HUD-certified appraisers using HUD-approved criteria overstate the true fair market value of homes purchased with down payment assistance, though inadequately substantiated, is nonetheless true, HUD does not explain how the proposed rule would remedy that perceived problem.

AmeriDream strongly supports any HUD initiative which would impose further safeguards on the appraisal process, such as requiring qualified appraisers to be randomly assigned to transactions or providing additional levels of review of the appraisal by disinterested experts. Yet it is essential that this concern be addressed *directly*. To do so *indirectly*—through restricting donations to a down payment assistance provider, which provides funds to a low or moderate income family seeking to buy a home, who borrows money from a mortgage lender, which hires the appraiser—is simply the wrong approach. The practical effect of the proposed rule would hurt, not help, aspiring homebuyers. It would wipe out the capacity of downpayment assistance providers to help all but a relative handful of the low and moderate income families they now serve.

**(b) Default or Claim Rates on Loans Obtained in DPA Transactions.** Neither HUD's proposed rule nor the accompanying discussion make any mention of the default or claim rates on loans obtained to finance homes purchased with down payment assistance. However, as detailed below, that issue is raised often in other contexts. For that reason, it merits mention in discussing housing policy issues presented by down payment assistance programs, and possible policy initiatives to address those issues.

It is well documented that foreclosure is typically due to life catastrophic events such as unexpected job loss, serious illness, or divorce - to name a few. It is also well documented and acknowledged that the population of homebuyers that HUD and DPA serve are financially the riskiest. However, HUD has not determined an acceptable risk or claim rate level. AmeriDream encourages HUD to establish a threshold so that programs and services can be evaluated appropriately.

The statistics regarding the incidence of default or claim among borrowers of FHA-insured loans who utilize down payment assistance relative to those who do not is a matter of considerable dispute. However, HUD itself apparently has determined that the

problem, to the extent it exists, may be effectively addressed through improved underwriting standards, which AmeriDream strongly supports.

In the recent June 2007 GAO report entitled "Federal Housing Administration: Modernization Proposals would have Program and Budget Implications and Require Continued Improvements in Risk Management", GAO stated that HUD indicated that the underwriting criteria for purchasers utilizing down payment assistance were "well understood". Specifically, GAO reported that:

> HUD indicated that it had a firm basis for anticipating the performance of zero- and lower-down-payment loans as a result of its experience with mortgages with seller-funded down payment assistance. HUD said it used this experience to establish risk-based insurance premiums and minimum credit scores for zero- and lower-down-payment borrowers.

GAO report, at page 42.

Although HUD did not cite default or claim rates among borrowers utilizing down payment assistance as a justification for its proposed rule, if, as HUD has claimed in other discussions, that is a concern, that may be effectively addressed through applying the underwriting criteria which HUD says it has developed for those borrowers. Doing so would be an example of the right way to address a problem—target it directly, and in a way that improves down payment assistance programs rather than abolishes them.

(c) **DPA Policy Issues Relating to HUD Zero Down Payment Program.** In the past several Congresses, HUD has strongly advocated passage of legislation which would authorize FHA to insure zero-down payment mortgages. AmeriDream does not object to those proposals; in general, we support legislation and other policy initiatives which help low and moderate income families achieve their dream of homeownership. However, AmeriDream strongly objects to HUD's contradictory positions opposing current down payment assistance programs and supporting proposed zero-down payment mortgages.

As HUD itself notes, as reported by GAO in the language excerpted above, the policy issues presented by down payment assistance are highly analogous to those relating to zero-down payment mortgages—so much so that HUD advised GAO that it did not require a pilot program for the latter because it could simply structure its program based on the data acquired through dealing with the former. How, then, can HUD actively lobby for zero-down payment programs while attacking current programs that also do not require a purchaser to come up with a down payment, but instead of requiring the purchaser to borrow the down payment, gives it to the purchaser? Clearly, if there is any meaningful difference between the two programs, down payment assistance confers the greater benefit to the purchaser. If the appraisals in DPA transactions are valid—and, again, AmeriDream very much supports measures designed to ensure that they are— families who purchase homes with down payment assistance rather than zero-down

payment mortgages benefit from a lower purchase price, smaller mortgage payments, and immediate equity in their homes.

