UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED, THE GENESIS FOUNDATION, HOME DOWNPAYMENT GIFT FOUNDATION, THE SOVEREIGN GRANT ALLIANCE, THE FUTURE HOME ASSISTANCE PROGRAM, and PARTNERS IN CHARITY, INC., <br><br> Plaintiff, <br><br> v. <br><br> HON. ALPHONSO JACKSON, SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, <br><br> Defendant. | Civil Action No. 07-1752 (PLF) |

## RESPONSE TO INTERVENORS' MOTIONS FOR PRELIMINARY INJUNCTION AND HUD'S BRIEF IN OPPOSITION THERETO

Plaintiff AmeriDream, Incorporated respectfully submits this response to (i) the Motions for Preliminary Injunction submitted by the Genesis Foundation, Home Downpayment Gift Foundation, Partners in Charity, Inc., Future Home Assistance Program, and Sovereign Grant Alliance (collectively "Intervenors"), and (ii) the Consolidated Opposition To Motions For Temporary Restraining Orders And Preliminary Injunctions submitted by the Secretary of the United States Department of Housing and Urban Development ("HUD").

I.  **INTRODUCTION**

AmeriDream filed suit on October 1, 2007, challenging a final regulation issued that day by HUD.  "Standards for Mortgagor's Investment in Mortgaged Property," 72 Fed. Reg. 56,002 (October 1, 2007)(to be codified at 24 C.F.R. pt. 203) ("Regulation"). The suit charges that HUD abruptly reversed a decade-old policy of approving and facilitating downpayment assistance ("DPA") programs without explaining or even acknowledging its departure from this history, without addressing less-restrictive alternatives, and without producing for public comment data and analysis that it substantially relied on to justify its action.  As set forth in the Complaint, and detailed in AmeriDream's earlier-filed motion for interim injunctive relief, the challenged Regulation is the product of a rush to judgment, reflected by the foregoing circumvention of administrative process and revealed in comments by HUD's Secretary during the comment period that HUD would shut down seller-funded DPA regardless of what commenters had to say. June 5, 2007 Bloomberg.com article, Ex. O to AmeriDream's Memorandum of Points and Authorities.

Shortly before responding to AmeriDream's request for interim injunctive relief, HUD agreed to stay enforcement of the Regulation as to AmeriDream until February 29, 2008, in exchange for an orderly briefing schedule on cross-motions for summary

judgment.    That  agreement  purportedly  prompted  Intervenors  file
actions  against  HUD  of  their  own.    However,  because  HUD  has
declined  to  enter  into  the  same  agreement  with  the  Intervenors,
the   Intervenors'   motions   for   preliminary   injunction   have
leapfrogged  the  Court's  consideration  of  AmeriDream's  claims
against  HUD.    For  that  reason,  and  because  the  intervenors
assert  some  claims  against  HUD  that  are  identical  to  those
asserted  by  AmeriDream,  AmeriDream  files  this  Response  to
address  overlapping  issues  and  bring  previously-unavailable
facts  to  the  Court's  attention.

## II.    Response to Intervenors' Motion

AmeriDream   concurs   that   Intervenors   have   a   substantial
likelihood  of  success  on  the  merits  in  their  challenge  to  HUD's
final  Regulation.  In  addition,  AmeriDream  wishes  to  bring  to  the
attention  of  the  Court  additional  information,  not  presented  by
Intervenors,   that   further   illuminates   HUD's   failings   in
developing  the  Regulation,  and  provides  additional  support  for
the  proposition  that  Intervenors  are  likely  to  prevail  on  the
merits  of  their  challenge  to  the  Regulation.

