**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERIDREAM, INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 07-1752 (PLF) |
| ) | |
| v. ) | |
| ) | |
| ) | |
| HON. ALPHONSO JACKSON ) | |
| SECRETARY OF THE UNITED ) | |
| STATES DEPARTMENT OF ) | |
| HOUSING AND URBAN ) | |
| DEVELOPMENT, ) | |
| ) | |
| Defendant. ) | |

**FREEDOM HOME BAPTIST CHURCH, INC. AND DOVE FOUNDATION, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

Freedom Home Baptist Church, Inc., dba Genesis Housing Development Corp.,
and Dove Foundation, Inc., dba American Family Funds Down Payment Gift Program,
move for summary judgment on their declaratory judgment claim and ask this Court to
permanently enjoin the Secretary of the United States Department of Housing and
Urban Development from enforcing the Regulation published at 72 Fed. Reg. 56,002-07
(October 1, 2007) (to be codified at 24 C.F.R. pt. 203). The pleadings and undisputed
evidence show that there is no genuine issue of material fact and that Freedom Home
Baptist Church and Dove Foundation are entitled to judgment as a matter of law.

In support of their motion for summary judgment, Freedom Home Baptist Church
and Dove Foundation adopt and incorporate the arguments and authorities provided by
Plaintiff AmeriDream in its Memorandum of Points and Authorities in Support of its
Motion for Summary Judgment.

**Rule 7(h) Statement Of Material Facts As To Which There Is No Genuine Issue**

1.      Freedom Home Baptist Church and the Dove Foundation are organizations with a faith-based heritage which provide downpayment assistance to low and moderate income families who seek to purchase their own homes.  Pate Affidavit (Dove Foundation), **Exhibit A** ¶ 4; Smith Affidavit (Freedom Home Baptist Church), **Exhibit B** ¶ 4.

2.      Because the vast majority of the funding for Movants' downpayment assistance programs comes from sellers and others in the real estate industry, the Regulation temporarily enjoined by this Court will, if it comes into effect, essentially prevent Freedom Home Baptist Church and Dove Foundation from providing downpayment assistance to new homebuyers, interfering with their core faith-based practice of providing housing to the less fortunate.  Pate Affidavit, Exhibit A ¶ 8; Smith Affidavit, Exhibit B  ¶ 8.

3.      For approximately ten years, HUD has expressly permitted and encouraged downpayment assistance programs, including programs funded in part by sellers, as a means of fulfilling the purpose expressed by Congress in its creation of the Federal Housing Administration ("FHA"):  assisting low and moderate income families in transitioning from renting to purchasing a home.  *See* November 2005 GAO Report, **Exhibit C**, R. at 530 & 533 (noting a 1998 memorandum from HUD's Office of General Counsel finding that downpayment assistance using seller funds was not in conflict with FHA's guidelines).

4.      On May 11, 2007, HUD changed its decade-long policy of supporting downpayment assistance programs funded by sellers and published proposed

Regulation 72 Fed. Reg. 27,048-051 ("the Regulation"), which completely prohibits down payment assistance when the funds used are, even in part, provided by sellers. 72 Fed. Reg. 27,048-051 (proposed May 11, 2007), **Exhibit D**, R. at 10–14.

5.     HUD's stated rationale for the Regulation was that downpayment assistance using in part a seller's funds leads to an increased price for the house sold, and this alleged increase in price is "often to the detriment of the borrower and the FHA." *Id.* at 11.

6.     HUD cited a Revenue Ruling by the Internal Revenue Service and a GAO report released in February 2005 as bases for the Regulation. *Id.* at 11–12.

7.     But HUD did not produce for comment a more relevant GAO report issued in November 2005, nor a portfolio analysis that HUD mentioned in the final Regulation. 72 Fed. Reg. 56,002-07 (October 1, 2007) (to be codified at 24 C.F.R. pt. 203), **Exhibit E**, R. at 5.

8.     HUD specified IRS Revenue Ruling 2006-27 as providing a basis for the Regulation, but the Revenue Ruling did not make the assertions described in the final Regulation.  HUD stated the IRS Revenue Ruling found that downpayment assistance funded in part by sellers' contributions causes an increase in the cost of the home and misleads honest homebuyers.   Instead the Revenue Ruling was concerned with whether certain organizations which provided seller-funded downpayment assistance could operate as 501(c)(3) charities.   Certainly, that inquiry says nothing about the valuation of homes.   Indeed, the Revenue Ruling found that a seller contribution to downpayment assistance  represents "a rebate or purchase price reduction."  Rev. Rul. 2006-07, 2006-21 I.R.B. 915, **Exhibit F**, R. at 21–5.

9.      HUD also cited a February 2005 GAO report, entitled "Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products," as a basis for the Regulation.  But that report did not recommend prohibiting seller-funded downpayment assistance.  Instead, the report only acknowledged that officials at Freddie Mac and Fannie Mae had commented, without citing any data, that seller-related contributions could contribute to overvaluation of the property.  The report gave no further consideration to the subject.  February 2005 GAO Report, **Exhibit G**, R. at 470.

10.     Notably, though in the administrative record, HUD failed to provide for comment a more recent November 2005 GAO Report, entitled "Additional Action Needed to Manage Risks of FHA-Insured Loans with Down Payment Assistance," that recommended that HUD restrict the use of seller contributions.  The Report, because of its relevance, appears to have been a critical factor relied upon by HUD for the Regulation.  November 2005 GAO Report, Exhibit C, R. at 568.

11.     But in its comments on the November 2005 GAO Report, HUD refused to limit seller-funded downpayment assistance, explaining, in part, that the buyers who are served by those programs are "representative of the population that FHA was established to serve . . . . [and] additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are costlier and more risky than FHA."  *Id.* at 612.

12.     Further, HUD mentioned in response to a negative comment on the Regulation that it had relied on a "portfolio analysis" of additional data.  But HUD also failed to produce that analysis for comment.  72 Fed. Reg. 56,002-07 (October 1, 2007)

(to be codified at 24 C.F.R. pt. 203), Exhibit E, R. at 5.

13.    HUD received more than 15,000 comments on the proposed Regulation. "The overwhelming majority" of the comments were opposed to the proposed policy. *Id.* at 3.

14.    HUD failed to consider comments proposing alternatives to the Regulation, including alternatives suggested by AmeriDream; and failed to offer reasonable explanations for rejecting those alternatives.  AmeriDream's Memo. P. & A. Ex. M. at 14–16.

15.    Secretary Alphonso Jackson commented to Neil Roland, news reporter for Bloomberg News, that he was "very much against" seller-funded downpayment assistance, stating that "I think it's wrong. I don't want to be a partner with a program where so many people can't afford to keep up their payments."  Jackson also commented to Neil Roland that HUD intended to finalize the Regulation even if the agency received critical comments.  Secretary Jackson's statements to Bloomberg News were reported by Bloomberg News on June 5, 2007, in an article entitled *U.S. to Ban Down Payment Program Over Objections, Jackson Says.  See* **Exhibit H**, Neil Roland Declaration, at Exhibit A to Declaration.

16.    Since the publication of Bloomberg News' June 5, 2007, article entitled *U.S. to Ban Down Payment Program Over Objections, Jackson Says,* neither Bloomberg News nor the news reporter, Neil Roland, who wrote the article has received any comment from or on behalf of HUD Secretary Alphonso Jackson regarding the accuracy of the article or the quotes or the paraphrases of comments attributed to the Secretary.  Exhibit H, Neil Roland Declaration.

17.    Despite the vast number of negative comments on the proposed Regulation, the failure to make available for comment all of the bases for the Regulation, and its own prior statements about the ability of seller-funded downpayment assistance to help its target population, HUD finalized the Regulation on October 1, 2007.  72 Fed. Reg. 56,002-07 (October 1, 2007) (to be codified at 24 C.F.R. pt. 203), Exhibit E, R. at 1.

18.    HUD has thus prohibited a major means of downpayment assistance for low to moderate income potential homebuyers.  Approximately 30 percent of FHA-insured loans received downpayment assistance from seller-funded nonprofits in 2004. November 2005 GAO Report, Exhibit C, R. at 526.

19.    When the Regulation goes into effect, Freedom Home Baptist Church and the Dove Foundation will be forced to cease these charitable activities and will no longer be able to provide downpayment assistance to potential homebuyers.  Pate Affidavit, Exhibit A ¶ 8, Smith Affidavit, Exhibit B ¶ 8.

20.    The Regulation makes an exception for Nehemiah Progressive Housing Development Corporation, an organization with a faith-based heritage which provides seller-funded downpayment assistance.  For Nehemiah, the Regulation will not apply until March 31, 2008, six months after the Regulation's publication.  Pate Affidavit, Exhibit A ¶ 5; Smith Affidavit, Exhibit B ¶ 5.

21.    In 1998, HUD entered into an agreement with Nehemiah.  Pate Affidavit, Exhibit A ¶ 5 (Exhibit B-Nehemiah agreement)); Smith Affidavit, Exhibit B ¶ 5 (Exhibit B-Nehemiah agreement).

22.    The agreement states that should HUD change its policies regarding downpayment assistance programs or the source of downpayment funds, those changes would "become applicable to Nehemiah and all other similarly situated down payment assistance programs six months after the final promulgation and issuance of any such changes."  Pate Affidavit, Exhibit A ¶ 5 (Exhibit B-Nehemiah agreement); Smith Affidavit, Exhibit B ¶ 5 (Exhibit B-Nehemiah agreement).

23.    Dove Foundation, Freedom Home Baptist Church, and Nehemiah are similarly situated entities.  Pate Affidavit, Exhibit A ¶ 6; Smith Affidavit, Exhibit B ¶ 6.

24.    Dove Foundation and Freedom Home Baptist Church relied on the agreement between Nehemiah and HUD and believed any change in any regulation concerning downpayment assistance would not apply to them until six months after such regulation's promulgation.  Pate Affidavit, Exhibit A ¶ 6; Smith Affidavit, Exhibit B ¶ 6.

## Grounds for Summary Judgment

Freedom Home Baptist Church and Dove Foundation move for summary judgment on the following grounds:

(1)    The Regulation is arbitrary and capricious because HUD did not provide a reasoned analysis for departing from its decade-long policy regarding seller-funded downpayment assistance programs;

(2)    The Regulation is arbitrary and capricious because HUD failed to consider reasonable alternatives for the Regulation and to offer a reasoned explanation for rejecting them;

(3)    The Regulation is arbitrary and capricious because HUD relied substantially on data that it never produced for comment or mentioned in the notice of proposed rulemaking;

(4)    The Regulation is arbitrary and capricious because HUD failed to provide a reasoned justification for providing different effective dates for similarly-situated entities;

(5)    The Regulation violates due process because Secretary Jackson had an unalterably closed mind, which prejudiced the outcome of the rulemaking process; and

(6)    The Regulation violates the Equal Protection component of the Due Process Clause of the Fifth Amendment because it fails to meet the rational basis test.

Freedom Home Baptist Church and Dove Foundation would also show that they would be essentially prevented from providing down payment assistance and would therefore suffer irreparable harm should the Regulation be enforced.

In support of these grounds, Freedom Home Baptist Church and Dove Foundation adopt and incorporate the arguments and authorities set forth in Plaintiff AmeriDream's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment, filed November 16, 2007.

## **Conclusion and Prayer**

For the foregoing reasons, and for those set forth in Plaintiff AmeriDream's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment adopted herein, and based on the pleadings on file and the evidence submitted, Freedom Home Baptist Church and Dove Foundation respectfully request this Court to grant their motion for summary judgment.  Further, Movants request that the Court issue a declaratory judgment declaring the Regulation arbitrary, capricious, and contrary to law, and to permanently enjoin Secretary Jackson from enforcing the Regulation.

Respectfully submitted this 16th day of November, 2007.


/s/  Craig T. Enoch
Craig T. Enoch (TX Bar No. 00000026)
Linda J. Burgess (TX Bar No. 03381300)
Alex S. Valdes (TX  Bar No. 24037626)
401 Congress Avenue, Suite 2100
Austin, Texas 78701
512.370.2800 (telephone)
512.370.2850 (facsimile)
cenoch@winstead.com

-and-

/s/  Tessa L. Frederick
Tessa L. Frederick
   D.C. Federal Bar No. 46551
Miles & Stockbridge PC
10 Light Street
Baltimore, MD 21202
410.385.3765 (telephone)
410.385.3700 (facsimile)
tfrederick@milesstockbridge.com


**ATTORNEYS FOR FREEDOM HOME BAPTIST CHURCH, INC.
and DOVE FOUNDATION, INC.**

## CERTIFICATE OF SERVICE

      I certify that on November 16, 2007, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Lee T. Ellis, Jr.
Baker & Hostetler LLP
Washington Square
Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036


Robert J. Katerberg, Esquire
U.S. Department Of Justice, Civil Division, Federal Programs
20 Massachusetts Avenue, NW
Washington, DC 20530

Scott Risner, Esquire
Christopher R. Hall, Esquire
Tamara Lynn Ulrich, Esquire
Assistant US Attorneys for the District of Columbia
Department of Justice
20 Massachusetts Avenue, NW
Washington, D.C.  20024


Frank S. Swain, Esquire
Baker & Daniels LLP
805 15th Street NW, Suite 700
Washington, DC 20005

David C. Merkin, Esquire
McMillan Metro, P.C.
1901 Research Blvd., Suite 500
Rockville, MD  20850



/s/  Tessa L. Frederick
Tessa L. Frederick

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERIDREAM, INCORPORATED; | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1752 (PLF) |
| | ) | |
| HON. ALPHONSO JACKSON | ) | |
| SECRETARY OF THE UNITED | ) | |
| STATES DEPARTMENT OF | ) | |
| HOUSING AND URBAN | ) | |
| DEVELOPMENT, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF JOEL S. PATE

BEFORE ME, the undersigned authority, personally appeared Joel S. Pate, who, being

by me duly sworn, deposed and stated as follows:

1.  "My name is Joel S. Pate. I am over the age of twenty-one and fully competent to make this Affidavit. I have never been convicted of a felony or crime involving moral turpitude. The facts stated in my affidavit are true and correct and within my personal knowledge.

2.  The Dove Foundation, Inc. ("The Dove") is a faith based ministry non-profit charity, with tithe-paying members that actively support providing housing for families displaced by drug, alcohol, and physical abuse. The predecessor to The Dove, Shiloh Ministries, Incorporation, was founded in the early 1980s. Attached to my Affidavit as Exhibit A is a true and correct copy of State of Alabama, Domestic Non-Profit Corporation, Articles of Amendment to Articles of Incorporation Guidelines, showing Shiloh Ministries, Incorporated changing its name to the Dove Foundation, Inc.

3.  The Dove provides community services, including participating in down payment assistance (DPA) programs privately funded in large measure by real estate sellers and developers. I am president of American Family Funds, Inc. The Dove's down payment assistant programs are and have always been administered by American Family Funds, Inc. The Dove has participated in DPA programs since 2001.

4.  Since 2001, The Dove has assisted over 20,000 low-to-moderate income individuals and families achieve the dream of homeownership through down payment assistance. Substantial funding for The Dove's DPA programs comes from contributions from sellers and others in the real estate industry.

5.  In 1998, the U.S. Department of Housing and Urban Development ("HUD") reached



EXHIBIT
"A"

an agreement with Nehemiah Home Ownership 2000 ("Nehemiah") —another non-profit organization with faith based heritage providing seller funded down payment assistance— that, in the event it changed its policies regarding DPA programs or the source of borrower down payment funds, "the changes will become applicable to Nehemiah <u>and all other similarly situated down payment assistance programs</u> six months after the final promulgation and issuance of any such changes." (emphasis added). A copy of the HUD agreement is attached to my Affidavit as Exhibit B.

6. Because The Dove is a faith based ministry non-profit and it existed before the 1998 Nehemiah agreement, The Dove has always considered itself similarly situated to Nehemiah. In fact, The Dove relied on the agreement between Nehemiah and HUD, attached as Exhibit B, when beginning its down payment assistance programs in 2001.

7. Counsel for The Dove communicated with HUD's counsel to inquire as to whether HUD opposed intervention in this case by The Dove and as to whether HUD would stay enforcement of the regulation for six months. HUD's counsel stated that HUD would not consider the request until The Dove intervened in the case.

8. Because the vast majority of the funding for The Dove's DPA programs comes from sellers and other in the real estate industry, the regulation will decimate The Dove's housing assistance programs and lead to the termination of personnel involved in the assistance programs. The regulation will also significantly prevent The Dove from providing down payment assistance to new homebuyers, interfering with a core practice of this faith based organization in providing housing to the less fortunate.

9. The facts stated in the Application for Preliminary Injunction with regard to The Dove Foundation, Inc., dba American Family Funds Down Payment Gift Program are true and correct."

FURTHER, Affiant sayeth not.

_____
(Signature)

_____
(Print name)     Joel S. Pate

11/15/2007 15:29 FAX                                                    ☑ 003/003

STATE OF ALABAMA        §
                        §
COUNTY OF MOBILE        §

    SUBSCRIBED AND SWORN TO BEFORE ME on November 15, 2007.

