UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED,<br><br>       Plaintiff,<br><br>    v.<br><br>HON. ALPHONSO JACKSON<br>SECRETARY OF THE UNITED<br>STATES DEPARTMENT OF<br>HOUSING AND URBAN<br>DEVELOPMENT,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 07-1752(PLF)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>MOTION FOR SUMMARY JUDGMENT BY
PLAINTIFF AMERIDREAM, INCORPORATED</u>

Comes now plaintiff AmeriDream, Incorporated and moves the Court for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, declaring the Regulation that is the subject of this action to be unlawful and permanently enjoining the enforcement of the Regulation; and as grounds therefor refers to the Memorandum Of Points And Authorities, Rule 7(h) Statement Of Material Facts As To Which There Is No Genuine Issue, Second Affidavit of Ann Ashburn, and Declaration of Neil Roland attached hereto and made a part thereof.

WHEREFORE, plaintiff AmeriDream, Incorporated prays that the Motion be granted and the permanent injunction issued, with attorney's fees and costs against the defendant.

BAKER & HOSTETLER LLP


By: */s/ Lee T. Ellis, Jr.*
    Lee T. Ellis, Jr. (3863)
    Washington Square, Suite 1100
    1050 Connecticut Avenue, N.W.
    Washington, D.C.  20036
    Tel:  202-861-1521
    Fax:  202-861-1783
    lellis@bakerlaw.com

Attorneys for Plaintiff


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of November, 2007, a copy of the foregoing were filed and served pursuant to the Court's electronic filing procedures using the Court's CM/ECF System.

BAKER & HOSTETLER LLP

By: */s/Lee T. Ellis, Jr.*
    Lee T. Ellis, Jr. (3863)
    Suite 1100
    1050 Connecticut Avenue, N.W.
    Washington, D.C.  20036
    Tel:  202-861-1521
    Fax:  202-861-1783
    lellis@bakerlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07 1752 (PLF) |
| ) | |
| HON. ALPHONSO JACKSON ) | |
| SECRETARY OF THE UNITED ) | |
| STATES DEPARTMENT OF ) | |
| HOUSING AND URBAN ) | |
| DEVELOPMENT, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PAGE

SUMMARY OF ARGUMENT............................................ 1

BACKGROUND.................................................... 3

I. HUD'S LONGSTANDING SUPPORT OF DPA......................... 3

II. THE REGULATION.......................................... 4

III. HUD RATIONALE FOR THE REGULATION ...................... 5

  A. February 2005 GAO Report ............................. 6

  B. IRS Press Release on Revenue Ruling 2006-27 ........... 10

IV. EFFECTIVE DATE OF THE REGULATION........................ 11

PROCEDURAL HISTORY........................................... 12

ARGUMENT..................................................... 13

I. AMERIDREAM PREVAILS ON THE MERITS........................ 15

  A. The Regulation Violates the Administrative Procedure Act 15

      1. HUD Failed to Supply A Reasoned Analysis for
      Departing from Its Longstanding Policy of Supporting DPA
      Program

  B. HUD Improperly Prejudiced the Outcome of the
     Rulemaking Proceeding ................................. 35

  C. The Regulation Violates the United States
     Constitution .......................................... 38

II. AMERIDREAM WILL SUFFER IRREPARABLE HARM ABSENT
    PERMANENT INJUNCTIVE RELIEF............................. 42

III. ISSUANCE OF A PERMANENT INJUNCTION WILL NOT CAUSE
     SUBSTANTIAL HARM TO HUD................................ 43

IV. AMERIDREAM'S REQUEST FOR PERMANENT INJUNCTIVE RELIEF
    WILL FURTHER THE PUBLIC INTEREST ......................... 43

i

# TABLE OF CONTENTS

PAGE

CONCLUSION ................................................ 45

## TABLE OF AUTHORITIES

PAGE

*ACLU v. Mineta*,
    319 F. Supp. 2d 69 (D.D.C. 2004) .......................14

*ANR Pipeline Co. v. FERC*,
    71 F.3d 897 (D.C. Cir. 1995) ...........................16

*Action for Smoking & Health v. CAB*,
    699 F.2d 1209 (D.C. Cir. 1983) ....................23, 26

*Amoco Prod. Co. v. Village of Gambell*,
    480 U.S. 531 (1987) ....................................14

*Association of National Advertisers, Inc. v. FCC*,
    627 F.2d 1151 (D.C. Cir. 1979) ........................35

*Independent Petroleum Ass'n of Am. V. Babbit*,
    92 F.3d 1248(D.C. Cir. 1996) ..........................35

*Baptist Health v. Thompson*,
    458 F.3d 768 (8th Cir. 2006) ..........................34

*Bolling v. Sharpe*,
    347 U.S. 497 (1954) ...................................39

*Brown v. Barry*,
    710 F. Supp. 352 (D.D.C. 1989) .......................39

*Chamber of Commerce v. SEC*,
    443 F.3d 890 (D.C. Cir. 2006) .....................29, 31

*City of Brookings Municipal Telephone Co. v. FCC*,
    822 F.2d 1153 (D.C. Cir. 1987) .......................22

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ...............................39, 40

*Columbia Broad. System v. FCC*,
    454 F.2d 1018 (D.C. Cir. 1971) .......................16

*Conn. Light & Power Co. v. Nuclear Regulatory
    Commission*,
    673 F.2d 525 (D.C. Cir. 1982) ........................31

# TABLE OF AUTHORITIES

PAGE

*County of Los Angeles v. Shalala*,
   192 F.3d 1005 (D.C. Cir. 1999) .........................32

*Garrett v. FCC*,
   513 F.2d 1056 (D.C. Cir. 1975) .........................33

*Greater Boston Telegraph Corp. v. FCC*,
   444 F.2d 841 (D.C. Cir. 1970) ..........................16

*Housing Study Group v. Kemp*,
   736 F. Supp. 321 (D.D.C. 1990) .....................35, 36

*eBay Inc. v. MercExchange, L.L.C.*,
   126 S. Ct. 1837 (2006) .................................14

*International Snowmobile Manufacturers Association v.
   Norton*,
   340 F. Supp. 2d 1249 (D. Wyo. 2004) ...................37

*International Ladies' Garment Workers' Union v.
   Donovan*,
   722 F.2d 795 (D.C. Cir. 1983) .........................23

*McCain v. United States*,
   No. 06-1701 (RCL), 2007 WL 1127883 (D.D.C. Apr. 16,
   2007) .................................................39

*Motor Vehicles Manufacturers Association v. State Farm
   Mutual Automobile Insurance Co.*,
   463 U.S. 29 (1983) ....................................21

*Muwekma Ohlone Tribe v. Kempthorne*,
   452 F. Supp. 2d 105 (D.D.C. 2006) .....................33

*NLRB v. Bell Aerospace*,
   416 U.S. 267 (1974) ...................................34

## TABLE OF AUTHORITIES

PAGE

*National Association of Psychiatric Health Systems v.
   Shalala*,
   120 F. Supp. 2d 33 (D.D.C. 2000) ......................14

*Office of Commc'n of the United Church of Christ v.
   FCC*,
   707 F.2d 1413 (D.C. Cir. 1983) ........................23

*Owner-Operated Independent Drivers Association, Inc.
   v. Federal Motor Carrier Safety Admin.*,
   494 F.3d 188 (D.C. Cir. 2007) .........................28

*President v. Vance*,
   627 F.2d 353 (D.C. Cir. 1980) .........................15

*Ramaprakash v. FAA*,
   346 F.3d 1121 (D.C. Cir. 2003) ........................16

*Romer v. Evans*,
   517 U.S. 620 (1996) ................................39, 41

*Bracco Diagnostic v. Shalala*,
   963 F. Supp. 20 (D.D.C. 1997) .........................35

*Shays v. FEC*,
   337 F. Supp. 2d 28 (D.D.C. 2004) ......................18

*Shays v. FEC*,
   No. 04-1597, 2007 WL 2446159 (D.D.C. Aug. 30, 2007)15, 22, 27

*Smiley v. Citibank (South Dakota) N.A.*,
   517 U.S. 735 (1996) ...................................33

*Sundance Associates v. Reno*,
   139 F.3d 804 (10th Cir. 1998) .........................17

*Tierney v. Schweiker*,
   718 F.2d 449 (D.C. Cir. 1983) .........................15

# TABLE OF AUTHORITIES

PAGE

*Transactive Corp. v. United States*,
   91 F.3d 232 (D.C. Cir. 1996) ..........................35

## STATUTES AND REGULATIONS

Administrative Procedure Act, 5 U.S.C. §§ 551 <u>et</u> <u>seq</u>..passim

National Housing Act, 12 U.S.C. §1701 <u>et</u> <u>seq</u>.........passim

Declaratory Judgment Act, 28 U.S.C. § 2201(a) (2000)......14

Standards for Mortgagor's Investment in Mortgaged
   Property, 72 Fed. Reg. 27,048-51 (May 11, 2007)
   (proposed regulation) ..............................passim

Standards for Mortgagor's Investment in Mortgaged
   Property, 72 Fed. Reg. 56,002-07 (Oct. 1, 2007)....passim

## LEGISLATIVE MATERIAL

H.R. Rep. No. 1922, 73rd Cong., 2d. Sess. 1 (1934)........40

Homeowner Downpayment Assistance Programs and Related
   Issues: Hearing Before Subcomm. on Housing and
   Community Opportunity of the H. Comm. on Financial
   Services, 110th Cong. 21 (2007) (GPO Serial 110-45) ....9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07 1752 (PLF) |
| | ) |
| HON. ALPHONSO JACKSON SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff AmeriDream, Incorporated ("AmeriDream") respectfully requests that this Court grant its Motion For Summary Judgment By Plaintiff AmeriDream, Incorporated, declare the regulation recently promulgated by the United States Department of Housing and Urban Development ("HUD") entitled "Standards for Mortgagor's Investment in Mortgaged Property", 72 Fed. Reg. 56,002-07 (Oct. 1, 2007) (to be codified at 24 C.F.R. pt. 203) ("Regulation"), unenforceable and contrary to law, and permanently enjoin enforcement of the Regulation.

### SUMMARY OF ARGUMENT

HUD violated the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq. (2000) ("APA") when it promulgated the Regulation. The Regulation abruptly reversed HUD's decade-old policy of

approving and facilitating downpayment assistance ("DPA") programs without explaining, or even acknowledging, HUD's departure from that established policy. HUD also failed to address less-restrictive reasonable alternatives and failed to produce for public comment data an analysis that it substantially relied upon to justify its rulemaking action. Moreover, HUD granted one DPA provider five more months than all others in which to comply with the Regulation without a reasoned basis for doing so and contrary to previous written assurance.

The Regulation is not only the product of a rush to judgment, but the product of prejudgment. HUD Secretary Alphonso Jackson ("Secretary") exhibited an "unalterably closed mind" when, as prominently reported, he made statements during the comment period that HUD would approve the proposed Regulation expeditiously "even if the agency receives critical comments". Ex. B, Roland Aff. In doing so, Secretary Jackson did not merely express an opinion, he impermissibly committed himself to an outcome.

In light of these clear violations of the APA, plaintiff AmeriDream succeeds on the merits of its claims in this litigation. Furthermore, the Regulation effectively terminates AmeriDream and all of the programs that AmeriDream provides to low- and moderate-income homebuyers, a result which, as HUD itself recently and emphatically affirmed, is contrary to the

public interest.   Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. ("Pl.'s Memo. P. & A.") Ex. D.   Accordingly, this Court should grant declaratory and permanent injunctive relief.

**BACKGROUND**

## I.   HUD'S LONGSTANDING SUPPORT OF DPA

For approximately ten years, HUD has allowed and facilitated downpayment assistance programs like AmeriDream's, which accept contributions from members of the real estate industry.[1]   HUD itself has even used charitable DPA in the sale of certain HUD-owned properties.   Pl.'s Memo. P. & A. 4-5.

Throughout the past decade, HUD did not curtail seller-assisted DPA programs.[2]   To the contrary, HUD recently affirmed its support for seller-funded DPA.   In an October 25, 2005 letter to the Government Accountability Office ("GAO"), HUD Assistant Secretary for Housing and Federal Housing Administration ("FHA") Commissioner Brian Montgomery noted that HUD's Office of General Counsel had examined seller-funded DPA programs and determined that entities, such as AmeriDream, which structured their programs as the Office of General Counsel

---

[1] HUD Handbook 4155.1 Rev. 5, § 2-10 provides authority for DPA through gifts by DPA charities like AmeriDream, the standard HUD-1 form allows for reporting on the use of DPA, and HUD has issued several mortgagee letters that clarify the appropriate use of DPA without questioning the source of DPA funding.  Pl.'s Memo. P. & A. 4-5; <u>see</u>, <u>also</u>, Mortgagee Letter 00-28 (August 7, 2000), Mortgagee Letter 2004-28 (July 21, 2004).

[2] HUD initiated a rulemaking eight years ago similar to the one at issue here, but withdrew the proposal because "[t]he overwhelming majority of comments opposed the rule."  Withdrawal of Proposed Rule on Sources of Homeownership Downpayment, 66 Fed. Reg. 2851, 2852 (Jan. 12, 2001).

directed presented no legal concerns. Pl.'s Memo. P. & A. Ex.
D; Ex. A, Second Ashburn Aff. ¶ 4. Assistant Secretary
Montgomery expressly rejected suggestions that seller-funded DPA
programs be restricted further, noting that such programs
provided critical assistance to underserved and disadvantaged
populations who aspired to own their own homes:

> Borrowers who rely on seller-funded downpayment
> assistance are representative of the population that
> FHA was established to serve, families who are
> otherwise underserved by the private sector. Because
> of this fact, FHA has determined that additional
> requirements or restrictions that would prevent these
> borrowers from obtaining FHA financing would not be
> beneficial, leaving this population with financing
> options that are more costly and riskier than FHA.
> Therefore, FHA has determined that charging a higher
> premium on these types of loans would be a more
> palatable alternative, compensating FHA for the
> additional risk, while still permitting these
> borrowers the advantage of a more affordable, less
> risky loan.

