UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
AMERIDREAM, INCORPORATED,               )
THE GENESIS FOUNDATION,                 )
HOME DOWNPAYMENT GIFT                   )
FOUNDATION, THE SOVEREIGN               )
GRANT ALLIANCE, THE FUTURE              )
HOME ASSISTANCE PROGRAM, and            )
PARTNERS IN CHARITY, INC.,              )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )   Civil Action No. 07-1752 (PLF)
                                        )
HON. ALPHONSO JACKSON                   )
SECRETARY OF THE UNITED                 )
STATES DEPARTMENT OF                    )
HOUSING AND URBAN                       )
DEVELOPMENT,                            )
                                        )
            Defendant.                  )
_____)

**GENESIS'S AND HOME DOWNPAYMENT
GIFT FOUNDATION'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Genesis Foundation ("Genesis") and the Home Downpayment Gift Foundation ("HDGF") endorse the arguments made by AmeriDream, Inc. in its Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment ("AmeriDream's Memorandum"), filed today, and confine their additional comments to the following two points.

**I.    HUD Failed to Consider Less Restrictive Alternatives Proposed By The Public.**

For many years HUD's policy has permitted FHA to finance transactions in which sellers offer up to six percent of the purchase price in concessions to buyers. Such concessions

can and do take many forms, from allowances toward closing costs to design or facility upgrades in the housing. Regardless of the type of concession, the economic impact of the seller's offering concessions up to a cap is identical in nature to a seller's funding of buyer down payments.

At least one commenter, the National Association of Home Builders ("NAHB") *(see Exhibit 1 to Schwedland Declaration, Appendix p. 38-42 )*, specifically suggested that seller-funded down payment assistance ("SFDPA") be permitted subject to inclusion within FHA's existing six percent concession allowance. *HUD Handbook 4155.1, Rev 5, section 1-7, Handbook excerpts attached here as Exhibit A*. There is nothing in the record suggesting that HUD seriously assessed that option. HUD states that its "primary concern" is that "the sales price is often increased to ensure that the seller's net proceeds are not diminished, and such increase in sales price is often to the detriment of the borrower and FHA." *72 Fed. Reg. at 56,002*. It is arbitrary for HUD to argue that SFDPA drives up housing prices and therefore should be prohibited, but at the same time to bless seller concessions that are the economic equivalent of SFDPA. If the former poses the risk that HUD claims, the latter must as well. Conversely, if seller concessions do not inflate prices, and therefore are acceptable, how is SFDPA any different?

As this Court observed in issuing the preliminary injunction, HUD did not adequately assess a myriad of suggested alternatives. *Transcript of Preliminary Injunction Hearing ("Transcript") at 22*. HUD's inadequate consideration of proposed alternatives is especially clear in HUD's dismissal of risk assessment and underwriting suggestions. *See NAHB comment letter, p 4*.[1] HUD's response blandly states that it has analyzed what is an acceptable

---

[1] "Credit risk concerns should be addressed through requirement of thorough credit analysis and prudent underwriting standards."

and unacceptable risk. *72 Fed. Reg. at 56,003*. But HUD offers no explanation for why it ignores the obvious solution of imposing credit standards, and instead chooses to disenfranchise an entire category of service providers to FHA borrowers.

Intervenors conclude, and this Court should as well, that HUD's failure to act on this obvious suggestion is a clear sign that HUD's real intention was simply to prohibit SFDPA. This conclusion is inescapable because, just days prior to finalizing the Regulation, HUD announced that FHA would start charging risk-based premiums for FHA loans after January 1, 2008. *72 Fed. Reg. 53872 (September 20, 2007), attached here as Exhibit B*. Whatever the merits of that approach, it is difficult to imagine that the same agency concluded, just prior to finalizing the Regulation, that underwriting standards are a useful tool for mitigating risk but later <u>rejected</u> calls for underwriting standards to mitigate those same perceived risks with respect to SFDPA.[2] HUD's adoption of underwriting standards underscores that its wholesale elimination of a valuable and heretofore encouraged form of financing assistance was arbitrary.[3]

## II. HUD Cannot Cure Its Failure To Explain The Regulation's Disparate Treatment of Similarly Situated Entities By Asking This Court To Rewrite The Regulation.

In its oral opinion granting a preliminary injunction, the Court stated:

> [W]hile the government may have had good and sufficient reasons for treating Nehemiah as it did in 1998, they have given no reason whatsoever, let alone a rational one, for why everybody else the Rule is effective on October 31. The rule says we are treating Nehemiah differently. . . . And nowhere is that explained other than to say we settled with them. That explains the settlement in 1998. It doesn't explain the October 31st date now. And it is clear

---

[2] The Federal Register "notice" has the effect of making the policy effective January 1, 2008. HUD solicited comments, notwithstanding the finality of the published notice.

