# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PENOBSCOT INDIAN NATION, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    Civil Action No. 07-1282 (PLF) |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | ) ) ) ) |
| Defendants. | ) ) |
| AMERIDREAM, INCORPORATED, | ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| GENESIS FOUNDATION, HOME DOWNPAYMENT GIFT FOUNDATION, PARTNERS IN CHARITY, INC., FUTURES HOME ASSISTANCE PROGRAM, and SOVEREIGN GRANT ALLIANCE, | ) ) ) ) ) ) ) |
| Intervenors, | ) ) |
| v. | )    Civil Action No. 07-1752 (PLF) |
| HON. ALPHONSO JACKSON SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) ) |
| Defendant. | ) ) ) ) |

## DEFENDANTS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.     THE REGULATION WAS PROMULGATED CONSISTENTLY
       WITH THE APA. ........................................................................................ 1

       A.     HUD's Reversal of Its Prior Policy Was Supported and Appropriate. ................... 1

       B.     HUD Gave Sufficient Consideration to Reasonable Alternatives. ......................... 8

       C.     HUD Did Not Improperly Fail to Produce Any Critical Factual Material,
              Nor Were Plaintiffs Prejudiced By Any Such Alleged Failure. ........................... 13

II.    THE DIFFERENT EFFECTIVE DATES IN THE REGULATION
       DO NOT VIOLATE THE APA. ................................................................... 16

III.   PLAINTIFFS' PREJUDGMENT ARGUMENT FAILS. .................................. 17

IV.    THE REGULATION DOES NOT VIOLATE EQUAL PROTECTION. ............ 18

V.     PENOBSCOT'S ADDITIONAL CLAIMS ARE WITHOUT MERIT. ............. 21

       A.     HUD Did Not Violate Its Tribal Consultation Policy, Which is Not
              Actionable in Any Event ............................................................................. 21

       B.     HUD Did Not Violate Its Policies For Considering Impact on
              Small Entities. .......................................................................................... 22

       C.     Penobscot's Request to Supplement the Administrative Record
              Should Be Denied. ...................................................................................... 23

VI.    PLAINTIFFS' IRREPARABLE HARM ARGUMENTS ARE IRRELEVANT
       BECAUSE IF THEY PREVAIL, INJUNCTIVE RELIEF IS UNNECESSARY. ........... 25

CONCLUSION. ................................................................................................. 26

# TABLE OF AUTHORITIES

## CASES

Page(s)

ACLU v. Mineta,
    319 F. Supp. 2d 69 (D.D.C. 2004). ................................................................... 26

Action on Smoking and Health v. Civil Aeronautics Board,
    699 F.2d 1209 (D.C. Cir. 1983). ..................................................................... 11

Appalachian Power Co. v. EPA,
    251 F.3d 1026 (D.C. Cir. 2001). ..................................................................... 23

Baptist Health v. Thompson,
    458 F.3d 768 (8th Cir. 2006). ......................................................................... 17

BFI Waste Sys. v. FAA,
    293 F.3d 527 (D.C. Cir. 2002). ....................................................................... 21

Carlton v. Babbitt,
    900 F. Supp. 526 (D.D.C. 1995). .................................................................... 25

Carpenter v. Secretary of Veterans Affairs,
    343 F.3d 1347 (Fed. Cir. 2003). ........................................................................ 5

City of Brookings Mun. Tel. Co. v. FCC,
    822 F.2d 1153 (D.C. Cir. 1987). ..................................................................... 11

Cmty. Nutrition Inst. v. Block,
    749 F.2d 50 (D.C. Cir. 1984). ......................................................................... 14

Conecuh-Monroe Cmty. Action Agency v. Bowen,
    852 F.2d 581 (D.C. Cir. 1988). ....................................................................... 24

Covad Communications v. FCC,
    450 F.3d 528 (D.C. Cir. 2006). ......................................................................... 9

eBay, Inc. v. MercExchange, L.L.C.,
    126 S. Ct. 1837 (2006). ................................................................................... 26

FCC v. Beach Comm'ns,
    508 U.S. 307 (1993). ....................................................................................... 20

Florida Power & Light Co. v. Lorion,
    470 U.S. 729 (1985)..........................................................................................25

Greater Boston Tel. Corp. v. FCC,
    444 F.2d 841 (D.C. Cir. 1970). ................................................................. 4, 10

Hedgepeth ex rel. Hedgepeth v. WMATA,
    386 F.3d 1148 (D.C. Cir. 2004). .....................................................................20

Int'l Ladies' Garment Workers' Union v. Donovan,
    722 F.2d 795 (D.C. Cir. 1983). .......................................................................11

James Madison, Ltd. v. Ludwig,
    82 F.3d 1085 (D.C. Cir. 1996). .......................................................................18

Mobil Oil Exploration & Producing Southeast Inc. v. United Distrib. Cos.,
    498 U.S. 211 (1991)........................................................................................11

National Mining Association v. MSHA,
    116 F.3d 520 (D.C. Cir. 1997). .......................................................................11

Owner-Operator Independent Drivers Ass'n, Inc. v. FMCSA,
    494 F.3d 188 (D.C. Cir. 2007). .......................................................................15

Personal Watercraft Indus. Ass'n v. Department of Commerce,
    48 F.3d 540 (D.C. Cir. 1995). ......................................................... 4, 5, 14, 15

Reytblatt v. NRC,
    105 F.3d 715 (D.C. Cir. 1997). ........................................................................ 9

Rumely v. United States,
    197 F.2d 166 (D.C. Cir. 1952), aff'd, 345 U.S. 41 (1953)..............................24

Shays v. FEC,
    337 F. Supp. 2d 28 (D.D.C. 2004),
    aff'd on other grounds, 414 F.3d 76 (D.C. Cir. 2005). .................................... 6

Terrebonne v. Blackburn,
    646 F.2d 997 (5th Cir. 1981). .........................................................................24

Thompson v. Clark,
    741 F.2d 401 (D.C. Cir. 1984). ........................................................................ 9

Vermont Yankee Nuclear Power Corp. v. NRDC,
    435 U.S. 519 (1978)......................................................................................... 4

Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,
    429 U.S. 252 (1977)........................................................................................... 19

## STATUTES AND REGULATIONS

5 U.S.C. § 553(b). ................................................................................................ 4

5 U.S.C. § 601 et seq............................................................................................ 23

24 C.F.R. § 203.19. .............................................................................................. 2

57 Fed. Reg. 43,314 (Sept. 18, 1992). ................................................................. 5

66 Fed. Reg. 49,784 (Sept. 28, 2001). ............................................................ 21, 22

67 Fed. Reg. 36,102 (May 23, 2002). ................................................................. 5

72 Fed. Reg. 53,872 (Sept. 20, 2007). ............................................................... 12

72 Fed. Reg. 56,002 (Oct. 1, 2007)............................................................ passim

Defendants, by and through their undersigned counsel, file this consolidated memorandum in opposition to plaintiffs' motions for summary judgment in the above-referenced cases. In opposing plaintiffs' summary judgment motions, defendants incorporate by reference the arguments contained in their own earlier motions for summary judgment, and respond herein only as necessary to address issues that have not been sufficiently covered previously.[1]

## I.     THE REGULATION WAS PROMULGATED CONSISTENTLY WITH THE APA

### A.     HUD's Reversal of Its Prior Policy Was Supported and Appropriate

Plaintiffs first claim that the Department of Housing and Urban Development ("HUD") violated the Administrative Procedure Act ("APA") by not supplying a reasoned analysis for its departure from its policy of permitting the provision of seller-funded down payment assistance ("DPA") through certain conduits for the last nine years. As discussed in defendants' opening brief, the notice of proposed rulemaking ("NPRM") and the statement of basis and purpose accompanying the final rule constitute a reasoned analysis. See Defs' SJ Mem. at 28-31. Plaintiffs state that HUD "failed to acknowledge" that it was changing course (AmeriDream SJ Mem. at 17), but this assertion defies the text of the Federal Register releases. It is impossible to engage in a fair reading of the NPRM or the final rule release and come away with the

