UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
AMERIDREAM, INCORPORATED,      )
                               )
          Plaintiff,           )
                               )
     v.                        )      Civil Action No. 07-1752(PLF)
                               )
HON. ALPHONSO JACKSON          )
SECRETARY OF THE UNITED        )
STATES DEPARTMENT OF           )
HOUSING AND URBAN              )
DEVELOPMENT,                   )
                               )
          Defendant.           )
_____)
```

### OPPOSITION OF PLAINTIFF AMERIDREAM, INCORPORATED TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Comes now plaintiff AmeriDream, Incorporated and opposes Defendant's Motion For Summary Judgment filed herein; and as reasons therefor refers to the Memorandum Of Points And Authorities and Rule 7(h) Statement Of Material Facts As To Which There Exists A Genuine Issue Necessary To Be Litigated attached hereto and made a part thereof.

WHEREFORE, this party prays that Defendant's Motion For Summary Judgment be denied.

                                   BAKER & HOSTETLER LLP

                              By:/s/ Lee T. Ellis, Jr.
                                   Lee T. Ellis, Jr. (3863)
                                   Washington Square, Suite 1100
                                   1050 Connecticut Avenue, N.W.
                                   Washington, D.C.  20036
                                   Tel:  202-861-1521
                                   Fax:  202-861-1783
                                   lellis@bakerlaw.com

                              Attorneys for Plaintiff

OF COUNSEL:

Lawrence H. Norton, Esquire
Womble Carlyle Sandridge & Rice PLLC
1401 Eye Street, N.W.
7th Floor
Washington, D.C.  20005-2225
Tel:  202-857-4429
Fax:  202-261-0097
lnorton@wesr.com


                    CERTIFICATE OF SERVICE

     I hereby certify that on this 7th day of December, 2007, a

copy of the foregoing was filed and served pursuant to the

Court's electronic filing procedures using the Court's CM/ECF

System.

                         BAKER & HOSTETLER LLP

                              By:/s/Lee T. Ellis, Jr.
                                   Lee T. Ellis, Jr. (3863)
                                   Suite 1100
                                   1050 Connecticut Avenue, N.W.
                                   Washington, D.C.  20036
                                   Tel:  202-861-1521
                                   Fax:  202-861-1783
                                   lellis@bakerlaw.com

                         Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERIDREAM, INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07 1752 (PLF) |
| ) | |
| HON. ALPHONSO JACKSON ) | |
| SECRETARY OF THE UNITED ) | |
| STATES DEPARTMENT OF ) | |
| HOUSING AND URBAN ) | |
| DEVELOPMENT, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS............................................. i

TABLE OF AUTHORITIES......................................... ii

INTRODUCTION.................................................. 1

I.  HUD'S REGULATION VIOLATES THE ADMINISTRATIVE PROCEDURE ACT 3

    A.  Post Hoc Rationalizations Do Not Suffice To Explain  Final
        Agency Action Or HUD's Departure From  Longstanding Policy
        ...................................................... 3

    B.  HUD Failed To Produce For Comment An Analysis Of Its  Loan
        Portfolio That Purportedly Provides A Critical  Foundation
        For The Regulation .................................. 15

    C.  HUD Failed To Consider Less Restrictive, Responsible
        Alternatives To The Proposed Regulation ............. 28

II. HUD IMPROPERLY PREJUDGED THE OUTCOME OF THE RULEMAKING
    PROCEEDING............................................... 33

    A.  Secretary Jackson Was The Relevant Decision-maker ...... 34

    B.  The Bloomberg Article Is Properly Before The Court As
        Clear And Convincing Evidence Of Prejudgment .......... 38

III. THE DIFFERENTIAL EFFECTIVE DATES IN THE REGULATION VIOLATE
     THE APA AND EQUAL PROTECTION COMPONENT OF THE DUE PROCESS
     CLAUSE ................................................ 42

CONCLUSION................................................... 42

## TABLE OF AUTHORITIES

CASES

ANR Pipeline Co v. FERC,
    71 F.3d 897 (D.C. Cir. 1995) ............................6

Action on Smoking & Health v. Civil Aeronautics Bd.,
    600 F.2d 1209 (D.C. Cir. 1983) ....................31, 39

Am. Med. Ass'n v. Reno,
    57 F.3d 1129 (D.C. Cir. 1995) ..........................16

Burlington Truck Lines, Inc. v. U.S. Gen. Drivers &
Helpers Union Local 554,
    371 U.S. 156 (1962) ............................13, 32, 33

C&W Fish Co. v. Fox,
    931 F.2d 1556 (D.C. Cir. 1991) ........................40

City of Brooking Mun. Co. v. FCC,
    822 F.2d 1153 (D.C. Cir. 1987) ........................12

Covad Commc'ns v. FCC,
    450 F.3d 528 (D.C. Cir. 2006) ..........................28

Envtl. Integrity Project v. EPA,
    425 F.3d 992 (D.C. Cir. 2005) ..........................40

Grand Canyon Tour Coalition v. FAA,
    154 F.3d 455 (D.C. Cir. 1998) ..........................11

Home Box Office, Inc. v. FCC,
    567 F.2d 9 (D.C. Cir. 1977) ............................40

Indep. U.S. Tanker Owners Comm. v. Lewis,
    690 F.2d 908 (D.C. Cir. 1982) ..........................15

Int'l Snowmobile Mfs. Ass'n v. Norton,
    340 F. Supp. 2d 1249 (D. Wyo. 2004) ..................38

Liang Lin v. U.S. Dep't of Justice,
    416 F.3d 184 (2d Cir. 2005) ............................14

Milk Indus. Found. v. Glickman,
    949 F. Supp. 882 (D.D.C. 1996) ........................13

Motor Vehicle Mfs. Ass'n of the U.S., Inc. v. State
Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) ......................................12

Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC,
    737 F.2d 1095 (D.C. Cir. 1984) .........................23

Owner-Operated Indep. Drivers Ass'n, Inc., v. Fed.
Motor Carrier Safety Admin.,
    494 F.3d 188 (D.C. Cir. 2007) ..........................16

Portland Cement Ass'n v. Ruckelshaus,
    486 F.2d 375 (D.C. Cir. 1973) .................17, 25, 27

Ramaprakash v. FAA,
    346 F.3d 1121 (D.C. Cir. 2003) ..........................6

Shays v. FEC,
    337 F. Supp. 2d 28 (D.D.C. 2004) .......................18

Shays v. FEC (Shays III),
    No. 04-1597, 2007 WL 2616689 (D.D.C. Aug. 30, 2007) ....32

Solite Corp. v. EPA,
    952 F.2d 473 (D.C. Cir. 1991) .................16, 21, 22

U.S. Telecom. Ass'n v. FCC,
    359 F.3d 554 (D.C. Cir. 2004) ..........................36

Univ. Med. Ctr. of S. Nev. v. Shalala,
    173 F.3d 438 (D.C. Cir. 1999) ..........................41

STATUTES

5 U.S.C. §§ 551 et seq .....................................1

5 U.S.C. § 553(c) .........................................39

12 U.S.C. § 1709(b)(9) ....................................35

12 U.S.C. § 1715b ........................................35

26 U.S.C. § 6110(b)(1) ....................................17

26 U.S.C. § 6110(k)(3) ....................................17

42 U.S.C. § 3533(b) ....................................35, 36

ADMINISTRATIVE MATERIAL

Consolidated Delegation of Authority for the Office of
     Housing-Federal Housing Administration,
71 Fed. Reg. 60,169, 60,169-73  (Oct. 12, 2006).......35, 36

Notice of Proposed Rulemaking ("NPRM"), Standards for
     Mortgagor's Investment in Mortgaged Property,
72 Fed. Reg. 27,048 (May 11, 2007)......................9, 17

Special Regulations, Areas of the National Park
     System,
65 Fed. Reg. 79,024, 79,034 (Dec. 18, 2000)..............38

Special Regulations, Areas of the National Park
     System,
66 Fed. Reg. 7260, 7268 (Jan. 22, 2001)..................38

Standards for Mortgagor's Investment in Mortgaged
     Property,
72 Fed. Reg. 56,002-07 (Oct. 1, 2007).................passim

Withdrawal of Proposed Rule on Sources of
     Homeownership Downpayment,
66 Fed. Reg. 2851, 2851 (Jan. 12, 2001)...................8

OTHER AUTHORITIES

Richard J. Pierce, Administrative Law Treatise (4th
     ed. 2002) .................................14, 25, 26, 27

Homeowner Downpayment Assistance Programs and Related
     Issues: Hearing Before Subcomm. on Housing &
     Community Opportunity of the H. Comm. on Financial
     Services, 110th Cong. 8-9 (2007) ......................21

About HUD: Powers of the Secretary,
     http://www.hud.gov/about/secretary/powersec.cfm
     (last visited Dec. 6, 2007) ...........................35

## INTRODUCTION

This Court should deny the Department of Housing and Urban Development ("HUD")'s Cross-Motion for Summary Judgment because in issuing the challenged regulation, "Standards for Mortgagor's Investment in Mortgaged Property", 72 Fed. Reg. 56,002-07 (Oct. 1, 2007) (to be codified at 24 C.F.R. pt. 203) ("Regulation"), HUD violated the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq. (2000) ("APA"), by (1) failing to offer a reasoned explanation for its departure from its longstanding approval of seller-funded downpayment assistance ("DPA") programs like that provided by AmeriDream; (2) failing to provide for comment the analysis of its loan portfolio that purportedly provided a critical foundation for the Regulation; (3) failing to consider less restrictive, responsible alternatives offered during the comment period; and (4) improperly prejudging the outcome of the rulemaking proceeding.

