UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERIDREAM, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1752 (PLF) |
| | ) | |
| HON. ALPHONSO JACKSON SECRETARY OF THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>NOTICE OF SUPPLEMENTAL AUTHORITY BY CONSENT</u>

Comes now the plaintiff AmeriDream, Incorporated and submits this Notice of supplemental authority with the defendant's consent.  The Order dated February 29, 2008, in <u>Nehemiah Corporation of America v. Jackson</u>, No. CIV. S-07-2056 LKK/DAD, United States District Court For The Eastern District of California is attached to this Notice.

BAKER & HOSTETLER LLP

By:/s/*Lee T. Ellis, Jr.*
    Lee T. Ellis, Jr. (3863)
    Suite 1100
    1050 Connecticut Avenue, N.W.
    Washington, D.C.  20036
    Tel:  202-861-1521
    Fax:  202-861-1783
    lellis@bakerlaw.com

Attorneys for Plaintiff

OF COUNSEL:

Lawrence H. Norton, Esquire
Womble Carlye Sandridge & Rice PLLC
1401 Eye Street, N.W.
7th Floor
Washington, D.C. 20005-2225
Tel: 202-857-4429
Fax: 202-261-0097
lnorton@wcsr.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of March, 2008, a

copy of the foregoing was filed and served pursuant to the

Court's electronic filing procedures using the Court's CM/ECF

System.

BAKER & HOSTETLER LLP

By:/s/Lee T. Ellis, Jr.
     Lee T. Ellis, Jr. (3863)
     Suite 1100
     1050 Connecticut Avenue, N.W.
     Washington, D.C. 20036
     Tel: 202-861-1521
     Fax: 202-861-1783
     lellis@bakerlaw.com

Attorneys for Plaintiff

1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9
NEHEMIAH CORPORATION OF
10 AMERICA,

11                                    NO. CIV. S-07-2056 LKK/DAD
            Plaintiff,
12
       v.
13                                      O R D E R
ALPHONSO JACKSON, et al.,
14
            Defendants.
15 _____/

16      Plaintiff Nehemiah Corporation of America ("Nehemiah") has

17 brought this action against the Department of Housing and Urban

18 Development and its Secretary Alphonso Jackson (collectively,

19 "HUD") pursuant to the Administrative Procedures Act ("APA"), 5

20 U.S.C. § 551. Nehemiah alleges that HUD violated the APA when it

21 adopted a rule barring the use of seller-funded downpayment

22 assistance for mortgages insured by the Federal Housing

23 Administration ("FHA"), a component of HUD.  In particular,

24 Nehemiah claims that HUD failed to provide a reasoned analysis for

25 the departure from its previous policy, ignored reasonable

26 alternatives to the final rule, relied on data that it never

1

produced for public comment, and prejudged the merits of the final rule.   Pending before the court are cross-motions for summary judgment.   The court resolves the motions after oral argument and upon the parties' initial papers and supplemental briefing.   For the reasons explained below, plaintiff's motion is granted in part and denied in part, and defendants' motion is denied.

## I. Background

**A. Overview**

As authorized by the National Housing Act, 12 U.S.C. § 1701 et seq., the FHA insures mortgages, meaning that it agrees to protect mortgage lenders against the risk of losses caused by borrower non-payment.   As an insurer, FHA sets conditions on the types of mortgages it will insure.   One such condition is the requirement that home buyers must make a downpayment of at least 3 percent of the total cost of acquisition.   12 U.S.C. § 1709(b)(9) ("[T]he mortgagor shall have paid on account of the property . . . at least 3 per centum").   HUD's policy has been to allow certain third-parties, such as family members and charities, to assist with the downpayment, but to disallow other third-parties, such as the home seller to the transaction, from doing so.

In the 1990s, organizations such as Nehemiah sprouted up and began exploiting what HUD describes as a loophole against the ban on downpayment assistance ("DPA") by sellers.   They devised a form of transaction in which a charity would make a gift to the home buyer to satisfy the 3 percent downpayment requirement, with the understanding that the seller would make a donation to the charity

1  after the sale was complete.  Because this donation was not being

2  used to fund the downpayment of the individual purchasing the

3  seller's home -- but rather would be used to fund a future home

4  buyer's downpayment -- it was not prohibited by HUD's policy

5  against downpayment assistance by sellers.  Sellers also paid a

6  processing fee in addition to their "donations."

7     On October 1, 2007, HUD published a rule that would prohibit

8  transactions such as those facilitated by Nehemiah.  Standards for

9  Mortgagor's Investment in Mortgaged Property, 72 Fed. Reg. 56,002,

10  56,007 (Oct. 1, 2007) (to be codified at 24 C.F.R. § 203.19(c).

11  The regulation provides that in order for FHA to insure a mortgage,

12  the funds for a buyer's downpayment may not be provided by the

13  seller or any entity that financially benefits from the

14  transaction.  The effect of the rule would be to bar indirect

15  seller-funded DPA.[1]

16  **B. Statutory and Regulatory History**

17     **1. FHA Mortgage Insurance Program**

18     Congress created the FHA through the National Housing Act of

19  1934.  48 Stat. 1246 (1934).  In 1965, FHA became a part of the

20

21     [1] Although Nehemiah prefers the nomenclature of "privately-
   funded DPA" because not all of its funding comes from sellers, what

22  is at stake in this litigation is only the portion of that private
   funding derived from sellers.  While the method employed by

23  plaintiff does not involve direct funding by the seller, it is not
   unreasonable to recognize that seller assistance is ultimately

24  necessary to make the scheme work.  In doing so, no intent to
   denigrate the program is manifested.  Accordingly, the court

25  employs the terminology of "seller-funded DPA."  As used in this
   order, seller-funded DPA refers to the financing arrangements

26  between sellers and home buyers facilitated by organizations such
   as Nehemiah.

1  Department of Housing and Urban Development and is still a
2  component of HUD to this day.  42 U.S.C. § 3534(a).  FHA was
3  established primarily for the purpose of insuring mortgage lenders
4  against default by borrowers.  48 Stat. 1246 (1934).

5      To accomplish this end, both HUD and FHA depend on the Mutual
6  Mortgage Insurance Fund ("MMIF").  See 12 U.S.C. § 1708(a).  The
7  MMIF is a revolving fund that uses proceeds from insurance
8  premiums, investment income, and foreclosure sales to provide funds
9  for future mortgage insurance.  Id.  In other words, MMIF is self-
10  sustaining.  Aside from an initial $10 million appropriation from
11  Congress, HUD has operated the MMIF using only the proceeds that
12  the fund generates, without any other congressional appropriations.
13  See generally Lee v. Kemp, 731 F. Supp. 1101, 1103-04 (D.D.C.
14  1989).