Similarly, in the proposed rule, HUD goes out of its way to point out that the proposed rule does not interfere with "market practices in which sellers customarily agree to pay some of buyer's closing costs...[up to] 6 percent of the purchase price." (page 27050)  Yet HUD does not seek to explain why seller-financed down payment assistance (applied to future homebuyers) of up to 6 percent is pernicious, while seller-financed closing cost assistance of up to 6 percent is benign.  If HUD determines that the 6 percent threshold is meaningful in terms of housing policy, perhaps it may wish to consider limiting the *total* amount of seller-financed down payment assistance *and* closing cost assistance to that amount.

### Rulemaking Considerations

(a) **HUD's Proposed Rule is Impermissibly Arbitrary and Capricious.**  HUD's proposal that would eliminate DPA programs cannot be justified.  The programs are a proven success and have years of regulatory acceptance and recent legislative actions. HUD has done more than acquiesce; for the past decade, it has actively facilitated DPA programs and, over six years ago, shut down a formal proceeding in which it proposed virtually the same change in the regulations as it proposes here.

This rulemaking is not prompted by any instruction from Congress or implied from any change in the law.  HUD concedes that the section of the statute that it purports to apply here is "silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute."  In fact, HUD initiated a rulemaking proceeding eight years earlier, which made the very same proposal to restrict downpayment assistance, Congress has amended §1709 several times.  Each time, it has left §1709(b) untouched, adding not one prohibition on downpayment assistance.  When Congress revises a statute, its decision to leave certain sections unamended constitutes at least acceptance, if not explicit endorsement of the preexisting construction and application of the unamended terms.  *See Cook County, Illinois v. United States ex rel. Chandler*, 538 U.S. 119, 132 (2003); *Cottage Sav. Ass'n v. Comm'r*, 499 U.S. 554, 561-62 (1991); *Asarco Inc. v. Kadish*, 490 U.S. 605, 632 (1989).

HUD also shut down its prior rulemaking on prohibited sources of DPA, leaving its existing regulations undisturbed.  HUD initiated the earlier rulemaking in September 1999, expressing concern that "the sales price is often increased so that the seller's net proceeds are not diminished ... [which] increases FHA's risk that it will not recover the full amount owed if forced to acquire and resell a home purchased by a participating borrower who then defaults on the loan."  In January 2001, HUD withdrew the proposed rule, noting that it had received 1,871 comments during the commend period, with only 21 favoring the rule.  "The overwhelming majority of comments opposed the rule."  66 FR 2851.  HUD said nothing to suggest that the decision was a close call, that it continued to have concerns, or that it planned to revisit the subject at a later time.

For the next six-and-a-half years, HUD made no further proposals for DPA regulations and took no other action inconsistent with DPA programs. The current proposed rule states, however, that "[t]he matter … remains of concern" to HUD for what appears to be the same reason as expressed in the 1999 rulemaking – "that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA." HUD points to little or no evidence, however, for renewing the proposal, or for why its concerns are any different now than when it decided to close its rulemaking in January 2001.

If HUD is relying on more compelling evidence than it had in 2001 to support its concern about sales prices, basic Administrative Procedures Act (APA) notice requirements dictate that the evidence be presented in the proposed rule and subjected to public comment. While "the mere fact that an agency interpretation contradicts a prior agency position is not fatal," *Baptist Health v. Thompson*, 458 F.3d 768, 777 (8th Cir. 2006), a "[s]udden and unexplained change .. or change that does not take account of legitimate reliance on prior interpretation may be arbitrary, capricious, or an abuse of discretion." *Id.*, citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996).