### A.    HUD fails to supply a reasoned analysis to justidy departing from its longstanding position on SFDPA programs.

For  approximately  ten  years,  HUD  has  expressly  permitted
seller-funded  DPA  charities  to  accept  contributions  from  sellers

and others involved in the real estate industry.[1]  For example,
in 1998, HUD's Office of General Counsel reviewed the process
for accepting contributions and awarding gifts utilized by
AmeriDream and numerous other DPA providers, and found that it
was in compliance with HUD's guidelines.  In 2005, HUD defended
this approved process, explaining that it did not involve a
seller's inducement to purchase:

> HUD's Office of General Counsel has advised that the
> timing of the payments is a key point in whether there
> is a seller inducement to purchase.  If a gift is made
> from a nonprofit entity (either directly or through an
> entity such as a closing agent), from the nonprofit's
> own funds, prior to the completion of the closing, the
> gift becomes the homebuyer's property so the buyer can
> make the three percent required downpayment.  After
> the completion of the closing, a seller makes a
> contribution (perhaps through the closing agent as
> well) from the gross process sales proceeds to the
> nonprofit entity.  The donation is commingled with
> other nonprofit funds that later become a source of
> donations to buyers other than the buyer who has just
> closed the purchase of the seller's property.

Letter from FHA Ass't Sec'y Brian Montgomery, to the Gov't
Accountability Office ("GAO") (Oct. 25, 2005) ("2005 HUD Letter
to GAO").

Moreover, the standard HUD-1 form allows for reporting on
the use of DPA, and HUD has issued several mortgagee letters
that clarify the appropriate use of DPA without questioning the

---

[1] HUD Handbook 4155.1 Rev. 5, § 2-10 provides authority for DPA through gifts
by DPA charities like AmeriDream.

source of DPA funding.[2]  HUD also has encouraged the rapid growth of charitable DPA providers by readily extending FHA insurance to loans obtained in transactions utilizing downpayment assistance.  Remarkably, HUD even has used charitable DPA in the sale of certain HUD-owned properties on numerous occasions.  Affidavit of Ann Ashburn, Ex. A to AmeriDream's Memorandum of Points and Authorities, at 7.

In fact, HUD's own use of seller-funded DPA is consistent with HUD's past acknowledgement of the benefits of seller-funded DPA.  As recently as 2005, HUD clearly articulated those benefits, and pointedly rejected suggestions that those programs be curtailed:

> Borrowers who rely on seller-funded downpayment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector.  Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA.  Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan.

2005 HUD Letter to GAO.

---

[2] For example, Mortgagee Letter 2004-02 addresses proper documentation when downpayment funds are provided from charities, Letter from HUD, to All Approved Mortgagees (Jan. 12, 2004), and Mortgagee Letter 2002-02 addresses credit policy issues regarding payment of borrower's obligations, Letter from HUD to All Approved Mortgagees (Jan. 16, 2002).

Contrary to HUD's prior position, the Regulation completely prohibits DPA in the form of gifts from charities supported in part by contributions from sellers or others that financially benefit from the transaction. Yet HUD provides no reasoned explanation for its abrupt change of course and flat contradiction of its prior longstanding policy and statements regarding these DPA programs.

Instead, HUD simply ignores its longstanding approval and support of these programs, insisting without factual support that the Regulation merely "codifies HUD's longstanding practice" of allowing nonseller-funded DPA and denigrating the seller-funded DPA programs and providers it previously supported by referencing "so-called charities" who award "so-called gifts." 72 Fed. Reg. at 56,002. Again without explanation, HUD then flatly contradicts its prior published position that approved seller-financed DPA gifts are not a seller's inducement to purchase, see 2005 HUD Letter to GAO, by summarily stating that DPA gifts directly or indirectly supported by seller contributions often "function as an inducement to purchase the home." 72 Fed. Reg. at 56,002.

The only "concern" advanced in the explanation for the final regulation that refers to any supporting authority at all is "that the sales price is often increased to ensure that the seller's net proceeds are not diminished" But the two

-6-

authorities cited – a February 2005 GAO report and a 2006 IRS Revenue Ruling as described in a pres release – do not state what HUD claims. Id. At 56,002-03.

First, HUD claims that a GAO report released in February 2005, entitled "Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Loan Products" ("February 2005 GAO Report"), found "that seller-related contributions *could* contribute to an overvaluation of the price of the property." 72 Fed. Reg. at 27,048-49; 72 Fed. Reg. at 56,002 (<u>citing</u> February 2005 GAO Report at 16) (Emphasis added).