                                                    Margaret Colwell Carter
                                         Notary Public, State of Alabama

(SEAL)



                                       NOTARY PUBLIC STATE OF ALABAMA AT LARGE
                                        MY COMMISSION EXPIRES:  Feb 21, 2010
                                        BONDED THRU NOTARY PUBLIC UNDERWRITERS

2001073150  Book-5045  Page-1627
Total Number of Pages: 3

## STATE OF ALABAMA
### DOMESTIC NON-PROFIT CORPORATION
### ARTICLES OF AMENDMENT TO ARTICLES OF INCORPORATION GUIDELINES

Instructions (Please Type)

File the Original and two copies in the County where the original Articles of Incorporation are filed. If the Amendment changes the name, the Secretary of State's fee is $10.00. Otherwise, there is no fee for filing a non-profit amendment. The Probate Judge's minimum fee for fling an amendment is $10.00.

Pursuant to the provisions of the Alabama Nonprofit Corporation Act, the undersigned hereby adopts the following Articles of Amendment.

Article I    The name of the corporation:    **SHILOH MINISTRIES, INCORPORATED**

Article II    The following amendment was adopted:

Article I - The name of the corporation shall be DOVE FOUNDATION, INC.

Article III - The name and address of the initial registered agent and registered office are: Chris Patrick, 1567 Eslava Street, Mobile, AL 36604

Article V - The purposes for which the corporation is organized are: to operate exclusively for religious, charitable, education and distinct ecclesiastical purposes within the meaning of Section 501 (c)(3) of the Internal Revenue Code of 1954, as amended, or any superseding statute thereto.

Article VII - (A)    No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth hereof.

(B)    No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of any candidate for public office.

(C)    Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or (b) by a corporation, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code, or corresponding section of any future federal tax code.

(D)    Upon dissolution of the corporation, assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by the court of jurisdiction of the county in which the principle office of the corporation is then located, exclusively for such purposes or to such organization or organizations, as said court shall determine which are organized and operated exclusively for such purposes.

Article IX - (f) - The Board of Trustees of the corporation, shall have power and authroity which is hereby given, to negotiate or designate agents to negotiate all of the business transactions, all receipts and all disbursements, for any such additional departments, associations, institutions, schools, mission stations, programs, and/or any and all such other vehicles established or instituted by this Corporation.

Article X - The manner in which the Directors or Trustees of the Corporation shall be elected or appointed shall be governed by the provisions of the bylaws of the Corporation.

EXHIBIT
A

The Corporation shall be a sovereign body, and the regulation of the internal affairs of the Corporation shall be governed by the provisions of the Bylaws of the Corporation.

The place where the business of the corporation, shall be transacted is Mobile, Alabama, where said principal office shall be.

**Article III** The date of the meeting of the members where the amendment was adopted, a quorum was present, and the amendment received at least two-thirds of the votes entitled to be cast: __N/A__

**Article IV** If there was no meeting, attach a statement that such amendment was adopted by written consent and signed by all members entitled to vote.

**Article V** There are members, but they are not entitled to vote. The Board of Directors had a meeting on the _5th_ day of _October_, 2001, and the above-mentioned amendments were adopted unanimously at that time.

Date: __10-05-01__

_Frank C. Palmm_
Signature of President or Vice President

_Reah H Patrick_
Signature of Secretary or Assistant Secretary

State of Alabama
County of Mobile

Before me the undersigned authority in and for said County and State, personally appeared _Frank C. Patrick_ who being by me first duly sworn, doth depose and say that he/she is the _President_ of _Shiloh Ministries Inc_, an Alabama Corporation, and that the foregoing statements contained in this amendment are true, full and correct.

Subscribed and sworn to before me on this the _5_ Day of _Oct._, _2001_, in witness whereof I hereto subscribe my name and affix the seal of my office.

Signature of Notary
NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Apr 25, 2004
BONDED THRU NOTARY PUBLIC UNDERWRITERS

My commission expires

**CERTIFIED TRUE COPY**
Probate Court of Mobile Co., AL
Don Davis, Judge

Signature _____
Joe McEachern Jr., Chief Clerk

Date: __10-5-01__

State of Alabama - Mobile County
I certify this instrument was filed on:

Fri, Oct-05-2001 @ 1:14:24PM

| | |
|---|---|
| S. R. FEE | 2.00 |
| RECORDING FEE | 11.00 |
| TOTAL AMOUNT | $13.00 |

2001073150
Don Davis, Judge of Probate



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410

OFFICE OF THE ASSISTANT SECRETARY FOR
HOUSING-FEDERAL HOUSING COMMISSIONER

APR 3 1998

Don F. Harris, Esq.
Nehemiah Home Ownership 2000
770 L St. Suite 750
Sacramento, CA 95814

RE: Nehemiah Home Ownership 2000

Dear Mr. Harris:

The United States Department of Housing and Urban Development
("HUD") has received and reviewed the IRS ruling that the non-
profit organization which administers the Nehemiah down payment
assistance program qualifies for Section 501(c)(3) status. Based
upon the program specific information accompanying your
submission to the IRS, we find that your program complies with
HUD's regulations and guidance pertaining to the source of funds
for the borrowers' down payments. Accordingly, HUD will insure
eligible mortgages in which home buyers use Nehemiah's program (as
set out in the submission to the IRS for Section 501 (c)(3)
status) for borrower down payment assistance.

Although HUD has no immediate plans to change its policies
regarding down payment assistance programs or regarding the
source of borrower down payment funds, HUD reserves the right to
do so in the future in accordance with applicable procedures. In
the event that there are any such changes regarding the source of
borrower down payment funds, the changes will become applicable
to Nehemiah (and) all other similarly situated down payment
assistance programs six months after the final promulgation and
issuance of any such changes.

Sincerely,

Emelda Johnson
Deputy Assistant Secretary
Single Family Housing Programs

EXHIBIT
B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERIDREAM, INCORPORATED;    )
                             )
            Plaintiff,       )
                             )
        v.                   )    Civil Action No. 07-1752 (PLF)
                             )
HON. ALPHONSO JACKSON        )
SECRETARY OF THE UNITED      )
STATES DEPARTMENT OF         )
HOUSING AND URBAN            )
DEVELOPMENT,                 )
                             )
            Defendant.       )

### AFFIDAVIT OF KEVIN SMITH

BEFORE ME, the undersigned authority, personally appeared Kevin Smith, who, being by me duly sworn, deposed and stated as follows:

1.    "My name is Kevin Smith.  I am over the age of twenty-one and fully competent to make this Affidavit.  I have never been convicted of a felony or crime involving moral turpitude.  The facts stated in my affidavit are true and correct and within my personal knowledge.

2.    Freedom Home Baptist Church, Inc. ("Baptist Church") is a non-profit religious organization.  The Baptist Church's congregation is predominately African-American and has served the east Austin, Texas, community since 1982.  Attached to my affidavit as Exhibit A is a true and correct copy of the Baptist Church's Articles of Incorporation.

3.    The Baptist Church provides community services, including participating in down payment assistance (DPA) programs privately funded in large measure by real estate sellers and developers.  I am the program director of Freedom Home Baptist Church, Inc.'s down payment assistance programs.  In that regard, the Baptist Church's down payment assistant programs does business as Genesis Housing Development Corp.  The Baptist Church has participated in DPA programs since early 2000.

4.    Since 2000, the Baptist Church has assisted over 30,000 low-to-moderate income individuals and families achieve the dream of homeownership through down payment assistance.  Substantial funding for the Baptist Church's DPA programs comes from contributions from sellers and others in the real estate industry.

5.    In 1998, the U.S. Department of Housing and Urban Development ("HUD") reached an agreement with Nehemiah Home Ownership 2000 ("Nehemiah") —another non-



EXHIBIT
"B"

profit organization with faith based heritage providing seller funded down payment assistance— that, in the event it changed its policies regarding DPA programs or the source of borrower down payment funds, "the changes will become applicable to Nehemiah and all other similarly situated down payment assistance programs six months after the final promulgation and issuance of any such changes." (emphasis added). A copy of the HUD agreement is attached to my Affidavit as Exhibit B.

6.      Because the Baptist Church is a non-profit religious organization and it existed before the 1998 Nehemiah agreement, Baptist Church has always considered itself similarly situated to Nehemiah. And because the Baptist Church is similarly situated to Nehemiah, it has relied on the agreement between Nehemiah and HUD, attached as Exhibit B, to provide it a six-month grace period before any changes to HUD policies regarding DPA programs or the source of borrower down payment funds became applicable to it.

7.      Counsel for the Baptist Church communicated with HUD's counsel to inquire as to whether HUD opposed intervention in this case by the Baptist Church and as to whether HUD would stay enforcement of the regulation for six months. HUD's counsel stated that HUD would not consider the request until the Baptist Church intervened in the case.

8.      Because the vast majority of the funding for the Baptist Church's DPA programs comes from sellers and other in the real estate industry, the regulation will decimate the Baptist Church's housing assistance programs and lead to the termination of personnel involved in the assistance programs. The regulation will also significantly prevent the Baptist Church from providing down payment assistance to new homebuyers, interfering with a core practice of this faith based organization in providing housing to the less fortunate.

9.      The facts stated in the Application for Preliminary Injunction with regard to Freedom Home Baptist Church, Inc., dba Genesis Housing Development Corp. are true and correct."

FURTHER, Affiant sayeth not.

_____
(Signature)

_____
S. Kevin Smith
(Print name)

STATE OF TEXAS            §
                         §
COUNTY OF TRAVIS          §

      SUBSCRIBED AND SWORN TO BEFORE ME on November 15, 2007.

_____
Notary Public, State of Texas

ARNETRIS A. WILLIAMS
Notary Public, State of Texas
My Commission Expires
January 20, 2008

(SEAL)

ARTICLES OF INCORPORATION

OF

FREEDOM HOME BAPTIST CHURCH, INC.

We, the undersigned natural persons of the age of eighteen (18) years or more, at least two (2) of whom are citizens of the state of Texas, acting as incorporators of a corporation under the Texas Non-Profit Corporation Act, do hereby adopt the following Articles of Incorporation for such corporation:

### ARTICLE ONE
### NAME

The name of the corporation is Freedom Home Baptist Church, Inc.

### ARTICLE TWO
### NON-PROFIT CORPORATION

The Corporation is a non-profit corporation.

### ARTICLE THREE
### DURATION

The period of its duration is perpetual.

### ARTICLE FOUR
### PURPOSES

The purposes for which this corporation if formed are:

(1) to maintain public worship;

(2) to exalt Christian standards of living;

(3) to engage in the preaching of the Gospel;

(4) to administer the ordinances of the New Testament;

(5) to provide a place for Christian education and activities;

(6) to receive and maintain a fund or funds of real or personal property, or both, and, subject to any restrictions and limitations hereinafter set forth, to use and apply the whole or any part or the income and principal thereof exclusively for the furtherance of the purposes stated in these articles or the church's constitution;

(7) to create a legal entity which is recognizable at law for purposes of holding title to real estate, giving and executing mortgages and the like and performing all secular functions deemed to be necessary and reasonable in conducting

-1-


EXHIBIT
A

the civil affairs of the church;

(8) to restrict the legal liability to the
corporation for damages arising out of and
in the course of operating and using church
property;

(9) to protect the individual church member from
the potential liability which may exist for
members of an incorporated association; and,

(10) to facilitate the obtaining of multirisk
insurance policies to protect the church and
its activities.

The corporation is organized pursuant to the Texas
Non-Profit Corporation Act and does not contemplate
pecuniary gain or profit to the members thereof and is
organized for non-profit purposes.

### ARTICLE FIVE
#### INITIAL REGISTERED OFFICE AND AGENT

The street address of the initial registered office
of the corporation is 1144 3/4 Gunter Street, Austin, Texas,
78721, and the name of its initial registered agent at
such address is Mr. Oscar B. Howard, Sr.

### ARTICLE SIX
#### BOARD OF TRUSTEES

The number of trustees constituting the initial
board of trustees of the corporation is three (3), and the
names and addresses of the persons who are to serve as
the initial trustees are:

Mr. Oscar B. Howard, Sr.           3109 E. 14½ Street
                                   Austin, Texas  78702

Mr. Herman F. Christophe           5203 Gladstone
                                   Austin, Texas  78723

Mr. Alfred Freeman                 13906 Avenue I
                                   Round Rock, Texas  78664

ARTICLE SEVEN

INCORPORATORS

The Name and street address of each incorporator is:

Mr. Oscar B. Howard, Sr.        3109 E. 14½ Street
                                Austin, Texas  78702

Mr. Herman F. Christophe        5203 Gladstone
                                Austin, Texas  78723

Mr. Alfred Freeman              13906 Avenue I
                                Round Rock, Texas  78664

IN WITNESS WHEREOF, we have hereunto set our hands,
this ___10th___ day of _September_ , 1982.

_____
Mr. Oscar B. Howard, Sr.

_____
Mr. Herman F. Christophe

_____
Mr. Alfred Freeman

-3-

STATE OF TEXAS
COUNTY OF TRAVIS

I, _Wilma Raney_ a notary public, do
hereby certify that on this _10th_ day of _September_,
1982, personally appeared before Mr. Oscar B. Howard, Sr., Mr.
Herman F. Christophe, and Mr. Alfred Freeman, who, each being
by me first duly sworn, severally declared that they are the
persons who signed the foregoing document as incorporators,
and that the statements therein contained are true.

IN WITNESS WHEREOF, I have hereunto set my hand and
seal the day and year above written.

_Wilma Raney_
Notary Public in and for
Travis County, Texas

Wilma Raney

Comm. Expires: 2-28-85



U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
WASHINGTON, D.C. 20410

OFFICE OF THE ASSISTANT SECRETARY FOR
HOUSING-FEDERAL HOUSING COMMISSIONER

APR 3  1998

Don F. Harris, Esq.
Nehemiah Home Ownership 2000
770 L St. Suite 750
Sacramento, CA 95814

RE: Nehemiah Home Ownership 2000

Dear Mr. Harris:

   The United States Department of Housing and Urban Development
("HUD") has received and reviewed the IRS ruling that the non-
profit organization which administers the Nehemiah down payment
assistance program qualifies for Section 501(c)(3) status. Based
upon the program specific information accompanying your
submission to the IRS, we find that your program complies with
HUD's regulations and guidance pertaining to the source of funds
for the borrowers' down payments.  Accordingly, HUD will insure
eligible mortgages in which home buyers use Nehemiah's program(as
set out in the submission to the IRS for Section 501 (c)(3)
status) for borrower down payment assistance.

   Although HUD has no immediate plans to change its policies
regarding down payment assistance programs or regarding the
source of borrower down payment funds, HUD reserves the right to
do so in the future in accordance with applicable procedures. In
the event that there are any such changes regarding the source of
borrower down payment funds, the changes will become applicable
to Nehemiah (and) all other similarly situated down payment
assistance programs six months after the final promulgation and
issuance of any such changes.

                         Sincerely,

                         Emelda Johnson
                         Deputy Assistant Secretary
                           Single Family Housing Programs



EXHIBIT
B

**United States Government Accountability Office**

# GAO

Report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

November 2005

# MORTGAGE FINANCING

## Additional Action Needed to Manage Risks of FHA-Insured Loans with Down Payment Assistance



G A O

Accountability ★ Integrity ★ Reliability

00518

GAO-06-24



EXHIBIT

tabbies®

compared these with certain internal control standards.[6] We also interviewed mortgage industry participants about the controls they used to manage the risks associated with affordable loan products that permit down payment assistance and, as appropriate, compared their practices with FHA's. We did not verify that these institutions did in fact use these controls. We selected these entities because they offered products intended to expand affordable homeownership opportunities in part by permitting down payment assistance. Appendix I provides a full description of our scope and methodology. We performed our audit work in Boston, Massachusetts, and Washington, D.C., from January 2005 to September 2005 in accordance with generally accepted government auditing standards.

## Results in Brief

The proportion of FHA-insured loans that are financed in part by down payment assistance from various sources has increased substantially in the last few years, while the overall number of loans that FHA insures has fallen dramatically. Assistance from nonprofit organizations funded by sellers has accounted for a growing percentage of that assistance.[7] From 2000 to 2004, the total proportion of FHA-insured loans with down payment assistance grew from 35 to nearly 50 percent. Approximately 6 percent of FHA-insured loans in 2000 received down payment assistance from seller-funded nonprofits, but by 2004 nonprofit assistance had grown to about 30 percent. Our analysis showed that those states where the use of nonprofit down payment assistance, primarily from seller-funded nonprofits, was higher than average tended to have lower-than-average house price appreciation rates.

---

[6]GAO, *Internal Control Management and Evaluation Tool*, GAO-01-1008G (Washington, D.C.: August 2001).

[7]Seller-funded down payment assistance programs are supported, in part, by financial contributions and service fees collected by nonprofit organizations from participating property sellers.

**00526**

limitations may understate the impact that down payment assistance has on estimates of loan performance. We, therefore, modified our recommendation to address one of these weaknesses and to emphasize the continuing need to consider the presence and source of down payment assistance in future loan performance models.

## Background

Mortgage insurance, a commonly used credit enhancement, protects lenders against losses in the event of default. Lenders usually require mortgage insurance when a homebuyer has a down payment of less than 20 percent of the value of the home. FHA, the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture's Rural Housing Service (RHS), and private mortgage insurers provide this insurance. In 2003, lenders originated $3.8 trillion in single-family mortgage loans, of which more than 60 percent were for refinancing. Of all the insured loans originated in 2003, including refinancings, private companies insured about 64 percent, FHA about 26 percent, VA about 10 percent, and RHS a very small number.