Pl.'s Memo. P. & A. Ex. D (2005 HUD Letter to GAO).

**II.  THE REGULATION**

In May 2007, HUD departed from its longstanding policy of
approving seller-funded downpayment assistance when it published
"Standards for Mortgagor's Investment in Mortgaged Property."
72 Fed. Reg. 27,048-051 (May 11, 2007) (to be codified at 24
C.F.R. pt. 203) ("Proposed Regulation"). Contrary to HUD's
prior position, the Proposed Regulation sought to prohibit
completely DPA in the form of gifts from charities supported in

part by contributions from sellers or others that conceivably could benefit financially from the transaction.

The public comment period for the Proposed Regulation was extended from July 10, 2007 until August 10, 2007, during which time HUD received approximately 15,000 comments. 72 Fed. Reg. at 56,003. Over 14,000 comments opposed the Regulation and requested that it be withdrawn, while fewer than 30 comments supported the Regulation. Notwithstanding this strong opposition, HUD published the Regulation adopting this change in policy on October 1, 2007. Id. at 56,002-07.

### III. HUD RATIONALE FOR THE REGULATION

There is no dispute that HUD-approved, seller-funded DPA programs administered by AmeriDream and other charities have enabled hundreds of thousands of low- to moderate-income families to purchase homes for the first time, thus helping to increase homeownership rates to record levels, particularly among minority groups. See Ashburn Aff. ¶ 7-8.

Despite that undisputed success, HUD failed to provide a reasoned explanation in the Regulation for its abrupt change of course and flat contradiction of its prior longstanding policy regarding these DPA programs. Instead, HUD sought to deny its longstanding approval of these programs by suggesting that the Regulation merely "codifies HUD's longstanding practice" of allowing nonseller-funded DPA. In lieu of articulating a

rationale, HUD denigrated seller-funded DPA providers through which HUD itself arranged for downpayment assistance to facilitate the sale of HUD properties by referring to the DPA providers as "so-called charities" who award "so-called gifts." 72 Fed. Reg. at 56,002. HUD further asserted, without explanation, that DPA gifts directly or indirectly supported by seller contributions "function as an inducement to purchase the home", id., thus contradicting its prior public position that for seller-funded DPA providers structured like AmeriDream, "there has not been an inducement to purchase by the seller." Pl.'s Memo. P. & A. Ex. B (2005 HUD Letter to GAO).

Finally, HUD stated that its "primary concern" with seller-funded DPA was "that the sales price is often increased to ensure that the seller's net proceeds are not diminished." 72 Fed. Reg. at 56,002. HUD cited only two sources as bases for this concern: a February 2005 study by GAO and a 2006 Internal Revenue Service ("IRS") Revenue Ruling *as described in a related press release.* Yet, as detailed below, neither source states as HUD claims, and both have been dismissed by this Court as "flimsy bases" for the Regulation. Tr. Prelim. Inj. Hearing 20, Oct. 31, 2007.

### A.  February 2005 GAO Report

In both the Proposed Regulation and the final Regulation, HUD claimed that a GAO report released in February 2005,

entitled "Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Loan Products" ("February 2005 GAO Report"), found "that seller-related contributions *could* contribute to an overvaluation of the price of the property." 72 Fed. Reg. at 27,048-49; 72 Fed. Reg. at 56,002 (citing February 2005 GAO Report at 16) (emphasis added). But what HUD presented as a determination made by GAO, presumably based upon rigorous analysis of reams of data, is in fact only a remark made, without attribution, in a conversation with unidentified Fannie Mae and Freddie Mac officials. The February 2005 GAO Report merely stated that "*Fannie Mae and Freddie Mac officials told us that such seller-related contributions could contribute to an overvaluation of the property.*" Pl.'s Memo. P. & A. Ex. G at 16 (emphasis added). Moreover, there is no indication in the February 2005 GAO Report that the Fannie Mae or Freddie Mac officials with whom GAO chatted cited any data or other source supporting their observation, or whether they even had any particular knowledge of the issue, or any expertise to evaluate the relevant facts.

Inexplicably absent from the Proposed or final Regulation is any mention of a November 2005 GAO report entitled "Mortgage Financing: Additional Action Needed to Manage Risk of FHA-Insured Loans with Downpayment Assistance" ("November 2005 GAO Report"). The November 2005 GAO report, which was cited in

AmeriDream's comments on the Proposed Regulation, Pl.'s Memo. P. & A. Ex. M at 5-7, is more recent than the February 2005 GAO Report HUD relied upon and addresses the issues associated with DPA more directly.  Yet HUD failed to cite the latter report, thus avoiding discussion of both the policy recommendations GAO presented, which HUD did not act on, as well as the flawed methodology upon which GAO relied.

In the November 2005 GAO Report, the GAO presented to HUD six specific policy recommendations.  Pl.'s Memo. P. & A. Ex. J at 44-45.  HUD reviewed these recommendations at the time the November 2005 GAO Report was issued and responded to GAO in the 2005 HUD Letter to GAO discussed <u>supra</u>.  Pl.'s Memo. P. & A. Ex. D.  In its letter to GAO, HUD rejected a ban on seller-funded DPA programs.  <u>Id.</u>  Instead, HUD expressed its intention to continue to permit seller-funded DPA.  HUD did, however, commit to implement several of GAO's recommendations relating to seller-funded DPA programs, particularly those that addressed the higher credit risk associated with the DPA recipients, "while still permitting these borrowers the advantage of a more affordable, less risky [FHA] loan" through continued DPA assistance.  <u>Id.</u>  Despite that commitment, HUD later acknowledged in Congressional testimony that it knowingly ignored GAO's recommendations and sought to ban seller-funded DPA.  Homeowner Downpayment Assistance Programs and Related

Issues:    Hearing  Before  Subcomm.  on  Housing  and  Community
Opportunity  of  the  H.  Comm.  on  Financial  Services,  110th  Cong.
21  (2007)  (GPO  Serial  110-45)  ("Cong.  Hearing  Tr.").    The
Regulation  does  not  attempt  to  explain  HUD's  abrupt  reversal.

Had  HUD  cited  the  November  2005  GAO  Report,  it  also  would
have  had  to  address  significant  issues  concerning  the
methodology  used  by  GAO  to  examine  the  relationship  between
nonprofit  DPA  and  home  purchase  prices.    Specifically,  a  study
conducted  by  the  George  Mason  School  of  Public  Policy  concluded
that  the  November  2005  GAO  Report  "could  be  overstating  the
extent  of  the  default  and/or  claim  rates  of  FHA  loans  with
assistance  from  NDPA  [nonprofit  downpayment  assistance]
providers."   Pl.'s Memo. P. & A. Ex. K at 2 ("GMU Study").   The
GMU  Study,  which  also  was  cited  in  AmeriDream's  comment  letter,
Pl.'s Memo. P. & A. Ex. M at 7-8,  further  questioned  GAO's  "lack
of  attention  given  to  two  key  factors  that  influence  whether  or
not  a  loan  is  defaulted  or  goes  to  claim:    (1)  the  financial
situation  of  the  borrower  and  (2)  the  economic  conditions  of  the
area  in  which  the  home  is  located."   <u>Id.</u>   As  HUD  itself
acknowledges,  nonprofit  DPA  providers  tend  to  help  families  with
more  limited  means,  living  in  more  marginal  neighborhoods  than
FHA  generally  serves.   <u>See</u> 72 Fed. Reg. at 56,003.  Accordingly,
any  quantitative  analysis  of  their  work  properly  should  factor
in  the  types  of  families  and  communities  they  serve.

Even if GAO's methodology was accepted uncritically, the November 2005 GAO Report still would fail to support HUD's "primary concern", that the sales price of homes purchased with nonprofit DPA are "often increased to ensure that the seller's net proceeds are not diminished." 72 Fed. Reg. at 56,002. The November 2005 GAO Report stated that the price of homes purchased with DPA tended to exceed the purchase price of comparable homes by a modest increment, but that increment was *less than* the average DPA provided by AmeriDream, 3.3 percent of a home's purchase price. See Pl.'s Memo. P. & A. Ex. J at 3-4.

## B.  IRS Press Release on Revenue Ruling 2006-27

HUD also relies on statements found in an IRS press release, claiming that the Regulation is justified because it "harmonize[s] its regulations regarding downpayment assistance with recent rulings of the IRS." 72 Fed. Reg. at 56,003. It is unclear what "rulings" HUD has in mind, because HUD only cites a single IRS ruling, Revenue Ruling 2006-27. Moreover, that ruling concerns an entirely different set of regulatory concerns than those the Regulation purports to address.

According to HUD, Revenue Ruling 2006-27 "addresses [the] same concerns" regarding purchase price inflation that HUD incorrectly attributes to the February 2005 GAO report. 72 Fed. Reg. at 56,002. In fact, the Revenue Ruling states precisely the opposite: in those cases where home purchasers received DPA

10

from charities that received contributions from home sellers, "the downpayment assistance represents a rebate or purchase price reduction." Pl.'s Memo. P. & A. Ex. H at 16. HUD's confusion regarding the Revenue Ruling may be due to its misplaced reliance on a one-page IRS *press release* announcing the revenue ruling, rather than on the text of the ruling itself.[3] In view of those shortcomings, this Court has been quite clear on the inadequacy of the IRS materials as support for the Regulation, stating flatly, "That's not a basis." Tr. Prelim. Inj. Hearing 20, Oct. 31, 2007.

Other than those two sources, the February 2005 GAO Report and Revenue Ruling 2006-27 and accompanying press release, the Regulation did not cite a single authority in its support. Although the Regulation did mention an analysis of its internal loan portfolio HUD claimed to have done, the Regulation failed to either provide that study or even include a citation noting where it could be found.

## IV.  EFFECTIVE DATE OF THE REGULATION

As initially promulgated, the Regulation was to have taken effect October 31, 2007, that is, thirty days after publication in the Federal Register, for all but one DPA provider, Nehemiah

---

[3] Ironically, even the press release upon which HUD relies does not mention, let alone support, the proposition for which HUD cites the Revenue Ruling. Although the press release briefly discusses "financing arrangements" among the seller, buyer, and DPA provider, it does so only in the context of compliance with § 501(c)(3) of the tax code. Pl.'s Memo. P. & A. Ex. I.

Progressive Housing Development Corporation ("Nehemiah"). The Regulation provided that it would not apply to Nehemiah until March 31, 2008, that is, six months after publication. According to HUD, this disparate treatment stemmed from an April 1998 settlement agreement resolving litigation with Nehemiah. Id. at 56,002-03. However, in a letter that forms part of HUD's court-approved settlement agreement with Nehemiah, HUD states that the six-month delay in the effective date will apply not just to Nehemiah, but also to "all other similarly situated" DPA programs. Pl.'s Memo. P. & A. Ex. L. Although HUD noted the basis for Nehemiah's effective date in the discussion accompanying the Regulation, HUD failed to explain why other DPA providers were not afforded the benefits of the 1998 agreement.

## PROCEDURAL HISTORY

AmeriDream filed its Complaint For Declaratory And Injunctive Relief on October 1, 2007, requesting permanent injunctive and declaratory relief. Compl. ¶ 13. AmeriDream next filed a Motion For Preliminary Injunction and a Motion For A Temporary Restraining Order, but withdrew both upon HUD's agreement to delay enforcement of the Regulation as against AmeriDream while the issues raised in the Complaint For Declaratory And Injunctive Relief were litigated. As part of this agreement, HUD and AmeriDream stipulated to an orderly briefing schedule, including the submission of cross-motions for

summary judgment and responses thereto.  To permit that schedule
to be implemented, HUD stipulated that the Regulation would not
apply to AmeriDream until February 29, 2008, by which time a
decision on the merits was expected.  Order, Oct. 19, 2007.

HUD declined to provide a similar stay of enforcement of
the Regulation for other similarly-situated DPA providers.  As a
result, a number of DPA providers intervened in AmeriDream's
lawsuit and sought a preliminary injunction temporarily
enjoining enforcement of the Regulation.  This Court granted
intervenors' motions for preliminary injunction on October 31,
2007.  Tr. Prelim. Inj. Hearing 31, Oct. 31, 2007.  Plaintiff-
intervenors agreed to adhere to the same briefing schedule.

## ARGUMENT

AmeriDream moves for summary judgment on its claims that
the Regulation is arbitrary and capricious, unenforceable, and
otherwise contrary to law, and requests that the Court grant the
requested permanent injunction and declaratory relief.

This Court should grant the requested relief because
AmeriDream has met the applicable criteria for permanent
injunctive and declaratory relief.

Permanent injunctive relief is appropriate in this case.
When determining whether to grant a permanent injunction, "the
Court considers a modified iteration of the factors it utilizes
in assessing preliminary injunctions: (1) success on the merits,

13

(2) whether the plaintiff will suffer irreparable injury absent an injunction, (3) whether, balancing the hardships, there is harm to the defendant or other interested parties, and (4) whether the public interest favors granting the injunction."[4] ACLU v. Mineta, 319 F. Supp. 2d 69, 87 (D.D.C. 2004) (Friedman, J.); see eBay, Inc. v. MercExchange, L.L.C., 126 S. Ct. 1837, 1839 (2006) ("well-established principles of equity" dictate a plaintiff seeking a permanent injunction must show irreparable injury, inadequacy of a remedy at law, the balance of hardships favors injunctive relief, and an injunction would not disserve the public interest). Essentially, the standard for a permanent injunction differs from the standard for preliminary injunction only in that a plaintiff must show actual success, rather than a likelihood of success, on the merits. Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987).