[3] The HUD notice states "By offering a range of premiums based on risk, FHA will be able to offer options to mortgagees serving borrowers who were previously underserved, or not served, by the conventional marketplace. A range of premiums based on risk will also ensure the future financial soundness of FHA programs that are obligations of the Mutual Mortgage Insurance Fund (MMIF)."

3

> under the Administrative Procedure Act an agency must either provide a rational basis for treating two similarly situated entities differently, or must treat them all the same. There may be some cases where there's a reason to do it, but it's got to be explained.

*Transcript at 25*.

HUD responds, first, by repeating what the Court has already found insufficient. It says that, "because of a prior contractual obligation, the Regulation had to carve out a special effective date for Nehemiah." *HUD Brief at 61*. Since "[t]he final rule described the nature and source of that contractual obligation," HUD insists, "[t]his was sufficient explanation." *Id*. Not so. HUD is merely repeating, "We settled with them." As the Court has already concluded, that explains what HUD did in 1998, but it does not provide a rational basis for HUD's disparate treatment now.

Secondly, HUD contends that, even if the Court continues to find the Regulation deficient on this score, the Court should not invalidate the Regulation in its entirety, but simply "stay its effectiveness until March 31, 2008 to bring all parties into parity with Nehemiah." *HUD Brief at 64*. This is equivalent to arguing that the Court should revise the Regulation to provide for a single effective date—March 31, 2008—applicable to all. But that is not what HUD intended when it enacted the Regulation, and this Court has neither the authority nor the policy-making prerogative to rewrite a regulation in a way that the administrative body did not intend when it wrote it.[4] HUD explicitly stated that its intent was to enact a regulation that applied to everyone <u>except</u> Nehemiah as of October 31st, and to everyone <u>including</u> Nehemiah

---

[4] HUD cites *Davis County Solid Waste Mgmt. v. U.S. EPA*, 108 F.3d 1454, 1460 (D.C. Cir. 1997), for the proposition that a court should save a regulation if severance of an invalid provision would not impair the function of the remainder and there is no indication that the regulation would not have been issued "but for the inclusion" of the invalid portion. *HUD Brief at 64*. There is such an indication here. As noted in the text, HUD declares that, because of its 1998 contractual obligation, "the Regulation *had to* carve out a special effective date for Nehemiah." *Id*. at 61 (emphasis added). If the Regulation "had to" have the offending provision, how can HUD contend that there is no indication that the regulation would not have been issued without it?

4

as of March 31st. If this Court were to rewrite the Regulation to defer its effective date until March 31st, then the Court would be taking on the power to rewrite legislation in a way that conflicts with the stated intent of the administrative body. Instead, the Court should declare that the Regulation is infirm for the reason that it treated similarly situated parties differently without explanation, and leave it to HUD to decide whether to enact a new regulation that complies with the law, or to do nothing (since it has said the Regulation *had to* contain the offending provision). And if it chooses the former, HUD must determine whether to try to honor its claimed contractual commitment to Nehemiah and, if so, how to do it lawfully -- issue it legally by delaying the effective date six months for all similarly situated parties, or again attempt to treat Nehemiah differently.

For all of these reasons, and for the reasons set forth in AmeriDream's Memorandum, this Court should deny HUD's motion for summary judgment, enter a permanent injunction barring HUD's enforcement of the Regulation, and award Genesis and HDGF all other appropriate relief.

Respectfully submitted this 7th day of December, 2007.

/s/ Frank S. Swain
Frank S. Swain, #427792
Baker & Daniels LLP
805 15th Street NW, Suite 700
Washington, DC  20005
Telephone  202.312.7440
Facsimile  202.312.7460
frank.swain@bakerd.com

Attorneys for Genesis Foundation and Home Downpayment Gift Foundation

5

# CERTIFICATE OF SERVICE

I certify that on December 7, 2007, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Lee T. Ellis, Jr.
Baker & Hostetler LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC  20036

David C. Merkin
McMillan Metro, PC
1901 Research Blvd., Suite 1100
Rockville, MD  20850

Daniel Van Horn
Assistant United States Attorney for the
District of Columbia
555 4th Street, N.W.
Washington, DC  20001

Alejandro S. Valdes
Craig T. Enoch
Linda J. Burgess
Winstead P.C.
401 Congress Avenue, Suite 2100
Austin, TX  78701

Robert M. Couch
General Counsel
Office of General Counsel
U.S. Department of Housing and Urban
Development
451 7th Street, S.W.
Washington, DC  20410-0500