---

[1] Defendants' memorandum in support of its motions for summary judgment will be cited as "Defs' SJ Mem." AmeriDream's memorandum in support of its motion for summary judgment, which was joined in by the intervenor-plaintiffs in AmeriDream, will be cited as "AmeriDream SJ Mem." The memorandum in support of the motion for summary judgment of the Penobscot Indian Nation plaintiffs will be cited as "Penobscot SJ Mem." The transcript of the Court's preliminary injunction decision on October 31, 2007 will be cited as "Tr. (10/31/07)." We note that none of the plaintiffs' summary judgment motions contain any argument relating to the claims in their complaints that the Regulation (a) exceeded HUD's statutory authority, or (b) violated the Regulatory Flexibility Act and/or Executive Order 12,866. Because this action will be finally resolved through these cross-motions for summary judgment, plaintiffs have effectively abandoned these claims.

impression that HUD was not changing its position.[2]  Clearly, judging from the 15,000 comments received and the vigorous opposition from providers of seller-funded DPA, no one was misled into somehow thinking that the Regulation preserved HUD's prior policies permitting seller-funded DPA when provided through an intermediary.

Moreover, while plaintiffs imply that it is some kind of mystery "why the purported risks associated with such loans are unacceptable now after having been acceptable for the past ten years" (AmeriDream SJ Mem. at 18), their own summary judgment papers contain the answer to this question, derived directly from the Administrative Record.  AmeriDream's Rule 7(h) Statement of Material Facts as to Which There is No Genuine Dispute emphasizes that "[t]he proportion of FHA-insured loans financed in part by DPA has increased substantially in recent years."  Rule 7(h) Statement ¶ 36 (citing Nov. 2005 GAO Report at 3).[3]  It goes on to explain that "[f]rom 2000 to 2004, the proportion of FHA-insured loans financed with DPA grew from 35

---

[2]  Plaintiffs try to portray HUD as obscuring the fact that it was changing its position, quoting language in the final rule release stating that the Regulation "codifies HUD's longstanding practice."  AmeriDream SJ Mem. at 17 (quoting 72 Fed. Reg. at 56,002).  However, plaintiffs' quotation misleadingly omits the language that immediately follows:  "codifies HUD's longstanding practice, authorized by statute, of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations."  72 Fed. Reg. at 56,002 (emphasis added to show language omitted by plaintiffs' quotation).  It has, indeed, been HUD's longstanding practice to permit those types of gifts, and the Regulation does, indeed, codify that practice, which previously had only been set forth as a HUD handbook provision, rather than as a full regulation.  See 24 C.F.R. § 203.19(d) (providing that a mortgagor may use loans or gifts described in paragraphs (e) or (f) to meet the minimum cash investment requirement), (f) (enumerating "[p]ermissible sources of gifts").  The fact that the Regulation also does other things that do depart from HUD's past practices does not render this language inaccurate or misleading.

[3]  We note that AmeriDream's Rule 7(h) Statement erroneously cites page 3 of the November 2005 GAO Report as A.R. 00457.  The correct citation is A.R. 00526.  It would appear that AmeriDream confused the November 2005 GAO Report with the February 2005 GAO Report.

2

percent to nearly 50 percent," and that "[s]eller-funded downpayment assistance has accounted

for an increasing percentage of these DPA-financed loans." Id. ¶¶ 37, 38 (citing Nov. 2005 GAO

Report at 3). Plaintiffs are remiss in criticizing HUD for not sufficiently "explaining" things that

plaintiffs themselves consider indisputable.

      Plaintiffs also argue that HUD did not "attempt to explain how its current reversal in

policy better fulfills the will of Congress than its decade-long favorable position toward DPA

programs." AmeriDream SJ Mem. at 17. Particularly given that plaintiffs have apparently now

abandoned their marginal claim that the Regulation exceeds HUD's statutory rulemaking

authority, this argument is puzzling at best. An agency is not required in a statement of basis and

purpose to engage in some formulaic exegesis of its enabling statute. The NPRM and statement

of basis and purpose alike outlined the statutory scheme, including the fundamental 3%

minimum cash investment requirement, and then went into significant detail about why seller-

funded DPA transactions that circumvent that requirement are of concern to HUD, e.g., that

"loans made to borrowers who rely on these types of seller-funded assistance perform very

poorly," that "the sales price is often increased to ensure that the seller's net proceeds are not

diminished, and such increase in sales price is often to the detriment of the borrower and FHA,"

and that "[g]iven that seller-funded gift programs thrive in stagnant or depreciating housing

markets, the risk to FHA increases if FHA cannot recover the full amount owed when FHA

acquires and resells a home," which also "hurt[s] the families who lose their homes and the

neighborhoods in which those homes are located." 72 Fed. Reg. at 56,002, 56,003.

      While plaintiffs boldly proclaim that "HUD provides no evidence" to explain its position

(AmeriDream SJ Mem. at 18), the ensuing discussion in their brief completely ignores the

Administrative Record, which, as detailed in our opening brief (see Defs' SJ Mem. at 17-27), provides extensive evidence in support of the Regulation.  See AmeriDream SJ Mem. at 18-21 (containing not one reference to the Administrative Record).  Moreover, plaintiffs' arguments misapprehend the requirements for informal rulemaking, in which "evidence" in the strict or literal sense of the word is not required.  Plaintiffs seem to take the position that a final rule must read like an order of proof, containing evidentiary citations and empirical data to support each and every proposition.  However, the APA simply requires that final rules be published with a "concise general statement of their basis and purpose."  5 U.S.C. § 553(b).  As one of the cases upon which plaintiffs rely makes clear, an agency is permitted to be "tolerably terse," just not "intolerably mute."  Greater Boston Tel. Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970), cited in AmeriDream SJ Mem. at 15-16.  The Supreme Court has specifically held that courts may not transplant standards from formal rulemaking or otherwise ratchet up the requirements for informal rulemaking above those imposed by the Constitution and the APA.  See Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 545-48 (1978).

It is instructive to consider what the courts have found to constitute an adequate statement of basis and purpose in informal rulemaking.  In Personal Watercraft Indus. Ass'n v. Department of Commerce, 48 F.3d 540 (D.C. Cir. 1995), the court reviewed a National Oceanic and Atmospheric Administration ("NOAA") rule limiting the use of motorized personal watercraft in waters of marine sanctuary.  The D.C. Circuit held that two paragraphs containing four sentences of citation-less text, which are reproduced in the margin to illustrate the point and for comparison

with the instant rule,[4] were sufficient: "The first paragraph is the 'basis,' the second the

'purpose.' The statement is 'concise' and it is 'general.'" Id. at 545. The court did not insist on

empirical evidence or iron-clad statistics about collisions between watercraft and marine life, or

demand proof that the fish were in fact "frequently alarmed" by passing watercraft and modified

their behavior as a result.

Similarly, in Carpenter v. Secretary of Veterans Affairs, 343 F.3d 1347 (Fed. Cir. 2003),

the Federal Circuit upheld a Department of Veterans Affairs ("VA") rule barring certain conduit-

assisted payments of attorneys' fees based on a statement of basis and purpose substantially

shorter and less detailed that the one in the instant case. See id. at 1355-56 (noting that agency

made "statements as to its experience with such agreements," found suspicious circumstances in

a number of such agreements, and received comments that corroborated its concerns); 67 Fed.