The HUD Memorandum in Support of Motions for Summary Judgment ("HUD Motion") fails to address adequately these claimed violations, attempting instead to substitute alternative grounds for the justification provided by the agency when it issued the challenged Regulation. It is long settled, however, that the propriety of HUD's action must be judged by the reasons actually articulated by the agency in promulgating the regulation, not the later effort of lawyers attempting to

rationalize it.  Moreover, the story that the HUD Motion seeks to tell  – one of unbroken opposition to seller-funded DPA programs – not only ignores most of HUD's official explanation of its own actions, but also is inconsistent with nearly a decade of express HUD approval for such programs.  Such attempted revisionism does not absolve HUD of the obligation it had <u>at the time it adopted the final Regulation</u> to provide reasoned analysis for its actions and explain its departure from longstanding policy.

HUD's Motion also has surprisingly little to say in response to other issues of procedural irregularity in this case.  For instance, the brief devotes a mere paragraph to HUD's failure to produce for comment its purported analysis of its own loan portfolio.  Here, HUD implausibly argues that it was merely producing "a more precise metric of the increased risk" in response to objections to "HUD's [own] risk assessment."  HUD Motion 33.  But the only risk assessment in HUD's rulemaking notice derived from the IRS Press Release and the February 2005 GAO Report, neither of which contains a metric of any kind.

As for HUD's failure to consider less restrictive alternatives, the agency continues to insist that the final Regulation's litany of non sequiturs and conclusory statements constitutes an adequate explanation of agency action.  The Court properly rejected this notion at the preliminary injunction

stage.    In  fact,  the  only  proposed  alternatives  that  HUD mentioned  in  the  final  Regulation  were  summarily  dismissed  by the  agency  as  outside  the  scope  of  the  rulemaking—that  is,  they were  not  what  HUD  wanted  to  do.

Finally,  HUD  offers  no  rebuttal  to  the  substance  of  the Bloomberg  article,  in  which  HUD's  Secretary,  during  the  comment period,  expressed  his  commitment  to  abolish  downpayment assistance  programs  regardless  of  what  commenters  had  to  offer. Instead,  HUD  makes  the  strained  case  that  comments  made  by  the Secretary  of  a  Cabinet-level  agency  do  not  demonstrate prejudgment  by  the  agency  when  the  Secretary  has  delegated signature  authority  to  a  subordinate  official.

I.    **HUD'S REGULATION VIOLATES THE ADMINISTRATIVE PROCEDURE ACT**

    A.    **Post Hoc Rationalizations Do Not Suffice To Explain Final Agency Action Or HUD's Departure From Longstanding Policy**

On  October  31,  2007,  this  Court  granted  a  preliminary injunction  blocking  HUD  from  implementing  the  Regulation  based on  its  determination  that  AmeriDream,  Incorporated ("AmeriDream")  and  intervenor  plaintiffs  had  a  substantial likelihood  of  prevailing  on  the  merits  in  their  challenge  to  the Regulation  under  the  APA.    This  Court's  decision  was  based  on numerous  grounds,  among  which  was  HUD's  failure  to  identify adequate  bases  for  the  Regulation.    This  Court  observed  that  HUD cited  only  two  sources  in  support  of  the  Regulation:  Government

3

Accountability Office ("GAO") Report No. 05-194, "Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products" (Feb. 2005)("February 2005 GAO Report") and Revenue Ruling 2006-27 and accompanying Internal Revenue Service ("IRS") press release, IRS News Release IR-2006-74 (May 4, 2006)("IRS Press Release"). This Court characterized those sources as "flimsy", and concluded that "the plaintiffs have a substantial likelihood of succeeding in showing that neither of those provide a basis for this rule". Tr. Prelim. Inj. Hearing 20, Oct. 31, 2007 ("Opinion Transcript").

In its 65-page[1] brief, HUD offers faint opposition to the claims that it violated the APA, and attempts instead to substitute a fresh explanation for the justification provided by the agency when it issued the challenged Regulation. Moreover, HUD's belated explanations heavily rely on the very sources it failed to reference, cite, or, in the case of the loan portfolio analysis, even provide at any point in the rulemaking process. See HUD Motion 17-23. For example, HUD failed to cite GAO Report No. 06-04, "Mortgage Financing: Additional Action Needed to Manage Risks of FHA-Insured Loans with Down Payment

---

[1] Defendant's counsel for HUD contacted counsel for AmeriDream on November 16, 2007, the day the parties' cross-motions for summary judgment were due, to request consent to 20 extra pages in defendant's motion. Counsel explained that defendant needed more pages to address fully the arguments raised by intervenor-plaintiffs, particularly the unique arguments raised by the Penobscot Indian Nation. AmeriDream consented. Defendant then filed a 65-page brief, of which one-half of one page is devoted to addressing the unique

Assistance" (Nov. 2005) ("November 2005 GAO Report") a single time in either the proposed or final Regulation, but cites it a remarkable 13 times in the HUD Motion as support for the Regulation.

Such post-hoc rationalization cannot cure an agency's failure to act lawfully in the first instance. The propriety of HUD's action must be judged by the reasons actually articulated by the agency in promulgating the Regulation, not the later effort of lawyers attempting to rationalize it. In addition, the story counsel seeks to present—one of unbroken opposition to seller-funded downpayment assistance programs—not only contradicts HUD's official explanation of its own actions, but is inconsistent with nearly a decade of HUD's approval of seller-funded DPA programs. Such attempted revisionism does not absolve HUD of the obligation it had <u>at the time it adopted the final Regulation</u> to provide reasoned analysis for its actions and explain its departure from longstanding policy.

In issuing the challenged Regulation, HUD failed to explain, much less acknowledge, the striking departure from its long record of approving DPA programs, facilitating their operation and growth, and even utilizing such programs itself when selling some of its own inventory of properties. The "failure to come to grips with conflicting precedent constitutes

---

arguments raised by the Penobscot Indian Nation.

'an inexcusable departure from the essential requirement of reasoned decision making.'" <u>Ramaprakash v. FAA</u>, 346 F.3d 1121, 11125 (D.C. Cir. 2003) (<u>citing</u> <u>Columbia Broad. Sys. v. FCC</u>, 454 F.2d 1018, 1027 (D.C. Cir. 1971)). "[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." <u>ANR Pipeline Co v. FERC</u>, 71 F.3d 897, 901 (D.C. Cir. 1995).

In HUD's cross-motion for summary judgment, the agency's attorneys attempt to piece together a chronology that supports the final Regulation's assertion that "HUD has long taken the position that downpayment funding from the seller of the home to be purchased by a borrower with an FHA-insured loan is not a permissible source of the mortgagor's investment in the property." 72 Fed. Reg. at 56,002. Counsel argues that "[w]hen this scheme was in its nascent stage, HUD did not act immediately to stop it," HUD Motion at 2, or even act to "curb this newly evolving scheme," <u>id.</u> at 7, but "[f]or various reasons . . . resolved to study and monitor these down payment assistance programs over a period of years." <u>Id.</u>

In contrast, the explanation for the final Regulation that was produced <u>by the agency</u> describes no such "nascent stage" or "evolving scheme," and offers not a word as to when and how HUD expressed such resolve about DPA programs, or in what manner the

agency undertook this long period of monitoring and study.[2]
Likewise, HUD's Motion is replete with references to the
agency's observations over the years about DPA programs, but
these, too, are nowhere to be found in HUD's explanation for the
final Regulation, and are noted in the motion without reference
to substantiating authority.[3]

Upon this shaky foundation, HUD's Motion turns history on
its head.  Counsel argues: "It is also important to note that
rather than a far-reaching and unanticipated departure from
settled issues of policy, as plaintiffs suggest, the Regulation
in fact reconciles HUD's longstanding policies of allowing
charitable organizations and certain other specified entities,
but not sellers, to contribute to a home buyer's down payment."
HUD Motion 30.  This belated attempt by counsel to explain HUD's
decisionmaking is at odds with HUD's longstanding record of
approving DPA programs, and fails to fulfill HUD's obligations
under the APA to offer a reasoned explanation for departing from

---

[2] In the HUD Motion, HUD's counsel repeatedly calls DPA a "scheme."  HUD
Motion 1-2, 7, 9, 18.  It is notable that the only place this word appears in
the agency's final explanation for the Regulation, however, is in a quote
from the IRS Press Release.