15      If an FHA-insured mortgage has been in default for at least
16  three months, or when the mortgage lender forecloses on a property,
17  the lender is entitled to file a claim for insurance benefits from
18  the MMIF.  See 12 U.S.C. § 1710(a); 24 C.F.R. §§ 203.355 to
19  203.371.  In order to receive benefits, the mortgage-holder must
20  convey clear title to HUD.  12 U.S.C. § 1710(a)(1).  According to
21  HUD, loans originated with seller-funded DPA have much higher rates
22  of default and foreclosure than other types of loans, and the
23  continued increase of such loans threatens the solvency of the
24  MMIF.[2]

25  ───────────────

26      [2] In today's market, it hardly needs noting that other, and
    perhaps more pernicious, conduct relating to mortgages threatens

4

## 2. Three Percent Requirement

Before FHA can insure a single-family home mortgage, the loan must first meet certain eligibility requirements set forth in the National Housing Act. 12 U.S.C. § 1709. One of these eligibility requirements involves the three percent downpayment of the home's acquisition cost. 12 U.S.C. § 1709(b)(9). The statute mandates that "the mortgagor" must be the individual to pay this sum. Id. ("*the mortgagor* shall have paid on account of the property . . . at least 3 per centum) (emphasis added). But the statute also provides two exceptions: first, a family member may lend the required sum to the home buyer, and second, a corporation or person other than the borrower may pay the sum under certain circumstances not relevant here (e.g., when the borrower is 60 years of age or older, or when the mortgage covers a housing unit under the Homeownership and Opportunity Through HOPE Act). Id. These are the only exceptions to the three percent rule expressly stated in the statute. 12 U.S.C. § 1709(b)(9).

Nevertheless, HUD's policy has been to permit the downpayment to be financed by sources in addition to a family member: these include the borrower's employer or labor union, a governmental entity, a charitable organization,[3] and a close friend with a

_____

the entire economy.

[3] HUD defines a charitable organization as a nonprofit "exempt from income taxation under section 501(a) of the Internal Revenue Code (IRC) of 1986 pursuant to section 501(c)(3) of the IRC." HUD Mortgagee Letter 2006-13 (May 25, 2006) (Def.'s Mot, Ex. 4).

5

clearly defined and documented interested in the borrower.[4]    HUD
Handbook 4155.1, Rev. 5, "Mortgage Credit Analysis for Mortgage
Insurance, One to Four Family Properties" (Def.'s Mot., Ex. 3).
But HUD's policy prohibits the seller from financing the buyer's
downpayment: "The gift donor may not be a person or entity with an
interest in the sale of the property, such as the seller, real
estate agent or broker, builder, or any entity associated with
them." Id. The prohibition on direct financing of downpayments
by sellers is also not challenged in this action.[5]

### 3. Plaintiff Nehemiah

In the 1990s, organizations such as Nehemiah developed seller-
funded DPA programs. Pl.'s Statement of Undisputed Fact ("SUF")
¶ 11. Nehemiah provides funds for downpayment and closing costs
to home buyers. In exchange, the seller agrees to make a
contribution to Nehemiah of one to six percent of the final
contract sales price and to pay a processing fee. SUF ¶ 20. The
contribution paid by the seller is not used specifically for the
buyer's downpayment assistance. SUF ¶ 22. Instead, Nehemiah
provides the funds to the home buyer from a pre-existing pool of
funds. SUF ¶ 22. The seller then pays a contribution to Nehemiah
only after the loan has successfully closed. SUF ¶ 23. The
contributions collected from sellers replenish Nehemiah's pool of

---

[4] HUD's policy of allowing downpayments to be financed by
these other sources is not challenged in this action.

[5] Indeed, Nehemiah's business model depends entirely on such
a prohibition; otherwise, Nehemiah would have no role to play as
the intermediary.

1 funds for other home buyers.  SUF ¶ 23.

2     In late 1997, HUD and Nehemiah engaged in litigation over the

3 legality of Nehemiah's seller-funded down payment program.  <u>See</u>

4 <u>Nehemiah Progressive Housing Corp. v. Andrew Cuomo, et al.</u>, Civ.

5 S-97-1817-GEB/PAN (E.D. Cal.).  This litigation ended in a

6 settlement agreement whereby Nehemiah was permitted to continue

7 operation of its DPA program.  Administrative Record ("A.R.")

8 00884.  HUD, however, "expressly reserve[d] the right to and may

9 take [regulatory] actions with regard to down payment assistance

10 programs generally."  <u>Id.</u>

11     **4. Earlier Treatment of Seller-Funded DPA**

12     In 1999, HUD proposed a rule that would have accomplished the

13 same effect as the present rule at issue.  Sources of Homeowner

14 Downpayment, 64 Fed. Reg. 49,956 (proposed Sept. 14, 1999).  Under

15 the proposed rule, a gift could not be used for the borrower's

16 downpayment if the organization providing the gift received its

17 funds either directly or indirectly from the seller of the

18 property.  <u>Id.</u>  Following the receipt and review of public

19 comments, the "overwhelming majority of [which] opposed the rule,"

20 HUD withdrew the proposed rule.  Withdrawal of Proposed Rule on

21 Sources of Homeowner Downpayment, 66 Fed. Reg. 2,851, 2,852 (Jan.

22 12, 2001).

23     In November 2005, the Government Accountability Office (GAO)

24 issued a report expressing concerns that seller-funded DPA results

25 in higher home prices without comparable increases in equity for

26 buyers.  A.R. 00545-46 (finding homes with seller-funded DPA sold

7

1  for three percent more than comparable homes without such

2  assistance). Accordingly, buyers relying on seller-funded DPA

3  possess less initial equity in their homes. The report also found

4  that seller-funded DPA was associated with a greater likelihood of

5  delinquency and default claims. A.R. 00549-50 (finding 22-28

6  percent delinquency for loans with seller-funded DPA, compared to

7  11-16 percent for other types of DPA and 8-12 percent for loans

8  without any type of DPA at all).[6]

9      Furthermore, the November 2005 GAO report recommended that the

10  FHA "revise [] standards to treat assistance from a seller-funded

11  nonprofit as a seller contribution" because "down payment

12  assistance provided by seller-funded entities is, in effect, a

13  seller inducement." A.R. 00568-69. In a letter responding to the

14  report, FHA Commissioner (and HUD Assistant Secretary) Brian

15  Montgomery defended seller-funded DPA against outright prohibition.

16  A.R. 00614. He argued that if a seller's contribution could not

17  _____

18  [6] The greater risk associated with loans involving seller-funded DPA may be caused by several factors. For instance, buyers

19  who are unable to satisfy the three percent downpayment requirement through other nonseller-related sources (e.g., personal savings,

20  family members) may also be less able to turn to these sources in the event of income disruption (occasioned by illness or job loss, for example).

21      Further, seller-funded DPA results in higher home prices, which in turn may result in higher and more unmanageable mortgage

22  payments. But the difference in home prices (in the neighborhood of $4,100, the average amount that Nehemiah gives to borrowers,

23  plus Nehemiah's processing fee) -- amortized over the life of a mortgage -- may not represent a significant difference between the

24  monthly mortgage payments of borrowers who relied on seller-funded DPA and those who did not. In addition, delinquency rates for

25  loans with DPA from sources other than sellers are still higher than those without any type of DPA, and yet there is no seller-

26  induced price inflation with either of these types of loans.