Finally, although HUD is not bound by comments made by individual Members of Congress, the recent comments by Members of the House Subcommittee on Housing and Community Opportunity, coming just a month after HUD issued the proposed rule, are worthy of notice. Subcommittee Members strongly and unequivocally supported the continued operation of DPA programs. Indeed, there was not a single voice in favor of HUD's proposed action. Chairwoman Maxine Waters (CA) noted that between 2000 and 2005, approximately 680,000 homebuyers have been supported by downpayment assistance. Congressman Gary Miller (CA) observed: "Let's not just throw a program out that obviously is benefiting hundreds of low-income people who otherwise would never have an opportunity to own a home." Congressman Al Green (TX) noted that DPA programs help many break the cycle of poverty. Congressman David Scott (GA) commented. "What we can look at and continually strive for is the goodness and decency in man. Nowhere is that more applicable than in making sure that this DPA program continues and is strengthened." These comments further demonstrate that this rulemaking is headed in the wrong direction.

An agency must "supply a reasoned analysis" when it departs from a prior position. *Sun Country Airlines v. F.A.A.*, 56 F.3d 1531 (D.C. Cir. 1995), citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*, 463 U.S. 29, 42 (1983). There is no sound basis for HUD to abandon a position it has consistently maintained for a decade, and to reverse a path that literally hundreds of thousands have followed in pursuit of home ownership.

(b) **Administrative Procedures Act Compliance.** The regulatory process of a proposed rule is subject to the Administrative Procedures Act. As such, the public, entities affected by the proposed rule, and other stakeholders are able to provide

comments so that their views are considered and appropriately addressed. AmeriDream, its programs and its program participants of which 95% are FHA homebuyers, will be negatively affected should this proposed rule become final.

Prior to the end of the proposed rule comment period, over 14,000 comments have been submitted to the regulations division opposing the proposed rule and requesting it be withdrawn. There are less than 30 comments supporting the proposed rule.

The proposed rule was issued May 11, 2007, and recommended that comments be submitted through www.regulations.gov. However, the regulations.gov site was not operating May 29-31, 2007 and experienced subsequent problems. Additionally, a significant number of comments submitted to regulations.gov are not posted on the website. Less than 3,000 comments are posted.

A statement causing concern to the fairness of this rulemaking process was made by Secretary Jackson that he intended to ban DPA by the end of the year even if critical comments to the proposed rule were received. [June 5, 2007 *Bloomberg News* "U.S. To Ban Down Payment Program Over Objections Jackson Says."]

The first time HUD issued a similar proposed rule in 1999, that rule was ultimately withdrawn in January 2001. The withdraw notice states "by the time of the close of the comment period, HUD received 1,871 comments. Only 21 of these comments favored the rule. The overwhelming majority of comments opposed the rule. Based on these public comments, HUD has determined to withdraw this proposed rule on sources of homeowner downpayment."

(c) **Executive Order 12866 & Regulatory Flexibility Act Best Practices.** We recognize the discretion in applying the EO and RFA best practices to proposed rules is in the sole discretion of the agencies. However, we submit for the record, the "Findings and Certifications" portion of the proposed rule contains flaws in analysis and conclusions. The two primary inaccuracies are: 1) this proposed rule meets all 4 components of the definition of "Significant Regulatory Action" defined in Executive Order 12866. While there is no specific definition for "economically significant" listed in the Executive Order, the description of "having an annual effect on the economy of $100 million or more..." is clearly met by DPA, as detailed above. As such that would then provide under the Regulatory Flexibility Act additional analysis on the DPA subject matter to be undertaken; 2) IRS Revenue Ruling 2006-27 does not warrant the deference given it in the proposed rule. HUD's Mortgagee Letter 2006-13 recognizes charities operating today with a 501(c)(3) tax exemption as allowable sources to provide down payments. The organizations providing DPA contain a 501(c)(3) status and warrant the recognition of a small entity.

(d) **Proposed Regulation Violates the United States Constitution.** The proposed regulation, if adopted, would also violate the United States Constitution's Fifth

Amendment's Equal Protection clause by discriminating against charitable, non-profit organizations that provide down payment assistance in the form of gifts, which are supported through service fees paid by home sellers, while permitting down payment gifts from governmental agencies and instrumentalities, family members, disaster relief grants, and charitable organizations that are not reimbursed, directly, or indirectly, by the seller. The proposed regulation also discriminates among groups of potential homebuyers: those who have access to funds from churches, government agencies, and approved charities will have the means to buy their own homes, while those for whom DPA programs are the only recourse will "suffer precisely the privations [that Congress, HUD, and FHA have long sought] to alleviate." *U.S. v. Califano*, 506 F. Supp. 1230 (D. Mass. 1981).