Yet, that statement mischaracterizes the passage cited. What HUD presents as a determination made by GAO, presumably based upon rigorous analysis of reams of data, is in fact only a general characterization of remarks made by Fannie Mae and Freddie Mac officials, who are neither identified nor even quoted anonymously, in a conversation with GAO. The February 2005 GAO Report merely states that "Fannie Mae and Freddie Mac officials told us that such seller-related contributions could contribute to an overvaluation of the property." February 2005 GAO Report at 16. Moreover, there is no indication in the GAO report that the Fannie Mae or Freddie Mac officials with whom GAO chatted cited any data or other source supporting their observation, or whether they even had any particular knowledge of the issue, or any expertise to evaluate the relevant facts.

Second, HUD relies on statements found in an IRS <u>press</u> <u>release</u> to support the claim that the final Regulation is justified because it "harmonize[s] [HUD's] regulations regarding downpayment assistance with recent rulings of the IRS." 72 Fed. Reg. at 56,003. It is unclear what "rulings" HUD has in mind, because HUD points only to a single IRS revenue ruling. More significantly, Revenue Ruling 2006-27 concerns an entirely different set of regulatory concerns.

According to HUD, the revenue ruling "addresses [the] same concerns" that HUD incorrectly attributes to the February 2005 GAO Report, <u>i.e.</u>, that the sales price of homes purchased with nonprofit DPA "often increased to ensure that the seller's net proceeds are not diminished." In fact, Revenue Ruling 2006-27 states precisely the opposite: in those cases where home purchasers received DPA from charities that received contributions from home sellers, "the downpayment assistance represents a *rebate or purchase price reduction*." Rev. Rul. 2006-27, 2006-21 I.R.B. 915, at 16. HUD's confusion on the meaning of the revenue ruling may be due to its misplaced reliance on a one-page IRS <u>press release</u> announcing the revenue ruling, instead of the ruling itself.[3]

---

[3] Ironically, even the press release to which HUD refers does not mention, let alone support, the proposition for which HUD cites the Revenue Ruling Although the press release briefly discusses "financing arrangements" among the seller, buyer, and DPA provider, it does so only in the context of compliance with § 501(c)(3).

In sum, the Regulation's failure to supply a reasoned analysis for departing from its longstanding position on DPA is, on its face, a violation of the Administrative Procedure Act.

**B.    HUD's Congressional Testimony During Pendency of the Rulemaking**

HUD's determination to abolish seller-funded DPA programs, regardless of facts, its own record, and the availability of reasonable alternatives, may be better understood in light of its testimony at a Congressional hearing held shortly after the Regulation was proposed, for which the transcript was made available only on or about October 12, 2007.  Homeowner Downpayment Assistance Programs and Related Issues:  Hearing Before Subcomm. On Hos. & Cmty.  Opportunity of the H. Comm. On Fin. Servs., 110th Cong. 20-21 (2007) (GPO Serial 110-45) ("Hearing Transcript").[4]

On June 22, 2007, the House Financial Services Committee's Housing and Community Opportunity Subcommittee conducted a hearing on the proposed Regulation and downpayment assistance programs entitled "Homeowner Downpayment Assistance and Related Issues".  HUD was represented at the hearing by Margaret Burns, Director, Office of Single Family Housing Program Development, FHA, and James A. Heist, Assistant

---

[4]  Although the Hearing Transcript was not yet available at the time, AmeriDream filed its comments to the Regulation,  AmeriDream's comments nonetheless referred to proceedings at the hearing.  Ex. M to AmeriDream's

Inspector General for Audits, Office of the Inspector General, HUD.

The testimony reveals that HUD's plan to abolish seller-funded DPA programs was motivated, above all else, by the desire to pressure Congress into passing legislation which would expand FHA's authority, specifically by authorizing FHA to insure zero downpayment loans. Yet that explanation for the Regulation, though central to HUD's testimony, appears nowhere in either the Notice of Proposed Rulemaking or the explanation for the final Regulation.