One of FHA's primary goals is to expand homeownership opportunities for first-time homebuyers and other borrowers who would not otherwise qualify for conventional mortgages on affordable terms. As a result, FHA plays a particularly large role in certain market segments, including first-time and low-income homebuyers. During 2001 to 2003, FHA insured about 3.7 million mortgages with a total value of about $425 billion. FHA insures most of its single-family mortgages under its Mutual Mortgage Insurance Fund (Fund), which is primarily funded with borrowers' insurance premiums and proceeds from the sale of foreclosed properties. FHA's mortgage insurance program is currently a negative subsidy program—that is, the Fund is self-financed and FHA estimates that it operates at a profit; however, the Fund is experiencing higher-than-estimated claims. The economic value of the Fund that supports FHA's guarantees depends on the relative size of cash outflows and inflows over time. Cash flows out of the Fund from payments associated with claims on defaulted loans and refunds of up-front premiums on prepaid mortgages. To cover these outflows, FHA receives cash inflows from borrowers' up-front and annual insurance premiums and net proceeds from recoveries on defaulted loans. If the Fund were to be exhausted, the U.S. Treasury would have to cover lenders' claims directly. We reported that FHA submitted a $7 billion reestimate for the Fund's credit subsidy and interest as of the end of 2003, primarily due

**00530**

Among nonprofits that provide down payment assistance, some receive contributions from property sellers. When a homebuyer receives down payment assistance from one of these organizations, the organization requires the property seller to make a financial payment to their organization. These nonprofits are commonly called "seller-funded" down payment assistance providers. Examples of seller-funded nonprofits that provide the most down payment assistance to homebuyers with FHA-insured mortgages, include: Nehemiah Corporation of America; AmeriDream, Incorporated; and The Buyers Fund, Incorporated. A 1998 memorandum from HUD's Office of the General Counsel found that funds from a seller-funded nonprofit were not in conflict with FHA's guidelines that prohibit down payment assistance from sellers.[14] In contrast, some nonprofits do not require property sellers to make a financial payment to their organization in return for providing down payment assistance to a homebuyer. Examples of these nonprofits that provide the most down payment assistance to homebuyers with FHA-insured mortgages, include the Clay Foundation, Incorporated; and Family Housing Resources, Incorporated.  For a nonprofit to provide down payment assistance to a homebuyer, regardless of its funding source, FHA requires that the organization have a Taxpayer Identification Number.[15] FHA does not approve down payment assistance programs administered by nonprofits; instead, lenders are responsible for assuring that the gift to the homebuyer from a nonprofit meets FHA requirements.

FHA relies on lenders to underwrite the loans and determine their eligibility for FHA mortgage insurance. Lenders wanting to participate in FHA's mortgage programs receive approval from HUD. As of August 2004, over 10,000 lending institutions had been approved. These lenders review loan applications and assess applicants' creditworthiness and ability to make payments. FHA relies on these lenders to ensure compliance with FHA standards. Lenders often initiate the use of down payment assistance from seller-funded down payment assistance providers. Additionally, FHA and its lenders rely upon appraisers to provide an independent and accurate valuation of properties. A primary role of appraisals in the loan underwriting process is to provide evidence that the collateral value of a

---

[14]HUD Office of the General Counsel, April 7, 1998; Memorandum; Subject: Nehemiah Homeownership 2000 Program—Downpayment Assistance.

[15]A Taxpayer Identification Number is an identification number used by the IRS in the administration of tax laws.

00533

GAO-06-24 Mortgage Financing

- Because down payment assistance provided by seller-funded entities is, in effect, a seller inducement, revise FHA standards to treat assistance from seller-funded nonprofits as a gift from the seller and, therefore, subject to the prohibition against using seller contributions to meet the 3 percent borrower contribution requirement.

## Agency Comments and Our Evaluation

We provided a draft of this report to HUD for its review and comment. We received written comments from HUD's Assistant Secretary for Housing (Federal Housing Commissioner), which are reprinted in appendix IV. HUD generally agreed with the report's findings, noting that the analysis of loan performance is consistent with its own findings regarding the performance of loans with down payment assistance and how seller-funded down payment assistance programs operate. HUD also agreed to take steps that will improve its oversight of down payment assistance lending. Specifically, HUD will modify its information systems to document assistance from seller-funded nonprofits, and HUD will consider incorporating down payment assistance into FHA's TOTAL Mortgage Scorecard and requiring lenders to inform appraisers when assistance is provided by seller-funded nonprofits.

The department commented on certain aspects of selected recommendations. First, although HUD agreed with the report's recommendation to perform routine and targeted loan performance analyses of loans with down payment assistance, it maintained that FHA already performs monitoring of these loans. We recognized that FHA has conducted ad hoc risk analyses of its loans with down payment assistance. Additionally, the actuarial review of FHA's insurance Fund for 2005 includes, for the first time, down payment assistance as a variable in its model of loan performance. Consistent with our findings, the 2005 actuarial review found the presence of down payment assistance to be a significant factor in explaining loan performance. Further, the 2005 actuarial review states that loans with down payment assistance should be closely monitored. We agree. Because the proportion of loans FHA insures that involve some form of down payment assistance is growing dramatically, and because the risks associated with down payment assistance are substantial, we continue to recommend that FHA more routinely monitor the performance of loans with down payment assistance.

Second, HUD disagreed with our recommendation that it should revise its standards to prohibit the use of down payment assistance from seller-funded nonprofit organizations to meet the three percent borrower

00568

Appendix IV

# Comments from the Department of Housing and Urban Development



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, DC 20410-8000

October 25, 2005

ASSISTANT SECRETARY FOR HOUSING-
FEDERAL HOUSING COMMISSIONER

Mr. William B. Shear
Director
Financial Markets and Community Investments
United States Government Accountability Office
441 G Street, NW
Washington, D.C. 20548

Dear Mr. Shear:

Thank you for permitting FHA to respond to the GAO Draft Report 06-24, "MORTGAGE FINANCING: Additional Action Needed to Manage Risks of FHA-insured Loans with Down Payment Assistance." As you know, FHA has been examining these types of down payment assistance programs for the past several years. The report confirms FHA's own analysis of loan performance and the findings of an independent contractor hired by FHA to evaluate how seller-funded gift programs operate.

The GAO report provides additional analysis and reiterates that borrowers receiving seller-funded down payment assistance pay more for their homes than homebuyers who receive no such assistance or assistance from down payment programs funded without seller involvement. Borrowers who rely on seller-funded down payment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector. Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA. Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while still permitting these borrowers the advantage of a more affordable, less risky loan.

FHA has also determined that a Zero Down program would better serve borrowers who have little savings for a down payment, but who have steady incomes and acceptable credit. The proposed Zero Down program was designed to address the concerns that GAO raises in the report – that buyers using seller-funded gifts are paying too much for their homes and putting themselves in a risky position, as evidenced by the historical loan performance – and to ensure that FHA was keeping pace with the rest of the mortgage market, where 100% financing products have become increasingly common.

That said, although the report reaffirms FHA's own findings, the agency is disappointed that the recommendations do not acknowledge that a Zero Down program would provide FHA with a better way to serve families in need of down payment assistance. FHA represents a better, safer

**00612**

Appendix IV
Comments from the Department of Housing
and Urban Development

-2-

financing alternative for many families with blemished credit. Providing a new product would serve these families well, by offering consumer protections to ensure that these families would not pay more than they should for their homes or their financing, and that these families would have the benefits of loss mitigation to help them stay in their homes should they experience any future financial hardship.

FHA's responses to the individual recommendations are as follows:

GAO Recommendation: To provide FHA with data that would permit it to identify whether down payment assistance is from a seller-funded down payment assistance provider, modify FHA's "gift letter source" categories to include "nonprofit seller-funded" and "nonprofit non-seller-funded" and require lenders to accurately identify and report this information when submitting loan to FHA.

FHA Response: FHA agrees with this recommendation and will modify the systems to collect this additional information.

GAO Recommendation: To more fully consider the risk posed by down payment assistance when underwriting loans, include the presence and source of down payment assistance as a loan variable in FHA's TOTAL Scorecard.

FHA Response: Consistent with past practice, HUD will consider and incorporate into TOTAL all appropriate factors, including the presence and source of down payment assistance, that can with historical data be shown empirically relevant for assessing borrower credit risk with respect to loan performance.

GAO Recommendation: To ensure that FHA has an ongoing understanding of the impact that down payment assistance has on loan performance, implement routine and targeted performance monitoring of loans with down payment assistance, including analyses that consider the source of assistance.

FHA Response: FHA agrees and believes that it already performs monitoring of portfolios of such mortgages based on the information residing in its system of records. Obviously, FHA's concern, based on loan performance data, resulted in seeking the services of a contractor to analyze and explore these down payment assistance programs in detail.

GAO Recommendation: To improve the forecasting ability of the loan performance models used in the annual review of actuarial soundness, consider the presence and source of down payment assistance.

FHA Response: FHA incorporated the source of down payment assistance into its FY 2005 Actuarial Review of the Mutual Mortgage Insurance Fund, a variable that has proved to have considerable explanatory power. FHA informed GAO that it planned to incorporate this variable during its interviews about down payment assistance.

00613

-3-

GAO Recommendation:  To ensure appraisers have the information necessary to establish the market value of the property, require lenders to inform appraisers about the presence of down payment assistance from a seller-funded source.

FHA Response:  Lenders are required to inform appraisers about all seller concessions, including down payment assistance.  Appraisers are aware of seller funded down payment assistance providers in their markets, as evidenced by the findings of the Concentrance study referenced several times in the GAO report.  Regardless, FHA will consider imposing the additional requirement that the lender inform the appraiser when down payment assistance is provided by a nonprofit that relies on contributions from the seller.

GAO Recommendation:  Because down payment assistance provided by seller funded entities is, in effect, a seller inducement, revise FHA standards to treat assistance from a seller-funded nonprofit as a seller contribution, and therefore subject to the 6 percent limit on seller contributions and the prohibition against using seller contributions to meet the 3 percent borrower contribution requirement.

FHA Response:  HUD's Office of General Counsel has advised that the timing of the payments is a key point in whether there is a seller contribution that is an inducement to purchase.  If a gift is made from a nonprofit entity (either directly or through an entity such as the closing agent), from the nonprofit's own funds, prior to the completion of the closing, the gift becomes the homebuyer's property so the buyer can make the three percent required down payment.  After completion of the closing, a seller makes a contribution (perhaps through the closing agent as well) from the gross sales proceeds to the nonprofit entity.  The donation is commingled with other nonprofit funds that later become a source of donations to buyers other than the buyer who has just closed the purchase of the seller's property.  Because the buyer has not received funds from the nonprofit that can be traced to the seller's contribution, there has not been an inducement to purchase provided by the seller.

Thank you again for the opportunity to review the GAO report.  Consistent with the spirit of your report and its recommendations, HUD will continue to take all steps needed for responsible financial management of its down payment assistance programs, while ensuring that FHA programs serve effectively families who are otherwise underserved by the private sector.

Sincerely,

Brian D. Montgomery
Assistant Secretary for Housing-
Federal Housing Commissioner

00614

GAO-06-24 Mortgage Financing



Friday,
May 11, 2007

Part IV

# Department of Housing and Urban Development

24 CFR Part 203
Standards for Mortgagor's Investment in
Mortgaged Property; Proposed Rule

00010

EXHIBIT
"D"
tabbies

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**24 CFR PART 203**

[Docket No. FR–5087–P–01]

RIN 2502–AI52

**Standards for Mortgagor's Investment in Mortgaged Property**

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Proposed rule.

**SUMMARY:** Through this proposed rule, HUD submits, for public comment, specific standards governing a mortgagor's investment in property for which the mortgage is insured by the Federal Housing Administration (FHA). Specifically, this proposed rule would codify HUD's longstanding practice, authorized by statute, of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations.

The standards would address a situation in which the mortgagor's investment is derived from a gift, loan, or other payment that is provided by any donor, including an individual or an organization, and would also specify prohibited sources for a mortgagor's investment. The proposed rule would establish that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: (1) The seller, or any other person or entity that financially benefits from the transaction; or (2) any third party or entity that is reimbursed directly or indirectly by any of the parties listed in clause (1).

**DATES:** *Comments Due Date:* July 10, 2007.

**ADDRESSES:** Interested persons are invited to submit comments regarding this rule to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 Seventh Street, SW., Room 10276, Washington, DC 20410–0500. Communications should refer to the above docket number and title.

*Comment by Mail.* Please note that due to security measures at all federal agencies, submission of comments by mail often results in delayed delivery.

*Electronic Submission of Comments.* HUD now accepts comments electronically. Interested persons may now submit comments electronically through the Federal eRulemaking Portal at *www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available for public viewing. Commenters should follow the instructions provided at *www.regulations.gov* to submit comments electronically.

*No Facsimile Comments.* Facsimile (Fax) comments are not acceptable. In all cases, communications must refer to the docket number and title.

*Public Inspection of Public Comments.* All comments and communications submitted will be available, without revision, for inspection and downloading at *www.regulations.gov.* Comments are also available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the Office of Regulations. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the comments by calling the Regulations Division at (202) 708–3055 (this is not a toll-free number).

**FOR FURTHER INFORMATION CONTACT:** James Beavers, Acting Director, Office of Single Family Program Development, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; telephone (202) 708–2121 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Information Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:**

**Background**

In order for a mortgage to be eligible for insurance by the Federal Housing Administration (FHA), section 203(b)(9) of the National Housing Act (12 U.S.C. 1709(b)(9)) requires the mortgagor (with narrow exceptions) to pay on account of the property at least 3 percent of the cost of acquisition. The statute and the implementing regulation at 24 CFR 203.19 are silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute. For example, section 203(b)(9) of the National Housing Act permits family members to provide loans to other family members, and permits the mortgagor's downpayment to be paid by a corporation or person other than the mortgagor in certain circumstances, such as when the mortgagor is 60 years of age or older, or when the mortgage covers a housing unit in a homeownership program under the Homeownership and Opportunity through HOPE Act (Title IV of Pub. L. 101–625, 104 Stat. 4148, approved November 28, 1990).

In a 1999 proposed rule, HUD addressed the subject of prohibited sources of downpayment assistance. At that time, downpayment assistance from seller-funded or reimbursed charitable organizations was a matter of concern to HUD. (See HUD's proposed rule published on September 14, 1999, 64 FR 49956.) In 2001, HUD withdrew the 1999 proposed rule. (See January 12, 2001, notice of withdrawal of proposed rule at 66 FR 2851.) The matter, however, remains of concern to HUD. Gifts for homeowners' downpayments from charitable organizations have continued to raise concerns in those cases in which the seller, or any party that financially benefits from the transaction, contributes funds to the mortgagor's downpayment. A party that might benefit from the transaction may be a family member of the seller, a real estate agent, or a broker.

Although FHA has attempted to preclude downpayment funding derived from contributions of the seller of the property, some charitable organizations have been able to circumvent these restrictions in various ways, including the establishment of a fund that provides the so-called "gift" to the homebuyer. The situations that cause FHA concern are primarily those in which the fund is replenished after loan closing by the seller who provides a "charitable donation" and, in some cases, pays a "service fee" to the organization from the proceeds of the sale of the house and does so only if the homebuyer is using the charitable organization's downpayment assistance program. In these cases, there is a clear *quid pro quo* between the homebuyer's purchase of the property and the seller's "contribution" or payment to the charitable organization. This is also true if the contribution to the charitable organization comes from an entity other than the seller that has an expectation of being reimbursed by the seller. Often, these contributions function as an inducement to purchase the home.

FHA's primary concern with these transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA. A Government Accountability Office (GAO) report released in 2005 entitled "Mortgage Financing Actions Need to Help FHA Manage Risks from New Loan Products" (GAO Mortgage Financing Report) stated that Fannie Mae and Freddie Mac do not allow

00011

seller-related contributions to the downpayment, and that seller-related contributions could contribute to an overvaluation of the price of the property (GAO Mortgage Financing Report at page 16).

In May 2006, the Internal Revenue Service (IRS) addressed these same concerns by issuing Revenue Ruling 2006–27, which provides guidelines on organizations that may provide downpayment assistance to homebuyers and qualify as tax-exempt charitable or educational organizations under Internal Revenue Code (IRC) section 501(c)(3), and those that do not qualify for this tax-exempt status. The IRS, in its press announcement of the ruling, stated that funneling downpayment assistance from sellers to buyers through "self-serving, circular-financing arrangements" is inconsistent with operation as a section 501(c)(3) charitable organization. The IRS stated that, in a typical scheme, there is a direct correlation between the amount of the downpayment assistance provided to the buyer and the payment received from the seller, the seller pays the organization only if the sale closes, and the organization usually charges an additional fee for its services. The IRS noted that so-called charities that manipulate the system do more than mislead honest homebuyers; these organizations ultimately cause an increase in the cost of the home and damage the image of honest, legitimate charities. (See IRS News Release of May 4, 2006, at *http://www.irs.gov/ newsroom/article/0,id=156675,00.html*.)

As the IRS also noted in its press release, inflated sales prices are often found on properties purchased with downpayment assistance from seller-funded nonprofit programs. Unlike true gifts that reduce the amount of the purchase price financed by the homeowner, such seller contributions increase the sales price of the home and result in higher mortgage payments. As noted by the revenue ruling, inflated sales prices result in inflated mortgage amounts, which increase the severity of individual claims on the FHA Insurance Fund and FHA losses on claims paid on such mortgages. Given that seller-funded gift programs thrive in stagnant or depreciating housing markets, the risk to FHA increases if FHA cannot recover the full amount owed when FHA acquires and resells a home that had been purchased by a participating borrower who had defaulted on the FHA-insured loan.