Declaratory relief is also appropriate in this case. Courts have discretion to grant declaratory relief. See 28 U.S.C. § 2201(a) (2000). Declaratory relief is typically granted when it will (1) "serve a useful purpose in clarifying the legal relations in issue," or (2) "terminate and afford relief from the uncertainty, insecurity, and controversy giving

---

[4] These "well-settled requirements" are "adopted from requirements for a preliminary injunction as stated in Wis. Gas Co. v. FERC, 758 F.2d 669, 673-74 (D.C. Cir. 1985) and Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)." Nat'l Ass'n of Psychiatric Health Sys. v. Shalala, 120 F. Supp. 2d 33, 44 (D.D.C. 2000).

14

rise to the proceeding," <u>Tierney v. Schweiker</u>, 718 F.2d 449, 456 (D.C. Cir. 1983) (<u>quoting</u> <u>President v. Vance</u>, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980).

**I.    AMERIDREAM PREVAILS ON THE MERITS**

The Regulation is arbitrary and capricious under the APA, invalid because the Secretary prejudged the outcome of rulemaking proceedings, and unconstitutional under the equal protection component of the Due Process Clause of the Fifth Amendment.

**A.    <u>The Regulation Violates the Administrative Procedure Act</u>**

The Regulation is subject to review pursuant to section 706 of the APA, 5 U.S.C. § 706 (2000). While APA review is deferential, this Court has recognized that an agency has a higher burden when, as here, it changes longstanding policy. <u>Shays v. FEC</u>, No. 04-1597, 2007 WL 2446159, at *4 (D.D.C. Aug. 30, 2007) (<u>Shays III</u>). For while "[a]n agency's view of what is in the public interest may change in circumstances[,] . . . an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion, it may cross the line from the tolerably terse to

the intolerably mute." <u>Greater Boston Tel. Corp. v. FCC</u>, 444 F.2d 841, 852 (D.C. Cir. 1970).

The Regulation fails to meet this higher burden and should be vacated as arbitrary and capricious because HUD: (1) failed to supply a reasoned analysis for departing from its longstanding policy; (2) failed to consider or offer reasoned explanations for rejecting reasonable alternatives; (3) relied on data it never mentioned or produced for comment in the Proposed Regulation; and (4) failed to give a reasoned justification for providing different effective dates for similarly-situated entities.

### 1.    *HUD Failed to Supply a Reasoned Analysis for Departing from Its Longstanding Policy of Supporting DPA Programs*

The "failure to come to grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirement of reasoned decision making.'" <u>Ramaprakash v. FAA</u>, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (<u>citing</u> <u>Columbia Broad. Sys. v. FCC</u>, 454 F.2d 1018, 1027 (D.C. Cir. 1971)). "[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." <u>ANR Pipeline Co. v. FERC</u>, 71 F.3d 897, 901 (D.C. Cir. 1995).

For nearly a decade, HUD has regarded seller-funded DPA programs as consistent with the letter of the law and the

16

purposes of the National Housing Act, 12 U.S.C. §§1701 et seq. (2000), namely to promote housing affordability and choice, and protect the availability of adequate funding for housing at low cost.  It defies well-settled principles of administrative law for HUD to terminate those DPA programs without addressing its longstanding record and explaining the reasons for the complete reversal in its position.

Yet such an explanation is utterly lacking in HUD's justification for the Regulation.  HUD failed to acknowledge, much less explain, the striking departure from its record of approving these DPA programs, facilitating their operation and growth, and even utilizing such programs itself when selling some of its own inventory of properties.  To the contrary, the Regulation claimed that it merely "codifies HUD's longstanding practice."  72 Fed. Reg. at 56,002.

Nor did HUD even attempt to explain how its current reversal in policy better fulfills the will of Congress than its decade-long favorable position toward DPA programs.  It is axiomatic that an "agency's rulemaking power is not the power to make law, it is only the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." Sundance Assocs. v. Reno, 139 F.3d 804 (10th Cir. 1998) (internal quotation marks and citations omitted).  HUD only mentioned its authorizing statute to acknowledge that "[t]he

17

statute [is] silent about permissible or impermissible sources of the mortgagor's investment, except that some loans are permitted sources under the statute." 72 Fed. Reg. at 56,002.

HUD's explanation for the Regulation failed to come to grips with agency precedent on the subject. HUD also failed to indicate whether there had been any change whatsoever in the risk of defaults or claims with various DPA programs over the past decade. HUD did not even attempt to explain why the purported risks associated with such loans are unacceptable now after having been acceptable for the past ten years.

HUD provides no evidence to explain its new-found position beyond irrelevant and unsupported assertions. HUD's reliance on statements found in an IRS press release is misplaced. That document is both irrelevant and does not support HUD's assertions. The referenced revenue ruling concerns an entirely different set of regulatory issues, i.e., whether organizations can engage in DPA and retain their 501(c)(3) designations. Furthermore, the press release rests neither on expertise nor evidence about the effect of DPA loans on defaults or sale prices, and states precisely the opposite of the proposition that HUD claims it supports. See supra at 10-11; see also Shays v. FEC, 337 F. Supp. 2d 28, 126-28 (D.D.C. 2004) (Shays I) (FEC regulation arbitrary and capricious when FEC assumed the compatibility of the Federal Election Campaign Act [FECA] with

18

IRS requirements, and noting that "[i]t is the FEC, not the IRS, that is charged with enforcing FECA"). The IRS's discussion of how section 501(c)(3) of the Internal Revenue Code may apply to DPA providers is not a reasoned basis for the Regulation. Accordingly, this Court has observed that the IRS revenue ruling and related press release are "flimsy" and "not a basis" for the Regulation. Tr. Prelim. Inj. Hearing 20, Oct. 31, 2007.

HUD's passing references to the February 2005 GAO Report fare no better because the report merely refers to unattributed comments made by unidentified individuals with no indicia of reliability or empirical support. Supra at 6-7. Accordingly, this Court found that the February 2005 Report, too, was "flimsy", and failed to provide an adequate basis for the Regulation. Id.

As noted, other than those two sources, the Regulation did not provide a citation to a single authority in its support.

The Regulation failed to mention at all the November 2005 GAO Report[5] in which HUD both stated its opposition to a ban on seller-funded DPA programs, a position the Regulation reversed, and committed to implement certain GAO recommendations, a

---

[5] Although the November 2005 GAO Report more directly addresses the issue of seller-funded DPA than does the February 2005 GAO Report cited by HUD, the former provides no more support for the Regulation than does the latter. As commenters pointed out, the November 2005 GAO report fails to "segregate the effects of downpayment assistance from those of low downpayments and low credit ratings." 72 Fed. Reg. at 56,005. HUD did not offer any rebuttal at all to this assertion.

commitment HUD knowingly did not carry out. The November 2005 GAO Report also was based on questionable methodology and, even so, reported conclusions inconsistent with the "primary concern" identified by HUD as prompting the Regulation. <u>Supra</u> at 6-10.

Although the Regulation did mention an analysis of HUD's internal loan portfolio HUD claimed to have done, it failed to provide that study or even include a citation noting where it could be found. Moreover, that analysis was not even mentioned, let alone cited, in the Proposed Regulation, thus denying commenters the opportunity to discuss and rebut its findings.[6] Had commenters properly been given that opportunity, they undoubtedly would have pointed out while HUD claimed to have evaluated the performance of loans utilizing seller-funded DPA, no records were kept identifying the funding source for any downpayment assistance for several years of the period HUD purportedly analyzed. <u>See</u> Pl.'s Rule 7(h) Statement Of Material Facts As To Which There Is No Genuine Issue ¶¶92-94. Nor does HUD provide any citation supporting the stray sentence in which HUD claims that an analysis of Real Estate Owned (REO) sales "*suggests* that the sales prices of such properties *may* have been inflated." 72 Fed. Reg. at 56,005 (emphasis added). Such overreaching reveals the rulemaking for what it really is: a desired result in search of a justification.

20

Although courts clearly may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," <u>Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (internal quotations omitted), there is no such record here.  In this case, HUD's record is one of a rush to judgment.  HUD simply ignores its long history of approving, facilitating, and even using DPA programs.  HUD presents no evidence that the purported risks associated with DPA programs are any greater than they ever were, or showing that the purported risk is suddenly unacceptable after ten years of agency approval.  A press release from another agency that lacks expertise in housing policy, combined with a desire to "harmonize" action with that agency, and bald assertions that other studies, which were not cited, "could" or "may" indicate that certain DPA programs cause inflated property values, are "flimsy bases" for the Regulation and cannot substitute for reasoned analysis.  Tr. Prelim. Inj. Hearing 20, Oct. 31, 2007. Nor can HUD's eleventh-hour effort to prop up its desired conclusion with unsubstantiated data, drawn from sources lacking citations and never offered for public comment, satisfy basic notice obligations under the APA.

> **2.  HUD Failed To Consider Reasonable Alternatives To Its Chosen Policy And To**

---

[6] <u>See</u> Part I.A.3. <u>infra</u>.

### *Offer A Reasoned Explanation For Rejecting Them*

The law in this Circuit is quite clear that an agency must, in a statement of basis and purpose accompanying a final rule, provide a reasoned explanation for its rejection of reasonable alternatives. If an agency fails to do so, the final rule will be vacated. See Shays III, 2007 WL2616689, at *24 ("Unless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned"). For example, in City of Brookings Municipal Telephone Co. v. FCC, 822 F.2d 1153, 1169 (D.C. Cir. 1987), the D.C. Circuit invalidated action by the FCC for "failure to even consider" a commenter's proposal:

> It is well settled that an agency has 'a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.' Of course . . . this duty extends only to 'significant and viable' alternatives, not to 'every alternative device and thought conceivable by the mind of man.' . . . But with that sensible caveat, the fact remains that '[t]he failure of an agency to consider obvious alternatives has led uniformly to reversal.'

(citations omitted). Such a result is appropriate in this case, for HUD failed to consider the most obvious alternatives of all: those presented by (1) the very GAO which HUD cites, erroneously, to support its action; (2) the commenters whose input HUD ostensibly solicited; and (3) the Congress whose intent HUD purports to implement.

22

An agency's duty to consider responsible alternatives clearly applies where, as here, the agency is offered less restrictive alternatives to the action taken. For example, in International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795 (D.C. Cir. 1983), the D.C. Circuit considered the Secretary of Labor's rescission of longstanding restrictions on employing homeworkers in the knitted outerwear industry. The court vacated the agency's decision because the Secretary ignored various proposed alternatives aimed at accommodating the Secretary's concerns without completely rescinding the Department of Labor's longstanding restrictions:

> We do not suggest that [the Secretary] had to opt for any particular one of these proposals. However, he was required to address common and known or otherwise reasonable options, and to explain any decision to reject such options. His complete failure to satisfy these quintessential aspects of reasoned decision making is the primary basis for our decision to vacate his rescission of the restrictions in the knitted outerwear industry.

Id. at 818; see also Office of Commc'n of the United Church of Christ v. FCC, 707 F.2d 1413 (D.C. Cir. 1983); Action for Smoking & Health v. CAB, 699 F.2d 1209 (D.C. Cir. 1983), opinion supplemented by 713 F.2d 795 (D.C. Cir. 1983) (Board's reliance on "generalized and conclusory policy considerations" was an inadequate basis for rejecting less restrictive alternatives).

Like these earlier cases, HUD's explanation for the Regulation fails to address responsible alternatives to

23

abolishing AmeriDream's program and others like it. In violation of APA requirements, HUD simply ignores proposals advanced by AmeriDream, and others, for remedying alleged shortcomings in current DPA programs. Among other recommendations, AmeriDream suggested that HUD:

- Require mandatory homebuyer/ownership education for higher risk homebuyers;

- Mitigate default rates by developing and applying eligibility criteria for borrowers receiving DPA;

- Refine the current appraisal process, for example by adopting a blind draw process;

- Limit the total amount of DPA and closing cost assistance to six percent of a home's purchase price; and

- Review and approve organizations that want to provide DPA.

Pl.'s Memo. P. & A. Ex. M at 14-16.

All of AmeriDream's proposals address the concern HUD raises in its Notice of Proposed Rulemaking, namely, that homebuyers with very high loan-to-value ratios present an increased risk to FHA's insurance fund. 72 Fed. Reg. at 27,049. But as AmeriDream explained in its comment, all homebuyers who need assistance, regardless of the source of those funds, present a higher risk and need additional services to be successful. Pl.'s Memo. P. & A. Ex. M at 14-15. AmeriDream's proposed alternatives would allow DPA providers to address those

risks while continuing to provide the type of additional services necessary to help DPA recipients become homeowners.

Despite the relevance and reasonableness of AmeriDream's suggested alternatives, HUD cursorily mentions only a few: reforming the appraisal process, requiring homebuyer education, and including DPA as part of the closing cost assistance sellers are already allowed to provide (up to six percent of a home's purchase value), thus wholly ignoring the remainder of AmeriDream's proposals. 72 Fed. Reg. at 56,004. Of the alternatives suggested by AmeriDream that HUD even bothers to mention, HUD disposes of one by stating that DPA differs from closing costs, and shrugs off the other two by characterizing them as "beyond the scope of the present rule". Id. This circular reasoning—"we don't have to consider it because it's not what we proposed"—is flatly improper.

Furthermore, HUD makes only cursory mention of other alternatives advanced by commenters in the rulemaking, of which the agency has long been aware. These include:

- Mitigating risk by requiring a complete home inspection to avoid potentially high repair costs to the homeowner;

- Requiring homeowners to obtain a homeowner's warranty for a specified period of time in order to prevent high repair costs from being a potential source of default and foreclosure; or

- Requiring organizations that provide downpayment assistance to offer mandatory risk mitigation tools, or offer insurance to homebuyers.

72 Fed. Reg. at 56,004. Once again, HUD simply responds that "[t]he commenters' recommendations are noted, but the suggested actions are outside the scope of the present rule." Id.