Robert J. Katerberg
Scott Risner
Christopher R. Hall
U.S. Department of Justice,
Civil Division, Federal Programs
20 Massachusetts Avenue, NW
Washington, DC  20530

Tessa Laspia Frederick
Miles & Stockbridge, PC
10 Light Street, Suite 1200
Baltimore, MD  21202

Michael S. Rothman
Law Office of Michael S. Rothman
401 East Jefferson Street, Suite 201
Rockville, MD  20850

Jerome A. Tatar
Law Office of Jerome A. Tatar
790 Frontage Road, Suite 218
Northfield, IL  60093

Tamara Lynn Ulrich
U.S. Department of Justice
PO Box 883
Washington, DC  20044

/s/ Frank S. Swain

6

BDDB01 4955961v2

**EXHIBIT A**

# FOREWORD

This Handbook describes the basic mortgage credit underwriting requirements for single-family (one to four units) mortgage loans insured under the National Housing Act. For each loan FHA insures, the lender must establish that the borrower has the ability and willingness to repay the mortgage debt. This decision must be predicated on sound underwriting principles consistent with the guidelines, rules, and regulations described throughout this Handbook and must be supported by sufficient documentation.

These underwriting guidelines discuss the types of transactions and properties eligible for mortgage insurance, and FHA's requirements for determining the borrower's ability and willingness to repay the debt. Information regarding valuation and architectural requirements can be found in HUD Handbooks 4150.1 REV-1 and 4145.1 REV-2, CHG-1, respectively. These underwriting guidelines apply to mortgages insured under Sections 203(b) and 234(c) of the National Housing Act, and are also generally applicable to other single-family mortgage insurance programs (except where inconsistent with special features of those programs). Other single-family mortgage insurance programs are described in HUD Handbook 4000.2 REV-2.

This Handbook provides direction to lenders and FHA staff and is based on FHA's experience in insuring single-family mortgages. While it is not FHA's intent to insure mortgages that are likely to result in default, regardless of the borrower's equity, lenders may exercise some discretion in the underwriting of home mortgages where the borrower's financial and other circumstances are not specifically addressed by this Handbook. However, lenders are expected to exercise both sound judgment and due diligence in the underwriting of loans to be insured by FHA. For ease of reading, we have chosen to use "lender" in lieu of "mortgagee" throughout this user guide. However, "lender" is to be interpreted as a FHA-approved mortgagee as described in 24 CFR § 202.10. Similarly, "loan" is to be interpreted as "mortgage" as also described in 24 CFR § 202.10

Questions not addressed in the text should be directed to the appropriate Home Ownership Center (HOC) or the Director, Office of Single Family Program Development, HUD Headquarters, Robert Weaver Building, 451 Seventh St., SW, Washington, DC 20410-8000.


References:

1) 4000.2 REV-2 Mortgagees' Handbook, Application through Insurance
2) 4145.1 REV-2, CHG-1, Architectural Processing and Inspections
3) 4150.1 REV-1 Valuation Analysis for Home Mortgage Insurance
4) 4330.1 REV-5 Administration of Insured Home Mortgages
5) Code of Federal Regulations, Title 24 (24 CFR). Codifies the general and permanent rules of the Department.

## TABLE OF CONTENTS

### CHAPTER 1    INTRODUCTION

| | | |
|---|---|---|
| 1-1 | WHAT FHA INSURES........................................................................... | 1-1 |

#### SECTION 1:    OCCUPANCY STATUS

| | | |
|---|---|---|
| 1-2 | PRINCIPAL RESIDENCES ................................................................. | 1-1 |
| 1-3 | SECONDARY RESIDENCES.............................................................. | 1-1 |
| 1-4 | INVESTMENT PROPERTIES ............................................................. | 1-1 |
| 1-5 | NONPROFIT ORGANIZATIONS AND GOVERNMENT AGENCIES ............. | 1-1 |

#### SECTION 2:    MAXIMUM MORTGAGE AMOUNTS

| | | |
|---|---|---|
| 1-6 | MAXIMUM MORTGAGE AMOUNT................................................... | 1-1 |
| 1-7 | MAXIMUM MORTGAGES FOR PURCHASE TRANSACTIONS............. | 1-1 |
| 1-8 | TRANSACTIONS THAT AFFECT MAXIMUM MORTGAGE CALCULATIONS | 1-1 |

#### SECTION 3:    SETTLEMENT REQUIREMENTS

| | | |
|---|---|---|
| 1-9 | SETTLEMENT REQUIREMENTS....................................................... | 1-1 |

#### SECTION 4:    REFINANCE TRANSACTIONS

| | | |
|---|---|---|
| 1-10 | REFINANCING....................................................................................... | 1-1 |
| 1-11 | CALCULATING THE MORTGAGE AMOUNT ON REFINANCES................ | 1-1 |
| 1-12 | STREAMLINE REFINANCES ............................................................... | 1-1 |