Reg. 36,102 (May 23, 2002). The Federal Circuit's opinion contains no suggestion that VA bore

---

[4] The portion of the NOAA final rule found by the D.C. Circuit to constitute a sufficient
statement of basis and purpose is the following:

> The small size, maneuverability and high speed of these craft is what causes these
> craft to pose a threat to resources. Resources such as sea otters and seabirds are
> either unable to avoid these craft or are frequently alarmed enough to significantly
> modify their behavior such as cessation of feeding or abandonment of young. Also
> other, more benign, uses of the Sanctuary such as sailing, kayaking, surfing and
> diving are interfered with during the operation of [personal watercraft].
> * * * * * *
> This regulation is intended to provide enhanced resource protection by prohibiting
> operation of motorized personal watercraft in areas of high marine mammal and
> seabird concentrations, kelp forest areas, river mouths, estuaries, lagoons and
> other similar areas where sensitive marine resources are concentrated and most
> vulnerable to disturbance and other injury from personal watercraft.

Personal Watercraft Indus. Ass'n, 48 F.3d at 545 (quoting 57 Fed. Reg. 43,314, 43,321 (Sept. 18,
1992)) (omission in Personal Watercraft).

a burden to "prove" in a traditional courtroom sense that the transactions being barred were undertaken in bad faith or had caused concrete harms. Judged against these standards, it is clear that the Regulation's statement of basis and purpose passes muster.

Plaintiffs again attack HUD for relying on the Government Accountability Office's ("GAO") comparison of FHA policies on seller-funded DPA to those of Fannie Mae and Freddie Mac, and for relying on the IRS's Revenue Ruling. But those materials are highly relevant and supportive for the reasons discussed in our summary judgment motion. See Defs' SJ Mem. at 23-27. Plaintiffs rely on Shays v. FEC, 337 F. Supp. 2d 28, 126-28 (D.D.C. 2004), aff'd on other grounds, 414 F.3d 76 (D.C. Cir. 2005), to support their contention that HUD should not have consulted the IRS Revenue Ruling. However, Shays is readily distinguishable. In that case, the Federal Election Commission ("FEC") had issued a regulation that categorically treated 501(c)(3) organizations more favorably than everyone else by making them exempt from the definition of "electioneering communications" regulated by the Bipartisan Campaign Reform Act ("BCRA"). The court held that the FEC had not adequately explained its use of 501(c)(3) status as essentially a proxy for permissible communications under BCRA, observing that BCRA prohibited some such activities that the IRS apparently did not itself bar 501(c)(3) entities from engaging in. See id. at 125-26.

Here, in contrast, rather than broadly placing 501(c)(3) organizations outside the statutory framework based on the premise that the tax laws would be interpreted coextensively with the laws HUD enforces, HUD simply took note, as one factor, that the IRS had officially concluded that organizations that act as conduits for seller-funded DPA transactions were not legitimately

entitled to 501(c)(3) status.[5]  This development was highly pertinent, as valid 501(c)(3) status

was the only basis that ever allowed such organizations to engage in seller-funded DPA in the

first place.  As discussed in defendants' opening brief, longstanding HUD policy not challenged

in this case provides that only 501(c)(3) organizations, relatives, employers or labor unions,

certain governmental agencies or public entities (including Indian tribes), or close friends may

make gifts of downpayment assistance.  See Defs' SJ Mem. at 25-26; AmeriDream SJ Mem. at 3

n.1 (citing HUD Handbook 4155.1 Rev. 5, § 2-10).[6]

     Plaintiffs' discussion of GAO's November 2005 report (see AmeriDream SJ Mem. at 7-

10, 19 n.5) also misses the mark.  Plaintiffs criticize the methology of GAO's study for not

giving sufficient attention "'to two key factors that influence whether or not a loan is defaulted or

goes to claim:  (1) the financial situation of the borrower and (2) the economic conditions of the

area in which the home is located.'"  AmeriDream SJ Mem. at 9 (quoting GMU study (A.R.

00441)).  However, the George Mason University ("GMU") study upon which AmeriDream

relies for this criticism proceeds to acknowledge that the GAO study did "attempt[] to account

for these other factors in their regression analysis," which "included variables for the borrowers'

---

[5] Plaintiffs' reliance on Shays is ironic because, if anything, that case discourages the
blanket exemption of 501(c)(3) entities from otherwise applicable requirements.  The plaintiffs in
Shays were not 501(c)(3) entities complaining that the FEC was overly restricting their activities
based on concerns raised by the IRS; rather, plaintiffs claimed to be injured by the 501(c)(3)
entities' activities and alleged that the FEC had been overly tolerant of 501(c)(3) entities and had
not sufficiently enforced the law against them.  Thus, if Shays has any relevance to this case at
all, it would be to suggest revisiting the policy categorically allowing 501(c)(3) entities, as a
class, to engage in legitimate DPA transactions -- a result that the putative 501(c)(3) plaintiffs
presumably would not welcome.

[6] We note that Penobscot erroneously attributes this longstanding policy to the statute
itself.  See Penobscot SJ Mem. at 7.  In fact, it is a function not of the statute, but of HUD
handbook policy (previously) and of the Regulation (going forward).

resources, first-time home buyer, whether or not the area was a HUD-designated underserved area, unemployment rate, and home price appreciation," and found that "[n]one of these variables was a statistically significant predictor of the probability of default or foreclosure." A.R. 00442. Although the GMU study then theorizes about how various additional variables might be desirable for "[a]n ideal regression analysis," it forthrightly admits that in the real world such an "ideal" analysis would be "virtually impossible." Id. Plaintiffs also assert that the November 2005 GAO report does not support the proposition that the sales prices of homes purchased with seller-funded DPA are often inflated, finding great significance in the fact that the increment of inflation the GAO found -- "2 to 3 percent" (GAO Nov. 2005 Report at 4 (A.R. 00527)) -- was "less than the average DPA provided by AmeriDream, 3.3 percent of a home's purchase price." AmeriDream SJ Mem. at 10 (emphasis in original). But this comparison is meaningless because the November 2005 GAO report's analysis was not limited to AmeriDream-assisted transactions. In any event, systematic inflation of home prices associated with seller-funded DPA gifts is no less problematic merely because it does not precisely match the size of the DPA gift to the dollar.

Finally, Penobscot claims that the Regulation's applicability to Indian tribes is not supported because "HUD's identified data deals exclusively with charitable DPA programs." Penobscot SJ Mem. at 2. This contention is misplaced because the salient consideration is the source of funding used for down payment "gifts," not the legal form or background affiliation of the entity that serves as the conduit. See Defs' SJ Mem. at 19 n.17.

### B.    HUD Gave Sufficient Consideration to Reasonable Alternatives

Plaintiffs contend (AmeriDream SJ Mem. at 24-27; Penobscot SJ Mem. at 19-22) that HUD failed adequately to consider responsible alternatives to the Regulation. But when one

8

looks at specifically what "responsible alternatives" plaintiffs claim HUD ignored, the argument falls apart.

Specifically, AmeriDream points to five policy recommendations it made in its comment letter. See AmeriDream SJ Mem. at 24. It then complains that HUD "cursorily mentions only a few," while "wholly ignoring the remainder of AmeriDream's proposals." Id. at 25. But it has long been clear that an agency is not obligated to respond individually to every discrete recommendation made by every commenter. See Covad Communications v. FCC, 450 F.3d 528, 550 (D.C. Cir. 2006); Reytblatt v. NRC, 105 F.3d 715, 722 (D.C. Cir. 1997); Thompson v. Clark, 741 F.2d 401, 408 (D.C. Cir. 1984). To hold otherwise would effectively make it impossible for an agency to engage in rulemaking in a setting where, as here, many thousands of comments are received. AmeriDream admits the final rule's statement of basis and purpose did specifically address three of its five recommendations, a respectable showing in a rulemaking where AmeriDream's comment letter was one of nearly 15,000. See AmeriDream SJ Mem. at 25.