[3] See, e.g., HUD Motion 2 ("HUD observed that loans originated with seller-
funded down payment assistance performed significantly worse than other FHA-
insured loans, meaning that they experienced a much higher rate of defaults,
foreclosures, and resultant claims on the FHA insurance fund, and could
eventually be expected to threaten the fund's insolvency.");  Id. at 6 ("A
home seller who has to pay the buyer's down payment in order to make the
transaction happen will often demand a higher sale price for that transaction
than he would have required in an otherwise equivalent transaction where such
down payment assistance was not necessary (or will refrain from discounting
the sales price when he otherwise would have done so).  Thus, seller-funded
down payment assistance tends to push sales prices upwards.").

7

that record.

Indeed, while counsel proffers a storyline that the disputed Regulation reconciles years of agency policy, all previous manifestations of a policy point the other way. Counsel acknowledges, for instance, that "[i]n 1999, HUD proposed a rule that would have done substantially the same thing as the present Regulation," but later withdrew that proposed rule. HUD Motion 7 n.8. Unmentioned is the fact that in withdrawing the proposal, HUD expressed no continuing concerns whatsoever; announced no plan to watch and monitor these programs; and offered no caution that it might revisit the issue.[4]

Likewise, in mentioning HUD's settlement with Nehemiah, counsel acknowledges "that [HUD] had determined that Nehemiah's down payment assistance program was not in conflict with HUD's regulations and administrative requirements, but 'expressly reserv[ed] the right to and may make changes or modifications to HUD's regulations, handbook, mortgagee letters, or other governing documents applicable to transactions under Section 203(b) in particular, as they may deem appropriate.'" HUD

---

[4] The notice of withdrawal merely cited overwhelming public opposition to the proposal, expressed in comments filed with the agency – exactly the reaction the same proposal elicited this time around. Withdrawal of Proposed Rule on Sources of Homeownership Downpayment, 66 Fed. Reg. 2851, 2851 (Jan. 12, 2001). There is nothing in the final Regulation's statement of basis and purpose to explain why that outpouring of comments was so significant then, but unworthy of any weight now.

Motion 7 n.7.  What HUD fails to say is that in the <u>eight years</u> between the time HUD "determined" that a comparable down payment assistance program "was not in conflict with HUD's regulations and administrative requirements" and the issuance of a Notice of Proposed Rulemaking ("NPRM"), "Standards for Mortgagor's Investment in Mortgaged Property", 72 Fed. Reg. 27,048 (May 11, 2007) (to be codified at 24 C.F.R. pt. 203), HUD made no changes to its handbook, mortgagee letters, or other governing documents applicable to downpayment assistance transactions.  This long period of acquiescence is also completely unaddressed in the explanation for the final Regulation.

The recitation of history in HUD's Motion also ignores repeated instances of the agency actively approving DPA charities to accept contributions from sellers and others involved in the real estate industry. For example, in 1998, HUD's Office of General Counsel reviewed the process for accepting contributions and awarding gifts utilized by AmeriDream, and found that it was in compliance with HUD's guidelines.  <u>See</u> November 2005 GAO Report at 45-46.  Likewise, the standard HUD-1 form allows for reporting on the use of DPA. Pl.'s Memo P.& A. Supp. Mot. Prelim. Inj. Ex. A, at 23; <u>see also</u> Mortgagee Letter 00-28 (Aug. 7, 2000); Mortgagee Letter 2004-28 (July 21, 2004).  HUD also has issued several mortgagee letters that clarify the appropriate use of DPA without questioning the

source of DPA funding,[5] and has encouraged the rapid growth of charitable DPA providers by readily extending Federal Housing Administration ("FHA") insurance to loans obtained in transactions utilizing downpayment assistance.   HUD has even used charitable DPA in the sale of certain HUD-owned properties. Ashburn Aff. ¶ 26.

Moreover, in October 2005, the very same HUD official who in 2007 approved issuance of the final Regulation responded to a draft GAO report by rejecting GAO's suggestion that DPA programs be eliminated:

> The GAO report provides additional analysis and reiterates that borrowers receiving seller-funded down payment assistance pay more for their homes than homebuyers who receive no such assistance or assistance from down payment programs funded without seller involvement. <u>Borrowers who rely on seller-funded down payment assistance are representative of the population that FHA was established to serve, families who are otherwise underserved by the private sector.  Because of this fact, FHA has determined that additional requirements or restrictions that would prevent these borrowers from obtaining FHA financing would not be beneficial, leaving this population with financing options that are more costly and riskier than FHA.</u>  Therefore, FHA has determined that charging a higher premium on these types of loans would be a more palatable alternative, compensating FHA for the additional risk, while permitting these borrowers the advantage of a more affordable, less risky loan.

Letter from Assistant Secretary-FHA Comm'r Brian Montgomery to

---

[5] For example, Mortgagee Letter 2004-02 addresses proper documentation when down payment funds are provided from charities, Letter from HUD to All Approved Mortgagees (Jan. 12, 2004), and Mortgagee Letter 2002-02 addresses credit policy issues regarding payment of borrower's obligations, Letter from HUD to All Approved Mortgagees (Jan. 16, 2002).

GAO (Oct. 25, 2005) (emphasis added) (A.R. 00612).

Simply put, it was for HUD to explain—in conjunction with the issuance of this Regulation—what evidence altered the view expressed by Assistant Secretary Montgomery in October 2005 that abolishing seller-funded DPA would "not be beneficial" to the population that FHA was established to serve, "leaving this population with financing options that are more costly and riskier than FHA." Id. But there is literally nothing in the explanation for the Regulation reflecting consideration of the alternatives available to this community should DPA be abolished. HUD also failed to provide a reasoned explanation as to why the purported risks associated with DPA-financed loans are unacceptable now after having been acceptable for the past ten years; evidence that DPA programs do, in fact, drive up sales prices; and why less restrictive alternatives would be inadequate to address concerns about default rates or higher sales prices.

It is well-established that "in determining whether [a] Final Rule is arbitrary or capricious, [courts] may consider only the regulatory rationale offered by the agency during the development of the regulation, and not the post-hoc rationalizations of its lawyers." Grand Canyon Tour Coalition v. FAA, 154 F.3d 455, 469 (D.C. Cir. 1998) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971)).

11

In determining whether the administrative record adequately supports an agency's conclusions, "the [agency] must demonstrate a "rational connection between the facts found and the choice made. . . . Post hoc rationalizations advanced to remedy inadequacies in the agency's record or its explanation are bootless." City of Brookings Mun. Co. v. FCC, 822 F.2d 1153 (D.C. Cir. 1987); see Motor Vehicle Mfs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co. (State Farm), 463 U.S. 29, 50 (1983) ("an agency's action must be upheld, if at all, on the basis articulated by the agency itself" and "courts may not accept . . . counsel's post hoc rationalizations for agency action").

For the same reasons, counsel's effort to rummage through the administrative record to provide the Court with evidence of the danger of downpayment assistance programs is unavailing. HUD Motion 17-18. As discussed below, and as the Court observed in issuing a preliminary injunction, neither of the only two bases for action cited by HUD in its final explanation—the IRS Press Release and related Revenue Ruling and the February 2005 GAO report—shows that downpayment assistance programs increase home prices, increase the risk to the FHA, or lead to more foreclosures. Opinion Transcript 19-20.[6] Should HUD believe

---

[6] The only other authority cited in the final explanation was HUD's own analysis of its loan portfolio, which HUD failed to produce for comment.

that other material in the administrative record supports these conclusions, that assessment should be made by the agency in the context of a rulemaking proceeding, not through post hoc rationalizations of agency counsel. This Court clearly articulated that principle in Milk Indus. Found. v. Glickman, 949 F. Supp. 882 (D.D.C. 1996) (Friedman, J.), in which this Court stated:

> But no matter how thorough counsel may have been in combing through the record and picking out the materials they think support the Secretary's finding, that is no substitute for the Secretary himself reviewing the record materials, examining the relevant data, and coherently articulating the decision he made and the bases on which he in fact rested his finding – which is, of course, his obligation under the APA.

Id. at 895 (citing State Farm).

To permit backfilling at this stage would usurp the role of the agency in the rulemaking process. "For the courts to substitute their or counsel's discretion for that of the Commission is incompatible with the orderly functioning of the process of judicial review. This is not to deprecate, but to vindicate the administrative process, for the purpose of the rule is to avoid 'propel(ling) the court into the domain which Congress has set aside exclusively for the administrative agency.'" Burlington Truck Lines, Inc. v. U.S. Gen. Drivers & Helpers Union Local 554, 371 U.S. 156, 169 (1962) (internal and

That failure provides an additional basis for invalidating HUD's action, as

13

external citations omitted). <u>Cf. Liang Lin v. U.S. Dep't Of Justice</u>, 416 F.3d 184, 192 (2d Cir. 2005) ("[W]e will limit our review of the [agency's] decision to the reasons [it] actually articulates. . . . To assume a hypothetical basis for the [agency's] determination, even one based in the record, would usurp [the agency's] role.").