1  be traced to the organization's gift to the buyer, the contribution
2  was not a seller inducement to purchase.    Id.

3      In May 2006, the Internal Revenue Service ("IRS") ruled that
4  an organization is not eligible for 501(c)(3) status when it
5  receives substantial funding from sellers and other entities that
6  stand to benefit from the home purchases facilitated by the
7  organization.[7] See Rev. Rul. 2006-27, 2006-21 I.R.B. 915, 918;
8  accord A.R. 00021.  In its press release accompanying the ruling --
9  which HUD subsequently referenced in its own rulemaking -- the IRS
10 expressed concern with arrangements where the seller only pays the
11 organization if the buyer completes the purchase of the home.
12 I.R.S. News Release IR-2006-74 (May 4, 2006) ("The IRS is
13 increasingly concerned with organizations that are taking advantage
14 of homebuyers who need assistance for a down payment to realize the
15 American dream of homeownership. . . . So-called charities that
16 manipulate the system do more than mislead honest homebuyers and
17 ultimately jack up the cost of the home.  They also damage the
18 image of honest, legitimate charities.") (internal quotation marks
19 omitted); accord A.R. 00026.

20 **C. Proposed and Final Rule**

21     On May 11, 2007, HUD published a notice of proposed rulemaking
22 ("notice" or "proposed rule").  Standards for Mortgagor's
23 Investment in Mortgaged Property, 72 Fed. Reg. 27,048 (May 11,
24 2007) (to be codified at 24 C.F.R. pt. 203).  The notice indicated

25 _____

26     [7] Despite this ruling, Nehemiah contends that its tax-exempt
   status remains intact.  SUF ¶¶ 37-41.

that "[t]he proposed rule would establish that a prohibited source of downpayment assistance is a payment that consists, in whole or in part, of funds provided by any of the following parties before, during, or after closing of the property sale: (1) The seller, or any other person or entity that financially benefits from the transaction; or (2) any third party or entity . . . that is reimbursed directly or indirectly by any of the parties listed in clause (1)." <u>Id.</u> at 27,049.  HUD also cited to both an earlier February 2005 GAO report[8] and the IRS press release.  <u>Id.</u> at 27,048-49.

HUD provided a total of 90 days for the comment period.  <u>See</u> 72 Fed. Reg. at 27,048 (initial provision for 60 days); 72 Fed. Reg. 37,500 (July 11, 2007) (extension by 30 days).  As described in greater detail below, Secretary Jackson purportedly made a statement to Bloomberg News in the middle of the comment period suggesting that the rule would be passed, regardless of critical comments.  Neil Roland, *U.S. to Ban Down Payment Program Over Objections, Jackson Says*, Bloomberg News, June 5, 2007 (Decl. of Joseph Genshlea, Ex. U).  During the entire comment period, HUD received over 15,000 comments in response to the rule.  72 Fed. Reg. at 56,003.  After reviewing the comments, HUD published a final rule that was substantially similar to the proposed rule.  <u>Id.</u>  The final rule included HUD's discussion of 28 categories of issues raised in public comments.  <u>Id.</u> at 56,003-06.

_____

[8] This is distinct from the November 2005 GAO report discussed above.

1    The final rule was scheduled to take effect on October 31,

2   2007.  Id. at 56,002.  Due to the terms of HUD's 1998 settlement

3   agreement with Nehemiah, any changes to HUD's treatment of DPA

4   providers would only become applicable to Nehemiah "after the

5   expiration of six (6) months from the date of final promulgation

6   and issuance of any such changes or modifications."  A.R. 00884.

7   Accordingly, HUD delayed the effective date of the final rule as

8   to Nehemiah until March 31, 2008.  72 Fed. Reg. at 56,003.

9   **D. Other Litigation**

10   Litigation is currently pending in the U.S. District Court for

11   the District of Columbia in two similar cases challenging the

12   regulation: Penobscot Indian Nation, et al., v. HUD, No. 07-cv-1282

13   (D.D.C.), and AmeriDream, Inc., et al., v. Jackson, No. 07-cv-1752

14   (D.D.C.).  In October 2007, plaintiffs in both cases (excluding

15   AmeriDream) moved for preliminary injunctions barring enforcement

16   of the regulation.  On October 31, 2007, following a hearing on the

17   motions, the district court orally ruled on the motions and

18   enjoined HUD from enforcing the regulation until the court rendered

19   a decision on the parties' cross-motions for summary judgment.

20   The court found that plaintiffs had shown a substantial

21   likelihood of irreparable harm and demonstrated a likelihood of

22   success on the merits, or at least raised serious questions, as to

23   some of their claims.  Among other things, the court found that

24   plaintiffs were likely to succeed on their claims that HUD violated

25   the APA by not adequately responding to public comments.  In

26   addition, the court found that plaintiffs were likely to succeed

1  on their claim that the Secretary of HUD improperly prejudged the

2  rule.   The <u>Penobscot/AmeriDream</u> court has not yet issued a ruling

3  on pending cross-motions for summary judgment.

4                          **II. Standard**

5  **A. Summary Judgment**

6      In challenges to final agency action, the court does not

7  employ the standard summary judgment analysis for determining

8  whether a genuine issue of material fact exists when analyzing the

9  merits of the challenge.  <u>Home Builders Ass'n of N. Cal. v. United</u>

10 <u>States Fish & Wildlife Serv.</u>, 268 F. Supp. 2d 1197, 1206 (E.D. Cal.

11 2003).  This is because the court is not generally called upon to

12 resolve facts in a review of an agency action.  <u>Occidental Eng'q</u>

13 <u>Co. v. INS</u>, 753 F.2d 766, 769-70 (9th Cir. 1985); <u>Home Builders</u>

14 <u>Ass'n</u>, 268 F. Supp. 2d at 1207.

15     While there may have been issues of fact before the

16 administrative agency, the court's function is to determine whether

17 or not, as a matter of law, the evidence in the administrative

18 record permitted the agency to make the decision it did.

19 <u>Occidental Eng'q</u>, 753 F.2d at 769-70; <u>Home Builders Ass'n</u>, 268 F.

20 Supp. 2d at 1207.  Summary judgment is therefore an appropriate

21 mechanism for deciding the legal question of whether the agency

22 could reasonably have found the facts as it did.  <u>Occidental Eng'q</u>,

23 753 F.2d at 769-70; <u>Home Builders Ass'n</u>, 268 F. Supp. 2d at 1207.

24 **B. Review of Agency Action**

25     In a rulemaking action, the APA "requires an agency to: (1)

26 publish a general notice of proposed rulemaking in the Federal

1  Register; (2) give interested parties an opportunity to participate

2  in the rulemaking through submission of data, views, and arguments;

3  and (3) after consideration of the relevant matter presented,

4  incorporate in the rules a concise general statement of the rule's

5  basis and purpose." <u>Ober v. EPA</u>, 84 F.3d 304, 312 (9th Cir. 1996)

6  (citing 5 U.S.C. § 553(b)-(c)).