"Where a governmental regulation creates a classification which results in different treatment of the members of each class, the constitutional requirement of equal protection mandates that the classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relationship to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Id.*, quoting *Reed v. Reed*, 404 U.S. 71 (1971). *See also General Media Communications, Inc. v. Cohen*, 131 F.3d 273, 285 (2d Cir. 1997, cert. denied, 524 U.S. 951 (1998

In this case, HUD asserts that the targeted group of charitable nonprofit organizations offers gifts to homebuyers in a manner that "often" increases the sales price "to the detriment of the borrower and FHA." 72 FR 27048. HUD not only fails to identify reliable evidence to support this assertion, but it literally ignores the fact that hundreds of thousands of borrowers would not have acquired their first homes if not for these programs. Even if the proposed regulation is not foreclosed by the statutory provisions governing applications for mortgage insurance - and AmeriDream makes no concession as to that point - it is flatly inconsistent with the goals of the National Housing Act, and imposes burdens irrationally on some groups and not others. It therefore violates the Equal Protection Clause of the Fifth Amendment.

### Policy Recommendations

In order to best serve the interests of aspiring low and moderate income homebuyers who rely on down payment assistance to purchase their homes, AmeriDream respectfully requests that HUD withdraw its proposed rule. Instead, AmeriDream asks that HUD promulgate new rules which are directly targeted at remedying alleged shortcomings in current DPA programs, not abolishing them.

Towards that end, AmeriDream would like to identify some of the policy options available to HUD to improve all FHA-insured loan programs that use down payment assistance from any allowable source or provide 100% financing. Homebuyers who need assistance, regardless of the source of those funds, or homebuyers qualifying for 100%

financing present a higher risk and need additional services to be successful. These homebuyers have the same very high loan-to-value (LTV) characteristic.

- Require mandatory homebuyer/ownership education for very high LTV homebuyers either in person or online. Pre and post-purchase education has been proven to lower foreclosure rates. Often the difficulty with administering pre and post-purchase education is the location of the classes. It is also suggested that HUD approve long distance learning via the internet to better serve today's homebuyers.

- Mitigate default rates by developing and applying eligibility criteria for borrowers receiving down payment assistance in accordance with the data HUD advised GAO it has acquired and analyzed with respect to such borrowers.

- Refine the current appraisal process:

  o Select appraisers through a blind draw process modeled upon programs currently administered under the auspices of the Department of Veterans Affairs.

  o Require, in accordance with GAO's recommendation, that the appraiser be informed about the use of down payment assistance in the transaction.

  o Require the lender, seller, and appraiser to affirm that no coercion or manipulation took place in connection with the appraisal.

- Limit the total amount of down payment assistance and closing cost assistance to 6 percent of the purchase price of homes financed by FHA-insured mortgages.

- HUD should review and approve organizations that want to provide DPA. HUD currently has an approval process for several of its programs. Approval and oversight of entities providing down payment assistance will help ensure a successful program.

  o In order to offset any administrative costs of implementing a review and approval of organizations to provide DPA, it is recommended that HUD charge an application fee that would appropriately cover HUD's administrative costs.

  o Impose more rigorous standards and certification requirements for down payment assistance organizations, such as strengthened financial requirements, annual disclosures for participating organizations, and greater accountability.

  o Require minimum levels of experience and strong histories of compliance with applicable law for down payment assistance providers seeking to

raise funds from private sellers that operate in states other than their own home state.

o   Require background checks for all officers and board members or other such decision-makers for down payment assistance.

If you have any questions or wish to discuss this comment letter in more detail, please do not hesitate to contact me.  All of the reports referenced in these comments are public documents or are in HUD's possession.  If duplicate reports are needed please let me know.  I may be contacted at (301) 977-9133.

On behalf of AmeriDream, thank you for your consideration of our comments.  We look forward to working with HUD to address these very important issues in a manner which best serves the public interest.

Respectfully submitted,

Ann Ashburn
President
AmeriDream, Inc.

Page 16

**59**