In their testimony, HUD's representatives initially declined to acknowledge that the proposed the Regulation reflected a change in position at all, characterizing it instead as a clarification. Hearing Transcript at 8. However, HUD ultimately admitted its position on seller-funded downpayment assistance had changed, and, with remarkable candor, its motive for pursuing that change. In her written statement, Ms. Burns stated:

> So why has FHA taken the approach that it has and why now? . . . Because congressional efforts have yet to result in FHA being permitted to offer better and more flexible financing options, we determined it was time for our agency to stop recognizing this particular type of assistance.

Id. at 56.

---

Memorandum of Points and Authorities, at 12.

HUD's singular focus on pushing legislation authorizing zero downpayment FHA loans, and its consequent disregard for both legitimate policy concerns and even the interests of the low- and moderate-income homebuyers HUD is meant to serve, was evident throughout HUD's oral testimony as well.

For example, when HUD was asked what alternatives to subprime mortgages exist for low-income borrowers if seller-funded downpayment assistance were to be  banned, HUD responded by advocating zero downpayment legislation.

> Ms. VELAZQUEZ. Ms. Burns, what is your response to those supporters of downpayment programs such as Nehemiah who argue that even if HUD's audit conclusion is correct, this Downpayment Assistance Program serves low-income home buyers better than subprime mortgages, which have even higher default rates?
> Ms. BURNS. I would say that the FHA could serve them even better, which is why we would hope to have 100 financing—

Id. At 16.

Similarly, when HUD was asked why it failed to implement changes to seller-funded  downpayment assistance recommended by GAO and others which, HUD acknowledged, would be effective in addressing concerns with the programs, HUD responded that it instead wanted to expand its own authority.

> Mr. Miller.  And that is where I am having problems: If it was possible to establish standards, and we didn't establish standards, and GAO said, you should have established standards in 2005.. . . Why didn't you implement some standards?
> Ms. BURNS. We decided internally that a better way to

>    deal with this was to request additional authority to
>    offer 100 percent financing programs. We have been
>    pursuing that.

Id. at 21.

HUD's admission that it sought to ban, rather than
fix, seller-funded downpayment assistance programs, and seek
to replace those programs with yet to be authorized zero
downpayment FHA loans prompted an angry reaction from
Congresswoman Maxine Waters, the chairwoman of the Housing and
Community Opportunity who presided over the Hearing.  After
Congressman Miller concluded his questioning, Chairwoman
Waters stated:

>    Let me say, Mr. Miller, before I call on Mr. Green, that
>    none of us were told that is the reason why FHA wanted
>    zero downpayment in the bill that we had put together. I
>    feel a little bit duped. Mrs. Biggert [the Ranking
>    Minority Member of the Subcommittee] was not told; I
>    just consulted with her.

Id. at 22.

HUD's testimony also demonstrated that, in its zeal for
advocating authorization of zero downpayment FHA loans, HUD
failed to analyze adequately existing downpayment assistance
programs.  Accordingly, HUD's testimony, like the Regulation
itself, offered no reasoned analysis for departing from its
longstanding policy of permitting seller-funded downpayment
assistance.

HUD testified repeatedly that it had not examined key

data in developing the Regulation, and it was largely unable to respond to questions regarding key factual matters relating to the Regulation.  Among numerous examples:

- When Chairwoman Waters asked HUD to explain how the foreclosure rate for the low-income families served by seller-funded downpayment assistance would improve if that assistance was banned and families without the means to save for a downpayment instead received zero downpayment FHA loans, Ms. Burns replied that was "an excellent question", but did not provide the information requested, notwithstanding Chairwoman Waters's admonition that "I also want you to be more specific and give me some hard numbers on the foreclosure rate."  Id. at 13.