## This Proposed Rule

This proposed rule would codify standards regarding the use of gifts as a source of the mortgagor's investment in the mortgaged property, and would also specify prohibited sources for a mortgagor's investment. Permissible sources of gifts as a source of the mortgagor's investment include a family member, a governmental or public agency, the borrower's employer or labor union, and a charitable organization that qualifies as a tax-exempt charitable or educational organization under section 501(c)(3) of the IRC of 1986. The proposed rule would establish that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the home sale: (1) The seller, or any other person or entity that financially benefits from the transaction; or (2) any third party or entity (referred to as a "donor") that is reimbursed directly or indirectly by any of the parties listed in clause (1). The use of the term "indirectly" in this proposed rule precludes the seller from providing the donor with funds through an individual or organization other than the seller, such as a family member of the seller. The use of the term "financially benefits" in this proposed rule is intended to capture, for example, real estate agents or real estate brokers who would benefit from the sale of the home to the mortgagor. The concern is that the problems with seller-funded contributions, as described earlier in this preamble, exist regardless of the route by which the funds are provided to the mortgagor.

A prohibited source of downpayment assistance, as defined in this rule, would apply to sales of existing homes by private sellers as well as sales by builders, developers, and others involved in new construction, or any party that financially benefits from the transaction. HUD would not allow any form of downpayment assistance, in any of its programs, if the downpayment assistance is derived, in whole or in part, directly or indirectly, from prohibited funds as described in this rule.

While the proposed rule is intended to prevent sellers from funding downpayments in their own home sales transactions, the proposed rule is not intended to preclude sellers from contributing to charitable organizations, which are often sources of donor downpayment assistance, that provide downpayment assistance that is unrelated in any manner to any properties sold by the seller. In addition, the rule is not intended to preclude reasonable assistance with closing costs not related to the minimum investment, which may be permitted under local practice. Nothing in this rule proposes to change HUD's policy of allowing builders and other sellers to offer cash incentives to homebuyers, provided that any cash or cash equivalent given to a homebuyer before, at, or after closing results in a proportionate reduction to the mortgage; an amount which the homebuyer then would have to provide as additional funds at closing. The primary focus of this rule is to establish appropriate standards for downpayment assistance to a homebuyer that is categorized as a gift.

HUD currently requires that the gift to the borrower that is to serve as an investment in the property to be purchased must be documented in writing. The lender must document the gift funds through a letter signed by the donor and the borrower specifying, among other things, information about the donor, that no repayment by the borrower is required, and describing the relationship between the donor and the borrower. This proposed rule does not propose to change these current practices. Therefore, given the continued concerns about gifts based on seller-funded contributions, this rule proposes the following regulatory changes to 24 CFR 203.19.

HUD's current regulation of the mortgagor's minimum payment requirement is found at 24 CFR 203.19. As proposed to be revised by this rule, § 203.19 would have the following organization:

Paragraph (a) would require a mortgagor to have the funds needed to complete the transaction (payment of purchase price and settlement costs) in addition to the funds provided by the insured mortgage. This basic policy was previously stated only in a handbook rather than a regulation, but it is a basic requirement of mortgage lending and does not represent a new substantive policy.

Paragraph (b) would correspond with the first part of section 203(b)(9) of the National Housing Act by stating the basic rule for a 3 percent mortgagor cash investment. The statute and the current regulation give HUD the discretion to require more than 3 percent, but it is no longer necessary to reserve this discretion in regulations. In practice, HUD has not required more than 3 percent, except as needed to satisfy the basic requirement for cash sufficient to close the transaction (as stated in proposed new paragraph (a)). Both the statute and the current regulation exempt the following from the 3 percent requirement: (1) Veterans who can qualify under section 203(b)(2) of the

National Housing Act and (2) disaster victims who can qualify for 100 percent mortgage financing under section 203(h) of the National Housing Act. However, HUD's current regulation in § 203.19(a)(2) imposes a $200 minimum cash investment requirement for those mortgagors. That $200 requirement is no longer meaningful in relation to vast increases in home values and mortgage amounts since the $200 requirement was adopted, and HUD proposes to delete it from the regulations in the interest of simplifying mortgage processing.

Paragraph (c) of the proposed rule would establish prohibited sources of downpayment assistance, as discussed in this preamble. HUD, however, has recognized local market practices in which sellers customarily agree to pay some of the buyer's closing costs. Beginning in the mid-1980's, HUD's administrative policies reflected in mortgagee letters and handbooks have permitted some seller contributions, consistent with local market practices that would be reflected in local appraisal practices, but never more than 6 percent of the purchase price. Proposed paragraph (c) will not prohibit reasonable seller contributions to closing costs.

Paragraph (d) would state the general policy that funds from loans or gifts may not be used for any part of the mortgagor's minimum investment, unless otherwise permitted by the rule.

Paragraph (e), like current § 203.19(b), would identify certain loan sources authorized by statute. The paragraph would clearly state HUD's historical understanding of the congressional intent behind section 203(b)(9) of the National Housing Act, which is that loans are a forbidden source of the 3 percent minimum investment unless a statute provides otherwise.

Paragraph (e) would also include certain statutory authorizations on which HUD relies, but which are currently not stated or referenced in regulations (family loans and government loan programs). Although paragraph (e) would restrict only the use of loans for the 3 percent minimum cash investment and would not apply to the rest of the required investment, it is important to note that 24 CFR 203.32 contains restrictions on secondary financing that is unsecured or secured by the home. Paragraph (e) would not supersede § 203.32.

Finally, paragraph (f) would list the limited permissible sources of gifts.

## Findings and Certifications

### Regulatory Planning and Review

The Office of Management and Budget (OMB) reviewed this rule under Executive Order 12866, *Regulatory Planning and Review*. OMB determined that this rule is a "significant regulatory action," as defined in section 3(f) of the Order (although not an economically significant regulatory action under the Order). The docket file is available for public inspection in the Regulations Division, Office of General Counsel, Room 10276, 451 Seventh Street, SW., Washington, DC 20410–0500. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the docket file by calling the Regulations Division at (202) 708–3055 (this is not a toll-free number).

### Environmental Review

A Finding of No Significant Impact is not required for this proposed rule. Under 24 CFR 50.19(b)(6), this proposed rule is categorically excluded from the requirements of the National Environmental Policy Act (42 U.S.C. 4332 *et seq.*).

### Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.

The purpose of this rule, as noted in the preamble, is to establish standards regarding the use of gifts by borrowers with an FHA-insured mortgage—primarily standards that would address gifts by charitable organizations—as a source of an FHA mortgagor's investment in the mortgaged property. To date, HUD's practice has been to limit permissible sources of gifts to family members, governmental agencies, employer of the mortgagor, labor union of the mortgagor, or charitable organizations. HUD is not narrowing the sources of gifts through this rulemaking but rather striving to ensure that gifts are gifts and that especially in the situation of gifts from charitable organizations, the gift is not a *quid pro quo* between the homebuyer's purchase of the property and the seller's "contribution" or payment to the charitable organization.

The prohibited sources of downpayment assistance, as structured in this proposed rule, are narrow and should not encompass a substantial number of small entities that are engaged in downpayment assistance to homebuyers, which, to date, have primarily been charitable organizations with tax-exempt status.

As noted earlier in this preamble, the IRS, in Revenue Ruling 2006–27, has ruled that an organization that relies "on sellers and other real-estate related businesses that stand to benefit from the transaction" to finance downpayment assistance provided as part of the same transaction does not qualify as charitable organizations described in section 501(c)(3) of the IRC. Organizations that meet the criteria of section 501(c)(3) qualify for exemption from federal income taxation pursuant to IRC section 501(a). HUD's proposed rulemaking will not have any significant economic impact on small entities that qualify as charitable organizations described in section 501(c)(3) of the IRC and are exempt from tax under section 501(a) of the IRC because existing law prevents those organizations from providing seller-financed downpayment assistance while maintaining their tax-exempt status.

The IRS ruling also describes two organizations that provide downpayment assistance and qualify as charitable organizations described in section 501(c)(3) of the IRC and are exempt from tax under section 501(a) of the IRC. These organizations do not accept contributions from sellers that are contingent upon the sale of the seller's property. They follow additional policies and procedures that ensure that any benefit to sellers or other parties with an interest in selling homes is incidental to any transaction in which the charitable organization provides downpayment assistance. The organizations will accept contributions from property sellers, but only if the contributions are not contingent on the sale of the seller's property or a *quid pro quo* for the sale of the property. HUD's proposed rule permits downpayment assistance to be provided by section 501(c)(3) organizations in a manner consistent with the IRS ruling.

Charitable organizations, large or small, remain eligible to provide downpayment assistance to FHA mortgagors, subject to meeting the requirements of § 203.19, as proposed to be revised by this rule. HUD's proposed rule does not preclude gifts from charitable organizations that provide housing assistance in a manner that is consistent with operation for exclusively charitable purposes.

Accordingly, the undersigned certifies that this rule will not have a significant economic impact on a substantial number of small entities.

**00013**

Notwithstanding this determination, small entities are specifically invited to comment on whether this proposed rule will significantly affect them, and to make any recommendations on alternatives for compliance with the requirements of this rule. Comments should be submitted in accordance with the instructions in the DATES and ADDRESSES sections in the preamble of this proposed rule.

*Executive Order 12612, Federalism*

The General Counsel, as the Designated Official under section 6(a) of Executive Order 12612, *Federalism,* has determined that this proposed rule would not have "federalism implications" because it does not have substantial direct effects on the states (including their political subdivisions), or on the distribution of power and responsibilities among the various levels of government. This proposed rule solely addresses requirements under HUD's FHA mortgage insurance programs.

*Unfunded Mandates Reform Act*

Title II of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4, approved March 22, 1995) established requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and the private sector. This proposed rule does not impose any federal mandates on any state, local, or tribal governments or the private sector within the meaning of the Unfunded Mandates Reform Act of 1995.

*Catalog of Federal Domestic Assistance*

The Catalog of Federal Domestic Assistance Number for the principal FHA single-family mortgage insurance program is 14.117. This proposed rule would also apply through cross-referencing to FHA mortgage insurance for condominium units (14.133), and other smaller single-family programs.

**List of Subjects in 24 CFR Part 203**

Loan programs—housing and community development, Mortgage insurance, Reporting and recordkeeping requirements.

Accordingly, the Department proposes to amend 24 CFR part 203, as follows:

**PART 203—SINGLE FAMILY MORTGAGE INSURANCE**

1. The authority citation for part 203 continues to read:

**Authority:** 12 U.S.C. 1709, 1710, 1715b, 1715z–16, and 1715u; 42 U.S.C. 3535(d).

2. Section 203.19 is revised to read as follows:

**§ 203.19   Mortgagor's investment in the property.**

(a) *Required funds.* The mortgagor must have available funds equal to the difference between:

(1) The cost of acquisition, which is the sum of the purchase price of the home and settlement costs acceptable to the Secretary; and

(2) The amount of the insured mortgage.

(b) *Mortgagor's minimum cash investment.* The required funds under paragraph (a) of this section must include an investment in the property by the mortgagor, in cash or cash equivalent, equal to at least 3 percent of the cost of acquisition as determined by the Secretary, unless the mortgagor is:

(1) A veteran meeting the requirements of § 203.18(b); or

(2) A disaster victim meeting the requirements of § 203.18(e).

(c) *Restrictions on seller funding.* Notwithstanding paragraphs (e) and (f) of this section, the funds required by paragraph (a) of this section shall not consist, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale:

(1) The seller or any other person or entity that financially benefits from the transaction; or

(2) Any third party or entity that is reimbursed, directly or indirectly, by any of the parties described in paragraph (c)(1) of this section.

(d) *Gifts and loans usually prohibited for minimum cash investment.* A mortgagor may not use funds for any part of the minimum cash investment under paragraph (b) of this section if the funds were obtained through a loan or a gift from any person, except as provided in paragraphs (e) and (f) of this section, respectively.

(e) *Permissible sources of loans.*

(1) *Statutory authorization needed.* A statute must authorize a loan as a source of the mortgagor's minimum cash investment under paragraph (b) of this section.

(2) *Examples.* The following loans are authorized by statute as a source for the minimum investment:

(i) A loan from a family member, a loan to a mortgagor who is at least 60 years old when the mortgage is accepted for insurance, or a loan that is otherwise expressly authorized by section 203(b)(9) of the National Housing Act;

(ii) A loan made or held by, or insured by, a federal, state, or local government agency or instrumentality under terms and conditions approved by the Secretary; and

(iii) A federal disaster relief loan.

(f) *Permissible sources of gifts.* The following are permissible sources of gifts or grants used for the mortgagor's minimum investment under paragraph (b) of this section:

(1) Family members and governmental agencies and instrumentalities eligible under paragraphs (e)(2)(i) and (ii) of this section;

(2) An employer or labor union of the mortgagor;

(3) Charitable organizations exempt from taxation under section 501(a), pursuant to section 501(c)(3) of the Internal Revenue Code of 1986, subject to paragraph (c) of this section;

(4) Disaster relief grants; and

(5) Other sources as may be approved by the Secretary on a case-by-case basis.

Dated: April 13, 2007.

**Brian D. Montgomery,**

*Assistant Secretary for Housing-Federal Housing Commissioner.*

[FR Doc. E7–9067 Filed 5–10–07; 8:45 am]

**BILLING CODE 4210–67–P**



Monday,
October 1, 2007

Part IV

# Department of Housing and Urban Development

24 CFR Part 203
Standards for Mortgagor's Investment in
Mortgaged Property: Final Rule

00001



EXHIBIT
"E"

tabbies

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

## 24 CFR Part 203

[Docket No. FR–5087–F–02]

RIN 2502–AI52

## Standards for Mortgagor's Investment in Mortgaged Property

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends the Department's regulations governing the specific standards for a mortgagor's investment in property for which the mortgage is insured by the Federal Housing Administration (FHA). Specifically, this final rule codifies HUD's longstanding practice, authorized by statute, of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations.

The standards established by this final rule address a situation in which the mortgagor's investment is derived from a gift, loan, or other payment that is provided by any donor, including an individual or an organization, and also specify prohibited sources for a mortgagor's investment. The final rule establishes that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: The seller, or any other person or entity that financially benefits from the transaction; or any third party or entity that is reimbursed directly or indirectly by the seller, or any other person or entity that financially benefits from the transaction.

This final rule follows publication of a May 11, 2007, proposed rule and takes into consideration the public comments received on the proposed rule. After considering all comments received, HUD is adopting the May 11, 2007, proposed rule with certain minor clarification changes.

**DATES:** *Effective Date:* October 31, 2007.

**FOR FURTHER INFORMATION CONTACT:** Margaret Burns, Director, Office of Single Family Program Development, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; telephone number (202) 708–2121 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Information Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:**

## I. Background

In order for a mortgage to be eligible for insurance by the Federal Housing Administration (FHA), section 203(b)(9) of the National Housing Act (12 U.S.C. 1709(b)(9)) requires the mortgagor (with narrow exceptions) to pay on account of the property at least 3 percent of the cost of acquisition. The statute and the implementing regulation at 24 CFR 203.19 are silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute. For example, section 203(b)(9) of the National Housing Act permits family members to provide loans to other family members, and permits the mortgagor's downpayment to be paid by a corporation or person other than the mortgagor in certain circumstances, such as when the mortgagor is 60 years of age or older, or when the mortgage covers a housing unit in a homeownership program under the Homeownership and Opportunity Through HOPE Act (Title IV of Pub. L. 101–625, 104 Stat. 4148, approved November 28, 1990). HUD has long taken the position that downpayment funding from the seller of the home to be purchased by a borrower with an FHA-insured loan is not a permissible source of the mortgagor's investment in the property. FHA's experience is that loans made to borrowers who rely on these types of seller-funded assistance perform very poorly.

Although FHA has attempted to preclude downpayment funding derived from contributions of the seller of the property, some so-called charitable organizations have been able to circumvent these restrictions in various ways, including the establishment of a fund that provides the so-called "gift" to the homebuyer. The situations that cause FHA concern are those in which a so-called charitable organization provides a so-called gift to a homebuyer from funds that it receives, directly or indirectly, from the seller. In these cases, there is a clear *quid pro quo* between the homebuyer's purchase of the property and the seller's "contribution" or payment to the charitable organization. This is also true if the contribution to the charitable organization comes from an entity, other than the seller, that has an expectation of being reimbursed by the seller. Often, these contributions function as an inducement to purchase the home. It is these concerns that prompted HUD's rulemaking in 1999, which did not

result in final regulations, and now again, in 2007.

## II. The May 11, 2007, Proposed Rule

On May 11, 2007, HUD published a proposed rule (72 FR 27047) for public comment to codify standards regarding the use of gifts as a source of the mortgagor's investment in the mortgaged property, and to also specify prohibited sources for a mortgagor's investment. The proposed rule established that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: (1) The seller, or any other person or entity that financially benefits from the transaction; or (2) any third party or entity (referred to as a "donor") that is reimbursed directly or indirectly by any of the parties listed in clause (1).