Assuming that HUD means that all of these suggestions are outside the scope of the *rulemaking proceeding*, this position is plainly contrary to the law in this Circuit. A notice-and-comment rulemaking is not a take-it-or-leave-it proposition:

> The Board offers several reasons to justify its minimal discussion of individual proposals. First, the Board claims that even though it did not explicitly discuss each proposal, 'there can be little doubt that the Board was aware of the pros and cons of each alternative.' Thus, the Board suggests that as long as the record contains evidence to support its conclusion, it need not explain its action. Precisely the opposite is true. The APA guarantees the public an opportunity to comment on proposed rules. That opportunity is 'meaningless unless the agency responds to significant points made by the public.'

Smoking & Health, 699 F.2d at 1217.

In its rush to judgment, HUD simply ignored its obligation to consider less-restrictive alternatives, even though it was fully aware such options existed. In testimony before Congress on the Proposed Regulation, HUD affirmed that it "[a]bsolutely" could develop "underwriting standards" that would make loans utilizing seller-funded DPA "safe and sound" without eliminating current programs, but chose not to do so. Cong. Hearing Tr. 20-21. HUD also knowingly went back on its commitment to implement recommendations made by GAO which HUD had stated in writing that

it would implement rather than ban seller-funded DPA programs.
Id. at 21.

As this Court observed as recently as August of this year,
a decision which fails to consider reasonable alternatives "can
hardly be classified as reasoned." Shays III, 2007 WL 2616689,
at *24. And, in fact, this Court has recognized that the
Regulation's consideration of alternatives was inadequate:

> HUD, of course, is right that they don't need to
> respond to every comment, they don't need to analyze
> every alternative. They need to only consider the
> significant comments and the reasonable alternatives.
> They say that there are 28 discrete categories that
> they discussed, they grouped the comments, they listed
> them, they responded to them. The truth is that when
> you look at most of the 28 comments on which they
> commented, they are either irrelevant or minor points.
> And as to the major points, HUD didn't do a very good
> job of explaining why they were rejecting the
> comments. In fact, if you look at the first four and
> read the responses by HUD, they're mostly
> nonsequiters.

Tr. Prelim. Inj. Hearing 22, Oct. 31, 2007.

### 3.    *HUD Relied Substantially On Data That It Never Produced For Comment Or Even Mentioned In The Notice Of Proposed Rulemaking*

HUD's substantial reliance on an analysis of its loan
portfolio that was never produced for public comment violates
the APA's rulemaking requirements. The APA requires that an
agency publish a notice of proposed rulemaking, setting forth
"either the terms or substance of the proposed rule or a
description of the subjects and issues involved," 5 U.S.C. §

27

553(b)(3), and "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments". Id. at § 553(c).

As the D.C. Circuit recently explained, it is "'[i]ntegral' to these requirements" that an agency "identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules." Owner-Operated Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin., 494 F.3d 188, 199 (D.C. Cir. 2007) (internal citations omitted). Therefore, "An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." Id.

As discussed above, the final Regulation, like the Proposed Regulation, cited only two sources for HUD's purported concerns about the impact of DPA loans on home sale prices, and the alleged negative impact on borrowers and FHA: (1) an IRS press release (and related revenue ruling), and (2) the February 2005 GAO Report. As this Court already has pointed out, both of these sources are "flimsy bases" for the Regulation. Tr. Prelim. Inj. Hearing 20, Oct. 31, 2007.

Even before this Court made that observation, HUD apparently already was mindful of the inadequacies of those two sources. Thus, in the final Regulation, HUD mentioned for the

28

first time, but still did not cite, an internal analysis of its loan portfolio it claimed to have conducted. 72 Fed. Reg. at 56,005. HUD appeared to be asking commenters, and this Court, to ignore the flaws in its reliance upon an the IRS press release and GAO report because it came up with something else. Moreover, the Regulation did not provide the loan portfolio analysis, did not provide a meaningful account of its conclusions, and did not contain information about HUD's methodology employed in the analysis. Nor did HUD even provide a citation which would permit the public to locate the analysis.

The APA permits an agency to "use 'supplementary' data," unavailable during the notice and comment period, that "expands on and confirms information contained in the proposed rulemaking and addresses 'alleged deficiencies' in the preexisting data, so long as no prejudice is shown." Chamber of Commerce v. SEC, 443 F.3d 890, 900 (D.C. Cir. 2006) (internal citations omitted). But to be permissible, "'at least the most critical factual material that is used to support the agency's position on review . . . [must have] been made public in the proceeding and exposed to refutation." Id. (citation omitted).

In fact, had the loan portfolio analysis mentioned in the final Regulation properly been presented for public comment earlier, commenters would have had compelling grounds to challenge its findings. Specifically, the Regulation referred

to an "analysis of its loan portfolio going back to 1998," highlighting those "loans endorsed for insurance in Fiscal Year (FY) 2001," in which it purports to compare the claim rates of loans in which DPA was received from a seller-funded charity with claim rates of loans in which DPA was received from other sources.  72 Fed. Reg. at 56,003.  However, the basis for HUD's statements is entirely conjectural, because HUD did not have reliable records concerning sources of DPA in loan closings during that much of that period, including 2001 and even later.  Supra at 20.

Here, the data underlying the newly-revealed analysis purportedly derives from HUD's own loan portfolio dating back to 1998.  By definition, then, such data was available to HUD before the notice-and-comment period.  Moreover, given the flimsiness of HUD's other sources of support for the Regulation, i.e., the IRS press release and GAO report, HUD's analysis of its loan portfolio is "the most critical factual material that is used to support" HUD's position.  See id.

Indeed, HUD's portfolio analysis is the only data upon which HUD relies in the final Regulation to support its conclusions about the impact of DPA programs.  It is this analysis alone that HUD cites in response to the comment that "[t]he rule is not supported by data."  72 Fed. Reg. at 56,005.

30

Accordingly, the new data is not supplementary; it is all the data HUD has.

As the D.C. Circuit has aptly stated, "[t]o allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be genuine interchange as mere bureaucratic sport." Conn. Light & Power Co. v. Nuclear Regulatory Comm'n, 673 F.2d 525, 530 (D.C. Cir. 1982).

HUD's failure to disclose the data on which it relied, and the methodology it employed for reaching its conclusions, violates fundamental tenets of administrative law and compels rejection of the Regulation.  In granting the preliminary injunction in this case, this Court squarely addressed this issue, stating:

> Given the flimsiness of the other two bases in particular, [FHA's analysis of its loan portfolio] becomes a critical factor, a critical source of information that went to the heart of the matter as to whether this rule is justified.  And it should have been offered to the original commentators and any others, to the public, for comment.  And the language of Chamber of Commerce [v. SEC, 443 F. 3d 890 (D.C. Cir. 2006)] supports that.  It isn't merely supplemental information.  It is among the critical factual material that was used to support the agency's position.  And it wasn't made available for public comment.

Tr. Prelim. Inj. Hearing 21, Oct. 31, 2007.

31

4.    *HUD Failed To Provide A Reasoned Justification For Providing Different Effective Dates For Similarly-Situated Entities*

HUD acted arbitrarily and capriciously by providing different effective dates under the Regulation for similarly-situated entities without a reasoned justification. The Regulation provides that it will take effect 30 days after publication in the Federal Register as to all DPA providers except for Nehemiah, which is not subject to the Regulation until March 31, 2008, six months after publication of the Regulation. After AmeriDream brought the case at bar, HUD agreed to suspend application of the Regulation to AmeriDream until February 29, 2008—-still one month short of Nehemiah's "grace period"—-but refused to accord the same treatment to other similarly-situated DPA providers.

HUD's widely disparate treatment of DPA providers is the essence of arbitrariness, and HUD's attempt to justify it falls well short of what is required under settled principles of administrative law.

Both this Court and the D.C. Circuit have recognized that "[a] long line of precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently." County of Los Angeles v. Shalala, 192 F.3d 1005, 1022 (D.C. Cir. 1999)

(internal citation omitted); see also Muwekma Ohlone Tribe v. Kempthorne, 452 F. Supp. 2d 105, 115 (D.D.C. 2006) and cases cited therein.  Under this well-established precedent, "[m]ore than enumeration of factual differences between cases is required" to justify disparate treatment.  Garrett v. FCC, 513 F.2d 1056, 1060 (D.C. Cir. 1975).

HUD did not mention the 1998 Nehemiah settlement agreement in the Proposed Regulation, thus denying other DPA providers an opportunity to comment.  HUD did, however, provide for a special effective date for Nehemiah in the Regulation itself, 72 Fed. Reg. 56,003, thus, as this Court noted, subjecting that disparity to judicial review under the APA.  Tr. Prelim. Inj. Hearing 25, Oct. 31, 2007.  Significantly, HUD's discussion of the special effective date for Nehemiah omits the critical fact that, at the time of the settlement with Nehemiah, HUD stated in writing that the six-month delay in the effective date of any change would apply to "all other similarly situated DPA programs."  Pl.'s Memo. P. & A. Ex. L.

Based on the plain language of the letter and ordinary principles of fair play, AmeriDream could, and did, reasonably rely on the expectation that HUD would afford DPA programs similarly situated to Nehemiah the same six months.  Ex. A, Second Ashburn Aff. ¶ 3; see, e.g., Smiley v. Citibank (South Dakota) N.A., 517 U.S. 735, 742 (1996) ("change that does not

33

take account of legitimate reliance on prior [agency] interpretation may be arbitrary and capricious [or] an abuse of discretion") (internal citations omitted). Indeed, "[l]egitimate reliance on prior administrative decisions can be shown where 'some *new liability* is sought to be imposed on individuals for past actions which were taken in good-faith reliance on [agency] pronouncements.'" Baptist Health v. Thompson, 458 F.3d 768, 777 (8th Cir. 2006) (quoting NLRB v. Bell Aerospace, 416 U.S. 267, 295 (1974)) (emphasis added).

The "new liability" here could not be more stark. AmeriDream would have been forced to shut down the charitable program it has operated since 1999 thirty days after publication of the Regulation, and thousands of aspiring homeowners would have had to go elsewhere. Moreover, HUD's decision to make a deal with AmeriDream does not change the ultimate effect of disparate effective dates if the Regulation remains in force, that is, AmeriDream will be forced to shut down before Nehemiah. HUD's disparate treatment of similarly-situated DPA providers is without reasoned explanation and, as a result, is arbitrary and capricious.

As this Court stated in granting the preliminary injunction:

> And while the government may have had good and
> sufficient reasons for treating Nehemiah as it did in
> 1998, they have given no reason whatsoever, let alone

34

a rational one, for why everybody else the Rule is
effective October 31.  The Rule says we are treating
Nehemiah differently. ... And it is clear that under
the Administrative Procedure Act an agency must either
provide a rational basis for treating two similarly
situated entities differently, or must treat them all
the same.  There may be some cases where there's a
reason to do it, but it's got to be explained.  That
was stated by the Circuit in Independent Petroleum
Association of America versus Babbitt, 92 F.3d 1248,
in Transactive Corporation versus United States, 91
F.3d 232, and by me in [Bracco] Diagnostics versus
Shalala, 963 F.Supp. 20.  So I think there is a
substantial likelihood of success on that issue.

Tr. Prelim. Inj. Hearing 25-26, Oct. 31, 2007.

## B. <u>HUD Improperly Prejudiced the Outcome of the Rulemaking Proceeding</u>

Secretary Jackson's statements in an interview during the pendency of the rulemaking reveal that HUD improperly prejudged the outcome of the rulemaking.  A court may set aside a final regulation based on prejudgment of the outcome "only when there has been a clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the proceeding."  <u>Ass'n of Nat'l Advertisers, Inc. v. FCC</u>, 627 F.2d 1151, 1170 (D.C. Cir. 1979).  However, while "[m]ere proof that the official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute" cannot overcome the presumption that an official kept an open mind, <u>Hous. Study Group v. Kemp</u>, 736 F. Supp. 321 (D.D.C. 1990), that is not the case in this instance.  Secretary Jackson, as the deciding

official, did not merely express an opinion—-he committed himself to an outcome.[7]

Indeed, statements made by the Secretary during the pendency of the challenged rulemaking establish beyond doubt that HUD was not going to be swayed by the comment process, and would adopt the proposed rule regardless of the opposition. On June 5, 2007, Bloomberg News reported that HUD "*will* ban a downpayment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said." Pl.'s Memo. P. & A. Ex. O (emphasis added). The Secretary stated, "I'm very much against it . . . . I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments." Id. With respect to the then-pending rulemaking, "Jackson said in his interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments." Id. Mr. Neil Roland, the journalist who was present for Secretary Jackson's statements and wrote the Bloomberg article, recently has executed an affidavit affirming the accuracy of the article and the statements attributed to Secretary Jackson. Mr. Roland's affidavit also attests, "Neither I nor Bloomberg News has received any comment from or on behalf of HUD Secretary

---

[7] The situation here is also distinguishable from <u>Hous. Study Group</u>, where the district court stressed that Secretary Kemp's statements were made prior to the start of any rulemaking proceedings and did not establish an intention

Alphonso Jackson regarding the accuracy of the report or the quotes or paraphrases of comments attributed to the Secretary." Ex. B, Roland Aff.

Secretary Jackson's statements amply satisfy the "clear and convincing showing" of agency prejudgment. First, the statements not only express the Secretary's strong opposition to DPA programs, but convey, in explicit terms, HUD's intention to approve the proposal to abolish DPA programs by year-end despite critical comments. As paraphrased by this Court, Secretary Jackson stated, "I don't care what the comments say. We're going to approve this rule." Tr. Prelim. Inj. Hearing 27, Oct. 31, 2007. Second, the Secretary's comments were made during the very period HUD's proposal was out for public comment and agency decision-makers were required to keep6 an open mind.