#### SECTION 5:    SECONDARY FINANCING

| | | |
|---|---|---|
| 1-13 | SECONDARY FINANCING.................................................................... | 1-1 |

### CHAPTER 2    MORTGAGE CREDIT ANALYSIS

| | | |
|---|---|---|
| 2-1 | OVERVIEW.............................................................................................. | 2-1 |
| 2-2 | MORTGAGE ELIGIBILITY (BORROWERS).......................................... | 2-1 |
| 2-3 | ANALYZING THE BORROWER'S CREDIT............................................ | 2-1 |
| 2-4 | CREDIT REPORT REQUIREMENTS ..................................................... | 2-1 |
| 2-5 | CREDIT ELIGIBILITY REQUIREMENTS............................................... | 2-1 |

#### SECTION 2:    EFFECTIVE INCOME

| | | |
|---|---|---|
| 2-6 | STABILITY OF INCOME........................................................................ | 2-1 |
| 2-7 | SALARIES, WAGES, AND OTHER FORMS OF INCOME........................ | 2-1 |
| 2-8 | EMPLOYMENT BY FAMILY-OWNED BUSINESS................................. | 2-1 |
| 2-9 | SELF-EMPLOYED BORROWERS .......................................................... | 2-1 |

#### SECTION 3:    BORROWER'S CASH INVESTMENT IN THE PROPERTY

| | | |
|---|---|---|
| 2-10 | FUNDS TO CLOSE ................................................................................... | 2-1 |

#### SECTION 4:    TYPES OF LIABILITIES

| | | |
|---|---|---|
| 2-11 | LIABILITIES ............................................................................................ | 2-1 |

#### SECTION 5:    BORROWER QUALIFYING

| | | |
|---|---|---|
| 2-12 | DEBT TO INCOME RATIOS .................................................................. | 2-1 |
| 2-13 | COMPENSATING FACTORS .................................................................. | 2-1 |

### SECTION 6: SPECIAL UNDERWRITING INSTRUCTIONS

| | | |
|---|---|---|
| 2-14 | TEMPORARY INTEREST RATE BUYDOWNS | 2-1 |
| 2-15 | ADJUSTABLE RATE MORTGAGES | 2-1 |
| 2-16 | CONDOMINIUM UNITS: UTILITY EXPENSES | 2-1 |
| 2-17 | CONSTRUCTION- PERMANENT MORTGAGE PROGRAM | 2-1 |
| 2-18 | MORTGAGE ASSISTANCE FOR DISASTER VICTIMS [Section 203(h)] | 2-1 |
| 2-19 | ENERGY EFFICIENT HOMES (EEH) | 2-1 |
| 2-20 | ENERGY EFFICIENT MORTGAGE (EEM) PROGRAM | 2-1 |

## CHAPTER 3 DOCUMENTATION AND OTHER PROCESSING REQUIREMENTS

### SECTION 1: UNDERWRITING DOCUMENTATION

| | | |
|---|---|---|
| 3-1 | APPLICATION PACKAGE | 3-1 |
| 3-2 | DOCUMENTATION STANDARDS | 3-1 |
| 3-3 | REAL ESTATE CERTIFICATION | 3-1 |
| 3-4 | AMENDATORY CLAUSE | 3-1 |

### SECTION 2: PROCESSING REQUIREMENTS

| | | |
|---|---|---|
| 3-5 | POWER OF ATTORNEY | 3-1 |
| 3-6 | LOAN APPLICATION DOCUMENT PROCESSING | 3-1 |
| 3-7 | SEVEN-UNIT DOCUMENTATION | 3-1 |
| 3-8 | HOTEL AND TRANSIENT USE | 3-1 |
| 3-9 | SALES CONTRACT AND LOAN CLOSING | 3-1 |
| 3-10 | LENDER RESPONSIBILITY AT CLOSING | 3-1 |

### SECTION 3: FAIR HOUSING AND OTHER FEDERAL REQUIREMENTS

| | | |
|---|---|---|
| 3-11 | FEDERAL STATUTES AND REGULATIONS | 3-1 |
| 3-12 | FHA-PROCESSED HUD EMPLOYEE LOANS | 3-1 |