AmeriDream complains that HUD "shrug[ged] off" those three recommendations with "cursory" responses. Id. It also asserts that for HUD to say that a comment is beyond the scope of the rulemaking is "circular" and "flatly improper." Id. But these arguments rest on plaintiffs' self-serving parody of HUD's responses, rather than the actual responses. For example, in its response to AmeriDream's suggestion that HUD reform the appraisal process -- where AmeriDream chides HUD for invoking a "beyond the scope" rationale -- the full text of HUD's response was as follows:

> HUD response: Downpayment assistance can be an independent source of price inflation separate from, or in conjunction with, any price inflation that may arise from the appraisal process, which, while noted by HUD, is an issue beyond the

> scope of the present rule.  HUD has already taken steps to address the appraisal
> issue.  HUD's Appraiser Roster, for which the regulations can be found in 24 CFR
> part 200, subpart G, is intended to ensure fairness and accuracy in the appraisal
> process for FHA-insured mortgages.

72 Fed. Reg. at 56,004.  Obviously, plaintiffs' pithy one-liner, "We don't have to consider it because it's not what we proposed" (AmeriDream SJ Mem. at 25), does not accurately capture the full substance of HUD's thoughtful discussion.  Nor is it true that HUD simply "ignore[d]" comments about improving the appraisal process (Penobscot SJ Mem. at 21).  To the contrary, HUD responded to this comment by acknowledging that inflated appraisals present a genuine issue; noting that it was already taking action, through other regulations, in an attempt to address that issue; and explaining that because appraisals are an independent source of price inflation, such action does not obviate the need to address other such sources, such as seller-funded DPA. There was nothing inadequate about this explanation.  It may have been "tolerably terse," but it was not "intolerably mute."  Greater Boston, 444 F.2d at 851.

Moreover, contrary to plaintiffs' argument, it is not circular for an agency to treat comments as outside the scope of a particular rulemaking.  In National Mining Association v. MSHA, 116 F.3d 520, 549 (D.C. Cir. 1997), the D.C. Circuit rejected this very argument.  There, the Mine Safety and Health Administration ("MSHA") entirely declined to address certain union comments suggesting mine safety standards solely because it considered them "outside the scope of this rulemaking," and the unions challenged this treatment of their comments as violating the APA.  Id.  The D.C. Circuit upheld the rule against this challenge, explaining that it took the agency's "beyond the scope" statement as meaning that "the agency was choosing to impose some standards without addressing 'everything that could be thought to pose any sort of

problem.'" Id. (quoting Personal Watercraft, 48 F.3d at 544). As the court explained, "'[a]n

agency does not have to make progress on every front before it can make progress on any front.

Agencies often must contend with matters of degree. Regulations, in other words, are not

arbitrary just because they fail to regulate everything that could be thought to pose any sort of

problem.'" Id. (quoting Personal Watercraft, 48 F.3d at 544). See also Mobil Oil Exploration &

Producing Southeast Inc. v. United Distrib. Cos., 498 U.S. 211, 230 (1991) ("An agency enjoys

broad discretion in determining how best to handle related, yet discrete, issues in terms of

procedures and priorities." (citations omitted)).[7]

Here, as discussed above, HUD's response to recommendations to improve the appraisal

process said much more than that the proposal was outside the scope of the rulemaking. Among

other things, it noted that it was already attempting to address the issue, through a different set of

rules. See 72 Fed. Reg. at 56,004. This Court itself observed, in its preliminary injunction

ruling, that "things that were already being done" are "not really alternatives to the Rule," Tr.

(10/31/07) at 22-23. For all of these reasons, HUD did not act arbitrarily or capriciously in

---

[7] The cases plaintiffs cite are distinguishable. In International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795 (D.C. Cir. 1983), the "Secretary's explanation of his decision d[id] not provide the slightest indication that he gave any consideration to the alternatives raised in his original notice and the comments," and the agency effectively conceded on appeal that no such consideration had been given. Id. at 816 (emphasis added). The court also emphasized that the agency's obligation to address proposed alternatives explicitly does not extend to all comments, only to those that are "common and known or otherwise reasonable." Id. at 818. Similarly, in Action on Smoking and Health v. Civil Aeronautics Board, 699 F.2d 1209 (D.C. Cir. 1983), the agency "offered no explanation for its rejection of the proposal." Id. at 1218; see also id. at 1219 (noting that another proposal "received no attention whatsoever"). In City of Brookings Mun. Tel. Co. v. FCC, 822 F.2d 1153 (D.C. Cir. 1987), the agency "fail[ed] even to consider the proposed alternative." Id. at 1169. Here, in contrast, the discussion of comments in the preamble and the Administrative Record alike plainly demonstrate that HUD gave ample consideration to common and known or otherwise reasonable options.

responding to comments suggesting improvements in appraisal procedures.  And for similar

reasons, HUD did not act arbitrary or capriciously in the way it dealt with the various other

comments to which plaintiffs refer.[8]  See also Defs' SJ Mem. at 35-37.

Plaintiffs also say that HUD has improperly failed to implement policy recommendations

---

[8] For instance, plaintiffs characterize HUD as "disposing of [another one of AmeriDream's comments] by stating that DPA differs from closing costs" (AmeriDream SJ Mem. at 25), implying some kind of conclusory treatment.  The actual text of this discussion reads as follows:

> Comment:  Downpayment assistance should be permitted in the 6 percent seller concession for closing costs that FHA allows.

> HUD Response:  The downpayment differs from closing costs in that the downpayment creates equity in the property for the buyer and closing costs do not.  As such, the downpayment cannot be included in the mortgage, whereas certain closing costs are permitted to be included in the mortgage.  For this reason, downpayment assistance cannot be treated as closing costs.

72 Fed. Reg. at 56,004.  This is a perfectly logical and sound explanation.

Penobscot also argues that HUD improperly rejected the "less restrictive reasonable alternative" of charging a higher premium for DPA-assisted loans.  See Penobscot SJ Mem. at 21-22.  HUD recently announced its intent to implement a risk-based premium system, with one of the factors determining premiums being whether the down payment is funded by the borrower or relative, or by some other source.  See Federal Housing Administration (FHA) Single Family Mortgage Insurance:  Announcement of Planned Implementation of Risk-Based Premiums, 72 Fed. Reg. 53872 (Sept. 20, 2007).  Thus, HUD has not "rejected" this "alternative" at all; it simply concluded that both measures needed to be taken in tandem.

Finally, Penobscot also claims that HUD erred by not specifically addressing "the 2006 GMU Study, which showed that homeowners receiving assistance from DPA saw their total wealth grow by $9.6 billion between 2000 and 2005."  Penobscot SJ Mem. at 22.  However, the 2006 GMU study simply does not support that statement; nothing in it attempts to quantify any increase in wealth by homeowners.  See A.R. 00437-00450.  Penobscot's mis-citation aside, our opening brief shows why HUD did not violate the APA by not specifically discussing the 2006 GMU study.  See Defs' SJ Mem. at 37-39.  While a different, 2007 GMU study that some of the plaintiffs have attached to their papers in this litigation is apparently the source for the $9.6 billion figure, that study was not a part of the Administrative Record and was not submitted by any commenter during the rulemaking process, and HUD was under no obligation to discuss it.

suggested by GAO in its November 2005 report.  See AmeriDream SJ Mem. at 8-9, 26-27.  This argument is rather curious, as the policy recommendation by GAO most pertinent to this case was to prohibit the use of seller-funded DPA to meet the statutory 3 percent minimum investment requirement -- i.e., the approach adopted in the Regulation.  See A.R. 00568.  As this Court previously recognized, the other "suggestions in the November, 2005, GAO report were not really alternatives to the Rule.  They were things that were already being done, or suggestions as to how to tweak things, but not really alternatives."  Tr. (10/31/07) at 22-23.  Indeed, GAO itself must not have viewed the other suggestions as "alternatives," because they were presented conjunctively with its overarching recommendation to restrict seller-funded DPA.  See A.R. 00567-68.  In any event, plaintiffs are wrong that HUD has not implemented the other GAO recommendations.  HUD has implemented or is in the process of implementing several of them, as discussed in the Commissioner's October 25, 2005 letter (see A.R. 00612-14).  The source plaintiffs cite for the proposition that HUD "went back on its commitment" to do so (see AmeriDream SJ Mem. at 26-27), a page out of a congressional hearing transcript, simply does not support that characterization.