Finally, in apparent recognition of the shortcomings in HUD's explanation for the final Regulation, agency counsel seek to downplay the importance of an agency's "statement of basis and purpose" that must accompany issuance of a final regulation. Counsel argues that the APA requires only "that final rules be published with a 'concise general statement of their basis and purpose,'" and cites to a treatise for the proposition that the statement need not be "stacked with layers of evidentiary citations."[7] HUD Motion 21. The D.C. Circuit, however, has been quite clear about the critical role of such statements in evaluating agency action:

> This requirement is not to be dealt with lightly. We have cautioned before against an 'overtechnical reading' of the words 'concise' and 'general.' The statement of basis and purpose should 'enable us to see what major issues of policy were ventilated by the informal proceeding and why the agency reacted to them

---

discussed <u>infra</u> at .

[7] The text of the treatise cited by HUD, Richard J. Pierce, Administrative Law Treatise 436 (4th ed. 2002) ("Treatise"), has no relevance to the present facts. The treatise merely makes the common sense observation that if a "hypothetical" rule is based on "thousands" of sources, an agency need not cite every single one of those sources. <u>Id.</u>; <u>see</u> <u>infra</u> at 25-27.

as it did.'  The basis and purpose is not intended to be an abstract explanation addressed to imaginary complaints.  Rather, its purpose is, at least in part, to respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule.

Indep. U.S. Tanker Owners Comm. v. Lewis, 690 F.2d 908, 918-19 (D.C. Cir. 1982).  HUD's overly general and non-responsive statement of basis and purpose does not pass muster under this standard.

**B.    HUD Failed To Produce For Comment An Analysis Of Its Loan Portfolio That Purportedly Provides A Critical Foundation For The Regulation**

In the explanation for the final Regulation, HUD premised its decision to abolish DPA programs on a purported analysis of its own loan portfolio.  HUD asserted that it "collected and analyzed [this] additional data," which furnished "additional verification of the higher level of risk associated with downpayments funded by a seller or other financially interested party compared to down payments funded from other sources, which HUD continues to permit.  HUD's analysis has also established that loans with downpayment assistance from sellers or other parties with a financial interest in the transaction have a higher loss rate associated with them and currently represent 30 percent of FHA's REO [Real Estate Owned] portfolio."  72 Fed. Reg. at 56,005.

15

This alleged analysis was not produced for public comment when the Regulation was proposed. As the D.C. Circuit recently explained, it is "'[i]ntegral to [APA] requirements' that an agency 'identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules. . . . An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.'" <u>Owner-Operated Indep. Drivers Ass'n, Inc., v. Fed. Motor Carrier Safety Admin.</u>, 494 F.3d 188, 199 (D.C. Cir. 2007) (internal citations omitted).[8]

The significance of the portfolio analysis in justifying HUD's final action is underscored by the fact that the only other sources cited by HUD—an IRS Press Release (and related Revenue Ruling) and a February 2005 report issued by the GAO—do not support the action taken. As this Court observed in issuing a preliminary injunction: "Given the flimsiness of [these two] bases in particular, [the portfolio analysis] becomes a critical factor, a critical source of information that went to the heart of the matter as to whether this rule is justified." Opinion Transcript 20-21.

In its Motion, HUD argues that "plaintiffs [and presumably

---

[8] There is a long line of authority reaching the same conclusion. <u>See, e.g.</u>, <u>Solite Corp. v. EPA</u>, 952 F.2d 473, 499-500 (D.C. Cir. 1991); <u>Am. Med. Ass'n</u>

the Court, too] are far too quick to diminish the significance"
of these bases for final agency action. HUD Motion 23.
Specifically, HUD disputes the Court's conclusion that the IRS's
view as to DPA programs' entitlement to 501(c)(3) materials is
"not a basis" for this rule, arguing "that the IRS's
determination . . . was highly significant because it removed
the sole basis, tax-exempt status – upon which plaintiffs could
maintain seller-funded DPA programs for FHA-insured mortgages,
even absent the new Regulation." Id. at 25-26. This is simply
incorrect. In fact, HUD falsely implies throughout its Motion
that the IRS Revenue Ruling stripped AmeriDream of 501(c)(3)
status. AmeriDream was, and is, a valid 501(c)(3) organization.
Revenue rulings do not have the force and effect of regulations,
26 U.S.C. §§ 6110(b)(1),(k)(3) (2000); they are merely
statements of position that have no legal consequence unless
affirmed by some other authority. Revenue Ruling 2006-27 did
not alter AmeriDream's tax status. As for the legal implication
of AmeriDream's tax status, HUD conceded in the NPRM that the
National Housing Act is "silent about permissible or
impermissible sources of the mortgagor's investment, except that
some loans are not permitted sources under the statute." 72
Fed. Reg. at 27,048.

---

v. Reno, 57 F.3d 1129, 1133 (D.C. Cir. 1995); Portland Cement Ass'n v.
Ruckelshaus, 486 F.2d 375 (D.C. Cir. 1973).

HUD also states that "this may be the first time a litigant has ever argued that an agency violated the APA by being overly cognizant of another agency dealing with a different facet of the same problem." HUD Motion at 27 (emphasis in original). But that is precisely what this Court concluded in invalidating an FEC regulation, when the FEC assumed the compatibility of the Federal Election Campaign Act [FECA] with IRS requirements. The Court noted: "It is the FEC, not the IRS, that is charged with enforcing FECA." Shays v. FEC, 337 F.Supp.2d 28, 126-28 (D.D.C. 2004). What is novel in this case is HUD's reliance on another agency's press release for guidance in an area of HUD's own substantive expertise.

As for the February 2005 GAO Report, it simply "observes that Freddie Mac and Fannie Mae said we think these arrangements increase loan prices, lead to more foreclosures, and are problematic." Opinion Transcript 20. The report does not examine or cite any data whatsoever concerning DPA programs or their impact on property values. Indeed, in the explanation for the final Regulation, HUD offered no defense in response to commenters' criticisms concerning its reliance on the report. 72 Fed. Reg. at 56,005.

In the HUD Motion, counsel defends the February 2005 GAO Report, asserting that "GAO duly consulted with Fannie Mae and Freddie Mac," and that the comments in the report were the

18

product of that consultation.  HUD Motion 23-24.  It is unclear how counsel for HUD can vouch for the substance of consultations among three other entities, or for the positions and authority of the persons involved.  Moreover, the February 2005 GAO Report merely indicates that these unidentified Fannie Mae and Freddie Mac officials stated that "seller-related contributions could contribute to an over-valuation of the property."  February 2005 GAO Report 16 (A.R. 00470).

HUD also argues that a reference in the rulemaking notice to the February 2005 GAO Report was sufficient to inform AmeriDream and others that HUD was relying for its proposed action on a separate report issued by GAO nine months later. The "subject" matter was "similar," counsel argues, and "there is little doubt that [the later report] was widely discussed among providers of seller-funded DPA.  HUD Motion 33.  Even if true, this argument misses the point.  The function of a rulemaking proposal is to provide notice of the bases for proposed agency action, not to require interested parties to assume that an agency's stated reliance on one report implies reliance on an entirely separate report issued nine months later.

Alternatively, HUD argues that "plaintiffs fail to recognize that the IRS Press Release accompanying Revenue Ruling 2006-27, which was cited in the NPRM, directly refers to the

19

November 2005 GAO Report by name."    HUD Motion 33 (citation
omitted).    Interested parties could scarcely have imagined that
this "three-step" was required to ascertain the basis for HUD's
decision to abolish DPA programs.    Nor does such bootstrapping
warrant rejection of the arguments AmeriDream makes now about
the George Mason University ("GMU") study.    As discussed more
fully in AmeriDream's motion for summary judgment, the GMU
School of Public Policy concluded that the November 2005 GAO
Report "could be overstating the extent of the default and/or
claim rates of FHA loans with assistance from NDPA [nonprofit
downpayment assistance] providers" and questioned the "lack of
attention given to two key factors that influence whether or not
a loan is defaulted or goes to claim: (1) the financial
situation of the borrower and (2) the economic conditions of the
area in which the home is located."    AmeriDream Brief 9.    HUD
criticizes AmeriDream for using the study at this stage to
challenge the November 2005 GAO Report when it made different
use of the study during the rulemaking proceeding.    HUD Motion
37.    The reason for this is simple.    AmeriDream did not refute
the November 2005 GAO Report because it had no notice that HUD
was relying on it.

     Even if it were appropriate for HUD to rest final agency
action on the November 2005 GAO Report, as this Court noted,
"HUD and FHA actually said we don't agree with [the November

20

2005 GAO Report], we want to keep doing this." Opinion Transcript 20. Indeed, in its response to GAO, HUD vowed to continue to permit seller-funded DPA, expressing concern that eliminating DPA programs would force the community that FHA is charged with serving into financing options that are more costly and risky. See supra pp. 11-12. HUD assured GAO that instead of abolishing the programs, it would act on some of GAO's recommendations, especially those that addressed the higher credit risk of DPA borrowers. Id.[9]

Notwithstanding HUD's response to the November 2005 GAO Report and its failure to mention that report in either the NPRM or the explanation accompanying the final Regulation, HUD now argues that this report was the trigger for HUD to abolish DPA programs entirely. See, e.g., HUD Motion at 20 (Following the GAO's recommendations, "[i]t was appropriate for HUD to subsequently decide to take such action.") This is yet another post-hoc rationalization of counsel, and moreover, the argument that the November 2005 GAO Report would have supported the final Regulation is utterly without merit.