7      The APA authorizes the court to set aside agency action that

8  is "arbitrary, capricious, an abuse of discretion, or otherwise not

9  in accordance with the law."  5 U.S.C. § 706(2)(A); <u>Nw. Envt'l Def.</u>

10 <u>Ctr. v. Bonneville Power Admin.</u>, 477 F.3d 668, 682 (9th Cir. 2007).

11 While "the scope of review under the arbitrary and capricious

12 standard is narrow and a court is not to substitute its judgment

13 for that of the agency," "the agency must examine the relevant data

14 and articulate a satisfactory explanation for its action including

15 a rational connection between the facts found and the choice made."

16 <u>Id.</u> at 687 (internal quotation marks omitted).

17      "That is, an agency must cogently explain why it has exercised

18 its discretion in a given manner and in reviewing that explanation,

19 [the court] must consider whether the decision was based on a

20 consideration of the relevant factors and whether there has been

21 a clear error of judgment."  <u>Id.</u> (internal quotation marks

22 omitted).  The court "may uphold a decision of less than ideal

23 clarity if the agency's path may be reasonably be discerned." <u>Beno</u>

24 <u>v. Shalala</u>, 30 F.3d 1057, 1073 (9th Cir. 1994) (internal quotation

25 marks omitted).  But the court "cannot infer an agency's reasoning

26 from mere silence or where the agency failed to address significant

1  objections and alternative proposals." <u>Id.</u>

2                          **III. Analysis**

3       Here, Nehemiah argues that HUD violated the APA for four

4  independent reasons.  Nehemiah contends that HUD (1) failed to

5  supply a reasoned analysis for departing from its longstanding

6  support of seller-funded DPA, (2) neglected to provide

7  reasonable explanations for rejecting alternatives to the rule,

8  (3) relied on data that it never produced for the public, and

9  that (4) Secretary Jackson exhibited an unalterably closed mind

10 regarding the final rule.

11 **A. Reasoned Analysis for Departure from Prior Policy**

12      First, in Nehemiah's words, "HUD reversed its decade-long

13 history without coming to grips with the fact that it was

14 undertaking [a] 180-degree change in course."[9]  Pl.'s Mot. at

15 34.  An agency "is entitled to change its course when its view

16 of what is in the public's interest changes," <u>Nw. Envt'l Def.</u>

17 <u>Ctr.</u>, 477 F.3d at 687, "with or without a change in

18 circumstances," <u>Greater Boston Television Corp.</u>, 444 F.2d at

19 852.  Flexibility and adaptability are integral to an agency's

20 efficacy.  <u>See</u> <u>Am. Trucking Ass'ns v. Atchison, Topeka & Santa</u>

21 <u>Fe Ry. Co.</u>, 387 U.S. 397, 416 (1967) ("Regulatory agencies do

22 not establish rules of conduct to last forever; they are

---

23      [9] It is not unreasonable to contend, as HUD does, that the
   complaint failed to allege this particular claim.  But the court
24 finds that it was captured by the catch-all paragraph stating that
   the "Final Rule violates the APA inasmuch as it constitutes
25 arbitrary and capricious agency action."  Compl. ¶ 36.  In
   addition, because there were cross-motions for summary judgment,
26 HUD has had an adequate opportunity to respond.

1  supposed, within the limits of the law and of fair and prudent

2  administration, to adapt their rules and practices to the

3  Nation's needs in a volatile, changing economy.").

4      Nevertheless, an agency "'must supply a reasoned analysis

5  indicating that prior policies and standards are being

6  deliberately changed, not casually ignored, and if an agency

7  glosses over or swerves from prior precedents without discussion

8  it may cross the line from the tolerably terse to the

9  intolerably mute.'"  Id. at 687-88 (quoting Greater Boston

10  Television Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970));

11  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.

12  Ins. Co., 463 U.S. 29, 42 (1983) ("[A]n agency changing its

13  course by rescinding a rule is obligated to supply a reasoned

14  analysis for the change.").

15      The rule requiring reasoned analysis exists because there

16  is a presumption that an agency's current course of behavior

17  best carries out Congress' policies; accordingly, deviation from

18  that course warrants explanation.  Atchison, Topeka & Santa Fe

19  Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 807-08 (1973).

20  Where an agency reverses track, it has a duty to provide a

21  reasoned analysis "over and above" that required when writing on

22  a clean slate, in the first instance.  W. Petroleum Ass'n v.

23  E.P.A., 87 F.3d 280, 284 (9th Cir. 1996); Motor Vehicle Mfrs.

24  Ass'n, 463 U.S. at 42.

25      **1. HUD's Prior Policy**

26      Here, Nehemiah argues that HUD has "openly embraced"

15

seller-funded DPA for years.  Pl.'s Mot. at 37.  At least with
respect to HUD's initial treatment of seller-funded DPA, this
overstates the case.  During this initial phase, it may be more
accurate to say that HUD begrudgingly tolerated entities such as
Nehemiah.  In 1999, for example, HUD proposed a rule that,
although ultimately withdrawn, would have accomplished the same
effect as the present regulation.  64 Fed. Reg. 29,956 (Sept.
14, 1999).

While Nehemiah points out that HUD approved of its business
model in the 1998 settlement agreement, that agreement seems to
contemplate the potential demise of seller-funded DPA as much as
it approves of the same.  A.R. 00883-91.  A provision of the
agreement permits Nehemiah to continue operations for six months
longer than would otherwise be permitted in the event that HUD's
position regarding seller-funded DPA changes.[10]  More
fundamentally, HUD approved of seller-funded DPA in the context
of a settlement agreement, which is necessarily a product of
compromise and mutual acquiescence and is rarely reflective of
each party's ideal desired outcome.

More recently, however, HUD warmed to seller-funded DPA.
In a 2005 letter, Commissioner Montgomery defended it against
calls for its ban by the GAO.  He wrote that because those who

_____

[10] A.R. 00884 ("Notwithstanding the approval of plaintiff's
[program], however, HUD . . . expressly reserve[s] the right to and
may take [] actions with regard to down payment assistance programs
generally."); id. ("Any such actions, changes or modifications .
. . shall thereafter become applicable to plaintiff's [program]
after the expiration of six (6) months.").

1  use seller-funded DPA "are representative of the population that

2  FHA was established to serve," FHA would prefer to charge a

3  higher premium on loans arising from seller-funded DPA, rather

4  than banning them altogether.  A.R. 00612.  But he recognized

5  that there were problems associated with seller-funded DPA that

6  needed to be addressed.  He also responded to GAO's concern that

7  seller-funded DPA was a seller inducement to purchase, arguing

8  that "the timing of the payments is a key point," and that

9  "[b]ecause the buyer has not received funds from the nonprofit

10  that can be traced to the seller's contribution, there has not

11  been an inducement."  A.R. 00614.  In sum, HUD supported seller-

12  funded DPA in more recent history, whatever the agency's

13  previous position.