- When Chairwoman Waters asked HUD, "Is there something wrong with those appraisals [used in DPA transactions]? … Are they illegal?" Ms. Burns replied, "No, absolutely not.  They are not illegal.  The appraisers are doing the best that they can."  When, contrary to that assessment, Ms. Burns went on to suggest that appraisals used in DPA transactions were flawed because there were reasons to inflate sales prices in those  transactions, but not other FHA-financed purchases, Chairwoman Waters countered that

the motive to inflate prices existed in any transaction, to which Ms. Burns agreed. <u>Id.</u> at 13-14.

- When Congressman Cleaver asked HUD for data comparing the foreclosure rate for FHA transactions utilizing downpayment assistance with similar non-FHA transactions, which the Congressman stated was "the only accurate comparison" for purposes of evaluating DPA programs, Mr. Heist responded, "That might be a legitimate comparison if one could make one. That is not something that we have done now." <u>Id.</u> at 19.

C.     **HUD failed to consider reasonable alternatives to its chosen policy and to offer a reasoned explanation for rejecting them.**

In <u>City of Brookings Mun. Telephone Co. v. FCC</u>, 822 F.2d 1153, 1169 (D.C. Cir. 1987), the District of Columbia Circuit noted that "'[t]he failure of an agency to consider obvious alternatives has led uniformly to reversal.'" (Citations omitted). Such a result is likely in this case, for HUD failed to consider the most obvious alternatives of all: those presented by (i) the very GAO which HUD cites, erroneously, to support its action; (ii) the commenters whose input HUD obstensibly solicited; and (iii) the Congress whose intent HUD purports to implement.

Inexplicably, the Regulation fails to mention a November

2005 GAO Report which both is more recent than the February 2005 GAO report HUD does cite and addresses the issues associated with DPA more directly.    Gov't Accounting Office, Mortgage Financing: "Additional Action Needed to Manage Risk of FHA-Insured Loans with Downpayment Assistance" (2005) ("November 2005 Report").   In the latter report, the GAO presented to HUD six specific recommendations relating to seller-funded downpayment assistance programs. Id. at 44-45. Yet HUD does not identify or discuss *any* of GAO's recommendations, other than proposing a ban on seller-funded DPA, in the comments accompanying the Regulation, nor does HUD assess the efficacy of GAO's proposals as alternative ways to address the issues that the Regulation purports to resolve.

Stunningly, HUD's representatives conceded to Congress that HUD declined to consider alternatives to terminating seller-funded downpayment assistance, including those proposed by GAO, even though it "[a]bsolutely" could develop and apply underwriting standards that would both effectively address issues presented by DPA programs, and still provide low- and moderate-income borrowers with the downpayment assistance needed to qualify for FHA loans:

> Mr. MILLER. How do you propose preventing risk in the future associated with the new zero downpayment program?
> Ms. BURNS. There are several measures we will take. One is clearly on the underwriting side; with

underwriting the core components that you look at are
the credit history of the borrower—
Mr. MILLER. Standards, that is good. And what else?
Ms. BURNS. It would be primarily on the underwriting
standards.
That is really where we will—
Mr. MILLER. Could you not apply this same standard to
downpayment assistance?
Ms. BURNS. Yes.
Mr. MILLER. Could you enforce that standard?
Ms. BURNS. Absolutely.
Mr. MILLER. So you are telling me that it is possible
to be certain on appraisals, it is possible to be
certain on underwriting standards where the program
would be safe and sound. That is possible? Because
I am very concerned about whether we are making loans
that put the program at risk. I don't want do that.
Based on your testimony, it is possible to do that?
Ms. BURNS. It is possible to put—
Mr. MILLER. Then why don't we?
Ms. BURNS. —more stringent underwriting standards.
Ms. BURNS. Well, we are in the middle of a rulemaking
process.
Mr. MILLER. No, we are in the middle of saying, we
don't want these babies thrown out—
Ms. BURNS. That is an indication of FHA's position
but—
Mr. MILLER. I would like to propose that you listen to
your testimony, and if it is possible—I think we
should do it. So I am just adding to the debate at
this point in time; you haven't released the [final]
rule. I am strongly suggesting, and I think many will
echo this, that maybe that is the approach we should
take, because that is not the approach I am reading of
this coming down.
Ms. BURNS. Right. And just so you know, we certainly
hear you and that is what the rulemaking process is
all about.