As discussed in the proposed rule, FHA's primary concern with these transactions is that the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA. A Government Accountability Office (GAO) report released in 2005 entitled "Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Loan Products" (GAO Mortgage Financing Report) stated that Fannie Mae and Freddie Mac do not allow seller-related contributions to the downpayment, and that seller-related contributions could contribute to an overvaluation of the price of the property (GAO Mortgage Financing Report, at page 16).

In May 2006, the Internal Revenue Service (IRS) addressed these same concerns by issuing Revenue Ruling 2006–27, which provides guidelines on organizations that may provide downpayment assistance to homebuyers and qualify as tax-exempt charitable or educational organizations under Internal Revenue Code (IRC) section 501(c)(3), and those that do not qualify for this tax-exempt status. The IRS, in its press announcement of the ruling, stated that funneling downpayment assistance from sellers to buyers through "self-serving, circular-financing arrangements" is inconsistent with operation as a section 501(c)(3) charitable organization. The IRS stated that, in a typical scheme, there is a direct correlation between the amount of the downpayment assistance provided to the buyer and the payment received from the seller, the seller pays the organization only if the sale closes, and the organization usually charges an

**00002**

additional fee for its services. The IRS noted that so-called charities that manipulate the system do more than mislead honest homebuyers; these organizations ultimately cause an increase in the cost of the home and damage the image of honest, legitimate charities. (See IRS News Release of May 4, 2006, at *http://www.irs.gov/ newsroom/article/0,id=156675,00.html*.)

As the IRS also noted in its press release, inflated sales prices are often found on properties purchased with downpayment assistance from seller-funded nonprofit programs. Unlike true gifts that reduce the amount of the purchase price financed by the homeowner, such seller contributions increase the sales price of the home and result in higher mortgage payments.

Given that seller-funded gift programs thrive in stagnant or depreciating housing markets, the risk to FHA increases if FHA cannot recover the full amount owed when FHA acquires and resells a home that had been purchased by a participating borrower who had defaulted on the FHA-insured loan. While these situations represent a financial burden for FHA and taxpayers, of equal if not greater concern, is that they hurt the families who lose their homes and the neighborhoods in which those homes are located.

### III. This Final Rule

For the foregoing reasons, HUD is proceeding, through this final rule, to codify the regulations submitted for public comment in the May 11, 2007, proposed rule. This final rule makes the following change to the May 11, 2007, proposed rule in response to public comment. This final rule clarifies in § 203.19(f) that a tribal government or a tribally designated housing entity (TDHE), as defined at 25 U.S.C. 4103(21), is a permissible source of downpayment assistance. Additionally, the final rule revises in § 203.19(f) the description of tax-exempt organizations that are permissible sources of gifts to more closely align this description with the description used by IRS of such organizations.

In addition, notwithstanding the effective date provided under the **DATES** caption of this rule, pursuant to an April 1998 settlement agreement resolving litigation between the Nehemiah Progressive Housing Development Corporation (Nehemiah) and HUD, the effective date shall be March 31, 2008 for the Nehemiah downpayment assistance program described in the settlement agreement between Nehemiah and HUD.

While this rule prevents sellers from funding downpayments in their own

home sales transactions, the rule is not intended to preclude sellers from contributing to charitable organizations that provide downpayment assistance that is unrelated in any manner to any properties sold by the seller. In addition, the rule is not intended to preclude reasonable assistance with closing costs not related to the minimum investment, which may be permitted under local practice. Nothing in this rule changes HUD's policy of allowing builders and other sellers to offer cash incentives to homebuyers, provided that any cash or cash equivalent given to a homebuyer before, at, or after closing results in a proportionate reduction to the mortgage; an amount which the homebuyer then would have to provide as additional funds at closing. The primary focus of this rule is to establish appropriate standards for downpayment assistance to a homebuyer that is categorized as a gift.

### IV. Discussion of Key Issues Raised by Public Commenters on Proposed Rule

The public comment period for the May 11, 2007, proposed rule was initially set to close on July 10, 2007, but HUD extended the comment period to August 10, 2007. HUD received approximately 15,000 public comments on the proposed rule. The overwhelming majority of these comments consisted of brief statements opposing HUD's rule, with the majority also submitting their comments in a standard similar format and wording, and urging HUD not to eliminate downpayment assistance in connection with FHA-insured mortgages. However, a number of comments supported the rule, and approved of FHA's efforts to harmonize its regulations regarding downpayment assistance with recent rulings of the IRS. These commenters shared HUD's concerns about home price inflation and the associated risks for increased delinquency and foreclosure. They stated that inflated home prices affect a community's housing market, and can magnify existing housing affordability problems.

The following provides a summary of the major themes and issues raised during the public comment period on the proposed rule.

*Comment:* HUD should not eliminate downpayment assistance, but regulate such assistance, or establish standards for downpayment supported loans, including taking action to improve appraisals and require stricter underwriting and a higher insurance premium for such loans.

*HUD response:* Many commenters, through their statements urging HUD

not to eliminate downpayment assistance, indicated that they believed the May 11, 2007, proposed rule would eliminate all downpayment assistance. HUD's May 11, 2007, rule did not propose to eliminate downpayment assistance, but rather proposed to regulate such assistance as the commenters requested. Additionally, HUD is not eliminating all privately funded downpayment assistance. Such assistance is permitted, for example, from family members, the borrower's employer, state or local governments, charitable organizations that do not rely upon a party with a financial interest in the transaction for downpayment assistance, or labor organizations. The proposed rule, however, did propose to preclude as acceptable downpayment assistance, assistance that, in whole or in part, is funded by the seller or any other person or entity that financially benefits from the transaction or any third party or entity that is reimbursed, directly or indirectly, by the seller or any other party that financially benefits from the transaction.

*Comment:* Although downpayment assistance presents risks, HUD should address what an acceptable level of risk is, and determine how the risk can be maintained at or below that level.

*HUD response:* Based on HUD's analysis of its loan portfolio going back to 1998, HUD has assessed that risk and has determined that there is 2 to 3 times greater risk of default and claim with purchase loans that receive downpayment assistance from the seller or other persons or entities that financially benefit from the sale of a home to the borrower than from all other loans with downpayment assistance from all other sources.

For example, for loans endorsed for insurance in Fiscal Year (FY) 2001, the cumulative claim rate as of July 2007 was 7.1 percent for loans with downpayment assistance from relatives, public agencies, and employers, but 15.8 percent for loans with downpayment assistance from nonprofit entities that received reimbursements from sellers. A cumulative claim rate is calculated by dividing the number of claims that have occurred to date by the number of loans endorsed in a particular fiscal year. In conjunction with the FY 2006 Actuarial Review of the Mutual Mortgage Insurance Fund, FHA's independent actuaries estimated that the ultimate claim rate for 30-year fixed-rate purchase loans endorsed in FY 2008 would be 11.04 percent if they did not have seller-funded downpayment assistance, but 23.06 percent if they did. An ultimate claim rate is defined as the total number of

claims expected to occur over the 30-year life of a book of business divided by the total number of loans endorsed in a particular fiscal year. The difference between these rates represents the difference between acceptable and unacceptable levels of risk to the FHA insurance fund.

In addition, HUD has determined that loans with downpayment assistance from sellers or other parties with a financial interest in the transaction are also associated with a higher loss rate than other single family loans insured by FHA. In other words, homeowners with this type of downpayment assistance have a two to three times higher possibility of losing their home. This rule, therefore, is HUD's effort to mitigate an unacceptable level of risk.

*Comment:* HUD can mitigate the risk from downpayment assistance by requiring full disclosure of the amount of downpayment assistance for underwriting and to appraisers.

*HUD response:* FHA requirements currently require disclosure of the full amount of downpayment assistance.

*Comment:* Rather than eliminate downpayment assistance, HUD can further mitigate risk by requiring a complete home inspection, to avoid potentially huge repair costs to the homeowner. HUD could also require the owner to obtain a homeowner's warranty for a specified period of time, to avoid high repair cost as a potential source of default and foreclosure. Alternatively, HUD could require downpayment assistance companies to offer mandatory risk mitigation tools or offer insurance to the buyer.

*HUD response:* HUD reiterates that downpayment assistance is not being eliminated by this rule. The commenters' recommendations are noted, but the suggested actions are outside the scope of the present rule. In addition, the recommendations pertaining to warranty or insurance does not deal directly with sales price inflation, which is a separate issue from repair costs a homeowner may face after purchasing a home.

*Comment:* Price inflation does not arise from downpayment assistance, but from the appraisal process. The appraisal process should be reformed, for example, by establishing a blind pool appraiser selection process for loans with downpayment assistance.

*HUD response:* Downpayment assistance can be an independent source of price inflation separate from, or in conjunction with, any price inflation that may arise from the appraisal process, which, while noted by HUD, is an issue beyond the scope of the present rule. HUD has already taken steps to

address the appraisal issue. HUD's Appraiser Roster, for which the regulations can be found in 24 CFR part 200, subpart G, is intended to ensure fairness and accuracy in the appraisal process for FHA-insured mortgages.

*Comment:* HUD should make rules to deal with predatory lenders and lenders who charge outrageous rates. Such lenders are the real problem, rather than downpayment assistance. It is a lender's responsibility to ensure that people cannot buy more than they can afford, and downpayment assistance should not be affected because of bad lender decisions.

*HUD response:* HUD acknowledges that problems may arise at each stage of, and with each party to, a complex transaction such as purchasing a home. In addition, problems change over time, and the way any given problem is addressed also changes. This rule addresses an aspect, other than predatory lending, of the home purchase transaction that has been identified as a problem. HUD notes the recommendation *is outside the scope of* this rule. Although HUD does not regulate non-FHA lending practices, HUD has taken steps, such as issuing rules on property flipping, appraisal reform, and lender accountability, to address predatory lending, and continues to monitor this problem and develop new ways of addressing it. FHA has also taken *steps to mitigate mortgage* insurance losses with the development and implementation of Credit Watch, Neighborhood Watch, and Appraiser Watch. FHA also strengthened its education efforts by doubling housing counseling grant funds, creating anti-predatory lending brochures, featuring anti-predatory lending messages in advertising, and increasing training opportunities for FHA's program participants.

*Comment:* HUD should require homebuyer education instead of eliminating downpayment assistance.

*HUD response:* HUD notes that it is not eliminating downpayment assistance but, as requested by many commenters, is establishing standards for the use of downpayment assistance in FHA-insured mortgages. HUD encourages and supports homebuyer education, and for some programs requires homebuyer counseling, but addressing that subject is beyond the scope of the current rule.

*Comment:* HUD should permit sellers to directly contribute downpayment assistance to buyers without a middleman.

*HUD response:* HUD has determined that contributions to downpayment assistance from sellers and other parties

with a financial interest in the transaction, whether direct or indirect, present an unacceptable level of risk for FHA-insured mortgages.

*Comment:* Rather than doing away with downpayment assistance, HUD should increase FHA loan limits.

*HUD response:* It is unclear how increasing loan limits would mitigate the risk that HUD has experienced with seller-funded downpayment assistance.

*Comment:* Rather than doing away with downpayment assistance, HUD should enforce Mortgagee Letter 02–02.

*HUD response:* While noting again that HUD is not ending downpayment assistance, HUD also notes that Mortgagee Letter 02–02 addresses a different issue than that addressed by this rule. Mortgagee Letter 02–02 addresses a situation where a seller or a nonprofit entity has paid a homebuyer's consumer debt, which then makes it easier for the buyer to meet debt to income ratios. Further, HUD does enforce Mortgagee Letter 02–02. The focus of this rule is downpayment assistance provided by a party with a financial interest in the transaction.

*Comment:* Rather than doing away with downpayment assistance, HUD should limit the seller contribution to 3 percent.

*HUD response:* HUD reiterates that it is seeking to establish reasonable and prudent standards for the use of downpayment assistance, and that downpayment assistance from a seller or other party with a financial interest in the transaction presents an unacceptable risk to FHA.

*Comment:* Downpayment assistance should be permitted in the 6 percent seller concession for closing costs that FHA allows.

*HUD response:* The downpayment differs from closing costs in that the downpayment creates equity in the property for the buyer and closing costs do not. As such, the downpayment cannot be included in the mortgage, whereas certain closing costs are permitted to be included in the mortgage. For this reason, downpayment assistance cannot be treated as closing costs.

*Comment:* Downpayment assistance helps first-time, low-credit, and low-income homebuyers, who are often minority or single-parent households. HUD should not eliminate or limit such assistance.

*HUD response:* As noted, HUD is not eliminating downpayment assistance but is establishing reasonable and prudent standards for the use of downpayment assistance. All homebuyers will benefit if the debt

burdens of homeownership are set more realistically and if price inflation at the time of purchase is mitigated. Further, mortgage insurance premiums would likely have to be increased without these standards, which would negatively impact all homebuyers. In addition, an analysis of HUD Real Estate Owned (REO) sales since 2004 shows that sales proceeds from this type of downpayment assistance is 3 to 6 percent less than other REO sales. This suggests that the sales prices of such properties may have been inflated.

*Comment:* This rule will negatively impact the market devastated by Hurricane Katrina by reducing the number of families willing to rebuild or buy in that market.

*HUD response:* A number of special incentives and forms of assistance, such as disaster relief loans and grants and lower buyer investment requirements, are available in disaster zones such as that created by Hurricane Katrina. FHA, for example, offers eligible disaster victims section 203(h)-insured mortgages, which require no downpayment. Such assistance and requirements appropriately leave homebuyers in a much more favorable position to reestablish homeownership. The reasonable and prudent standards established by this rule will help to ensure that the benefits provided to disaster victims are not undercut by burdensome price and debt inflation.

*Comment:* The rule will have a negative impact on FHA's business, because of the substantial percentage of loans supported by downpayment assistance. The rule would immediately cause a huge contraction in FHA's business.

*HUD response:* HUD does not intend to maintain or expand the volume of FHA business at the expense of sound and sustainable purchases by homebuyers. Such a result would be contrary to the public purposes underlying FHA's business.

*Comment:* The rule is not supported by data. The analysis of the Government Accountability Office (GAO) found that downpayment-assisted loans had higher default and claim rates than other FHA loans, but did not segregate the effects of downpayment assistance from those of low downpayments and low credit ratings. HUD should conduct additional research because the data presented does not appear to be conclusive.

*HUD response:* HUD has collected and analyzed additional data through its portfolio analysis. This analysis provides additional verification of the higher level of risk associated with downpayments funded by a seller or other financially interested party

compared to downpayments funded from other sources, which HUD continues to permit. HUD's analysis has also established that loans with downpayment assistance from sellers or other parties with a financial interest in the transaction have a higher loss rate associated with them and currently represent 30 percent of FHA's REO portfolio.

*Comment:* Prohibition of downpayment assistance would harm otherwise qualified borrowers, who will have to delay or forego homeownership or turn to the subprime market.

*HUD response:* HUD notes again that the current rule does not prohibit or eliminate downpayment assistance, but only establishes reasonable and prudent standards for its use that will benefit, and not harm, homebuyers. The purpose of the rule is to mitigate the harm caused by downpayment assistance from sources with a financial interest in the transaction, and help assure continued homeownership. As previously stated, downpayment assistance from parties with a financial interest in the transaction have higher default and claim rates and higher loss rates.

*Comment:* Downpayment assistance should not be prohibited because it provides borrowers instant equity when they purchase a home.

*HUD response:* HUD agrees, and the rule does not prohibit all downpayment assistance.

*Comment:* The rule will have a negative impact on the housing market and on the economy.

*HUD response:* To the contrary, HUD expects that the reasonable and prudent approach taken by this rule will have a positive impact on the housing market and on the economy by reducing the number of mortgages that would otherwise default and go into foreclosure, driving down property values and negatively impacting a community's tax base and economic viability.

*Comment:* HUD should partner with downpayment assistance programs to promote homeownership. A zero downpayment program or downpayment assistance is needed to address the subprime crisis, because there is little or no equity in a substantial number of troubled properties. HUD should postpone action on downpayment assistance until 100 percent financing is permitted.

*HUD response:* HUD does sponsor downpayment assistance programs through such programs as the American Dream Downpayment Initiative, and others in which the assistance is not linked to the financial interest of parties

other than the homebuyer. HUD currently does not have the authority for a zero downpayment program; however, a zero downpayment program would not address this issue of the financial interest of the providers of downpayment assistance. Reasonable standards would still be necessary for downpayment assistance, even if there is no requirement for a minimum investment by the homebuyer.

*Comment:* HUD is replacing a private sector program that works and is forcing people to rely on government bureaucracy. In addition, government-sponsored downpayment assistance has eligibility requirements such as income limits. Private downpayment assistance is available to anyone. The rule will vastly increase the size and cost of government.

*HUD response:* Many of the comments recognized the value of, and the need for, reasonable standards, and the eligibility requirements noted here provide such standards. The cost of government is controlled by prioritizing the availability of benefits to those who need them most. Private downpayment assistance that does not rely upon a party with a financial interest in the transaction is not affected by this rule, which establishes reasonable and prudent standards for the use of downpayment assistance. This rule addresses certain forms of downpayment assistance that increase the cost of government because they increase FHA mortgage insurance payments for losses attributable to loan defaults and lower REO sales proceeds.

*Comment:* A developer should be able to offer buyers incentives to purchase properties.

*HUD response:* A developer's ability to offer incentives, such as a reduced purchase price or a lower interest rate, is not affected by this rule. These incentives are distinguishable from downpayment assistance, and only the provision of downpayment assistance by a seller or a party with a financial interest in the transaction is prohibited by this rule.