Under these circumstances, the Regulation cannot stand. See Int'l Snowmobile Mfrs. Ass'n v. Norton, 340 F. Supp. 2d 1249, 1261 (D. Wyo. 2004) ("definite" statements by an Assistant Secretary during the administrative process show that the National Park Service had already reached a prejudged political conclusion). As this Court observed:

> It seems to me that by [Secretary Jackson] saying he's very much against it and that practice is wrong, and if he said that this rule is going to be approved regardless of what the comments are, it would appear that the test is met. That is, that he seemed

---

"set in stone." 736 F. Supp. 2d at 333.

> prepared to disregard any significant new material
> subsequently introduced during the comment period.

Tr. Prelim. Inj. Hearing 28, Oct. 31, 2007. Thus, in granting
the preliminary injunction, this Court concluded that "the
plaintiffs have a substantial likelihood of succeeding in
showing that Secretary Jackson prejudged this matter." Id. at
26-27.

### C.    The Regulation Violates the United States Constitution

The Regulation is also invalid because it irrationally
discriminates between similarly-situated organizations and
individuals in violation of the equal protection component of
the Due Process Clause of the Fifth Amendment. First, the
Regulation unconstitutionally prohibits DPA from seller-funded
charitable organizations like AmeriDream while permitting
similar gifts from similar entities that are not so supported.
Second, the Regulation imposes a disparate burden on low- and
moderate-income homebuyers, a disproportionate number of whom
are legal immigrants, female heads of household, or single
parents. Finally, the Regulation impermissibly discriminates
among those similarly-situated charities that fall within its
prohibitions because it is effective thirty days after
publication in the Federal Register for all such organizations,
except Nehemiah. 72 Fed. Reg. at 56,003.

38

Thus, the Regulation creates classes of DPA providers and recipients. In creating these classifications, HUD is subjected to the limitations imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, which prohibits the federal government from invidiously discriminating among individuals and groups. See Bolling v. Sharpe, 347 U.S. 497 (1954). Under standards virtually identical to those of the Fourteenth Amendment, see, e.g., Brown v. Barry, 710 F. Supp. 352, 353 n.4 (D.D.C. 1989), the Fifth Amendment requires that all persons similarly situated must be treated alike. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); McCain v. United States, No. 06-1701 (RCL), 2007 WL 1127883, at *2 (D.D.C. Apr. 16, 2007).

### 1.  *Rational Basis Standard*

The Regulation's disproportionate burdening of minorities, immigrants, and female heads of households normally would trigger heightened scrutiny. But because neither the downpayment classification itself, nor the effective date classification favoring Nehemiah, is expressly based on a suspect classification, the constitutionality of the Regulation depends on whether it rationally advances a legitimate government interest or purpose. See, e.g., Romer v. Evans, 517 U.S. 620, 632 (1996).

Under the rational basis standard, although courts give deference to the expressed objectives of the legislature, the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne, 473 U.S. at 446. Neither the Regulation's DPA classifications nor its effective date disparity can pass the rational basis test because the relationship, if any, between these classifications and the goals asserted by HUD is simply too attenuated to pass constitutional muster.

### 2. The Regulation's DPA Classification Fails The Rational Basis Test

The Regulation's DPA classification is fundamentally inconsistent with the legislative goals of the National Housing Act, which was created to establish and implement crucial policy initiatives to assist low- and moderate-income individuals in making the transition from tenants to homeowners. See H.R. Rep. No. 1922, 73rd Cong., 2d Sess. 1 (1934). The Regulation runs counter to this legislative goal by prohibiting homebuyers from accessing DPA from charitable organizations like AmeriDream, drastically reducing the number of low- and moderate-income families eligible for FHA-insured loans. Indeed, the very DPA programs that this Regulation would eviscerate have been crucial to the success of FHA's mission to assist low- and moderate-

income individuals and families purchase their own homes; home purchases that utilize downpayment assistance comprise approximately 40 percent of FHA loans. Pl.'s Memo. P. & A. Ex. D.

Nor is the DPA classification rationally related to the purposes HUD attributes to the Regulation. The Regulation's stated purpose is to codify HUD's "longstanding practice . . . of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations." 72 Fed. Reg. at 56,002. Contrary to this stated purpose, the DPA classification abruptly reverses HUD's longstanding practice of allowing gifts by charitable organizations like AmeriDream—even gifts that are supported in part by seller contributions.

In the absence of a rational relationship between the classification adopted and the legitimate goals of the Regulation, the Regulation's wholesale classification of these programs as "prohibited" unconstitutionally discriminates against providers of and recipients of downpayment gifts from seller-funded DPA programs. Romer, 517 U.S. at 633.

### 3. The Regulation's Effective Date Disparity Fails The Rational Basis Test

The Regulation's effective date disparity is also contrary to the purposes of the National Housing Act. HUD's reference to a prior settlement with Nehemiah does not satisfy the rational

basis standard. While the settlement may explain Nehemiah's effective date, the Regulation did not provide any rational basis for treating all other similarly-situated charitable organizations differently, especially given that the settlement expressly was intended to apply to all similarly-situated DPA providers. Accordingly, this classification should be struck down as violating the equal protection component of the Fifth Amendment.

### II.   AMERIDREAM WILL SUFFER IRREPARABLE HARM ABSENT PERMANENT INJUNCTIVE RELIEF

AmeriDream will suffer irreparable harm if HUD is not enjoined from enforcing the Regulation. The Regulation will eliminate the great majority of AmeriDream's funding. Pl.'s Memo. P. & A. 41-43. As a result, AmeriDream will be forced to cease operations and terminate its employees. AmeriDream is totally dependent on a highly skilled and highly specialized staff whose tenures with the organization are quite long; AmeriDream experiences little employee turnover. Once those employees depart, it will be virtually impossible to replace them with similarly-skilled employees. Ex. A, Second Ashburn Aff. ¶ 5. Accordingly, even if seller-funded DPA is later explicitly authorized, AmeriDream, and all of its charitable programs, would be permanently terminated absent injunctive relief.

### III. ISSUANCE OF A PERMANENT INJUNCTION WILL NOT CAUSE SUBSTANTIAL HARM TO HUD

HUD adopted this Regulation after ten years of actively facilitating seller-funded DPA programs without material adverse effects upon the agency. HUD has presented no meaningful evidence that it will now incur substantial harm if its historic policies remain in place and the Regulation is not implemented. Indeed, this Court observed that the declaration HUD submitted estimating the extent of any harm HUD would suffer as a result of the preliminary injunction likely overstated such harm. Tr. Prelim. Inj. Hearing 30, Oct. 31, 2007.

### IV. AMERIDREAM'S REQUEST FOR PERMANENT INJUNCTIVE RELIEF WILL FURTHER THE PUBLIC INTEREST

Granting permanent injunctive relief to AmeriDream will further the public interest. If the Regulation is implemented, AmeriDream and other similar charities, which conduct virtually all nonprofit DPA programs, will cease operations. The resulting harm to the public will be immediate and severe.

A range of statistics quantify the devastating impact of this result, particularly upon the low- and moderate-income families that FHA historically has had difficulty reaching. For example, over the past decade, seller-funded DPA programs have helped over one million individuals and families to buy their own homes, of whom an estimated 80 percent are first-time homebuyers. Ashburn Aff. ¶ 27.

43

Though these statistics are compelling, HUD itself presents the most convincing accounts of how devastating it would be to the public interest if seller-funded DPA was eliminated. HUD expressly recognized the benefits of seller-funded downpayment assistance in the 2005 HUD Letter to GAO. See supra at 4. More recently, in testimony given before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, HUD addressed the problems presented by FHA's downpayment requirement and the need to help aspiring homeowners who "find it difficult to save for a downpayment, but have adequate incomes to make monthly mortgage payments and do not pose a significant credit risk." Pl.'s Memo. P. & A. Ex. B at 4. HUD Assistant Secretary Montgomery elaborated on this harm:

> Without a viable FHA alternative, many homebuyers turned to high-cost financing and nontraditional loan products to afford their first homes. While low initial monthly payments seemed like a good thing, the reset rates on some interest-only loans are substantial and many families are unable to keep pace when the payments increase....Some will be forced to sell or lose their homes to foreclosure. The foreclosure rate for subprime loans is twice that of prime loans. And I think we can all agree that foreclosures are bad for families, bad for neighborhoods, and bad for the economy as a whole.

Id. at 3. In his testimony, Assistant Secretary Montgomery acknowledged that "The downpayment is the biggest barrier to homeownership in this country," and a major impediment to borrowers seeking access to FHA-insured loans. Id. at 4. Although Assistant Secretary Montgomery's 2006 testimony

44

advocated overcoming this impediment by changing FHA's authorizing statute to permit it to insure zero downpayment loans, the FHA cannot insure zero downpayment loans under current law. Thus, as HUD's testimony indicates, homebuyers deprived of seller-funded DPA under this Regulation will likely either be unable to purchase a home at all or be forced to take out predatory loans. <u>See also</u> Pl.'s Memo. P. & A. Ex. P, U.S. Conference of Mayors, "Resolution on Downpayment Assistance Programs", (2006) ("nonprofit and city downpayment assistance programs combined with FHA mortgage insurance is often a cheaper and financially better homeownership solution than other products available in the private mortgage marketplace").

<u>**CONCLUSION**</u>

For the foregoing reasons, AmeriDream respectfully requests that this Court grant its Motion for Summary Judgment, declare the Regulation unenforceable and contrary to law, and permanently enjoin enforcement of the Regulation.

BAKER & HOSTETLER LLP


By:<u>*/s/Lee T. Ellis, Jr.*</u>
   Lee T. Ellis,Jr. (3863)
   Suite 1100
   1050 Connecticut Avenue, N.W.
   Washington, D.C.  20036
   Tel:  202-861-1521
   Fax:  202-861-1783
   lellis@bakerlaw.com