## CHAPTER 4 ASSUMPTIONS

| | | |
|---|---|---|
| 4-1 | GENERAL | 4-1 |
| 4-2 | RESTRICTIONS OF THE HUD REFORM ACT OF 1989 | 4-1 |
| 4-3 | RELEASE FROM LIABILITY | 4-1 |
| 4-4 | CREDIT-WORTHINESS REVIEW PROCESSING | 4-1 |
| 4-5 | LTV REDUCTION REQUIREMENTS | 4-1 |

### APPENDICES

| | | |
|---|---|---|
| I. | SINGLE FAMILY HOC JURISDICTIONS | |
| II. | CLOSING COSTS AVERAGES FOR STATES | |

1-7  **MAXIMUM MORTGAGES/CASH INVESTMENT REQUIREMENTS FOR PURCHASE TRANSACTIONS.** The property's sales price, subject to certain required adjustments as described in A-C below, or the appraised value, if less, is multiplied by a loan-to-value ratio. The resulting amount is the maximum mortgage that FHA will insure. The borrower must make a cash investment at least equal to the difference between the sales price and the resulting maximum mortgage amount.

Except for certain property and transaction types as described in 1-8 below, the lower of the adjusted sales price or the appraised value is multiplied by the factor shown in the chart below. The resulting amount is the maximum loan that FHA will insure *provided* that the mortgagor has made a cash investment of at least three percent of the contract sales price.

Borrower-paid closing costs may be used to meet the three percent minimum cash investment. If the borrower pays no closing costs at settlement, the loan amount must be reduced sufficiently so that the three percent minimum cash investment is met.

The maximum LTV limits shown below are functions of the property's appraised value or the adjusted sales price (whichever is less) and the State in which the property is located. (A list of states and their closing costs averages may be found in Appendix II.) The maximum LTVs for most purchase transactions are as follows:

---

**Maximum Loan-to-Value Percentages**
(Purchase Transactions Only on Proposed and Existing Construction)

**States with Average Closings Costs *At or Below* 2.1 Percent of Sales Price**

- **98.75 percent**: For properties with values/sales prices equal to or less than $50,000.

- **97.65 percent**: For properties with values/sales prices in excess of $50,000 up to $125,000

- **97.15 percent**: For properties with values/sales prices in excess of $125,000.

**States with Average Closings Costs *Above* 2.1 Percent of Sales Price**

- **98.75 percent**: For properties with values/sales prices equal to or less than $50,000.

- **97.75 percent**: For properties with values/sales prices in excess of $50,000.

---

Our definition of closing costs does not include discount points or prepaid items and, thus, these fees and expenses cannot be used in meeting the cash investment requirements; see paragraph 1-9 A for additional information including a description of closing costs eligible for meeting the minimum cash investment requirement.

The borrower may pay for the appraisal and credit report with a credit card. However, when these fees are paid for in this manner, they may not be counted in meeting the minimum investment requirement.

Closing costs paid by the seller or lender may not be used to meet the minimum investment requirement. Subject to the limits described below, we are not concerned with the dollar amount of any particular fee charged to the seller.

A. **Seller Contributions.** The seller (or other interested third parties such as real estate agents, builders, developers, etc., or a combination of parties) may contribute up to six percent of the property's sales price toward the buyer's actual closing costs, prepaid expenses, discount points, and other financing concessions. Contributions exceeding six percent of the sales price or exceeding the actual cost of prepaid expenses, discounts points, and other financing concessions will be treated as inducements to purchase, thereby reducing the amount of the mortgage. Closing costs normally paid by the borrower are considered contributions if paid by the seller. Inducements to purchase are described in paragraph B, below.

The six percent limitation also includes seller payment for permanent and temporary interest rate buydowns and other payment supplements, payments of mortgage interest for fixed rate mortgages and GPMs only (but not principal), mortgage payment protection insurance, and payment of UFMIP.

Fees typically paid by the seller under local or state law, or local custom, such as real estate commissions, charges for pest inspections, fees paid for trustees to release a deed of trust, etc., are not considered contributions. The dollar limit for seller contributions is calculated by using Attachment A on the HUD-92900-PUR/HUD-92900WS. Each dollar exceeding FHA's six percent limit must be subtracted from the property's sales price before applying the appropriate LTV ratio.

B. **Inducements to Purchase.** Certain expenses (beyond those described above) paid on behalf of the borrower, as well as other inducements to purchase, result in a dollar-for-dollar reduction to the sales price before applying the appropriate LTV ratio. These inducements include decorating allowances, repair allowances, moving costs, and other costs as determined by the appropriate HOC. We also require dollar-for-dollar

reductions to the sales price for excess rent credit (see 2-10 N), as well as for gift funds not meeting the requirements stated in Chapter 2.