C.    **HUD Did Not Improperly Fail to Produce Any Critical Factual Material, Nor Were Plaintiffs Prejudiced By Any Such Alleged Failure**

Plaintiffs also fault HUD for referring in its discussion of comments to a loan portfolio analysis that corroborated HUD's concerns about the risks posed by seller-funded DPA transactions, showing "that there is a 2 to 3 times greater risk of default and claim with purchase loans that receive downpayment assistance from the seller or other persons or entities that financially benefit from the sale of a home to the borrower than from all other loans with

13

downpayment assistance from all other sources."  72 Fed. Reg. at 56,003; see AmeriDream SJ

Mem. at 27-31.  Largely ignored by plaintiffs is the fact that this analysis was mentioned as part

of the agency's response to comments asking HUD to be more specific about the degree of risk

that it believed seller-funded DPA posed.  The D.C. Circuit has long held that an agency can

refer to new material in responding to comments, so long as it is not the most critical factual

material upon which the rule relies, because "[r]ulemaking proceedings would never end if an

agency's response to comments must always be made the subject of additional comments."

Cmty. Nutrition Inst. v. Block, 749 F.2d 50, 58 (D.C. Cir. 1984).  The additional loan portfolio

analysis is not the most critical factual material upon which the Regulation rests.  The

Administrative Record shows that a plethora of material supports the Regulation.  See Defs' SJ

Mem. at 17-27.

Moreover, "[a]gencies may develop additional information in response to public

comments and rely on that information without starting anew 'unless prejudice is shown.'"

Personal Watercraft Indus. Ass'n, 48 F.3d at 544 (quoting Cmty. Nutrition Inst., 749 F.2d at 58)).

"The party objecting has the burden of 'indicat[ing] with "reasonable specificity" what portions

of the documents its objects to and how it might have responded if given the opportunity.'"  Id.

(quoting Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 540-41 (D.C. Cir.

1983)).  For example, in Personal Watercraft, the D.C. Circuit rejected the argument that the

agency erred by referring to a study done by a researcher after the comment period closed,

finding that "[t]he Association has not even come close to shouldering that burden.  It does not

point to anything in Dr. Rote's findings that might be considered erroneous.  It does not suggest

that his methodology was in any wise defective." 48 F.3d at 544.[9]

Here, plaintiffs' attempts to meet this standard fall short. As a threshold matter, a number -- in fact, a majority -- of the plaintiffs apparently did not submit comments on the proposed rule at all. See Defs' SJ Mem. at 53 n.37 (giving breakdown). Of course, plaintiffs who never submitted any comments on the proposed rule at all are hard-pressed to argue that they were prejudicially deprived of the ability to comment on the loan portfolio analysis because it was not mentioned in the NPRM. As for those plaintiffs who did comment, the only challenge to the loan portfolio analysis they offer at this time is that "the basis for HUD's statements is entirely conjectural, because HUD did not have reliable records concerning sources of DPA in loan closings during that much of that period [sic], including 2001 and even later." AmeriDream SJ Mem. at 30. This is a makeweight argument that vastly exaggerates the facts and fails to show prejudice.

First, the sources plaintiffs rely on for the proposition that "HUD did not have reliable records" pertain to only a small subset of the data: for loans originated before 2002. See AmeriDream's Rule 7(h) Statement of Material Facts ¶¶ 92-95. As AmeriDream itself

---

[9] Owner-Operator Independent Drivers Ass'n, Inc. v. FMCSA, 494 F.3d 188 (D.C. Cir. 2007), cited by plaintiffs, is distinguishable on several grounds. First, the agency there did not merely look at additional material to respond to comments or validate its earlier findings, but changed a key aspect of its methodology in a way that was central to the substance of the rule. As the court explained, "the addition of the time-on-task element to the model was not a minor modification used to check or confirm prior analyses; it constituted the agency's response to an important defect in its previous methodology identified by this court in [a decision involving an earlier iteration of the same rule]." Id. at 201-02. Further, the court emphasized the need for the complaining party to show prejudice, finding that in that case there was no question that the petitioner could have mounted a "credible challenge" to the new methodology. Id. at 202-03. Here, as discussed below, plaintiffs have not formulated any credible challenge to HUD's loan portfolio analysis.

acknowledges, see id. ¶¶ 36-39, the number of seller-funded DPA transactions has ballooned in recent years, meaning that the vast bulk of data points would represent loans originated since 2002, rather than before then.  Second, even as to pre-2002 loans, plaintiffs significantly exaggerate the source they cite, which states only that it was not possible "'to readily identify all loans with [Downpayment Assistance Program] assistance from the [Single Family Data Warehouse] data.'"  Id. ¶ 93 (quoting OIG audit report) (alterations AmeriDream's) (emphasis added).  The fact that certain data repositories did not exhaustively flag every DPA transaction before 2002 does not mean that a meaningful analysis was not possible based on the ample data that was available.  Third, the data limitations to which AmeriDream refers would, if anything, cause the disparity between claim rates for nonprofit-DPA-assisted loans, on the one hand, and loans with assistance from all other sources, on the other, to be understated.  The issue was that some loans that received nonprofit DPA assistance were not consistently coded or recorded as such; thus, claims or defaults for those loans would show up in the data as claims or defaults for the other population of loans.  See id. ¶ 93.  This data limitation could introduce a bias, to be sure, but it would be, if anything, a bias favoring nonprofit DPA loans.  In other words, the implications of AmeriDream's quibbles about a small fraction of data points would be that the default and claim risks associated with seller-funded DPA loans are somewhat greater than HUD's loan portfolio analysis showed.  AmeriDream cannot establish that it was materially prejudiced by not being able to raise this issue.

## II.   THE DIFFERENT EFFECTIVE DATES IN THE REGULATION DO NOT VIOLATE THE APA

Plaintiffs' summary judgment motions do not say anything in their discussion of the different effective dates that has not been said previously.  Thus, defendants stand on and

16

incorporate by reference the discussion of this issue in their opening memorandum, <u>see</u> Defs' SJ Mem. at 60-64, except to make three brief points. First, we observe that AmeriDream is oddly situated to argue that the later effective date that HUD gave to Nehemiah pursuant to the 1998 settlement somehow violated the APA or equal protection principles, given that it had no compunctions about procuring almost the exact same thing (but for a one-month difference) for itself via stipulation earlier in this litigation. Second, the Eighth Circuit case upon which plaintiffs rely is, by its own terms, inapposite. <u>See</u> AmeriDream SJ Mem. at 34 (citing <u>Baptist Health v. Thompson</u>, 458 F.3d 768, 777 (8th Cir. 2006)). The Regulation obviously does not impose any "new liability" for "past actions." It does not impose any liability at all -- it simply prescribes conditions necessary for FHA to insure a mortgage loan -- and it is purely prospective in effect. Third, Penobscot's characterization that "the settlement document" in the 1998 Nehemiah settlement "provides" for an industry-wide six-month grace period (Penobscot SJ Mem. at 23) is misleading. As explained in defendants' summary judgment motion, the Settlement Agreement provided for a six-month delay in effectiveness only as to <u>Nehemiah</u>. While HUD sent a letter to Nehemiah containing a reference to its plan to make the six-month delay universal, and that letter was attached as an exhibit to the Settlement Agreement, that was merely a reflection of HUD's unilateral intent in 1998, and in no way was a term of the settlement itself. <u>See</u> Defs' SJ Mem. at 62-63; A.R. 00883-84.