In its Motion, HUD argues that its reliance on its loan portfolio analysis was "[e]xactly the same" as in Solite Corp. v. EPA, 952 F.2d 473 (D.C. Cir. 1991), where the D.C. Circuit

---

[9] In fact, as HUD later acknowledged in Congressional testimony, HUD did not act on GAO's recommendations. Homeowner Downpayment Assistance Programs and Related Issues: Hearing Before Subcomm. on Housing & Community Opportunity of

upheld an agency's use of data in connection with a rulemaking. HUD Motion at 32. Reliance on Solite, however, is misplaced.

In Solite, the D.C. Circuit held that EPA did not violate notice and comment provisions of the APA by using "updated and expanded data" from a newly available study because the methodology the EPA chose did not change significantly from the notice of proposed regulation to the final rule and "the added data was used to check or confirm prior assessments." 952 F.2d at 485 (emphasis added). The D.C. Circuit reasoned that an agency may use supplementary data, which was "unavailable during the notice and comment period, that 'expand[s] on and confirm[s]' information contained in the proposed rulemaking and addresses 'alleged deficiencies' in the pre-existing data, so long as no prejudice is shown." Id. at 484 (quoting Cmty. Nutrition Inst. v. Block, 749 F.2d 50, 57-58 (D.C. Cir. 1984)).

Unlike Solite, HUD engaged here in a classic bait-and-switch. There was no "pre-existing data" proffered by HUD in the NPRM, as in Solite, and therefore nothing to expand or confirm. Additionally, there is no evidence that HUD's loan portfolio data, or for that matter, HUD's analysis of it, was unavailable to HUD when it issued the NPRM.

Moreover, HUD's effort to characterize the role of the data "as part of a specific response to public comments," rather than

---

the H. Comm. on Financial Services, 110th Cong. 8-9 (2007) at 21.

crucial support for its determination, cannot survive scrutiny. HUD specifically noted the portfolio analysis in response to a comment that "[t]he rule is not supported by data," and specifically, that the GAO analysis was flawed.  72 Fed. Reg. at 56,005.  In other words, HUD offered no response to cited flaws in the February 2005 GAO Report, but instead countered these criticisms by pointing to the analysis of its own portfolio.

Even HUD's Motion makes plain that the portfolio analysis is a critical underpinning for the final Regulation.  In arguing that HUD provided a reasoned basis for the final Regulation, HUD Motion 28-31, HUD highlights the alleged results of the portfolio analysis, concluding: "In these circumstances it was hardly unreasonable for HUD to reconsider the propriety of continuing to insure such a problematic category of loans." Likewise, HUD argues: "Most importantly, HUD found in its own experience that loans originated with seller-funded down payment assistance had a much higher rate of defaults and foreclosures than FHA-insured loans in general, and that the continued growth of such transactions would eventually threaten the solvency of the MMIF.  HUD needs to take action to protect the solvency of its programs."  HUD Motion at 9.  The critical role of HUD's own portfolio analysis could hardly be stated more strongly.

In Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC, 737 F.2d 1095, 1121 (D.C. Cir. 1984), the D.C. Circuit stressed the

23

importance of allowing public comment on analytic studies produced by agency staff:

> We have more than once cautioned agencies 'that even in an informal [proceeding] parties have a right to be informed of and comment on staff positions. . . . Disclosure of staff reports allows the parties to focus on the information relied on by the agency and to point out where that information is erroneous or where the agency may be drawing improper conclusions from it. An agency's denial of a fair opportunity to comment on a key study may fatally taint the agency's decisional process.

This is especially true where, as here, the study relied on by the agency rests on unpublished data and unknown methodology. As discussed in AmeriDream's brief supporting its motion for summary judgment, had the loan portfolio analysis been available for public comment, commenters would likely have grounds for challenging its findings. For instance, HUD's rulemaking statement referred to an "analysis of its loan portfolio going back to 1998," which highlights those "loans endorsed for insurance in Fiscal Year (FY) 2001" and purportedly compares the claim rates of loans in which DPA was received from a seller-funded charity with claim rates of loans in which DPA was received from other sources. 72 Fed. Reg. at 56,003. However, the basis for HUD's statements is entirely conjectural, because, as HUD itself has noted, it did not have reliable records concerning sources of DPA in loan closings during that much of that period, including 2001 and even later. See Pl.'s Rule 7(h)

Statement Of Material Facts As To Which There Is No Genuine
Issue ¶¶ 92-94.

HUD cites a treatise, Richard J. Pierce, Administrative Law
Treatise (4th ed. 2002), to support its claim that it did not
need to explain itself further in issuing the Regulation. Yet
HUD's position is clearly refuted by the very passage that HUD
cites in support of its position.

HUD states that the Treatise supports the position that "in
the context of proposed rules . . . agencies cannot be expected
to provide 'a complete bibliography of the scientific works'
that support the rule". HUD Motion 21. Later, HUD quotes from
the same passage, stating, "As a leading administrative law
scholar has explained, "potentially affected members of the
public do not need . . . a bibliography to submit meaningful
comments critical (or supportive) of the agency's proposal.
They should assume that the agency's proposal is based on the
published literature in the fields relevant to the proposal and
should shape their comments with reference to that literature."
Id. at 34.

The quoted text is part of a discussion of Portland Cement
Ass'n v. Ruckelshaus, 486 F.2d 375 (D.C. Cir. 1973), in which,
according to the Treatise, "The court stated the basis for its
action in terms of a broad principle of general applicability:
'It is not consonant with the purpose of a rule-making

25

proceeding to promulgate rules on the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency.'" Treatise at 435. The Treatise strongly concurs with the holding, noting that "[I]t is impossible to file meaningful comments critical of a proposed action that is premised on particular data unless that data is available in time for comments." Id. at 436.

The text cited by HUD acknowledges that there are "limits to the Portland Cement requirement that an agency provide notice of the facts on which it predicates a proposed rule", such as a "hypothetical rule" that is "premised on thousands of books, articles, and studies concerning chemistry, meteorology, botany, fisheries biology, epidemiology, and a dozen other disciplines. It would be impossible even for an agency to provide a complete bibliography of the scientific work." Id. at 436. (Emphasis added). Unlike the hypothetical in the Treatise, there was no practical impediment to HUD identifying the bases for the Regulation: HUD relies on two, not thousands of, cited sources.

Indeed, the Treatise explains, point-by-point, why EPA's actions in Portland Cement, and HUD's actions in the present case, constitute an "easy case" for invalidating the Regulation. The Treatise states that, in Portland Cement,

> The agency attempted to defend the substantive merits
> of its final rule principally by reference to
> unpublished studies that were accessible only to the

26

> agency until the agency issued its final rule, and the
> petitioner was able to persuade the court that it
> could have raised serious questions abou [sic] the
> study if it had notice of the study.  <u>This is the easy
> case</u>: (1) the agency relied on the studies as central
> to the validity of its rule; (2) commentators lacked
> timely access to the studies; and, (3) commentators
> could have raised serious questions about the study if
> they had timely access to it.  The case becomes much
> less compelling . . . [if] an agency does not attempt
> to support its final rule by reference to an
> undisclosed study.

<u>Id.</u> at 436.  (Emphasis added).

The present case is even stronger than the "easy case" of
<u>Portland Cement</u>.  First, not only was HUD's internal study
"central" to the validity of the Regulation, the study was the
only authority HUD mentioned other than the "flimsy" IRS
materials and the February 2005 GAO Report.  Opinion Transcript
22.  Second, unlike <u>Portland Cement</u>, in which EPA shared its
data belatedly, here HUD has yet to share it at all.  Third, not
only could commenters have "raised serious questions" about the
HUD study had it been made available, commenters could have
pointed out that the data which the HUD study purported to
analyze was not just flawed but, according to HUD itself,
unavailable during much of the period HUD purported to study.
<u>Supra</u> at 24.

As this Court noted, the internal HUD study was "a critical
source of information"; accordingly, "plaintiffs have a
substantial likelihood of persuading me that they should have

27

had the opportunity to comment on it." Opinion Transcript at 21. The HUD Motion fails to demonstrate why that is not true.

### C. HUD Failed To Consider Less Restrictive, Responsible Alternatives To The Proposed Regulation

In issuing the preliminary injunction, this Court noted "HUD didn't do a very good job of explaining why they were rejecting the comments." Opinion Transcript at 22. The Court further concluded that "there were alternatives that were proposed, that were suggested, that were not adequately dealt with." Id. at 23.