14  ////

15      **2. Reasoned Analysis**

16      The issue is whether HUD "'suppl[ied] a reasoned analysis

17  indicating that prior policies and standards [were] being

18  deliberately changed, not casually ignored.'"  <u>Nw. Envt'l Def.</u>

19  <u>Ctr.</u>, 477 F.3d at 687.  Conceptually, this requirement can be

20  viewed as containing two components: first, whether HUD's change

21  was supported by reasoned analysis, and second, whether HUD was

22  honest with itself and the public that it was changing its

23  policy.

24      With respect to the first point, the court finds that HUD

25  provided the requisite reasoned analysis.  The notice of

26  proposed rulemaking explained:

> [I]nflated sales prices are often found on properties
> purchased with downpayment assistance from
> seller-funded nonprofit programs. Unlike true gifts
> that reduce the amount of the purchase price financed
> by the homeowner, such seller contributions increase
> the sales price of the home and result in higher
> mortgage payments. . . . [I]nflated sales prices
> result in inflated mortgage amounts, which increase
> the severity of individual claims on the FHA Insurance
> Fund and FHA losses on claims paid on such mortgages.
> Given that seller-funded gift programs thrive in
> stagnant or depreciating housing markets, the risk to
> FHA increases if FHA cannot recover the full amount
> owed when FHA acquires and resells a home that had
> been purchased by a participating borrower who had
> defaulted on the FHA-insured loan.

72 Fed. Reg. at 27,049; _accord_ 72 Fed. Reg. at 56,003. The

final rule also reiterated that, in FHA's experience, "loans

made to borrowers who rely on these types of seller-funded

assistance perform very poorly." _Id._ at 56,002.

Although not categorized as such, HUD essentially discussed

two distinct negative outcomes it associated with seller-funded

DPA: one directed at the consumer and one directed at HUD (and,

specifically, the MMIF). With regard to harm to consumers, HUD

stated that seller-funded DPA leads to sales price inflation,

causing home buyers to pay above-market mortgage payments. This

consequence remains even if the loans originating from seller-

funded DPA do not present any added risk to HUD.[11]

---

[11] The court will assume without deciding that HUD may
permissibly act to curb such inflation, even in instances where the
home buyer might be willing to accept the price inflation. Because
the government has no duty to insure mortgages at all, it may
choose to do so on such terms and conditions that it deems
appropriate (subject to constitutional limitations). Accordingly,
the court will presume that it is permissible for HUD to refuse to
insure loans for borrowers who, although perhaps willing to accept
price inflation, have a "two to three times higher possibility of
losing their home" based on HUD's statistics, 72 Fed. Reg. at

1    With regard to harm to itself, HUD noted that loans relying

2  upon seller-funded DPA do, in fact, present an added risk to

3  HUD, as they categorically perform worse than other loans.

4  Also, when these loans do default, the resulting impact on FHA

5  is more severe than with other loans because they tend to thrive

6  in depreciating housing markets, making it more difficult for

7  FHA to recoup its losses.  Accordingly, even if loans originated

8  with seller-funded DPA defaulted at the same rate as other

9  loans, there would still be a greater impact on FHA and the

10 MMIF.

11    The description of each of these harms independently

12 satisfies HUD's duty to provide a reasoned basis for the

13 regulation.  Other courts have upheld agency action on less.

14 See, e.g., Personal Watercraft Indus. Ass'n v. Dep't of

15 Commerce, 48 F.3d 540, 545 (D.C. Cir. 1995) (finding that APA

16 requirement of "concise general statement" of the "basis and

17 purpose" for a regulation satisfied by two paragraphs).

18    Nevertheless, HUD was not honest with itself or the public

19 that it was reversing course from its prior policy.  See Int'l

20 Union, United Auto., Aerospace and Agric. Implement Workers of

21 Am. v. NLRB, 802 F.2d 969, 974 (7th Cir. 1986) (noting that an

22 agency must "`fess up to its changes of position").  While HUD

23 obliquely recognized that its prior practice was to allow

24 seller-funded DPA, it was less than fully candid in doing so.

25 _____

26 56,004, or for HUD to choose to only insure loans for homes
   purchased at a fair market price.

19

For example, in the "Background" section in the notice of proposed rulemaking, HUD noted that it attempted to prohibit seller-funded DPA in 1999 but withdrew the rule.  72 Fed. Reg. at 27,048.  At best, this abortive attempt at banning seller-funded DPA indirectly indicated that HUD's prior policy was to permit the practice.

Similarly, in the final rule, HUD noted that certain organizations "have been able to circumvent" the general rule against direct DPA from a seller.  72 Fed. Reg. at 56,002. This, however, hardly appears to be even a reluctant recognition that seller-funded DPA was previously permitted.  Indeed, as Nehemiah argues, HUD never mentioned Commissioner Montgomery's defense of seller-funded DPA in 2005.  Thus, it is difficult to conclude that HUD made it clear that its prior policy supported seller-funded DPA.  The court cannot find that HUD manifested the requisite candor about its previous positions.

Put differently, while HUD may have set forth good reasons for the rule's adoption, it did not adequately explain why it was changing its mind.  See Sec'y of Agriculture of U.S. v. U.S., 347 U.S. 645, 652-53 (1984) ("[W]hile the Commission has adumbrated the reasons that commended these charges to its approval, the Commission has not adequately explained its departure from prior norms.").  Accordingly, while HUD provided substantive analysis to support the rule, it failed to acknowledge its previous position, thereby violating the APA. ////

**B. Reasonable Alternatives**

Second, Nehemiah argues that HUD failed to provide reasonable explanations for rejecting several proposed alternatives to an outright prohibition on seller-funded DPA. An agency "need only respond to 'significant' comments, i.e., those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule." <u>Am. Mining Congress v. EPA</u>, 965 F.2d 759, 771 (9th Cir. 1992) (citing <u>Home Box Office v. FCC</u>, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977)). The agency "is required to address common and known or otherwise reasonable options, and to explain any decision to reject such options." <u>Int'l Ladies' Garment Workers' Union v. Donovan</u>, 772 F.2d 795, 818 (D.C. Cir. 1983). Here, Nehemiah argues that HUD failed to respond to four categories of comments. The court agrees that HUD failed to satisfy its duties under the APA with respect to the first two categories.

**1. Risk-Based Insurance Premiums**

The first comment in the final rule suggested that "HUD should not eliminate downpayment assistance, but regulate such assistance or establish standards for downpayment supported loans, including . . . [the use of] a higher insurance premium for such loans." 72 Fed. Reg. at 56,003. Risk-based insurance premiums could, presumably, compensate HUD for the extra risk posed by loans originating from seller-funded DPA. HUD's response to this comment clarified that the rule would not eliminate all DPA, such as that received from a family member,

1 because many commenters apparently expressed beliefs to the

2 contrary.  The response to the comment did not, however, address

3 the issue of insurance.