Hearing Testimony at 20-21. Despite HUD's suggestion

otherwise in its testimony, the final Regulation, like the

proposed Regulation which was the subject of the Hearing, made

no attempt to consider alternatives to banning seller-funded

downpayment assistance.

In addition to ignoring GAO's recommendations, HUD failed to give adequate consideration to the formal comments submitted with respect to the Regulation. HUD did not even respond to many of the commenters' most substantive suggestions, and the few alternatives that were mentioned were dismissed, repeatedly, without a substantive response on the basis that the suggested actions were "outside the scope of the proposed rule." Fed. Reg. at 56,004. As the Intervenors note, "Yes, that is the point. To say that commenters' recommendations are different from what HUD has decided to do does nothing to explain the bases for HUD's decision." Intervenor's Memorandum of Points and Authorities at 10.

In sum, HUD's determination to end seller-funded programs, without regard for facts and without pausing to consider less restrictive alternatives, is underscored by HUD's disregard for alternatives presented by Congress, whozse intent the Regulation is required to implement. For example, at the hearing on the proposed Regulation, Congressman Green bluntly called on HUD to consider viable alternatives:

> People with common sense can tell you that a seller can have an appraisal that is legitimate and give his money to whomever he chooses. That makes sense. Now, if this is the case, if you can have these legitimate transactions, the question becomes, why would we end a process as opposed to amend the process to make the process legitimate such that we can continue the

> process? Why would we want to eliminate as oppose to
> regulate? That is the question we are trying to get
> to, because truthfully, it appears to me that what you
> have done is overreact. It was not necessary to go to
> the extreme that you have gone to when you could have
> done some things in between and protected people who
> truly want to buy homes and don't have downpayments.

Hearing Transcript at 23. However, the admonitions of Congressman Green and his colleagues were ignored: the final Regulation does not address alternatives, and its operative text is unchanged from when first proposed.

**III.  Response to HUD's Brief in Opposition to Intervenor's Motion for Injunction**

AmeriDream received HUD's Consolidated Opposition to Motions for Temporary Restraining Orders and Preliminary Injunctions ("HUD Brief") only minutes before submission of this Response. For that reason, AmeriDream cannot, and does not purport to, provide a thorough analysis of the arguments HUD presents. AmeriDream will provide such an analysis in the Motions and accompanying documents it will submit in accordance with the schedule stipulated by this Court. However, at this time, AmeriDream does wish to highlight for the Court a few examples of the shortcomings of HUD's positions.

**A.  HUD's Opposition Brief Misstates Its Own Position Regarding Downpayment Assistance**

The HUD Brief misstates its own position regarding downpayment assistance. HUD states that its practice has been to permit downpayment assistance from charities, but not from

"parties with an interest in the transaction". Id. at 4. However, HUD's General Counsel unequivocally stated that the practice that HUD now seeks to ban does not constitute such an arrangement. Supra at 5. In fact, HUD itself has used the very seller-funded DPA it now deems to be a pernicious "loophole", supra at 6, and, as recently as late 2005, HUD emphatically rejected suggestions to curtail seller-funded DPA it now says it opposed all along. At that time, HUD articulated many of the benefits of seller-funded DPA programs that the Regulation seeks to shut down 2005 HUD Letter to GAO.

**B.  HUD's Opposition Brief Relies on Information and Data not Presented as Part of the Rulemaking Process**

The very first authority, other than the statute authorizing DPA, cited by HUD in its Brief is a GAO report not cited at all in the proposed Regulation, the final Regulation, or the accompanying rationale: GAO: Additional Action Needed to Manage Risk of FHA-Insured Loans with Down Payment Assistance (November 2005) ("November 2005 GAO Report").