*Comment:* Real estate agents should be permitted to use their commission to fund the downpayment where the real estate agent is the buyer/mortgagor, because the commission is earned, and not a seller contribution or gift.

*HUD response:* The circumstance described by this comment are not affected by this rule, because a borrower's earned income, such as a real estate agent's commission, is a permissible source of downpayment.

*Comment:* The rule should not exclude Indian tribes or tribally designated housing entities (TDHEs)

from the governments considered in the rule. In taking this significant action, HUD did not follow its own policy on tribal consultation and the rule should be withdrawn until HUD follows the consultation procedure.

*HUD response:* The rule did not intend to exclude Indian tribes or TDHEs from the governments considered in this rule. This final rule specifically clarifies the treatment of downpayment assistance from Indian tribes and TDHEs. As with other rules that are generally applicable and, thus, also incidentally apply to Indian tribes, HUD did not undertake tribal consultation. HUD's tribal consultation policy states, "Tribal Coordination, Collaboration and Consultation applies when any proposed policies, programs or actions are identified by HUD as having a substantial direct effect on an Indian tribe." (66 FR 49785). Since the effect of the rule on tribes is only incidental and since the rule applies to all FHA-insured single family mortgages, the tribal consultation policy is not applicable. All providers of downpayment assistance are subject to the general standard of this rule and their downpayment assistance cannot be funded by sellers or other parties with a financial interest in the transaction. HUD follows, and will continue to follow, its tribal consultation policy when identified by HUD as applicable.

*Comment:* HUD should clarify whether downpayment assistance provided by grantees under government programs is permitted.

*HUD response:* Grant funds made available to assist homebuyers may be used for downpayment assistance because such funds are not linked to the sources addressed by this standard, namely, the seller or other parties with a financial interest in the transaction. Grantees act with a public purpose, using government-provided funds, rather than acting with a private financial interest in the transaction or using funds from parties with a financial interest in the transaction.

*Comment:* HUD should provide a definition of "family members."

*HUD response:* The term "family member" is defined at section 201(e) of the National Housing Act (12 U.S.C. 1707(e)) and governs regulations issued for FHA programs under section 203 of the National Housing Act, such as the current rule.

*Comment:* HUD should permit loans for downpayment assistance and second mortgages, including loans from the seller and from governments.

*HUD response:* The rule continues to permit loans authorized by statute as a source for the minimum investment.

Loans from sellers are not authorized by statute.

*Comment:* HUD should clarify that this rule does not prohibit assistance from nonprofit developers.

*HUD response:* HUD permits downpayment assistance from charitable organizations. Downpayment assistance from nonprofit developers is permitted as long as it complies with this general standard and their downpayment assistance cannot be funded by sellers or other parties with a financial interest in the transaction.

## V. Findings and Certifications

### Regulatory Planning and Review

The Office of Management and Budget (OMB) reviewed the rule under Executive Order 12866, *Regulatory Planning and Review.* OMB determined that the rule is a "significant regulatory action," as defined in section 3(f) of the Order (although not an economically significant regulatory action under the Order). The docket file was available for public inspection in the Regulations Division, Office of General Counsel, Room 10276, 451 Seventh Street, SW., Washington, DC 20410–0500.

### Environmental Review

A Finding of No Significant Impact was not required for the proposed rule. Under 24 CFR 50.19(b)(6), the rule is categorically excluded from the requirements of the National Environmental Policy Act (42 U.S.C. 4332 *et seq.*) and that categorical exclusion continues to apply.

### Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*) generally requires an agency to conduct a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities.

The purpose of this rule, as noted in the preamble, is to establish standards regarding the use of gifts by borrowers with an FHA-insured mortgage—primarily standards that would address gifts by charitable organizations—as a source of an FHA mortgagor's investment in the mortgaged property. To date, HUD's practice has been to limit permissible sources of gifts to family members, governmental agencies, employer of the mortgagor, labor union of the mortgagor, or charitable organizations. HUD is not narrowing the sources of gifts through this rulemaking, but rather is striving to ensure that gifts are gifts and that, especially in the

situation of gifts from charitable organizations, the gift is not a *quid pro quo* between the homebuyer's purchase of the property and the seller's "contribution" or payment to the charitable organization.

The prohibited sources of downpayment assistance, as structured in the final rule, are narrow and should not encompass a substantial number of small entities that are engaged in downpayment assistance to homebuyers, which, to date, have primarily been charitable organizations with tax-exempt status. Charitable organizations, large or small, remain eligible to provide downpayment assistance to FHA mortgagors, subject to meeting the requirements of § 203.19, as revised by this final rule.

Accordingly, the undersigned certifies that this rule will not have a significant economic impact on a substantial number of small entities.

### Executive Order 12612, Federalism

Executive Order 12612, (entitled "Federalism") prohibits, to the extent practicable and permitted by law, an agency from promulgating a regulation that has federalism implications and either imposes substantial direct compliance costs on state and local governments and is not required by statute, or preempts state law, unless the relevant requirements of section 6 of the Executive Order are met. This final rule does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order. This final rule solely addresses requirements under HUD's FHA mortgage insurance programs.

### Unfunded Mandates Reform Act

Title II of the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4, approved March 22, 1995) established requirements for federal agencies to assess the effects of their regulatory actions on state, local, and tribal governments, and the private sector. This final rule does not impose any federal mandates on any state, local, or tribal governments or the private sector within the meaning of the Unfunded Mandates Reform Act of 1995.

### Catalog of Federal Domestic Assistance

The Catalog of Federal Domestic Assistance Number for the principal FHA single family mortgage insurance program is 14.117. This final rule also applies through cross-referencing to FHA mortgage insurance for condominium units (14.133), and other smaller single family programs.

**List of Subjects in 24 CFR Part 203**

Loan programs—housing and community development, Mortgage insurance, Reporting and recordkeeping requirements.

■ Accordingly, the Department amends 24 CFR part 203, as follows:

## PART 203—SINGLE FAMILY MORTGAGE INSURANCE

■ 1. The authority citation for part 203 continues to read as follows:

**Authority:** 12 U.S.C. 1709, 1710, 1715b, 1715z–16, and 1715u; 42 U.S.C. 3535(d).

■ 2. Section 203.19 is revised to read as follows:

### § 203.19 Mortgagor's investment in the property.

(a) *Required funds.* The mortgagor must have available funds equal to the difference between:

(1) The cost of acquisition, which is the sum of the purchase price of the home and settlement costs acceptable to the Secretary; and

(2) The amount of the insured mortgage.

(b) *Mortgagor's minimum cash investment.* The required funds under paragraph (a) of this section must include an investment in the property by the mortgagor, in cash or cash equivalent, equal to at least 3 percent of the cost of acquisition, as determined by the Secretary, unless the mortgagor is:

(1) A veteran meeting the requirements of § 203.18(b); or

(2) A disaster victim meeting the requirements of § 203.18(e).

(c) *Restrictions on seller funding.* Notwithstanding paragraphs (e) and (f) of this section, the funds required by paragraph (a) of this section shall not consist, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale:

(1) The seller or any other person or entity that financially benefits from the transaction; or

(2) Any third party or entity that is reimbursed, directly or indirectly, by any of the parties described in paragraph (c)(1) of this section.

(d) *Gifts and loans usually prohibited for minimum cash investment.* A mortgagor may not use funds for any part of the minimum cash investment under paragraph (b) of this section if the funds were obtained through a loan or a gift from any person, except as provided in paragraphs (e) and (f) of this section, respectively.

(e) *Permissible sources of loans.*

(1) *Statutory authorization needed.* A statute must authorize a loan as a source of the mortgagor's minimum cash investment under paragraph (b) of this section.

(2) *Examples.* The following loans are authorized by statute as a source for the minimum investment:

(i) A loan from a family member, a loan to a mortgagor who is at least 60 years old when the mortgage is accepted for insurance, or a loan that is otherwise expressly authorized by section 203(b)(9) of the National Housing Act;

(ii) A loan made or held by, or insured by, a federal, state, or local government agency or instrumentality under terms and conditions approved by the Secretary;

(iii) A loan made or held by, or insured by, a tribal government or an agency or instrumentality thereof, including a tribally designated housing entity as defined at 25 U.S.C. 4103(21), which is treated as a state or local government under applicable state or local law, under terms and conditions approved by the Secretary; and

(iv) A federal disaster relief loan.

(f) *Permissible sources of gifts.* The following are permissible sources of gifts or grants used for the mortgagor's minimum investment under paragraph (b) of this section:

(1) Family members and governmental agencies and instrumentalities eligible under paragraphs (e)(2)(i) and (ii) of this section;

(2) A tribal government or an agency or instrumentality thereof, including a tribally designated housing entity, as defined at 25 U.S.C. 4103(21);

(3) An employer or labor union of the mortgagor;

(4) Organizations described in section 501(c)(3) and exempt from taxation under section 501(a) of the Internal Revenue Code;

(5) Disaster relief grants; and

(6) Other sources as may be approved by the Secretary on a case-by-case basis.

Dated: September 26, 2007.

**Brian D. Montgomery,**
*Assistant Secretary for Housing—Federal Housing Commissioner.*

[FR Doc. 07–4846 Filed 9–28–07; 8:45 am]

**BILLING CODE 4210–67–P**

explain in simple and clear language what we have determined and the reasons for and the effect of our determination. If our determination involves a determination of disability that is in whole or in part unfavorable to you, our written notice also will contain in understandable language a statement of the case setting forth the evidence on which our determination is based. The notice also will inform you of your right to review by a Federal reviewing official and explain your right to representation. We will not mail a notice if the beneficiary's entitlement to benefits has ended because of his or her death.

### Subpart I—[Removed]

17. Remove and reserve subpart I, consisting of §§ 405.801 through 405.850.

### PART 416—SUPPLEMENTAL SECURITY INCOME FOR THE AGED, BLIND, AND DISABLED

### Subpart I—[Amended]

18. The authority citation for subpart I is revised to read as follows:

Authority: Secs. 702(a)(5), 1611, 1614, 1619, 1631(a), (c), (d)(1), and (p), and 1633 of the Social Security Act (42 U.S.C. 902(a)(5), 1382, 1382c, 1382h, 1383(a), (c), (d)(1), and (p), and 1383b); secs. 4(c) and 5, 6(c)–(e), 14(a), and 15, Pub. L. 98–460, 98 Stat. 1794, 1801, 1802, and 1808 (42 U.S.C. 421 note, 423 note, 1382h note).

19. Amend § 416.903 by removing the last sentence in paragraph (a).

### Subpart J—[Amended]

20. The authority citation for subpart J continues to read as follows:

Authority: Secs. 702(a)(5), 1614, 1631, and 1633 of the Social Security Act (42 U.S.C. 902(a)(5), 1382c, 1383, and 1383b).

21. Amend § 416.1002 by adding a definition for "Quick disability determination," to read as follows:

### § 416.1002   Definitions.

\*    \*    \*    \*    \*

*Quick disability determination* means an initial determination on a claim that we have identified as one that reflects a high degree of probability that you will be found disabled and where we expect that your allegations will be easily and quickly verified.

\*    \*    \*    \*    \*

22. Amend § 416.1003 by revising paragraph (c)(2) to read as follows:

### § 416.1003   Basic responsibilities for us and the State.

\*    \*    \*    \*    \*

(c) \* \* \*

(2) Provide an organizational structure, adequate facilities, qualified personnel, medical consultant services, designated quick disability determination examiners (§§ 416.1019 and 416.1020(c)), and a quality assurance function (§§ 416.1020 through 416.1024);

\*    \*    \*    \*    \*

23. Add a new § 416.1019 under the new undesignated center heading QUICK DISABILITY DETERMINATIONS to read as follows:

### § 416.1019   Quick disability determination process.

(a) If we identify a claim as one involving a high degree of probability that the individual is disabled, and we expect that the individual's allegations will be easily and quickly verified, we will refer the claim to the State agency for consideration under the quick disability determination process pursuant to this section and § 416.1020(c).

(b) If we refer a claim to the State agency for a quick disability determination, a designated quick disability determination examiner must:

(1) Have a medical or psychological consultant verify that the medical evidence in the file is sufficient to determine that, as of the alleged onset date, the individual's physical or mental impairment(s) meets the standards we establish for making quick disability determinations;

(2) Make quick disability determinations based only on the medical and nonmedical evidence in the files; and

(3) Subject to the provisions in paragraph (c) of this section, make the quick disability determination by applying the rules in subpart I of this part.

(c) If the quick disability determination examiner cannot make a determination that is fully favorable to the individual or if there is an unresolved disagreement between the disability examiner and the medical or psychological consultant, the State agency will adjudicate the claim using the regularly applicable procedures in this subpart.

24. Amend § 416.1020 by adding a new paragraph (c) to read as follows:

### § 416.1020   General administrative requirements.

\*    \*    \*    \*    \*

(c) Each State agency will designate experienced disability examiners to handle claims we refer to it under § 416.1019(a).

### Subpart N—[Amended]

25. The authority citation for subpart N continues to read as follows:

Authority: Secs. 702(a)(5), 1631, and 1633 of the Social Security Act (42 U.S.C. 902(a)(5), 1383, and 1383b); sec. 202, Pub. L. 108–203, 118 Stat. 509 (42 U.S.C. 902 note).

26. Amend § 416.1403 by revising paragraphs (a)(22) and (a)(23) to read as follows:

### § 416.1403   Administrative actions that are not initial determinations.

(a) \* \* \*

(22) Determining whether to select your claim for the quick disability determination process under § 416.1019;

(23) The removal of your claim from the quick disability determination process under § 416.1019;

\*    \*    \*    \*    \*

27. Amend § 416.1404 by revising paragraph (a), removing existing paragraph (b) and redesignating existing paragraph (c) as paragraph (b), to read as follows:

### § 416.1404   Notice of the initial determination.

(a) We will mail a written notice of our initial determination to you at your last known address. The written notice will explain in simple and clear language what we have determined and the reasons for and the effect of our determination. If our determination involves a determination of disability that is in whole or in part unfavorable to you, our written notice also will contain in understandable language a statement of the case setting forth the evidence on which our determination is based. The notice also will inform you of your right for reconsideration. We will not mail a notice if the beneficiary's entitlement to benefits has ended because of his or her death.

\*    \*    \*    \*    \*

[FR Doc. E7–13288 Filed 7–9–07; 8:45 am]
BILLING CODE 4191–02–P

### DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### 24 CFR Part 203

[Docket No. FR–5087–N–02]

RIN 2502–AI52

### Standards for Mortgagor's Investment in Mortgaged Property: Extension of Public Comment Period

AGENCY: Office of the Assistant Secretary for Housing–Federal Housing Commissioner, HUD.

**ACTION:** Notice: Extension of Public Comment Period.

**SUMMARY:** This notice extends the public comment period for an additional 30-day period for HUD's proposed rule on Standards for Mortgagor's Investment in Mortgaged Property, published on May 11, 2007.

**DATES:** The comment period for the proposed rule published a 72 FR 27048, May 11, 2007, is extended until August 10, 2007.

**ADDRESSES:** Interested persons are invited to submit comments regarding this rule to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 Seventh Street, SW., Room 10276, Washington, DC 20410–0500. Communications should refer to the above docket number and title.

*Comment by Mail.* Please note that due to security measures at all federal agencies, submission of comments by mail often results in delayed delivery.

*Electronic Submission of Comments.* HUD now accepts comments electronically. Interested persons may now submit comments electronically through the Federal eRulemaking Portal at *www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available for public viewing. Commenters should follow the instructions provided at *www.regulations.gov* to submit comments electronically.

*No Facsimile Comments.* Facsimile (Fax) comments are not acceptable. In all cases, communications must refer to the docket number and title.

*Public Inspection of Public Comments.* All comments and communications submitted will be available, without revision, for inspection and downloading at *www.regulations.gov.* Comments are also available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the Office of Regulations. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the comments by calling the Regulations Division at (202) 708–3055 (this is not a toll-free number).

**FOR FURTHER INFORMATION CONTACT:** James Beavers, Acting Director, Office of Single Family Program Development, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; telephone (202) 708–2121 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Information Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:**

**Background**

HUD published a proposed rule entitled "Standards for Mortgagor's Investment in Mortgaged Property" on May 11, 2007 (72 FR 27048). Through this rule, HUD proposes to codify in regulation specific standards governing a mortgagor's investment in property for which the mortgage is insured by the Federal Housing Administration (FHA). Specifically, this proposed rule would codify HUD's longstanding practice, authorized by statute, of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations.

The standards would address a situation in which the mortgagor's investment is derived from a gift, loan, or other payment that is provided by any donor, including an individual or an organization, and would also specify prohibited sources for a mortgagor's investment. The proposed rule would establish that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: (1) The seller, or any other person or entity that financially benefits from the transaction; or (2) any third party or entity that is reimbursed directly or indirectly by any of the parties listed in clause (1).

**Extension of Public Comment Period**

HUD's May 11, 2007, proposed rule provides for the public comment period to end on July 10, 2007. Due to significant interest in this rule, HUD is extending the public comment period, for an additional 30-day period, to August 10, 2007.

Dated: July 5, 2007.