Attorneys for Plaintiff

45

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
AMERIDREAM, INCORPORATED,     )
                              )
          Plaintiff,          )
                              )
     v.                       )   Civil Action No. 07-1752(PLF)
                              )
ALPHONSO JACKSON              )
SECRETARY OF THE UNITED       )
STATES DEPARTMENT OF          )
HOUSING AND URBAN             )
DEVELOPMENT,                  )
                              )
          Defendant.          )
                              )
_____ )
```

RULE 7(h) STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to LCvR7(h), the United States District Court for the District of Columbia requires that each motion for summary judgment shall be accompanied by a statement of material facts as to which there is no genuine issue. For its statement, plaintiff sets forth as follows:

1. Plaintiff AmeriDream, Incorporated ("AmeriDream") is a 501(c)(3) organization. Ashburn Aff. ¶ 3, Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. Ex. A ("Ashburn Aff."); Compl. ¶ 5, 16.

2. Defendant Alphonso Jackson is the Secretary of the United States Department of Housing and Urban Development ("HUD"). Compl. ¶ 17.

## Timeline of the Rulemaking Proceeding

3.   On May 11, 2007, the Secretary published "Standards for Mortgagor's Investment in Mortgaged Property" ("Proposed Regulation") in the Federal Register, 72 Fed. Reg. 27,048-051. Administrative R. 00010-14 ("Admin. R."); Def.'s Consolidated Opp. Mots. TROs & Prelim. Injs. 11 ("Def.'s Opp."); Compl. ¶ 19.

4.   The Proposed Regulation changed the standards governing a homebuyer's investment in property when the mortgage on the property is insured by the Federal Housing Administration ("FHA").   Admin. R. 00011 (72 Fed. Reg. at 27,048); Def.'s Opp. 12; Compl. ¶ 19.

5.   HUD received "over 15,000 public comments" on the Proposed Regulation.   Def.'s Opp. 12; Admin. R. 00003 (72 Fed. Reg. at 56,003).

6.   A majority of the public comments opposed the Proposed Regulation.   Admin. R. 00003 (72 Fed. Reg. at 56,003); Def.'s Opp. 12.

7.   On October 1, 2007, the Secretary published the final version of the regulation, entitled "Standards for Mortgagor's Investment in Mortgaged Property" ("Regulation"), in the Federal Register, 72 Fed. Reg. 56,002-007.   Admin. R. 00001-07; Compl. ¶ 20.

## AmeriDream's Programs and Services

8.    AmeriDream's mission is "to expand affordable housing opportunities for underserved groups and promote the value of homeownership as the foundation for building strong communities and individual prosperity."  Ashburn Aff. ¶ 4.

9.    AmeriDream provides a wide range of programs and services to benefit the individuals and families it serves. Ashburn Aff. ¶ 5, 14.    These programs include:    homebuyer education, loss mitigation counseling, community development, and privately-funded down payment gift assistance.    Ashburn Aff. ¶ 5; Compl. ¶ 5.

10.   AmeriDream not only helps families purchase homes; it also helps homeowners meet the responsibility of homeownership. Compl. ¶ 5.

11.   The philosophy underlying AmeriDream's charitable endeavors is that, in turn, these committed homeowners help build safe, thriving communities.  Compl. ¶ 5.

12.   AmeriDream has relieved poverty, lessened the burden on the government, and improved community beautification and maintenance.  Ashburn Aff. ¶ 9; Compl. ¶ 12.

13.   AmeriDream helps thousands of families break the cycle of poverty and develop financial independence, increases homeownership opportunities for thousands of underserved and traditionally disenfranchised populations, replaces blight with

development, and sustains strong communicates by preventing foreclosures. Ashburn Aff. ¶ 9; Compl. ¶ 12.

14. Since 1999, AmeriDream has educated over 60,000 homebuyers through its homebuyer education course. Ashburn Aff. ¶ 14; Compl. ¶ 9.

15. AmeriDream's homebuyer education program has helped give homebuyers the tools to understand what it means to purchase, own, and keep their homes. Ashburn Aff. ¶ 15. The program is free and offered both online and in workshops throughout the country. Id.

16. Since some lenders require evidence of participation in a homebuyer education class, an ancillary benefit of AmeriDream's homebuyer education program is that participants receive a certificate upon completion of the class, which fulfills the lenders' requirement. Ashburn Aff. ¶ 15.

17. Since 1999, AmeriDream has counseled and assisted approximately 1,200 people to retain their homes when confronted with mortgage difficulties. Ashburn Aff. ¶ 14; Compl. ¶ 9.

18. AmeriDream's loss mitigation service assists homeowners who find themselves at a crossroads of financial risks—such as an unexpected illness or a job layoff—and have difficulty maintaining ownership of their homes. Ashburn Aff. ¶ 16.

19.  AmeriDream's loss mitigation service is a free resource that provides counseling to homeowners in areas including, but not limited to: what to do if they miss their mortgage payment; how to catch up on insufficient escrows; what their rights may be regarding military service; and how to approach their mortgage company about foreclosure alternatives and reinstatement options.  Ashburn Aff. ¶ 16.

20.  Since 1999, AmeriDream has been responsible for making available 168 affordable housing units in our inner cities, most notably in Southeast Washington, D.C.  Ashburn Aff. ¶ 14; Compl. ¶ 9.

21.  Through its redevelopment program, AmeriDream builds new homes and renovates existing properties to create affordable housing opportunities for low- and moderate-income homebuyers. Ashburn Aff. ¶ 18.

22.  AmeriDream has committed more than $12 million to its redevelopment projects over the last six years.  Ashburn Aff. ¶ 18.  Projects have included affordable housing developments locally in Maryland and Washington, D.C., as well as in Florida. Id.

23.  AmeriDream's diverse redevelopment projects have included single-family and multi-family communities; environmentally-friendly "green" homes; hurricane resistant

homes; and a special accessible home built for a disabled couple. Ashburn Aff. ¶ 18.

24. AmeriDream is currently working with the District of Columbia government to build a new affordable housing community of 106 homes in Woodson Heights. Ashburn Aff. ¶ 18.

25. Without the funding support AmeriDream receives from downpayment assistance ("DPA"), it will have to abandon the Woodson Heights project. Ashburn Aff. ¶ 18.

26. AmeriDream's ability to continue homebuyer education, loss mitigation, and community development programs depends on the funding support AmeriDream receives from DPA. Ashburn Aff. ¶ 29.

27. All of AmeriDream's services and programs have, since their inception, been conducted with the explicit intention of enabling individuals and families to develop wealth through homeownership. Ashburn Aff. ¶ 6; Compl. ¶ 12.

### FHA and Downpayment Assistance

28. The FHA, which is a unit of HUD, insures mortgages that conform with specified criteria. Def.'s Opp. 1.

29. Under section 1709 of the National Housing Act ("NHA"), 12 U.S.C. § 1709(b)(9), homebuyers seeking to qualify for an FHA-insured loan must meet certain requirements, including the ability to make a cash or cash-equivalent

downpayment in the amount of three percent of the purchase price of their home. Def.'s Opp. 1, 5; Compl. ¶ 21.

30. Section 1709 of the NHA, 12 U.S.C. § 1709(b)(9), expressly permits prospective homebuyers to use monetary gifts from specified sources to meet the downpayment requirement. Admin. R. 00002 (72 Fed. Reg. at 56,002).

31. Permitted sources of downpayment gifts include family members, certain close friends, employers, labor unions, and charitable organizations. Def.'s Opp. Ex. 3 at 2-24.

32. Governmental agencies and public entities that run homeownership assistance programs for low- and moderate-income families or first-time homebuyers are also permitted sources of downpayment gifts. Def.'s Opp. Ex. 3 at 2-24.

33. AmeriDream is a charitable organization that serves low- and moderate-income individuals and families who are trying to qualify for FHA-insured loans. Ashburn Aff. ¶ 7; Compl. ¶ 10.

34. Many of these individuals and families can meet all of the requirements of an FHA-insured loan—such as employment history, income, and credit—yet cannot afford to set aside the minimum down payment of three percent of the contract sales price of their home. Ashburn Aff. ¶ 7; Compl. ¶ 10; Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. Ex. B at 4 (Cong. Testimony of Brian D. Montgomery, Assistant Secretary for Housing-Federal

Housing Comm'r, United States Department of Housing and Urban Development).

35. Many prospective low- and moderate-income homebuyers are unable to meet the downpayment requirement without the assistance of charitable organizations like AmeriDream. Admin. R. 66616 (AmeriDream Comment at 4); Compl. ¶ 21.

36. The proportion of FHA-insured loans financed in part by DPA has increased substantially in recent years. Admin. R. 00457 (Gov't Accountability Office, Mortgage Financing: Additional Action Needed to Manage Risks of FHA-Insured Loans with Down Payment Assistance 3 (Nov. 2005) ("Nov. 2005 GAO Rep.").

37. From 2000 to 2004, the proportion of FHA-insured loans financed with DPA grew from 35 percent to nearly 50 percent. Admin. R. 00457 (Nov. 2005 GAO Rep. at 3).

38. Seller-funded downpayment assistance has accounted for an increasing percentage of these DPA-financed loans. Admin. R. 00457 (Nov. 2005 GAO Rep. at 3).

39. In 2004, 30 percent of all FHA-insured loans were financed by non-profit DPA providers, and over 90 percent of that DPA was seller-funded. Admin. R. 00457, 00537 (Nov. 2005 GAO Rep. at 3, 14); Def.'s Opp. 2, Ex. 1 at 14.

40. As of 2005, 94 percent of FHA-insured borrowers who utilized DPA programs had successfully become and remained

homeowners.    Admin. R. 66619 (AmeriDream Comment at 7, <u>citing</u> Nov. 2005 GAO Rep. at 26-28).

41.  As of 2005, the national claim rate for DPA-financed FHA-insured loans seasoned three years was approximately 6 percent.    Admin. R. 00438 (Lisa Fowler & Stephen Fuller, George Mason Univ. Sch. of Pub. Policy, An Evaluation of Research on the Performance of Loans with Down Payment Assistance 2 (2006) (<u>citing</u> Nov. 2005 GAO Rep. at 26-28) ("GMU Study"); Admin. R. 66619 (AmeriDream Comment at 7, <u>citing</u> Nov. 2005 GAO Rep. at 26-28); Def.'s Opp. Ex. 7 at 1.

42.  Between  2000  and  2005,  families  who  received assistance from non-profit DPA programs to become homeowners grew their total wealth by $9.6 billion over the five-year period.    Admin. R. 66619 (AmeriDream Comment at 7); Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. Ex. C at ii (Lisa Fowler & Stephen Fuller, George Mason Univ. Sch. of Pub. Policy, National Economic Impact of Non-Profit Down Payment Assistance Providers (2007)).

### AmeriDream's DPA Program

43.  AmeriDream's DPA program is designed to work with FHA and  homebuyers  to  help  homebuyers  safely  overcome  the downpayment barrier to homeownership while giving them positive equity in their home from day one.    Ashburn Aff. ¶ 8; Compl. ¶ 10.

44.  Approximately 80 percent of homes purchased with DPA provided by AmeriDream are purchased by first-time homebuyers. Ashburn Aff. ¶ 8; Compl. ¶ 22(d).

45.  Seller-funded DPA programs like AmeriDream's have helped over one million individuals and families buy their own homes for approximately ten years.  Ashburn Aff. ¶ 27.

46.  A disproportionate number of individuals benefiting from AmeriDream's activities are minorities, legal immigrants, female heads of household, or single parents.  Ashburn Aff. ¶ 7.

47.  Nearly 32 percent of AmeriDream's first time home purchasers in 2006 were minorities.  Compl. ¶ 22(d).

48.  Since 1999, AmeriDream has provided over 200,000 gifts to homebuyers, totaling over $726 million, resulting in $21.8 billion in FHA-insured loans.  Ashburn Aff. ¶ 10; Compl. ¶ 9.

49.  The average amount of AmeriDream gifts has been $3,600, or 3.3 percent of the average purchase price of $108,000.  Ashburn Aff. ¶ 10; Compl. ¶ 9.

50.  Individuals and families receiving DPA from AmeriDream have a median income of $49,700.  Ashburn Aff. ¶ 10; Compl. ¶ 9.

51.  Since 1999, the median income of AmeriDream gift recipients has averaged 74 percent of the HUD national area median income.  Ashburn Aff. ¶ 10; Compl. ¶ 9.

52. AmeriDream is one of the largest "anti-predatory" lending programs in the United States and helps hundreds of thousand of individuals and families to avoid the tricks and traps of predatory lending. Ashburn Aff. ¶ 17; Compl. ¶ 22(d).

53. Since 1999, the average home price for an AmeriDream gift recipient has been $108,000 compared to the HUD overall average of $116,000. Ashburn Aff. ¶ 11; Compl. ¶ 9.

54. The average home price for an AmeriDream gift recipient is lower than the price of homes purchased with gifts from family, employers, or without gift assistance. Ashburn Aff. ¶ 11; Compl. ¶ 9.

55. While DPA programs began primarily as faith-based initiatives, AmeriDream relies on other sources of support, particularly within the real estate industry. Ashburn Aff. ¶ 12; Compl. ¶ 13.

56. An expanded support base—one that includes home builders and home sellers—has allowed AmeriDream to provide DPA to far more families. Ashburn Aff. ¶ 12; Compl. ¶ 13.

57. An expanded support base also has allowed AmeriDream's DPA program to grow without dependence on taxpayer funds. Ashburn Aff. ¶ 13; Compl. ¶ 9, 13.

58. AmeriDream has established, and continues to follow, procedures to ensure that AmeriDream gift recipients are

qualified low- to moderate-income borrowers, and that homes purchased are safe, sanitary, and affordable.  Compl. ¶ 11.

59.  Aspiring homeowners who use AmeriDream's DPA program purchase homes at valuations validated by HUD-certified appraisers selected by neither AmeriDream nor home sellers. Ashburn Aff. ¶ 12; Compl. ¶ 13.

60.  It is possible for a charitable organization to structure DPA such that a charity's payment to a homebuyer and contributions to the charity by members of the real estate industry are not related.  Admin. R. 00569, 00614 (Nov. 2005 GAO Rep. at 46, 91); Def.'s Opp. 9, 10 n. 11, Ex. 2 at 918 (Rev. Rul. 2006-27, 2006-21 I.R.B. 915).

61.  In 1998, HUD's Office of General Counsel stated in an internal memorandum that "as long as seller-funded down payment assistance is provided to the buyer *before* closing, and the seller's contribution to the nonprofit entity occurs *after* closing, the buyer has not received funds that can be directly traced to the seller's contribution."  Admin. R. 00569 (Nov. 2005 GAO Rep. at 46); Admin. R. 66617-18 (AmeriDream Comment at 5-6); Def.'s Opp. Ex. 1 at 46, 91.

62.  The internal memorandum from HUD's Office of General Counsel also advised that when "a seller makes a contribution (perhaps through the closing agent as well) from the gross sales proceeds to the nonprofit entity . . . [and t]he donation is

commingled with other nonprofit funds that later become a source of donations to buyers other than the buyer who has just closed the purchase of the seller's property . . . the buyer has not received funds from the nonprofit that can be traced to the seller's contribution, [and] there has not been an inducement to purchase provided by the seller." Admin. R. 00614 (Nov. 2005 GAO Rep. at 91); Admin. R. 66617-18 (AmeriDream Comment at 5-6).

63.   AmeriDream structures its DPA program to comply fully with the HUD Office of General Counsel's directives concerning the proper operation of seller-funded DPA programs.   Pl.'s Memo. P. & A. Supp. Mot. Summ. J. By Pl. AmeriDream, Incorporated Ex. A, Second Ashburn Aff. ¶ 4 ("Second Ashburn Aff.").

64.   The money AmeriDream raises for down payment gifts is deposited into a commingled account, which is drawn upon as necessary to make downpayment gifts to qualified homebuyers who are taken from a waiting list.   Admin. R. 66617 (AmeriDream Comment at 5); Ashburn Aff. ¶ 19; Compl. ¶ 6.

65.   The downpayment gift is sent directly to the closing attorney and placed in the homebuyer's escrow account in advance of the loan closing.   Admin. R. 66617 (AmeriDream Comment at 5); Ashburn Aff. ¶ 19; Compl. ¶ 6.

66.   After the loan closes and the real estate transaction is complete, the seller of a given property often pays AmeriDream a service fee, typically within seven to ten days

after closing.    Admin. R. 66617 (AmeriDream Comment at 5);
Ashburn Aff. ¶ 19; Compl. ¶ 6.

68. Service fees are deposited into AmeriDream's fund for
DPA and are later used to help homebuyers requesting downpayment
assistance, to fund other charitable programs, and to pay
administrative costs.    Admin. R. 66617 (AmeriDream Comment at
5); Ashburn Aff. ¶ 20; Compl. ¶ 6.

68. AmeriDream's DPA program was developed with the full
knowledge and approval of HUD's Office of General Counsel.
Admin. R. 66617 (AmeriDream Comment at 5); Ashburn Aff. ¶ 21;
Compl. ¶ 7.

### HUD's Longstanding Support of DPA Programs

69. HUD Handbook 4155.1, Rev. 5, "Mortgage Credit Analysis
for Mortgage Insurance, One to Four Family Properties," which
sets forth HUD's longstanding credit underwriting requirements,
specifies that a homebuyer's minimum downpayment may be financed
by a gift from a charitable organization.    Def.'s Opp. 6, Ex. 3
at 2-24.

70. In 1998, HUD's Office of General Counsel reviewed the
DPA process used by AmeriDream and found that it complied with
HUD guidelines.    Admin. R. 66617 (AmeriDream Comment at 5);
Ashburn Aff. ¶ 21; Compl. ¶ 7.

71. In 2005, Assistant Secretary for Housing-Federal
Housing Commissioner, Brian Montgomery, stated that HUD would

not prohibit the use of down payment assistance from seller-funded nonprofit organizations to meet FHA's three percent borrower contribution requirement. Admin. R. 00568-69 (Nov. 2005 GAO Rep. at 45-46); Def.'s Opp. Ex. 1 at 45-46; Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. Ex. D.

72. Specifically, Mr. Montgomery stated in a 2005 letter to the Government Accountability Office ("GAO") that gifts from any provider that conformed to specified procedures when processing donations and awarding gifts did not represent an improper inducement to purchase a home. Admin. R. 00614 (Nov. 2005 GAO Rep. at 91); Ashburn Aff. ¶ 22; Def.'s Opp. 10 n.11, Ex. 1 at 91; Compl. ¶ 7.

73. HUD has designed its standard forms to facilitate the reporting of down payment assistance. Ashburn Aff. ¶ 23; Compl. ¶ 8.

74. HUD has issued mortgagee letters that clarify the use of DPA, but are silent as to the way in which DPA providers are funded. Ashburn Aff. ¶ 24; Compl. ¶ 8; Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. Exs. E-F.

75. HUD has made favorable statements about DPA programs. Ashburn Aff. ¶ 25; Compl. ¶ 8.

76. HUD has itself used DPA when selling properties from its own inventory. Ashburn Aff. ¶ 26; Compl. ¶ 8.

77.  HUD adopted the Regulation more than six years after abandoning a rulemaking proceedings in which HUD proposed a virtually identical rule.  Admin. R. 00011 (72 Fed. Reg. at 27,048); Def.'s Opp. 9-10 n.10; Compl. ¶ 2.

78.  Opposition to the rule proposed six years ago was, in HUD's own words, "overwhelming."  Def.'s Opp. 33; Compl. ¶ 2.

## HUD Rationale for the Regulation

79.  HUD offered two documents in support of the Proposed Regulation:  (1) an IRS press release describing an IRS Revenue Ruling and (2) a study published by the GAO in February 2005, entitled "Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products."  Admin. R. 00011-12 (72 Fed. Reg. at 27,048-49).

80.  HUD offered the same two documents in support of the final rule, the Regulation at issue.  Admin. R. 00002-03 (72 Fed. Reg. at 56,002-03).

81.  In neither the Proposed Regulation nor the Regulation did HUD cite to a study published by the GAO in November 2005, entitled "Mortgage Financing: Additional Action Needed to Manage Risks of FHA-Insured Loans With Down Payment Assistance," as support for the Regulation.  Admin. R. 00001-07; 00010-14.

82.  George Mason University's Center for Regional Analysis published a study that critically reviewed the November 2005 GAO study.  Admin. R. 00439 (GMU Study at 2).

83.  The November GAO 2005 study did not account for two key factors that influence whether a loan is defaulted:  (1) a borrower's financial situation, and (2) the economic conditions of the geographical region in which a borrower's home is located.  Admin. R. 00438, 00441-42 (GMU Study at 1, 4-5); Def.'s Opp. Ex. 7 at 1; Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. Ex. K at 4-5.

84.  The GMU Study determined that, due to methodological flaws, GAO's November 2005 study could be overstating the extent of foreclosure rates of FHA-insured loans secured with assistance from non-profit DPA programs compared with foreclosure rates of loans secured with other types of assistance.  Admin. R. 00438 (GMU Study at 1); Def.'s Opp. Ex. 7 at 1.