Personal property items such as cars, boats, riding lawn mowers, furniture, televisions, etc., given by the seller to consummate the sale result in a reduction to the mortgage. The value of the item(s) must be deducted from the sales price and the appraised value of the property (if not already done so by the appraiser) before applying the LTV ratio. However, certain items, depending upon local custom or law, may be considered as part of the real estate transaction with no adjustment to the sales price or appraised value necessary. These items include ranges, refrigerators, dishwashers, washers, dryers, carpeting, window treatments, and other items as determined by the jurisdictional HOC. That office determines if these items affect value and are considered customary. Replacement of existing equipment or other realty items by the seller before closing, such as carpeting or air conditioners, does not require a value adjustment provided no cash allowance is given to the borrower.

In addition, if the seller or builder of the property agrees to pay any portion of the borrower's sales commission on the sale of the borrower's present residence, the amount paid by the seller or builder is an inducement to purchase and must be subtracted dollar for dollar from the sales price before the LTV ratio is applied. Similarly, a borrower not paying real estate commission on the sale of a present home constitutes a sales concession, if the real estate broker or agent is involved in both transactions and the seller of the property purchased by the borrower pays a real estate commission exceeding that typical for the area. In these situations, the amount paid by the seller above the normal real estate commission is considered an inducement to purchase and must be subtracted from the sales price of the property being purchased before applying the LTV ratio.

C.  **Additions to the Mortgage Amount.** In some cases, the maximum mortgage amount may be increased. Except for solar energy systems discussed below, an increase generally is permitted only when the appraised value exceeds the sales price. Only the amount by which the value exceeds the sales price may be added; any remaining costs become part of the borrower's settlement requirements. The following may result in an increase to the mortgage amount:

   1.  **Repairs and Improvements.** Repairs and improvements required by the appraiser as essential for property eligibility and to be paid by the borrower may be added to the sales price before calculating the mortgage amount. (The appraised value will reflect these requirements.) For the cost of repairs and improvements to be eligible for inclusion in the mortgage amount, the sales contract or

addendum must identify the borrower as responsible for paying for or otherwise completing the repairs or improvements.

The amount that may be added to the sales price before calculating the maximum mortgage amount is the lowest of:

a. The amount the value of the property exceeds the sales price; or
b. The appraiser's estimate of repairs and improvements; or
c. The amount of the contractor's bid, if available.

Only repairs and improvements *required* by the appraiser may be included. Any repairs completed by the borrower on the property *before* the appraisal is made are not eligible for inclusion in calculating the maximum mortgage. The amount that cannot be financed into the mortgage will become part of the borrower's required cash investment.

If repairs cannot be completed before loan closing due to weather-related delays, the lender must establish an escrow account to ensure eventual completion of all required repairs. See HUD Handbook 4145.1 REV-2 for details.

2. **Energy-Related Weatherization Items.** If weatherization items are to be added to the property and paid for by the borrower, the mortgage amount may be increased by the cost of those items as described below. Weatherization items include thermostats, insulation, storm windows and doors, weather stripping and caulking, etc. These items may be added to both the sales price *and* the appraised value before determining the maximum mortgage amount. (A contractor's statement of cost of work completed or a buyer's estimate of the cost of materials must be submitted. See HUD Handbook 4150.1 REV-1 for details.) If the weatherization items cannot be completed before loan closing due to weather-related delays, the lender must establish an escrow account to ensure eventual completion of all items. See HUD Handbook 4145.1 REV-2 for details.

The amount that may be added in calculating the maximum mortgage is:

a. $2000 without a separate value determination; or
b. Up to $3500 if supported by a value determination by an approved or FHA roster appraiser or DE underwriter; or
c. More than $3500 subject to a value determination by an approved or FHA roster appraiser or DE underwriter <u>and</u> a

        separate on-site inspection made by a FHA-approved fee inspector or DE staff appraiser.

    3.    **Solar Energy Systems.** The cost of solar energy systems may be added *directly to the mortgage amount* (before adding the UFMIP) after applying the LTV ratio limits. The *statutory* mortgage limit for the area also may be exceeded by 20 percent to accommodate the cost of the system.

        The amount that may be added to the mortgage is limited to the *lesser* of the solar energy system's replacement cost or its effect on the property's market value. Both active and passive solar systems are acceptable, as are wind-driven systems. See HUD Handbooks 4150.1 REV-1 and 4930.2 for details.

1-8    **TRANSACTIONS THAT AFFECT MAXIMUM MORTGAGE CALCULATIONS.** Certain types of loan transactions affect the amount of financing available and the calculation of the maximum mortgage. These transactions include identity-of-interest, properties with non-occupying co-borrowers, three- and four-unit properties, properties for which a house will be constructed by the borrower on his or her own land or as a general contractor, payoffs of land contracts, and transactions involving properties under construction or less than a year old. Unless otherwise stated in this Handbook, the mortgage calculation procedures described in paragraph 1-6 also apply.