## III.    PLAINTIFFS' PREJUDGMENT ARGUMENT FAILS

Plaintiffs' prejudgment argument also largely repeats arguments that have previously been made. Thus, again, defendants stand on and incorporate by reference the discussion of this issue in their opening memorandum. <u>See</u> Defs' SJ Mem. at 43-51. In particular, we note that

plaintiffs do not confront the fact that the Regulation was issued by the Federal Housing Administration, and the operative decision to adopt the Regulation was made not by Secretary Jackson, who they claim made comments showing bias, but by the head of FHA, Assistant Secretary for Housing/Federal Housing Commissioner Brian Montgomery, pursuant to a valid delegation.  Far from presenting any evidence that the decision-maker harbored a bias against seller-funded DPA, plaintiffs' brief literally begins and ends with quotations from FHA Commissioner Montgomery that they characterize as expressing support for seller-funded DPA. See AmeriDream SJ Mem. at 3-4, 44-45.[10]

## IV.    THE REGULATION DOES NOT VIOLATE EQUAL PROTECTION

Plaintiffs' equal protection argument also adds nothing beyond previous arguments.  We generally incorporate our summary judgment motion's discussion, see Defs' SJ Mem. at 42-43, and add four brief observations.  First, plaintiffs do not even acknowledge, much less address, this Court's ruling at the preliminary injunction stage that they were not likely to succeed on their equal-protection challenge to the substance of the Regulation because "[t]here is a rational basis

---

[10] Plaintiffs have introduced a declaration by Neil Roland, the reporter who wrote the story that is the basis for plaintiffs' "prejudgment" argument.  However, this declaration postdates the agency's decision and is outside the administrative record, see James Madison, Ltd. v. Ludwig, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (administrative record comprises the "materials compiled by the agency . . . that were before the agency at the time the decision was made"), and plaintiffs have not met the standard for consideration of extra-record materials, see Defs' SJ Mem. at 47-48 & n.35.  In addition, the declaration notably stops short of actually attesting to the accuracy of the paraphrased comments in the story attributed to Secretary Jackson.  While plaintiffs make much of the fact that Mr. Roland and Bloomberg did not receive any follow-up comment from Secretary Jackson or HUD on the story, agencies do not have a duty to comb through the scores of media pieces that may appear in print or on the Internet on any given day to ferret out any possible embellishments or inaccuracies and follow up with reporters.  Most importantly, plaintiffs' reliance on the Roland declaration cannot bridge the critical logical gap in their argument -- that final approval of the Regulation was given by Commissioner Montgomery acting in his capacity as head of FHA, not by Secretary Jackson.

for saying that seller-funded down-payment assistance poses special problems." Tr. (10/31/07) at 26.

Second, plaintiffs' allegation about "the Regulation's disproportionate burdening of minorities, immigrants, and female heads of household" (see AmeriDream SJ Mem. at 39) is gratuitous and of no consequence. While this language appears calculated to plant a subtle hint that something more than rational-basis review might be appropriate, plaintiffs immediately and directly concede that the Regulation does not distinguish between suspect classes, and that rational-basis review therefore applies. See id. Indeed, it is well-settled that an equal protection claim requires intentional discrimination, and is not satisfied by disparate impact or "disproportionate burdening." See, e.g., Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 264-65 (1977).

Third, plaintiffs fundamentally misunderstand equal protection analysis. They assert that the Regulation violates equal protection because it allegedly "runs counter to [the] legislative goal" of "assist[ing] low- and moderate-income individuals in making the transition from tenants to homeowners" because some such homebuyers allegedly will face difficulty buying a house unless sellers are permitted to subsidize their down payments through an intermediary. AmeriDream SJ Mem. at 40-41. But equal protection analysis is not a vehicle for debating how well a regulation serves, or whether it "runs counter to," certain overarching policies embodied in the underlying statute.[11]   The question, rather, is simply whether "'there is any reasonably

---

[11]   Under plaintiffs' sweeping theory, any eligibility requirement for FHA insurance presumably could be said to violate equal protection, because any eligibility requirement will have the effect of withholding FHA insurance from those mortgages that fail to meet the requirement. Plaintiffs' argument proves too much and is a dramatic distortion of equal

(continued...)

conceivable state of facts that could provide a rational basis for the classification.'" <u>Hedgepeth ex rel. Hedgepeth v. WMATA</u>, 386 F.3d 1148, 1156 (D.C. Cir. 2004) (quoting <u>FCC v. Beach Comm'ns</u>, 508 U.S. 307, 313 (1993)). Here, as the Court previously found, there is undoubtedly a rational basis for treating down payment assistance that is financed by the seller differently from down payment assistance financed by people who do not have an economic interest in the transaction. <u>See</u> Tr. (10/31/07) at 26. AmeriDream's own hired experts agree. <u>See</u> A.R. 00447 (GMU study funded by AmeriDream agreed that differences in default rates "between 'seller-funded' assistance and assistance from other sources were large and statistically significant"). Moreover, the classification made by the Regulation <u>does</u> serve the overall goals of the National Housing Act, because it promotes the continued solvency of the Mutual Mortgage Insurance Fund so that FHA has the wherewithal to insure eligible mortgages in the future. It also protects prospective homebuyers from being lured into unsuitable transactions that may seem superficially attractive but in fact put them at higher risk of foreclosure.[12]

Fourth, the Court need not reach the issue of whether the different effective date for Nehemiah violates equal protection. The Court has stated that, independent of constitutional requirements, "under the Administrative Procedure Act an agency must either provide a rational

---

[11](...continued)
protection law.

[12] Plaintiffs also argue that the seller-funded DPA classification is not rationally related to the purpose of the Regulation, namely, in plaintiffs' view, "to codify HUD's 'longstanding practice . . . of allowing a mortgagor's investment to be derived from gifts by family members and certain organizations.'" AmeriDream SJ Mem. at 41 (quoting 72 Fed. Reg. at 56,002). However, as discussed above, <u>see supra</u> n.2, plaintiffs' characterization of the purpose of the Regulation is incomplete: while the Regulation <u>does</u> codify HUD's longstanding practice of permitting gifts from certain sources, that is obviously not its <u>exclusive</u> purpose.

basis for treating two similarly situated entities differently, or must treat them all the same." Tr. (10/31/07) at 25. As the Court concluded at the preliminary injunction stage, see id. at 26, if the Court ultimately holds that the different effective date for Nehemiah does not pass muster under the APA, there would be no need to reach whether it also violates equal protection. See, e.g., BFI Waste Sys. v. FAA, 293 F.3d 527, 535 n.5 (D.C. Cir. 2002) (noting "practice of avoiding constitutional questions" and refusing to reach claim that agency action violated Constitution, after having already held that it violated APA). Conversely, if the rational basis required by the APA exists, ipso facto the same rational basis should satisfy the deferential equal protection standard. It also bears mentioning, as discussed in our opening memorandum, that this issue diminishes in significance with each day that passes between now and March 31, 2008, regardless of whether the issue is analyzed under the APA or the equal protection rubric. See Defs' SJ Mem. at 60-61.