Here, as at the preliminary injunction stage, HUD falls back on its insistence that the statement of basis and purpose provided "a detailed discussion of 28 discrete categories of comments." While it is true that HUD need only address in a reasonable manner those comments that raise significant problems, Covad Commc'ns v. FCC, 450 F.3d 528, 550 (D.C. Cir. 2006), the agency's statement of basis and purpose is stunning in its superficiality and redundancy. As this Court noted in issuing a preliminary injunction, "if you look at the first four [comments] and read the responses by HUD, they're mostly nonsequiturs." Opinion Transcript 22.

HUD protests this characterization, but it is difficult to see the final rulemaking statement in any other light. Take the first example in the statement of basis and purpose.

28

> *Comment*:     HUD   should   not   eliminate   downpayment
> assistance, but regulate such assistance, or establish
> standards for downpayment supported loans, including
> taking  action  to  improve  appraisals  and  require
> stricter  underwriting  and  a  higher  insurance  premium
> for such loans.[10]

> *Response*: The agency is not eliminating all privately
> funded downpayment assistance . . . The proposed rule,
> however,  did  propose  to  preclude  as  acceptable
> downpayment  assistance,  assistance  that,  in  whole  or
> in part, is funded by the seller or any other person
> or  entity  that  financially  benefits  from  the
> transaction  or  any  third  party  or  entity  that  is
> reimbursed, directly or indirectly, by the seller or
> any  other  party  that  financially  benefits  from  the
> transaction.

72 Fed. Reg. at 56,003.

This, of course, is no answer to the issue raised.  Indeed, it is no more than a brush-off, offering no consideration whatsoever as to whether tighter underwriting standards could achieve the same or better results with respect to foreclosure rates, home prices, and risk to the FHA.

Similarly, the fourth comment noted by HUD refers to a group of proposals, also advanced by AmeriDream and others, to mitigate risk:

> *Comment*:     Rather   than   eliminate   downpayment
> assistance, HUD can further mitigate risk by requiring

---

[10] The proposal for tighter "underwriting criteria" for borrowers is one of many proposals specifically raised by AmeriDream in its comments.  AmeriDream noted that such standards, which HUD had indicated it had already developed, would reduce default rates.  Comment Submitted by Ann Ashburn, President, AmeriDream, Incorporated, to U.S. Dep't of Hous. & Urban Dev. Regarding Docket No. FR-5087-P-01, Standards for Mortgagor's Investment in Mortgaged Property, at 15 (Aug. 9, 2007) (A.R. 66627).  "Doing so," AmeriDream proposed, "would be an example of the right way to address a problem – target it directly, and in a way that improves down payment assistance programs rather than abolishes them." Id. at 10 (A.R. 66622).

a complete home inspection, to avoid potentially huge repair costs to the homeowner. HUD could also require the owner to obtain a homeowner's warranty for a specified period of time, to avoid high repair cost as a potential source of default and foreclosure. Alternatively, HUD could require downpayment assistance companies to offer mandatory risk mitigation tools or offer insurance to the buyer.

*Response*: HUD reiterates that downpayment assistance is not being eliminated by this rule. The commenters' recommendations are noted, but the suggested actions are outside the scope of the present rule. In addition, the recommendations pertaining to warranty or insurance does not deal directly with sales price inflation, which is a separate issue from repair costs a homeowner may face after purchasing a home.

72 Fed Reg. at 56,004.

Here, again, the first part of the response is a non sequitur. As to the proposal that these proposed risk management measures would address HUD's concerns about defaults and foreclosures, the response is simply that this is not what HUD proposed to do, and therefore HUD need not consider it. This also begs the question: if these measures would reduce defaults and foreclosures, would HUD still conclude that DPA should be eliminated because of the program's alleged effect on sales prices? The answer is anyone's guess. HUD cannot skirt its obligation to consider less restrictive alternatives by defining the scope of the rulemaking to exclude all responsible alternatives.

Finally, on the subject of sales price, HUD noted that commenters, which again included AmeriDream, proposed reforms in

the appraisal process, for example by adopting a blind pool appraiser selection process for loans with downpayment assistance.  72 Fed. Reg. at 56,004.  HUD's response was to say that "[d]ownpayment assistance can be an independent source of price inflation separate from, or in conjunction with, any price inflation that may arise from the appraisal process, which, while noted by HUD, is an issue beyond the scope of the present rule."  Id.  The rulemaking statement then noted that HUD has taken already taken "steps to address the appraisal issue."  Id.

Notably, HUD had not taken the same steps to address appraisals as were proposed by the commenters.  As for HUD's assertion that DPA leads to price inflation, "separate from, or in conjunction with," the appraisal process, it is simply one more conclusory statement.  This is unsurprising: there is no support, in either the rulemaking proposal or the explanation for the final Regulation, for HUD's concerns about price inflation.

"An agency need not respond to every comment, but it must 'respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule. . . . The basis and purpose statement is inextricably intertwined with the receipt of comments."  Action on Smoking & Health v. Civil Aeronautics Bd., 600 F.2d 1209,

1216 (D.C. Cir. 1983); see also Shays v. FEC (Shays III), No.
04-1597, 2007 WL2616689, at *24 (D.D.C. Aug. 30, 2007) ("Unless
the [agency] answers objections that on their face seem
legitimate, its decision can hardly be classified as
reasoned.").

In this case, the comments were merely in the way.  The
explanation for the final Regulation gives all of them short
shrift: terse responses, non sequiturs, and bald assertions that
the proposal would not resolve every one of the agency's
concerns.  Moreover, the rulemaking statement is devoid of
analysis as to why these less restrictive alternatives,
separately or taken together, would not serve low- and moderate-
homebuyers better than would abolishing DPA altogether.  Nor
does HUD's response address why these measures would not achieve
the same or better results with respect to foreclosure rates,
home prices, and risk to the FHA.

The demands of the APA are not onerous.  But HUD's
explanation for the action taken here cannot suffice to wipe out
a decade-old industry — one that has enabled hundreds of
thousands of low- to moderate-income families to purchase homes
for the first time.  The discussion in Burlington Truck Lines is
apropos here:

> There are no findings and no analysis here to justify
> the choices made, no indication of the basis on which
> the [agency] exercised its expert discretion.  We are

not prepared to and the Administrative Procedure Act will not permit us to accept such . . . practice . . . Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.'

371 U.S. 882, 884 (citations omitted).

## II. HUD IMPROPERLY PREJUDGED THE OUTCOME OF THE RULEMAKING PROCEEDING

In issuing the preliminary injunction, this Court concluded that "the plaintiffs have a substantial likelihood of succeeding in showing that Secretary Jackson prejudged this matter." Opinion Transcript at 26-27. This Court noted that remarks attributed to the Secretary by a reporter for a national publication, who attended a press conference at which the Secretary discussed the proposed Regulation, indicated "that he seemed prepared to disregard any significant new material subsequently introduced during the comment period." Id. at 28.

HUD's brief contains eight pages of argument on the issue of prejudgment, yet HUD does not once dispute the substance of the Bloomberg article.

In the article, which was published while the proposed Regulation was out for public comment, HUD Secretary Alphonso Jackson asserted that he was "very much against" DPA programs, saying "I think it's wrong." Pl.'s Memo. Supp. Mot. Prelim. Inj. Ex. O (Neil Roland, U.S. to Ban Down Payment Program Over

33

Objections, Jackson Says, Bloomberg.com, June 5, 2007). HUD argues that "[t]he direct quote statement" falls short of establishing predecisional bias, but admits that "[t]he article then purports to paraphrase Secretary Jackson, contending that 'Jackson said in the interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments.'" HUD Motion 50.

As to whether the paraphrased language accurately reflects the substance of the Secretary's remarks, HUD has nothing to say. <u>See</u> HUD Motion 50-51. For purposes of this motion, the substance of the Secretary's statement is undisputed. <u>See</u> Pl.'s 7(h) Statement Of Material Facts As To Which There Is No Genuine Issue ¶ 129. Moreover, neither the Secretary nor HUD's press office, nor anyone else acting on the Secretary's or the agency's behalf <u>ever</u> sought to retract or clarify the direct quotes or the paraphrased language attributed to Secretary Jackson. Roland Decl., Memo. P. & A. Supp. Pl.'s Mot. Summ. J. Ex. B.

## A.    **Secretary Jackson Was The Relevant Decision-maker**

Rather than dispute the Secretary's statement that the agency would put DPA programs out of business regardless of what commenters might say, HUD argues that Secretary Jackson's comments were "immaterial to the process because he was not the decision-maker in the rule-making process." HUD Motion 43. It

is true that Brian D. Montgomery, Assistant Secretary of HUD and FHA Commissioner, approved the final Regulation pursuant to an express delegation of authority from the Secretary. Id. at 43-44. However, HUD points to no legal support for the extraordinary proposition that delegation of decision-making authority by the head of an agency renders immaterial anything the agency head might say that reflects on the delegated matter.