4     In its brief, HUD argues that it did not need to do so,

5 because two weeks before the publication of the rule at issue,

6 HUD published a proposed rule that would implement risk-based

7 premiums.  Federal Housing Administration (FHA) Single Family

8 Mortgage Insurance: Announcement of Planned Implementation of

9 Risk-Based Premiums, 72 Fed. Reg. 53,872 (Sept. 20, 2007).  One

10 of the factors that would be taken into account under the

11 proposed rule is whether the downpayment is funded by the

12 borrower or the borrower's relative, or by some other source.

13 Id.  Given this regulatory context, HUD argues that it

14 adequately addressed the insurance alternative -- and in fact

15 agreed that it should be adopted -- but expressed its position

16 in a separate proposed rule.

17     HUD's argument is a non-sequitur.  The proposal of risk-

18 based insurance premiums was suggested in lieu of banning

19 seller-funded DPA -- not merely in addition to banning  seller-

20 funded DPA.  Whether the proposal has utility beyond that

21 purpose, such as in differentiating risks between loans where

22 the downpayment is paid by a family member versus some other

23 (nonseller-funded) source, is a wholly separate issue.

24     Nevertheless, HUD stressed in both the proposed and final

25 rule that its "primary concern with [seller-funded DPA]

26 transactions is that the sales price is often increased to

1  ensure that the seller's net proceeds are not diminished, and

2  such increase in sales price is often to the detriment of the

3  borrower and the FHA."  72 Fed. Reg. at 27,048; accord 72 Fed.

4  Reg. at 56,002.  Thus, it could be argued that insurance only

5  addresses half the problem, because it mitigates harm to FHA,

6  but not to the borrowers at issue, who pay inflated sales prices

7  and are also more likely to "ultimately lose their homes."  A.R.

8  00565.  Even assuming that this form of consumer protection is a

9  permissible objective, however, HUD did not rely on such a

10 rationale for the rule's adoption.[12]  Beno, 30 F.3d at 1073

11 (court "may not consider reasons for agency action which were

12 not before the agency").  Accordingly, the court finds that HUD

13 failed to respond adequately to this category of comments.

14     **2. Disclosure of Downpayment Assistance**

15         Second, Nehemiah also argues that HUD provided an

16 inadequate response to the comment that "HUD can mitigate risk

17 from downpayment assistance by requiring full disclosure of the

18 amount of downpayment assistance for underwriting and to

19 appraisers."  72 Fed. Reg. at 56,004.  HUD responded by stating

20 that "FHA requirements currently require disclosure of

21 downpayment assistance."  Id.

22         But it appears that at least some of the comments proposed

23 _____

24         [12] Indeed, by contrast, HUD did make this argument in response
   to a different issue.  See 72 Fed. Reg. at 56,004 ("the
25 recommendations pertaining to warranty . . . do[] not deal directly
   with sales price inflation, which is a separate issue from repair
   costs a homeowner may face after purchasing a home.").

26

1 that FHA require disclosure of the *source* of DPA, not merely its

2 existence or amount.[13]  For example, AmeriDream suggested that

3 HUD "[r]equire, in accordance with GAO's recommendation, that

4 the appraiser be informed about the use of downpayment

5 assistance in the transaction."  GAO's recommendation, in turn,

6 was to require that lenders inform appraisers of the source of

7 DPA.  A.R. 00567 ("To more fully consider the risks posed by

8 downpayment assistance when underwriting loans, include the

9 presence and source of down payment assistance as a loan

10 variable in . . . the underwriting process.").  HUD therefore

11 failed to respond to the suggestion that it require disclosure

12 of the source of DPA.

13     **3. Home Inspections and Homeowner's Warranties**

14     Another category of comments argued that "HUD can further

15 mitigate risk by requiring a complete home inspection, to avoid

16 potentially huge repair costs to the homeowner.  HUD could also

17 require the owner to obtain a homeowner's warranty . . . to

18 avoid high repair cost as a source of default and foreclosure."

19 72 Fed. Reg. at 56,004.  HUD responded: "The commenters'

20 recommendations are noted, but the suggested actions are outside

21 the scope of the present rule.  In addition, the recommendations

22 pertaining to warranty . . . do[] not deal directly with sales

23 price inflation, which is a separate issue from repair costs a

24 _____

25     [13]  HUD fixates on the wording of Nehemiah's comment to the
exclusion of all others, because Nehemiah's comment only suggested
26 disclosure as to the existence and amount of DPA, rather than its
source.

1  homeowner may face after purchasing a home." Id.  With regard

2  to this issue, there was nothing incomplete or improper about

3  HUD's response.  Warranties and inspections might mitigate a

4  cause of default and foreclosure (repair costs) but they would

5  not address the problem of sales price inflation.

6      **4. Blind Pool Appraiser Selection Process**

7      The last category of comments identified by Nehemiah

8  suggested that "[p]rice inflation does not arise from

9  downpayment assistance, but from the appraisal process.  The

10  appraisal process should be reformed, by example, by

11  establishing a blind pool appraiser selection process for loans

12  with downpayment assistance."  72 Fed. Reg. at 56,004.  HUD

13  responded: "Downpayment assistance can be an independent source

14  of price inflation separate from, or in conjunction with, any

15  price inflation which may arise from the appraisal process. . .

16  . HUD has already taken steps to address the appraisal issue

17  [through other regulations]."  Id.

18      Again, there was nothing inadequate about HUD's response.

19  Price inflation may occur for two separate reasons: first,

20  sellers increase prices because they want to recoup what they

21  pay to entities such as Nehemiah, and second, appraisers may

22  overvalue property because those who procure their services

23  (e.g., loan officers, mortgage brokers) are more likely to do so

24  when the appraisers "bring in value." A.R. 00720.  Even if HUD

25  only chose to address the first issue and ignore the second one,

26  it would have been entitled to do so.  An agency does not have

1  to "make progress on every front before it can make progress on

2  any front." <u>United States v. Edge Broadcasting Co.</u>, 509 U.S.

3  418 (1993).  But, in fact, HUD explained that it was addressing

4  the second reason through other regulations.

5  **C. Failure to Produce Data**

6      Third, Nehemiah argues that the rule should be set aside

7  because HUD failed to make available the data that it relied

8  upon in proposing and evaluating the rule.[14]  "'To suppress

9  meaningful comment by failure to disclose the basic data relied

10 upon is akin to rejecting comment altogether.'"  <u>Wash. Trollers</u>

11 <u>Ass'n v. Kreps</u>, 646 F.2d 684, 686 (9th Cir. 1981) (quoting

12 <u>United States v. Nova Scotia Food Prods. Corp.</u>, 568 F.2d 240,

13 252 (2d Cir. 1977)).  "'It is not consonant with the purpose of

14 a rulemaking proceeding to promulgate rules on the basis of

15 inadequate data, or on data that, to a critical degree, is known

16 only to the agency.'"  <u>Wash. Trollers</u>, 646 F.2d at 686 (quoting

17 <u>Portland Cement Ass'n v. Ruckelshaus</u>, 486 F.2d 375, 393 (D.C.