In fact, HUD had ample reason not to mention the November 2005 GAO Report earlier, for it underscores HUD's failure to consider alternative ways of addressing issues relating to seller-funded DPA, and the methodology the Report uses has since been called into question.

In the November 2005 GAO Report, GAO presented to HUD six

specific recommendations.  November 2005 GAO Report at 44-45.
At the time it was issued, HUD reviewed these recommendations
and responded to GAO.  See 2005 HUD Letter to GAO, also appended
to November 2005 GAO Report at 89-91.  HUD does not identify or
discuss any of GAO's recommendations in the comments
accompanying the Regulation.  Nor does HUD assess their efficacy
as alternative ways to address the issues that the Regulation
purports to resolve.  Instead, as noted in its Congressional
testimony, supra at 13-17, HUD chose to ignore those
recommendations even though it believed it could develop
standards which adequately addressed issues presented by DPA.

   Further, by failing to cite earlier the November 2005 GAO
Report it now chooses to highlight, HUD denied commenters an
opportunity to present compelling information that GAO's
analysis was based on flawed methodology.  In fact, significant
questions have been raised by prominent academic economists who
have identified serious flaws in the methodology used by GAO to
examine the relationship between nonprofit DPA and home purchase
prices.  See George Mason University School of Public Policy,
"An Evaluation of Research on the Performance of Loans with Down
Payment Assistance" (September 2006) ("GMU Study").  The GMU
Study questioned the methodology underlying the GAO study
because it "could be overstating the extent of the default
and/or claim rates of FHA loans with assistance from NDPA

[nonprofit down payment assistance] providers." GMU Study at 2.

Specifically, the GMU Study rebuked the GAO for the "lack of attention given to two key factors that influence whether or not a loan is defaulted or goes to claim: (1) the financial situation of the borrower and (2) the economic conditions of the area in which the home is located." GMU Study at 4. As HUD itself acknowledges, Hearing Testimony at 16, nonprofit DPA providers tend to help families with more limited means, living in more marginal neighborhoods, than FHA generally serves. Thus, any quantitative analysis of their work properly should factor in the types of families and communities they serve which, as the GMU Study notes, HUD failed to do.

Finally, even if accepted uncritically, the findings of the November 2005 GAO Report fail to support HUD's position that the sales price of homes purchased with nonprofit DPA "often increased to ensure that the seller's net proceeds are not diminished", which HUD identifies as the "primary" concern prompting the Regulation. 72 Fed. Reg. at 56,002. Specifically, the November 2005 GAO Report states, at 4, that the price of homes purchased with DPA tended to exceed the purchase price of comparable homes by a modest increment, but this increment was less than the average DPA provided by AmeriDream, i.e. 3.2% of the purchase price. Affidavit of Ann Ashhburn, Ex. A to AmeriDream Memorandum of Points and

Authorities.   Again, by waiting to raise these issues, HUD
denies commenters the opportunity to make such points.

**IV.   <u>CONCLUSION</u>**

Intervenors have successfully demonstrated that they are
likely to prevail on the merits in their challenge to the
Regulation.

BAKER & HOSTETLER LLP


By:


            /s/ Lee T. Ellis, Jr.
            Lee T. Ellis, Jr. (3863)
            Washington Square
            Suite 1100
            1050 Connecticut Avenue, N.W.
            Washington, D.C.  20036-5304
            Tel: 202.861.1500
            Fax: 202.861.1783

            Attorneys for Plaintiff

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 29th day of October, 2007, a
copy of the foregoing Response to Intervenors' Motions for
Preliminary Injunction and HUD's Brief in Opposition Thereto WAS
FILED AND SERVED PURSUANT TO THE COURT'S ELECTRONIC filing
procedures using the Court's CM/ECF System.

By: _/s/ Lee T. Ellis, Jr._
   Lee T. Ellis, Jr. (3863)
   Washington Square
   Suite 1100
   1050 Connecticut Avenue, N.W.
   Washington, D.C.  20036
   Tel:  202-861-1521
   Fax:  202-861-1783
   lellis@bakerlaw.com

Attorneys for Plaintiff