**Brian D. Montgomery,**

*Assistant Secretary for Housing—Federal Housing Commissioner.*

[FR Doc. 07–3357 Filed 7–6–07; 11:24 am]

BILLING CODE 4210–67–P

## DEPARTMENT OF LABOR

**Occupational Safety and Health Administration**

**29 CFR Part 1910**

[Docket No. OSHA–2007–0024]

RIN 1218–AC 23

**Regulatory Flexibility Act Review of the Methylene Chloride Standard**

**AGENCY:** Occupational Safety and Health Administration, Labor.

**ACTION:** Request for comments.

**SUMMARY:** The Occupational Safety and Health Administration (OSHA) is conducting a review of its Methylene Chloride Standard under Section 610 of the Regulatory Flexibility Act and Section 5 of Executive Order 12866 on Regulatory Planning and Review. In 1997, OSHA promulgated the Standard to protect workers from occupational exposure to methylene chloride. The purpose of this review is to determine whether there are ways to modify this Standard to reduce regulatory burden on small business and to improve its effectiveness. Written comments on these and other relevant issues are welcomed.

**DATES:** Written comments to OSHA must be sent or postmarked by October 9, 2007.

**ADDRESSES:** You may submit comments by any of the following methods:

*Electronically:* You may submit comments and attachments electronically at *http://www.regulations.gov,* which is the Federal eRulemaking Portal. Follow the instructions on-line for making electronic submissions.

*Fax:* If your submissions, including attachments, are not longer than 10 pages, you may fax them to the OSHA Docket Office at (202) 693–1648.

*Mail, hand delivery, express mail, messenger and courier service:* You must submit three copies of your comments and attachments to the OSHA Docket Office, Docket No. OSHA–2007–0024, U.S. Department of Labor, Room N–2625, 200 Constitution Avenue, NW., Washington, DC 20210. Deliveries (hand, express mail, messenger and courier service) are accepted during the Department of Labor's and Docket Office's normal business hours, 8:15 a.m.–4:45 p.m., Eastern Time.

*Instructions:* All submissions must include the Agency name and the OSHA docket number for this rulemaking, (OSHA–2007–0024). Submissions are placed in the public docket without change and may be available online at

# Part I. Rulings and Decisions Under the Internal Revenue Code of 1986

## Section 61.—Gross Income Defined

Whether certain down payment assistance provided to a home buyer is includible in the recipient's gross income under section 61. See Rev. Rul. 2006-27, page 915.

## Section 102.—Gifts and Inheritances

Whether certain down payment assistance provided to a home buyer is excludible from the recipient's gross income as a gift under section 102. See Rev. Rul. 2006-27, page 915.

## Section 501.—Exemption From Tax on Corporations, Certain Trusts, etc.

*26 CFR 1.501(c)(3)–1: Organizations organized and operated for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals. (Also §§ 61, 102, 1012.)*

**Down payment assistance; home buyers.** This ruling sets forth the applicable rules and standards for determining whether organizations that provide down payment assistance to home buyers qualify as tax-exempt charities. In addition, the ruling addresses whether assistance received for a down payment is treated as a gift and included in a home buyer's basis.

## Rev. Rul. 2006–27

ISSUES:

1. Whether organizations that otherwise meet the requirements of § 501(c)(3) of the Internal Revenue Code and are described in the situations below operate exclusively for charitable purposes.

2. Whether home buyers who receive down payment assistance from the organizations may exclude the amount of the assistance from their gross income as gifts under § 102.

3. Whether home buyers who receive down payment assistance from the organizations may include the amount of the assistance in the cost basis of their homes under § 1012.

FACTS

Situation 1

*X* is a non-profit corporation that helps low-income individuals and families purchase decent, safe and sanitary homes throughout the metropolitan area in which *X* is located. As a substantial part of its activities, *X* makes assistance available exclusively to low-income individuals and families to provide part or all of the funds they need to make a down payment on the purchase of a home. *X* uses standards set by Federal housing statutes and administered by the Department of Housing and Urban Development to determine who is a low-income individual. Individuals are eligible to receive assistance from *X*'s program if they are low-income individuals, have the employment history and financial history necessary to qualify for a mortgage, and would so qualify but for the lack of a down payment. *X* also offers financial counseling seminars and conducts other educational activities to help prepare potential low-income home buyers for the responsibility of home ownership.

*X* will consider applications for assistance in connection with an applicant's purchase of any home that meets *X*'s standards for habitability. Before making a grant of down payment assistance, *X* requires a home inspection report for the property that the applicant intends to buy to ensure that the house will be habitable.

To fund its down payment assistance program and other activities, *X* conducts a broad based fundraising program that attracts gifts, grants and contributions from several foundations, businesses and the general public.

*X*'s grantmaking process is structured to ensure that *X*'s staff awarding grants on behalf of *X* does not know the identity of the party selling the home to the grant applicant or the identities of any other parties, such as real estate agents or developers, who may receive a financial benefit from the sale. The staff also does not know whether any of the interested parties to the transaction have been solicited for contributions to *X* or have made pledges or actual contributions to *X*. Further, *X* does not

accept any contributions contingent on the sale of a particular property or properties.

Situation 2

*Y* is a nonprofit corporation that is like *X* in all respects as set forth in Situation 1, except as follows. Under *Y*'s grantmaking procedures, *Y*'s staff considering a particular applicant's application knows the identity of the party selling the home to the grant applicant and may also know the identities of other parties, such as real estate agents and developers, who may receive a financial benefit from the sale. Moreover, in substantially all of the cases in which *Y* provides down payment assistance to a home buyer, *Y* receives a payment from the home seller. Further, there is a direct correlation between the amount of the down payment assistance provided by *Y* in connection with each of these transactions and the amount of the home seller's payment to *Y*. Finally, *Y* does not conduct a broad based fundraising campaign to attract financial support. Rather, most of *Y*'s support comes from home sellers and real estate-related businesses that may benefit from the sale of homes to buyers who receive *Y*'s down payment assistance.

Situation 3

*Z* is a nonprofit corporation formed to combat community deterioration in an economically depressed area that has suffered a major loss of population and jobs. Studies have shown that the average income in the area is below the median level for the State. *Z* cooperates with government agencies and community groups to develop an overall plan to attract new businesses to the area and to provide stable sources of decent, safe and sanitary housing for the area residents without relocating them outside the area. As part of the renewal project, *Z* receives funding from government agencies to build affordable housing units for sale to low and moderate-income families. As a substantial part of its activities, *Z* makes down payment assistance available to eligible home buyers who wish to purchase the newly-constructed units



EXHIBIT "F"

from *Z. Z* also offers financial counseling seminars and conducts other educational activities to help prepare potential low and moderate-income home buyers for the responsibility of home ownership.

To fund its down payment assistance program and other activities, *Z* conducts a broad based fundraising program that attracts gifts, grants and contributions from several foundations, businesses and the general public.

LAW

Section 501 of the Code provides for the exemption from federal income tax of corporations organized and operated exclusively for charitable or educational purposes, provided that no part of the net earnings inures to the benefit of any private shareholder or individual. *See* § 501(c)(3).

Section 1.501(c)(3)–1(c)(1) of the Income Tax Regulations provides that an organization operates exclusively for exempt purposes only if it engages primarily in activities that accomplish exempt purposes specified in § 501(c)(3). An organization must not engage in substantial activities that fail to further an exempt purpose. In *Better Business Bureau of Washington, D.C. v. U.S.*, 326 U.S. 279, 283 (1945), the Supreme Court held that the "presence of a single . . . [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly . . . [exempt] purposes."

Section 1.501(c)(3)–1(d)(1)(ii) provides that an organization is not organized or operated exclusively for exempt purposes unless it serves a public rather than a private interest. To meet this requirement it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests.

Section 1.501(c)(3)–1(d)(2) defines the term "charitable" as used in § 501(c)(3) as including the relief of the poor and distressed or of the underprivileged, and the promotion of social welfare by organizations designed to lessen neighborhood tensions, to eliminate prejudice and discrimination, or to combat community deterioration. The term "charitable" also includes the advancement of education.

Section 1.501(c)(3)–1(d)(3)(i) provides, in part, that the term "educational" as used in § 501(c)(3) relates to the instruction of the public on subjects useful to the individual and beneficial to the community.

Section 1.501(c)(3)–1(e) provides that an organization that .operates a trade or business as a substantial part of its activities may meet the requirements of § 501(c)(3) if the trade or business furthers an exempt purpose, and if the organization's primary purpose does not consist of carrying on an unrelated trade or business.

In *Easter House v. U.S.*, 12 Cl. Ct. 476, 486 (1987), *aff'd*, 846 F.2d 78 (Fed. Cir. 1988), the U.S. Court of Federal Claims considered whether an organization that provided adoption and related health services to pregnant women who agreed to place their newborns for adoption through the organization qualified for exemption under § 501(c)(3). The court concluded that the organization did not qualify for exemption under § 501(c)(3) because its primary activity was placing children for adoption in a manner indistinguishable from that of a commercial adoption agency. The court rejected the organization's argument that the adoption services merely complemented the health-related services to unwed mothers and their children. Rather, the court found that the health-related services were merely incident to the organization's operation of an adoption service, which, in and of itself, did not serve an exempt purpose. The organization did not provide health-related services to unwed mothers who wished to keep their children or who arranged for an adoption independent of the organization. The organization's sole source of support was the fees it charged adoptive parents, rather than contributions from the public. The court also found that the organization competed with for-profit adoption agencies, engaged in substantial advertising, and accumulated substantial profits. Accordingly, the court found that the "business purpose, and not the advancement of educational and charitable activities purpose, of plaintiff's adoption service is its primary goal" and held that the organization was not operated exclusively for purposes described in § 501(c)(3). *Easter House*, 12 Cl. Ct. at 485–86.

In *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the court held that an organization that operated a school to train individuals for careers as political campaign professionals, but that could not establish that it operated on a nonpartisan basis, did not exclusively serve purposes described in § 501(c)(3) because it also served private interests more than incidentally. The court found that the organization was created and funded by persons affiliated with a particular political party and that most of the organization's graduates worked in campaigns for the party's candidates. Consequently, the court concluded that the organization conducted its educational activities with the objective of benefiting the party's candidates and entities. Although the candidates and entities benefited were not organization "insiders," the court stated that the conferral of benefits on disinterested persons who are not members of a charitable class may cause an organization to serve a private interest within the meaning of § 1.501(c)(3)–1(d)(1)(ii). The court concluded by stating that even if the political party's candidates and entities did "comprise a charitable class, [the organization] would bear the burden of proving that its activities benefited members of the class in a non-select manner." *American Campaign Academy*, 92 T.C. at 1077.

In *Columbia Park and Recreation Association v. Commissioner*, 88 T.C. 1 (1987), *aff'd* without published opinion, 838 F.2d 465 (4th Cir. 1988), the court held that an association formed in a private real estate development to operate parks, swimming pools, boat docks, and other recreational facilities did not qualify as a § 501(c)(3) organization. Although the organization provided some benefit to the general public, the primary intended beneficiaries were the residents and property owners of the private development. Thus, the organization operated for a substantial non-exempt purpose rather than for exclusively charitable purposes.

Rev. Rul. 67–138, 1967–1 C.B. 129, held that helping low-income persons obtain adequate and affordable housing is "charitable" because it relieves the poor and distressed or underprivileged. In Rev. Rul. 67–138, the organization carried on several activities directed to assisting low-income families in obtaining improved housing, including (1) conducting a training course relative to various aspects of homebuilding and homeownership, (2) coordinating and supervising joint construction projects, (3) purchasing building

sites for resale at cost, and (4) lending aid in obtaining home construction loans.

Rev. Rul. 70–585, 1970–2 C.B. 115, discussed four situations of organizations providing housing and analyzed whether each organization qualified as charitable within the meaning of § 501(c)(3). Situation 1 described an organization formed to construct new homes and renovate existing homes for sale to low-income families who could not obtain financing through conventional channels. The organization also provided financial aid to low-income families eligible for loans under a Federal housing program who did not have the necessary down payment. The organization made rehabilitated homes available to families who could not qualify for any type of mortgage. When possible, the organization recovered the cost of the homes through very small periodic payments, but its operating funds were obtained from federal loans and contributions from the general public. The revenue ruling held that by providing homes for low-income families who otherwise could not afford them, the organization relieved the poor and distressed.

Situation 2 described an organization formed to ameliorate the housing needs of minority groups by building housing units for sale to persons of low and moderate-income on an open-occupancy basis. The housing was made available to members of minority groups who were unable to obtain adequate housing because of local discrimination. The housing units were located to help reduce racial and ethnic imbalances in the community. As the activities were designed to eliminate prejudice and discrimination and to lessen neighborhood tensions, the revenue ruling held that the organization was engaged in charitable activities within the meaning of § 501(c)(3).

Situation 3 described an organization formed to formulate plans for the renewal and rehabilitation of a particular area in a city as a residential community. The median income level in the area was lower than in other sections of the city and the housing in the area generally was old and badly deteriorated. The organization developed an overall plan for the rehabilitation of the area, sponsored a renewal project, and involved residents in the area renewal plan. The organization also purchased an apartment building that it rehabilitated and rented at cost to low and moderate-income families with a preference given to residents of the area. The revenue ruling held that the organization was described in § 501(c)(3) because its purposes and activities combated community deterioration.

Situation 4 described an organization formed to alleviate a shortage of housing for moderate-income families in a particular community. The organization planned to build housing to be rented at cost to moderate-income families. The Service held that the organization failed to qualify for exemption under § 501(c)(3) because the organization's program was not designed to provide relief to the poor or further any other charitable purpose within the meaning of § 501(c)(3) and the regulations.

Rev. Rul. 72–147, 1972–1 C.B. 147, held that an organization that provided housing to low-income families did not qualify for exemption under § 501(c)(3) because it gave preference to employees of a business operated by the individual who also controlled the organization. Although providing housing for low-income families furthers charitable purposes, doing so in a manner that gives preference to employees of the founder's business primarily serves the private interest of the founder rather than a public interest.

Rev. Rul. 72–559, 1972–2 C.B. 247, held that an organization that subsidized recent law graduates during the first three years of their practice to enable them to establish legal practices in economically depressed communities that have a shortage of available legal services, and to provide free legal services to needy members of the community, qualified for exemption under § 501(c)(3). Although the recipients of the subsidies were not themselves members of a charitable class, the resulting benefit to them did not detract from charitable purposes. Rather, the young lawyers were merely the instruments by which the organization accomplished the charitable purpose of providing free legal services for those unable to pay for, or obtain, such services.

Rev. Rul. 74–587, 1974–2 C.B. 162, held that an organization providing low-cost or long-term loans to, or equity investments in, businesses operating in economically depressed areas qualified for exemption under § 501(c)(3). The organization provided financial assistance only to businesses that were unable to obtain funds from conventional sources, and gave preference to businesses that would provide training and employment opportunities for unemployed or under-employed area residents. Although some of the individual business owners receiving financial assistance from the organization were not themselves members of a charitable class, the benefit to them did not detract from the charitable character of the organization's program. As in Rev. Rul. 72–559, the recipients of aid were instruments for accomplishing the organization's charitable purposes.

Rev. Rul. 76–419, 1976–2 C.B. 146, held that an organization that converts blighted land in an economically depressed community to an industrial park and leases space on favorable terms to businesses that agree to hire a significant number of unemployed area residents and train them in needed skills qualifies for exemption under § 501(c)(3). The organization furthered charitable purposes by improving economic conditions for the poor and distressed and combating community deterioration. The organization offered inducements to businesses solely for the purpose of advancing charitable goals.

Section 61 provides that, except as otherwise provided in subtitle A (relating to income taxes), gross income means all income from whatever source derived.

Section 1012 provides, generally, that the basis of property shall be its cost to the taxpayer.

Section 1016(a)(1) provides that proper adjustment shall be made to the basis of property for expenditures, receipts, losses, or other items properly chargeable to capital account.

Section 1001(a) provides that the gain from the sale or other disposition of property is the excess of the amount realized over the adjusted basis for determining gain provided in § 1011. Section 1011(a) provides generally that the adjusted basis for determining gain from the sale or other disposition of property is the basis determined under § 1012, adjusted as provided in § 1016.

Section 102 provides that the value of property acquired by gift is excluded from gross income. A gift "proceeds from a 'detached and disinterested generosity,' ... 'out of affection, respect, admiration,

charity or like impulses.'" *Commissioner v. Duberstein*, 363 U.S. 278, 285 (1960). Payments that proceed from "the constraining force of any moral or legal duty," or from "'the incentive of anticipated benefit' of an economic nature," are not gifts. *Duberstein*, 363 U.S. at 285. Thus, payments attendant to ordinary business or commercial transactions, or that proceed primarily from the moral or legal obligations attendant such transactions, are not gifts. However, a payment made to an individual that responds to the individual's needs, that is made without economic or other consideration being received by the donor, and that does not proceed from any moral or legal duty, is motivated by detached and disinterested generosity, and may be excluded from gross income as a gift under § 102. *See, e.g.*, Rev. Rul. 99–44, 1999–2 C.B. 549.