85.  When foreclosure is the measure of loan performance, as it was in the November 2005 GAO study, the GMU Study concluded that the difference in performance of loans with non-profit DPA and loans with other types of DPA may be smaller than suggested by the GAO studies.  Admin. R. 00438 (GMU Study at 1); Def.'s Opp. Ex. 7 at 1.

86.  The GMU Study concluded that any difference in the performance of loans with non-profit DPA and loans with other types of DPA may be related to the performance of loans for which a buyer receives a gift from any source and not

specifically to assistance from non-profit DPA programs.  Admin. R. 00438 (GMU Study at 1); Def.'s Opp. Ex. 7 at 1.

87.  HUD performed an analysis of its mortgage loan portfolio in response to public comments.  Admin. R. 00003-04 (72 Fed. Reg. at 56,003-04); Def.'s Opp. 23-24.

88.  HUD merely referred to the analysis in the final Regulation.  Admin. R. 00003-04 (72 Fed. Reg. at 56,003-04).

89.  HUD did not include a citation or any other information in the Regulation identifying how the study could be obtained for review.  Admin. R. 00003-04 (72 Fed. Reg. at 56,003-04).

90.  HUD did not once mention its internal analysis of its loan portfolio in the Proposed Regulation.  Admin. R. 00010-14 (72 Fed. Reg. at 27,048-51).

91.  HUD did not otherwise make the analysis available for public comment.  Def.'s Opp. 23-24.

92.  In an Audit Report dated March 31, 2000, the Office of the HUD Inspector General reported, "HUD's databases do not specifically identify loans in which down payment assistance was provided by private nonprofit organizations such as Nehemiah or HART.  As such the HOCs did not have any information on the default rates for FHA loans with down payment assistance from nonprofits.  Without a system to track these loans, HUD cannot assess the performance of the loans."  Office of the Inspector

General, Audit Report, Audit Case Number 2000-SE-121-0001 at 31 (Mar. 31, 2000).

93.    In an Audit Report dated September 25, 2002, the Office of the HUD Inspector General concluded that it was "impossible for HUD to readily identify all loans with [Downpayment Assistance Program] assistance from the [Single Family Data Warehouse] data." Office of the Inspector General, Audit Report, Audit Case Number 2002-SE-0001 at iv (Sept. 25, 2002).

94.    Although no citation is provided, HUD claimed in the discussion accompanying the final Regulation that HUD conducted "an analysis of its loan portfolio going back to 1998" which assessed the "risk of default of and claim with purchase loans that receive downpayment assistance from the seller of other persons or entities that financially benefit from the sale of the home to the borrower". 72 Fed. Reg. 56,003. However, as reported by the Office of the HUD Inspector General, HUD did not collect the data "going back to 1998" necessary to make such an analysis.

95. At a June 22, 2007 Congressional hearing on DPA programs and the Proposed Regulation, Margaret Burns, Director, Office of Single Family Housing Program Development, testified on behalf of HUD. Homeowner Downpayment Assistance Programs and Related Issues: Hearing Before Subcomm. on Housing & Community

Opportunity of the H. Comm. on Financial Services, 110th Cong. 8-9 (2007) ("Cong. Hearing Tr.").

96. Ms. Burns testified as follows regarding seller-funded DPA: "So why has FHA taken the approach that it has and why now? . . . Because congressional efforts have yet to result in FHA being permitted to offer better and more flexible financing options, we determined it was time for our agency to stop recognizing this particular types of assistance." Cong. Hearing Tr. 56.

97. When asked what program could serve "low-income homebuyers better than subprime mortgages" if seller-funded DPA were to be banned, Ms. Burns responded that "FHA could serve them even better" if Congress would authorize FHA to "have 100 financing," that is, zero downpayment mortgages. Cong. Hearing Tr. 16.

98. When asked why HUD failed to implement changes to seller-funded DPA recommended by GAO and others that would be effective in addressing concerns with the programs, Ms. Burns responded that HUD had "decided internally that a better way to deal with this was to request additional authority to offer 100 percent financing programs" and that HUD had been "pursuing that." Cong. Hearing Tr. 21.

99. When Chairwoman Waters asked HUD to explain how the foreclosure rate for the low-income families served by seller-

funded DPA would improve if that assistance was banned and families without the means to save for a downpayment instead received zero downpayment FHA loans, Ms. Burns replied that Chairwoman Waters had asked "an excellent question," but did not provide the information solicited by the question, notwithstanding Chairwoman Waters's statement that she wanted Ms. Burns "to be more specific and give [her] some hard numbers on the foreclosure rate." Cong. Hearing Tr. 13.

100. When Congressman Cleaver asked HUD for data comparing the foreclosure rate for FHA transactions utilizing DPA with similar non-FHA transactions, James A. Heist, Assistant Inspector General for Audits, Office of Inspector General, United States Department of Housing and Urban Development, responded, "That might be a legitimate comparison if one could make one. That is not something that we have done now." Cong. Hearing Tr. 19.

101. When Congressman Miller asked how HUD planned to prevent risk associated with a new zero downpayment program, the following exchange took place between Ms. Burns and Congressman Miller:

> MS. BURNS: There are several measures we will take. One is clearly on the underwriting side; with underwriting the core components that you look at are the credit history of the borrower—
> MR. MILLER: Standards, that is good. And what else?
> MS. BURNS: It would be primarily on the underwriting standards. That is really where we will—

MR. MILLER:  Could you not apply this same standard to downpayment assistance?
MS. BURNS:  Yes.
MR. MILLER:  Could you enforce that standard?
MS. BURNS:  Absolutely.
MR. MILLER: So you are telling me that it is possible to be certain on appraisals, it is possible to be certain on underwriting standards where the program would be safe and sound.  That is possible?  Because I am very concerned about whether we are making loans that put the program at risk.  I don't want to do that.  Based on our testimony, it is possible to do that?
MS. BURNS:  It is possible to put—
MR. MILLER:  Then why don't we?
MS. BURNS:  —more stringent underwriting standards.
MS. BURNS:  Well, we are in the middle of a rulemaking process.
MR. MILLER:  No, we are in the middle of saying, we don't want these babies thrown out—
MS. BURNS:  That is an indication of FHA's position but—
MR. MILLER:  I would like to propose that you listen to your testimony, and if it is possible—I think we should do it.  So I am just adding to the debate at this point in time; you haven't released the [final] rule.  I am strongly suggesting, and I think many will echo this, that maybe this is the approach we should take, because that is not the approach I am reading of this coming down.
MS. BURNS: Right.  And just so you know, we certainly hear you and that is what the rulemaking process is all about.

Cong. Hearing Tr. 20-21.

102. When Congressman Miller concluded his questioning, Chairwoman Waters stated, "Let me say . . . that none of us were told that is the reason why FHA wanted zero downpayment in the bill that we had put together.  I feel a little duped.  Mrs. Biggert [the Ranking Minority Member of the Subcommittee] was not told; I just consulted with her."  Cong. Hearing Tr. 22.

**Reasonable Alternatives HUD Failed to Consider**

103. AmeriDream suggested the following reasonable alternatives to the Regulation in its comment:

(a) Require mandatory homebuyer/ownership education for very high loan-to-value homebuyers, either in person or online, because such education has been proven to lower foreclosure rates, and approve long distance learning via the Internet to better serve today's homebuyers;

(b) Mitigate default rates by developing and applying eligibility criteria for borrowers receiving downpayment assistance in accordance with the data HUD advised GAO it has acquired and analyzed with respect to such borrowers;

(c) Refine the current appraisal process by selecting appraisers through a blind draw process, requiring that appraisers be informed about downpayment assistance transactions, and requiring lenders, sellers, and appraisers to affirm that no coercion or manipulation has taken place in connection with appraisals;

(d) Limit the total amount of DPA and closing cost assistance provided by sellers to six percent of

the purchase price of homes financed by FHA-

insured mortgages;

(e)    Review and approve organizations that want to

provide DPA and charge an application fee to help

defray administrative costs of doing so;

(f)    Impose more rigorous standards and certification

requirements for DPA organizations, such as

strengthened financial requirements, annual

disclosures for participating organizations, and

greater accountability;

(g)    Require minimum levels of experience and strong

histories of compliance with applicable law for

DPA providers seeking to raise funds from private

sellers that operate in states other than their

home state; and

(h)    Require background checks for all officers and

board members, or other such decision-makers.

Admin. R. 66626-68 (AmeriDream Comment at 14-16); Pl.'s Memo. P.
& A. Supp. Mot. Prelim. Inj. Ex. M at 14-16.

104. HUD only addressed three of AmeriDream's suggested
alternatives in the section of the Regulation in which HUD
responded to public comments: the suggestion of requiring
homebuyer education, the suggestion of reforming the appraisal
process, and the suggestion of limiting DPA and closing cost

assistance to six percent of the purchase price of a home. Admin. R. 00004 (72 Fed. Reg. at 56,004).

105. In response to AmeriDream's suggestion that HUD require homebuyer education, HUD said, "HUD notes that it is not eliminating downpayment assistance but, as requested by many commenters, is establishing standards for the use of downpayment assistance in FHA-insured mortgages.  HUD encourages and supports homebuyer education, and for some programs requires homebuyer counseling, but addressing that subject is beyond the scope of the current rule."  Admin. R. 00004 (72 Fed. Reg. at 56,004).

106. Nehemiah and the National Association of Home Builders also suggested that HUD require homebuyer education and counseling.  Admin. R. 52628, 52634, 56464, 57819.

107. HUD did not respond to AmeriDream's suggestion that HUD develop and apply eligibility criteria for borrowers receiving DPA.  Admin. R. 00003-06 (72 Fed. Reg. at 56,003-06).

108. The Mortgage Banker's Association also suggested that HUD adopt eligibility requirements, specifically those that would account for high-risk factors, such as very high ratios, low or no reserves, and poor credit history.  Admin. R. 58015, 58024.

109. In response to AmeriDream's suggestion that HUD reform the appraisal process, HUD said, "Downpayment assistance can be

an independent source of price inflation separate from, or in conjunction with, any price inflation that may arise from the appraisal process, which, while noted by HUD, is an issue beyond the scope of the present rule.  HUD has already taken steps to address the appraisal issue.  HUD's Appraiser Roster, for which the regulations can be found in 24 CFR part 200, subpart G, is intended to ensure fairness and accuracy in the appraisal process for FHA-insured mortgages."  Admin. R. 00004 (72 Fed. Reg. at 56,004).

110. Nehemiah, the Mortgage Bankers Association, and the National Association of Home Builders all also suggested that HUD reform its appraisal process.  Admin. R. 52628, 52635, 56464, 57820, 58015, 58024.

111. HUD did not respond directly to AmeriDream's suggestion that HUD limit DPA and closing cost assistance to six percent of the purchase price of a home, but the most pertinent response by HUD states, "The downpayment differs from closing costs in that the downpayment creates equity in the property for the buyer and closing costs do not.  As such, the downpayment cannot be included in the mortgage, whereas certain closing costs are permitted to e included in the mortgage.  For this reason, downpayment assistance cannot be treated as closing costs."  Admin. R. 00004 (72 Fed. Reg. at 56,004).

112. The National Association of Home Builders, the Mortgage Bankers Association, and the National Association of Mortgage Brokers all also suggested that HUD limit the amount of sellers' contributions to a fixed percentage of the home purchase price, and most specifically made the same, or a substantially similar, suggestion as did AmeriDream. Admin. R. 52635, 56356, 57820, 58014, 58023.

113. HUD did not respond to AmeriDream's suggestion that HUD review and approve organizations that want to provide DPA, or to AmeriDream's more specific suggestions that HUD impose more rigorous standards and certification requirements for DPA organizations, require minimum levels of experience and strong histories of compliance with applicable law, and require background checks. Admin. R. 00003-06 (72 Fed. Reg. at 56,003-06).

### Effective Date of the Regulation

114. The Regulation states that its effective date is October 31, 2007. Admin. R. 00002 (72 Fed. Reg. at 56,002); Def.'s Opp. 12-13.

115. The Regulation makes an exception for Nehemiah Progressive Housing Development Corporation ("Nehemiah"). Admin. R. 00003 (72 Fed. Reg. at 56,003); Def.'s Opp. 12-13.

116. The Regulation does not apply to Nehemiah until March 31, 2008—six months after publication of the Regulation.  Admin. R. 00003 (72 Fed. Reg. at 56,003); Def.'s Opp. 12-13.

117. There was no mention in the Proposed Regulation of a special effective date for Nehemiah.  Admin. R. 00010-14 (72 Fed. Reg. at 27,048-51).

118. There is no explanation in the final Regulation for why the Regulation is effective on October 31, 2007 for all DPA providers similarly-situated to Nehemiah.  Admin. R. 00003 (72 Fed. Reg. at 56,003).

119. In 1998, HUD entered into a settlement agreement with Nehemiah.  Admin. R. 00883-00891; Def.'s Opp. 25.

120. The settlement agreement specified that Nehemiah's DPA program was "not in conflict with HUD's regulations and administrative requirements."  Admin. R. 00883-84, 00891; Def.'s Opp. Ex. 5 at 1-2.

121. As part of HUD's settlement with Nehemiah, HUD stated that, in the event it changed its policies regarding DPA programs or the source of down payment funds, "the changes will become applicable to Nehemiah and all other similarly-situated down payment assistance programs six months after the final promulgation and issuance of any such changes."  Admin. R. 00883, 00891; Def.'s Opp. 25 n.20, Ex. 5.

122. AmeriDream and Nehemiah are similarly-situated DPA providers. Second Ashburn Aff. ¶ 2.

123. AmeriDream believed that it would receive the same six-month grace period as Nehemiah. Second Ashburn Aff. ¶ 3.

124. There is no explanation in the Regulation for why Nehemiah's effective date does not also apply to AmeriDream, a similarly-situated DPA provider. Admin. R. 00001-00007 (72 Fed. Reg. at 56,002-07).

125. HUD and AmeriDream reached an agreement to delay enforcement of the Regulation, as against AmeriDream only, until February 29, 2008—still one month short of the delay accorded Nehemiah. Order, Oct. 19, 2007; Def.'s Opp. 25.

### Prejudgment by Secretary Jackson

126. Secretary Jackson made public statements during the pendency of the rulemaking proceeding, which Bloomberg published on June 5, 2007. Roland Decl. ¶ 2, Pl.'s Memo. P. & A. Supp. Mot. Summ. J. By Pl. AmeriDream, Incorporated Ex. B ("Roland Decl."); Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. Ex. O (Neil Roland, U.S. to Ban Down Payment Program Over Objections, Jackson Says, Bloomberg.com, June 5, 2007) ("Bloomberg Article").

127. Secretary Jackson publicly stated of non-profit down payment assistance, "I am very much against it . . . I think it's wrong. I don't want to continue to be a partner in a

program where so many people can't afford to keep up their payments." Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. Ex. O (Bloomberg Article).

128. Secretary Jackson has never denied this public statement. Roland Decl. ¶ 3; Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. Ex. O (Bloomberg Article).

129. Secretary Jackson stated in substance in the Bloomberg Article that "HUD intends to approve the new rule by the end of the year even if the agency receives critical comments." Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. Ex. O (Bloomberg Article).

130. Secretary Jackson has never denied this public statement. Roland Decl. ¶ 3; Pl.'s Memo. P. & A. Supp. Mot. Prelim. Inj. Ex. O (Bloomberg Article).

### Harm to AmeriDream and the Public

131. The Regulation will eviscerate AmeriDream's downpayment gift fund pool. Compl. ¶ 22(b).

132. AmeriDream will have to close its doors soon after it is prohibited from using funds provided by sources in the real estate industry to provide DPA assistance. Ashburn Aff. ¶ 29.

133. AmeriDream employs and is dependent on a highly skilled and specialized staff whose tenures with the organization have lasted many years, and who have developed valuable relationships with industry partners and vendors. Ashburn Aff. ¶ 30.

134. AmeriDream's staff possess unique institutional knowledge crucial to AmeriDream's ability to serve the public. Ashburn Aff. ¶ 30.

135. If AmeriDream's staff leave for other employment, they will be extremely difficult to replace.  Second Ashburn Aff. ¶ 5.

136. The Regulation effectively prohibits aspiring low- and moderate-income homeowners from making their statutorily-required three percent downpayment on an FHA-insured mortgage with funds provided by charitable organizations when members of the real estate industry are a source of funding and support. Compl. ¶ 22(a).

137. Many individuals and families trying to qualify for an FHA-insured loan regularly have no source of funds other than charitable DPA with which to make the downpayment required by the NHA.  Admin. R. 66616 (AmeriDream Comment at 4); Compl. ¶ 21, 22(b).

BAKER & HOSTETLER LLP


By: */s/ Lee T. Ellis, Jr.*
    Lee T. Ellis, Jr. (3863)
    Washington Square, Suite 1100
    1050 Connecticut Avenue, N.W.
    Washington, D.C.  20036
    Tel:  202-861-1521
    Fax:  202-861-1783
    lellis@bakerlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ALPHONSO JACKSON<br>SECRETARY OF THE UNITED<br>STATES DEPARTMENT OF<br>HOUSING AND URBAN<br>DEVELOPMENT,<br><br>　　　　　Defendant. | ) <br>) <br>) <br>) <br>) <br>) Civil Action No. 07-1752(PLF)<br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) |

## ORDER FOR SUMMARY JUDGMENT, DECLARATORY JUDGMENT, AND PERMANENT INJUNCTION

Upon consideration of the Motion For Summary Judgment By Plaintiff AmeriDream, Incorporated filed herein, and the Court having considered the Motion, Memorandum Of Points And Authorities, Rule 7(h) Statement Of Material Facts As To Which There Is No Genuine Issue, and affidavits in support thereof, and any opposition thereto, and it appearing to the Court after due deliberation that the Regulation at issue in this action is unlawful, arbitrary, and capricious and that movant is accordingly entitled to judgment as a matter of law, and that defendant is engaged in committing, and will continue to commit, acts to the irreparable injury and harm of the movant, it is by the Court this _____ day of _____, 2007

ORDERED, that the Motion For Summary Judgment By Plaintiff AmeriDream, Incorporated be, and it is hereby, granted; and it is further

ORDERED, that the Motion for Summary Judgment submitted by defendant be, and it is hereby, denied; and it is further

ORDERED, that the Regulation of the United States Department of Housing and Urban Development that is the subject of this action be, and it is hereby, declared unenforceable and contrary to law; and it is further

ORDERED, that defendant, his successors in office, officers, agents, servants, employees, attorneys and all others acting in concert and participation with him be, and they are, permanently restrained and enjoined from implementing, enforcing, or applying the Regulation of the United States Department of Housing and Urban Development that is the subject of this action.

_____
United States District Judge

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
AMERIDREAM, INCORPORATED,     )
                              )
          Plaintiff,          )
                              )
     v.                       )    Civil Action No. 07-1752(PLF)
                              )
ALPHONSO JACKSON              )
SECRETARY OF THE UNITED       )
STATES DEPARTMENT OF          )
HOUSING AND URBAN             )
DEVELOPMENT,                  )
                              )
          Defendant.          )
_____   )
```