    A.    **Identity-of-Interest Transactions.** Identity-of-interest transactions on principal residences are restricted to a maximum LTV ratio of *85 percent*. Identity-of-interest is defined as a sales transaction between parties with family relationships or business relationships. However, maximum financing above 85 percent LTV is permissible under the following circumstances:

        1.    A family member purchases another family member's home as a principal residence.

        If a property is sold from one family member to another and is the seller's investment property, the maximum mortgage is the lesser of either:

        a.    85 percent of the appraised value, or
        b.    The appropriate LTV ratio percentage applied to the sales price, plus or minus required adjustments.

        *The 85 percent limit may be waived if the family member has been a tenant in the property for at least six months*

**EXHIBIT B**



Thursday,
September 20, 2007

Part IV

# Department of Housing and Urban Development

Federal Housing Administration (FHA) Single Family Mortgage Insurance: Announcement of Planned Implementation of Risk-Based Premiums; Notice

53872    Federal Register/Vol. 72, No. 182/Thursday, September 20, 2007/Notices

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–5171–N–01]**

**Federal Housing Administration (FHA) Single Family Mortgage Insurance: Announcement of Planned Implementation of Risk-Based Premiums**

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

**SUMMARY:** This notice applies to FHA single family mortgage insurance programs. This notice announces FHA's planned implementation of risk-based premiums, which are designed for mortgage lenders to offer borrowers an FHA-insured product that provides a range of mortgage insurance premium pricing, based on the risk the insurance contract represents.

**DATES:** *Comment Due Date:* October 22, 2007.

**ADDRESSES:** Interested persons are invited to submit comments regarding this notice to the Regulations Division, Office of General Counsel, Department of Housing and Urban Development, 451 Seventh Street, SW., Room 10276, Washington, DC 20410–0500. Communications should refer to the above docket number and title.

*Comment by Mail.* Please note that due to security measures at all federal agencies, submission of comments by mail often results in delayed delivery.

*Electronic Submission of Comments.* HUD now accepts comments electronically, which interested persons may now submit through the Federal eRulemaking Portal at *http://www.regulations.gov.* HUD strongly encourages commenters to submit comments electronically. Electronic submission of comments allows the commenter maximum time to prepare and submit a comment, ensures timely receipt by HUD, and enables HUD to make them immediately available for public viewing. Commenters should follow the instructions provided at *http://www.regulations.gov* to submit comments electronically.

*No Facsimile Comments.* Facsimile (FAX) comments are not acceptable. In all cases, communications must refer to the docket number and title.

*Public Inspection of Public Comments.* All comments and communications submitted will be available, without revision, for inspection and downloading at *http://www.regulations.gov.* Comments are also available for public inspection and copying between 8 a.m. and 5 p.m. weekdays at the Regulations Division. Due to security measures at the HUD Headquarters building, please schedule an appointment to review the comments by calling the Regulations Division at (202) 708–3055 (this is not a toll-free number).

**FOR FURTHER INFORMATION CONTACT:** Margaret Burns, Director, Office of Single Family Program Development, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; telephone (202) 708–2121 (this is not a toll-free number). Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Information Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:**

**I. Risk-Based Premiums**

This notice announces HUD's plan to implement risk-based premiums for FHA loans for which case numbers have been assigned on or after January 1, 2008. Section 203(c)(2) of the National Housing Act (12 U.S.C. 1709(c)(2)) establishes mortgage insurance premiums for most FHA single family programs. Such upfront and annual insurance premiums are set at levels not to exceed 2.25 percent and 0.50 percent (0.55 percent for mortgages involving an original principal obligation that is greater than 95 percent of the appraised value of the property), respectively, with a discount available on the upfront premiums for mortgagors who are first-time homebuyers and who successfully complete pre-purchase homeownership counseling approved by the Secretary.

By offering a range of premiums based on risk, FHA will be able to offer options to mortgagees serving borrowers who were previously underserved, or not served, by the conventional marketplace. Alternatively, FHA will also be able to offer options to mortgagees serving those borrowers wishing to lower their premiums by, for example, increasing their downpayment or by improving their credit scores. A range of premiums based on risk will also ensure the future financial soundness of FHA programs that are obligations of the Mutual Mortgage Insurance Fund (MMIF). Under risk-based premiums, however, no qualified borrower will be charged by the mortgage lender in excess of the current statutory upfront and annual mortgage insurance premium limits. Additionally, this notice, when issued in final, will replace FHA's Mortgagee Letter 00–38, which identifies the current mortgage insurance premiums for FHA's single family programs.