## V.    PENOBSCOT'S ADDITIONAL CLAIMS ARE WITHOUT MERIT

### A.    HUD Did Not Violate Its Tribal Consultation Policy, Which is Not Actionable in Any Event

HUD's promulgation of the Regulation did not violate its tribal consultation policy because, as set forth in the final rule itself, discussed in defendants' summary judgment brief, and held by the Court in its ruling on Penobscot's preliminary injunction motion, the Regulation was not "identified by HUD as having a substantial direct effect on an Indian tribe." HUD Government-to-Government Tribal Consultation Policy ¶ IV.A, 66 Fed. Reg. 49,784, 49,785 (Sept. 28, 2001); see also 72 Fed. Reg. at 56,006; Defs' SJ Mem. at 59-60; Tr. (10/31/07) at 29.[13]

_____

[13] For the first time in its summary judgment papers, Penobscot comes forward with new
(continued...)

In addition, Penobscot's argument fails because of paragraph X of the policy, which provides that "[t]his document has been adopted for the purpose of enhancing government-to-government relationships, communications, and mutual cooperation between the U.S. Department of Housing and Urban Development and tribes and is not intended to, and does not, create any right to administrative or judicial review, or any other right or benefit or trust responsibility, substantive or procedural, enforceable by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other persons."  HUD Government-to-Government Tribal Consultation Policy ¶ X, 66 Fed. Reg. at 49,786 (emphasis added).  Finally, Penobscot cannot show any prejudice from a lack of consultation under the tribal consultation policy, because it could and did meaningfully participate in the rulemaking and make its views known to HUD through the submission of a detailed, 17-page comment letter.  A.R. 66589-606 (Penobscot comment letter).  Penobscot fails to explain what it would have brought to HUD's attention through "consultation" that it was unable to convey in its letter.

**B.**    **HUD Did Not Violate Its Policies For Considering Impact on Small Entities**

Penobscot's claim that "HUD violated its own policies by failing to consider the impact the Final Rule would have on small entities" (Penobscot SJ Mem. at 26) is similarly without

---

[13](...continued)
allegations portraying the ability to grow a seller-funded DPA business as central to the continued economic viability of Penobscot Indian Nation.  See Penobscot SJ Mem. at 26; Francis Decl. ¶¶ 39-43.  Putting aside the inherent lack of credibility of these claims since Penobscot first launched its seller-funded DPA business earlier this year, Penobscot cannot rely on any of its present particularized allegations of reliance on a seller-funded DPA business because it never submitted them in comments to HUD during the rulemaking process.  All that its comment letter offered on this topic is the generalized statement that "[w]ithout question, the proposed rules [sic] has a substantial direct affect [sic] on, not just one, but all Indian tribes."  A.R. 66598.  That conclusory statement is plainly incredible on its face.

merit.  Penobscot did not raise this issue or cite HUD's Policy for Considering Potential Impact

of HUD Rules on Small Entities during the rulemaking proceeding.  Therefore, this issue has

been waived.  See A.R. 66589-606 (Penobscot comment letter); Appalachian Power Co. v. EPA,

251 F.3d 1026, 1036 (D.C. Cir. 2001) ("It is black-letter administrative law that absent special

circumstances, a party must initially present its comments to the agency during the rulemaking in

order for the court to consider the issue." (internal quotation marks omitted)).  Moreover, the

HUD policy in question simply implements HUD's obligations under the Regulatory Flexibility

Act 5 U.S.C. § 601 et seq.  Penobscot has abandoned any claim under the Regulatory Flexibility

Act itself, see supra note 1, and any such claim would fail for the reasons discussed in our

opening brief.  See Defs' SJ Mem. at 51-59.  Penobscot's claim under HUD's policy to

implement the Regulatory Flexibility Act fails for those same reasons.  Moreover, while the gist

of Penobscot's grievance seems to be that HUD allegedly did not "engage in outreach efforts to

solicit the views of small entities" (Penobscot SJ Mem. at 27), Penobscot cannot claim any

prejudice because, as discussed above, it could and did make its views on the proposed rule

known to HUD during the rulemaking.

### C.    Penobscot's Request to Supplement the Administrative Record Should Be Denied

Penobscot's request (Penobscot SJ Mem. at 30-31) that the Court supplement the

Administrative Record in this case should be rejected.  First, Penobscot fails to identify

sufficiently or specifically the materials with which it seeks to supplement the Administrative

Record.  It refers vaguely to "the congressional hearing transcript regarding the Final Rule, news

stories regarding statements made by HUD Secretary Alphonso Jackson and HUD mortgagee

23

letters regarding DPA." Penobscot SJ Mem. at 31. While the congressional hearing transcript

can reasonably be discerned as the one submitted to the Court by other parties earlier in this

litigation,[14] defendants are aware of only <u>one</u> news story regarding statements allegedly made by

Secretary Jackson, and do not know which particular Mortgagee Letters Penobscot is referring to.

  In any event, there is no need to supplement the Administrative Record and it should not

be supplemented. With respect to the congressional hearing transcript, while defendants question

its relevance, it should be undisputed that the Court can take judicial notice of it, and therefore

supplementation is unnecessary. <u>See</u> <u>Rumely v. United States</u>, 197 F.2d 166, 181 (D.C. Cir.

1952) ("judicial notice can be taken of congressional hearings"), <u>aff'd</u>, 345 U.S. 41 (1953). The

same is true of HUD Mortgagee Letters, whichever particular ones plaintiffs may have in mind.

<u>See</u> <u>Conecuh-Monroe Cmty. Action Agency v. Bowen</u>, 852 F.2d 581, 583 (D.C. Cir. 1988)

(taking judicial notice of decisions of administrative agency); <u>Terrebonne v. Blackburn</u>, 646 F.2d

997, 1000 n.4 (5th Cir. 1981) ("courts have not hesitated to take judicial notice of agency records

and reports"). With respect to the Bloomberg news story, it is not properly part of the

Administrative Record, and the Administrative Record should not be supplemented to include it,

for the reasons discussed in defendants' opening brief, <u>see</u> Defs' SJ Mem. at 46-48. Penobscot

fails to make a showing that its request meets the rigorous standard for supplementing the

Administrative Record under this Circuit's and this Court's case law. <u>See</u> <u>id.</u> at 46-48 & n.35.

---

[14] <u>Homeowner Downpayment Assistance Programs and Related Issues</u>, Hearing Before
the Subcommittee on Housing and Community Opportunity, of the Committee on Financial
Services, U.S. House of Representatives, 110th Cong. (June 22, 2007).

## VI.    PLAINTIFFS' IRREPARABLE HARM ARGUMENTS ARE IRRELEVANT BECAUSE IF THEY PREVAIL, INJUNCTIVE RELIEF IS UNNECESSARY

Plaintiffs' respective memoranda and fact statements contain detailed allegations regarding the irreparable harm they allegedly stand to suffer as a result of the Regulation and the alleged lack of harm to HUD from not being able to implement the Regulation.  However, now that the case has passed the preliminary injunction stage, it is unnecessary for the Court to consider these arguments.[15]  If the Court holds that the Regulation does not violate the APA or the Constitution, of course no amount of irreparable harm would justify relief for the plaintiffs. Conversely, if the Court finds the Regulation defective, the appropriate remedy would simply be to remand it to the agency.  See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); see also Carlton v. Babbitt, 900 F. Supp. 526, 534, 537-38 (D.D.C. 1995) (where this Court found, on cross-motions for summary judgment, that decision by Fish and Wildlife Service was

---

[15] While the Court does not need to reach the issue, plaintiffs are mistaken to rely on the Court's finding at the preliminary injunction stage that the harm HUD alleged it would suffer from a delay in implementation of the Regulation was overstated.  See AmeriDream SJ Mem. at 43 (citing Tr. (10/31/07) at 30).  What the Court found was that the harm to HUD from issuance of a preliminary injunction was probably less than the full $278 million amount mentioned in the May declaration, because Nehemiah and AmeriDream would have been able to continue providing seller-funded DPA for several months regardless of whether a preliminary injunction issued.  See Tr. (10/31/07) at 30-31 ("[T]he truth is that this kind of business is not going to stop today if I didn't issue the injunction. . . . It is going to go on until March 31, 2008, both for Ameridream, at least through the end of February, and they actually get an extra day this year, and for Nehemiah because of the settlement agreement. . . . [T]he number of $278 million is necessarily inflated because there are two major players that are going to still be in the market.").  The fact that two major players were going to be in the market during the period of any preliminary injunction regardless of whether the court issued one has no bearing on the harm HUD would suffer from a permanent invalidation of the Regulation.