Indeed, the FHA Commissioner has only "such duties and powers as may be prescribed by the Secretary," and acts "under the supervision and direction of the Secretary." 42 U.S.C. § 3533(b). Delegated authority to authorize the adoption of regulations does not alter this structure. And as HUD's website makes clear, "[i]mplicit in [the Secretary's] power [of delegation], of course, is the related authority to revoke or revise any delegations already in effect." About HUD: Powers of the Secretary, http://www.hud.gov/about/secretary/powersec.cfm (last visited Dec. 6, 2007).

Congress expressly vested the authority to promulgate regulations under the National Housing Act to Secretary Jackson. 12 U.S.C. §§ 1709(b)(9), 1715b; see HUD Motion 14 (arguing that the Regulation is within HUD's statutory rulemaking authority). Secretary Jackson delegated some of that authority to FHA Commissioner Montgomery, allowing the FHA Commissioner to issue regulations like the one at issue in this case. Consolidated

35

Delegation of Authority for the Office of Housing-Federal Housing Administration, 71 Fed. Reg. 60,169, 60,169-73 (Oct. 12, 2006) ("Notice of Delegation"). But delegated authority to authorize the adoption of regulations does not limit Secretary Jackson's authority to issue such regulations over his own signature,[11] or alter the fact that FHA Commissioner Montgomery, as the Secretary's delegate, was acting at the direction of, and was accountable to, Secretary Jackson.[12] See U.S. Telecom. Ass'n v. FCC, 359 F.3d 554, 565 (D.C. Cir. 2004) (characterizing a federal official's delegation of authority to a subordinate as creating a "principal-agent relationship" in which there are "lines of accountability"); 42 U.S.C. § 3533(b) (stating that the FHA Commissioner works "under the supervision and direction of the Secretary.").

Moreover, the Notice of Delegation explicitly reserved to Secretary Jackson "the power to sue and be sued." 71 Fed. Reg. at 60,173. Thus, HUD's own delegation notice requires that suit be brought against Secretary Jackson, who is alone liable (in his official capacity) for any and all infirmities in HUD's

---

[11] Under the provisions of HUD's Notice of Delegation and the will of Congress as expressed in the National Housing Act, Secretary Jackson did not, and indeed could not, eliminate his own statutorily-vested rulemaking authority.

[12] That Assistant Secretary and FHA Commissioner Montgomery was directly appointed by President Bush is a red herring. His independent appointment does not weaken the argument that Assistant Secretary Montgomery was acting as Secretary Jackson's agent. See HUD Motion 44. FHA Commissioner Montgomery was appointed into a position explicitly subordinate to the Secretary Jackson and, as noted supra, works under the "supervision and direction" of Secretary Jackson.

rulemakings.   To accept HUD's argument would grant HUD effective immunity from the rule against prejudgment in rulemaking every time HUD promulgated a rule over the signature of an official other than the Secretary.

As HUD would have it, an agency would be able to evade the constitutional requirement of due process so long as the official promulgating a rule was not authorized to be sued on the agency's behalf.   This would be an absurd result, particularly in this case where Secretary Jackson's prejudgment of the Regulation was so strong that nothing the commenters said could have influenced HUD's ultimate policy toward seller-funded downpayment assistance.   Either FHA Commissioner Montgomery would have, as he did, issued a rule consistent with Secretary Jackson's views, or else Secretary Jackson would have intervened in the rulemaking proceeding and issued the Regulation on his own retained authority.

Furthermore, Secretary Jackson was deeply involved in the rulemaking process.   HUD makes no assertion that the Secretary recused himself from participating in the decision; such a claim would hardly be credible, given that the Secretary was giving interviews about the rulemaking while it was pending before the agency.   In short, HUD's contention that Secretary Jackson's comments are immaterial because of FHA Commissioner Montgomery's

37

role[13] in the rulemaking process is unfounded.

**B.    The Bloomberg Article Is Properly Before The Court As Clear And Convincing Evidence Of Prejudgment**

Equally spurious is HUD's argument that "the Bloomberg article was not part of the agency's administrative record during the rulemaking process, [and therefore] it cannot support plaintiffs' claims on this count." HUD Motion 46.  In a section of its rulemaking comment entitled, "Administrative Procedure Act Compliance," AmeriDream cited the Bloomberg article and expressed concern that the comments by the Secretary compromised the fairness of the rulemaking process.  Comment Submitted by Ann Ashburn, President, AmeriDream, Incorporated, to U.S. Dep't of Hous. & Urban Dev. Regarding Docket No. FR-5087-P-01, Standards for Mortgagor's Investment in Mortgaged Property, at 15 (Aug. 9, 2007) (A.R. 66627).  At that point in time, there was nothing more AmeriDream could have said about the matter.  A claim that an agency has prejudged the outcome of a rulemaking

---

[13] Notwithstanding HUD's description of the case, it is interesting to note that the official found to have prejudged the rulemaking in <u>International Snowmobile Manufacturers Association v. Norton</u>, 340 F. Supp. 2d 1249 (D. Wyo. 2004), was not, formally at least, the decision-making official responsible for the final rule.  The <u>International Snowmobile</u> court found that Assistant Secretary for Fish and Wildlife and Parks Donald Barry had reached "a prejudged political conclusion to ban snowmobiles" from certain national parks.  340 F. Supp. 2d at 1261.  Yet both the proposed and final versions of the rule challenged in <u>International Snowmobile</u> were issued over the signature of Acting Assistant Secretary for Fish and Wildlife and Parks Stephen C. Saunders.  <u>See</u> Special Regulations, Areas of the National Park System, 65 Fed. Reg. 79,024, 79,034 (Dec. 18, 2000) (proposed rule); Special Regulations, Areas of the National Park System, 66 Fed. Reg. 7260, 7268 (Jan. 22, 2001) (final rule).  Imputing a superior officer's prejudgment to his subordinate is just as reasonable as imputing a predecessor's prejudgment to his acting successor, as did the court in <u>International Snowmobile</u>.

proceeding logically cannot ripen until the agency makes a final determination.[14]

HUD argues that "it is hardly prejudicial for an agency official to express the mere intention to implement the rule as proposed."  HUD Motion 50-51.  This argument trivializes what happened here.  The Secretary went well beyond an expression of intention to adopt the proposed Regulation.  Secretary Jackson declared that HUD would adopt the Regulation regardless of what commenters had to say, and he did so during the pendency of the rulemaking proceeding.

"The APA guarantees the public an opportunity to comment on proposed rules.  That opportunity is 'meaningless unless the agency responds to significant points made by the public.'" Action on Smoking & Health, 699 F.2d at 1217; see 5 U.S.C. § 553(c) (requiring agency "to give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation").  Indeed, "[i]f the APA's notice requirements mean anything, they require that a reasonable commenter must be able to trust an agency's representations

---

[14] AmeriDream immediately expressed its concern with Secretary Jackson's remarks.  The same article quotes AmeriDream President, Ann Ashburn:  "Did Secretary Jackson just imply that the governmental process of an open public comment period is just a sham?  I know that the American people expect more from Secretary Jackson."  Pl.'s Memo. Supp. Mot. Prelim. Inj. Ex. O (Bloomberg Article).  Notwithstanding that AmeriDream expressed concerns then, and again in its formal comments, there is no word from HUD about it in

about which particular aspects of its proposal are open for consideration." Envtl. Integrity Project v. EPA, 425 F.3d 992, 998 (D.C. Cir. 2005) (citation omitted).

Furthermore, although the rule against prejudgment guards against the same due process violations as does the APA, review of prejudgment claims is not limited to the administrative record. Review under the APA is distinct from consideration of prejudgment claims. See C&W Fish Co. v. Fox, 931 F.2d 1556, 1564-65 (D.C. Cir. 1991) (treating arbitrary and capricious review as distinct from an inquiry into whether an agency official prejudged a final rule); cf. Home Box Office, Inc. v. FCC, 567 F.2d 9, 51-59 (D.C. Cir. 1977) (indicating a willingness to look beyond the administrative record when concerned about the integrity of the rulemaking process). APA review ensures that agency officials act after having thoroughly reviewed the relevant facts, data, and reasonable alternatives, and justify a given regulation on the basis of the administrative record. See C&W Fish Co., 931 F.2d at 1564-65.

A prejudgment claim, by contrast, requires a court to examine the mindset of agency officials who considered a given proposed rule. While arbitrary and capricious review assumes a fair mind and specifically eschews inquiry into the minds of

---

the final explanation and justification for the Regulation.

agency officials, a prejudgment claim, by its very nature, requires that a court engage in just such inquiry.

Moreover, courts necessarily sit as finders of fact in the first instance when determining the merits of a prejudgment claim. By contrast, APA review is premised on agencies having been the finders of fact in the first instance while reviewing courts are considered to be acting as appellate courts. See Univ. Med. Ctr. of S. Nev. v. Shalala, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999). Thus, the rationale underlying the APA's restriction of judicial review to the administrative record is inapplicable to prejudgment claims. The comments Secretary Jackson made during the pendency of the rulemaking proceeding are, accordingly, properly before this Court as clear and convincing evidence of prejudgment.