18 Cir. 1973)).  That said, "'[n]othing prohibits [an a]gency from

19 adding supporting documentation for a final rule in response to

20 public comments.'"  <u>Kern County Farm Bureau v. Allen</u>, 450 F.3d

21 1072, 1076 (9th Cir. 2006) (quoting <u>Rybachek v. EPA</u>, 904 F.2d

22 1276, 1286 (9th Cir. 1990)).  "[T]he public is not entitled to

23 review and comment on every piece of information utilized during

24 _____

25      [14] HUD argues that this claim, like the "reasoned analysis"
   claim, was not articulated in the complaint.  For the reasons
   explained earlier, the court declines to dismiss the claim on this
26 basis.

1  rule making.  Instead, an agency, without reopening the comment

2  period, may use 'supplementary data, unavailable during the

3  notice and comment period, that expands on and confirms

4  information contained in the proposed rulemaking and addresses

5  alleged deficiencies in the pre-existing data, so long as no

6  prejudice is shown.'"  <u>Id.</u> (quoting <u>Idaho Farm Bureau Fed'n v.</u>

7  <u>Babbitt</u>, 58 F.3d 1392, 1402 (9th Cir. 1995)).

8       Here, Nehemiah contends that HUD relied on its own

9  portfolio analysis to gauge the risk of loans with seller-funded

10  DPA but failed to disclose what that analysis entailed.  72 Fed.

11  Reg. at 56,003 ("Based on HUD's analysis of its loan portfolio

12  going back to 1998, HUD has assessed that risk and has

13  determined that there is a 2 to 3 times greater risk of default

14  and claim with purchase loans that receive downpayment

15  assistance from the seller . . . than from all other loans with

16  downpayment assistance from all other sources.").

17       First, assuming that HUD's disclosure of its analysis was

18  deficient, the analysis at issue may not be material to the

19  rule's adoption.  <u>See</u> <u>Kern County Farm Bureau</u>, 450 F.3d at 1079

20  (declining to reopen notice-and-comment where new/undisclosed

21  information did "not provide the sole, essential support for the

22  [agency] decision").  As even AmeriDream pointed out in its

23  comment, "HUD did not cite default or claim rates among

24  borrowers utilizing downpayment assistance as a justification

25  for its proposed rule," A.R. 66622; rather, it was not until

26  later in the rulemaking process that HUD noted the increased

1  default and claim rates associated with seller-funded DPA,

2  prompted principally in response to comments.[15]  But throughout

3  the process, HUD was clear that its "primary concern" with

4  seller-funded DPA was that "sales price is often increased to

5  ensure that the seller's net proceeds are not diminished."  72

6  Fed. Reg. at 56,002.

7       Regardless of how loans with seller-funded DPA ultimately

8  perform as a class (e.g., whether they default more often), the

9  regulation nevertheless counters sales price inflation.[16]  As

10  noted in the proposed rule, the February 2005 GAO report also

11  stated that mortgage industry participants (Fannie Mae and

12  Freddie Mac) "do not allow seller-related contributions to the

13  downpayment [because they] could contribute to an overvaluation

14  of the price of the property."  72 Fed. Reg. at 27,049.  There

15  is nothing improper about HUD's consideration of private

16  industry practices.  See A.R. 00557 ("Government internal

17  _____

18      [15]  Agencies are entitled to respond to comments with
    additional material without triggering a new comment period.
19  Rybachek, 904 F.2d at 1286 (otherwise, "either the comment period
    would continue in a never-ending circle, or, if the [agency] chose
20  not to respond to the last set of public comments, any final rule
    could be struck down for lack of support in the record.").

21      [16] These are two distinct issues.  Even if loans with seller-
    funded DPA defaulted at an identical rate as loans without seller-
22  funded DPA, and HUD foreclosed on homes within these two groups at
    the same frequency, HUD's losses on loans with seller-funded DPA
23  would be more severe than with other loans because HUD would be
    unable to resell the homes at their same inflated purchase prices.
24  These losses are also exacerbated by the fact these homes are
    likely to have depreciated, because seller-funded DPA programs tend
25  to thrive in depreciating markets.  72 Fed. Reg. at 27,049; accord
    72 Fed. Reg. at 56,003.

26

1  control guidelines advise agencies to consider and recognize the

2  value of industry practices that may be applicable to agency

3  operations.").

4      Furthermore, in the proposed and final rules, HUD relied

5  upon information and analysis available to the public to support

6  its concern regarding sales price inflation.  For example, HUD

7  relied upon the IRS press release, A.R. 00026, which in turn

8  cited the November 2005 GAO report and the 2005 HUD report.[17]

9  Both reports confirmed that seller-funded DPA leads to sales

10 price inflation.  The November 2005 GAO report found that "for

11 loans with seller-funded down payment assistance, the appraised

12 value and sales price were higher as compared with loans without

13 such assistance."  A.R. 00546.  The 2005 HUD report also "found

14 overwhelming evidence that the cost of the [downpayment

15 assistance] is added to the sales price."[18]  A.R. 00631.  Because

16 price inflation was the "primary reason" for the rule, the

17 information that was actually material to HUD's rule was

18 available to the public.

19      Second, even if HUD's portfolio analysis of the default

20      [17] Nehemiah argues that the latter two sources cannot be
   considered here because HUD did not expressly cite them.  Reduced
21 to its essence, Nehemiah's position is that if HUD relied on Source
   A, and Source A relied on Sources B and C, examination of those
22 latter sources would be beyond the court's scope of review.  The
   argument is unavailing.
23

24      [18] The report, commissioned by HUD and conducted by a
   management consulting firm, stopped short of recommending an
25 outright ban on seller-funded DPA.  But HUD is entitled to rely on
   part of the report (i.e., its findings) without adopting it
26 wholesale (i.e., both the findings and recommendations).

risk for loans with seller-funded DPA was material to the rule's

adoption, plaintiff would need to demonstrate that it were

prejudiced by HUD's non-disclosure.  See <u>Kern County Farm</u>

<u>Bureau</u>, 450 F.3d at 1076 (agency may use supplementary data not

previously available "so long as no prejudice is shown"); <u>see</u>

<u>also Personal Watercraft Industry Ass'n</u>, 48 F.3d at 544 ("The

party objecting has the burden of 'indicat[ing] with 'reasonable

specificity' what portions of the documents it objects to and

how it might have responded if given the opportunity.'")

(quoting <u>Small Refiner Lead Phase-Down Task Force v. EPA</u>, 705

F.2d 506, 540-41 (D.C. Cir. 1983)).

     Nehemiah cannot do so here.  It argues that "[p]rior to

2003, it was virtually impossible to use the HUD database to

identify which loans had down payment assistance and the source

of that assistance."  A.R. 00446 (2006 GMU Report[19]).  But this

fails to refute analyses for year 2003 to the present.

Furthermore, if loans with seller-funded DPA were not reliably

flagged, they would have been incorrectly categorized with other

types of loans, artificially depressing this latter group's

performance.  Accordingly, if there was any bias, it would have

understated rather than overstated the disparity in claim and

default rates between the two groups.  For all of these reasons,

the court rejects Nehemiah's contention that HUD violated the

APA by failing to disclose data.