ANALYSIS

In Situation 1, *X*'s purposes and activities relieve the poor, distressed and underprivileged by enabling low-income individuals and families to obtain decent, safe and sanitary homes. The way *X* conducts its down payment assistance program establishes that *X*'s primary purpose is to address the needs of its low-income grantees. *See* Rev. Rul. 70–585, Sit. 1. As a condition of providing assistance, *X* requires a home inspection to ensure that the house the applicant intends to buy will be habitable. *X*'s financial counseling seminars and other educational programs help to prepare potential home buyers for the responsibility of home ownership. *See* Rev. Rul. 67–138. *X* conducts a broad based fundraising program, and *X* receives support from a wide array of sources. *X*'s policies of ensuring that its grantmaking staff does not know the identity or contributor status of the party selling the home to the grant applicant (or any other party who may receive a financial benefit from the sale), and of not accepting contributions contingent on the sale of any particular properties, ensure that *X* is not beholden to any particular donors or other supporters whose interest may conflict with that of the low-income buyers *X* is working to help.

*X*'s grantmaking procedures combined with its efforts to educate home buyers ensure that *X* is operated primarily to benefit the low-income beneficiaries of its down payment assistance. The low-income beneficiaries constitute a charitable class. Any benefit to other parties (such as home sellers, real estate agents, or developers) who participate in the transactions does not detract from the charitable purpose of relieving the poor and distressed. *See* Rev. Ruls. 72–559, 74–587, 76–419. Because *X* is operated exclusively for charitable purposes, *X* qualifies for exemption from federal taxation as an organization described in § 501(c)(3).

By contrast, in Situation 2, *Y* does not qualify as an organization described in § 501(c)(3). To finance its down payment assistance activities, *Y* relies on sellers and other real-estate related businesses that stand to benefit from the transactions *Y* facilitates. Furthermore, in deciding whether to provide assistance to a low-income applicant, *Y*'s grantmaking staff knows the identity of the home seller and may also know the identities of other interested parties and is able to take into account whether the home seller or another interested party is willing to make a payment to *Y*. *Y*'s receipt of a payment from the home seller corresponding to the amount of the down payment assistance in substantially all of the transactions, and *Y*'s reliance on these payments for most of its funding indicate that the benefit to the home seller is a critical aspect of *Y*'s operations. In this respect, *Y* is like the organization considered in *Easter House*, which received all of its support from fees charged to adoptive parents, so that the business purpose of the adoption service became its primary goal and overshadowed any educational or charitable purpose. Like the organization considered in *American Campaign Academy*, *Y* is structured and operated to assist private parties who are affiliated with its funders. Like the organizations considered in *American Campaign Academy*, *Easter House*, and *Columbia Park Recreation Association*, *Y* also serves an exempt purpose, but because *Y* is not operated exclusively for exempt purposes, *Y* does not qualify for exemption from federal income tax as an organization described in § 501(c)(3).

In Situation 3, although *Z* does not limit its down payment assistance program to low-income recipients, *Z*'s down payment assistance program still serves a charitable purpose described in § 501(c)(3) because it combats community deterioration in a specific, economically depressed area that has suffered a major loss of population and jobs. Through a combination of counseling and financial assistance, *Z* helps low and moderate-income families in that area to acquire decent, safe and sanitary housing and to prepare for the responsibilities of home ownership. In this respect, *Z* is like the organization described in Situation 3 of Rev. Rul. 70–585. Because *Z* is operated exclusively for charitable purposes, *Z* qualifies for exemption from federal taxation as an organization described in § 501(c)(3).

Down payment assistance payments for home buyers in Situations 1 and 3 are made by those organizations out of a detached and disinterested generosity and from charitable or like impulse, rather than to fulfill any moral or legal duty, and thus qualify for exclusion from such home buyers' gross incomes as "gifts" under § 102. The benefits provided to the home buyers in these circumstances are sufficiently removed from the interests of any home sellers or sales agents that they proceed from a detached and disinterested generosity on the part of the donor organization, and such grants lack the indicia of a rebate, price adjustment, or *quid pro quo* incident to a sale. Favorable treatment under § 102 is thus appropriate. The home buyer's payment of such amount toward the purchase of the residence will be included in his or her cost basis under § 1012.

In Situation 2, in substantially all of the cases in which *Y* provides down payment assistance to a home buyer, *Y* receives a payment from the home seller that directly correlates to the amount of the down payment assistance *Y* provides to the home buyer. In those cases, the payments received by the home buyers do not qualify for exclusion from gross income as gifts under § 102. The payments do not proceed from detached and disinterested generosity, but rather are in response to an anticipated economic benefit, namely facilitating the sale of a seller's home. Under *Duberstein, supra*, such payments are not gifts for purposes of § 102. Unlike in Situations 1 and 3, in Situation 2, the down payment assistance received by those home buyers represents a rebate or purchase price reduction. As a rebate or purchase price reduction, the down payment assistance is not includible in a home

buyer's gross income under § 61 and the amount of the down payment assistance is not included in the home buyer's cost basis under § 1012, as adjusted under § 1016.

HOLDINGS

1. In Situations 1 and 3, the organization is operated exclusively for charitable purposes and qualifies for exemption from federal income tax as an organization described in § 501(c)(3). In Situation 2, the organization is not operated exclusively for charitable purposes, and consequently, does not qualify for exemption from federal income tax as an organization described in § 501(c)(3).

2. In Situations 1 and 3, the home buyers may exclude the down payment assistance from their gross income as gifts under § 102. In Situation 2, the home buyers may not exclude the down payment assistance as gifts under § 102. However, in Situation 2, the down payment assistance is excluded from the gross income of home buyers because it represents a rebate or purchase price reduction.

3. In Situations 1 and 3, the home buyers may include the down payment assistance in the cost basis of their homes under § 1012. In Situation 2, the home buyers may not include the amount of the down payment assistance in the cost basis of their homes under § 1012. Rather, the amount of the down payment assistance represents a rebate or purchase price reduction that is excluded from the home buyer's cost basis under § 1012.

DRAFTING INFORMATION

The principal author of this revenue ruling is Elizabeth C. Kastenberg of Exempt Organizations, Tax Exempt and Government Entities Division. For further information regarding this revenue ruling, contact Elizabeth C. Kastenberg at (202) 283–9468 (not a toll-free call).

## Section 1012.—Basis of Property—Cost

Whether certain down payment assistance provided to a home buyer is included in the buyer's cost basis under section 1012. See Rev. Rul. 2006-27, page 915.

## Section 1502.—Regulations

*26 CFR 1.1502–13: Intercompany transactions.*

## T.D. 9261

## DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## 26 CFR Part 1

## Intercompany Transactions; Manufacturer Incentive Payments

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Final regulations.

SUMMARY: This document contains final regulations under section 1502 of the Internal Revenue Code. *Example 13* of the intercompany transaction regulations illustrates the treatment of manufacturer incentive payments. Because a premise underlying the example is under reconsideration, these final regulations remove and reserve this example. The regulations will affect corporations filing consolidated returns.

DATES: *Effective Date:* These regulations are effective on May 8, 2006.

FOR FURTHER INFORMATION CONTACT: Frances Kelly, (202) 622–7770 (not a toll-free number).

SUPPLEMENTARY INFORMATION:

## Background

Section 1.1502–13 of the consolidated return regulations provides rules for taking into account items of income, gain, deduction, and loss of members from intercompany transactions. In particular, §1.1502–13(c)(7)(ii), *Example 13*, illustrates how the matching rule of the intercompany transaction regulations treats a transaction involving manufacturer incentive payments. On August 13, 2004, the IRS and Treasury Department published a notice of proposed rulemaking (REG–131264–04, 2004–2 C.B. 506) in the **Federal Register** (69 FR 50112) proposing regulations to address additional transactions involving manufacturer incentive payments and to clarify the

proper treatment of such incentive payments under the intercompany transaction regulations.

On April 25, 2005, the IRS and Treasury Department published Rev. Rul. 2005–28, 2005–19 I.R.B. 997, which suspends, in part, Rev. Rul. 76–96, 1976–1 C.B. 23. Rev. Rul. 2005–28 states that the IRS will not apply, and taxpayers may not rely upon, the conclusion reached in Rev. Rul. 76–96 that certain rebates made by a manufacturer to retail customers are ordinary and necessary business expenses deductible under section 162, pending the IRS's reconsideration of the issue and publication of subsequent guidance.

## Explanation of Provisions

The manufacturer incentive payment transaction described in §1.1502–13(c)(7)(ii), *Example 13*, relies, in part, upon the premise that the manufacturer incentive payment is an ordinary and necessary business expense deductible under section 162. To the extent that this premise is correct, this example illustrates the proper application of the intercompany transaction regulations. However, because Rev. Rul. 2005–28 suspends Rev. Rul. 76–96, in pertinent part, these final regulations remove §1.1502–13(c)(7)(ii), *Example 13*, pending further guidance on the section 162 issue considered in Rev. Rul. 76–96.

## Special Analyses

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It is hereby certified that these regulations will not have a significant economic impact on a substantial number of small entities. These final regulations do not alter substantive provisions of the intercompany transaction regulations. They merely remove an example which may be misleading and cause confusion for taxpayers. Accordingly, good cause is found for dispensing with prior notice and comment pursuant to 5 U.S.C 553(b), and for dispensing with a delayed effective date pursuant to 5 U.S.C 553(d). Because no notice of proposed rulemaking is required, the provisions of the Regulatory Flexibility Act (5 U.S.C. chapter 6) do not apply. Pursuant to section 7805(f)

United States Government Accountability Office

# GAO

Report to the Chairman, Subcommittee on Housing and Community Opportunity, Committee on Financial Services, House of Representatives

February 2005

# MORTGAGE FINANCING

## Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products



**G A O**

Accountability ★ Integrity ★ Reliability

GAO-05-194

00451



EXHIBIT "G"

**Most Low and No Down Payment Products Require Some Form of Borrower Investment**

Most low and no down payment mortgage products require some form of borrower investment, either a borrower contribution or cash reserve, as a way of reducing risk and assuring that the borrower has a stake in the property. Low down payment products offered by FHA, Fannie Mae, Freddie Mac and private insurers require a cash investment of at least 3 percent from the borrower. No down payment mortgage products offered by VA, RHS, Fannie Mae, Freddie Mac, and some private insurers require either no down payment or a minimum amount (such as $500 in Fannie Mae's MyCommunityMortgage program).

Many institutions permit down payment assistance. FHA stipulates that the gift donor may not be a person or entity with an interest in the sale of the property, such as the seller, real estate agent or broker, builder, or entity associated with them. FHA mortgagee letters state that "gifts from these sources (seller, builder, etc.) are considered inducements to purchase and must be subtracted from the sales price." However, FHA allows nonprofit agencies that may receive contributions from the seller to provide down payment assistance to the borrower. In contrast, Fannie Mae, Freddie Mac, and some of the private insurers generally do not allow down payment funds, either directly or indirectly, from an interested or seller-related party to the transaction. Fannie Mae and Freddie Mac officials told us that such seller-related contributions could contribute to an overvaluation of the price of the property.

Even where borrowers pay no down payment they very often must pay a minimum percentage of closing costs from their own funds.[18] FHA requires that borrowers pay 3 percent of the total loan amount toward the purchase of the home. This contribution may be used for down payment or closing costs. Thus, FHA borrowers may finance closing costs, within limits. FHA borrowers may also finance their insurance premium. Unlike FHA, some mortgage institutions do not allow financing of the closing costs and the insurance premiums in the first mortgage. VA generally allows payment of all closing costs to be negotiated while restricting those that may be charged to the borrower. VA allows borrowers to finance their insurance premium, called the funding fee. In the section 502 Guaranteed Loan program for RHS, borrowers may pay closing costs but they are not required to do so and may be allowed to finance the closing costs and their

---

[18]Closing costs could include a loan origination fee, a mortgage recordation fee, a title transfer tax, appraisal fees, attorney fees, and title insurance.

**00470**

11/14/2007 14:09 FAX 2024089538          CanonLAS                                    ☑001

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **AMERIDREAM, INCORPORATED,**<br><br>        **Plaintiff,**<br><br>       **v.**<br><br>**HON. ALPHONSO JACKSON, SECRETARY**<br>**OF THE UNITED STATES DEPARTMENT OF**<br>**HOUSING AND URBAN DEVELOPMENT,**<br><br>       **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)   **Civil Action No. 07-1752 (PLF)**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF NEIL ROLAND

1. My name is Neil Roland. I am over the age of twenty-one and fully competent to make this Declaration. I have never been convicted of a felony or crime involving moral turpitude. The facts stated in this declaration are true and correct and within my personal knowledge.

2. I am a reporter for Bloomberg News. In my capacity as a reporter for Bloomberg, I wrote the news article titled *"U.S. to Ban Down Payment Program Over Objections, Jackson Says."* The news article, which was published by Bloomberg on June 5, 2007, is attached to this affidavit as *Exhibit A*.

3. *Exhibit A* is a true and accurate copy of what was published by Bloomberg News. Neither I nor Bloomberg News has received any comment from or on behalf of HUD Secretary Alphonso Jackson regarding the accuracy of the report or the quotes or the paraphrases of comments attributed to the Secretary.

4. I declare under the penalties for perjury that the foregoing representations are true and correct.

                             *Neil Roland*
                             Neil Roland

Executed: November 14, 2007.

Austin_1\513121\1
48366-1 11/14/2007

**EXHIBIT**
tabbies
**"H"**

Bloomberg Printer-Friendly Page

# Bloomberg.com



## U.S. to Ban Down Payment Program Over Objections, Jackson Says

By Neil Roland

June 5 (Bloomberg) -- The U.S. Department of Housing and Urban Development will ban a down payment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said.

``I'm very much against it,'' Jackson said in an interview. ``I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments.''

The program, which was used by more than 100,000 low- and moderate-income consumers last year, allows nonprofit groups to fund down payments and get reimbursed by sellers. Audits have found it has contributed to higher housing prices and a surge in foreclosures of government-backed mortgages.

HUD is seeking to end it at a time when foreclosure filings have hit an all-time high, spurred by rising delinquencies among borrowers with poor or limited credit histories. The agency last month proposed terminating the assistance and has given the housing industry and consumer groups until July 10 to comment.

The National Association of Home Builders and nonprofits including AmeriDream Inc. and Sacramento, California-based Nehemiah Corp. of America criticized HUD's plan last week. They said the program helps consumers become home owners and should be tightened, not ended.

`Sham' Period?

``Did Secretary Jackson just imply that the governmental process of an open public comment period is just a sham?'' AmeriDream Chief Executive Officer Ann Ashburn said in an e-mail today. ``I know that the American people expect more from Secretary Jackson.''

AmeriDream, based in Gaithersburg, Maryland, makes as much as $100 million a year in fees from the program, Ashburn said.

Under the HUD program, nonprofit groups fund the entire down payment for buyers and get reimbursed by the sellers. The arrangement was designed with HUD's approval to circumvent U.S. rules that bar sellers from giving direct assistance.

Audits have found that home sellers typically pay a service fee to the nonprofits and raise the price of their homes to recoup the money. Once sold, the foreclosure rate on these homes is more than double that of other loans sponsored by HUD's Federal Housing Administration, according to HUD data.

Jackson said in the interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments. A similar 1999 HUD proposal was withdrawn by the agency in 2001 following industry opposition.

To contact the reporter on this story: Neil Roland in Washington at **nroland@bloomberg.net**

*Last Updated: June 5, 2007 12:18 EDT*





© 2007 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERIDREAM, INCORPORATED, )<br><br>Plaintiff, )<br><br>v. )<br><br>HON. ALPHONSO JACKSON<br>SECRETARY OF THE UNITED<br>STATES DEPARTMENT OF<br>HOUSING AND URBAN<br>DEVELOPMENT, )<br><br>Defendant. ) | Civil Action No. 07-1752 (PLF) |

## ORDER GRANTING SUMMARY JUDGMENT

Upon consideration of Freedom Home Baptist Church, Inc., dba Genesis Housing Development Corp.'s and Dove Foundation, Inc,. dba American Family Funds Down Payment Gift Program's Motion for Summary Judgment filed herein, the Court, having considered the Motion, the Memorandum of Points and Authorities in support thereof, the admissible summary judgment evidence, and any opposition thereto, finds the motion is meritorious and should be GRANTED.

Accordingly, it is hereby

ORDERED that Movants Freedom Home Baptist Church, Inc. dba Genesis Housing Development Corp.'s and Dove Foundation, Inc. dba American Family Funds Down Payment Gift Program's motion for summary judgment is GRANTED; and it is

FURTHER ORDERED that the Regulation published at 72 Fed. Reg. 56,002-07 (October 1, 2007) (to be codified at 24 C.F.R. pt. 203), is hereby DECLARED contrary

to law, arbitrary and capricious, unenforceable, and otherwise unlawful; and it is

FURTHER ORDERED that the defendant Secretary of the United States Department of Housing and Urban Development is permanently enjoined from enforcing the Regulation.

SO ORDERED.


Dated: _____     _____
                                United States District Judge Paul L. Friedman

Copies to:

Lee T. Ellis, Jr.
Baker & Hostetler LLP
Washington Square
Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036


Robert J. Katerberg, Esquire
U.S. Department Of Justice, Civil Division, Federal Programs
20 Massachusetts Avenue, NW
Washington, DC 20530

Scott Risner, Esquire
Christopher R. Hall, Esquire
Tamara Lynn Ulrich, Esquire
Assistant US Attorneys for the District of Columbia
Department of Justice
20 Massachusetts Avenue, NW
Washington, D.C.  20024


Frank S. Swain, Esquire
Baker & Daniels LLP
805 15th Street NW, Suite 700
Washington, DC 20005

David C. Merkin, Esquire
McMillan Metro, P.C.
1901 Research Blvd., Suite 500
Rockville, MD  20850