## SECOND AFFIDAVIT OF ANN ASHBURN

1.    I have personal knowledge of the facts contained herein and I am competent to testify thereto.

2.    AmeriDream, Incorporated ("AmeriDream") and Nehemiah Progressive Housing Development Corporation ("Nehemiah") are similarly-situated providers of downpayment assistance.

3.    When the United States Department of Housing and Urban Development ("HUD") issued the proposed rule, "Standards for Mortgagor's Investment in Mortgaged Property," 72 Fed. Reg. 27,048 (May 11, 2007), AmeriDream believed that, like Nehemiah, any changes regarding the source of downpayment gifts would not apply to AmeriDream until six months after final promulgation of any such changes.

4.    AmeriDream    structures    its    downpayment    assistance
("DPA") program to comply fully with (i) the HUD Office of
General Counsel's directive concerning the proper operation of
seller-funded DPA programs, which directive is set forth in an
October  25,  2005  letter  from  Brian  Montgomery,  Assistant
Secretary  for  Housing-Federal  Housing  Commissioner,  to  the
Government Accountability Office; (ii) the terms set forth in
Mortgagee Letter 2004-28, dated July 21, 2004; and (iii) the
terms set forth in Mortgagee Letter 00-28, dated August 7, 2000.

5.    If AmeriDream's staff leave for employment elsewhere
once AmeriDream is forced to cease operations, they will be
extremely difficult to replace.

I declare to the best of my knowledge and belief that the
foregoing is true and correct.

Executed on November 16, 2007

_____
Ann Ashburn

**Exhibit B**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED,　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| 　　　　　Plaintiff,　　　　　　　　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| 　　　　v.　　　　　　　　　　　　　） | Civil Action No. 07-1752 (PLF) |
| 　　　　　　　　　　　　　　　　　　） | |
| HON. ALPHONSO JACKSON, SECRETARY　） | |
| OF THE UNITED STATES DEPARTMENT OF　） | |
| HOUSING AND URBAN DEVELOPMENT,　　） | |
| 　　　　　　　　　　　　　　　　　　） | |
| 　　　　　Defendant.　　　　　　　　　） | |

### DECLARATION OF NEIL ROLAND

1. My name is Neil Roland. I am over the age of twenty-one and fully competent to make this Declaration. I have never been convicted of a felony or crime involving moral turpitude. The facts stated in this declaration are true and correct and within my personal knowledge.

2. I am a reporter for Bloomberg News. In my capacity as a reporter for Bloomberg, I wrote the news article titled *"U.S. to Ban Down Payment Program Over Objections, Jackson Says."* The news article, which was published by Bloomberg on June 5, 2007, is attached to this affidavit as *Exhibit A.*

3. *Exhibit A* is a true and accurate copy of what was published by Bloomberg News. Neither I nor Bloomberg News has received any comment from or on behalf of HUD Secretary Alphonso Jackson regarding the accuracy of the report or the quotes or the paraphrases of comments attributed to the Secretary.

4. I declare under the penalties for perjury that the foregoing representations are true and correct.

*Neil Roland*
　　　　　　　　　　　Neil Roland

Executed: November 14, 2007.

# Exhibit A



# Bloomberg.com

## U.S. to Ban Down Payment Program Over Objections, Jackson Says

By Neil Roland

June 5 (Bloomberg) -- The U.S. Department of Housing and Urban Development will ban a down payment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said.

``I'm very much against it,'' Jackson said in an interview. ``I think it's wrong. I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments.''

The program, which was used by more than 100,000 low- and moderate-income consumers last year, allows nonprofit groups to fund down payments and get reimbursed by sellers. Audits have found it has contributed to higher housing prices and a surge in foreclosures of government-backed mortgages.

HUD is seeking to end it at a time when foreclosure filings have hit an all-time high, spurred by rising delinquencies among borrowers with poor or limited credit histories. The agency last month proposed terminating the assistance and has given the housing industry and consumer groups until July 10 to comment.

The National Association of Home Builders and nonprofits including AmeriDream Inc. and Sacramento, California-based Nehemiah Corp. of America criticized HUD's plan last week. They said the program helps consumers become home owners and should be tightened, not ended.

`Sham' Period?

``Did Secretary Jackson just imply that the governmental process of an open public comment period is just a sham?'' AmeriDream Chief Executive Officer Ann Ashburn said in an e-mail today. ``I know that the American people expect more from Secretary Jackson.''

AmeriDream, based in Gaithersburg, Maryland, makes as much as $100 million a year in fees from the program, Ashburn said.

Under the HUD program, nonprofit groups fund the entire down payment for buyers and get reimbursed by the sellers. The arrangement was designed with HUD's approval to circumvent U.S. rules that bar sellers from giving direct assistance.

Audits have found that home sellers typically pay a service fee to the nonprofits and raise the price of their homes to recoup the money. Once sold, the foreclosure rate on these homes is more than double that of other loans sponsored by HUD's Federal Housing Administration, according to HUD data.

Jackson said in the interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments. A similar 1999 HUD proposal was withdrawn by the agency in 2001 following industry opposition.

To contact the reporter on this story: Neil Roland in Washington at **nroland@bloomberg.net**

*Last Updated: June 5, 2007 12:18 EDT*



Terms of Service | Privacy Policy | Trademarks