Risk-based premiums will utilize the following schedule for upfront mortgage insurance premium rates:

FHA SINGLE FAMILY MORTGAGE INSURANCE UPFRONT MORTGAGE INSURANCE PREMIUMS—EFFECTIVE AS OF JANUARY 1, 2008

[All premiums are specified in basis points (0.01%)]

|  | Minimum Downpayment[a] (%) | Decision Credit Score | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  |  | 850–680 | 679–640 | 639–600 | 599–560 | 559–500 | 499–300 | None |
| Funds from Borrower or a Relative | 10 | 75 | 100 | 125 | 150 | 175 | 175 | 200 |
|  | 5 | 100 | 125 | 150 | 175 | 200 | ............ | 225 |
|  | 3 | 125 | 150 | 175 | 200 | 225 | ............ | ............ |
| Other Sources of Funds | 3 | 175 | 200 | [b]225 | ............ | ............ | ............ | ............ |

a. Premiums are based on two categories of sources of funds: (1) The borrower's own funds or gifts from relatives and (2) any other acceptable source. See HUD Handbook 4155.1 for guidance on acceptable sources of funds.

b. A minimum decision credit score of 620 is required when downpayment funds come from a source other than the borrower or a relative of the borrower.

Notes:

1. Annual premium rates are: 50 basis points for loans with 5 and 10 percent downpayments; 55 basis points for loans with 3 percent downpayments; and 25 basis points for all loans with amortization terms of 15 years or less.

2. Downpayment percentage is determined by the base loan-to-value ratio (LTV). The "base LTV" is calculated by: (1) Dividing the base mortgage amount by the lesser of the sales price or appraised value of the property (for refinances, the base mortgage is divided by the appraised value of the property); (2) subtracting the result from 1 (one); and (3) multiplying by 100. "Base mortgage amount" is defined as the mortgage amount prior to adding any financed closing costs or upfront mortgage insurance.

3. Eligibility for the mortgage insurance premiums listed in the chart above is based on an applicant's decision credit score (FICO). A "decision credit score" is determined for each applicant according to the following guidelines: when three scores are available (one from each repository), the median (middle) value is used; when only two are available, the lesser of the two is chosen; when only one is available, then that score is used. If more than one individual is applying for the same mortgage, the lender should determine the decision credit score for each individual borrower and then average them to determine the final decision credit score for the application. That application "decision" credit score is then used to underwrite and determine if the mortgage is considered an acceptable risk.

4. Except as provided below, eligibility for these insurance premiums is dependent upon borrower acceptance by TOTAL (Technology Open to Approved Lenders). Therefore, all borrowers with valid credit scores must be scored by TOTAL.

5. Borrowers not scored by TOTAL or with insufficient trade lines to generate credit bureau scores are considered as "none" in the premium chart and are priced accordingly. Borrowers falling into cells with no premium price shown are not eligible for FHA-insured financing.

6. If TOTAL refers a loan for manual underwriting and the underwriter deems that there are sufficient compensating factors to create an acceptable risk to FHA, then the upfront insurance premium charge will be as shown on the premium chart.

7. These premiums apply to all purchase loans and to fully underwritten (non-streamline) refinance loans. Cash-out refinance loans must meet a minimum 5 percent equity requirement, based on the appraised value of the property.

8. Streamline refinance of an existing FHA loan for which a case number was assigned prior to January 1, 2008, will have an upfront premium of 100 basis points and an annual premium of 50 basis points.

9. First-time homebuyers who would otherwise pay an upfront premium of 225 basis points, but who complete pre-purchase homeownership counseling acceptable to the Secretary, will pay an upfront premium of no more than 200 basis points.

## II. Solicitation of Public Comments

FHA welcomes comments on the risk-based premiums for a period of 30 days. The risk-based premiums are based on FHA insurance eligibility requirements as they exist at the time of publication of this notice. FHA's proposed rule on downpayment assistance, if issued in final, would affect the risk-based premiums proposal contained in this notice.

Any changes made to the risk-based premiums in response to public comment will be announced through publication of a subsequent notice in the **Federal Register**.

## III. Findings and Certifications

*Environmental Review*

A Finding of No Significant Impact is not required for this notice. Under 24 CFR 50.19(b)(6), the subject matter of this notice is categorically excluded from the requirements of the National Environmental Policy Act (42 U.S.C. 4332 *et seq.*).

Dated: September 13, 2007.

**Brian D. Montgomery,**

*Assistant Secretary for Housing—Federal Housing Commissioner.*

[FR Doc. 07–4651 Filed 9–17–07; 10:16 am]

**BILLING CODE 4210–67–P**