"arbitrary and capricious" for being inadequately supported by evidence in the administrative record, remedy was simply to remand the decision to the agency for further consideration in light of its opinion).  Plaintiffs themselves recognize that, at most, vacatur is the remedy for their claims.  See, e.g., AmeriDream SJ Mem. at 16 ("Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." (internal quotation marks omitted)), 22 ("If an agency fails to [provide a reasoned explanation for its rejection of reasonable alternatives], the final rule will be vacated."). Vacating the Regulation would obviate any need for a permanent injunction because a regulation that has been vacated cannot be enforced and, by definition, cannot cause plaintiffs any harm.[16]

## CONCLUSION

For the foregoing reasons, defendants respectfully request that plaintiffs' motions for summary judgment be denied, that defendants' motions for summary judgment be granted, and that judgment be entered for defendants.

Dated: December 7, 2007                    Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

[*signature block continued on next page*]

---

[16] The cases plaintiffs cite regarding irreparable harm and permanent injunctions did not involve judicial review of an agency regulation under the APA.  See ACLU v. Mineta, 319 F. Supp. 2d 69, 87 (D.D.C. 2004) (First Amendment challenge to statute); eBay, Inc. v. MercExchange, L.L.C., 126 S. Ct. 1837, 1839 (2006) (commercial litigation between private parties).

_/s/_ Robert J. Katerberg

MICHAEL SITCOV
TAMARA ULRICH
CHRISTOPHER HALL
ROBERT J. KATERBERG
SCOTT RISNER
United States Department of Justice
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 616-8298
Fax: (202) 616-8460

Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PENOBSCOT INDIAN NATION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | Civil Action No. 07-1282 (PLF) |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | ) ) ) ) | |
| Defendants. | ) | |
| AMERIDREAM, INCORPORATED, | ) ) | |
| Plaintiff, | ) ) | |
| and | ) ) | |
| GENESIS FOUNDATION, HOME DOWNPAYMENT GIFT FOUNDATION, PARTNERS IN CHARITY, INC., FUTURES HOME ASSISTANCE PROGRAM, and SOVEREIGN GRANT ALLIANCE, | ) ) ) ) ) ) ) | |
| Intervenors, | ) ) | |
| v. | ) | Civil Action No. 07-1752 (PLF) |
| HON. ALPHONSO JACKSON SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
STATEMENTS OF MATERIAL FACTS NOT IN DISPUTE**

Defendants, by and through their undersigned counsel, and pursuant to Local Rules 7(h)

and 56.1, submit the following response to Plaintiffs' statements of material facts not in dispute.

As discussed in Defendants' statement of material facts not in dispute, this case is brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* The issue to be resolved is whether the final rule promulgated by the Department of Housing and Urban Development ("HUD") on October 1, 2007 complied with legal requirements of the APA. This issue is resolved by reference to the administrative record, which contains all material facts pertinent to the legal issue before the Court. In an APA case, the Court does not determine whether facts are undisputed to rule on summary judgment; it reviews the material facts set forth in the administrative record to ascertain whether as a matter of law the evidence permits the agency to make its decision. See Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985); Hammond v. Norton, 370 F. Supp. 2d 226, 238 (D.D.C. 2005).

Due to the nature of this case as an APA case in which there is no necessity for the Court to determine undisputed facts, as well as the voluminous statements of alleged material facts proffered by Plaintiffs, many of them irrelevant to any issue presently before the Court, Defendants respond categorically to Plaintiffs' statements of material facts as follows.

To the extent Plaintiffs proffer facts that are not supported by citations to the Administrative Record in this case, Defendants respond that such facts are not material to the Court's disposition of the matter.[1] The following factual allegations fall within this category of

---

[1] Local Rule 56.1 requires statements of material fact to "include references to the parts of the record relied upon to support the statement." As the D.C. Circuit has stated, "[r]equiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes." Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 150 (D.C. Cir. 1996) (discussing predecessor to Local Rule 56.1, with identical language). At times, Plaintiffs referenced documents contained in the administrative record without citation

(continued...)

material: Freedom Home Baptist Church, Inc and Dove Foundation, Inc's Statement of Material

Facts As To Which There is No Genuine Issue ("Freedom Home's Statement of Material Facts")

¶¶ 1, 2, 15, 16, 19, 22 - 24; Partners In Charity, Inc,'s, Futures Home Assistance Program's and

Sovereign Grant Alliance's Rule 7(h) Statement of Material Facts as to Which There Is No

Genuine Issue ("PIC's Statement of Material Facts") ¶¶ 1, 2, 4 - 23, 25-28; AmeriDream's Rule

7(h) Statement of Material Facts As to Which There is no Genuine Issue ("AmeriDream's

Statement of Material Facts") ¶¶ 1, 8 - 27, 33, 34, 43 - 59, 63, 69, 73 - 76, 78, 91 - 93, the last

sentence of 94, 95 - 102, 122, 123, 125 - 136; Penobscot Indian Nation, Penobscot Indian Nation

Enterprises, and Global Direct Sales, LLC's Statement of Material Facts ("Penobscot Plaintiffs'

Statement of Material Facts") ¶¶ 1 - 34, 66, 67, 69 - 71.

To the extent that Plaintiffs proffer facts that are contained in the Administrative Record,

Defendants respond that such facts are fully set forth in the Administrative Record, and refer the

Court to the Administrative Record, rather than Plaintiffs' various characterizations of such facts.

The following factual allegations fall within this category of material:  Freedom Home's

Statement of Material Facts ¶¶ 3 - 14, 17, 18, 20 - 21; PIC's Statement of Material Facts ¶¶ 3, 24;

AmeriDream's Statement of Material Facts ¶¶ 2 - 7, 28, 35 - 42, 60 - 62, 64 - 68, 70 - 72, 77, 79 -

90, the first sentence of 94, 103 - 121, 124, 137; Penobscot Plaintiffs' Statement of Material

Facts ¶¶ 39 - 65, 68.

To the extent Plaintiffs proffer legal conclusions, Defendants respond that they are not

---

[1](...continued)
to the administrative record.  Defendants consider those factual materials to be covered by their
response regarding materials in the administrative record, if such a conclusion is readily
ascertainable.  Otherwise, Defendants consider the material without citation to the administrative
record to be outside of the administrative record.

material facts and should not be treated by the Court as material factual assertions.  The

following allegations fall within this category of material: AmeriDream's Statement of Material

Facts ¶¶ 29 - 32, Penobscot Plaintiffs' Statement of Material Fact ¶¶ 35 - 38.

Dated: December 7, 2007                          Respectfully submitted,

                                                 JEFFREY S. BUCHOLTZ
                                                 Acting Assistant Attorney General

                                                 JEFFREY A. TAYLOR
                                                 United States Attorney

                                                 */s/*  Robert J. Katerberg
                                                 MICHAEL SITCOV
                                                 TAMARA ULRICH
                                                 CHRISTOPHER HALL
                                                 ROBERT J. KATERBERG
                                                 SCOTT RISNER
                                                 United States Department of Justice
                                                 20 Massachusetts Avenue, N.W.
                                                 Washington, D.C. 20530
                                                 Telephone: (202) 616-8298
                                                 Fax: (202) 616-8460

                                                 Attorneys for Defendants