To be sure, an agency will intend to issue the rules it proposes. An agency may also expect strong opposition to its proposals. The crucial point, however, is that an agency is not thereby excused from the requirements of the APA. The agency must give fair, open minded consideration to all comments and adequately explain its rationale for taking the action it did. Here, to the contrary, HUD's actions were in lock step with Secretary Jackson's promise that HUD would promulgate the Regulation regardless of the comments it received during the notice and comment process. The effect of Secretary Jackson's

41

comments was to reduce the rulemaking proceeding to a sham.  The only appropriate remedy is to invalidate the Regulation.

## III. THE DIFFERENTIAL EFFECTIVE DATES IN THE REGULATION VIOLATE THE APA AND EQUAL PROTECTION COMPONENT OF THE DUE PROCESS CLAUSE

As set forth in AmeriDream's Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For Summary Judgment, the differential effective dates in the challenged Regulation violate the APA and equal protection because HUD provided no reasoned justification, and there is no rational basis for, the distinction between Nehemiah and other similarly-situated DPA providers like AmeriDream.  The HUD Motion does not effectively dispute this, instead arguing that HUD could have changed its mind since it announced in connection with the Nehemiah settlement that it intended to treat all DPA providers the same in regard to the effective date of any future changes. This argument merely begs the question and points out the irregularity and unconstitutionality of HUD's action in this regard – there is no rational justification for having treated these comparable competitors differently.  Accordingly, HUD's motion for summary judgment should be denied on this ground as well.

### CONCLUSION

For the foregoing reasons, AmeriDream respectfully requests that this Court deny Defendant's Motion For Summary Judgment.

42

BAKER & HOSTETLER LLP


By:/s/Lee T. Ellis, Jr.
    Lee T. Ellis, Jr. (3863)
    Suite 1100
    1050 Connecticut Avenue, N.W.
    Washington, D.C.  20036
    Tel:  202-861-1521
    Fax:  202-861-1783
    lellis@bakerlaw.com

    Attorneys for Plaintiff


OF COUNSEL:

Lawrence H. Norton, Esquire
Womble Carlye Sandridge & Rice PLLC
1401 Eye Street, N.W.
7th Floor
Washington, D.C.  20005-2225
Tel:  202-857-4429
Fax:  202-261-0097
lnorton@wesr.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                  )
AMERIDREAM, INCORPORATED,         )
                                  )
          Plaintiff,              )
                                  )
     v.                           )     Civil Action No. 07-1752(PLF)
                                  )
ALPHONSO JACKSON                  )
SECRETARY OF THE UNITED           )
STATES DEPARTMENT OF              )
HOUSING AND URBAN                 )
DEVELOPMENT,                      )
                                  )
          Defendant.              )
                                  )
_____ )
```

ORDER DENYING SUMMARY JUDGMENT

Upon consideration of Defendant's Motion For Summary Judgment filed herein, and the Opposition of plaintiff AmeriDream, Incorporated thereto, it is by the Court this _____ day of _____, 2007

ORDERED, that Defendant's Motion For Summary Judgment be, and it is hereby, denied.

_____
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                          )
AMERIDREAM, INCORPORATED,  )
                          )
        Plaintiff,         )
                          )
    v.                     )   Civil Action No. 07-1752(PLF)
                          )
ALPHONSO JACKSON           )
SECRETARY OF THE UNITED    )
STATES DEPARTMENT OF       )
HOUSING AND URBAN          )
DEVELOPMENT,               )
                          )
        Defendant.         )
                          )
_____
```

RULE 7(h) STATEMENT OF MATERIAL FACTS AS TO WHICH PLAINTIFF
CONTENDS THERE EXISTS A GENUINE ISSUE NECESSARY TO BE LITIGATED

Pursuant to LCvR7(h), the United States District Court for the District of Columbia requires that each opposition to a motion for summary judgment shall be accompanied by a statement of material facts as to which it is contended there exists a genuine issue necessary to be litigated. For its statement, plaintiff AmeriDream, Incorporated sets forth as follows:

1. Defendant contends it is undisputed that Secretary Jackson "expressly delegated" to the FHA Commissioner his authority to promulgate regulations like the one at issue in this case. Def.'s Statement Material Facts Not In Dispute ¶ 1. The contention is disputed to the extent that, by law, Secretary Jackson retains authority to promulgate regulations like the one at issue in this case. National Housing Act, 12 U.S.C. 1715b,

1709(b)(9) (2000); Def.'s Memo. Supp. Mot. Summ. J. Ex. 11 at 13.

2.    Defendant contends it is undisputed that HUD "explained" in the Proposed Regulation that seller-funded downpayment assistance results in inflated home prices, "often to the detriment of homebuyers and FHA." Def.'s Statement Material Facts Not In Dispute ¶ 3.  The contention is disputed because HUD failed to adequately explain or provide a basis for its assertion.  A.R. 00011-12 (72 Fed. Reg. 27,048, 27,048-49 (May 11, 2007)).

3.    Defendant contends it is undisputed that the Proposed Rule refers to a February 2005 report from the Government Accountability Office entitled "Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Loan Products," Revenue Ruling 2006-27, and "other sources." Def.'s Statement Material Facts Not In Dispute ¶ 3.  The contention is disputed to the extent it fails to mention that the "other source[]" is an IRS press release describing Revenue Ruling 2006-27.  A.R. 00012 (72 Fed. Reg. at 27,049).  HUD primarily referred to the press release, and not Revenue Ruling 2006-27, as support for its stated concern about seller-funded downpayment assistance.  A.R. 00012 (72 Fed. Reg. at 27,049).  Also, the contention is disputed to the extent that HUD referred to any source other than the February 2005 GAO report, the IRS press release, and

Revenue Ruling 2006-27 as described in the press release. In fact, HUD did not refer to any other sources in the Proposed Regulation. A.R. 00011-12 (72 Fed. Reg. at 27,048-49).

4. Defendant contends it is undisputed that the Internal Revenue Service ("IRS") "found that seller-funded DPA providers do not qualify as tax-exempt organizations under section 501(c)(3) of the Internal Revenue Code." Def.'s Statement Of Material Facts Not In Dispute ¶ 3. The contention is disputed. Revenue Ruling 2006-27 does not constitute a finding, and does not alter the tax status of any seller-funded downpayment assistance providers. See 26 U.S.C. §§ 6110(b)(1),(k)(3) (2000); A.R. 00021 (Rev. Ruling 2006-27, 2006-21 I.R.B. 915).

5. Defendant contends it is undisputed that HUD noted "most of the comments were submitted 'in a standard similar format and wording.'" Def.'s Statement Of Material Facts Not In Dispute ¶ 5. The contention is disputed to the extent defendant has not established that the substance of the quotation is accurate.

6. Defendant contends it is undisputed that the final Regulation includes "detailed discussion of 28 discrete categories of issues" raised by commenters. Def.'s Statement Of Material Facts Not In Dispute ¶ 7. The contention is disputed to the extent that the issues discussed were irrelevant or minor points and that the discussion did not adequately explain why

HUD was rejecting the comments.  A.R. 00003-06 (72 Fed. Reg. at 56,003-006).

7.   Defendant contends it is undisputed that HUD agreed in its 1998 settlement agreement with Nehemiah Progressive Development Corporation ("Nehemiah") that "any future changes to its treatment of DPA providers" would not be applicable to Nehemiah until "six (6) months from the date of final promulgation and issuance of any such changes or modifications." Def.'s Statement Material Facts Not In Dispute ¶ 8.   The contention is disputed to the extent it implies that HUD made the promise to Nehemiah only.   In a letter appended to the settlement agreement with Nehemiah, HUD extended the same six-month grace period to "all other similarly situated down payment assistance programs."  A.R. 00891.

8.   Defendant contends it is undisputed that all other material facts not set out by HUD "are contained in the certified administrative record."  Def.'s Statement Of Material Facts Not In Dispute ¶ 9.  The contention is disputed because some of the material facts plaintiff AmeriDream, Incorporated sets forth in its Rule 7(h) Statement Of Material Facts As To Which There Is No Genuine Issue are not contained in the administrative record, but are properly considered by this Court.  See, e.g., Pl.'s Statement Material Facts As To Which There Is No Genuine Issue ¶¶ 126-130.  Also, it is contended that

-4-

genuine issues exist regarding some of the facts in the administrative record, but since defendant has not set forth all of the material facts that it contends support its motion for summary judgment, it is impossible to know which of those facts are relied upon by defendant.

BAKER & HOSTETLER LLP

By: */s/ Lee T. Ellis, Jr.*
    Lee T. Ellis, Jr. (3863)
    Washington Square, Suite 1100
    1050 Connecticut Avenue, N.W.
    Washington, D.C. 20036
    Tel: 202-861-1521
    Fax: 202-861-1783
    lellis@bakerlaw.com

Attorneys for Plaintiff

OF COUNSEL:

Lawrence H. Norton, Esquire
Womble Carlye Sandridge & Rice PLLC
1401 Eye Street, N.W.
7th Floor
Washington, D.C. 20005-2225
Tel: 202-857-4429
Fax: 202-261-0097
lnorton@wesr.com