_____

    [19] The fact that there are public critiques of HUD's database
also casts doubt on plaintiff's claim that it could not meaningful
respond to HUD's analysis.

**D. Prejudgement**

Last, Nehemiah alleges that Secretary Jackson prejudged the merits of the rule by manifesting an unalterably closed mind. To succeed, plaintiff must prove with "clear and convincing" evidence that Secretary Jackson exhibited "an unalterably closed mind on matters critical to the disposition of the proceeding." See Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1467 (9th Cir. 1987) (citing Ass'n of Nat'l Advertisers, Inc. v. FTC, 627 F.2d 1151, 1170 (D.C. Cir. 1979)). Allowing the public to submit comments to an agency that has already made its decision is no different from prohibiting comments altogether. Indeed, if the public perceives that the agency will disregard its comments, there may be a chilling effect that causes the public to refrain from submitting comments as an initial matter.

Nevertheless, it has been said that "[m]ere proof that the official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute" is not enough to overcome the presumption that an official is objective and fair. Housing Study Group v. Kemp, 736 F. Supp. 321, 332 (D.D.C. 1990). Whatever the value of the observation is generally, it is particularly true in administrative rulemaking as opposed to adjudication, because "[t]he legitimate functions of a policymaker, unlike an adjudicator, demand interchange and discussion about important issues." Ass'n of Nat'l Advertisers, 627 F.2d at 1168.

If, on the one hand, the court finds that an official has

31

exhibited an unalterably closed mind and the proceeding in question is still ongoing, the court may disqualify that official from further participation.  See Housing Study Group, 736 F. Supp. at 332 (attempt to disqualify HUD Secretary from ongoing rulemaking proceeding).  If, on the other hand, the proceeding has already been completed, then the appropriate remedy would be to vacate and remand the proceeding to be redone without the participation of the biased official.  See, e.g., Int'l Snowmobile Mfrs. Ass'n v. Norton, 340 F. Supp. 2d 1249, 1266 (D. Wyo. 2004) (vacating and remanding for further proceedings).

Here, on June 5, 2007, Bloomberg News published an article indicating that HUD "will ban a downpayment assistance program for home buyers over objections from nonprofit groups, HUD Secretary Alphonso Jackson said."  Neil Roland, *U.S. to Ban Down Payment Program Over Objections, Jackson Says*, Bloomberg News, June 5, 2007 (Genshlea Decl., Ex. U).  The only direct quote attributed to Secretary Jackson stated: "I'm very much against it. . . . I think it's wrong.  I don't want to continue to be a partner in a program where so many people can't afford to keep up their payments."  Id.  The article also stated that "Jackson said in the interview that HUD intends to approve the new rule by the end of the year even if the agency receives critical comments."  Id.

Secretary Jackson's direct quote (that he is "very much against" seller-funded DPA and that he thinks it is "wrong") is

1  perhaps not enough, standing alone, to demonstrate a closed mind

2  given that policymakers have leeway to "express strong views."

3  Housing Study Group, 736 F. Supp. at 332.  What is troubling,

4  however, is the indirect quote, in which Secretary Jackson

5  allegedly stated that HUD would approve the new rule even in the

6  face of critical comments.  See Int'l Snowmobile Mfrs. Ass'n,

7  340 F. Supp. 2d at 1261 (agency prejudged outcome to ban

8  snowmobile access to national parks where agency memorandum

9  showed "sweeping condemnation" of such access and where official

10  stated at press conference that "there will be no[] future" for

11  such vehicles in national parks).

12      As a threshold matter, HUD argues that the news article may

13  not be considered by the court.  Although the court's review is

14  generally limited to the record, extra-record evidence is

15  admissible subject to certain narrow exceptions, such as when

16  plaintiffs make a "strong showing" of agency bad faith.  Animal

17  Defense Council v. Hodel, 840 F.2d 1432, 1437 (9th Cir. 1998);

18  Ranchers Cattlemen Action Legal Fund United Stockgrowers of

19  America v. USDA, 499 F.3d 1108, 1117 (9th Cir. 2007).  If the

20  Bloomberg News article falls short of this admittedly exacting

21  standard, it is hard to imagine what evidence could possibly

22  satisfy the standard, at least in the context of a prejudgment

23  claim where the comments at issue were made outside the

24  administrative record.  Accordingly, the court finds that the

25  article is appropriately before it.

26      The next question is whether Secretary Jackson was the

1   decision-making official for the rule at issue.  It appears

2   that, as a practical matter, Commissioner Montgomery was the

3   decision-making official rather than Secretary Jackson.  The FHA

4   Commissioner (who, pursuant to 42 U.S.C. § 3533(b), is a HUD

5   Assistant Secretary) has (delegated) rule-making authority for

6   regulations governing a range of single- and multi-family

7   housing programs, and rules regarding DPA fall within this

8   scope.  <u>See</u> 71 Fed. Reg. 60,169 ("[T]he Assistant Secretary . .

9   . [is] delegated the power and authority of the Secretary of HUD

10  with respect to all housing programs").  Moreover, it was

11  Commissioner Montgomery who signed the proposed rule as well as

12  the final rule.  72 Fed. Reg. at 27,051; 72 Fed. Reg. at 56,007.

13      Plaintiff responds that although the HUD Secretary may

14  delegate this authority to Assistant Secretaries, the relevant

15  statute only empowers him to do so "without in any way relieving

16  him from final responsibility."  12 U.S.C. § 1701c(a) ("The

17  Secretary, without in any way reliving himself from final

18  responsibility, may delegate any of his functions and powers to

19  such officers, agents, or employees as he may designate.").  But

20  it seems imprudent, as a matter of the efficient allocation of

21  administrative resources, to reopen a rulemaking process simply

22  to exclude from participation an official who was never involved

23  with that process in the first instance.

24      Because the court has already concluded that HUD failed to

25  provide a reasoned analysis for its departure from prior policy

26  and failed to adequately respond to comments, and must set aside

the rule on those bases, the only issue is whether it would be
appropriate to disqualify Secretary Jackson from the remanded
proceedings.  Given that Secretary Jackson was not actually
involved in the initial rulemaking proceeding, disqualifying him
from further participation in this matter will likely impose
little or no burden on the agency.  In addition, while the
agency received voluminous comments in response to the rule, it
is unknown whether any prospective commenters were chilled by
Secretary Jackson's statement.  Accordingly, the court finds
that disqualification is an appropriate remedy.

### IV. Conclusion

For the reasons explained above, the court orders as
follows:

1. Plaintiff's motion for summary judgment granted in part
and denied in part and defendants' motion for summary judgment
is denied;

2. The final rule is set aside;

3. The matter is remanded to the agency for further action
consistent with this order;

4. Secretary Jackson is disqualified from participating in
the remanded proceedings; and

5. The clerk's office is directed to enter judgment and
close the case.

IT IS SO ORDERED.

DATED:  February 29, 2008.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

35